1

Kevin T. Snider, State Bar No. 170988
*Counsel of record*

2

Matthew B. McReynolds, State Bar No. 234797

3

PACIFIC JUSTICE INSTITUTE
P.O. Box 276600

4

Sacramento, CA 95827
Tel.  (916) 857-6900

5

Fax  (916) 857-6902

6

Email: kevinsnider@pacificjustice.org
        mattmcreynolds@pacificjustice.org

7

8

Peter D. MacDonald, State Bar No. 69789
LAW OFFICE OF PETER MACDONALD
400 Main Street, Suite 210

9

Pleasanton, CA 94566-7371
Tel. (925) 462-0191

10

Fax. (925) 462-0404

11

Email: pmacdonald@macdonaldlaw.net

12

Attorneys for Plaintiff and Real Party in Interest

13

14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16

INTERNATIONAL CHURCH OF THE
FOURSQUARE GOSPEL,

17

18

Plaintiff,

19

v.

20

CITY OF SAN LEANDRO, et al.

21

Defendants.

22

FAITH FELLOWSHIP FOURSQUARE
CHURCH,

23

24

Real Party in Interest.

25

26

27

28

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:  C07-03605 –PJH-JCS

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
APPLICATION FOR PRELIMINARY
INJUNCTION**

**Date:**    September 5, 2007
**Time:**    9:00 a.m.
**Ctrm:**    3
**Hon.:**    Phyllis J. Hamilton

1

## <u>TABLE OF CONTENTS</u>

2

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

3

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

4

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5

6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7

I.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

8

II.     The CHURCH Is Likely to Succeed on the Merits and Already Suffers Irreparable Harm. 4

9

        A.  The CITY's denial of Religious Assembly Use at the CATALINA property violates
10          RLUIPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

11          1.  The CITY's actions violate RLUIPA's "Equal Terms" provision . . . . . . . . . . 5

12              (a)  The CITY violates the Equal Terms provision by allowing
13                   entertainment and recreational assembly uses but denying religious
                     assembly use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
14
                (b)  The CITY violates the Equal Terms provision by imposing a hazardous
15                   materials burden on the CHURCH but not on any of the 196 properties
                     approved under the AU overlay. . . . . . . . . . . . . . . . . . . . . . . . . 7
16

17          2.  The CHURCH has been Substantially Burdened . . . . . . . . . . . . . . . . . . . . 9

18              (a)  The CHURCH's core functions are actually inhibited . . . . . . . . . . . . 10
19                   (i)    *The CHURCH's outreach to the needy is hindered and
                            its charitable efforts must be curtailed* . . . . . . . . . . . . . . . . 11
20                   (ii)   *The CHURCH's counseling ministries are severely limited.* . . 12
                     (iii)  *The CHURCH's ministry to women is restricted.* . . . . . . . . . 13
21                   (iv)   *The CHURCH's outreach to children is overcrowded.* . . . . . . 13
                     (v)    *The CHURCH's ministry to youth is being stifled.* . . . . . . . . .14
22                   (vi)   *The CHURCH cannot effectively evangelize.* . . . . . . . . . . . . 15

23          3.  The CITY's actions cannot survive Strict Scrutiny. . . . . . . . . . . . . . . . . . . 16
24
                (a)  The CITY cannot demonstrate a compelling state interest. . . . . . . . . . 16
25                   (i)    *Seeking to maximize tax revenue is not a compelling state
                            interest.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
26                   (ii)   *Promoting positive change does not rise to the level of a
                            compelling state interest.* . . . . . . . . . . . . . . . . . . . . . . . . .18
27

28

(iii)   *Preventing traffic congestion by excluding the CHURCH from areas that do not abut or are not within one-quarter mile from an arterial is not a compelling state interest.* . . . . . . . . . . . . . .18

(iv)   *Excluding the CHURCH from locations in the vicinity of Hazardous Materials Business Plan sites does not protect public health and safety and is not a compelling state interest.* . . . . . .19

(b)   Even assuming arguendo that the CITY's interest is compelling, the means taken to achieve this interest are not narrowly tailored. . . . . . .20

III.   The CHURCH Is Already Suffering Irreparable Harm. . . . . . . . . . . . . . . . . . . . . . . . . . .21

IV.   The Balancing of Hardships Tips in the CHURCH's Favor . . . . . . . . . . . . . . . . . . . . . . .22

V.   It is in the Public Interest to Grant this Motion for a Preliminary Injunction. . . . . . . . . . 23

VI.   Bond Should Be Waived or Set at $1,000 or Some Other Reasonable Sum . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Civil Liberties for Urban Believers v. City of Chicago,*
    342 F.3d 752 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cottonwood Christian Ctr. v. Cypress Redevelopment Agency,*
    218 F.Supp.2d 1203 (C.D.Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 21

*Elrod v. Burns,*
    427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal,*
    546 U.S. 418, 126 S. Ct. 1211 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Guru Nanak Sikh Society of Yuba City v. County of Sutter,*
    456 F.3d 978 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 17-18, 23

*Hollywood Community Synagogue, Inc. v. City of Hollywood, Fla.,*
    430 F. Supp. 2d 1296 (S.D. Fla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Los Angeles Mem. Coliseum Comm'n v. Nat'l Football League,*
    634 F.2d 1197 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Midrash Sephardi, Inc. v. Town of Surfside,*
    366 F.3d 1214 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,6, 20

*Sammartano v. First Judicial Dist. Court,*
    303 F.3d 959 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22

*Sampson v. Murray,*
    415 U.S. 61 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*San Jose Christian College v. City of Morgan Hill,*
    360 F.3d 1024 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin,*
    396 F.3d 895 (7th Cit. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Thomas v. Collins,*
    323 U.S. 516 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

---

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

*Topanga Press, Inc. v. City of Los Angeles,*
   989 F.2d 1524 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ventura County Christian High School v. City of San Buenaventura,*
   233 F. Supp. 2d 1241 (C.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Vietnamese Buddhism Study Temple in America v. City of Garden Grove,*
   460 F. Supp. 2d 1165 (C.D. Cal. 2006) . . . . . . . . . . . . . . . 4-5, 7, 15, 19, 21, 23-25

*Warsoldier v. Woodford,* 418 F.3d 989 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 21

**U.S. STATUTES**

42 U.S.C. 2000cc *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7, 9, 16

Fed. R. Civ. P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 65.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**OTHER SOURCES**

146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) . . . . . . . . . . . . . . . .4, 7, 15, 18, 20, 23

H. Rep. 106-219, 106th Cong., 1st Sess. 19 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

# INTRODUCTION

To the members of Faith Fellowship, the present case illustrates the wry maxim, "No good deed goes unpunished." At least, not when local government gets involved. As will be shown, Faith Fellowship's programs for children, the disadvantaged, women, youth and people struggling with addictions—to name but a few—have been so successful that the church's current location and surrounding neighborhood are being pushed beyond the limit. In order to continue its religious mission and maintain its goodwill in the community, Faith Fellowship has no choice but to relocate to a facility which will accommodate the overwhelming demand for the spiritual nourishment and practical resources it provides.

Time out of mind, the invaluable social services which houses of worship offer to their communities—largely cost-free—have been recognized as a vital partnership with governmental programs. Inexplicably, the City of San Leandro has blocked the church's move, apparently preferring that fewer people have access to its services and that the nightmarish parking and traffic situation continues unabated. Some of the City's asserted justifications—such as claims that the new location is too close to hazardous materials sites—are puzzling, if not outright absurd, given the prevalence of such sites, even in close proximity to City Hall. Other justifications—like the loss of tax revenue—have already been deemed legally insufficient bases for preventing a church from using its own property. At bottom, the City's stated reasons do not begin to satisfy federal law which expressly protects religious groups from discriminatory misuse of land-use authority.

# FACTS

Faith Fellowship Foursquare Church ("CHURCH") is home to a thriving church family experiencing sustained growth in numbers and in impact. The CHURCH revolves around three core principles: heartfelt evangelism, relevant discipleship and compassionate outreach. Its members practice what is preached, welcoming more than 1,700 attendees each Sunday in three services, offering countless ministries for people of all ages throughout the week, and participating in charitable outreaches to the underprivileged.

For a church so focused on giving itself to the community, it should not be surprising that many local residents have flocked to Faith Fellowship. But the extent of the demand for the church's services has surpassed anything its leaders could have expected or hoped for, leading to the exciting but challenging necessity of moving to a larger facility.

As it now stands, a church sanctuary designed for 650 people is visited every Sunday by more than twice that number of congregants. A parking lot with only 154 spaces spills over into residential neighborhoods, clogging streets and endangering residents and pedestrians with increased traffic. Indeed, people must often park far away and walk twenty minutes or more just to attend church. Scores of others who cannot find a coveted parking spot even in these remote locales or are unable to make the trek are barred from attending altogether. And a church kitchen that is smaller than most found in surrounding *homes* is being stretched beyond its limits, feeding between 300 and 400 people from the community's neediest families each Wednesday night.

The CHURCH assiduously searched for a solution and found one on Catalina Avenue ("CATALINA"). The new facility there can accommodate 1,100 people in the sanctuary and an additional 500 in other activities (e.g., Sunday school for youth, adult Bible studies, etc.) per service. Ample parking surrounds the new location, as well, with nearly 500 spaces available for attendees each weekend in a commercial zone that is largely vacant on weekends. Food is no longer a problem at the CATALINA site, either; the kitchen and food preparation area is five times larger and professional equipment can be installed to facilitate expanded charitable services and allow the church to better meet the community's needs. In sum, the CATALINA property enables CHURCH members to more fully follow their sincerely held beliefs in proclaiming the Gospel, providing instruction, and helping the poor.

Because the CATALINA site was zoned for commercial use, CHURCH representatives met with City ("CITY") officials to discuss use of the property for religious activities. These officials then advised the CHURCH to apply for rezoning of the property from Industrial Park (IP) to Industrial Limited (IL).[1] Relying on misinformation from CITY officials, the CHURCH embarked on a futile and financially burdensome fourteen-month endeavor, spending more than $460,000 on a building they have been locked out of. Despite the best efforts of the CHURCH to comply with onerous requirements differentially applied, the CITY sought to justify its actions with pretextual concerns over speculative loss of tax revenue resulting from religious assembly use of land zoned for industry. Limiting churches to residential zones prohibits large congregations like the CHURCH from locating *anywhere* in the CITY. When CITY officials realized this—and its violation of federal law—the CITY began an eleven-month process to create an assembly overlay ("AO") district covering 196 properties approved for assembly use. Though the AO district has been adopted, the CATALINA property is conspicuously absent. When the CHURCH gave solid grounds for its inclusion in the AO, the CITY cited public health and safety concerns, even though these additional criteria were not applied to *any* of the 196 assembly use properties approved.

The CHURCH is in an impossible situation. It cannot remain at its current location, yet the CITY prevents it from using property it has purchased. The CHURCH is expending more than $1,100 every day for a location it must have but is not permitted to use. It has complied with the entire administrative morass created by the CITY, to no avail. Hence, injunctive relief is essential.

---

[1] Industrial Light is an area which generally allows light manufacturing. Industrial Park is a landscaped area used for high technology, research and development, and offices. (Ex. A(q)(3), p. 2).

## ARGUMENT

**I.    Standard of Review**

The Ninth Circuit has held that preliminary injunctive relief is available "to a party who demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." *Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 965 (9th Cir. 2002). These two standards represent a single continuum, rather than two separate tests; thus, the greater the hardship on the movant, the less probability of success must be shown. *Vietnamese Buddhism Study Temple in America v. City of Garden Grove*, 460 F. Supp. 2d 1165 (C.D. Cal. 2006).

**II.    The CHURCH Is Likely to Succeed on the Merits and Already Suffers Irreparable Harm.**

    **A.    The CITY's denial of Religious Assembly Use at the CATALINA property violates RLUIPA.**

Congress passed RLUIPA in response to findings of discrimination against churches and other religious assemblies by zoning ordinances and discriminatory discretion by zoning boards. 146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) (joint statement of Senators Kennedy and Hatch). "'The right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements. The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes.'" *Vietnamese Buddhism Study Temple in America*, 460 F. Supp. 2d at 1171, quoting 146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) (joint statement of Senators Kennedy and Hatch).

Violation of RLUIPA can take several forms, two of which are relevant to this discussion. First, it may not discriminate against religious assemblies through a land use regulation "that treats [them] on less than equal terms with nonreligious assembl[ies]." *Id.* at § 2000cc(b)(1). Second, it

may not "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a . . . religious assembly or institution." 42 U.S.C. § 2000cc(a)(1). The equal terms provisions and the substantial burden provisions are "operatively independent of one another." *Vietnamese Buddhism Study Temple of America*, 460 F. Supp. 2d at 1171 (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir. 2003)). Violation of either provision results in liability against the government unless its conduct survives strict scrutiny. *See*, *Vietnamese Buddhism Study Temple of America*, 460 F. Supp. 2d at 1171, quoting 42 U.S.C. § 2000cc(a)(1); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1232 (11th Cir. 2004).

Here, the CITY violates both provisions of RLUIPA. It discriminates against the CHURCH by treating it on less than equal terms with nonreligious assemblies and it applies hazardous materials restrictions exclusively to the CHURCH. The CITY also imposes oppressive land use regulations that substantially burden the religious exercise of the CHURCH. Its egregious conduct cannot hope to survive strict scrutiny.

### 1. The CITY's actions violate RLUIPA's "Equal Terms" provision.

The plain text of RLUIPA's Equal Terms provision sets forth a bright-line standard:

(1) EQUAL TERMS- No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution. 42 U.S.C. § 2000cc(b)(1).

As will be demonstrated, the CITY violates this provision (a) by allowing entertainment and recreational assembly uses but not religious assembly use, and (b) by placing a hazardous materials burden on the CHURCH but not on any of the 196 properties approved for assembly. Such actions explicitly contravene the protections afforded by RLUIPA, specifically its Equal Terms provision. The CHURCH bears the initial burden of producing *prima facie* evidence to

1   support a claim alleging an equal terms violation. *See*, 42 U.S.C. § 2000cc-2(b).  Once the

2   CHURCH has satisfied that burden, the CITY bears the ultimate burden of persuasion on all

3   elements of the claim. *Id.*

     **(a) The CITY violates the Equal Terms provision by allowing**
       **entertainment and recreational assembly uses but denying**
       **religious assembly use.**

7      The CITY allows entertainment and commercial recreational assembly uses by permit in

8   both IL and IP areas.  (Ex. A(q)(3), pp. 2,11).   Yet it has denied use of the CATALINA site for

9   religious assembly.  Excluding a church from locations where recreational and entertainment

10  assemblies are permitted violates the Equal Terms provision of RLUIPA as a matter of law.

11  *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1219 (11th Cir. 2004).  The CITY

12  blatantly defies RLUIPA's Equal Terms provision which codifies "existing Supreme Court

13  decisions under the Free Exercise and Establishment Clauses of the First Amendment as well as

14  under the Equal Protection Clause of the Fourteenth Amendment."  *Ventura County Christian*

15  *High School v. City of San Buenaventura*, 233 F. Supp. 2d 1241, 1246 (C.D. Cal. 2002)

16  (quotations omitted); *see also*, *Midrash Sephardi*, 366 F.3d at 1239 (11th Cir. 2004).

17     The legislative history behind this provision sheds more light on a clear, unequivocal

18  mandate.  The Congressional record identifies "recreation centers" and "places of amusement" as

19  two examples of nonreligious assemblies identified as comparable to religious assemblies.  H.

20  Rep. 106-219, 106th Cong., 1st Sess. 19 (1999).[2]  In a Joint Statement, Senators Hatch and

---

[2] The legislative history lists myriad nonreligious assemblies to be compared with religious ones: "banquet halls, clubs, community centers, funeral parlors, fraternal organizations, health clubs, gyms, *places of amusement*, *recreation centers*, lodges, libraries, museums, *municipal buildings*, meeting halls, and theatres," H.R. Rep. No. 106-219, 106th Cong., 1st Sess. 19 (1999) (emphasis added); and "*recreation centers* and *health clubs*," 146 Cong. Rec. S7774-01 at S7777 (daily ed. July 27, 2000) (emphasis added).

1  Kennedy articulated the need for the Equal Terms provision of RLUIPA as follows: "Zoning

2  codes frequently exclude churches in places where they permit . . . large groups of people [to]

3  assemble for secular purposes."  146 Cong. Rec. at S7775.

4

5       Such is the case at bar.  CITY officials noted that recreational and entertainment

6  assemblies were allowed under a different industrial zone and **_directed_** CHURCH representatives

7  to apply for rezoning of the CATALINA property (G. Mortara Decl. ¶ 8).  The CITY recognized

8  that recreational and commercial entertainment assemblies are comparable to religious assemblies,

9  as noted by congressional members in the legislative history of RLUIPA's Equal Terms provision.

10  Regardless of the CHURCH's efforts to comply with an endless administrative runaround, the

11  CITY **_allows_** entertainment and commercial recreational assembly uses in industrial zones but

12  **_prohibits_** the CHURCH from assembling on its CATALINA property, also in an industrial zone.

13  There can be no question that the CITY treats "a religious assembly . . . on less than equal terms

14  with a nonreligious assembly," in violation of RLUIPA's Equal Terms provision.  42 U.S.C. §

15  2000cc(b)(1).  In that the CHURCH has met its burden under Equal Terms, the CITY must

16  demonstrate a narrowly tailored compelling state interest to prevent use of the CATALINA

17  property for religious assembly.

18

19

20            **(b)  The CITY violates the Equal Terms provision by imposing a**
**hazardous materials burden on the CHURCH but not on any of**
21            **the 196 properties approved under the AU overlay.**

22       An equal terms violation also occurs when government officials impose a zoning

23  requirement on a religious group but not on similarly situated nonreligious groups. *Vietnamese*

24  *Buddhism Study Temple in America v. City of Garden Grove*, 460 F. Supp. 2d 1165 (C.D. Cal.

25  2006); see also, *Hollywood Community Synagogue, Inc. v. City of Hollywood, Fla.*, 430 F. Supp.

26  2d 1296, 1323 (S.D. Fla. 2006).  Realizing that its zoning policies directly violated federal law, the

27  CITY created an Assembly Use Overlay District to permit assembly uses in places where they

28

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

1    would be otherwise impermissible.  (Ex. A, § E(3), Joint Work Session Minutes, 10/19/06).

2    However, CITY officials then foisted upon the CHURCH an ***additional*** criterion related to

3    hazardous materials which was not applied to ***any*** of the 196 properties approved for assembly use

4    (Ex. A, § N(2), Staff Report, 4/12/07, pp. 5-6).

5

6         In a staff report, CITY officials claimed that the presence—and potential future presence—

7    of hazardous materials and activities in the vicinity of the CATALINA site rendered it

8    inappropriate for rezoning with the Assembly Use Overlay. *Id*.  Denial of the CATALINA site

9    was based upon the presence of businesses with Hazardous Materials Business Plans (HMBP's)

10   within ¼ mile.  But if that criterion was applied across-the-board to all proposed assembly uses it

11   would prohibit ***all*** 196 parcels, since all are within ¼ mile of a HMBP.  *Id*.  This disparate

12   treatment reveals the degree of animus towards the CHURCH, though its right to assembly is

13

14   protected by core constitutional concerns and federal law.

15        The imposition of an added hurdle for the CHURCH also underscores the extent to which

16   the CITY grasps at straws to prevent the CHURCH from assembling on its property while

17   providing assembly opportunities to similarly situated nonreligious groups, in contravention of

18

19   federal law and its own zoning policies.  The CHURCH has provided *prima facie* evidence that its

20   proposed religious assembly use is singled out relative to the ¼ mile hazardous materials

21   perimeter.  Incredibly, even City Hall, located at 835 E. 14th St. in San Leandro, is within ¼ mile

22   of a site with a hazardous materials plan.  (Ex. D; Req. for Jud. Notice filed herewith.)  As quoted

23   above in footnote 2, municipal buildings were specifically identified as comparable "assembly

24   uses" when RLUIPA was adopted.  As a result, the burden now shifts to the CITY to demonstrate

25

26

27

28

---

a narrowly tailored compelling state interest as to why the other 196 properties approved for assembly use are not subject to the same hazardous materials requirement.[3]

##### 2.      The CHURCH has been Substantially Burdened.

RLUIPA states at 42 U.S.C. 2000cc(a)(1)(A) and (B) in pertinent part as follows:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution – (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

The text, *supra*, does not define the key phrase "substantial burden," leaving courts to adopt their own interpretations.  The Ninth Circuit has recently solidified its approach to substantial burden for RLUIPA, essentially asking whether the land use regulation in question is "'oppressive' to a 'significantly great' extent." *Guru Nanak Sikh Society of Yuba City v. County of Sutter,* 456 F.3d 978 (9th Cir. 2006) (quoting *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034) (referencing Merriam-Webster's Collegiate Dictionary).

In adopting this approach, the Ninth Circuit deemed the Supreme Court's Free Exercise jurisprudence—which also examines substantial burden—to be "instructive," *id.* at 988, but not dispositive.  The court also declined to adopt the more stringent substantial burden frameworks utilized by other federal courts such as the Seventh Circuit.  *Id.* at 989.  Thus, citations to decisions from other jurisdictions are inapposite to the extent that they incorporate a substantial burden framework which is inconsistent to that used by the Ninth Circuit.

---

[3] It should be noted that the CHURCH's current building is also located within ¼ mile of hazardous materials (Ex. B) yet the CITY's opposition to the CHURCH's move is keeping the CHURCH at that location.

1
2
3
4
5
6
7

The "oppressive" nature of the CITY's actions—and corresponding "restriction or onus" on the church—are manifest from the Declarations filed concurrently herewith. Due to space considerations, the CHURCH has explained the harsh impact on a few—but certainly not all—of its ministries and callings. Because of the CITY's pretext that an assembly use cannot be located within ¼ mile of a Hazardous Materials Business Plan, there is still no site within the CITY for which a congregation of more than 1,500 persons can locate.

8

### (a)  The CHURCH'S core functions are actually inhibited.

9
10
11
12
13
14
15
16
17
18
19
20

The core beliefs and values of the CHURCH include: joyous, united worship of God; local and global evangelism to lead people to faith in Christ; instruction; and works of compassion, justice, and human aid. These elements are incorporated into an overarching holistic approach focused on helping the entire individual. The inability of the CHURCH to use the CATALINA property is a significant restriction on its pursuit of these core tenets, because it limits the number of members and visitors who can attend, participate in activities, and receive spiritual help at its current location on Manor Blvd. (G. Mortara Decl. ¶¶ 5, 33, 35, 41). Many CHURCH ministries blend these tenets, e.g., women's ministries will primarily involve discipleship (educational) yet also consist of elements related to social services and evangelism. In short, all constituent parts of the church are operatively interdependent—a burden on one encumbers all.

21
22
23
24
25

Elsewhere, federal courts have acknowledged the struggles of large congregations to find adequate meeting space. These courts have further noted the substantial burden created by cities' refusals to allow churches to use property they have purchased. Consider *Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cit. 2005):

26
27
28

> The burden here was substantial. The Church could have searched around for other parcels of land (though a lot more effort would have been involved in such a search than, as the City would have it, calling up some real estate agents), or it could have continued filing applications with the City, but in either case there would have been

1   delay, uncertainty and expense.  That the burden would not be insuperable would
2   not make is insubstantial.

3   The CHURCH has already spent months searching for its ideal location, the CATALINA

4   property.  (G. Mortara Decl. ¶¶ 5-6.)  It has endured more than a year of delays from the CITY, *id.*

5   ¶ 31, and it has incurred significant expenses in the process.  *Id.* at ¶ 32.  The CHURCH has even

6   sent out staff and church members into other cities on five separate occasions to plant new

7   churches, due to lack of space in the present location.  *Id.* at ¶ 34.

8   Moreover, the rights of assembly are infringed because children are turned away due to

9   lack of classroom space.    Part of the traditional Christian faith involves meeting together as a

10  "church body" or *corpus*.  The breaking apart of the CHURCH is an impermissible burden.  Those

11  who are turned away each Sunday results in the infliction of suffering in the body.  The absence of

12  these dozens of worshippers in the present case is, in a profound theological sense, a substantial

13  burden on the religious practices of gathering together as one body for worship, fellowship, and

14  ministry.  (Decls. of G. Mortara ¶ 3; D. Mortara ¶ 3; Lacey ¶ 3; Lee ¶ 3; Swinderman ¶ 3; and

15  Cabrera ¶ 3).

16  **(i)     *The CHURCH's outreach to the needy is hindered and its charitable efforts must be curtailed.***

17  Performing acts of charitable service for the less fortunate is a fundamental tenet of the

18  CHURCH.   The CHURCH's theological position is that to serve those in need is to serve Christ

19  himself.  As such, the CHURCH provides a number of charitable services for the community and

20  their membership.  These services are substantially burdened by the CITY's denial of use of the

21  CATALINA property.  Specifically, the CHURCH's Food Ministry, Single Parent Ministry, and

22  Community Counseling Ministries have been—and continue to be—substantially burdened.  The

23  CHURCH is hindered in providing charitable services due to the lack of parking, massive

24  residential traffic problems, and shortage of general space.  If people cannot attend these

25
26
27
28

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

ministries, the charitable activities cannot be accomplished.  Thus, the CHURCH has been unable

to effectively and fully execute its mission of helping the weakest members of the community.

This onus on the church has substantially burdened its free exercise of religion.  (Decls. of G.

Mortara ¶ 43; Cabrera ¶¶ 3-4; Vaughn ¶ 6; Lacey ¶ 4-5).

For example, the Food Ministry provides meals to the public.  The CHURCH serves

between 300 to 400 men, women, and children from needy families each Wednesday night.

(Vaughn Decl. ¶ 3).  The MANOR kitchen—smaller than an average *home* kitchen (*Id*. at ¶ 4)—is

inadequate to safely prepare meals for the 300 to 400 adults and children served. (*Id*. at ¶ 4).   The

kitchen does not have adequate space to accommodate the staff, preparers, and servers necessary

for the number of people the CHURCH serves.  (*Id*. at ¶ 4).  It is overcrowded and the number

served cannot be expanded to meet the community's need.  (*Id*. at ¶ 4).  However, the new facility

at CATALINA will have a kitchen and food preparation area that is five times larger.  (*Id*. at ¶ 5).

The CHURCH will be able to install professional restaurant style equipment.  More space and

commercial equipment will enable the Food Ministry to better meet community needs.  As

demonstrated, not being able to use the CATALINA property is a substantial burden on the

CHURCH's religious exercise by hindering CHURCH members' sincerely held belief in

providing a community food ministry to needy individuals and families.  (*Id*. at ¶ 6).

### (ii)    *The CHURCH's counseling ministries are severely limited.*

Because of parking and facility space limitations the CHURCH has not been—and

continues to not be—able to conduct Community Counseling Ministries in line with community

need.  The CHURCH conducts marriage and divorce counseling, Biblical instruction counseling,

recovery drug and alcohol program counseling, youth counseling, and job counseling.  (Rico Decl.

¶ 3).  For example, the CHURCH's youth counselors help teens get out of gangs, off drugs and

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

back into school.  The CHURCH's counseling sessions for the youth are overcrowded.  Sadly, many people have been turned away due to lack of space and parking.  The overall growth of the above programs and the exponential growth of the CHURCH are hampered due to space restrictions.  The new building will accommodate well over 1,000 seats and parking for hundreds of vehicles.  Additionally, the building will have adequate classrooms and space needed to provide religious counseling.  (*Id*. at ¶ 4).  By denying access to the CATALINA property the Defendants are substantially burdening the CHURCH's free exercise of religion by not allowing them to fully operate their Community Counseling Ministries.

> ### (iii)   *The CHURCH'S ministry to women is restricted.*

Women comprise sixty percent of the congregation.  (Cabrera Decl. ¶ 3).  Faith Fellowship provides retreats, seminars, Bible studies, weight loss classes, classes for new mothers, and outreach programs.  The CHURCH ministers to single parents so they can effectively function in their families and in the community.  The MANOR property does not even have a clothing closet for this ministry.  Women receive free clothing and shoes for doctor appointments, job interviews, and any event requiring business attire.  (*Id*. at ¶ 4).  The CHURCH simply does not have enough room; it has outgrown the old facility.  (*Id*. at ¶ 4).  The CITY is crippling the CHURCH's ability to operate the Women's Ministry by blocking the use of the CATALINA property.

The Women's Ministry needs more space to accommodate the growing number of women who want to be involved in activities.  (*Id*. at ¶ 3).  Not being able to use the larger facility owned by the CHURCH inhibits growth and activities of the Women's Ministry and is a substantial burden on its religious exercise.

> ### (iv)   *The CHURCH'S outreach to children is overcrowded.*

The FaithKidz Ministry encompasses children from birth through fifth grades.  Safety considerations, such as (1) limited child-to-adult ratio, (2) physical size of the rooms, (3) the

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

number of rooms, and (4) the number of children allowed in each room, limit the ability to minister to children at the present location.  (Lee Decl. ¶ 5). Each Sunday classrooms reach maximum capacity.  When classrooms reach capacity they must be closed.  This occurs almost every Sunday (*Id*. at ¶ 6; Swinderman Decl. ¶ 4).  In denying use of the CHURCH's new facility Defendants caused—and continue to cause—said space encumbrance.  (Decls. of Swinderman ¶ 4; Lee ¶¶ 3-4).  The inability to use the CATALINA property creates a substantial burden on the CHURCH because children who want to participate in the activities and the parents who want their children to attend the ministry are, of necessity, turned away.  The new larger facility will allow the CHURCH to extend ministry opportunities to all children who want to attend, eliminating this substantial burden.

(v)  ***The CHURCH's ministry to youth is being stifled.***

The Discipleship Youth Ministry has been burdened by parking and facility space limitations.  The current youth building has a maximum capacity of 250 people, not including equipment needed to operate the Youth Ministry.  (Lacey Decl. ¶ 4). The CHURCH has been forced to split junior and senior high students into two nights because of space restrictions.  (*Id*. at ¶ 5).  The Defendants' decision to deny use of the new facility substantially burdens the Youth Ministry's ability to provide fellowship and mentoring between the Youth Ministry's junior high and senior high school students.

When a parent or visitor arrives at the CHURCH and finds no parking for blocks they are discouraged, especially if an individual suffers from a disability.  Students are encouraged to invite their parents to CHURCH.  Due to the congestion some parents will not attend.  (*Id*. at ¶ 6).   This makes many students not attend, either.  The CHURCH seeks to welcome all students to the youth ministry.  Moreover, the CHURCH has a vision for after-school programs, a learning center with

computers, onsite tutoring, and youth events and conferences. (*Id*. at ¶7). Without more space,

however, the CHURCH will be precluded from realizing these plans and goals. (*Id*. at ¶¶ 7-8).

### (vi)    *The CHURCH cannot effectively evangelize.*

Meeting to conduct worship services is one of the primary functions of a church.

*Vietnamese Buddhism Study Temple in America*, 460 F. Supp. 2d at 1171 ("The right to assemble

for worship is at the very core of the free exercise of religion.   Churches and synagogues cannot

function without a physical space adequate to their needs . . .", quoting 146 Cong. Rec. S7774-01,

Exhibit 1 (daily ed. July 27, 2000) (joint statement of Senator Hatch and Senator Kennedy)).  One

reason why the CHURCH has three separate services is due to lack of parking at the MANOR

property. (D. Mortara Decl. ¶ 3).   The current location is in a residential neighborhood and has

only 154 parking spaces. (*Id*. at ¶ 11).  Attendees park on crowded residential streets. *Id*. Often,

people must walk blocks to attend Sunday service.  (*Id*. at ¶ 4).  Each Sunday numerous vehicles

drive off and do not return due to lack of parking.  (*Id*. at ¶ 4).  The CHURCH loses the

opportunity to minister to dozens of people each Sunday as a result of Defendants' refusal to allow

the CHURCH to use the CATALINA property. (G. Mortara Decl. ¶ 41).    To alleviate the

parking at the MANOR property, the CHURCH purchased a neighboring house for $565,000 in

May of 2006—to obtain 10 additional parking spaces.  The CHURCH paid $56,500 per parking

space.  (D. Mortara Decl. ¶ 10).

The dozens of people in the forty or so vehicles turned away every Sunday creates a

substantial burden on the religious exercise of the CHURCH in its evangelistic efforts.  Many

precluded from attending are visitors to the CHURCH and are not Christians. (G. Mortara Decl.

¶ 41).   They have been invited by congregants or attend on their own for any number of reasons.

It is a core tenet of the CHURCH to share the gospel orally and through serving others.  Portions

of the worship services and ministry activities on Sunday mornings are designed especially for

1   visitors who are not Christians.  (*Id*. at ¶ 41).  Thus, the CITY's denial of the use of the

2   CATALINA property substantially burdens the CHURCH's evangelistic efforts. (*Id*. at ¶ 42).

3        The CHURCH's Sunday service is hampered by parking and facility space limitations.

4   Use of the new facility is vital to the CHURCH's religious service.  The Defendants' denial of

5   assembly blocks critical space needed to provide a service adequate for the CHURCH's size.  (*Id*.

6   

7   at ¶¶ 44-45).  The CHURCH's worship services have been, and continue to be, substantially

8   burdened by the Defendants' denial of access to their new facility.

9        **3.       The CITY's actions cannot survive Strict Scrutiny.**

10       "RLUIPA provides a strict scrutiny standard of review for land use cases."

11   *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F.Supp.2d 1203, 1220

12   (C.D.Cal. 2002).  That is, once Plaintiff establishes a violation of the Equal Terms

13   provision *or* the imposition of a substantial burden, the legal burden shifts to Defendants to

14   show the least restrictive means were taken to achieve a narrowly tailored compelling state

15   interest.   42 U.S.C. 2000cc(a)(1)(A) and (B).  The Supreme Court has recently reiterated

16   that burden-shifting statutes with a strict scrutiny requirement apply at the preliminary

17   injunction stage, as well as the trial stage.  *Gonzales v. O Centro Espirita Beneficente*

18   *Uniao Do Vegetal,* 546 U.S. 418, 126 S. Ct. 1211, 1220-21 (2006).

19   

20       **(a)       The CITY cannot demonstrate a compelling state interest.**

21       As an initial matter, the compelling interest test cannot be satisfied—at least not

22   when religious exercise is concerned—by reference to broad policy objectives.  In

23   interpreting 42 U.S.C. 2000bb-1(b), the Religious Freedom Restoration Act (RFRA), the

24   Supreme Court noted, "RFRA requires the government to demonstrate that the compelling

25   

26   interest test is satisfied through application of the law 'to the person'-the particular

27   

28

claimant whose sincere exercise of religion is being substantially burdened." *Gonzales,*

126 S.Ct. at 1220.  Since RLUIPA followed in the footsteps of RFRA, it is not surprising

that its formulation of the compelling interest test also obviates generalized justifications.

The denial of the CHURCH to use its CATALINA property is not in furtherance of

a narrowly tailored compelling governmental interest.  The Defendants' stated interests are

as follows:  (i) preserving the CITY's jobs and tax revenues by excluding the CHURCH

from job and tax-producing locations; (ii) promoting positive change in the next 15 years

by excluding the CHURCH from General Plan Focus Areas; (iii) preventing traffic

problems by excluding the CHURCH from areas that do not abut or are not within one-

quarter mile from an arterial; and (iv) protecting public health and safety by excluding the

CHURCH from locations in the vicinity of Hazardous Material Business Plan sites.  (Ex. A

§ o(4), p. 12).  However, as a threshold matter, whenever the state restricts "expressive

association," there is no presumption of constitutionality.  Therefore, the government must

have a compelling state interest in the subject matter to justify abridgment, and the scope

of the abridgment itself must be the least restrictive means, i.e., no greater than reasonably

necessary to serve the state interest.  *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

While the burden at this point falls squarely on the CITY to prove a compelling

state interest, *see, e.g., Gonzales, supra*, it is worth noting briefly that the interests

advanced thus far by the CITY—maximizing tax revenue, promoting positive change, and

easing traffic congestion—will not suffice.

> **(i)    *Seeking to maximize tax revenue is not a compelling state interest.***

The CITY seeks to increase employment and maximize tax revenues by excluding the

CHURCH from a light industrial area. (Ex. A §(n)(2)).  It is well-settled law that preserving jobs

---

1   and tax revenues is not a compelling governmental interest. *Guru Nanak Sikh Soc'y,* 456 F.3d at

2   987.  This is only logical, for, "If revenue generation were a compelling state interest,

3   municipalities could exclude all religious institutions from their cities." *Cottonwood*, at 1228.

4
    Providing non-profit institutions with tax exemptions—as has long been done in recognition of the

5   invaluable community services they provide—while at the same time using their tax-exempt status

6   as a reason for exclusion is utterly incongruent.  *Id.*  Thus, this financial interest articulated by the

7
8   CITY falls far short of approximating the level of a compelling state interest as a matter of law.

9                          **(ii)    *Promoting positive change does not rise to the level of a
                                    compelling state interest.***

10          Promoting positive change in the next 15 years by excluding the CHURCH from General

11  Plan Focus Areas is not a compelling governmental interest.   RLUIPA does not allow a

12
    government to use broad and discretionary land use rationales to select the precise property where

13  a religious group can worship.  *Guru Nanak Sikh Soc'y*, 456 F.3d at 992, n.20.  RLUIPA was

14  drafted to stop individualized discretionary land use restrictions.  "[O]ften, discrimination lurks

15
    behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with

16  the city's land use plan.'" 146 Cong. Rec. S774-01 (daily ed. July 27, 2000), quoted in *Guru

17
18  Nanak Sikh Soc'y*, 456 F.3d at 987.

19
                           **(iii)   *Preventing traffic congestion by excluding the CHURCH
20                                  from areas that do not abut or are not within one-quarter
                                    mile from an arterial is not a compelling state interest.***
21
            The CITY cites traffic congestion as a reason for denying the CHURCH use of the

22  CATALINA site.  But as a matter of law, traffic concerns simply do not rise to the level of a

23  compelling state interest. *Vietnamese Buddhism Study Temple in America*, 460 F.Supp.2d at 1174.

24
25
26
27
28
                    _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**(iv)  *Excluding the CHURCH from locations in the vicinity of Hazardous Materials Business Plan sites does not protect public health and safety and is not a compelling state interest.***

The CITY has permitted other assembly uses, such as entertainment and commercial recreation, in the same zone from which it bars the CHURCH.  (Ex. A §q(3), pp. 4, 11).  As a matter of California law, entertainment and commercial recreation are assembly uses.  (Cal. Building Code § 203 A; Req. for Jud. Notice).  Further, **all** of the 196 properties in the approved AU Overlay District are located within ¼ mile from a business which has filed a Hazardous Materials Business Plan. (Gantt Decl. ¶ 11).  Even the CHURCH's current property (MANOR) is within ¼ mile of HMBP (Ex. B).  As if that were not enough, City Hall itself is within ¼ mile of seven (7) HMBPs.  Ex. D; Req. for Jud. Notice.  As noted previously, footnote 2 *supra*, the legislative history of RLUIPA identifies municipal buildings as assembly uses comparable to churches.  The CITY's staff report, asserting that an assembly use cannot exist within ¼ mile from a Hazardous Materials Business Plan (Ex. A §n(2), pp. 6, ¶¶2-3), is manifestly inconsistent, unjust and unlawful.

In sum, the CITY has approved 196 properties for assembly use that are within ¼ mile from a Hazardous Materials Business Plan – yet, in the face of that fact, it denies use of the CATALINA site by the CHURCH for religious assembly because it is within ¼ mile of Hazardous Materials Business Plans.  The question must be asked, if the threat of exposure to hazardous materials is acceptable for the 196 properties designated for assembly use, why is a different standard being applied to the CHURCH?  If the CITY is allowing similarly situated properties to be used for assembly use, then the ¼ mile proximity to businesses which have filed a Hazardous Materials Plan is clearly not a compelling reason to prevent the religious assembly on the CATALINA site.  In view of this lack of a narrowly tailored compelling state interest, a

1    preliminary injunction is appropriate in that the CHURCH and ICFG are likely to succeed on the

2    merits.

3

4              **(b)    Even assuming arguendo that the CITY's interest is compelling,**
                 **the means taken to achieve this interest are not narrowly**
5                **tailored.**

6         In light of the foregoing discussion, the CITY has not stated a compelling state interest in

7    denying the CHURCH's AU overlay district amendment application.  Even were it hypothetically

8    possible for the CITY to state such an interest, however, the inquiry does not end there.  Rather,

9    the CITY bears the burden of proving that it has used the least restrictive means to further the

10   stated narrowly tailored compelling state interest.

11

12        The Planning Commission Staff Report states that "there is no less restrictive means (i.e.

13   no means short of outright denial of the rezone) that would further the City's interest in

14   safeguarding the health and safety of the future congregants…."  (Ex. A §(n)(2), pp. 7, ¶2).  This

15   position cannot be reconciled with allowing the 196 other assembly uses as well as entertainment,

16   commercial, recreation and even municipal uses that are also within a ¼ mile proximity to

17   hazardous materials.  It also bears repeating that the CITY'S actions are forcing the CHURCH to

18   remain at a site located within ¼ mile of a Hazardous Materials Business Plan.  (Ex. B.)

19

20        A church use that gathers people for worship and other activities is very similar to a

21   commercial entertainment facility, such as a multi-screen movie theater. *Midrash Sephardi, Inc. v.*

22   *Town of Surfside*, 366 F.3d 1214, 1231, n.14 (11th Cir. 2004) citing 146 Cong. Rec. S7774-01

23   (daily ed. July 27, 2000) (joint statement of Senators Kennedy and Hatch).   If the CITY can serve

24   the stated health interests while allowing commercial recreation and entertainment activities, it

25   follows that there must be other means of serving the health interest while allowing religious

26   assembly concurrently.   In view of the CITY's failure to articulate in the record an explanation for

27

28

1    this double standard, the CITY has failed to carry its burden as to the least restrictive means prong

2    of RLUIPA. In light of this failure, the CHURCH and ICFG are likely to succeed on the merits

3    and thus a preliminary injunction is appropriate.

### III.    The CHURCH Is Already Suffering Irreparable Harm.

Denying a congregation the ability to meet together for religious services on its own

property constitutes "clear irreparable injury." *Vietnamese Buddhism Study Temple in America*,

460 F. Supp. 2d at 1172. The impact is "especially burdensome" when it is placed on not just one

individual, but the hundreds of worshippers who have been turned away from the MANOR

property because capacity has been reached. *Id.* at 173. And while the financial hardship

accompanying the rezoning and CUP denial is also a basis for finding irreparable harm, i*d.,* the

uniqueness of the property is even more so. "Every piece of property is unique and thus damages

are an insufficient remedy to the denial of property rights." *Cottonwood*, 218 F. Supp. 2d at 1230.

Stepping back from minutiae to the larger picture, it is apparent that RLUIPA violations

often indicate concomitant First Amendment violations. It is well established that "[t]he loss of

First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Topanga Press, Inc. v. City of Los

Angeles* 989 F.2d 1524, 1528 (9th Cir. 1993). In the Ninth Circuit, the First Amendment claim

need only be "colorable" to demonstrate irreparable harm. *Warsoldier v. Woodford*, 418 F.3d 989,

1001 (9th Cir. 2005). Here, the denial of a rezoning and CUP to the CHURCH—resulting in

attendees being turned away at the door from hearing religious teaching and participating in

religious worship—constitutes irreparable harm. Thus a preliminary injunction is proper.

1    **IV.    The Balancing of Hardships Tips in the CHURCH's Favor**.

2        As noted in the explication of the Ninth Circuit's standard for preliminary injunctions, the

3    CHURCH can prevail by demonstrating *either* "(1) a combination of probable success on the

4    merits and the possibility of irreparable harm, *or* (2) that serious questions are raised and the

5    balance of hardships tips in its favor."  *Sammartano*, 303 F.3d at 965 (emphasis added).

6

7        Here, the CHURCH demonstrates both.  In addition to the immediate irreparable harm

8    articulated in the previous section, the potential for harm to the health and safety of congregants is

9    significant in view of the fact that they must walk across a busy street with no crosswalk in order

10   to attend church as well as the busy traffic that is present at their current location.  (D. Mortara

11   Decl. ¶ 7).  Indeed, there has already been a traffic accident in front of the church (D. Mortara

12   Decl. ¶ 7).  Moreover, an attendee of Faith Fellowship was hit by a vehicle while crossing the

13   street to attend church (D. Mortara Decl. ¶ 8).  Issuance of the preliminary injunction will allow

14   the CHURCH to use the CATALINA site in which the above problems are alleviated.

15

16       Moreover, unless a preliminary injunction is issued, the CITY's denial will cause serious

17   effects on the operation of the CHURCH.  Inability to use the CATALINA property restricts the

18   CHURCH's opportunity to receive visitors on Sunday, propagate the gospel message (G. Mortara

19   Decl. ¶ 41) provide religious instruction (*Id.* at ¶ 42) and assist the needy (*Id.* at ¶ 43).  (See also

20   generally, Decls. of Rico, Cabrera, Lee, Swinderman, Lacey, Vaughn and D. Mortara.)

21

22       Finally, a preliminary injunction is necessary because money will not adequately remedy

23   the violation of associative rights.  *Los Angeles Memorial Coliseum Comm'n v. National Football

24   League, Id.* at 1202 (citing *Sampson v. Murray,* 415 U.S. 61, 90 (1974)); G. Mortara Decl. ¶ 47.[4]

25

26   _____

27   [4] "Although Faith Fellowship is paying [] $33,809.88 per month … a return of that money is
     utterly inadequate to remedy the loss of opportunity to freely exercise religion due to having to

28   turn away dozens of people week after week.  From our perspective the loss of a soul is such a

By contrast, injury to the CITY is minimal if the assembly use restriction is lifted.   The CITY is arguably not without some hardship if a preliminary injunction is issued—a court order enjoining any municipality from enforcing its zoning policies impacts its authority—but this is mitigated by the limited duration, scope, and effect of the injunction Plaintiff seeks.  *Vietnamese Buddhism Study Temple in America*, 460 F. Supp. 2d at 1173.  Specifically, the injunction will not affect the City's authority with respect to all other parcels of land in San Leandro. *Id.*  And the CITY need only make limited accommodations necessary to allow the CHURCH and its congregation to engage in religious exercise at the CATALINA property. *Id.*  As such, the theoretical harm to the CITY is slight, if it exists at all.

In weighing the potential harm to the CITY versus the immediate and irreparable injury to CHURCH's loss of constitutional rights, it is clear that a preliminary injunction should be granted.

**V.    It is in the Public Interest to Grant this Motion for a Preliminary Injunction.**

The co-sponsors of RLUIPA, Senators Hatch and Kennedy, noted that churches are discriminated against "in the highly individualized and discretionary processes of land use regulation. . . . [O]ften, discrimination lurks behind such vague and universally applicable reasons as ***traffic***, aesthetics, or 'not consistent with the city's land use plan.'" 146 Cong. Rec. S774-01 (daily ed. July 27, 2000), quoted in *Guru Nanak Sikh Soc'y*, 456 F.3d at 987 (emphasis added).

Here, the CHURCH has grown to 1,700 people and church traffic is suffocated by cramped residential streets; health and safety risks to the public are severe.  The current facility, at the MANOR property, causes health and safety problems in a residential neighborhood.  Streets are crowded with parked and traveling vehicles where church members try to walk to attend church and where local families' children are playing.  (D. Mortara Decl. ¶¶ 7-8).  The new CATALINA

profound spiritual event that no remuneration could possibly be adequate.  This is not about

property has more space and is located in an industrial area that can accommodate the CHURCH's assembly.  Thus, the health and safety issues are actually abated rather than aggravated by lifting the religious assembly restriction.  If the CITY had *legitimate* concerns for public welfare, it would *allow* the CHURCH to move to a facility and locale more suited to its size, with ready access to arterials in many directions.  But the CITY hides behind pretextual concerns for public health and safety.

## VI.     Bond Should Be Waived or Set at $1,000 or Some Other Reasonable Sum.

Under Fed R. Civ. P. 65.1, a bond is required when a preliminary injunction is sought. Because this case involves the fundamental constitutional rights of the CHURCH and its many congregants, the CHURCH requests that the requirement of a bond be waived.  This is consistent with at least one recent RLUIPA case, *Vietnamese Buddhism Study Temple in America*, 460 F. Supp. 2d at 1177.  There, the City of Garden Grove expressed concerns over loss of tax revenues. Finding the city's argument unavailing, the court reasoned that the same loss of revenue would result if a tax exempt non-profit private organization operated the property rather than a church. This rationale speaks to the present matter, weighing in favor of waiving the bond.

Alternatively, if the Court issues a bond, the CHURCH requests that it be set at $1,000 or some other reasonable amount. Fed R. Civ. P. 65.1.  The circumstances of the present case show no significant loss to the city which would be safeguarded by an injunction bond.  The only possible loss proximately resulting from an injunction that the CITY has asserted is in property tax revenues, and even that was waived in *Vietnamese Buddhism Study Temple in America*.  Should the Court believe that a more substantial bond is required, the equivalent of property taxes which

inconvenience -- this is about irretrievable loss.".

the CITY would receive for one year (i.e., $1,212.56) would be reasonable.  Ex.  E.  Plaintiffs do not anticipate that litigation will continue for longer than this period of time.

### CONCLUSION

RLUIPA had its genesis in the First Amendment, which "provides every citizen with the right to practice his religion freely on his own property and to assemble peaceably there with other members of his faith." *Vietnamese Buddhism Study Temple in America*, 460 F. Supp. 2d at 1170-71.  The City of San Leandro had a pivotal opportunity to benefit the entire community by allowing Faith Fellowship to finally function in a location where it would not have to turn away the hundreds of individuals who seek spiritual and practical help every week.  The City missed that opportunity.

Fortunately, federal law is not so shortsighted.  The undeniable, almost unbelievable burden under which Faith Fellowship is being forced to operate is the exact type of harm RLUIPA was designed to remedy.  In light of the foregoing analysis and in conjunction with the voluminous evidence submitted herewith, the Plaintiff and real party in interest respectfully requests that this Court preliminarily enjoin Defendants from prohibiting the CHURCH from using the CATALINA property as a religious assembly.

Respectfully submitted this 27th day of July, 2007.

By:   PACIFIC JUSTICE INSTITUTE

_____ /S/ Kevin Snider_____
Kevin T. Snider
Mathew B. McReynolds
Peter MacDonald
Attorneys for Plaintiff and
Real Party in Interest

---