Kevin T. Snider, State Bar No. 170988
*Counsel of record*
Mathew B. McReynolds, State Bar No. 234797
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, CA 95827
Tel. (916) 857-6900
Fax (916) 857-6902
Email: kevinsnider@pacificjustice.org
        mattmcreynolds@pacificjustice.org

Peter D. MacDonald, State Bar No. 69789
LAW OFFICE OF PETER MACDONALD
400 Main Street, Suite 210
Pleasanton, CA 94566-7371
Tel. (925) 462-0191
Fax. (925) 462-0404
Email: pmacdonald@macdonaldlaw.net

Attorneys for Plaintiff and Real Party in Interest

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INTERNATIONAL CHURCH OF THE FOURSQUARE GOSPEL, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF SAN LEANDRO, et al., <br><br> Defendants. <br><br> FAITH FELLOWSHIP FOURSQUARE CHURCH, <br><br> Real Party in Interest. | Case No.: C07-03605 –PJH-JCS <br><br> **PLAINTIFF AND REAL PARTY IN INTEREST'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br><br><br><br><br><br><br> Date: Sept. 5, 2007 <br> Time: 9:00 a.m. <br> Courtroom: 3 <br> Hon.: Phyllis J. Hamilton |

Plaintiff and Real Party in Interest's Proposed Findings of Fact and Conclusions of Law

-1-

Plaintiff, International Church of the Foursquare Gospel (ICFG) and the real party in interest, Faith Fellowship Foursquare Church (CHURCH), respectfully submit their Proposed Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. ICFG is a Christian denomination with an episcopal polity.

2. ICFG holds title to property on 14600 and 14850 Catalina Street, San Leandro, CA (hereinafter "CATALINA PROPERTY").

3. The CATALINA PROPERTY comprises 3.56 acres and 188 parking spaces.

4. The CATALINA PROPERTY has access to major highways heading north and south (I-880) as well as east and west (I-580).

5. The CATALINA PROPERTY has access to major arterials heading north and south (Dolittle Dr., Wicks Blvd.) as well as east and west (Farallon Dr., Marina Blvd.).

6. The CATALINA PROPERTY is zoned Industrial Park.

7. The CHURCH's interest in the CATALINA PROPERTY is as follows: (1) it pays the mortgage, (2) submits applications to local governments for development and use of the property, (3) plans, executes and pays for the development of the property, and (4) occupies and uses the property for its religious activities.

8. The CHURCH is associated with ICFG.

9. The CHURCH is "a religious assembly or institution."

10. The core beliefs and values of the CHURCH and ICFG include: (1) joyous worship of God, (2) local and global evangelism to lead people to faith in Christ, (3) discipleship to instruct believers in life and service, and, (4) works of compassion, justice, and human aid.

11. "Evangelism," which is a core tenet of the CHURCH and ICFG, is the proclamation of the Christian Gospel, i.e., (1) God exists; (2) God desires a relationship with people; (3) because of sin, people are separated from God; (4) God sent his son, Jesus, to the earth as a man to demonstrate God's love and to pay the debt, accrued by human sin, through his own death; (5) Jesus authenticated the truth of his claims by rising from the dead; and, (6) those who believe that Jesus is God's son and was raised from the dead will be saved from their sin and thus restored to relationship with God. Communicating the Gospel and making as many converts to the Christian faith as possible is the primary goal of ICFG and the CHURCH.

12. "Discipleship," which is a core tenet of the CHURCH and ICFG, involves the instruction of believers in the Christian Faith. It is primarily educational in nature. After his resurrection, Jesus explicitly directed the first Christian leaders to make disciples in all parts of the earth. ICFG has unequivocally embraced this assignment. As such, the CHURCH expends a significant time and money in activities calculated to educate believers. The ultimate goal is to have believers internalize Christian principles and thus change their own behavior for the good and positively impact those with whom they have meaningful contact, e.g., family, friends, associates, and the community.

13. Performing "works of compassion, justice, and human aid" is a core tenet of the CHURCH and ICFG. In sum, it is the CHURCH and ICFG's theological position that when a believer assists someone in need it is deemed an act done to Christ, himself. As such, the CHURCH provides a number of charitable services for the community and their membership.

14. It is one of ICFG and the CHURCH's core precepts that believers gather for corporate meetings for joyous worship. Their theological position is that a local congregation is more than a legal entity that happens to provide religious activities. A church congregation is an

entity which is comprised of people who come together to form one body with Jesus Christ as its head. Sunday morning services are the local expression of this body. Those who attend congregate to worship God, fellowship with each other, and perform acts of religious service also known as "ministry." It is important to note that Sunday meetings and activities inevitably incorporate one or more of the core beliefs, i.e., evangelism, discipleship, works of compassion, fellowship and worship.

15. The CITY – including but not limited to the City Council, Mayor, Planning Commission, Board of Zoning Adjustments, City Manager, Development Services Department (formerly the Community Development Department), and Engineering and Transportation Department – has the authority to regulate and restrict the use of land and structures within its borders, including establishing Assembly Overlay to the Zoning Plan.

16. TONY SANTOS was, during the events described in the Complaint, and still is, a member of the City Council for Defendant CITY.

17. SURLENE G. GRANT was, during the events described in the Complaint, and still is, a member of the City Council for Defendant CITY.

18. DIANA M. SOUZA was, during the events described in the Complaint, and still is, a member of the City Council for Defendant CITY.

19. JOYCE R. STAROSCIACK was, during the events described in the Complaint, and still is, a member of the City Council for Defendant CITY.

20. BILL STEPHENS was, during the events described in the Complaint, and still is, a member of the City Council for Defendant CITY.

21. JIM PROLA was, during the events described in the Complaint, and still is, a member of the City Council for Defendant CITY.

22. JOHN JERMANIS was, during the events described in the Complaint, and still is, the City Manager for Defendant CITY.

23. DEBBIE POLLART was, during the events described in the Complaint, and still is, the Planning Manager for Defendant CITY.

24. The CHURCH has outgrown its present facilities at 577 Manor Boulevard San Leandro, CA (MANOR).

25. Each Sunday, parking at the MANOR property overflows which results in overwhelming the surrounding residential streets to the detriment of all concerned. The MANOR site is located in a residential neighborhood and only has 154 parking spaces.

26. Attendees park on crowded residential streets. At times, people walk twenty or more minutes to attend Sunday service.

27. Every Sunday numerous vehicles drive off and do not return because there is no place to park.

28. As a result of the numerous vehicles which drive off and do not return due to lack of parking, the CHURCH loses the opportunity to minister to dozens of people each Sunday.

29. To alleviate the parking at the MANOR property, the CHURCH purchased a neighboring house in the amount of $565,000 in May of 2006 to obtain 10 additional parking spaces. In other words the CHURCH paid $56,500 per parking space.

30. By January, 2006, three Sunday morning worship services were held for nearly 1,700 people at the MANOR site.

31. The CHURCH has sent out staff and church members into other cities on five separate occasions to plant new churches, due to lack of space in the present location.

32. The CHURCH began a diligent search for suitable property to accommodate its growth. In February, 2006, the CHURCH found a suitable building for sale which was the CATALINA site.

33. One month later, the CHURCH representatives met with CITY officials to discuss use of the property for church activities. Representing the CITY, Development Director Hanson Hom, Planning Manager Ms. Pollart and Business Development Director Luke Simms assured the CHURCH that while zoning for industrial districts precluded an assembly use for church activities, several assembly uses for commercial recreation and entertainment in Industrial Limited zones were allowed via a Conditional Use Permit.

34. CITY officials advised the CHURCH to apply for rezoning of the CATALINA PROPERTY from Industrial Park (IP) to Industrial Limited (IL).

35. The CITY did not inform the CHURCH that churches were only permitted in Residential zones.

36. Because the IP zone already permitted entertainment activities and commercial recreation as conditional uses, CITY Officials had directed the CHURCH to proceed with a futile and irrelevant rezoning application with the Planning Commission.

37. The CHURCH signed a purchase and sales agreement applicable to the purchase price of $5,375,000. ICFG also approved the sale.

38. On May 11, 2006, following the direction of CITY officials, the CHURCH filed a Planning Permit Application for a Zoning Map Amendment on the CATALINA site from Industrial Park to Industrial Limited to allow a subsequent application for a Conditional Use Permit for assembly use.

39. The CITY delayed review of the CHURCH's application from July through September of 2006.

40. On October 12, 2006, the City Council's Business Development Committee met and discussed the CHURCH's zoning amendment application. The Committee, made up of then-Mayor Young and then-City Council members Badger and Stephens, expressed concerns over the loss of tax revenue derived from industrial land that would result from permitting such a religious assembly use and decided that more research was needed.

41. On October 19, 2006, the Board of Zoning Adjustments and the Planning Commission held a joint work session, at which time the CHURCH's application was discussed. It was decided that, rather than amend the Zoning Code to allow assembly uses as conditionally permitted in Industrial Park zones, the CITY would apply an assembly use overlay to identified areas in which assembly uses would be permitted. The Planning Staff was directed to develop a specific proposal for an Assembly Use Overlay District.

42. The CHURCH's Senior Pastor, Gary Mortara, attended the meeting and advised regarding the purchase and sales agreement, the substantial investment already paid in escrow, and about how the CHURCH had been seeking approval from the CITY for six months (since March of that year).

43. On November 1, 2006, Kevin Snider, an attorney for the CHURCH, sent a letter to the Planning Commission outlining the CHURCH's need for a new meeting place and the reasons why denial of the CHURCH's application would be a violation of RLUIPA.

44. On December 7, 2006, the Board of Zoning Adjustment met and reviewed the refined proposal for an Assembly Use Overlay. CHURCH representatives attended the meeting.

45. Though the Board took no action—citing lack of information—it did raise concerns over the loss of taxes should the CHURCH use the property.

46. On December 29, 2006, the CHURCH closed escrow on the CATALINA site.

47. The CHURCH believed that the CITY would approve its application for a Zoning Map Amendment, based in part on the statements of CITY officials that other amendments for assembly uses by commercial recreation and entertainment businesses had been approved and on representations made by CITY officials at public meetings, especially the October 19, 2006, meeting of the joint session with the Board of Zoning Adjustments and the Planning Commission.

48. On January 2, 2007, the deed of trust for the CATALINA property in the legal name of the CHURCH and ICFG was recorded in the Alameda County Recorder's office.

49. On February 22, 2007, the Planning Commission recommended approval of the proposed Assembly Use Overlay District and Map amendments, which did not include the CATALINA property. The few parcels rezoned to the AU Overlay District of adequate size for a congregation of 1,500 persons (3.5 acres) were generally located between two railroad tracks near heavier industry, lacking in infrastructure, and adjacent to old strip commercial blight or residential development.

50. On March 19, 2007, the City Council approved the Assembly Use Overlay District and Map Amendments, creating an Assembly Use Overlay consisting of 196 properties but not the CATALINA site.

51. On March 20, 2007, at the direction of City officials, the CHURCH applied for an amendment to the Zoning Code and Map for the CATALINA property to change it from Industrial Park to Industrial Park with Assembly Use Overlay.

52. In the week prior to the April 12, 2007, Planning Commission meeting, the Planning Staff Report submitted by Ms. POLLART to the Planning Commission recommended denial of the CHURCH's application for an amendment for an Assembly Overlay on the CATALINA site.

53. In making its recommendation the report listed the following eight (8) criteria based on the CITY's General Plan and Policies used to produce the approved Assembly Overlay District covering 196 properties. Said criteria are as follows:

1) <u>Site is not located along a major commercial corridor</u> (identified as E. 14th Street and Marina Boulevard between San Leandro Boulevard and Merced Street);

2) <u>Site is not located within the following General Plan Focus Areas: Downtown, Bayfair, Marina Blvd./SOMAR, or West San Leandro</u> (each of these Focus Areas is governed by one or more of the following, which governs future development – special study/guidelines, special overlay district, or location within a redevelopment area);

3) <u>Site is not located in a regional-serving retail area</u> (identified as Greenhouse Marketplace, Westgate, Marina Square, and 'old' Target site);

4) <u>Site is not located inside the one-half-mile study area identified for the Downtown Transit-Oriented Development (TOD) Strategy</u>;

5) <u>Site abuts or is within one-quarter mile of an arterial street</u> (as identified in the Circulation Element of the General Plan);

6) <u>Site is not located in a Residential Zone</u> (Assembly uses are already conditionally permitted in residential zones, so they would not produce new areas for assembly uses to locate if considered);

7) <u>Site is not considered public land, and is not zoned Public Service (PS), Open Space (OS), or Commercial Recreation (CR); property is not owned by an Exempt Public Agency, or leased/owned by a public utility</u> (these areas represent properties and uses that are unlikely to change);

8) <u>Overlay Area must allow a contiguous area greater than or equal to two acres.</u> (This figure was derived from research indicating that large assembly uses require a minimum 2-acre site to accommodate bigger building size and to allow for adequate on-site parking.)

54. On April 9, 2007, Peter MacDonald, an attorney representing the CHURCH, wrote to the Planning Commission, addressing the proposed negative findings of the Planning Staff Report prepared by the Planning Manager and her recommendation that the Commission deny the CHURCH's application.

55. The report said that the CHURCH's project site, the CATALINA property, does not meet two of the criteria: "1) Criterion #2, because the property <u>is</u> located within one of the identified General Plan Focus Areas; and 2) Criterion #5, because the property <u>does not</u> abut or <u>is not</u> located within one-quarter mile of an arterial."

56. The staff report prepared by the Planning Manager also stated that the site failed to meet an additional criterion of public health and safety. This criterion was that a Hazardous Materials Plan had been filed by a business within a ¼ mile of the CATALINA property.

57. The Planning Commission did not apply the public health and safety criterion to the 196 properties approved for assembly use two months earlier.

58. The report said the presence—and the potential future presence—of hazardous materials and activities in the vicinity of the CHURCH's site and the intended assembly use rendered it inappropriate for rezoning with the Assembly Use Overlay.

59. This was allegedly based on findings that there are eight (8) businesses operating under a Hazardous Materials Business Plan within 500 feet of the CHURCH's site, and an additional 13 businesses between 500 feet and one-quarter mile of the site.

60. The San Leandro City Hall is within ¼ mile of seven (7) businesses which have filed Hazardous Materials Plans.

61. The San Leandro City Hall is a building which includes assembly uses of up to 156 occupants in Council Chambers.

62. On April 12, 2007, the Planning Commission denied the CHURCH's assembly use amendment application. The decision did not require concurrence by the City Council, but appeal to the City Council was permitted.

63. On May 7, 2007, the City Council voted 6-0 to deny the CHURCH's appeal. Defendants Tony Santos, Surlene G. Grant, Diana M. Souza, Joyse R. Starosciack, Bill Stephens, and Jim Prola each voted to deny the CHURCH the use of the CATALINA site.

64. The minutes reflect that the Board vote was based upon the Council not wanting the CATALINA property taken out of the tax base, traffic concerns and objections from home owners' associations.

65. The CHURCH has exhausted its administrative remedies.

66. The Defendants' denial of the CHURCH's use of the CATALINA property has caused, and continues to cause, economic damages to the CHURCH. Since January 2, 2007—when it completed the purchase—the CHURCH has made monthly mortgage payments of $33,809.88 each, over $1,100 a day, without being able to use its property.

67. Despite the CHURCH's good faith efforts for more than fourteen (14) months to comply with the Defendants' application process, the CHURCH has spent over $460,000 and still has not been able to use the CATALINA site.

68. At the time that the CHURCH first submitted its permit application, assembly uses such as commercial entertainment and recreational were allowed by use permit in areas zoned Industrial Limited and Industrial Park in the City of San Leandro.

## II. CONCLUSIONS OF LAW

69. The CHURCH is "a religious assembly or institution" for the purposes of RLUIPA, codified at 42 U.S.C. § 2000cc, *et seq.*

70. There is no basis for challenging the sincerity of Plaintiff's beliefs in this case. Nobody in the instant matter has questioned or challenged the sincerity of the beliefs held by the members of the CHURCH.

### A. RLUIPA and the "Equal Terms" provision

71. The "Equal Terms" provision of RLUIPA sets forth what a plaintiff must show to make out a violation: "No government shall impose or implement a *land use regulation* in a manner that treats a *religious assembly or institution* on *less than equal terms* with a *nonreligious assembly or institution*." 42 U.S.C. § 2000cc(b)(1) (emphasis added).

72. *Land Use Regulation.* The CITY's zoning ordinance governing what assembly uses are permitted and not permitted is a "land use regulation" within the meaning of the Act. *See*

42 U.S.C. § 2000cc-5(5).

73. In California, an assembly building is a structure or part of a structure "used for the gathering together of 50 or more persons at one time for such purposes as deliberation, education, instruction, worship, entertainment, amusement, drinking or dining, or waiting for transportation." Cal. Building Code § 203 A.

74. *Religious Assembly or Institution*. The Plaintiff CHURCH is a "religious assembly or institution" within the meaning of the Act.

75. Commercial entertainment or a recreational use business is an assembly use if the building is used for a gathering of 50 or more persons. Cal. Building Code § 203 A.

76. The Industrial Light and Industrial Park zones in the CITY each allow Commercial entertainment or recreational use business.

77. *Less Than Equal Terms*. The CITY treats the CHURCH on less than equal terms as nonreligious assemblies by allowing commercial entertainment and recreational assembly uses but denying religious assembly use.

78. The CITY violates the equal terms provision by imposing a hazardous materials burden on the CHURCH but not on any of the 196 properties approved under the AU overlay.

79. *Nonreligious Assembly or Institution*. Whether a nonreligious assembly is commercial or non-commercial, for profit or non-profit, a city may not afford it better treatment than a religious assembly. The legislative history lists myriad nonreligious assemblies to be compared with religious ones: "banquet halls, *clubs*, community centers, funeral parlors, fraternal organizations, *health clubs*, gyms, *places of amusement*, *recreation centers*, lodges, libraries, museums, *municipal buildings*, meeting halls, and theatres," H.R. REP. NO. 106-219, 106th Cong., 1st Sess. 19 (1999) (emphasis added); and "*recreation centers* and *health clubs*," 146 CONG. REC.

Plaintiff and Real Party in Interest's Proposed Findings of Fact and Conclusions of Law

-13-

S7774-01 at S7777 (daily ed. July 27, 2000) (emphasis added); *see also id.* at S7775 ("[T]he hearing record reveals a widespread pattern of discrimination against churches as compared to secular places of assembly . . .").

80. The CITY violates the equal terms provision by drafting and subsequently applying a rule, exclusively to the CHURCH, prohibiting assembly uses within ¼ mile of businesses which have filed Hazardous Materials Plans. Said assembly uses to which the rule has not been applied include City Hall and commercial entertainment and recreational assemblies.

**B.    RLUIPA and the "Substantial Burden" Test**

81. Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) in response to a chain of events set in motion by the decision in *Employment Division Department of Human Resources v. Smith*, 494 U.S. 872 (1990). In *Smith*, the Court held that laws that are neutral and generally applicable are not subject to strict scrutiny under the Free Exercise Clause. *Id.* at 879-82.

82. In response to *Smith*, Congress enacted the Religious Freedom Restoration Act (RFRA) of 1993, 42 U.S.C. §§ 2000bb, *et seq*. The stated purpose of RFRA was to "restore the compelling interest test set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder*" and to apply that test to all government acts, including laws of general applicability, that "substantially burdened" religious exercise. 42 U.S.C. §§ 2000bb-1, 2000bb(b). In *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997), however, the Court concluded that RFRA was unconstitutional as applied to state and local governments because it was beyond the scope of congressional authority under Section 5 of the Fourteenth Amendment.

83. Congress responded to the *City of Boerne* decision by enacting RLUIPA, 42 U.S.C. §§ 2000cc to 2000cc-5. In RLUIPA, Congress substantially modified and relaxed the

definition of "religious exercise" from the RFRA statute to ensure even more sweeping protections to religious practitioners. *See, e.g., San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004).

84. It is in this context that the determination of whether or not a government action results in "substantial burden" on the exercise of religion must be made.

85. Under the current definition of "exercise of religion," the Ninth Circuit has established the following rule in determining whether or not a "substantial burden" exists as a result of government land use:

> The government is prohibited from imposing or implementing a land use regulation in a manner that imposes a "significantly great" restriction or onus on "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" . . . unless the government can demonstrate that imposition of the burden . . . is: (1) in furtherance of a compelling governmental interest; and (2) the least restrictive means of furthering that compelling governmental interest. *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034-35 (9th Cir. 2004).

**1.     Plaintiff has Demonstrated that the Government Action at Issue Results in a Substantial Burden to Its Ability to Practice Its Religion.**

86. When the facts, as set forth extensively above, are applied to the rule articulated in *San Jose Christian College v. City of Morgan Hill*, 360 F.3d at 1034-35, it is clear that the government action in the instant case imposes a significantly great restriction or onus on some exercise of religion, whether or not compelled by or central to a system of religious belief.

87. The CHURCH has demonstrated that the government action at issue substantially burdened the exercise of religious beliefs.

88. The Defendants' denial of the CHURCH's use of the CATALINA property is a substantial burden on the CHURCH's exercise of its religious beliefs. The inability of the CHURCH to use the CATALINA site is a significant restriction on its pursuit of these core tenets,

because it limits the number of members and visitors who can attend, participate in activities, and receive spiritual help at its current location on Manor Blvd.

89.     Defendant's Zoning Ordinance at the time of initial application by the CHURCH in May 2006 substantially burdened the exercise of religious beliefs because there was no place in the City for a congregation of 1,500 persons or greater.  Industrial districts prohibited religious assembly but not other types of assembly.  Residential zones could not accommodate large congregations.  And a discretionary use permit process assured that any such CUP application in a residential setting would be denied.  As a result, large congregations are precluded from the City.

90.     The CITY's Zoning Ordinance as applied after adoption of the AU Overlay District in March 2007 substantially burdens the exercise of religious beliefs because there is still no place in San Leandro for a congregation of 1,500 people.

91.     The planning process dictated by the CITY substantially burdened the exercise of religion in several ways:  First, the CITY had the CHURCH make a meaningless application for rezoning to the Light Industrial district (IL) that had certain assembly uses (commercial recreation and entertainment activities).  Those uses (commercial recreation and entertainment activities) were already allowed under the existing zoning (Industrial Park – IP).  Second, the Defendants then left the CHURCH's rezoning application unprocessed on a shelf for 10 months with knowledge that the option to purchase the CATALINA site would expire before a fair hearing or any hearing from the City.  Third, the Defendant processed the proposed CHURCH use as three sequential approvals rather than as three parallel approvals (i.e., Creation of Assembly Use Overlay District, re-zone of CATALINA site to Assembly Use Overlay District, and then finally a conditional use permit.)   This allowed denial of the proposed re-zoning to AU Overlay based upon theoretical reasons (e.g. distance from arterial) which ignored the actual physical conditions

(outstanding traffic access) and unreasonably extended the time for decision.

92. By denying the CHURCH access to its CATALINA property for religious assembly, the Defendants are substantially burdening the CHURCH's ability to evangelize, provide social services, disciple (educate) believers, and, engage in corporate fellowship.

93. The Defendants' denial of the CHURCH's use of the CATALINA property imposes a substantial burden on the religious exercise of the CHURCH in violation of RLUIPA, 42 U.S.C. § 2000cc(a) *et seq.*, because the CHURCH has been, and is, to a significantly great degree, limited in its ability to fully exercise its beliefs in the commands of Jesus Christ to proclaim and propagate the Gospel, make disciples, and assist the poor. This occurs each Sunday when close to forty vehicles drive off and do not come back. As a result, the CHURCH misses the opportunity to minister to dozens of people every weekend. This is an onus on the CHURCH's religious exercise.

**C. The CITY does not have a narrowly tailored compelling governmental interest in preventing the CHURCH from using the CATALINA PROPERTY for religious assembly**

94. The CITY seeks to increase employment and maximize tax revenues by excluding the CHURCH from a light industrial area. Preserving jobs and tax revenues is not a compelling governmental interest. *Guru Nanak Sikh Soc'y,* 456 F.3d at 987.

95. Promoting positive change in the next 15 years by excluding the CHURCH from General Plan Focus Areas is not a compelling governmental interest. RLUIPA does not allow a government to use broad and discretionary land use rationales to select the precise property where a religious group can worship. *Guru Nanak Sikh Soc'y,* 456 F.3d at 992, n.20.

96. The CITY cites traffic congestion as a reason for denying the CHURCH use of the CATALINA site. As a matter of law, traffic concerns simply do not rise to the level of a

compelling state interest. *Vietnamese Buddhism Study Temple in America*, 460 F.Supp.2d at 1174.

97. The CITY asserts that the CHURCH's proximity to businesses which have filed a Hazardous Materials Plan as a compelling reason to deny use of the CATALINA property as a religious assembly. In addition, the CITY states that there is no less restrictive means other than denial of the use of the property for assembly. The presence of the Hazardous Materials Plans is neither compelling nor narrowly tailored because the same standard is not applied to the other 196 properties approved for assembly use, all of which are within ¼ mile of Hazardous Materials Plans. Moreover, the CITY's rule with regard to properties within a ¼ mile of Hazardous Materials Plans is neither compelling nor narrowly tailored because City Hall itself is within ¼ mile of seven (7) businesses which have filed such Plans.

98. The record shows that the CITY has not articulated a narrowly tailored compelling state interest for allowing assembly uses (e.g., commercial entertainment and recreation) by conditional use permit in Industrial Limited and Industrial Park areas but refused to grant the CHURCH a conditional use permit.

**D.     ICFG and CHURCH are entitled to a Preliminary Injunction.**

99. ICFG and the CHURCH have demonstrated a likelihood of success on the merits.

100. The issuance of a preliminary injunction would not cause substantial harm to others. Indeed, in balancing the harms granting a preliminary injunction weighs heavily in favor of ICFG and the CHURCH.

101. The public interest would be served by the issuance of a preliminary injunction, because the public would be permitted to exercise its First Amendment right to free of exercise of religion.

102. Stopping the ICFG, the CHURCH, and the public from practicing religion, for

-18-

any amount of time, leads to irreparable harm.  Moreover, given the facts of this case, the unequal treatment, and the substantial burden the CITY has imposed, Plaintiff is likely to succeed on the merits.

103.   ICFG and the CHURCH are experiencing harm to fundamental rights guaranteed them by the Constitution.  Defendants do not face a likelihood of harm if an injunction to preliminarily enjoin them from preventing the CHURCH from using the CATALINA property for religious use was ordered while this litigation is pending before the Court.

Dated:  July 27, 2007

                                               /S/ Kevin Snider
                                               Kevin T. Snider
                                               Matthew B. McReynolds
                                               Peter D. MacDonald
                                               Attorneys Plaintiff and Real Party in Interest