Kevin T. Snider, State Bar No. 170988
*Counsel of record*
Mathew B. McReynolds, State Bar No. 234797
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, CA 95827
Tel.  (916) 857-6900
Fax  (916) 857-6902
Email: kevinsnider@pacificjustice.org
        mattmcreynolds@pacificjustice.org

Peter MacDonald, State Bar No. 69789
LAW OFFICE OF PETER MACDONALD
400 Main Street, Suite 210
Pleasanton, CA 94566-7371
Tel. (925) 462-0191
Fax. (925) 462-0404
Email: pmacdonald@macdonaldlaw.net

Attorneys for Plaintiff and Real Party in Interest

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL CHURCH FOURSQUARE GOSPEL,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN LEANDRO, MICHAEL J. GREGORY (in his official capacity), SURLENE G. GRANT (in her official capacity), DIANA M. SOUZA (in her official capacity), JOYSE R. STAROSCIACK (in her official capacity), BILL STEPHES (in his | Case No.: CO7-03605-PJH-JCS<br><br>**DECLARATION OF SENIOR PASTOR GARY MORTARA IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:  September 5, 2007<br>Time:  9:00 a.m.<br>Courtroom:  3<br>Hon.:  Phyllis J. Hamilton |

official capacity), JIM PROLA (in his           )
official capacity), JOHN JERMANIS (in           )
his official and individual capacities),        )
DEBBIE POLLART (in her official and             )
individual capacities), DOES 1-50,              )
                                                )
Defendants.                                     )
FAITH FELLOWSHIP FOURSQUARE                     )
CHURCH,                                         )
                                                )
Real Party in Interest.                         )

I, Gary Mortara, do hereby declare as follows:

1.  That if called upon, I could and would testify truthfully, as to my own personal knowledge, as follows:

2.  I am the Senior Pastor of Faith Fellowship Foursquare Church (CHURCH), located at 577 Manor Boulevard, San Leandro, California 94579 (MANOR PROPERTY).

**History of the CHURCH**

3.  The CHURCH was originally founded in 1947. My wife and I took over the pastorate of this CHURCH in September 1993. At that time there were only 65 people attending and we were meeting in the first new church site that had been built in the City of San Leandro (CITY) in 25 years. The CHURCH has grown rapidly since 1993. After a year or so in a sanctuary that only seated 200 people, we had grown enough to add a second service. Soon after, we expanded to three and then four Sunday services. We expanded our sanctuary size by adding 80

more seats and still needed to hold four Sunday services to accommodate worshippers. Then we purchased the property next door and built a brand new sanctuary with 650-700 seats.  This project was completed in April 2003.

### Catalina Property

5.     Near the close of 2005, just two and a half years later, we were already at three Sunday services to accommodate the crowds which grew to over 1,500.  We began looking around San Leandro for a possible new location.  People started to turn away from Faith Fellowship due to the lack of parking and massive traffic problems we were causing in our residential neighborhood.  The reason we originally located in a residential area was that the CITY only allowed churches in a residential areas as of right.  There were no plans for church growth or allowances for areas that could accommodate a large church gathering.  After months of searching throughout the community, we found a building which had been on the market for over seven months and further investigated the purchase of this property.

6.     In February, 2006, the CHURCH found ideal property on 14600 and 14850 Catalina Street (hereinafter "CATALINA PROPERTY"), comprising 3.56 acres and 188 parking spaces, with access to arterials in every direction.  But, the property was zoned Industrial Park.

7.     One month later, CHURCH representatives met with CITY officials, to discuss use of the property for church activities.  Representing the CITY,

Development Director Hanson Hom; Planning Manager Ms. POLLART; and Business Development Director Luke Simms assured the CHURCH that while zoning for industrial districts precluded an assembly use for church activities, several assembly uses for commercial recreation and entertainment in Industrial Limited zones were allowed via a Conditional Use Permit.  CITY officials advised the CHURCH to apply for rezoning of the CATALINA PROPERTY from Industrial Park (IP) to Industrial Limited (IL).  But unbeknownst to the CHURCH, churches were *only* permitted in Residential zones.  Because the IP zone already permitted entertainment activities and commercial recreation as conditional uses, CITY Officials had directed the CHURCH to proceed with an irrelevant rezoning application.

8.   On March 24, 2006 the CHURCH signed a purchase and sales agreement and paid $50,000, half of a nonrefundable fee applicable to the purchase price of $5,375,000, giving them eight days to decide whether to complete the purchase.  Then, on March 31, 2007, the CHURCH paid the second half of the nonrefundable fee in the amount of $50,000.

9.   On March 30, 2006, the CHURCH's Council approved the purchase of the CATALINA PROPERTY.  Ten days later, CHURCH members concurred.  By December 7, 2006, the CHURCH's denomination -- International Church of the Foursquare Gospel (ICGF) -- also assented.

10. On May 11, 2006, following the direction of CITY officials, the CHURCH filed a Planning Permit Application for a Zoning Map Amendment on the CATALINA PROPERTY from Industrial Park to Industrial Limited to allow a subsequent application for a Conditional Use Permit for an assembly use. That same day, the CHURCH signed an amendment to their purchase and sales agreement and paid an additional $50,000 nonrefundable fee, applicable to the purchase price, to extend the agreement until July 6, 2006. The third extension of escrow, with a total non-refundable deposit of $150,000, was up December 31, 2006. The CHURCH informed CITY officials of this fee.

11. On May 18, 2006, the then owner of the CATALINA PROPERTY completed its portion of the Planning Permit Application for a Zoning Map Amendment. On the same day the CHURCH signed an Agreement for Payment of Fees for Application Processing and made a $2,000 deposit.

12. On June 8, 2006, the City Council Business Development Committee met and discussed the CHURCH's application to use the CATALINA PROPERTY. The Committee made up of then Mayor Young and City Council members Stephens and Badger expressed concerns over the policy implications of allowing an assembly use in an industrial zone. This was stated in apparent unawareness that under the municipal code assembly uses, such as, commercial recreation and entertainment activities, are allowed in industrial districts.

DECLARATION OF GARY MORTARA

-5-

13. On June 29, 2006, the CITY acknowledged receipt of the CHURCH's application.

14. On July 11, 2006, the CHURCH signed an amendment to their purchase and sales agreement on the CATALINA PROPERTY and paid an additional $50,000 nonrefundable fee, applicable to the purchase price, to extend the agreement until October 31, 2006. The CHURCH informed CITY officials of this fee.

15. For three months July-September, 2006, the Planning Commission delayed taking action on the CHURCH CATALINA PROPERTY. For example, in July the Planning Commission postponed discussion of the CHURCH's zoning code amendment application, due to lack of information from the Planning Department. In August, 2006, the Planning Commission held no meetings and conducted no business. In September, 2006, the Planning Commission again postponed discussion of the CHURCH's zoning code amendment application, again due to lack of information from the Planning Department.

16. On October 10, 2006, the San Leandro City Council held a public hearing on the CHURCH's application. I, along with an associate pastor, David Silvey, and with 300 church members in attendance, spoke about the proposed purchase of the CATALINA PROPERTY and the burdensome delays that the Defendants were causing in the review process.

17. On October 12, 2006, the City Council's Business Development Committee met and discussed the CHURCH's zoning amendment application. The Committee, made up of then Mayor Young and then City Council members Badger and Stephens, expressed concerns over the loss of tax revenue derived from industrial land that would result from permitting such a religious assembly use and decided that more research was needed.

18. On October 19, 2006, the Board of Zoning Adjustments and the Planning Commission held a joint work session, at which time the CHURCH's application was discussed. It was decided that, rather than amend the Zoning Code to allow assembly uses as conditionally permitted in Industrial Park zones, the CITY would apply an assembly use overlay to identified areas in which assembly uses would be permitted. The Planning Staff was directed to develop a specific proposal for an Assembly Use Overlay District. I attended the meeting and told of the purchase and sales agreement, the substantial investment already paid in escrow, and about how the CHURCH had been seeking approval from the CITY for six months (since March of that year).

19. On October 23, 2006, the CHURCH signed an amendment to their purchase and sales agreement on the CATALINA PROPERTY and paid an additional $50,000 nonrefundable fee, applicable to the purchase price, to extend the agreement until December 31, 2006.

20. On November 1, 2006, one of the CHURCH's attorneys, Kevin Snider, sent a letter to the Planning Commission outlining the CHURCH's need for a new meeting place and the reasons why denial of the CHURCH's application would be a violation under the Religious Land Use and Institutionalized Persons Act.

21. On December 7, 2006, the Board of Zoning Adjustment met and reviewed the refined proposal for an Assembly Use Overlay. CHURCH representatives attended the meeting. The Board took no action, citing lack of information. The alleged "lack of information" was not the result of the CHURCH failing to provide requested information. At all times, the CHURCH staff, or through its agents, provided whatever materials and performed all acts requested by the CITY in an expedited fashion. All delays emanated from the CITY.

22. On December 29, 2006, the CHURCH, believing that the CITY would approve its application for a Zoning Map Amendment, closed escrow on the CATALINA PROPERTY. Their belief was based in part on the statements of CITY officials that other amendments for assembly uses by commercial recreation and entertainment businesses had been approved and on representations made by CITY officials at public meetings, especially the October 19, 2006, meeting of the joint session with the Board of Zoning Adjustments and the Planning Commission. The CHURCH could not extend the purchase deadline any longer, because the note on

DECLARATION OF GARY MORTARA

-8-

the CATALINA PROPERTY had come due and the then owner was forced to either refinance or sell it.

23. On January 17, 2007, the Redevelopment Advisory Committee recommended that properties occupied by religious assembly uses be returned to a taxable use once the property is vacated.

24. On February 22, 2007, the Planning Commission recommended approval of the proposed Assembly Use Overlay District and Map amendments, which did not include the CATALINA PROPERTY.

25. On March 19, 2007, the City Council approved the Assembly Use Overlay District and Map Amendments effective on May 1, 2007, creating an Assembly Use Overlay, consisting of 196 properties, but not the CATALINA PROPERTY.

26. On March, 2007, at the direction of City officials, the CHURCH applied for an amendment to the Zoning Code and Map for the CATALINA PROPERTY, changing it from Industrial Park to Industrial Park with Assembly Use Overlay.

27. In the week prior to the April 12, 2007 Planning Commission meeting, the Planning Staff Report submitted by Ms. POLLART to the Planning Commission recommended denial of the CHURCH's application for an amendment for an

Assembly Overlay on the CATALINA PROPERTY.  Exhibit A -- Administrative Record §n (2) pp. 4-6, is a true and correct copy of the Planning Staff Report.

28.     The staff said that the CHURCH's project site, the CATALINA PROPERTY, does not meet two of the criteria: 1) Criterion #2, because the property <u>is</u> located within one of the identified General Plan Focus Areas; and 2) Criterion #5, because the property <u>does not</u> abut or <u>is not</u> located within one-quarter mile of an arterial. (See Exhibit A—Administrative Record §n (2)) pg. 4).

29.     The staff report prepared by Ms. POLLART went on to state that the site failed to meet an additional criterion of public health and safety, which the Planning Commission did not apply to the 196 properties approved for assembly use two months earlier.  It said the presence, and the potential future presence, of hazardous materials and activities in the vicinity of the CHURCH's site and the intended assembly use, rendered it inappropriate for rezoning with the Assembly Use Overlay.  This was allegedly based on findings that there are eight (8) businesses operating under a Hazardous Materials Business Plan within 500 feet of the CHURCH's site, and an additional 13 businesses between 500 feet and one-quarter mile of the site. (See Exhibit A—Administrative Record §n (2)) pp. 5-6).

30.     On April 12, 2007, the Planning Commission denied the CHURCH's assembly use amendment application.  The decision did not require concurrence by

the City Council, but appeal to the City Council was permitted. (See Exhibit A—Administrative Record §n (6)).

31. On May 7, 2007, the City Council denied the CHURCH's appeal. Defendants TONY SANTOS, SURLENE G. GRANT, DIANA M. SOUZA, JOYSE R. STAROSCIACK, BILL STEPHENS, and JIM PROLA each voted to deny the CHURCH the use of the CATALINA PROPERTY. (See Exhibit A—Administrative Record §o (5)). The City Council, one year after we submitted our rezoning request, denied occupancy on the specious ground of a "heath hazard risk." Faith Fellowship's hazardous materials consultant, former Fire Chief Paul Gantt, demonstrated that the staff's position on health and safety concerns was ill-founded, but the commissioners still voted to deny the rezoning.

32. The Defendants' denial of the CHURCH's use of the CATALINA PROPERTY has caused, and continues to cause, economic damages to the CHURCH. In addition to the $100,000 payment the CHURCH made with the purchase and sales agreement on March 24, 2006, it had to make three additional nonrefundable payments of $50,000 each, as it waited in vain to get a response from the CITY on its application. Since January 2, 2007, when it completed the purchase, the CHURCH has made monthly mortgage payments of $33,809.88 each, over $1,100 a day, without being able to use its property. Additionally, the CHURCH had to rely on an attorney to facilitate the application process with the CITY.

Despite the CHURCH's good faith efforts for more than fourteen (14) months to comply with the Defendants' application process, the CHURCH has spent over $460,000 and still has not been able to use the CATALINA PROPERTY.

33.   The CHURCH has grown to approximately 1,700 people in attendance on any given Sunday. Indeed, the CHURCH has grown such that it has reached the full capacity of the MANOR PROPERTY. Until this last year, the CHURCH has experienced significant annual growth. That growth has stopped this last year since the capacity of the MANOR PROPERTY has been exhausted.

34.   In an attempt to mitigate the growth and stay true to our religious convictions (discussed below) we sent out five of our pastors and some of our congregation to other areas. In 2001 we sent Pastor Brian Goodell to San Mateo along with 75 of our congregation; in 2002 the CHURCH sent Pastor Anthony Clifton to Oakland with 25 of parishioners from Faith Fellowship; in 2005 Pastor Benjamin Robinson was sent to Emoryville with 45 people from the CHURCH; again in 2005 Faith Fellowship sent Pastor Victor Cervantez to Hayward with 40 from the congregation; and, in 2007 Pastor David Silvey was sent to Mountain House with 25 people from the CHURCH.

35.   Despite this, many people have been, and continue to be, turned away due to lack of space and parking. Our classrooms for children are overcrowded and

parents feel this isn't safe and end up leaving, telling us they will return when we have more room.

## Essential Tenets of Faith and Theology

34. I am a member of the clergy in the International Church of the Foursquare Gospel (ICFG) in which I was licensed as a minister in 1989 and ordained in 1997. My biblical and theological training has been at Life Bible College and Patten University. Moreover, I serve as the Divisional Supervisor over six other churches in my denomination, ICFG. As such, I am qualified to provide testimony as to the tenets of faith and theology for ICFG, described below.

35. ICFG is episcopal in polity. This form of polity is also referred to as a hierarchical form of church governance. The CHURCH is a member of ICFG.

36. The core beliefs and values of ICFG and, by extension, the CHURCH, include: (1) local and global evangelism to lead people to faith in Christ; (2) discipleship to instruct believers in life and service; (3) works of compassion, justice, and human aid; and, (4) joyous corporate worship of God.

37. "Evangelism" is the proclamation of the Christian Gospel, i.e., (1) God exists; (2) God desires a relationship with people; (3) because of sin, people are separated from God; (4) God sent his son, Jesus, to the earth as a man to demonstrate God's love and to pay the debt, accrued by human sin, through his own death; (5) Jesus authenticated the truth of his claims by rising from the dead; and,

(6) those who believe that Jesus is God's son and was raised from the dead will be saved from their sin and thus restored to relationship with God. Communicating the Gospel and making as many converts to the Christian faith as possible is the primary goal of ICFG and the CHURCH.

38.  "Discipleship" involves the instruction of believers in the Christian Faith. It is primarily educational in nature. After his resurrection, Jesus explicitly directed the first Christian leaders to make disciples in all parts of the earth. ICFG has unequivocally embraced this assignment. As such, the CHURCH expends a significant time and money in activities calculated to educate believers. The ultimate goal is to have believers internalize Christian principles and thus change their own behavior for the good and positively impact those with whom they have meaningful contact, e.g., family, friends, associates, and the community.

39.  A third essential belief of ICFG is to perform "works of compassion, justice, and human aid." It is ICFG, and thus the CHURCH's theological position, that when a believer assists someone in need, it is deemed an act done to Christ, himself. As such, the CHURCH provides a number of charitable services for the community and their membership.

40.  It is one of ICFG's, and therefore the CHURCH's, core precept that believers gather for corporate meetings. In sum, it is our theological position that a local congregation is more than a legal entity that happens to provide religious

activities. A church congregation is an entity which is comprised of people who come together to form one body with Jesus Christ as its head. Sunday morning services are the local expression of this body. Those who attend congregate to worship God, fellowship with each other, and perform acts of religious service also known as "ministry." It is important to note that Sunday meetings and activities inevitably incorporate one or more of the core beliefs, i.e., evangelism, discipleship, works of compassion, fellowship and worship.

### Impact of the Denial of the use of the Catalina Building

41.     The denial of the use of the CATALINA PROPERTY for religious assembly has an enormous impact on our CHURCH's ability to exercise our religious beliefs relative to evangelism. Every Sunday dozens of cars are turned away from the CHURCH at the MANOR property because there is no place for them. Moreover, the MANOR PROPERTY has an insufficient number of rooms to accommodate the various meetings and activities on Sundays. Sunday worship services, Sunday school and other activities have portions of those gatherings calculated to articulate the Gospel to those who are not Christians. Practically every Sunday there are people who accept the Christian faith. As such, through the years hundreds of people have been converted. Due to the denial of the use of the CATALINA PROPERTY, the CHURCH has lost, and continues to loose,

opportunities to present the Gospel to numerous people each Sunday. This has substantially burdened our religious exercise.

42.   In like manner, the Sunday activities also have portions of them set aside for the discipleship of believers. In that many cars are turned away each Sunday at the MANOR PROPERTY, the CHURCH is unable to deliver the discipleship services that our faith requires. Due to the denial of the use of the CATALINA PROPERTY, the CHURCH has lost, and continues to loose, opportunities to disciple numerous believers each Sunday. This has substantially burdened our religious exercise.

43.   The lack of space also hinders us from meeting the social needs of the community which we are known for. We provide free marriage and family biblical instruction. We have Celebrate Recovery, a drug and alcohol program. Our Youth ministry helps teens get out of gangs and off drugs and back in school. The CHURCH assists people in getting through the difficulty of divorce and we often help individuals find jobs. Moreover, the CHURCH's ability to provide meals to 200-300 of the needy on Wednesdays is severely curtailed because the MANOR kitchen is smaller than an average home kitchen.   The CATALINA PROPERTY would enable the CHURCH to fulfill these missions and goals. However, due to the denial of the use of the CATALINA PROPERTY, the CHURCH has lost, and

continues to loose, opportunities to engage in works of compassion, justice, and human aid.  This has substantially burdened our religious exercise.

44.    Those turned away each Sunday, due to the denial of the use of the CATALINA PROPERTY, results, in a profound theological sense, in the infliction of suffering in this local expression of the body of Christ.  The absence of dozens of worshippers every Sunday is a substantial burden on the religious practices of gathering together as one body for worship, fellowship and ministry.

45.    The exponential growth of the CHURCH is hampered due to the denial of the use of the CATALINA PROPERTY.   The new building will accommodate well over 1,000 seats and parking for hundreds of vehicles at each service.  In addition, the building will have adequate classrooms and the space needed to accomplish our mission.  We have immediate neighbors at the new site who have written their support and approval of welcoming us into the new building.  Moreover, I spoke with businesses next to the CATALINA PROPERTY and informed them that they are welcome to use the CHURCH parking lot (188 spaces) during business hours because, as a church, the parking lot is used on Sundays and after hours.  The businesses were very appreciative of our offer and agreed to allow the CHURCH to use their parking spaces, approximately 300, on Sundays.

46. In sum, the move to our new building, which is already built, would enable us to practice our religious beliefs and accomplish the mission we have been called to do.

47. Although Faith Fellowship is paying a $33,809.88 per month mortgage ($1,100) per day, a return of that money is utterly inadequate to remedy the loss of opportunity to freely exercise religion due to having to turn away dozens of people week after week. From our perspective the loss of a soul is such a profound spiritual event that no remuneration could possibly be adequate. This is not about inconvenience -- this is about irretrievable loss. As such, we disparately need the Court to provide us injunctive relief.

I declare, under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct and is of my own personal knowledge, and indicate such below by my signature executed on this 12th day of July, 2007, in the County of Alameda, City of San Leandro.

                                                              /S/ Gary Mortara_____
                                                             Gary Mortara, Declarant

**Attorney Attestation re Signature**

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/S/) within this efiled document.

    /S/ Kevin Snider
Kevin T. Snider
Mathew B. McReynolds
Peter D. MacDonald
Attorneys for Plaintiff and
Real Party in Interest

DECLARATION OF GARY MORTARA

-19-