# Exhibit A

# Administrative Record

# §g(3)

*Excerpt of December 7, 2006 Board of Zoning Adjustments Meeting*  *Page 1 of 5*

> **Item 6: Public Hearing**
> (b)    Matter of consideration of amendments to the Zoning Code, including: Article 3 – Definitions, deleting the Clubs and Lodges and Religious Assembly definitions and providing a new Assembly Use definition; and adding new Article 13.1 Assembly Use Overlay District.

**Planning Manager Pollart** stated that staff had received an application from Faith Fellowship Church to amend the zoning code to conditionally permit assembly uses in the IL Industrial Limited District. The church was in contract to purchase a site in an Industrial Professional District, but desired to change it to IL, based upon discussions with staff concerning the best way to proceed with the application. Currently, assembly uses were indicated as Clubs and Lodges and Religious Assembly. At the work session, two options were presented:

- Option 1: Allow assembly uses as conditionally permitted in IL Zones, effective citywide.

- Option 2: Apply assembly use overlay to identified areas.

Option 2 was identified as the desired option at the joint work session. Several General Plan policies were used as a base for the amendments. The criteria were:

- Not located along commercial corridors to preserve the commercial characters
- Properties not identified as IG Industrial General or IP Industrial Professional
- Industrial zones could be used if the site was near the periphery of the industrial uses to avoid breaking up the industrial bases
- Minimum two-acre sites to address large assembly uses
- Properties that abutted or were one-quarter mile from an arterial streets to avoid impacting residential neighborhoods
- Vacant or underutilized properties that might be available in the future

She passed a large map to the Board that showed the entire city with existing religious assembly uses, IL zoned properties (Option 1), 13 overlay areas, and the existing Faith Fellowship Church site and its new proposed site. She described each area. Clubs and Lodges and Religious Assembly Uses would be deleted and all would be under Assembly Uses, which would be conditionally permitted in R Districts.

Article 13 would allow establishing an Assembly Use Overlay District. Additional criteria were being considered that would address impacts that larger assembly uses might have on parking and transportation.

Article 17 would, essentially, be a cleanup that would delete Clubs and Lodges and replace with Assembly Use. The parking requirement would be modified to provide the ability to require more parking, if needed.

All of the identified areas on the map would be rezoned with the special Assembly Use Overlay, with the exceptions noted. If the Assembly Use Overlay were instituted, it would not change the underlying zoning of the individual parcels or the current use of a property. The overlay would

affect the ability of adult oriented businesses to locate in certain of the areas, which could not locate in any I District or be within 1,000 feet of religious assemblies or any other adult oriented business. An Initial Study and Negative Declaration would have to be performed, which required a 20-day public review period. The West San Leandro-MacArthur Redevelopment Advisory Committee was scheduled to hear this on December 20th. Planning Commission would review it after the Negative Declaration was prepared, tentatively scheduled for January 11th. It should be ready for review by the City Council sometime in late February.

**Member Eliason** asked if a religious organization could rent space within a shopping center or would the whole site be redeveloped.

**Planning Manager Pollart** replied that a religious organization would be allowed to rent a tenant space.

**Chair Raposo** asked if there would be any size limits within the Assembly Use.

**Planning Manager Pollart** answered that he was correct. A possibility was to differentiate between small and large assembly use.

**Chair Raposo** expressed concern about mega church or mega theater assemblies. He would like staff to look into limiting the size of such establishments. He wondered how parking would be tailored to the size of the assembly, which he understood was the situation with the church that was previously mentioned.

**Planning Manager Pollart** stated that activities outside of the main assembly area but would affect the parking situation, would fall under the catch-all "or as required by the use permit." Additional parking could be required beyond the standard that was being proposed.

**Chair Raposo** opened the public hearing.

**Gary Mortara**, 577 Manor Boulevard, Pastor of the Faith Fellowship Church, stated that he was confused about how what had been discussed would affect the building his church wished to purchase on January 1st.

**Planning Manager Pollart** replied that the proposed amendments did not speak specifically to the property the speaker was in contract with. That site was zoned IP, rather than IL. This was a clean-up of the CZC.

**Pastor Mortara** asked what the church had to do to address the property on Catalina Street that they were concerned with.

**Planning Manager Pollart** suggested that he request that the site be included as one of the overlay areas.

**Pastor Mortara** asked if that was something he could do at this time. He had understood that was something that he had already requested.

**Planning Manager Pollart** told him that his application had opened up a lot of questions that staff had to consider from a city-wide standpoint, not only as it affected the property he wished to purchase. She offered to talk with him after the meeting.

**Chair Raposo** clarified that these zoning changes came about as a result of the speaker's application. However, his case was isolated and it would take special attention from staff. He asked **Planning Manager Pollart** to clarify what the speaker's next step could be.

**Planning Manager Pollart** stated that it would be appropriate to make his request to the Board, which would allow the future site of his church to be included in the overlay areas.

**Member Marr** stated that she knew the speaker had attended the joint work session and she asked when the speaker's original application was filed.

**Pastor Mortara** replied that the application was filed May 18th. He had originally contacted staff in March when they were first considering making an offer on the property.

**Member Marr** agreed that it would be appropriate for the applicant to make his request to the Board tonight. She recalled that he had mentioned that he had a deposit on the site, which he could lose by a certain date.

**Vice Chair Goldt** reiterated that this hearing tonight did not address the speaker's specific situation, so this was not the venue for his topic. She wondered how he could "still be out on a limb, somewhere."

**Planning Manager Pollart** stated that an application had been submitted regarding the site on Catalina for modifying the zoning code that would allow religious assembly use. The site was currently zoned IP. Originally, staff considered rezoning the IL site, then changing the zoning to allow the church to occupy the property. However, the application opened up the need to review all IL sites in the city. The Business Development Subcommittee were met with for direction to staff, the options were presented during the joint work session in October; and the amendments were created and brought forward.

**Member Marr** asked if staff had been communicating with Faith Fellowship all along.

**Planning Manager Pollart** responded that staff had stayed in communication with the applicant and his other representatives. They had been apprised of all the meetings and they had attended them.

**Vice Chair Goldt** asked if the applicant's purchase of a new site was entirely on hold until this was settled city-wide.

**Member Eliason** defended staff by reminding everyone that the applicant wanted to relocate where, currently, it was not allowed. Staff could have brought this application to the Planning Commission for denial, rather than working with this applicant to try to work with the Zoning Code to allow them to relocate in this location. Yes, the applicant was caught up, but he was asking for something that the Code did not allow at this time. The industrial base was very large and profitable and it should be protected. Much consideration should be taken before other uses

were allowed. She reminded the applicant that when his January 1st deadline arrived, he would not have surety, because the timeline was longer than that.

**Planning Manager Pollart** asked if the Board would want to consider that individual area to be included in the Overlay Area. It had not been included because it did not meet the criteria that had been developed for assessing assembly use. However, the Board could recommend that it be looked at as an overlay area, which could move on to the Planning Commission and the City Council.

**Vice Chair Goldt** asked if the Kaiser facility would be in that area and she wondered if the two facilities would impact each other.

**Planning Manager Pollart** stated that the Kaiser site would be at Marina and Merced. She displayed the map, which showed the two sites.

**Chair Raposo** asked if the city had been consulted about relocating in this location before agreeing to the purchase.

**Pastor Mortara** stated that he had met with staff about it in March. The growth of his church had started to cause problems in the neighborhood, so they had found a building that would fit their needs. It was away from residences and no one was there on Sunday mornings. His understanding was that the BZA would approve the rezoning and his application would move on to Planning Commission and City Council.

**Chair Raposo** asked if the Board wished to add the site to the overlay area.

**Vice Chair Goldt, Member Pearson and Chair Raposo** agreed that they did not have enough information to make that decision at this meeting.

**Member Marr** asked if this site could be added to the overlay district after the proposal had been heard by the Commission and Council.

**Planning Manager Pollart** replied that it could be added at the Planning Commission hearing. She would include it with the environmental analysis when this proposal was heard by the Planning Commission. She asked if the Board wanted to review the applicant's proposal. If so, the Board would have to hear it before it went to Planning Commission.

**Member Eliason** suggested that the applicant's proposal be added to the environmental review, which would allow it to be analyzed versus the criteria and analyzed for its environmental impacts. Then, it would be ready to be added for a decision by the Planning Commission or the City Council.

**Pastor Mortara** asked for clarification on how the above suggestion would affect his application.

**Member Eliason** explained that an environmental review would need to be performed on the environmental impacts of the locations that had been identified for the overlay. Traffic, air quality, biological and other impacts would be studied to identify how the assembly use could

impact the adjoining uses from being in that location. If his application was a part of that environmental review, an assessment of those environmental impacts would be available to the Commission and Council to allow them to add his proposal to the other proposed overlay districts and to make an informed opinion.

**Ed Bullok**, 25103 Vista Greens Court, Hayward, stated that he was a member of Faith Fellowship Church. He disagreed with staff that the proposed new site for the church did not fit the criteria for rezoning. He read the listed criteria (above, under Option 2) starting on page 2, which he believed were met by the proposed site.

**Planning Manager Pollart** stated that at the bottom of page 2, it stated that properties were not be designated IG or IP; this property was designated IP.

A discussion ensued concerning zoning, city overlays and the two options that had been presented at the joint work session in October, of which Option 2 had been chosen. It was recommended that the speaker meet with staff to clear up the confusion about the church's proposal and the city's wide ranging proposals.

> ### *Motion to Close the Public Hearing*
> ### *(Marr/Eliason; 5 Ayes, 0 Noes, 2 Absent-Chin, Sidari)*

**Member Eliason** believed in protecting the city's industrial areas and she expressed concerned about allowing incompatible land uses in those areas. However, she was more concerned with allowing churches to locate in vacant tenant spaces in the two marginal shopping centers. In her opinion, those spaces would slowly contribute to the further decline of the centers, because they were largely unused except on Sundays.

**Planning Manager Pollart** stated that all of the comments made would be forwarded to the Planning Commission.