# Exhibit A

# Administrative Record

# §j(3)

# SAN LEANDRO PLANNING COMMISSION
# CITY COUNCIL CHAMBERS
### 835 East 14th Street
### San Leandro, CA 94577

**MINUTES FOR AGENDA NO. 07-04**  **February 22, 2007**

**7:00 P.M. Regular Meeting**

---

## Item 1: Roll Call

**Present:**  Chair Perras, Vice-Chair Reed, Commissioners Collier, Dlugosh, Ponder, Wohltmann

**Excused:**  Commissioner Kleebauer

**Staff:**  Debbie Pollart, Planning Services Manager and Secretary to the Planning Commission; Sally Barros, Planner II; Hanson Hom, Community Development Director; Stephanie Stuart, Assistant City Attorney; Barbara Templeton, Recording Secretary.

---

## Item 2: Public Comments

None.

---

## Item 3: Minutes for the January 25, 2007 Work Session

---

***Motion to Approve the Minutes of the January 25, 2007***
***Work Session***
***(Collier / Reed; 6 Ayes; 0 Noes)***

---

## Item 4: Correspondence

**Secretary Pollart** indicated that she had placed correspondence relating to Matter of PLN2006-0075 on the Commissioners' chairs prior to the meeting.

## Item 5: Oral Communications

**Planner Barros** reported that there had been a telephone call requesting information about PLN2006-0075; the caller expressed neither endorsement of nor opposition to the proposal.

---

**Item 6:  Public Hearings**

---

**(a) Matter of PLN2006-00075; Rezone and Zoning Map Amendment to rezone one property that is zoned RD and four properties that are zoned IL to a commercial zoning district, CC Commercial Community, to be consistent with the properties' General Plan designation in the Land Use Element of Corridor Mixed Use. No physical changes to the properties are proposed as part of this entitlement. The properties are located between the west side of Washington Avenue and the east side of San Leandro Boulevard and are comprised of five separate parcels: 2385, 2395 and 2411 Washington Avenue; 2392 and "no address" Cherry Street; Assessor's Parcel Number 75-84-5, 75-84-6, 75-84-7, 75-84-8; and 75-84-19-04; Wallace and Karen Boswell (Applicant) and J. Montero, J. Silva and I. Heffernan; M. and H. Senna (Property Owners).**

**The proposed Rezone and Zoning Map Amendment underwent environmental analysis, for which an Initial Study Checklist and Negative Declaration were prepared. The public review period established for the Negative Declaration commenced on February 2, 2007, and concludes on February 22, 2007. All written comments on the Negative Declaration must be submitted to the City by 5:00 PM on February 22, 2007. Oral and written comments may also be received at the February 22 Planning Commission hearing.**

**Planner II Sally Barros** presented the facts surrounding the proposed rezoning of five Cherry Street and Washington Avenue properties to CC Community Commercial. The applicant and the property owners of two parcels located at the corner of Cherry Street and Hudson Lane approached the City to process a rezone consistent with the General Plan's Corridor Mixed Use designation. In analyzing this proposal, staff identified an opportunity to improve conformity with the General Plan in the area, and thus enlarged the scope of the proposed rezone to include three additional properties that are located in the vicinity that are also designated Corridor Mixed Use. Currently zoned either RD (Residential Duplex) or IL (Industrial Light}, the subject properties are located between Washington Avenue and San Leandro Boulevard and comprise five separate parcels:

- 2392 Cherry Street and "No address" Cherry Street is used for vehicle storage.
- 2385 Washington Avenue contains a single-family home.
- 2395 Washington Street contains a warehouse and wholesale distribution business.
- 2411 Washington Street is used for vehicle storage and an auto repair business.

The Corridor Mixed Use designation specifies a "mix of commercial and residential uses...along major transit-served arterials..." The CC (Commercial Community) zoning designation "provide sites for commercial centers...generally having a citywide market area." Staff determined that a rezone of the subject properties to CC afforded an opportunity to modify the zoning and bring it

into conformance with the existing General Plan designation for Corridor Mixed Use. The CC Zoning District was selected as the appropriate rezoning classification, as the majority of Washington Avenue to the north and south of the site is zoned CC. In addition, the General Plan Land Use compatibility table specifies that the CC District is a conditionally compatible designation for Corridor Mixed Use. The CC Zoning District allows uses ranging from office, retail commercial, and service commercial to residential. Specifically, a CC Zoning District is intended "to provide sites for commercial centers containing a wide variety of commercial establishments, including banking and financial establishments and businesses selling home furnishings, apparel, durable goods, and specialty items and generally having a citywide market area. Facilities, such as entertainment, eating-and-drinking establishments, hotels and motels are permitted, subject to certain limitations to avoid adverse effects on adjacent uses." Neither the rezone nor the Zoning Map amendment would affect the existing uses of the properties. Existing uses on developed lots would – or could – continue, because any uses that are conditionally permitted or not allowed under the new zoning district would be "grandfathered in" if no lapse in legal status occurs over a 180-day period. For example, in the case of vehicle storage at 2411 Washington Avenue, the use would no longer be conditionally permitted but it could remain as long as it maintains a valid business license. The applicant currently operates an auto repair business as a tenant at 2411 Washington Avenue, and desires to purchase two properties (2392 Cherry Street and "no address" Cherry Street) and relocate the business there. The auto repair use is not under consideration with this proposed rezone. If the rezone to CC is approved, a future proposal for auto repair would require a Conditional Use Permit and Site Plan Review, either by the Zoning Enforcement Official (ZEO) or the Board of Zoning Adjustments (BZA), depending on the scale of the project. Planner Barros further explained that the proposed rezone and Zoning Map amendment underwent environmental analysis, for which an Initial Study (IS) Checklist and Negative Declaration (ND) were prepared in keeping with the requirements of the California Environmental Quality Act (CEQA). No comments were made on the environmental document within the mandated IS/ND 20-day public review period (February 2-22), and as Planner Barros observed, the proposal does not include any actual physical project. Staff believes this proposal provides better consistency between the General Plan and the Zoning Map and will provide for the potential to develop these properties with commercial or residential uses that will harmonize with the neighborhood context of existing residential and commercial development along a transit-served corridor. Planner Barros explained that public outreach on the proposed rezoning consisted of public meetings with the Business & Housing Development Subcommittee as well as the Joint Redevelopment Advisory Committee. General support was expressed in both instances, she said, noting that there was interest in the fact that rezoning would enhance the properties' ability to have a greater variety of uses. In addition to those meetings, courtesy notices regarding the Planning Commission meeting went to property owners and businesses within the 300-foot radius of the entire aggregate of five sites, as well as being posted on the properties themselves and on utility poles in the area, and in a legal ad in the Daily Review. Although no one expressed objection to the rezone proposal per se, a few Cherry Street residents (two by telephone and one by mail) expressed concerns about eventual uses of the subject parcel(s), particularly auto-related uses. In summary, Planner Barros said that staff recommends that the Planning Commission review:

- The proposed rezone of the subject properties to CC Commercial Community
- The associated environmental documentation, and
- Related amendment of the Zoning Map

and forward a recommendation of approval for the amendments and adoption of the Negative Declaration to the City Council for consideration at a future meeting.

**Applicants Wallace and Karen Boswell** approached the lectern. Mr. Boswell said that he has operated an auto and truck repair business in San Leandro for 30 years, with the existing shop located at 2411 Washington Avenue. The Boswells want to move the business approximately 150 feet onto the two Cherry Street parcels, construct a new complex, including a sound wall, and meet any City requirements to improve the appearance of the property. As regards any potential impact on the neighbors, he said they try to run a very quiet business, and that BART makes more noise than the shop ever will. He test-drives vehicles on San Leandro Boulevard and Washington Avenue, he said, and not on Cherry Street. His shop tries to work with people in the community, and customers have been bringing their vehicles to him for many years. He has San Leandro customers who would provide any necessary letters or statements to describe his business and its operation.

**Chair Perras** invited questions from the Commissioners. There were none.

---

### *Motion to Close Public Hearing*
### *(Reed / Ponder; 6 Ayes, 0 Noes)*

---

**Chair Perras** then invited Commissioners to discuss the proposal. There was no discussion.

---

### *Motion to Forward PLN2006-00075 with Related Zoning Map*
### *Amendment and Negative Declaration*
### *to the City Council with a Recommendation for Approval*

### *(Reed / Dlugosh; 6 Ayes, 0 Noes)*
### *Motion passed*

---

---

**Item 6:  Public Hearings**

---

**(b) Matter of consideration of amendments to Article 3 – Definitions, Article 5 – Residential, Article 13 – Special Review Overlay District, and Article 17 – Off-Street Parking & Loading Regulations of the Zoning Code; and consideration of amendments to the Zoning Map. Amendments will include deleting definitions for "Clubs & Lodges' and 'Religious Assembly" and replacing them with "Assembly Uses," and making changes to Article 5 for consistency with the new definitions; creating a new Assembly Uses Overlay District; and modifying the parking standards for consistency with "Assembly Uses." The Zoning Map will be modified to include 197 properties with an Assembly Use (-AU) Overlay District, which would allow assembly uses to be conditionally permitted on these properties.**

**The proposed ordinance for the adoption of Zoning Code amendments related to Assembly Uses underwent environmental analysis, for which an Initial Study Checklist and Negative Declaration were prepared. The public review period established for the Negative Declaration commenced on February 1 and concludes on February 20. To date, no comments have been received.**

**Secretary Pollart** briefed the Planning Commission on this proposal, beginning by outlining its background. Last May Faith Fellowship Church (FFC) requested a Zoning Code amendment to conditionally permit Assembly Uses in IL (Industrial Limited) zones, and to rezone the site at 14600 Catalina (formerly occupied by MDL) from IP (Industrial Professional) to IL. The proposal before the Planning Commission does not address that request, but the request did trigger the review of Assembly Uses that in turn led to recommendations for the Commission's action. At this time, the Zoning Code contains no specific definition for "Assembly Uses," but rather includes separate definitions for and references to "Clubs and Lodges" and "Religious Assembly." The current Zoning Code conditionally permits:

- Religious Assembly use in R districts and
- Clubs and Lodges use in RO and RM districts.

FFC's current location at 577 Manor is zoned RS (PD), (Residential Single-Family, Planned Development Overlay District). The Planning Commission and the BZA discussed the matter during a joint work session on October 19. Based on policy and criteria set forth in the General Plan, staff presented two options for consideration to create additional opportunities for Assembly Uses, which are currently limited to residential districts. The two options: 1) Amend the Zoning Code to allow Assembly Uses as conditionally permitted in the IL zone; or 2) Apply an Assembly Use Overlay to identified areas. The direction given by the BZA and Planning Commission was for staff to move forward to develop a recommendation on Option 2. Following the joint work session, Planning Department staff went back to work on the overlay issue using several General Plan policies as a framework. They sought areas:

- Suitable for conversion to non-industrial uses (namely those located adjacent to existing housing, or in areas lacking the amenities to meet the needs of modern industry).
- Outside the "Industrial Sanctuary," which was created to protect major industrial areas from encroachment by potentially incompatible uses.
- Separated from sensitive uses (i.e., with adequate and safe separation between schools, residences and public facilities and areas where hazardous materials may be present).
- That build upon transportation features of West San Leandro.
- That would help ensure future land use development decisions that are in balance with the transportation system's capacity.

Staff also examined applicable Zoning Code policies, including physical development in accordance with the policies of the General Plan that:

- Preserve the character and quality of each of the distinct districts (residential, commercial, industrial).
- Promote the economic stability of existing land uses in the city.
- Protecting existing land uses from intrusion by inharmonious or harmful uses.

Within that general framework, staff developed several criteria for Assembly Use overlay sites. Appropriate sites would:

- Abut or lie within a quarter mile of arterial street (as identified in the Circulation Element of the General Plan) to ensure adequacy of street system.
- Contain at least two contiguous acres (not each individual property, but the aggregate), to accommodate large Assembly Uses.

They would *not* be located:

- Along major a commercial corridor (such as East 14th Street and the Auto Mall portion of Marina Boulevard – between San Leandro Boulevard and Merced Street).
- Within certain General Plan "focus areas," which for the most part are covered by the General Plan or long-range planning studies, special overlay districts or are in redevelopment areas with guidance for future development already in place (including downtown, Bayfair, Marina and South-of-Marina (SOMAR), or West San Leandro.
- In a regional-serving retail area, such as Greenhouse Marketplace, the "old" Target site at Hesperian and Lewelling, Bayfair, Westgate and other shopping areas.
- Within the Downtown Transportation-Oriented Development (TOD) study area, a half-mile circle radiating from Davis and East 14th Streets.
- On sites considered public land, zoned Public Service (PS), Open Space (OS), or Commercial Recreation (CR); owned by an Exempt Public Agency, or leased/owned by a public utility (these areas represent properties and uses that are unlikely to change.

Moving roughly north to south, the potential overlay areas meeting those criteria include a total of 197 properties encompassing a total of 211 acres:

- Along MacArthur Boulevard just north of the Evergreen site.
- The Park Street "Island," located between San Leandro Boulevard and Park Street, next to Siempre Verde Park and near a new industrial building.
- A section North of Marina and West of San Leandro Boulevard
- The area around where Washington Avenue and San Leandro Boulevard intersect

- Down Washington Avenue, in an area that begins near the Ghirardelli factory and proceeds south past the Floresta-Halcyon corner.
- In the area around Hesperian Boulevard and Springlake Drive
- A small shopping area in the Manor
- South of Lewelling Boulevard
- Near Windsor Square Shopping Center

The result of that effort is a proposal that includes text amendments to the Zoning Code and corresponding changes to the Zoning Map. Secretary Pollart explained that most of the changes are designed to establish the term "Assembly Use," essentially consolidating "Clubs and Lodges" and "Religious Assembly" into a single definition, and reflect that term wherever "Clubs and Lodges" and "Religious Assembly" appear currently. This would amend Article 3 (Definitions), Article 5 (Residential) and Article 17 (Off-Street Parking). Additionally, a new section in Article 13 (Special Review Overlay District) would create an overlay district for Assembly Use, outline the purpose of this overlay, and provide additional performance standards to be considered under future conditional use applications for an assembly use. Specifically, a Use Permit would be required for new assembly use or substantial expansion or alteration of an existing use. Review criteria and conditions of approval would be made in accord with Sections 5-2212 and 5-2214. Secretary Pollart emphasized that the proposed overlay would not change underlying zoning of any of the properties; it would merely add Assembly Use as conditionally permitted. It would thus affect neither existing uses nor existing tenants. However, it would affect the ability to locate adult-oriented businesses in the new overlay district in industrial zones, because no adult-oriented businesses may be established on properties with overlays. The Assembly Use Overlay proposal reflects input from several bodies, including:

- The City Council Business & Housing Development Subcommittee
- Joint BZA/PC Work Session
- Chamber of Commerce Government Affairs Committee
- West San Leandro/MacArthur Boulevard Redevelopment Area Advisory Committee saw no harm in the approach to the overlay district for assembly uses, but does not support assembly use as a conditionally permitted use in any area zoned industrial.
- Joint Redevelopment Area Advisory Committee concurred with the idea of creating an overlay district for assembly uses and made two additional recommendations. If a nonprofit assembly group relocates from a property, they want to see that property return to a taxable use once the property is vacated. Also, this group wanted the properties along Washington Avenue removed from the proposed overlay.

Courtesy notices went out for the December BZA meeting as well as tonight's Planning Commission meeting. Recipients included all 197 potentially affected property owners. Secretary Pollart reported that a couple of property owners called and inquired about the proposal, but no one expressed concerns about the overlay. As required by law (CEQA), staff prepared an Initial Study/Negative Declaration; no comments were received within the mandated 20-day public review period (February 1-20). In summary, Secretary Pollart indicated that staff is seeking a Planning Commission recommendation to forward to City Council to:

- Adopt the Negative Declaration
- Adopt of an ordinance amending the Zoning Code for Articles 3, 5, 13 and 17
- Rezone the areas identified with the Assembly Use Overlay
- Amend the Zoning Map accordingly.

**Chair Perras** opened the public hearing.

**Peter MacDonald**, 400 Main Street, Pleasanton, spoke on behalf of Faith Fellowship Church. He identified himself as a former urban planner and former city attorney who now practices land use law. He indicated that it is unusual for a church to contact him, because they rarely require the services of land-use attorneys. Mr. MacDonald said that he had met with parishioners, and is "shocked" by the process they've found themselves in. They have been involved in it for a year already, and it appears there is another year to go. Mr. MacDonald suggested that there may be potential for better decisions if the City engages in parallel process rather than linear process for some of the necessary approvals. By way of background, he said that Pastor Gary Mortara has built a thriving congregation of 1,500 people that has outgrown their church site. The facilities, located in a residential area, have become inadequate and parking is insufficient, so they began looking for another location. In early 2006, they found an ideal building in an IP District in San Leandro. It is a 46,000-square-foot building with 188 parking spaces, all situated on 3.65 acres with good access via freeway and nearby roads. They talked to the neighbors, who indicated that they would welcome the church, in part because the church's busiest times are off-peak days and hours – Sundays and evenings – when businesses tend to be closed. Mr. MacDonald suggested that rational land use planning, which he called the purpose of the whole process, would consider this a real improvement in the neighborhood that is not only compatible but meets the needs of the user perfectly. He noted that Valley Business Park in Pleasanton at one time had four operating churches and never had a problem with them. He said it is a very functional land use for the way churches operate now, especially with larger congregations. He said that Pastor Mortara and his committee met with the City Manager and the city planners in March of 2006. After getting direction from staff, they filed a complete application for rezoning to light industrial (from industrial park), and to add assembly use as a conditional use in the IL zone. It is now nine months later. Mr. MacDonald said that the problem is with the process. He contends that the proposed assembly ordinance before the Planning Commission was created in a vacuum, and that it does not include the very parcel that started the whole process. He suggested that the City could and should address this ordinance together with the rezoning of the parcel that initiated the process. By doing it sequentially, he said, the church faces four different processes before they can occupy the church, including another CEQA evaluation, another rezoning, and an assembly overlay process, followed by the whole procedure of applying for a conditional use permit. He described this scenario as inefficient, as "process gone crazy." He suggested that the Planning Commission continue this item, have staff incorporate the Faith Fellowship parcel in the proposal, and come back to the Commission so the decision would not be made in a vacuum. If the site is vetted, neighbors are noticed, and criteria of the ordinance and the circumstances of the site all came together, it may be that the ordinance itself would improve because at this time it does not address the "real world" that it will face the first time out. It would streamline the process. Also, he pointed out that if it has been fully vetted, it would be possible under the assembly overlay ordinance to do an administrative conditional use permit, because all the neighbors would have been here. And the church would not have to go through process after process after process, while they are paying $35,000 a month and cannot occupy the property.

**Chair Perras** invited others from the audience to speak.

**Robert Battinich**, 2014 Evergreen Avenue, said that he has various properties throughout the City, about 13 acres, several commercial. Most business people are busy with their businesses, he noted, trying to make a living. As for the $35,000 a month that the church is paying, he said that was a choice they made when they purchased the property. Instead, they might have purchased the property on condition that it could be rezoned. He said his big question is whether

it is morally right and correct to circumvent other people's rights and other businesses' rights, doing industrial work in an industrial area. Why, he asked, should zoning laws change to accommodate the church's needs? While Mr. Battinich said that he has nothing against the church, he does oppose what he considers the church's use of force against business, because each member of the congregation represents a voice. He considers this unfair to the other organizations.

**Commissioner Wohltmann** asked whether Mr. Battinich was making a general philosophical point or if he was taking issue with the specific issue of Faith Fellowship Church.

**Mr. Battinich** said he is concerned that the church purchased the property without knowing whether they could use it. He said they could have made different choices.

**Jeff McGallian**, 13885 Tahiti Road, noted that the delays in the process created the problem, because everything seemed it would flow in a timely, expeditious manner. The church did not buy the property to force the issue; rather they understood that the system and procedures would take much less time. Mr. McGallian also noted that problems that Faith Fellowship is having in its current location, primarily in parking. He said the desire is to streamline the process so that the delay does not continue, because the church's relocation plan is a positive reinforcement to the City, and does not detract from the community and its efforts to bring cohesiveness among church, community, and residents. He said that the proposed site is a perfect area, and that the church is trying to work within the confines of the community to make this a conducive situation. Mr. McGallian urged the Commission to review this with a mind to streamlining the process.

**Commissioner Dlugosh** asked what the Commission is supposed to be making a decision about – the Faith Fellowship Church or the ordinance as presented.

**Secretary Pollart** explained that the only proposal before the Commission concerns the zoning text and map amendments for the AU overlay. Staff has advised Faith Fellowship, based on advice from the City Attorney's office, that zoning code amendments need to be accomplished first, going through the Planning Commission and the City Council. Then, assuming City Council approval, staff would revise the church's application, to be included in the overlay, and bring that back to the Planning Commission.

**Mr. McGallian** added that the whole idea was to streamline the process. They just wanted the procedure to go forward in a timely manner, and not delay as it did for the first nine months.

**Commissioner Collier** asked about the timeframe. If the Planning Commission approves the overlay proposal and sends it to City Council, when will it go to City Council and how long will it take them? Will it be months, a year?

**Secretary Pollart** said that the issue is tentatively on the City Council's March 19 agenda, which is the minimum normal time it takes an item to go from the Planning Commission to the City Council. She said that she advised the applicant that if City Council approves the amendments on March 19, the Planning Department will modify the church's application on March 20 and get it ready to take to the next available Planning Commission meeting, probably in April. Then it would go back to the City Council in May.

With no further speakers stepping up, **Chair Perras** asked for a motion to close the public hearing.

---

## *Motion to Close Public Hearing*

---

> **(Dlugosh / Collier; 6 Ayes, 0 Noes)**

**Chair Perras** then invited Commissioners to discuss the proposal. There was no further discussion.

> **Motion to Forward to the City Council with
> a Recommendation for Approval
> to Adopt Ordinance to Amend Zoning Code Articles 3, 5, 13 and 17,
> to Re-Zone Areas with Assembly Use Overlay
> to Amend Zoning Map accordingly
> and to Adopt Related Negative Declaration**
>
> **(Dlugosh / Collier; 6 Ayes, 0 Noes)**
> **Motion passed**

**Vice Chair Reed** complimented staff on the scene and behind the scenes for the tremendous amount of work they put into this proposal, and the excellent proposal put together.

**Chair Perras** added his compliments to the staff.

**(c)** **Matter of PLN2006-00101; consideration of modification to the Planned Development for Bayside Business Park to include outdoor storage as a conditionally permitted use; Site Plan Review for construction of a new 5,200-square-foot office building and a 13,200-square-foot mechanics building; and consideration of approval of outdoor storage related to a proposed construction rental business that would locate on Lots D & E at Bayside Business Park. The proposed outdoor storage would include empty storage containers (stacked two-high), temporary chain link fencing sections, portable toilets, and electrical power poles. Property is identified as Lots D and E of the Bayside Business Park industrial park subdivision, located at the corner of Business Center Drive and the unnamed cul-de-sac; Assessors Parcel Numbers 79A-591-6, 11; National Construction Rentals (Applicant); Bayside BC, LP (Property Owners).**

**This item is categorically exempt from the California Environmental Quality Act (CEQA) per CEQA Guidelines, Article 19, Section 15332, as an in-fill development project.**

**Secretary Pollart** said that this item includes three discretionary actions for the Planning Commission. One is to modify the Planned Development to conditionally permit outdoor storage uses within Bayside Business Park. At this time, no outdoor storage is allowed, even as a conditionally permitted use. Secondly, the Commission is asked to consider approval of outdoor storage use associated with National Construction Rentals (which would include outdoor storage of

power poles, chain-link fencing, portable toilets, and metal containers stacked two high); and lastly, Site Plan Review for construction of two new structures on merged Lots D and E at 1300 Business Center Place and 1330 Business Center Place (a 5,200-square-foot office building and 13,200-square-foot mechanics building). This is the east side of Business Center Drive. Surrounding uses include furniture wholesaling and equipment manufacturing in Buildings A, B, and C toward the north, FedEx Ground to the south, as well as vacant Lots F and G. To the west is the Davis Street Transfer Station (zoned IG Industrial General), and to the east are a variety of industrial/manufacturing uses (zoned IG Industrial General). The City's Water Pollution Control Plant is also nearby, located to the north (zoned PS Public Service). When the subdivision was originally approved in late 2002, Buildings A, B, and C were built on speculation and now are occupied:

- Former Building A was purchased and received a conditional use permit in late 2004 for Silkroute, a wholesale furniture operation, whose core business is warehousing and delivery of home improvement goods to retailers and designers throughout the United States.
- NorCal Rigging, which assembles and installs large pieces of equipment, purchased and occupied Building B in mid-2005. No discretionary permits were required for this use.
- Last year, Building C was purchased and occupied by Calligaris USA, a furniture design and manufacturing business based in Northern Italy, to house a wholesale furniture warehousing and distribution operation. The warehousing operation required approval of a use permit.

The applicant is proposing to purchase Lots D and E, and merge them together for a new regional/division headquarters. The project site encompasses 4.69 acres total and is located immediately south of the existing Buildings A and C. The applicant is proposing to put its office building up near the western edge of the site and the mechanics building in the center. The original Planned Development was for an eco-industrial park that envisioned a cluster of value-added manufacturing companies ideally using recycled materials and resources from the adjacent Davis Street Transfer Station and/or gray water from the City's Water Pollution Control Plant to create products. Although a number of potential users showed interest, and Stopwaste.org offered financial incentives for businesses to go in, none ultimately materialized. Although the structures built on speculation have been sold (the last of them just in 2006), no appropriate buyers for the four interior parcels have emerged. Staff believes that with inclusion of outdoor storage as a conditionally permitted use in this development, adequate discretionary control and review would remain such that there will be no overall adverse effects on aesthetics and compatibility. Future applications for outdoor storage would go before the BZA. The outdoor storage use specific to National Construction Rentals would be located along the northern and eastern boundaries. Their site plan identifies three separate areas for temporary storage of construction rental items. Approximately 7,500 square feet each along the northern property line would house temporary power poles, portable fencing, and portable restrooms. The equipment would be stacked no higher than eight feet. An additional area of approximately 4,100 square feet on the eastern property line would be reserved for storing up to 60 containers; double-stacked, their height would not exceed 16 feet. Overnight parking for up to 17 of the company's own delivery trucks is sited along the eastern and southern boundaries. There is a 56-space parking area in front for employees and clients. Hours of operation are typically 6 a.m. until 10:30 p.m., over two shifts with a total of up to 90 employees. The first shift starts at 6 a.m., and the second starts at 2:30 p.m. Pumper trucks would service portable toilets at the construction sites during the day, then return to the mechanics building for dumping, cleaning, sanitizing and deodorizing. Proposed amenities include:

- Generous landscaping in front of the wall along the frontage as well as in front of the office building and on the cul-de-sac
- Decorative rolling iron gates for access to the yard area
- An eight-foot tall white-colored wall around the northern, eastern, and southern borders.

**Secretary Pollart** explained that staff realizes that the new buildings will differ somewhat from Buildings A, B, and C, which are 30-foot concrete tilt-ups, in contrast to the proposed office building, which rises to about 16 feet, and the mechanics building to about 17 feet. However, she added that staff is working with the applicant to make the structures as compatible with the neighboring buildings as possible. Efforts are underway, for instance, to bring the office building in particular closer in appearance to existing buildings in terms of paint and emulation of some architectural features, including windows, awnings and entryways. She noted that this project is exempt from CEQA.

**Michael Adams** of Mission Hills, California, represented the applicant, National Construction Rentals. He said that his company may be better known as National Rent-A-Fence, renting temporary fences on construction sites. Currently based out of Hayward, on a 1.5-acre facility plus office space in an industrial complex, it has outgrown its current site and would prefer the parts of its operation not be separate from one another. After looking for quite some time, they were unable to find suitable land and buildings for their vision. They built a flagship operation in Montebello that they want to duplicate to some degree here, which forms the basis for the plan for the Bayside Business Center property. In business for more than 40 years and the Northern California market for 30-plus years, National Construction Rentals services virtually every major metropolitan area in the U.S. Mr. Adams said the company is looking for opportunities to grow its business in this area, and bring additional jobs into San Leandro.

**Matt Matthes**, the company's planning consultant, talked about the plans and the zoning. Affiliated with Sacramento-based Carter & Burgess, he presented drawings designed to show attempts to color-coordinate the proposed buildings with Buildings A, B, and C in Bayside Business Park and give an idea of the landscape coverage plans. As regards siting outdoor storage in the industrial zone, he addressed the issue of view impacts on two fronts. First, no nearby buildings have windows with a view of the property, so people will not see into the property from those buildings. Secondly, the eight-foot wall around the yard would limit any pedestrian's seeing items stored in the yard. Mr. Matthes also indicated that the plans meet City criteria and codes, and is generally consistent with what the zoning classification seeks – employment with good wages – and a good specific fit for this piece of property, given what has already been developed in the area.

**Commissioner Collier** inquired about what would happen if the back area, with double-deck containers, got full? She is concerned that they might be stacked four or five high, and be visible from a long distance.

**Mr. Adams** replied that the goal is to rent the containers out; because they don't make any money when they stay in the yard, most of the time they are out in the field. Also, the company has other facilities in Northern California with which to exchange equipment and resources, so he does not see that the San Leandro property will become a storage facility.

**Secretary Pollart** added that the containers would be confined to the area and height previously indicated, and if they wanted to do anything differently, they would have to come back for a modification.

**Commissioner Collier** restated the idea that there would be one row of double-stacked containers on the eastern side, with no expansion without further approval.

**Vice Chair Reed** observed that San Leandro has become more and more sensitive to traffic issues, and in that context, he finds an attractive feature of the proposal that National Construction Rentals staggers shifts, which would have less impact on traffic rather than normal working hours. He asked about the company's plans regarding truck traffic, wanting to confirm that it is not in-and-out all day long.

**Mr. Adams** confirmed Vice Chair Reed's understanding. He said that typically all the trucks are scheduled out to do approximately 8 to 10 hours of work during the business day. They go out in the morning and return at the end of the day when the route is finished. While on the subject of traffic, he also noted that the company does 99% of its business with phone orders or in outside sales, so there is minimal customer traffic.

**Vice Chair Reed** expressed appreciation that National Construction Rentals' business model takes into account the traffic impact.

**Secretary Pollart** added that when the subdivision went in, it was assumed that Lots D and E would contain very large buildings. Environmental and traffic analysis reports at the time anticipated much heavier use, and so from the traffic engineering standpoint, this project generates much less traffic than originally planned.

**Mr. Adams,** referencing the traffic analysis, noted that some conditions pertain to payments by the subdivider to the city. With National Construction Rentals as the buyer, rather than the subdivider, he wanted to confirm that the conditions did not apply to the buyer.

**Secretary Pollart** advised that Mr. Adams check with the property owner on the exact terms, although she said that substantial payments and improvements have been made already.

**Mr. Adams** agreed that most of the conditions appear to have been completed, particularly those pertaining to Davis Street.

**Chair Perras** invited comments from the audience.

**Herb Decoito**, 650 Black Pine Drive, said that he has lived in San Leandro for the past 20 years, and has worked for National Construction Rentals for the past seven years. He saw the site being discussed for the first time five years ago, and has asked about it ever since. He thinks the proposal represents a good fit for his company as well as for the City of San Leandro.

**John McManus**, with Cushman and Wakefield at 1111 Broadway in Oakland, represents the seller. He does not know that it is necessary given the detail of the presentation and the photos shown, but wanted to add context and background. He said that Ms. Pollart and Hanson Hom for the past three or four years a lot of ideas have come forth, but none was appealing enough to get this far. As you comes down Davis Street, he says, you see scrap metal yards and auto yards. He says that the National Construction Rentals proposal will raise the bar for the aesthetics of that area. He considers it a tremendous upgrade for the neighborhood and the street.

With no further speakers stepping up, **Chair Perras** asked for a motion to close the public hearing.

> ### *Motion to Close Public Hearing*
> ### *(Ponder / Dlugosh; 6 Ayes, 0 Noes)*

---

> ### *Motion to Forward PLN2006-00101*
> ### *to Modify the Planned Development*
> ### *by Adding Outdoor Storage as a Conditionally Permitted Use,*
> ### *to Approve the Application for Outdoor Storage*
> ### *to Approve Site Plan Review for Two New Buildings*
>
> ### *(Collier / Reed; 6 Ayes, 0 Noes)*
> ### *Motion passed*

---

## Item 7:  Miscellaneous

**Secretary** Pollart remarked that as stated in the Staff Report, Government Code requires the Planning Commission to make a General Plan Conformity Finding – in other words, to determine conformance with the San Leandro General Plan – whenever the San Leandro Unified School District (SLUSD) purchases a property in the city. In addition, the Public Resources Code requires the school district to consult the Planning Commission prior to locating new school property.

**Secretary Pollart** first described the matter of APN 077E-1532-2-1, as a SLUSD proposal to acquire an approximate 5.2-acre vacant lot on Bancroft Avenue. This property is designated in the General Plan as "Public/Institutional" and is located in an RS (Residential Single-Family) zoning district. It contains Pacific Gas & Electric facilities. Adjacent to San Leandro High School, the site is needed to expand instructional space on the existing parking lot, to relieve overcrowding in the schools and to provide more adequate parking. The existing PG&E facilities would remain, with the parking lot configured to allow shared use of the property.

**Chair Perras** requested a motion.

---

> ### *Motion to Declare General Plan Conformance*
> ### *APN 077E-1532-2-1*
> ### *Bancroft Avenue*
> ### *by the San Leandro School District*
> ### *(Ponder / Collier; 6 Ayes, 0 Noes)*
> ### *Motion passed*

---

**Secretary Pollart** described the second General Plan Conformance Finding matter as concerning SLUSD acquisition of a 2.68-acre vacant lot at 13990 East 14th Street (APN 077E-1540-03), adjacent to Palma Plaza Shopping Center. It is designated as Corridor Mixed Use in the General Plan. At this time, Secretary Pollart explained, the school is considering using it for development of a Ninth Grade Academy, designed to relieve overcrowding at the high school and allow for expansion of instructional space.

**Commissioner Dlugosh** expressed concern about the potential effects on other developments on East 14th Street, and wondered if any fellow Commissioners shared his concerns. He acknowledged that the school needs space to grow, but it seems to him out of character with the vision for a commercial corridor in that area.

**Commissioner Ponder**, who has lived about a half-block away from the subject property for 10 years, believes the subject property is across the street from the proposed senior center. He said he thinks the school district's proposal would be a pretty good improvement for that area.

**Commissioner Collier**, also concerned about commercial development on East 14th Street, would in any case prefer to have the parcel in question renumbered so that it has a Bancroft Avenue address rather than an East 14th Street address. In other words, what is now the front of the property would be the back, and vice versa. Thus, it would not be so clearly on East 14th, and a barrier wall or sound wall, with landscaping on the East 14th side, would reinforce the disconnection between the educational and commercial uses. Commissioner Collier is aware of concerns about schoolchildren wandering off and hanging around businesses there, and that they have a bare lot to work with. She would encourage gently pushing SLUSD in this direction, reiterating a stance she took regarding this same property seven years ago when she served on the School Board. At that time, she added, SLUSD did not have the money to buy the property; if it had, school operations would have been on that property already.

**Commissioner Wohltmann** also expressed concern about the suitability of that location as a facility for ninth graders. He feels that the report provided doesn't include enough information on which to judge whether the proposal conforms to the General Plan in terms of safety issues for children of that age. He would like to know more about it.

**Secretary Pollart** clarified the Planning Commission's role in making a General Plan Conformity Finding. It is not to approve a project, especially in the case of a school district, which has considerable autonomy in terms of City regulations and does not require City approval. The school district's regulations emanate from the State. The City does have a good relationship with SLUSD, however, and they do contact staff regularly. For example, she recalled that the Planning Department was invited to comment on the plans when Jefferson School was still on the drawing boards. The General Plan Conformity Finding indicates that the intended public institutional use, whatever it may be, conforms to the General Plan designation. Comments and concerns do get passed on to both SLUSD and the City Council, but the Planning Commission is not in a role of necessarily approving a particular project.

**Commissioner Collier** said that her concerns are not so much with safety – because the State must address those – as with how the school is sited and where the student access is. After more than eight years on the school board, she said there are far more serious safety concerns that the State must deal with to guarantee student safety before a school can be sited anywhere.

**Commissioner Dlugosh** reiterated his earlier question: Is the SLUSD plan in conformance with the San Leandro General Plan for that area, given discussions over the past several years regarding the East 14th Street corridor?

**Secretary Pollart** confirmed the designation as Corridor Mixed Use. It is in the SA-1 District. When the South Area Strategy was undertaken, staff did not anticipate SLUSD's purchase of the site. When looking at conformity in school district terms, school use isn't like either a typical commercial or retail use. They generally go in wherever they can find property. Corridor Mixed Use, in and of itself, leaves it open for a mixture of uses.

**Commissioner Dlugosh** asked again, is it in conformance with what we are looking to do with that corridor?

**Community Development Director Hanson Hom** said it is an excellent question, and staff struggles with it. On one hand, he agreed that perhaps a school is not totally consistent with the urban design character we've been striving for in that area. On the other hand, the General Plan

also supports working with the school district to alleviate congestion problems and address capacity issues, recognizing that there are limitations on what they can do on existing sites. This site was approved for purchase in the voter-approved school bond.

**Commissioner Dlugosh** said that if that argument were applied to the Assembly Use issue, there would be no problems with Faith Fellowship Church, because they also have a dire need for a larger site, and have found a solution that does not conform to the General Plan. The school district's recognized dire need does not necessarily mean that it fits the General Plan and the overall direction in which the South Area Plan tries to steer that area. He concluded by saying that this City – perhaps like many other cities – does things because there's nothing else to do. There's been nothing there for years, but that doesn't mean we should go outside the effort we've been making for so long to improve that corridor. It is not a matter of design or appearance; he does not feel that the school use continues the direction the City has been trying to take, and if an exception is made here, why not for other uses? It's a leap of faith he finds it difficult to make.

**Secretary Pollart** said that she'd clarified with the City Attorney, asking what if the Commission decides this use is not in conformance. Inasmuch as this is a school district process, it does not preclude them from moving forward.

**Community Development Director Hom** added that if the City finds its planned use does not conform to the General Plan, the school district can override the General Plan.

**Assistant City Attorney Stephanie Stuart** confirmed that the school district can in effect "opt out" of the City's zoning and other planned entitlements.

**Community Development Director Hom**, having spent a number of years himself dealing with East 14th Street Strategy, agreed that the General Plan concerns expressed are valid ones. He noted, too, that the school district plans are subject to CEQA, so they will have to produce detailed plans and environmental documents and circulate them around for City comment regarding issues of safety, traffic, access, aesthetics and so on. The school district also has expressed a wish to address City concerns. While this may not totally offset Commissioner Dlugosh's concerns, the City does have some input.

**Commissioner Wohltmann** asked why, if the school district does not need the Planning Commission to find that its purchase conforms to the General Plan, why the matter is before the Commission at all.

**Secretary Pollart** said that it is just a matter of courtesy and to have something on the record that a proposed project is in conformance with the General Plan, but under State law, considering the type of entity the school district is, it can opt out of those regulations.

**Vice Chair Reed** acknowledged that Commissioner Dlugosh's comments struck a chord with him, having also spent considerable time on the East 14th Street Committee and the General Plan Committee. He said this is "a tough one" to appear to oppose the school board, but on the other hand, we all have given a lot of time and effort and thought to improving the General Plan and the East 14th Street corridor. He doesn't think it is such a bad idea to not favor the conformance finding, because it doesn't harm the school board at all but it may help make the community more aware of the efforts we keep trying to make to have a better San Leandro.

---

*Motion to Declare That the General Plan Conformance and Conformance
with the Implementation Policies of the South Area/East 14th Street
Development Strategy Are Lacking in
APN 077E-1540-03
13900 East 14th Street
by the San Leandro School District*

*(Reed / Dlugosh; 4 Ayes, 2 Noes – Collier, Ponder; Absent – Kleebauer)*

*Motion passed*

---

## Item 9:  Commissioners' Comments

**Vice Chair Reed** said that he recently became aware of a situation in Bay-O-Vista, which also came up at the latest City Council meeting, in which a 40-year resident now has a view impairment because a downhill neighbor, about 35 feet below, has built a six-foot fence at the top of a slope at the back of the yard. Vice Chair Reed suggests that such impairments may have escaped the City's planning efforts.

**Secretary Pollart** suggested that this topic be placed on the agenda of a future meeting.

**Community Development Director Hom** concurred, saying that perhaps the RS-VP (View Preservation) ordinance may require an amendment pertinent to the Bay-O-Vista area in particular, perhaps regulating fences that might obstruct views in those areas. With the item on the agenda at a future Planning Commission meeting, the Commissioners might pass a motion directing staff to develop options and perhaps a recommendation that could then go to City Council.

**Commissioner Collier**, who was also at the City Council meeting, inferred that it is not only fences that are an issue, and suggested that perhaps the entire view preservation ordinance needs to be examined for view obstructions, whether the obstruction is a tree or a fence or a permanent structure. She recalled that before RS-VP Zoning District was formed, Bay-O-Vista residents made numerous complaints of view obstructions by rows of tall poplars, junipers and so on that were fine when they were planted on lower properties, but 10 years later now obstruct views from bay-facing windows and yards.

**Commissioner Dlugosh** said that more discussion of this issue in a public forum is appropriate, and thus recommends putting it on the agenda for the next meeting, or as soon as staff can examine it. He asked whether any potential construction would be held in abeyance in the meantime.

**Secretary Pollart** said that no project would be held in abeyance.

**Commissioner Dlugosh** then suggested that the Planning Department address the issue sooner rather than later.

**Secretary Pollart** responded that it will appear on the next Planning Commission agenda. Although staff will not prepare a report for that, as Hom indicated, the Commission would make

and approve a motion to forward to the City Council to direct staff to analyze the issue, develop options, and make a recommendation.

**Community Development Director Hom** said that staff might very briefly outline the issue. He noted that the matter of fences is one thing, and fairly straightforward. Vegetation blockage is far more complicated, staff-intensive, and full of gray areas that could be extremely difficult for staff to administer. He said that while it is certainly something that can be explored, it would have to be done with the eyes pretty wide open to the potential problems.

**Vice Chair Reed** agreed that the issue can be very complicated, and noted that he was not trying to make a big program out of having brought the subject up. He is mostly concerned, at this time, about a flurry of fence-building that might obstruct views. He suggested starting with a small change in the ordinance to address that, and then perhaps later address the issue of vegetation.

**Chair Perras** invited further comments. There being none, he congratulated Secretary Pollart on being named San Leandro's Employee of the Quarter.

---

## Item 10:  Staff Updates/Project Status Report

**Secretary Pollart** said that there are no items for the March 8 meeting, so the Planning Commission may next meet possibly on March 22. The date is up in the air because it coincides with the Planners' Institute meeting, and it is uncertain at this point whether there will be a quorum.

**Community Development Director Hom** asked Commissioners to add to their calendars March 17, for the third and final Community Workshop on the Downtown Transit-Oriented Development (TOD) Strategy, the one-year effort to come up with a far-reaching, visionary policy statement on downtown development. He said there are several ambitious recommendations coming out of the Citizen Advisory Committee (CAC) effort. The meeting will be held from 9 a.m. until 1 p.m., and public notices will go out beforehand.

**Chair Perras** asked whether any additional retail is going in at Bayfair Center.

**Community Development Director Hom** said that March 3 is the date for the next Community Workshop on the Bayfair Downtown TOD effort, and he believes flyers on that meeting just went out. The meeting will be held in the Community Room on the second floor at Bayfair Center. Some general concepts of housing opportunities in the area will be on the agenda. As for additional retail, none is being processed at this time, but discussions are underway to put some quick-service restaurants, including possibly a Jamba Juice, in the area between Staples and Kohl's.

---

## Item 11:  Adjourn

---

### *Motion to Adjourn*
### *(Collier / Wohltmann; 6 Ayes, 0 Noes)*

---

**Chair Perras** adjourned the meeting at 9:00 p.m.

Respectfully Submitted,


Debbie Pollart, Secretary
Recording Secretary, Barbara Templeton