1  Jayne W, Williams, Esq. (SBN:63203)
   jwilliams@meyersnave.com
2  Deborah J. Fox, Esq. (SBN: 110929)
   dfox@meyersnave.com
3  Peter S. Hayes, Esq. (SBN: 184552)
   phayes@meyersnave.com
4  MEYERS, NAVE, RIBACK, SILVER & WILSON
   555 12th Street, Suite 1500
5  Oakland, California  94607
   Telephone: (510) 808-2000
6  Facsimile: (510) 444-1108

7  Attorneys for Defendants

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11 | INTERNATIONAL CHURCH OF THE          | Case No.  C 07-03605 PJH
   | FOURSQUARE GOSPEL                     |
12 |                                       |
   |                                       | **DEFENDANTS' APPENDIX OF FOREIGN**
13 |           Plaintiff,                  | **AUTHORITIES**
   |                                       |
14 | v.                                    | Date: September 5, 2007
   |                                       | Time:  9:00 a.m.
15 | CITY OF SAN LEANDRO, TONY SANTOS      | Crtrm: 3
   | (in his official capacity), SURLENE G.| Complaint Filed: 7/12/07
16 | GRANT (in her official capacity), DIANA M. | Hon. Phyllis J. Hamilton
   | SOUZA (in her official capacity), JOYCE R. |
17 | STAROSCIAK (in her official capacity), BILL |
18 | STEPHENS (in his official capacity), JIM |
   | PROLA (in his official capacity), JOHN |
19 | JERMANIS (in his official and individual |
20 | capacities), DEBBIE POLLART (in her official |
   | and individual capacities), DOES 1-50. |
21 |                                       |
22 |           Defendants.                 |

23

24

25

26

27

28

Attached hereto are copies of the following Non-Federal authorities cited in Defendant's

Opposition to Motion for Preliminary Injunction.

**Case Name**                                                                                          **Tab**

**California Cases**

*Lockard v. City of Los Angeles,*
   33 Cal.2d 435 (1949)....................................................................................... 1

*Neighborhood Action Group v. County of Calaveras,*
   156 Cal.App.3d 1176 (1984)............................................................................ 2

*O'Loane v. O'Rourke,*
   231 Cal.App.2d 774 (1965)............................................................................. 3

*Tandy v. City of Oakland,*
   208 Cal.App.2d 609 (1962)............................................................................. 4

**Other State Cases**

*Greater Bible Way Temple of Jackson v. City of Jackson,*
   478 Mich. 373, 733 N.W.2d 734 (Mich. 2007)................................................ 5

*Timberline Baptist Church v. Washington County,*
   211 Or.App. 437, 154 P.3d 759 (Or.App. 2007).............................................. 6

Dated: August 15, 2007                    Respectfully submitted,


MEYERS, NAVE, RIBACK, SILVER & WILSON


By_____
   Peter S. Hayes
   Attorneys for Defendants
   CITY OF SAN LEANDRO, TONY SANTOS,
   SURLENE G. GRANT, DIANA M. SOUZA, JOYCE R.
   STAROSCIAK, BILL STEPHENS, JIM PROLA, JOHN
   JERMANIS, DEBBIE POLLART

1003549

**Tab 1**

Westlaw.

202 P.2d 38                                                    Page 1
33 Cal.2d 453, 202 P.2d 38, 7 A.L.R.2d 990
(Cite as: 33 Cal.2d 453, 202 P.2d 38)

▷
Lockard v. City of Los Angeles
Cal.
CHARLES C. LOCKARD et al., Respondents,
v.
CITY OF LOS ANGELES, Appellant.
**L. A. No. 20383.**

Supreme Court of California
Feb. 1, 1949.

HEADNOTES

(**1**) Municipal Corporations § 144--Zoning
Ordinances--Validity.
A municipality may divide land into districts and
prescribe regulations governing the uses permitted
therein, and zoning ordinances, when reasonable in
object and not arbitrary in operation, constitute a
justifiable exercise of police power.
See 18 Cal.Jur. 858; 12 Cal.Jur. 10-Yr. Supp. 144;
58 Am.Jur. 947.
(**2**) Municipal Corporations § 145--Zoning
Ordinances--Legislative Discretion and Court
Review.
In enacting zoning ordinances the municipality
performs a legislative function, and every intendment
is in favor of the validity of such ordinances. It is
presumed that the enactment as a whole is justified
under the police power and adapted to promote the
public health, safety, morals and general welfare.

(**3**) Municipal Corporations § 145--Zoning
Ordinances--Legislative Discretion and Court
Review.
The decision of the zoning authorities as to matters of
opinion and policy will not be set aside or
disregarded by the courts unless the regulations have
no reasonable relation to the public welfare or unless
the physical facts show that there has been an
unreasonable, oppressive or unwarranted interference
with property rights in the exercise of the police
power.

(**4**) Municipal Corporations § 145--Zoning
Ordinances--Legislative Discretion and Court
Review.
The wisdom of zoning prohibitions and restrictions is

a matter for legislative determination, and even
though a court may not agree with that determination,
it will not substitute its judgment for that of the
zoning authorities if there is any reasonable
justification for their action.

(**5**) Constitutional Law § 78--Distribution of Powers
of Government--Judicial Interference.
The duty to uphold the legislative power is as much
the duty of appellate courts as it is of trial courts, and
under the doctrine of separation of powers neither the
trial nor appellate courts are authorized to " review"
legislative determinations. The only function of the
courts is to determine whether the exercise of
legislative power has exceeded constitutional
limitations.
See 5 Cal.Jur. 670; 11 Am.Jur. 888.
(**6**) Municipal Corporations § 160--Zoning
Ordinances--Remedies--Appeal-- Conclusiveness of
Findings.
The findings and conclusions of the trial court as to
the reasonableness of a zoning ordinance are not
binding on an appellate court if the record shows that
the question is debatable and that there may be a
difference of opinion on the subject.

(**7**) Municipal Corporations § 160--Zoning
Ordinances--Remedies--Appeal-- Conclusiveness of
Findings.
In a zoning case, findings of the trial court which
relate to matters of opinion and judgment, such as
that the property involved is " suitable only" for
certain purposes, are not controlling on appeal.

(**8**) Municipal Corporations § 145--Zoning
Ordinances--Legislative Discretion and Court
Review.
The action of a city planning commission and the city
council in refusing to extend the boundaries of a light
industrial zone to include a 12-block strip, and in
placing such strip in a zone permitting retail
businesses including processing and manufacturing
incidental to a retail store, could not be said to have
been unreasonable so as to warrant judicial
interference where the undisputed physical facts
showed that both the industrial and commercial zones
were small in comparison with the surrounding
residential areas, that the industrial zone was located
at the end of a long narrow strip zoned for light
commercial uses designed to serve the residential

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

202 P.2d 38

33 Cal.2d 453, 202 P.2d 38, 7 A.L.R.2d 990

(Cite as: 33 Cal.2d 453, 202 P.2d 38)

areas, and that the industrial area was bordered by a railroad which did not extend along the commercial zone but ran diagonally away from it.

**(9)** Municipal Corporations § 152--Zoning Ordinances--Reasonableness.

In a light commercial zone permitting retail businesses including processing and manufacturing incidental to a retail store, it is not unreasonable to make the line of demarcation depend on the size of the enterprises involved as measured by the number of employees.

**(10)** Municipal Corporations § 152(5)--Zoning Ordinances--Reasonableness-- Failure to Include All Property Similarly Situated.

Similar characteristics in adjacent and surrounding areas do not necessarily preclude the zoning authorities from placing adjoining territories in different zones or justify a court in substituting its judgment for the legislative decision, especially where the surrounding areas are different.

**(11)** Municipal Corporations § 152--Zoning Ordinances--Reasonableness-- Existence of Nonconforming Uses.

The existence of nonconforming uses does not necessarily invalidate a zoning ordinance, and no vested right to violate an ordinance may be acquired by continued violations.

**(12)** Municipal Corporations § 144--Zoning Ordinances--Validity--Right to Question.

Property owners who carry on prohibited businesses in defiance of the zoning regulations cannot take advantage of their own violations of the law.

**(13)** Municipal Corporations § 152--Zoning Ordinances--Reasonableness.

The fact that a commercial district has developed slowly is not determinative of the reasonableness of zoning restrictions, since one of the bases for such regulations is the guidance of future development for the protection of residential areas.

**(14)** Municipal Corporations § 152--Zoning Ordinances--Reasonableness.

Exercises of the police power are apt to have an adverse effect on property interests, and the fact that some hardship is experienced or that it may be more profitable to make other use of the property is not controlling in determining whether the zoning regulations are arbitrary or unreasonable.

**(15)** Municipal Corporations § 152--Zoning Ordinances--Reasonableness.

The mere fact that property in a light commercial zone could not be leased for commercial purposes but could be leased for industrial purposes, if true, would not show as a matter of law that the zoning ordinance was oppressive.

## SUMMARY

APPEAL from a judgment of the Superior Court of Los Angeles County. Thurmond Clarke, Judge. Reversed.

Action for a judgment declaring a zoning ordinance to be invalid as to plaintiffs' property. Judgment for plaintiffs reversed.

## COUNSEL

Ray L. Chesebro, City Attorney, Bourke Jones and Roger Arnebergh, Assistant City Attorneys, and Thos. H. Hearn, Deputy City Attorney, for Appellant. Albert H. Allen and Hyman Goldman for Respondents.

GIBSON, C. J.

This is an appeal by the city of Los Angeles from a judgment declaring certain provisions of a comprehensive zoning ordinance invalid and void insofar as it affects the use of a strip of property twelve blocks long within which plaintiffs' property is situated.

The zoning scheme of defendant city adopted in June, 1946, classifies the city into 16 types of districts as follows: Two agricultural districts; one suburban district; five residential districts, zoned R-1 through R-5 starting with the *456 most highly restricted one-family residential areas through various grades of multiple dwellings; four commercial districts, zoned C-1 through C-4, in which are permitted various types of commercial uses; one business district, zoned C-M; and three industrial and manufacturing districts, zoned M-1 through M-3, where light and heavy manufacturing is permitted.

In areas zoned C-2, in one of which plaintiffs' properties were placed, all uses are permitted which are allowed in the more restricted residential and C-1 zones. It is also permissible in C-2 areas to carry on retail businesses including processing and manufacturing clearly incidental to a retail store, provided there are no more than five persons engaged

33 Ca. 1 , 202 P.2d 38, 7 A.L.n.2d 990

(Cite is: 33 Cal.2d 453, 202 P.2d 38)

in processing or manufacturing, and service enterprises such as catering, cleaning, laundering, plumbing, upholstering, and the like, provided no more than five persons are engaged in that work. In an M-1 zone the ordinance permits all uses allowed in more restricted zones together with practically all types of light manufacturing, fabricating, and processing, including candy making, soap manufacturing, light sheet metal fabricating, auto assembling, painting and repairing, blacksmithing, battery manufacturing, casting of lightweight nonferrous metals, and the like. Under the zoning scheme two zones less restricted than a C-2 zone intervene between C-2 and M- 1: one permits the same uses as C-2, but allows taller buildings, and the other does not have the five-man limitation on fabrication incidental to retail business and allows the type of light manufacturing permitted in an M- 1 zone, provided not more than 10 per cent of the floor space is devoted to it.

This suit involves the zoning of property fronting on Jefferson Boulevard, a through street running in an easterly and westerly direction. Both sides of Jefferson were zoned for C-2 uses for a distance of several miles east of Vineyard Avenue. Plaintiffs' properties consist of various noncontiguous parcels located on Jefferson in the twelve blocks lying between Vineyard Avenue on the west and Crenshaw Boulevard on the east. This 12-block strip is approximately 125 feet deep on each side of Jefferson and is bordered by alleys. The property to the south of the strip was placed mainly in an R-1 zone, with some R-2 and R-3 uses permitted, and north of the strip about one-half of the property was zoned R-1, the remainder being R-2 and R-3.

West of Vineyard for about six blocks both sides of Jefferson were zoned M-1. This district was bordered on the south *457 by a railroad track running diagonally southeast so that the total area zoned M-1 on the south side of Jefferson includes a triangular section deeper than 125 feet. South of the M-1 zone the property is principally zoned R-4, and most of it is not available for development for private uses because it is publicly owned and occupied for school and playground purposes. To the north of the section of Jefferson zoned M-1, the property was zoned mainly for two-family and multiple dwellings (R-2, R-3, R-4, and R-5). The only ways across the railroad track are at Crenshaw on the east, at Farmdale Avenue two blocks east of Vineyard, and at La Brea Avenue four blocks west of Vineyard in the M-1

zone.

The trial court viewed the area, and the parties stipulated concerning the uses made of the properties and the efforts of plaintiffs to have the 12- block strip rezoned. The stipulation shows that prior to June 1, 1946, under the former zoning scheme, the 12-block strip in which plaintiffs' properties are located was in a zone denominated " C-3," which was apparently comparable to the present C-2 zone in the uses permitted. This controversy began in November, 1944, when 13 property owners in this strip were cited for violations of the former ordinance. In view of pending plans for comprehensive rezoning of the city, the prosecutions were held in abeyance until it was determined in which zone the strip would be placed under the new plan. Several hearings were held before the planning commission and the city council in which it was sought to have the strip placed in an M-1 zone, but ultimately it was placed in the present C-2 zone. Twenty owners or lessees of property within the strip then brought this action in July, 1946. It is not disputed that plaintiffs took all the necessary administrative steps to get the strip zoned M-1 and did not commence this action until their administrative remedies were exhausted. (See *Metcalf v. County of Los Angeles,* 24 Cal.2d 267 [148 P.2d 645].)

The 12-block strip was divided into approximately 60 lots on each side of the street with a total frontage of about 6,275 feet. Of the total frontage 2,725 feet or 52 lots were vacant, 1,835 feet or 36 lots were devoted to uses permitted in a C-2 zone, and 1,715 feet or 30 lots were being used for purposes permitted in an M-1, but not a C-2, zone. Nine other lots were being partially used for M-1 purposes. Of the frontage devoted to M-1 uses, however, 50 feet were lawfully used because of an established nonconforming use existing prior to the first zoning of the property, 455 feet were being used lawfully *458 under permitted variances, and many of the violations on the remaining 1,210 feet were commenced subsequent to 1943. The plaintiffs, 20 owners and lessees within the 12-block strip, were using their property in violation of the ordinance, and, although the precise date when such violations commenced does not appear, one started his business in 1940, another in 1944, three in 1945, two in 1946, and one in 1947. FN* Of the various parcels claimed to be used for purposes not permitted in a C-2 zone, at least 25 were not so used prior to 1940 and 20 not until 1944, and the testimony indicates that many

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

originally conformed to the ordinance but became nonconforming by reason of wartime expansion. A number of the violations were continuances of uses permitted under temporary variances of limited duration which were granted by the city during the war. It was stipulated that between September 23, 1946, and February 26, 1947, the date of the commencement of the trial, there were 19 instances of new uses along the 12-block strip, of which nine represented new construction. Of these new developments 15 were uses permissible in a C-2 zone, and four were uses not permissible there but proper in an M-1 zone.

> FN* A number of the claimed violations, including some by parties not plaintiffs, consisted of open storage outside of buildings, and it may be that such use was not a violation in view of *Greenfield v. Bd. of City Plan. Commrs.*, 6 Cal.App.2d 515 [45 P.2d 219] holding that under the prior ordinance contractors in " C" zone could maintain an open storage yard for usual machinery and equipment. (See, also, city attorney's opinion of May 19, 1947 [after trial], holding such use permissible in C-2 zone.)

There was testimony that property in the strip zoned C-2 has a value of $30 per front foot, that property in the immediately contiguous area zoned M-1 has a value of $150 to $200 per front foot, and that sales of 50-foot lots in the 12-block strip had taken place at $1,500 whereas similar lots in the M-1 zone sold for over $6,000. One property owner in the strip in question testified that he was unable to lease his property for a " commercial business" and another testified that when his property was for rent he had no inquiries for " commercial uses" but only from " light manufacturers."

The zoning administrator for defendant city testified that a special intensive study was made of the 12-block strip because of the efforts of the property owners to have it reclassified as an industrial zone, and that it was decided that the best use of the property was for commercial purposes. He further testified that in his opinion the proper classification *459 of the strip was C-2 because it constituted a " shoestring or ribbon area" running through a solidly developed residential section. He stated that to classify it as an industrial zone " undoubtedly would eventually result in blighting an extensive well

developed residential section," and that, although at the present time the property could not all be supported for retail stores, there were many businesses allowed in the C-2 zone which were of a servicing nature to which it could be devoted in addition to the permitted residential uses. In his opinion, there would be a need in the future for a good many types of servicing businesses which could be established and successfully supported. Such development would take place because a large residential area to the south named Baldwin Hills was rapidly being built up, and it would have to look to Jefferson for its service type businesses in view of the development along Crenshaw of the type of retail establishment which does not mix with the service enterprises. He also stated that a service type business frequently draws trade from a far greater distance than the ordinary retail store or shop, and that the lack of a way across the railroad track to the service businesses would not affect them because those enterprises are usually handled by telephone. He further testified that the surrounding residential area was a district " where people went in to establish their homes to be free from industrial noise."

Plaintiffs' experts testified that the strip could not be developed for C- 2 enterprises because access to the surrounding territory was limited by the railroad track and that all neighborhood trade went to the established commercial sections on Crenshaw and on Adams Boulevard approximately four blocks north of Jefferson. A former member of the planning commission testified that it was desirable that people live close to their places of work, and that development for industrial uses " would brighten the street for activity there, give better protection for the homes and unsightly lots that existed there so many years." He further testified that " areas are zoned for residences in order to provide for the comfort, safety, and health and welfare of the residential area embraced within the zones, and protect it from the intrusions and encroachments of any nature that would affect that." When asked if it was good zoning practice to permit commercial activities as the primary encroachment on a residential area and whether retail business was less detrimental than industrial to such an area, he replied, " Well, it is debatable ... *460 and it is only in the newer areas that it is possible to preserve all those ideals of zoning that you speak of, and not in the older areas."

There are numerous findings, some of which are in the nature of conclusions of law. The court found that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the owners of the property in the 12-block strip are unable to lease the land for commercial purposes and that the value of the land in the strip for a commercial use is $30 per front foot, whereas its value for light industry is between $150 and $200 per front foot. It was also found that the 12-block strip is similar and identical to the adjacent area zoned M-1 and is suitable only for light manufacturing and that the use of the strip for such purposes has increased to the point where it is now predominantly light industrial in nature. The court declared that the character and condition of the strip had so changed that it would be unfair and inequitable to refuse to permit the owners to use their property for light industries and that its use for M-1 purposes would not adversely affect, but would enhance, the health, morals, safety, and welfare of the people of the surrounding territory. It concluded that the city council had acted in an arbitrary and discriminatory manner in placing the strip in zone C-2 and that restriction to C-2 uses would amount to a confiscation of plaintiffs' property.

The trial court declared the ordinance invalid insofar as it restricted the property in the 12-block strip to C-2 uses, and the judgment restrained the city from interfering with the use of such properties for the limited light manufacturing purposes permitted in an M-1 zone.

(1) It is well settled that a municipality may divide land into districts and prescribe regulations governing the uses permitted therein, and that zoning ordinances, when reasonable in object and not arbitrary in operation, constitute a justifiable exercise of police power. (*Wilkins v. City of San Bernardino,* 29 Cal.2d 332, 337 [175 P.2d 542]; *Acker v. Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455]; see *Skalko v. City of Sunnyvale,* 14 Cal.2d 213, 215 [93 P.2d 93].) (2) In enacting zoning ordinances, the municipality performs a legislative function, and every intendment is in favor of the validity of such ordinances. (*Jardine v. City of Pasadena,* 199 Cal. 64, 72-73 [248 P. 225, 48 A.L.R. 509].) It is presumed that the enactment as a whole is justified under the police power and adapted to promote the public health, safety, morals, and general welfare. (See *Wilkins v. City of San Bernardino,* 29 Cal.2d 332, 338 [175 P.2d 542].) *461

(3) The courts will, of course, inquire as to whether the scheme of classification and districting is arbitrary or unreasonable, but the decision of the

zoning authorities as to matters of opinion and policy will not be set aside or disregarded by the courts unless the regulations have no reasonable relation to the public welfare or unless the physical facts show that there has been an unreasonable, oppressive, or unwarranted interference with property rights in the exercise of the police power. (See *Wilkins v. City of San Bernardino,* 29 Cal.2d 332, 338 [175 P.2d 542]; *Acker v. Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455]; *Reynolds v. Barrett,* 12 Cal.2d 244, 251 [83 P.2d 29]; *Jardine v. City of Pasadena,* 199 Cal. 64, 72-76 [248 P. 225, 48 A.L.R. 509]; *Zahn v. Board of Public Works,* 195 Cal. 497, 514 [234 P. 388].) (4) The wisdom of the prohibitions and restrictions is a matter for legislative determination, and even though a court may not agree with that determination, it will not substitute its judgment for that of the zoning authorities if there is any reasonable justification for their action. (*Sunny Slope Water Co. v. City of Pasadena,* 1 Cal.2d 87, 93-94 [33 P.2d 672]; *Wilkins v. City of San Bernardino,* 29 Cal.2d 332, 338, 339 [175 P.2d 542]; see *Reynolds v. Barrett,* 12 Cal.2d 244, 249 [83 P.2d 29]; *Acker v. Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455].) In passing upon the validity of legislation it has been said that " the rule is well settled that the legislative determination that the facts exist which make the law necessary, must not be set aside or disregarded by the courts, unless the legislative decision is clearly and palpably wrong and the error appears beyond reasonable doubt from facts or evidence which cannot be controverted, and of which the courts may properly take notice." (*In re Miller,* 162 Cal. 687, 696 [124 P. 427]; see, also, *Jardine v. City of Pasadena,* 199 Cal. 64, 72 [248 P. 225, 48 A.L.R. 509].)

(5) In considering the scope or nature of appellate review in a case of this type we must keep in mind the fact that the courts are examining the act of a coordinate branch of the government-the legislative-in a field in which it has paramount authority, and not reviewing the decision of a lower tribunal or of a fact-finding body. Courts have nothing to do with the wisdom of laws or regulations, and the legislative power must be upheld unless manifestly abused so as to infringe on constitutional guaranties. The duty to uphold the legislative power is as much the duty of appellate courts as it is of trial courts, and under the doctrine of separation of *462 powers neither the trial nor appellate courts are authorized to " review" legislative determinations. The only function of the courts is to determine whether the exercise of legislative power has exceeded constitutional

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

limitations. As applied to the case at hand, the function of this court is to determine whether the record shows a reasonable basis for the action of the zoning authorities, and, if the reasonableness of the ordinance is fairly debatable, the legislative determination will not be disturbed. (*Acker v. Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455]; *Sunny Slope Water Co. v. City of Pasadena,* 1 Cal.2d 87, 94 [33 P.2d 672]; *Feraut v. City of Sacramento,* 204 Cal. 687, 696 [269 P. 537]; *Jardine v. City of Pasadena,* 199 Cal. 64, 72 [248 P. 225, 48 A.L.R. 509]; *Zahn v. Board of Public Works,* 274 U.S. 325, 326 [47 S.Ct. 594, 71 L.Ed. 1074]; see *Reynolds v. Barrett,* 12 Cal.2d 244, 249 [83 P.2d 29].)

(6) The findings and conclusions of the trial court as to the reasonableness of a zoning ordinance are not binding on an appellate court if the record shows that the question is debatable and that there may be a difference of opinion on the subject. The appellate courts look beyond such determinations and consider in some detail the basic physical facts appearing in the record, such as the character of the property of the objecting parties, the nature of the surrounding territory, the use to which each has been put, recent trends of development, etc., to ascertain whether the reasonableness of the ordinance is fairly debatable. (See *Wilkins v. City of San Bernardino,* 29 Cal.2d 332, 338-339 [175 P.2d 542]; *Acker v. Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455]; *Hurst v. City of Burlingame,* 207 Cal. 134, 143 [277 P. 308]; *cf., Matter of Throop,* 169 Cal. 93, 97-99 [145 P. 1029].) (7) Similarly, findings which relate to matters of opinion and judgment, such as that property is " suitable only"   for certain purposes, are not controlling. (*Skalko v. City of Sunnyvale,* 14 Cal.2d 213, 216 [93 P.2d 93]; see *Jardine v. City of Pasadena,* 199 Cal. 64, 75 [248 P. 225, 48 A.L.R. 509].) As we have seen, matters of this type lie within the discretion of the zoning authorities, and their action will be upheld if the question is fairly debatable.

A case directly in point is *Ulmer Park Realty Co. v. City of New York,* 270 App.Div. 1044 [63 N.Y.S.2d 143] [aff'd 297 N.Y. 788, 77 N.E.2d 797]. Plaintiff sought a declaration that its land could not practically be developed for residential use, but only for industrial purposes, and the trial court found *463 that the land could not reasonably and profitably be used in conformity with the zoning law. Although the record showed that plaintiff's property was " pocketed"   by a highway and by industrial uses (see

57 N.Y.S.2d 713, 715), and plaintiff's expert witnesses testified that residential development would not be practicable financially, there was evidence that a hundred or more bungalows had been built on the property but had been destroyed by fire, and defendant's witnesses concluded that the property could be profitably put to residential use (see 77 N.E.2d 797, 798). The judgment was reversed by the appellate division, which stated that where " the suitability of plaintiff's property for residential use presents a debatable question, the court may not substitute its judgment for that of the local legislative body." (63 N.Y.S.2d at p. 144. See, also, *Kraft v. Village of Hastings-On-Hudson,* 258 App.Div. 1060 [17 N.Y.S.2d 630]; aff'd 285 N.Y. 639 [33 N.E.2d 558]; *Franklin v. Incorporated Village of Floral Park* (App.Div.), 53 N.Y.S.2d 537, aff'd 294 N.Y. 862 [62 N.E.2d 488]; *Edge v. City of Bellaire* (Tex.Civ.App.), 200 S.W.2d 224, 227; *City of University City v. Hoblitzelle* (Tex.Civ.App.), 150 S.W.2d 169, 171.)

(8) It appears from the record in the present case that there are undisputed physical facts which support the action of the planning commission and the city council in refusing to extend the boundaries of the M-1 zone. The maps introduced in evidence show clearly and graphically that both the industrial and commercial zones are small in comparison with the surrounding residential areas; that the industrial zone is located at one end of a long narrow strip zoned for light commercial uses designed to serve the residential areas; and that the present industrial area is bordered by a railroad which does not extend along the commercial zone but runs diagonally away from it. Also, most of the property south of the M-1 zone is publicly owned and occupied for school and playground purposes and is not available for private use, whereas all the property surrounding the C-2 strip is residential in character and fairly well developed. The legislative body was entitled to consider the fact that any extension of the industrial zone would not only tend to impose added burdens on the surrounding residential areas and create undesirable conditions such as noise, smoke, and heavier traffic, but might tend to displace the existing commercial uses and to force those uses, in turn, to encroach upon the residential areas. *464

The problem thus presented to the planning commission and city council was essentially that of determining where to draw the lines of demarcation. Plaintiffs here are not merely seeking to obtain reclassification of a number of scattered parcels, but

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rather are attempting to increase the M-1 area to encompass an entire additional 12-block district, including both their own properties and the properties of many persons not made parties to the action. Whether an industrial area should be so increased in size, and whether certain types of business uses may be permitted in sections immediately adjacent to residential areas, while manufacturing and industrial or other uses are prohibited, is primarily a matter of legislative concern and involves determinations not only of facts with respect to existing conditions in an area, but also of policy and opinion as to its future development. (See *Sunny Slope Water Co. v. City of Pasadena,* 1 Cal.2d 87, 93 [33 P.2d 672].) Accordingly, in the present case, whether the 12-block strip was suitable for commercial uses or only for light industrial purposes, whether its development would be unduly hampered by the regulations, and whether the welfare of the surrounding residential areas would be enhanced by those regulations were all questions addressed to the legislative authorities, and their decision cannot be disturbed if the matters are fairly debatable.

(9) It is asserted that the restriction in the C-2 zone to five employees engaged in manufacturing is an unfair discrimination between a successful business and one which is not successful. It is obvious, however, that the surrounding area will be much less affected by a small business than by a large one and that the number of persons employed in a manufacturing concern is indicative of the amount of the deleterious effects to be expected from such an enterprise. The placement of types of businesses within a city under a comprehensive zoning plan based on the number of employees is similar to the establishment of separate zones for single and multiple dwellings or the confinement of particular types of business to certain zones, and what is said with reference to properties situated on the boundaries of such zones is applicable here. " Somewhere the line of demarcation must be drawn, and it is primarily the province of the municipal body to which the zoning function is committed to draw that line of demarcation, and it is neither the province nor the duty of courts to interfere with the discretion with which such bodies are invested in the absence of a clear showing of an *465 abuse of that discretion." (*Miller v. Board of Public Works,* 195 Cal. 477, 495 [234 P. 381, 38 A.L.R. 1479]; *Brown v. City of Los Angeles,* 183 Cal. 783, 789 [192 P. 716].) Wherever the dividing line is drawn between small and large businesses, those on one side of the line in the nature of things are not

very different from those on the other, and we cannot say that it is unreasonable to make the line of demarcation depend upon the size of the enterprises involved as measured by the number of employees.

(10) For the same reason the finding of the trial court that the area on Jefferson zoned M-1 is similar and identical to the area zoned C-2 is not controlling on the issue of the reasonableness of enacting the ordinance. It is well established that similar characteristics in adjacent and surrounding areas do not necessarily preclude the zoning authorities from placing adjoining territories in different zones or justify a court in substituting its judgment for the legislative decision. (See *Reynolds v. Barrett,* 12 Cal.2d 244, 249 [83 P.2d 29]; *Feraut v. City of Sacramento,* 204 Cal. 687, 693 [269 P. 537]; *Ex parte Hadacheck,* 165 Cal. 416, 422 [132 P. 584, L.R.A. 1916B 1248]; *Brown v. City of Los Angeles,* 183 Cal. 783, 787 [192 P. 716].) Moreover, the two zones were not identical in that the record and the findings show that the surrounding areas are different. It is true that similar properties lie to the north of the two strips of property, although a more substantial portion of the land lying to the north of the C-2 strip was zoned solely for single family dwellings. The properties lying to the south, however, are decidedly different. The M-1 zone, being bordered by a railroad track, is more adaptable to industrial use, and almost all of the property immediately across the railroad track is devoted to public school and playground uses. On the other hand, the C-2 strip is not bordered by the railroad and, except for about three blocks (one zoned M-1 and two zoned C-2), all of the property to the south is residential in character. Most of it is zoned for single family dwellings, and a large portion of it is in use only for residential purposes.

(11) Reliance is also placed upon the finding that the 12-block strip is now predominantly light industrial in nature, and it is contended that there has been such a change in conditions within the strip that the placing of the properties within the C-2 zone is unreasonable. The existence of nonconforming uses, however, does not necessarily invalidate a zoning *466 ordinance, and no vested right to violate an ordinance may be acquired by continued violations. (*Wilkins v. City of San Bernardino,* 29 Cal.2d 332, 342, 344 [175 P.2d 542]; *Acker v. Baldwin,* 18 Cal.2d 341, 345-346 [115 P.2d 455].) (12) Moreover, it appears that the majority of the M-1 uses were carried on by plaintiffs in defiance of the zoning regulations, and they cannot take advantage of their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

202 P.2d 38                                                                                 Page 8

33 Cal.2d 453, 202 P.2d 38, 7 A.L.R.2d 990

**(Cite as: 33 Cal.2d 453, 202 P.2d 38)**

own violations of the law. Of the total violations, some were commenced under wartime emergency variances which had expired or would terminate in the near future; others were started in the expectation that the attempts to have the 12-block strip rezoned as M-1 would be successful; and most of them were not used in violation of the ordinance prior to 1944. In these circumstances there is nothing which could be said to render it unreasonable to place the strip in zone C-2.

(13) The only conflict in the evidence is to be found in the opinions of the witnesses as to future development of the property and as to the effect on surrounding territory of its use for various purposes. A commercial district of this type is necessarily limited as to expansion by the development of the surrounding area, and the fact that the district has developed slowly is not determinative of the reasonableness of the restrictions, since one of the bases for zoning regulations is the guidance of future development for the protection of residential areas. (See *Sunny Slope Water Co. v. City of Pasadena,* 1 Cal.2d 87, 93 [33 P.2d 672].) To be effective, zoning regulations must necessarily look to the future, and in determining what uses should be permitted in the 12-block strip, the legislative body was, of course, entitled to consider the effect of such uses on the surrounding areas, and to weigh the possibility of injury to those areas by reason of permitting various types of activity as against the desirability of allowing such uses. In view of the various factors involved and the testimony of the experts, it is clear that the propriety of restricting the 12-block strip to C-2 uses and its suitability for such uses were reasonably debatable, and it cannot be said that the regulations were unreasonable or arbitrary.

(14) Plaintiffs also rely on evidence to the effect that property values for commercial uses in the 12-block strip were much less than those for light industrial purposes, that the property in the 12-block strip had not developed commercially, and that property in the strip could not be leased for commercial purposes but could be leased for industrial uses, and assert that the ordinance is oppressive. Exercises *467 of the police power, however, are apt to have an adverse effect on property interests, and the fact that some hardship is experienced or that it may be more profitable to make other use of the property is not controlling in determining whether the regulations are arbitrary or unreasonable. (*Wilkins v. City of San Bernardino,* 29 Cal.2d 332, 338 [175 P.2d 542].) Before the

ordinance may be held invalid on the ground of hardship it must be shown that there was such an abuse of discretion on the part of the zoning authorities as would justify the court in concluding as a matter of law that the ordinance is unduly oppressive and not reasonably necessary to promote the general welfare of the people of the community. (See *Miller v. Board of Public Works,* 195 Cal. 477, 484, 488 [234 P. 381, 38 A.L.R. 1479].) (15) The circumstances presented here do not show as a matter of law that this ordinance was not reasonably related to the interests of the community or that there was an unwarranted interference with property rights in zoning the 12-block strip. Moreover, the finding to the effect that the property in the strip could not be leased for commercial purposes is somewhat inconsistent with the stipulation of the parties, which shows that during the six months prior to trial there were 19 instances of new uses started in this 12-block strip, including nine cases of new construction, and that 15 of these uses were permissible in a C-2 zone.

*People v. Hawley,* 207 Cal. 395 [279 P. 136], *Pacific Palisades Assn. v. Huntington Beach,* 196 Cal. 211 [237 P. 538, 40 A.L.R. 782], and *In re Smith,* 143 Cal. 368 [77 P. 180], relied on by plaintiffs, are not controlling. All three cases involve regulations prohibiting special and exceptional uses of property, namely rock excavation, oil drilling, and gas manufacturing. In *Feraut v. City of Sacramento,* the Pacific Palisades case was distinguished on the ground that such cases refer " to some special and exceptional use to which property may be put, and they have but little application to the powers of municipal authorities to enact a general zoning ordinance." In addition, the Hawley and Pacific Palisades cases related to regulations prohibiting the recovery of natural resources from the earth. Such a business must operate, if at all, where the resources are found. Considerations which justify an exercise of the police power that necessarily results in putting a business out of existence are different from those which justify regulations that do not prevent the operation *468 of the business but merely restrict its location. Moreover, the Smith and Palisades cases are based in part upon the fact that the ordinances in question were enacted under the guise of regulation and segregation but were in fact to insure monopolies to similar enterprise in unrestricted districts. (See *In re Ellis,* 11 Cal.2d 571, 575 [81 P.2d 911].)

As we have seen, the problem presented to the zoning authorities in the present case was essentially that of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

202 P.2d 38                                                                Page 9

33 Cal.2d 453, 202 P.2d 38, 7 A.L.R.2d 990

(Cite as: 33 Cal.2d 453, 202 P.2d 38)

determining where to draw the lines of demarcation between different zones. Various problems of wisdom and necessity are involved in such a determination, and, although there were a number of factors which, when considered together, might have justified an extension of the M-1 zone to embrace the 12-block area, there are undisputed physical facts in the record which support the action of the planning commission and the city council in placing the strip in a C-2 zone. It is, therefore, apparent that the reasonableness of the zoning ordinance was fairly debatable, and it cannot be held that the zoning authorities acted arbitrarily.

The judgment is reversed.

Edmonds, J., Traynor, J., and Spence, J., concurred.
CARTER, J.
I dissent.

This case presents the issue as to whether the findings of fact of a trial court on conflicting evidence may be ignored in determining on appeal whether a zoning ordinance is being unconstitutionally applied to plaintiffs' property. Concededly, whether or not the ordinance is so unreasonable or arbitrary as to be unconstitutional is a question of law, but the basic facts upon which the conclusion is based is one of fact for the appropriate tribunal. In the instant case, the majority opinion holds that this court will review and determine not only the law but also the facts. For illustration, it is said: " The appellate courts look beyond such determinations and consider in some detail the basic physical *facts* appearing in the record, such as the character of the property of the objecting parties, the nature of the surrounding territory, the use to which each has been put, recent trends of development, etc., to ascertain whether the reasonableness of the ordinance is fairly debatable. ... Similarly, findings which relate to *matters of opinion and judgment,* such as that property is 'suitable only' for certain purposes, *are not controlling."* (Emphasis added.) Since when have the appellate courts of *469 this state become trial tribunals? If expert evidence as to the effect of the ordinance on plaintiffs' property is admissible at all, its weight and credibility is exclusively for the trial court. It may not believe the experts on one side but believe those on the other. The cases-*Skalko v. City of Sunnyvale,* 14 Cal.2d 213 [93 P.2d 93], and *Jardine v. City of Pasadena,* 199 Cal. 64 [248 P. 225, 48 A.L.R. 509]-cited in the majority opinion, do not hold to the contrary. It is said in the Skalko case: " The question, therefore, is

whether under the facts shown by the appellant his rights are now being invaded by the existence and maintenance of the ordinance." The facts shown by the record are the findings of fact and we cannot go behind them if they are supported by any substantial evidence and we must review that evidence in the light most favorable to the prevailing party. In the Jardine case, the court held that certain evidence would not support the judgment because it was inherently incredible. Speaking generally and for illustration, it cannot be doubted that if the testimony showed that plaintiffs' property would be absolutely valueless if the zoning ordinance were applied to it and the court so found, the appellate court could not, without disregarding settled rules of law, reach any other conclusion than that the ordinance was unreasonable and arbitrary. The same would be true although there was also evidence to the contrary-that plaintiffs' property was fully usable and valuable for the purpose for which it was zoned if the ordinance was applied to it. For in such a case the trial court would have found the latter evidence not credible, false, or of no weight, in which event there would be nothing left but the first evidence. There would not even be an honest difference of opinion as to the effect the ordinance had on plaintiffs' property. Therefore, it could not be even reasonably debatable whether the legislative body had a basis for the ordinance. The United States Supreme Court considers the trial court as best suited to determine factual questions involved in constitutional law issues and will be guided by its findings. It will remand the case to the lower court to take evidence and make findings. (See *Chastleton Corp. v. Sinclair,* 264 U.S. 543 [44 S.Ct. 405, 68 L.Ed. 841]; *Hammond v. Schappi Bus Line,* 275 U.S. 164 [48 S.Ct. 66, 72 L.Ed. 218]; *Borden's Farm Products Co. v. Baldwin,* 293 U.S. 194 [55 S.Ct. 187, 79 L.Ed. 281]; *Polk Co. v. Glover,* 305 U.S. 5 [59 S.Ct. 15, 83 L.Ed. 6]; 49 Harv.L.Rev. 631; 38 Harv.L.Rev. 6; 21 Am. Bar Assn.J. 805.) *470

Turning to the findings in the instant case, it appears that " the uses of said land (where plaintiffs' land is located) for light industrial purposes has increased to the point where said use is now primarily and predominantly light industrial in nature.

" That although Jefferson Boulevard from Crenshaw Avenue to Vineyard Avenue has been zoned for commercial purposes for many years, little commercial usage has taken place on Jefferson Boulevard other than the usage for light industrial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

33 Cal.2d 453, 202 P.2d 38, 7 A.L.R.2d 990

**(Cite as: 33 Cal.2d 453, 202 P.2d 38)**

purposes. ... That the property on Jefferson Boulevard from Crenshaw Avenue to Vineyard Avenue for commercial purposes *has a present land valuation of $30.00 per front foot*; whereas, said land for light industrial purposes has a valuation of *$150.00 to $200.00 per front foot*. That a 50-foot lot for commercial purposes as permitted by the Ordinances, has a valuation of $1500.00 per lot; whereas said lot for industrial purposes has a valuation of at least $7500.00 per 50-foot lot; .... That while the land on Jefferson Boulevard from Crenshaw Avenue to Vineyard Avenue has been zoned for commercial purposes, said land has remained vacant and *has had little or no development for commercial purposes,* whereas, similar and identical land immediately to the west of Vineyard Avenue has developed solidly for industrial purposes and at present there are only a few lots from Vineyard Avenue to LaBrea Avenue that are vacant, whereas the property east of Vineyard Avenue and zoned for commercial purposes has remained largely vacant. That the property on the south side of Jefferson Boulevard between Vineyard Avenue and LaBrea Avenue, while almost wholly vacant until the zoning of said property for light industrial uses in 1944, is now solidly developed for light industrial purposes, and there are only 2 vacant lots on Jefferson Boulevard between Vineyard and LaBrea Avenue, whereas in a comparable section of land east of Vineyard Avenue, there are few buildings and 50% of said land is vacant; that the owners of said property *have not been able to lease said property for commercial purpose,* whereas the owners of the same property have been able to use and lease said properties for light industrial purposes, ... that the restriction of the use of plaintiffs' property for light industrial purposes will amount to a confiscation of plaintiffs' property, which is *unsuitable for other than light industrial purposes.*

" That the use of plaintiffs' property, or other property owners who own property on Jefferson Boulevard between *\*471 Crenshaw Avenue and Vineyard Avenue, for light industrial purposes, would not interfere with the uses of adjoining property to the north or south of Jefferson Boulevard, nor would it in any way hinder or destroy any vested property rights of other property owners, and that by plaintiffs' using their property for light industrial purposes the surrounding and adjoining property would not be adversely affected. ..." (Emphasis added.)

Those findings are fully supported by the evidence.

For example, Lockhard testified: " Q. Would your business (plumbing) be able to continue, or could you continue your business from the retail trade you receive from the neighborhood? A. No." An expert testified without objection: " Q. In your opinion, what is the best use that could be put to that property on Jefferson Boulevard, between Vineyard and Crenshaw? In your opinion, *could that property be profitably used for a C use?* A. I would say *it could not,* if I would be allowed to explain the answer. The property between Vineyard and Crenshaw could be used for some C uses, such as contractor's offices and things of that kind, but as a rule when a contractor gets a license for an office, which has always happened, he immediately has to have storage yard. It could be used for a filling station or two. It could be used for a few isolated uses but in general, *it could not be used for what we call general C (commercial) purposes.* One of the contributing factors of it is this, that the entire buying power of the neighborhood is shut off by public land, south of it by a railroad that has no crossing except at Farmdale. Another contributing factor is that Adams was an old street, and zoned for business; I think, therefore, if all the houses built in there which were originally merely single family residences were adjacent to Jefferson, take a few of them, there would not be enough purchasing power at all, because Adams Street originally had the original stores on it. Another contributing factor is that Crenshaw has been developed as a business street; take the corner of Crenshaw and south of that. North of that they are putting in a department store, the May Company, and other large stores on Crenshaw Boulevard south of this property. *The property does not have a chance, in my opinion, of becoming a C-2 Street.* It has no purchasing power. Q. You have had occasion to observe Jefferson Boulevard. In your opinion what has been the trend of development on Jefferson Boulevard west of Crenshaw? A. Industrial uses." And again: " My summing up of this *\*472 property is this, as stated before, that Jefferson Boulevard is so situated in relation to Adams Street, and to already developed business on Crenshaw Boulevard, and to its being bound in by that railroad track, that, in my opinion, *it will never develop as a C-2 business,* except such uses as might be isolated cases which did not depend particularly upon that particular location for their income." Another expert (formerly director of the city department of planning) testified without objection: " Q. As the director of the Department of Planning, in your opinion, was Jefferson Boulevard properly zoned for a C-2 zone? A. Was Jefferson

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

202 P.2d 38

33 Cal.2d 453, 202 P.2d 38, 7 A.L.R.2d 990

(Cite as: 33 Cal.2d 453, 202 P.2d 38)

Page 11

Boulevard in this area for C? Q. Yes. A. I think not. ... Q. In your opinion, could Jefferson Boulevard develop for *any* other purpose than light industrial use? A. *I think not.* ... Q. What in your opinion would the effect be on the surrounding neighborhood, on the life of families and the welfare of the people in the surrounding neighborhood if Jefferson Boulevard from Crenshaw to Vineyard was zoned M-1? A. Well, there is a very little amount of frontage available there, and I think the uses that might be permitted under M-1 are quite restricted. It provides good employment for the district, and substantial homes, it would brighten the street for activity there, give better protection for the homes and unsightly lots that existed there so many years, it would have a very beneficial effect, particularly so in times of depression, that homes might be available close by. The type of home in that area is that predominantly of working class people, and they would find employment in the adjacent property. Q. You don't think it would be adverse? A. No, on the contrary, I think it would be very beneficial." (Emphasis added.)

The foregoing evidence fully sustains the finding of the trial court that to apply the ordinance to plaintiffs' property would render it practically worthless. That is the fact we must accept. Being such, how can it be said that the ordinance is not arbitrary and unreasonable as applied to it? To hold otherwise is tantamount to saying that the so-called legislative determination is conclusive and may not be reviewed by the courts regardless of the arbitrary and unreasonable character of such determination. If such is the law of this state, and the majority decision so indicates, the cases which hold that such determination is subject to review by the courts when it is attacked as arbitrary and unreasonable, should be overruled. (*In re Smith,* 143 Cal. 368 [77 P. 180]; *Pacific Palisades Assn. v. Huntington Beach,* 196 Cal. 211 [*473 237 P. 538, 40 A.L.R. 782]; *People v. Hawley,* 207 Cal. 395 [279 P. 136]; *Skalko v. City of Sunnyvale,* 14 Cal.2d 213 [93 P.2d 93]; *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322]; 12 Cal.Jur. 10-Yr. Supp. 164; 58 Am.Jur. 954.)

In essence, what the majority opinion holds is this: That the validity of such an ordinance depends upon whether four members of this court think it is reasonable as applied to plaintiffs' property, they being the judges of both fact and law. Such being the case, the function of the trial court is that of a mere referee to hear the evidence and make his recommendation which has no binding effect as a factual determination. This is indeed a new and unique legal philosophy of law without constitutional or statutory postulate.

In the case at bar the trial court after hearing the testimony of numerous witnesses, examining many maps, charts and diagrams, and the trial judge himself viewing the premises, made elaborate findings of fact to the effect that the application of the ordinance in question to plaintiffs' property would render it almost valueless. That court then concluded that the ordinance was unreasonable, and therefore, invalid and unenforceable as against plaintiffs' property. The case was then appealed to the District Court of Appeal, Second District, Division Two, and that court, in a well reasoned opinion prepared by Associate Justice McComb, and concurred in by all the members of that court, affirmed the judgment of the trial court. (85 A.C.A. 202 [192 P.2d 110].) Now, this court, by a bare majority, reverses the judgment, and, in effect, directs the entry of a judgment upholding the validity of the ordinance. In other words, four members of this court override the view of seven other judges, one of whom heard the witnesses testify and saw the property, and the other six are certainly in as favorable position to determine the reasonableness of the ordinance as the four justices who have joined in the majority opinion. When such a thing occurs, I am constrained to question the soundness of the oft-repeated adage that " Ours is a government of law-not men."

The basic concept in both the <u>Constitution of the United States (Amendments V and XIV)</u> and the Constitution of the State of California (sections 1 and 14 of article I) is that the ownership and occupancy of land are fundamental rights to be enjoyed by all citizens of the United States, and with the exception of the limited field in which the police power operates, these rights cannot be violated without compensation being paid to the owner. It is conceded that zoning of land *474 for particular uses comes within the purview of the police power. It must be likewise conceded that the exercise of this power must be reasonable, and that the determination of whether or not it is reasonable is for the court. Otherwise the rights guaranteed by the constitutional provisions above cited would not be protected. If a city council or a board of supervisors can adopt a zoning ordinance arbitrarily and unreasonably restricting the use to which real property may be put,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

33 Cal.2d 453, 202 P.2d 38, 7 A.L.R.2d 990

**(Cite as: 33 Cal.2d 453, 202 P.2d 38)**

and such an ordinance is not subject to review by the courts as to its reasonableness, then the value of all privately owned property is subject to the whim and caprice of these constantly changing political boards. One board of supervisors might zone all agricultural land in a certain area for farms of 10 acres each, or limit such farms to 10 cows or less, and the next board might see fit to increase or reduce the area and specify what can be raised on it. Likewise, the number of employees a farmer could hire would also be limited.

This would seem to follow in the face of the holding of the majority in the case at bar that property may be zoned for an industrial use which does not employ over five employees. There is obviously no limit to which the use of property may be restricted by zoning under the holding of the majority in this case, and the property owner is without relief so far as the courts are concerned.

I do not consider the holding in the majority decision the announcement of a rule of law, but that it simply amounts to a dogmatic declaration that in the zoning field the will of the legislative body is supreme. This never has been, and never should be, the law of this state.

SHENK, J., and SCHAUER, J.
We agree with Justice Carter that, upon the record before us, established law requires affirmance of the judgment.

Respondents' petition for a rehearing was denied February 28, 1949. Shenk, J., Carter, J., and Schauer, J., voted for a rehearing. **\*475**

Cal.
Lockard v. City of Los Angeles
33 Cal.2d 453, 202 P.2d 38, 7 A.L.R.2d 990

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Tab 2**

Westlaw.

156 Cal.App.3d 1176                                                                Page 1

156 Cal.App.3d 1176, 203 Cal.Rptr. 401

**(Cite as: 156 Cal.App.3d 1176)**

▷

Neighborhood Action Group for Fifth Dist. v.
Calaveras County (Teichert Const. Co.)
Cal.App.3.Dist.
   NEIGHBORHOOD ACTION GROUP FOR THE
   FIFTH DISTRICT et al., Plaintiffs and Appellants,
                           v.
COUNTY OF CALAVERAS et al., Defendants and
   Respondents; TEICHERT CONSTRUCTION
COMPANY, Real Party in Interest and Respondent.
               **Civ. No. 22468.**

         Court of Appeal, Third District, California.
                   Jun 8, 1984.

                     SUMMARY

The trial court sustained general demurrers to a
complaint filed by a neighborhood action group
seeking to invalidate a conditional use permit issued
to a construction company for the processing of
hydraulic mine tailings for production of sand and
gravel. The complaint alleged the permit was invalid
because the county general plan did not comply with
the statutory criteria. The complaint claimed the
noise element of the county general plan did not
comply with statutes; similar claims were made as to
the seismic safety and safety elements of the general
plan. (Superior Court of Calaveras County, No.
10796, Martin H. Ryan, Judge.[FN*])

The Court of Appeal reversed with directions. The
court held that the issuance of a conditional use
permit is ultra vires if the general plan of the issuing
entity does not conform to mandatory statutory
criteria which are relevant to the uses sought by the
permit. Although use permits are not explicitly made
subject to a general plan meeting the requirement of
state law, that condition is necessarily to be implied
from the hierarchical relationship of land use laws.
Thus, use permits are struck from the mold of the
zoning law, the zoning law must comply with the
adopted general plan, and the adopted general plan
must conform with state law; the validity of the
permit process derives from compliance with this
hierarchy of planning laws. The court also held that
these laws delimit the authority of the permit issuing
agency to act and establish the measure of a valid
permit. Accordingly, the trial court erred in
sustaining the construction company's demurrers
without leave to amend, since the action group's
pleading of causes of action premised on
noncompliance of the use permit with the county's
general plan was facially proof against the general
demurrers.

             FN* Assigned by the Chairperson of the
             Judicial Council.(Opinion by Blease, J., with
             Sims, J., concurring. Regan, Acting P. J.,
             concurred in the result.) *1177

                     HEADNOTES

       Classified to California Digest of Official Reports

(1) Zoning and Planning § 24--Conditional Uses;
Permits and Certificates-- Purpose.
The traditional purpose of the conditional use permit
is to enable a municipality to exercise some measure
of control over the extent of certain uses, such as
service stations, which, although desirable in limited
numbers, could have a detrimental effect on the
community in large numbers.
[See Cal.Jur.3d, Zoning and Other Land Controls, §
122 et seq.; Am.Jur.2d, Zoning and Planning, § 281
et seq.]
(2) Zoning and Planning § 24--Conditional Uses;
Permits   and   Certificates--   Compliance   With
Hierarchy of Land Use Planning Laws--Validity of
Permit Process.
Although conditional use permits are not explicitly
made subject to a general plan meeting the
requirements of state law, that condition is
necessarily to be implied from the hierarchical
relationship of the land use laws. That is, a use permit
is struck from the mold of the zoning law; the zoning
law must comply with the adopted general plan; and
the adopted general plan must conform with state
law. The validity of the permit process derives from
compliance with this hierarchy of planning laws.
These laws delimit the authority of the permit issuing
agency to act and establish the measure of a valid
permit. Since consistency with the general plan is
required, absence of a valid general plan, or valid
relevant elements or components thereof, precludes
enactment of zoning ordinances, and the like. There
is no agency discretion to promulgate a regulation
which is inconsistent with a government statute.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Cal.App.3d 1176, 203 Cal.Rptr. 401

**(Cite as: 156 Cal.App.3d 1176)**

**(3)** Zoning and Planning § 9--Content and Validity of Zoning Ordinances and Planning Enactments and Orders--Scope of Agency's Authority.

Zoning ordinances are regulations governed by the superior enactments in the hierarchy of planning laws. Thus, the validity of a conditional use permit, which is governed by the zoning regulations, depends on the general plan's conformity with statutory criteria. Where the adopted general plan lacks elements required by state law, relevant to the uses sought, the ordinance fails to provide criteria mandated by such law for the measurement of the propriety of the uses to be authorized by the permit. These criteria are essential to evaluation of the proposed uses and the conditions which should be imposed. Thus, the scope of authority of the agency to enact a general plan and zoning ordinances, and to apply them, is governed by the requirements of state law. A permit action taken without compliance with the hierarchy of land use laws is ultra vires as to any defect implicated by the uses sought by the permit.

**(4)** Zoning and Planning § 30--Conditional Uses, Permits and Certificates-- Judicial Review--By Affected Citizens.

Affected citizens may challenge a permit that has been issued in violation of the law. The granting of a conditional use permit is a quasi-judicial act. Such an act may be challenged if the respondent has not proceeded in the manner required by law. Ordinarily, administrative mandamus is the proper means for review of an adjudicatory decision which is alleged to be invalid because it is based upon an invalid regulation. However, if a statutory remedy is explicitly provided, the applicability of that remedy must be addressed.

**(5)** Zoning and Planning § 38--Enforcement of Laws and Regulations; Offenses and Penalties-- Enforcement by Private Persons.

The purpose of the remedy under Gov. Code, § 65860, subd. (b), which authorizes a resident or property owner to bring an action to enforce compliance with the provisions of the Government Code which mandate that a zoning ordinance must be consistent with the adopted general plan (Gov. Code, § 65860, subd. (a)), is to compel amendment of the zoning ordinance to comply with the adopted general plan and to provide ancillary remedies while that is being done. This remedy is not applicable in cases in which the ordinance is in conformity with the adopted general plan but the adopted plan is out of

conformity with state statutes. Nor is it applicable where the action does not seek amendment of the zoning ordinance, but rather challenges the validity of a conditional use permit.

**(6)** Zoning and Planning § 30--Conditional Uses; Permits and Certificates-- Judicial Review-- Challenged Defect in General Plan.

A defect in a general plan element which has no bearing on the criteria applicable to the conditional use permit cannot affect its validity. In that event, there is no issue of criterial sufficiency, that is, sufficiency of the standards by which issuance of the conditional use permit is to be governed and hence no issue of ultra vires in the issuance of the permit by the government agency. In order to tender an issue reaching the validity of the general plan, a complaint must allege facts showing the permitted use implicates a defective policy or standard in the general plan. Where it does, a challenge to the general plan may be raised in the administrative proceedings at which the conditional use permit is considered.

**(7)** Zoning and Planning § 30--Conditional Uses; Permits and Certificates-- Judicial Review-- Challenged Defects in General Plan--Noise Element-- Seismic Safety and Safety Elements.

In an action by a neighborhood action group to invalidate a conditional use permit issued to a construction company for the processing of hydraulic mine tailings to produce sand and gravel, the trial court erred in sustaining the construction company's demurrers without leave to amend. The action group's pleading of causes of action premised on noncompliance of the use permit with the county's general plan was facially proof against the general demurrers. The issuance of a conditional use permit is ultra vires if the general plan of the issuing entity does not conform to the mandatory statutory criteria which are relevant to the uses sought by the permit, and it was alleged the use permit implicated a defect in the noise element of the county's general plan, as well as seismic safety and safety elements. Also, there were no facts available via judicial notice so as to render the pleading inadequate.

COUNSEL

Berliner & Spiller, Clarence H. McProud and David M. Walters for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, Joel S. Moskowitz and Mark Urban, Deputy Attorneys

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Cal.App.3d 1176, 203 Cal.Rptr. 401

**(Cite as: 156 Cal.App.3d 1176)**

General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Jeffrey Tuttle, County Counsel, for Defendants and Respondents.

McDonough, Holland & Allen and William L. Owen for Real Party in Interest and Respondent.

BLEASE, J.

In this case we decide that the issuance of a conditional use permit is ultra vires if the general plan of the issuing entity (see Gov. Code, § 65300 et seq.) [FN1] does not conform to mandatory statutory criteria which are relevant to the uses sought by the permit. *1180

> FN1 All statutory references are to the Government Code, unless otherwise noted.

The controversy arises from the transportation of processed detritus from hydraulic gold mining, California's archetypical environmental dispute. Calaveras County granted Teichert Construction Company a conditional use permit to process hydraulic mine tailings for the production of sand and gravel. Plaintiffs seek to invalidate the permit.

The complaint alleges the permit is invalid because the county general plan does not comply with statutory criteria. General demurrers to this claim were sustained without leave to amend. The remaining claims, the adequacy of an environmental impact report (EIR) and the conformity of the use permit with the current general plan, proceeded to trial. The county and Teichert prevailed and judgment was entered. We will conclude it was error to sustain the demurrers and will reverse the judgment. [FN2]

> FN2 The appeal also raises contentions the EIR certification is improper for failure to discuss the cumulative impacts of a prior sand and gravel permit and for failure to display in writing a proper balancing of environmental concerns. We do not reach these questions. Our disposition of the contention it was error to sustain the demurrers necessitates remand to the trial court. The outcome of the conformity causes of action may obviate the need for appellate resolution of the other contentions of error. No useful purpose would be served by piecemeal review in this context.

Facts

The action we review, in administrative mandamus (Code Civ. Proc., § 1094.5), tenders an issue of pleading on demurrer, uninformed (with one exception) by the administrative record. [FN3]

> FN3 The administrative record was not incorporated in the complaint.

We accordingly accept as true the factual allegations of the complaint. (See, e.g. Glaire v. La Lanne-Paris Health Spa., Inc. (1974) 12 Cal.3d 915, 918 [117 Cal.Rptr. 541, 528 P.2d 357].) It alleges the conditional use permit authorizes Teichert to harvest and process sand and gravel from hydraulic mine tailings near the Calaveras River immediately to the south of the Town of Jenny Lind. The operation is a large one. It is estimated by Teichert that 40 to 80 large tractor-trailer vehicles loaded with sand and gravel will leave the site each day during the peak seasons. A rock crushing plant is to be constructed at the site to reduce the gravel to a useable size. The operation will produce substantial noise, dust and traffic hazards, among other adverse effects.

On October 16, 1980, the Calaveras County Planning Commission approved the conditional use permit and certified its associated final environmental impact report (see Pub. Resources Code, § 21000 et seq.) as complete. *1181 Appellant Madeline Hobson appealed to the county board of supervisors on behalf of herself and Neighborhood Action Group for the Fifth District (Neighborhood), an unincorporated association of taxpayers residing in the vicinity of the project site. Hobson is a taxpayer residing in Jenny Lind. We collectively refer to Neighborhood and Hobson as Neighborhood.

On April 13, 1981, the Neighborhood appeal was heard by the board of supervisors. Neighborhood objected to the permit on the grounds it ' could not legally be approved because the noise, seismic safety and safety elements [of the county's general plan] were inadequate and that the proposed project could not therefore be consistent with [it], that there were significant unmitigated adverse environmental impacts, including noise, dust, aesthetics, road hazards caused by the large trucks, and others, and that the EIR was incomplete due to a failure to discuss culmulative [sic] effects of noise, dust and safety as related to the adjacent George Reed sand and gravel plant, a failure to respond to the significant environment [sic] points raised in the

Page 4

consultation and review process, among others, off site noise, safety and esthetics.' Nonetheless, the board of supervisors certified the environmental impact report as complete and approved the use permit.

An issue of concern to Neighborhood is the truck route. The route for the sand and gravel trucks is Milton Road or Jenny Lind Road to Highway 26 and thence to Stockton. ' A substantial subdivision of residential lots has been approved along Jenny Lind Road and numerous homes have already been or are in the process of construction. Along Milton Road there are a number of homes already constructed and there are a number of subdivision lots which have been approved.' The route traverses ' narrow rural roads and will utilize several bridges with a road width of approximately nineteen and one-half (19 1/2) feet. School buses pass over these bridges a number of times each day during the school year.' Teichert's operation increases road hazards on the route of the sand and gravel trucks.

The complaint claims the noise element of the Calaveras County general plan does not comply with state statutes. It says: a lawful ' noise element would have provided [the county] with standards and an analytic framework by which [it] would have been enabled to make a superior decision [on the use permit] taking into account the severe noise impacts of the project ....' ' The combined safety and seismic safety element of the General Plan of the County of Calaveras contains no description of evacuation routes, peak load water supply requirements, minimum road widths, clearances around structures or any mention of mud slides or slope stability.' These shortcomings render the elements out of conformity with governing state statutes. *1182

The complaint was filed on May 13, 1981. It requested: the use permit be vacated; the county adopt a general plan in compliance with statutory criteria; and the county abstain from future land use planning actions until such general plan compliance is achieved.

### Discussion

#### I

Neighborhood claims the county's approval of a conditional use permit is ultra vires because the county's general plan was not in compliance with

governing statutes. [FN4] Its premise is that a conditional use permit may not be granted unless the use is consistent with a lawful general plan. FN5 The county and Teichert insist a conditional use permit requires no such predicate for its issuance. Alternatively, they argue that any flaw in the general plan has been rendered moot because the California Office of Planning and Research, on August 14, 1981, extended the time for the county to amend its general plan to comply with the challenged statutory criteria. (See Gov. Code, § 65302.6.) We will conclude Neighborhood's legal premise has merit and post hoc absolution is unavailing.

> FN4 Neighborhood informs us in its appellate brief that the challenged general plan elements have been amended during the course of this litigation. We accept this statement as an abandonment of any quest for broader relief than invalidation of Teichert's permit.
>
> FN5 Neighborhood's explicit argument is narrower. Apparently it is resigned to the proposition that Hawkins v. County of Marin (1976) 54 Cal.App.3d 586 [126 Cal.Rptr. 754] (discussed at length, infra.) forecloses a general requirement of consistency between a conditional use permit and a lawful general plan. It argues for conformity as a requirement which is derivative of a condition imposed by the office of planning and research on extensions of time granted the county to remedy defects in the general plan. (See § 65302.6, discussed in fn. 12, post.) The condition requires that, during the extension period: ' All ... use permits may be approved only if the proposed action is consistent with: [¶] a. The policies of the existing General Plan ....' (Italics added.) As we find Hawkins not controlling, we have no occasion to address the arguments of the parties and amicus curiae on this point.

This case tenders two questions: first, does the county have authority to issue a conditional use permit if it has failed to adopt a general plan containing elements, required by state law, which are relevant to the uses authorized by the permit; second, if not, by what remedy may that authority be challenged?

#### A.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Planning and Zoning Law of California (see § 65000 et seq.) establishes the authority of most local government entities to regulate the use of land. (See § 65850; *1183 *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 518-519, fn. 18 [113 Cal.Rptr. 836, 522 P.2d 12].) It commands the county to adopt ' a comprehensive, long-term general plan for the physical development of the county ....' (§ 65300.) A general plan is ' a statement of development policies and shall include a diagram ... and text setting forth objectives, principles, standards, and plan proposals.' It must include designated elements. (§ 65302.) A seismic safety element and a noise element have been required since January 1, 1971, and a safety element since January 1, 1976. (See Stats. 1971, ch. 1803, p. 3900; Stats. 1975, ch. 1104, p. 2677.)

The general plan is atop the hierarchy of local government law regulating land use. It has been aptly analogized to ' a constitution for all future developments.' (See *O'Loane v. O'Rourke* (1965) 231 Cal.App.2d 774 [42 Cal.Rptr. 283].) The Legislature has endorsed this view in finding that ' decisions involving the future growth of the state, most of which are made and will continue to be made at the local level, should be guided by an effective planning process, including the local general plan, and should proceed within the framework of officially approved statewide goals and policies directed to land use, population growth and distribution, development, open space, resource preservation and utilization, air and water quality, and other related physical, social and economic development factors.' (§ 65030.1.)

Subordinate to the general plan are zoning laws, which regulate the geographic allocation and allowed uses of land. Zoning laws must conform to the adopted general plan. (§ 65860; *Resource Defense Fund v. County of Santa Cruz* (1982) 133 Cal.App.3d 800 [184 Cal.Rptr. 371].) These enactments provide the authority and the criteria for the regulation of land uses. (See §§ 65850, 65851 & 65860; Cal. Zoning Practice (Cont.Ed.Bar 1969) ch. 6.)

Zoning laws regulate land uses in two basic ways. Some uses are permitted as a matter of right if the uses conform to the zoning ordinance. Other sensitive land uses require discretionary administrative approval pursuant to criteria in the zoning ordinance. (§ 65901.) They require a conditional use permit.

(See Cal. Zoning Practice, *supra.*, § 7.55 et seq.) The reason for discretionary treatment is that these are uses which ' cannot be said to be always compatible in some zones while always incompatible in others .... uses that should not be allowed as of course, but could be allowed subject to conditions ....' (Gaylord, *Zoning: Variances, Exceptions and Conditional User Permits in California* (1958) 5 UCLA L.Rev. 179, 193.) (1)' [T]he traditional purpose of the conditional use permit is to enable a municipality to exercise some measure of control over the extent of certain *1184 uses, such as service stations, which, although desirable in limited numbers, could have a detrimental effect on the community in large numbers.' ( *Van Sicklen v. Browne* (1971) 15 Cal.App.3d 122, 126 [92 Cal.Rptr. 786].)

With this context in mind we consider the first question presented.

### B.

(2)Although use permits are not explicitly made subject to a general plan meeting the requirements of state law, that condition is necessarily to be implied from the hierarchical relationship of the land use laws. To view them in order: a use permit is struck from the mold of the zoning law (§ 65901); the zoning law must comply with the adopted general plan (§ 65860); the adopted general plan must conform with state law (§§ 65300, 65302). The validity of the permit process derives from compliance with this hierarchy of planning laws. These laws delimit the authority of the permit issuing agency to act and establish the measure of a valid permit. ' Since consistency with the general plan is required, absence of a valid general plan, or valid relevant elements or components thereof, precludes enactment of zoning ordinances, and the like.' ( *Resource Defense Fund v. County of Santa Cruz, supra.*, 133 Cal.App.3d at p. 806; see also *Save El Toro Assn. v. Days* (1977) 74 Cal.App.3d 64 [141 Cal.Rptr. 282]; *Guardians of Turlock's Integrity v. Turlock City Council* (1983) 149 Cal.App.3d 584, 592-593 [197 Cal.Rptr. 303].) This is a specific application of the general rule: ' [T]here is no agency discretion to promulgate a regulation which is inconsistent with the governing statute.' (See *Woods v. Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032].)

(3)Zoning ordinances are regulations governed by the superior enactments in the hierarchy of planning

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

laws. Thus, the validity of a conditional use permit, which is governed by the zoning regulations, depends (derivatively) on the general plan's conformity with statutory criteria. Where the adopted general plan lacks elements required by state law, relevant to the uses sought, the ordinance fails to provide criteria mandated by such law for the measurement of the propriety of the uses to be authorized by the permit. These criteria are essential to evaluation of the proposed uses and the conditions which should be imposed. Put another way, the scope of authority of the agency to enact a general plan and zoning ordinances and *to apply them* is governed by the requirements of state law. A permit action taken without compliance with the hierarchy of land use laws is ultra vires as to any defect implicated by the uses sought by the permit.

Our view is reinforced by section 65302.6. It provides for extension of the deadline for mandatory compliance of general plans with the requirements *1185 of section 65302. As a prerequisite to an extension, the local entity seeking an extension must propose ' policies and procedures which would ensure, during the extension ... that the land use proposed in an application for a ... *land use permit* ... will be consistent with the existing general plan elements, and on the basis of available information will be consistent with the new elements or plan proposals being considered or studied.' (§ 65302.6, subd. (c)(3).) The inference is plain that a conditional use permit must be consistent with a lawful general plan. If the general plan fails to provide required criteria relevant to the use sought by the permit, there is no valid measure by which the permit may be evaluated.

This reasoning is supported by *Friends of ' B ' Street v. City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514]. It correctly observes that an implicit statutory requirement that land use planning decisions comply with the general plan pervades the Planning and Zoning Law. ' The implied statutory requirement of consistency has no less effect than the express statutory subdivision map consistency requirement ....' ( *Id.*, at p. 998; also see DiMento, *Developing the Consistency Doctrine: The Contribution of The California Courts* (1980) 20 Santa Clara L.Rev. 285 (hereafter *Consistency*).)

The county and Teichert rely on *Hawkins, supra.*, to support their claim that conditional use permits need not be consistent with the county general plan. The

plaintiffs in *Hawkins* sought to invalidate a conditional use permit approved March 6, 1972, by means of a complaint filed two years after the permit was granted. They invoked a provision in section 65860 which provided then, as now, that zoning ordinances must be consistent with the adopted general plan commencing January 1, 1974. (See Stats. 1973, ch. 120, § 6, p. 184.) The use permit was approved (1972) prior to the effective date of the conformity requirement. (See Stats. 1971, ch. 1446, § 12, p. 2858.) However, in dicta, FN6 the court said that ' section 65860 is inapplicable to a review of the [conditional use] permit' since it contains ' no requirement ... that such permits themselves be reviewed for consistency with the [general] plan' ; it reasoned that ' [s]ince use permits issued pursuant *1186 to [the zoning ordinance] must necessarily conform to its requirements, it follows that *if* [the zoning ordinance] is kept consistent with the general plan, use permits issued thereunder will also be consistent therewith.' ( *Id.*, 54 Cal.App.3d at pp. 594-595, italics added.)

> FN6 As applicable to the facts in *Hawkins*, section 65907 imposed a 180-day statute of limitations upon a challenge to a conditional use permit. (See Stats. 1965, ch. 1341, § 5, p. 3228.) For reasons not immediately apparent, the court declined to apply section 65907 as a statute of repose. (It implied that to do so would be unfair because the statutory right to consistency (§ 65860) did not become effective until after the limitation period had elapsed.) ( *Id.*, 54 Cal.App.3d at pp. 593-594; but cf. *Youngblood v. Board of Supervisors* (1978) 22 Cal.3d 644, 653-657 [150 Cal.Rptr. 242, 586 P.2d 556], subdivision map consistency is measured by law in effect at the time of issuance of the tentative map.) Nonetheless, the court declined to apply section 65860 on the ground that, while it confers standing to challenge a zoning ordinance for lack of conformity, it does not explicitly require conformity of conditional use permits with the general plan.

The flaw in the argument is the conditional ' if.' *If* the general plan is not consistent with state law, the zoning ordinance may fail to provide criteria by which to measure the propriety of the uses sought by the permit. The *Hawkins* reasoning opens the door to defeat of the purpose of a general plan to provide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enforceable standards by which the administering agency must measure the propriety of the permits. (See DiMenito, *Consistency, supra.*, at pp. 295-298.) We will not join in its dictum. [FN7]

> FN7 We have no quarrel with the *Hawkins* result. But the facts here serve to distinguish it. At the time of approval of the conditional use permit in this case, the governing statute required that the zoning ordinance, which provides criteria for a conditional use permit, conform to the adopted general plan. (§ 65860.) The consistency claim was seasonably tendered in the administrative proceedings. (Compare *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 358-359 [176 Cal.Rptr. 620].) The action was timely filed within the time limitations of section 65907.

### C.

This brings us to the question of remedies: by what means may the validity of a conditional use permit be challenged as issued without the criteria of a valid general plan?

(4)We start with the general rule that affected citizens may challenge a permit that has been issued in violation of the law. The granting of a conditional use permit is a quasi-judicial act. (See *Essick v. City of Los Angeles* (1950) 34 Cal.2d 614, 623 [213 P.2d 492].) Such an act may be challenged if the respondent has not proceeded in the manner required by law. (See Code Civ. Proc., § 1094.5, subd. (b).) Ordinarily, administrative mandamus ' is the proper means for review of an adjudicatory decision ... which is alleged to be invalid because it is based upon an invalid regulation.' (See *Woods v. Superior Court, supra.*, 28 Cal.3d at pp. 674-675.) However, if a statutory remedy is explicitly provided, the applicability of that remedy must be addressed. We note that *Friends of ' B' Street* relies upon the absence of a statutory remedy as a predicate for its implied remedy. (106 Cal.App.3d at p. 999.)

The remedies applicable to the challenge of a zoning ordinance are, in part, specifically addressed by statute. The zoning ordinance is in the chain of authority by which the requirements of state planning law are transformed *1187 by quasi-legislative action into criteria for the issuance of conditional use permits. The legality of a zoning ordinance is thereby

impliedly called into question when a permit is challenged on the ground the general plan is not in conformity with state law. (5)Accordingly, our inquiry must encompass the statutory remedies which may apply to such an implied challenge to a zoning ordinance. That brings us to section 65860, subdivision (b). [FN8] It authorizes a resident or property owner to bring an action ' to enforce compliance' with the provisions of section 65860, subdivision (a), which mandates that the zoning ordinance ' shall be consistent with [the adopted]general plan.'

> FN8 Section 65860, subdivision (b) provides: ' (b) Any resident or property owner within a city or a county, as the case may be, may bring an action in the superior court to enforce compliance with the provisions of subdivision (a). Any such action or proceedings shall be governed by Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure. Any action or proceedings taken pursuant to the provisions of this subdivision shall be taken within 90 days of the enactment of any new zoning ordinance or the amendment of any existing zoning ordinance as to said amendment or amendments.'

The announced purpose of this remedy is to compel amendment of the zoning ordinance to comply with the adopted general plan and to provide ancillary remedies while that is being done. (See 58 Ops.Cal.Atty.Gen. 21 (1975).) It follows that this remedy is not applicable, as here, in cases in which the ordinance is in conformity with the ' adopted' general plan but the ' adopted' plan is out of conformity with state statutes. Nor is it applicable where the action does not, as here, seek amendment of the zoning ordinance but, rather, challenges the validity of a conditional use permit.

There is an additional consideration in this case which supports our reading of section 65860. The inherent likelihood of serious deleterious effects from surface mining is recognized by the provision in a Calaveras ordinance which requires that such an activity be accompanied by a zoning change permitting the use. Teichert's conditional use permit was granted subject to such a zoning change. Neighborhood had no remedy by reason of section 65860 to challenge an ordinance in advance of its

enactment.

### D.

This brings us to the question: what defects in the general plan may be raised in a challenge to a conditional use permit?

(6)A defect in a general plan element which has no bearing on the criteria applicable to the use permit cannot affect its validity. In that event, there is no issue of criterial sufficiency, i.e., sufficiency of the standards by *1188 which issuance of the permit is to be governed, and hence no issue of ultra vires. In order to tender an issue reaching the validity of the general plan, the complaint must allege facts showing the permitted use implicates a defective policy or standard in the general plan. Where it does, a challenge to the general plan may be raised in the administrative proceedings at which the conditional use permit is considered. (See _Woods, supra., 28 Cal.3d at p. 676.)_

We note that a challenge to an administrative act alleging the _present_ inadequacy of a general plan must be meshed with the provisions of section 65750 et seq., which became effective after this case arose. (Stats. 1982, ch. 27.) [FN9]

> FN9 Section 65751 provides: ' Any action to challenge a general plan or any element thereof on the grounds that such plan or element does not conform to the requirements of Article 5 (commencing with Section 65300) shall be brought pursuant to Section 1085 of the Code of Civil Procedure.' Unlike the provisions of section 65680, section 65751 applies to ' [a]ny action to challenge a general plan' as not in conformity with state standards. Accordingly, it provides an exclusive remedy by which to challenge such an infirmity whenever it is put in issue. This introduces some complexity into the remedial means by which this requirement is to be meshed with the challenge to the sufficiency of a permit predicated upon a defect in the general plan. The administrative body cannot be compelled to consider the defect in the administrative proceeding because the exclusive remedy lies in the ordinary mandamus proceeding. Consequently, there is no administrative

remedy to be exhausted. (See _Woods v. Superior Court, supra., 28 Cal.3d at pp. 680-681.)_ Thus, whenever the denial or invalidation of a conditional use permit is sought on numerous grounds, some of which must be raised in the administrative proceeding and some of which must be pursued by ordinary mandamus (as in cases like this one which arise _after_ the effective date of § 65751), the protesting parties will have to fashion a combination of remedies in administrative mandamus, ordinary mandamus and injunctive relief. This cumbersome procedure is a consequence of the rigidities introduced by section 65751.

(7)Here, Neighborhood claims Teichert's use permit implicates a defect in the noise element of the county's general plan. It is alleged (and the EIR shows) [FN10] the noise impacts of Teichert's activities were a specific focus of *1189 concern in the administrative proceedings. The statutory criteria for the noise element have included, since 1972, a quantitative inventory of noise levels associated with transportation facilities and a statement of land use policies for avoidance of excessive noise. (See Stats. 1971, ch. 1803, p. 3900; Stats. 1975, ch. 1104, p. 2677.) General plan compliance with these criteria provides the measure for land-use planning decisions in which noise is a significant issue. A quantitative inventory of existing transportation noise impacts must be compared with that added by a particular project. The aggregate noise level must be measured against policy statements and *1190 standards required to be in the general plan. Here, for example, such a comparison would have a bearing on the route selection for the trucks hauling the detritus.

> FN10 The EIR for the project was filed with the administrative record. The EIR incorporates the draft EIR as a base and contains modifications and supplements which were appended in the review process. The draft EIR specifically considered the increase in noise levels that would be occasioned by the project: ' _Impact._ Implementation of the proposal will not significantly increase noise levels in the area. It will, however, increase the frequency of noise incidents .... [¶] Off-site noise will be generated by truck traffic traveling to and from the proposed project. Studies conducted in several states under the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Cal.App.3d 1176                                                                      Page 9

156 Cal.App.3d 1176, 203 Cal.Rptr. 401

(Cite as: 156 Cal.App.3d 1176)

direction of the U.S. Environmental Protection Agency reflect that the mean sound level of heavy duty trucks measured at a point 50 feet from the center line of the roadway is 90 dba. [¶] Off-site truck traffic generated noise is not expected to constitute a significant hazard under current conditions. However, in that the proposed project is a long-term project, future planning for the Jenny Lind area should consider the truck routes and provide for adequate noise protection measures. Based on the mean sound level figure of 90 dba reflected above, a distance of some 500 feet would be required to meet Federal residential standards assuming no intervening noise barriers. Significant work has been done in the past several years to reduce truck generated noise. Most of this work centers around improved tire, engine, and muffler designs. [¶] The General Plan Noise Element prepared by the Central Sierra Planning Council does not specifically address agricultural lands. However, the subject area is becoming popular as a 'rural residential' area. [¶] The noise element proposes standards which would limit maximum sound levels in rural suburban residental [sic] area to 40 dB(A) from 10 p.m. to 2 a.m. and 45-50 dB(A) from 7 a.m. to 10 p.m. If residential development occurs along the haul routes described under the heading of traffic above these standards may become difficult or impractical to meet. [¶] No mitigating measures are proposed regarding off-site truck generated noise with respect to this project.'

Various state agencies submitted comments on the draft EIR. One of the comment letters is from the California Department of Transportation. The letter observed, inter alia: ' The Location Map, Figure 1 on page 2 does not show State Highway Routes 4 and 120. Highway 4 is 6 miles from Milton. [¶] The County should consider routing trucks on Route 4 which is rural and unpopulated. Also it probably has a better structural section to stand the higher T.I.'s (10 yr. = 8.5, 20 yr. = 9.0). At least for part of the way. [¶] This Quarry operation may route heavy trucks on to State Route 26 from Jenny Lind Rd. This is through the Rancho Calaveras subdivision which is a rapidly developing residential community. The noise from these trucks accelerating from the stop sign will

be intolerable to these residents. There is little room for sound walls, etc. [¶] Page 24 of the report suggests including all or part of the local access routes in the State Highway System. [¶] Accelerated deterioration of Route 26 can be expected due to greatly increased axle loadings and volume of hauling rigs. [¶] Increased traffic combined with existing alignment of Route 26 will probably lead to increase in accident rate, especially [sic] among the trucks.'

The response to this comment letter in the EIR is: ' It is acknowledged that increased truck traffic will accelerate road deterioration and add to truck related impacts. State Route 26 is currently used extensively by heavy trucks although Cal Trans traffic counts do not differentiate between various types of traffic. Traffic problems are discussed in greater detail in other sections of this report.'

The referenced discussion of traffic problems notes the various possible alternative routes including use of Highway 4 instead of Highway 26. This adds approximately 6 miles to the 28 mile distance of the route actually selected. ' Of these alternatives, number two [utilizing Highway 26] appears to be the most feasible from an environmental point of view. Although both alternates one and two are currently being extensively used for heavy truck traffic, the Calaveras County Department of Public Works indicates that the Jenny Lind Road route can best withstand heavy traffic. Limiting trucks to this route would also expose fewer local residents to noise and traffic congestion caused by trucks. [¶] Each of the other alternatives would require extensive new construction or reconstruction of existing routes. Construction of new roads into areas of relative inaccessibility would result in all of the environmental impacts associated with development of open space for intensive use. These include the encouragement of smaller lot sizes, loss of wildlife habitat, interruption of natural drainage patterns, the introduction of noise, etc. In short, the development of new haul routes could result in a greater number and intensity of environmental impacts than they would resolve.'

The anticipated duration of the project is from 10 to 20 years.

The relevance of Neighborhood's claim the Teichert use permit impacts the seismic safety and safety elements of the general plan is less evident. The claim the sand and gravel trucks will increase the road hazards to drivers of other vehicles has no manifest relation to these elements. If Neighborhood

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cannot tie the permit to these elements, regardless of their inconsistency with section 65502, the permit cannot be invalidated on this ground. This question was not addressed in the demurrer proceedings. Assuming Neighborhood's complaint is vulnerable for lack of specificity, it is improper to uphold the sustained general demurrer without leave to amend on this ground. (See 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 796 et seq.) Neighborhood's pleading of causes of action premised on noncompliance of the use permit with the general plan is facially proof against the general demurrer.

II

Nonetheless, a facially adequate pleading may fail if importation of facts via judicial notice renders it inadequate. (See Code Civ. Proc., § 430.30 subd. (a).) The county presented the trial court with extrinsic facts arguably susceptible to judicial notice in the demurrer proceedings, although without observance of the formality of a request for judicial notice. However, the contention that these facts are sufficient to uphold the sustaining of the demurrers is not meritorious.

In a memorandum of points and authorities to the trial court the county incorporated a letter from the State Director of Planning and Research. [FN11] The letter states the director approved the county's request for an extension of time for the preparation and adoption of the safety, seismic safety, scenic highways, and noise elements of the general plan pursuant to section 65302.6. It bears the date of August 13, 1981. On appeal the county and Teichert suggest we take cognizance of this letter. They argue the extension *1191 granted by the letter guts Neighborhood's conformity claim by curing any technical deficiency, thereby rendering the issues moot. We are not persuaded.

> FN11 We will assume arguendo we can properly notice the director's letter as an official act of the executive department of the State of California. (cf. Evid. Code, § 452, subd. (c), 459, subd. (a); Cal. Const., art. VI, § 13.)

The extension does not of necessity invalidate Neighborhood's claim. Defendants assume a grant by the director of an extension pursuant to section 65302.6 is impervious to judicial review. That is not the case. The statutory authority to grant extensions

of time to comply is circumscribed by numerous conditions. [FN12] The act of extension itself may be ultra vires as in violation of these conditions. Alternately, if not void, its legal effect may not extend a broad enough fig leaf to cover an antecedent deficiency. (Compare *Resource Defense Fund, supra., 133 Cal.App.3d at p. 813.*) Neighborhood has had no fair opportunity to litigate these issues. The letter was not introduced in the demurrer proceedings for the purpose now pursued.

> FN12 For example, section 65302.6 does not provide unlimited opportunity for procrastination. Subdivision (a) permits a maximum one year extension upon proper application. Subdivision (f) provides this period may be extended once, but for no more than one year. Whether any extension may be granted when application is made more than two years after the date when legal compliance was mandatory is a question open to doubt.

The legislative scheme requires that an extension application must be made if necessary as the compliance deadline approaches. Each new statutory requirement for a general plan must be met within two years from the date it is effective. Here, the noise element under challenge may not have complied with the original statutory criteria which became effective in 1972 and mandatory in 1977. (See § 65302.2.) 13If no timely application was made until after this period elapsed, the authority of the Director of Planning and Research to confer the boon of an extension is dubious.

13Moreover, extensions are predicated, inter alia, on compliance during the interim with existing general plan elements and ' with the new elements or plan proposals being considered or studied.' (§ 65302.6, subd. (c)(3).) On this record we cannot determine if the latter requirement would have provided a substantially different basis for review of Teichert's project than review for conformity with the existing general plan.

We imply no view on Neighborhood's potential for success in any counterattack on the effect of a post hoc extension. It suffices to note that triable issues relating to the effect of the director's letter exist. The letter cannot rescue the demurrers from error.

Disposition

It was error to sustain the general demurrers without

156 Cal.App.3d 1176

156 Cal.App.3d 1176, 203 Cal.Rptr. 401

**(Cite as: 156 Cal.App.3d 1176)**

leave to amend. Resolution of the remaining issues is premature. The judgment is reversed with the following directions. The order sustaining the general demurrers shall be vacated. The conformity causes of action shall proceed as though Neighborhood's complaint were newly filed, affording a fresh opportunity to defendants to test the pleading. **\*1192**

Sims, J., concurred. Rega, Acting P. J., concurred in the result. **\*1193**
Cal.App.3.Dist.
Neighborhood Action Group v. County of Calaveras
156 Cal.App.3d 1176, 203 Cal.Rptr. 401

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Tab 3**

Westlaw.

231 Cal.App.2d 774                                                                    Page 1

231 Cal.App.2d 774, 42 Cal.Rptr. 283

**(Cite as: 231 Cal.App.2d 774)**

**C**
O'Loane v. O'Rourke
Cal.App.2.Dist.
GLEN M. O'LOANE et al., Plaintiffs and
Respondents,
v.
LAWRENCE W. O'ROURKE, as City Clerk, etc., et
al., Defendants and Appellants.
**Civ. No. 28265.**

District Court of Appeal, Second District, Division 1,
California.
Jan. 21, 1965.

HEADNOTES

(1) Appeal and Error § 514(1)--Record--Judgment
Roll--Matters Reviewable-- Presumptions.
When there is no reporter's transcript and the record
consists of the judgment roll, the findings submitted
and signed, the objections thereto, the judgment as
proposed and as entered, and points and authorities,
the appellate court must and does presume that the
trial court received evidence that supports its
findings.
See Cal.Jur.2d, Appeal and Error, § 308.
(2) Appeal and Error § 514(1)--Record--Judgment
Roll--Matters Reviewable-- Presumptions.
When an appeal is taken on the judgment roll, the
findings as proposed and signed, the objections
thereto, the judgment as proposed and as rendered,
and points and authorities, all intendments support
the judgment, all proceedings necessary to its validity
are presumed to have been taken, and any matters
that might have been presented to the trial court to
authorize the judgment will be presumed to have
been presented.

(3) Municipal Corporations § 140--Police Power--
Zoning Ordinances.
The Legislature has not made the formulation of a
general plan for a city a precondition to the exercise
by the city of zoning control.

(4) Municipal Corporations § 139.5--Police Power--
City Planning.
Though municipal planning embraces zoning, the
converse is not true; planning has a broader

connotation and embraces the physical development
of the community and its environs according to a
master plan and is an exercise of the state's inherent
power, antedating the Constitution.

(5) Municipal Corporations § 139.5, 140--Police
Power--City PlanningZoning Ordinances.
A city master plan is a long-term general outline of
projected development; zoning is but one of the many
tools that may be used to implement the plan.

(6) Municipal Corporations § 250--Referendum.
Referendum, as provided by Const., art. IV, § 1, is
the exercise by the people of the power reserved to
them, not an exercise of a right granted to them.
See Cal.Jur.2d, Initiative, Referendum, and Recall, §
25; Am.Jur., Municipal Corporations (1st ed § 204).
(7) Municipal Corporations § 250--Referendum.
To protect the people in the exercise of the reserved
legislative power of referendum, statutory provisions
dealing with the referendum should be afforded
liberal construction.

(8) Municipal Corporations § 86--Legislative
Control--Municipal Affairs.
Adoption of a general plan by a city is purely a local
matter, not a matter of statewide legislative concern.

(9) Municipal Corporations § 253--Referendum--
Scope of Power.
Where the adoption of a general plan for a city is
legislative in character, then referendum is available
to the people of the city.

(10) Municipal Corporations § 253(1)--Referendum--
Scope of Power.
A vote may be taken on the adoption of a general
plan for a city by its electorate where the plan, in
effect, adopts a policy in many respects entirely new,
is of permanent and general character, declares the
public purpose and, as such, supposedly sets forth the
kind of city the community wants and supposedly
represents the the electors' judgment as to the future
physical form and character of the city.

SUMMARY

APPEAL from a judgment of the Superior Court of
Los Angeles County. Macklin Fleming, Judge.
Affirmed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

231 Cal.App.2d 774

231 Cal.App.2d 774, 42 Cal.Rptr. 283

(Cite as: 231 Cal.App.2d 774)

Proceeding in mandamus to compel a city council to either repeal a resolution adopting a general plan or submit the plan to popular vote. Judgment granting writ affirmed.

COUNSEL

William Camil, City Attorney, for Defendants and Appellants.

Bailie, Turner, Lake & Sprague and Richard R. Clements for Plaintiffs and Respondents.

Elmer Patrick Friel as Amicus Curiae on behalf of Plaintiffs and Respondents.

FOURT, J.

This is an appeal from a judgment in a mandate proceeding wherein it was ordered, among other things, that the City Council of the City of Commerce either repeal a resolution which adopted a " general plan" or submit the same to a vote of the electors.

In a petition for a writ of mandate, petitioners allege, among other things, that they are electors of the City of Commerce (hereinafter referred to as city) and entitled to vote in any referendum election in the city; that the city is organized under the general laws of the state and has no particular charter provisions for referendum of any legislative enactments *776 of the city council of the city; that O'Rourke is the city clerk of the city and the other named defendants are members of the city council (hereinafter referred to as council) of the city; that the council adopted a resolution entitled " A Resolution Of The City Council Of The City of Commerce Approving A General Plan" ; that the petitioners, with other qualified electors, circulated a petition against the resolution and petitioned the council to repeal the same or submit it to the vote of the electors of the city; that on September 18, 1963, the petition was filed with the clerk of the city and it bore the signatures of 632 electors of the city; that the total number of electors in the city is 3,267. It is further set forth that the clerk refused to examine the petition to determine whether it was signed by the requisite number of electors and referred the same to the council; that the council considered the petition and determined that the resolution was not a proper subject to be referred to the electorate and tabled the petitions; that the council failed to repeal the resolution or to take steps to submit the same to the vote of the electorate: there then followed a prayer in the petition for mandate that the court command the clerk to examine the petitions and ascertain whether they were signed by the requisite number of electors

and that the council reconsider the resolution and either repeal the same or submit it to the vote of the electors of the city.

An answer was filed by the clerk and the council wherein they denied, in effect, that petitioners had circulated a petition protesting the resolution, denied that the petition was circulated and signed by qualified electors and denied, in effect, that the petition contained the signatures of 632 electors and that there were 3,267 electors in the city. The answer also alleged that no cause of action was stated and that " the adoption of a general plan is not a subject of referendum under the laws of the State of California," and that a resolution, as distinguished from an ordinance, is not subject to referendum. Defendants, in substantially all other respects, in effect admitted the allegations of the petition for the writ of mandate.

The trial judge, after a hearing, made findings of fact and conclusions of law. [FN1] *777

FN1

" Findings of Fact

" I

" That Petitioners are residents, freeholders, and legally qualified electors of the City of Commerce, County of Los Angeles, State of California, and as such are entitled to vote at any election for municipal officers in said City and to vote at any referendum election which may be called therein.

" II

" That the City of Commerce is a Municipal Corporation and duly organized under the laws of the State of California, and under the provisions of the general laws of the State of California and that said City has no charter provisions for referendum of a legislative enactment to electorate; such referendum of said legislative enactment is governed by Division 4 of the Elections Code of the State of California.

" III

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

" That at all times herein mentioned, Lawrence O'Rourke was the duly appointed, qualified and acting Clerk of the City of Commerce; that Maurice H. Quigley was the duly elected, qualified and acting Mayor of said City; that Charles F. Scheibler, James W. Bristow, Robert B. Salerno, and George H. Chavez, and each of them, were the duly elected, qualified and acting City Councilmen of said City. That the legislative powers of said City are and at all times herein mentioned have been in said Mayor and Councilmen.

### " IV

" That on August 19, 1963, said City Council duly adopted Resolution No. 63-22 entitled 'A Resolution of the City Council of the City of Commerce Approving a General Plan.'

### " V

" That immediately after said adoption, said Petitioners, in conjunction with other qualified electors of said City, prepared, circulated and signed a Petition protesting against the passage of said ordinance and petitioning that said ordinance be forthwith repealed or that the same submitted to the vote of the qualified and registered electors of the City of Commerce as provided by law.

### " VI

" That on September 12, 1963, said Petition was filed with the Respondent City Clerk. That said Petition purported to bear the signatures of 633 electors of said City of Commerce. That the total electorate of said City of Commerce is 3,267 electors.

### " VII

" That the Respondent City Clerk failed and refused to examine said petition so as to ascertain whether or not said petition was signed by the requisite number of qualified and registered electors, to wit, 327. That said City Clerk did, however, set and place the petition before the aforesaid Mayor and City Council, and each of them, at the next regularly scheduled meeting of that body on September 16, 1963.

### " VIII

" That said petition was in the form required by law.

### " IX

" That said City Council and Mayor in the regular course of said meeting, duly considered said petition and were urged to reconsider said resolution, rescind the same or to refer the same to the voters of the City of Commerce. That said City Council, after obtaining an opinion from the City Attorney of the City of Commerce, that the aforesaid resolution was not a proper subject to be referred to the electorate, accepted and passed a seconded motion to table and file said petition indefinitely.

### " X

" That said Mayor and Councilmen, individually and as a body, have failed and neglected to reconsider the aforesaid resolution and to repeal the same, or to take steps to submit the same to the vote of the electorate and, although formal demand was made, on or about September 16, 1963, on said officials, they did fail, neglect and refuse to reconsider said resolution or to repeal the same and have refused to submit the same to the vote of the electors of said City either at the next general municipal election or at any special municipal election called for that purpose, and said refusal is in violation of Division 4 of the Elections Code of the State of California.

### " XI

" That petitioners have no plain, speedy, or adequate remedy at law.

### " Conclusions of Law

### " I

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

231 Cal.App.2d 774                                                                Page 4

231 Cal.App.2d 774, 42 Cal.Rptr. 283

(Cite as: 231 Cal.App.2d 774)

" The Petition states facts sufficient to constitute a cause of action for mandamus.

" II

" The adoption of a master plan has legislative effect; after its adoption all public buildings, streets, improvements, parks, etc., must conform to the master plan in the view of the planning commission (Government Code 65551-55).

" III

" The adoption of a master plan is a local and municipal, as contrasted to a statewide, matter. Referendum is an appropriate procedure to review the adoption of the plan. (Reagan v. City of Sausalito, 210 CA 2d 618)."

A judgment following the findings and conclusions was made and entered, and, in effect, ordered the clerk to examine the registration records and to ascertain whether the persons who signed the petitions are qualified voters of the city, to fairly determine if the petitions set forth the date required by the Elections Code, to transmit the petitions to the council and mayor properly certified if the petitions are sufficient, and to make known to the court how he has executed the writ of the court. The judgment further ordered the mayor and the council to reconsider the resolution and either repeal the same or submit it to the vote of the electors of the city, and to make known to the court, at a date to be set, what they have done.

(1) This appeal followed. There apparently is no reporter's transcript of the proceedings at the trial. With reference *778 to the record appellants desired in the appeal, notice was given to prepare a reporter's transcript (apparently knowing there was none to be had) and (pursuant to rule 5(a) of Cal. Rules of Court) the judgment roll, the proposed findings of fact and conclusions of law prepared and submitted by the petitioners, the findings of fact and conclusions of law as signed, the objections to said findings of fact and conclusions of law, the proposed formal judgment, points and authorities in opposition to the petition, the decision and judgment of the court and the copy of the general plan. Respondents requested, in addition to the matters mentioned, that their points and authorities in support of the petition,

an amicus curiae brief, a copy of the supplemental notice of appeal and a letter from the amicus curiae to the judge be included in the record.

Appellants now assert that in a general law city the adoption *779 of a general plan is not subject to referendum, and, further, that even if such a proceeding is subject to referendum, in this particular case the evidence does not support the findings.

With reference to the claim of lack of evidence to support the findings, under the circumstances of this case, as here presented, this court must and does presume that the trial court received evidence which supports its findings. (White v. Jones, 136 Cal.App.2d 567, 571 [288 P.2d 913]; Dumas v. Stark, 56 Cal.2d 673, 674 [16 Cal.Rptr. 368, 365 P.2d 424]; Hearst Publishing Co. v. Abounader, 196 Cal.App.2d 49, 55 [16 Cal.Rptr. 244].)

(2) This court holds that under the circumstances of this appeal all intendments are in support of the judgment, and all proceedings necessary to its validity are presumed to have been taken, and any matters which might have been presented to the trial court which would have authorized the judgment will be presumed to have been thus presented, as the record before us shows nothing to the contrary.

Had the appellants wanted a court reporter to take down and transcribe the proceedings, it would have been an easy matter to request that such be done, or they otherwise could have brought a proper record to this court if it was intended to question the sufficiency of the evidence. There is no merit to the assertion that the evidence does not support the findings.

The real question in this case is whether, under the general law, the adoption by a city council of a general plan is subject to referendum.

Appellants argue that the adoption of the general plan under the applicable provisions of the Government Code (§§ 65400-65555) is not subject to the referendum, stating, in effect, that the general plan is not a zoning ordinance, that it has no legislative effect, that the adoption of such a plan is an administrative and executive act and not a legislative act.

The operation of the Planning Act is optional or permissive with the council. The statute states on its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

231 Cal.App.2d 774                                                                  Page 5

231 Cal.App.2d 774, 42 Cal.Rptr. 283

(Cite as: 231 Cal.App.2d 774)

face that a city *may* have a planning commission; however, a planning *780 commission is not necessarily required in a city. Planning and zoning do not necessarily cover identical fields of municipal endeavors. (3) In other words, the Legislature has not made the formulation of a general plan a precondition to the exercise of zoning control. (4) It is appropriately said in *Angermeier v. Borough of Sea Girt*, 27 N.J. 298 [142 A.2d 624, 629-630]:

" ... While *municipal planning embraces zoning*, the converse does not hold true. They are not convertible terms. Zoning is not devoid of planning, but it does not include the whole of planning. Zoning is a separation of the municipality into districts, and the regulation of buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land. This is the constitutional sense of the term. ... *Planning* has a much broader connotation. *It has in view, as we have seen, the physical development of the community and its environs in relation to its social and economic well-being for the fulfillment of the rightful common destiny, according to a 'master plan' based on 'careful and comprehensive surveys and studies of present conditions and the prospects of future growth of the municipality,' and embodying scientific teaching and creative experience. In a word, this is an exercise of the State's inherent authority, antedating the Constitution* itself, to have recourse to such measures as may serve the basic common moral and material needs. Planning to this end is as old as government itself-of the very essence of an ordered and civilized society. ...

(5) " As Professor Haar has said in his notable contribution to the subject, '*In Accordance with a Comprehensive Plan*,' 68 Harv. L. Rev. 1154, 1156 (1955), the '*city master plan is a long-term general outline of projected development: zoning is but one of the many tools which may be used to implement the plan.*' ..." (Italics added.)

Professor Haar in the article above cited (68 Harv. L. Rev. 1175) further states that if the master plan is to have " ... a directly controlling influence on zoning regulation, it would appear necessary to have it *legislatively adopted*, rather than merely stated by the planning authorities and functioning as an interesting study without much direct relevance to day-to-day activity. In the past, the fear that legislative adoption and amendment might prove overly cumbersome has caused most planners to advise excluding the local

legislature from such direct participation at the planning *781 level. Yet it would seem that only where the master plan is not to have any legal effect on private property rights could it be left entirely to the planning commission. For if it is to be the standard whereby the validity of subsequent regulation is judged, leaving it entirely to the planners would in effect give them conclusive control over the legislature in the zoning area.

" *The master plan symbolizes a change in the organization of the land market.* Its primary justification is an assumption that the interdependence of land uses in an industrialized society makes necessary *municipal controls over private property*. This is the challenge-to create an institutional arrangement which can give meaning to planning ideas by delimiting them for effective use in the enactment of regulatory ordinances, and which can supply the courts with a sensible and reasonably precise basis for evaluation and review." (Italics added.)

The general plan in this instance very definitely has a direct effect upon all of the property in the city and upon its future development. The plan sets out that it is to become " the framework within which specific planning can be undertaken" and to be the " basis for the preparation of precise plans." The plan recognizes in this particular case that the city " was largely developed before it was incorporated," however, it calls for the enhancing of recreational facilities and the expansion and consolidation of certain commercial activities. It is stated that there are about 10,000 residents of the city and about 75,000 persons who work in the industries located in the city and that the " general plan is for the people." (Presumably for the " people" who are residents of the city and not the " people" who just work in the factories and do not live in the city.) It is contemplated by the plans that there will be " higher skilled and better pay categories," a " convenient walk-to-work arrangement," a gradual lessening of elementary school capacity and an increasing demand for " adult cultural amenities, and more passive types of recreation." Further, it is indicated that due to population density, single-family dwellings will become apartment houses. Standards of density are set forth and " [s]etbacks, driveways, walks, landscaping and service facilities would be controlled by the zoning or other ordinances *commensurate with the standards above.*" (Italics added.) It is anomalous that the general plan states that " the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

objective element of the general plan indicates how the people want their City to *782 develop" and that at the same time the council refuses to refer it to the people of the city for a vote on a referendum.

Under the title of " Objectives" in this plan, it is set forth that the city is about 6 1/2 square miles in size with less than 10 per cent of the land vacant, that the land use pattern is firmly set; however, changes in the future " should be made in accord with the following basic land use objectives." There then follow certain itemized provisions for " anticipated future land use," reservations for living purposes of selected land, location of industry, rails, highways, power and water lines, etc. The plan envisions the reduction of single-family dwellings and " as this occurs, development for a combination of high-rise and garden apartments and the closing of unnecessary streets should be encouraged to take advantage of the optimum use of the limited amount of residential land." Shopping centers are located on the general plan maps and business and commercial offices are set out for certain streets. Under the title of " Circulation Element" it is set forth, in effect, that the city under the circumstances has an unusual traffic problem is that there is a great deal of trucking and through highway travel. It is recommended in the plan that many street improvements be made, certain streets closed, grade separations made, and that certain private roads be dedicated to the public. The general plan also sets forth that " after adoption of the General Plan, any subsequent determination made by the Planning Commission should first be reviewed as to its conformity with the General Plan" and the council authorized " to adopt and use the General Plan as a guide for orderly community growth and development and to systematically correct deficiencies in existing facilities and provide for needed facilities" and further that " the General Plan should be referred to as a guide in making decisions that affect the elements of the General Plan." Also, that " implementation of the General Plan may be carried out by the City Council when it budgets and appropriates annually amounts to be expended for capital improvements" as such latter are set forth, such as grade separations, highway changes, public buildings and drains, all as set forth in the plan.

It is apparent that the plan is, in short, a constitution for all future developments within the city. No mechanical reading of the plan itself is sufficient. To argue that property rights are not affected by the general plan (as the city so asserts) as adopted

ignores that which is obvious. Any zoning *783 ordinance adopted in the future would surely be interpreted in part by its fidelity to the general plan as well as by the standards of due process. Frequently it has occurred that where a general plan was adopted, and later a zoning change was made which appeared to be in accord with the plan, that fact in and of itself was some evidentiary weight in the determination as to whether the zoning ordinance was proper or otherwise. If the general plan is anything at all, it is a meaningful enactment and definitely affects the community and, among other things, changes land market values. The general plan is legislatively adopted by the council. True, it is couched in part in general terms, but there are many specifics, and once adopted it becomes very effective. Many facets of activities between other public agencies and the city are effectively determined by the plan. Any subdivision or other development would necessarily be considered in its relation to the general plan, and such consideration practically by itself would be a sufficient legislative guide to the exercise of such discretions.

It surely cannot be contemplated that the council, in the adoption of future zoning ordinances (which are admittedly legislative and subject to referendum will go contrary, (in all but rare instances), to the general plan which it adopts.

(6) The Constitution, article IV, section 1, provides for referendum. It is the exercise by the people of a power reserved to them, and not an exercise of a right granted to them. (7) For that reason, and in order to protect the people of this state in the exercise of this reserved legislative power, the statutory provisions dealing with the referendum should be afforded liberal construction. (Blotter v. Farrell, 42 Cal.2d 804, 809 [270 P.2d 481].)

(8) The matter of the adoption of a general plan in a city is purely a local matter and is not a matter of statewide legislative concern. (Reagan v. City of Sausalito, 210 Cal.App.2d 618, 624- 625 [26 Cal.Rptr. 775]; Fletcher v. Porter, 203 Cal.App.2d 313, 318-320 [21 Cal.Rptr. 452].)

(9) If the adoption of the general plan is legislative in character, then the referendum is available to the people.

In 62 Corpus Juris Secundum, Municipal Corporations, section 454, at pages 874-875, under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

231 Cal.App.2d 774, 42 Cal.Rptr. 283

**(Cite as: 231 Cal.App.2d 774)**

the title of " Tests as to legislative or administrative acts" it is stated: " The form or name of an act of municipal authorities, such as whether it is called an ordinance or a resolution, is not determinative of its legislative or administrative nature, with respect to **\*784** whether or not it is subject to initiative and referendum. The following tests have been given for determining whether a particular action of the council belongs to one class or the other: Actions which relate to subjects of a permanent or general character are considered to be legislative, while those which are temporary in operation and effect are not. Acts constituting a declaration of public purpose or policy and making provisions for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. As has been said, the crucial test is whether the proposed ordinance is one making a new law, or one executing a law already in existence; and acts which are to be deemed as acts of administration, and classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved on it by the organic law of its existence. Furthermore, the distinction between legislative acts and those that are administrative is not destroyed by reason of the fact that the charter may require the latter to be accomplished by an ordinance instead of by resolution."

In *Martin v. Smith,* 184 Cal.App.2d 571, 575 [7 Cal.Rptr. 725], it is said:

" Acts of a legislative body which are legislative in nature are subject to the referendum process, whereas acts which are administrative in nature are not. The difference between the two types of activity is set forth in *McKevitt v. City of Sacramento,* 55 Cal.App. 117, 124 [203 P. 132], as follows: 'Acts constituting a declaration of public purpose, and making provisions for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. Acts which are to be deemed as acts of administration, and classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved upon it by the organic law of its existence.'

" McQuillin on Municipal Corporations (3d ed.),

volume 5, pages 255-256, states: 'Again it has been said: " The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it.'' ' (Citing *Seaton v. Lackey,* 298 Ky. 188 [182 S.W.2d 336, 339].)"

It has been held that an ordinance which, in effect, clarifies **\*785** the duty of a planning commission with reference to the adoption of a general plan is of legislative character and can be initiated by the people. (*Fletcher v. Porter, supra,* 203 Cal.App.2d 313.)

(10) The adoption of the general plan is, in effect, the adoption of a policy, and in many respects, entirely new policy. The plan is of permanent and general character, it is a declaration of public purpose and, as such, supposedly sets forth what kind of a city the community wants and, supposedly, represents the judgment of the electors of the city with reference to the physical form and character the city is to assume.

Under the circumstances we can discern no useful purpose which would be served by preventing the exercise of the democratic process, namely, the permitting a vote to be taken on the issue by the electorate of the city.

The judgment and order for the issuance of the peremptory writ of mandate is affirmed.

Wood, P. J., and Lillie, J., concurred.
Cal.App.2.Dist.
O'Loane v. O'Rourke
231 Cal.App.2d 774, 42 Cal.Rptr. 283

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Tab 4**

Westlaw.

208 Cal.App.2d 609                                                    Page 1

208 Cal.App.2d 609, 25 Cal.Rptr. 429

(Cite as: 208 Cal.App.2d 609)

C
Tandy v. City of Oakland
Cal.App.1.Dist.
　　RICHARD T. TANDY, Individually and as
Executor, etc., et al., Plaintiffs and Appellants,
　　　　　　　　v.
THE CITY OF OAKLAND et al., Defendants and
Respondents.
　　　　　　Civ. No. 20150.

District Court of Appeal, First District, Division 3,
California.
Oct. 17, 1962.

HEADNOTES

(1) Municipal Corporations § 140--Zoning
Ordinances.
The enactment of a zoning ordinance is purely a
legislative act and a governmental function.

(2) Municipal Corporations § 159.5--Zoning
Ordinances--Variances.
The enactment of a zoning ordinance is to be
distinguished from the granting or denying of a
variance, a conditional use permit or an exception to
use, all of which call for administrative action.

(3) Municipal Corporations § 145--Zoning
Ordinances--Legislative Discretion and Court
Review.
The courts do not have the power to issue a writ to
compel a city council to pass an order rezoning
particular property from multiple dwelling to
commercial; this would be a legislative act.
See Cal.Jur.2d, Zoning, § 215 et seq.; Am.Jur.,
Zoning (1st ed § 194).

(4) Municipal Corporations § 145--Zoning
Ordinances--Legislative Discretion and Court
Review.
The determination of whether to enact a zoning
ordinance and the determination of its provisions and
terms are entirely within the discretion of a city's
legislative body or other zoning legislative authority,
subject to existing requirements for study and
recommendation by zoning commissions, notices,
hearings, and initiative and referendum.

(5) Municipal Corporations § 145--Zoning
Ordinances--Legislative Discretion and Court
Review.
The discretion of a municipal legislative body to
enact a zoning ordinance and to determine its terms
will not be interfered with by the courts except for
clear abuse of discretion or excess of power, and
when the question of abuse or excess of power is
fairly debatable, a court cannot substitute its
judgment for that of the municipality.

(6) Municipal Corporations § 145--Zoning
Ordinances--Legislative Discretion and Court
Review.
A municipal corporation has a right to determine
whether conditions or the public interests demand an
exercise of the power to pass a zoning ordinance and
the right to select the measures that are necessary for
that purpose.

(7) Municipal Corporations § 152(2)--Zoning
Ordinances--Reasonableness and Uniformity--" Spot
Zoning."
The propriety of rezoning a single parcel in an area
from multiple dwelling to commercial and
maintaining the remainder of the area in a multiple
dwelling zone is a matter of legislative determination;
where there is room for difference of opinion on the
subject, the courts will not interfere with the
legislative determination.
See Cal.Jur.2d, Zoning, § 188 et seq.; Am.Jur.,
Zoning (1st ed § 34).

(8) Municipal Corporations § 152(2)--Zoning
Ordinances--Reasonableness and Uniformity--" Spot
Zoning."
That a zoning ordinance, as applied to plaintiffs'
property, is unreasonable or arbitrary is not supported
by allegations in a complaint from which it appears
that the situation of plaintiffs' property is no different
from that of other property in its area, that all parcels
in the area are being treated alike, and that they have
been so treated for many years.

SUMMARY

APPEAL from a judgment of the Superior Court of
Alameda County. Lewis E. Lercara, Judge. Affirmed.

Proceeding in mandamus to compel a city to rezone

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiffs' property and action to have the city's zoning ordinances declared unconstitutional as applied to plaintiffs' property. Judgment denying plaintiffs writ or relief after demurrer to amended complaint was sustained without leave to amend, affirmed.

COUNSEL

Charles Reagh for Plaintiffs and Appellants.

Hilton J. Melby, City Attorney, and George M. Cahalan, Assistant City Attorney, for Defendants and Respondents.

SALSMAN, J.

Plaintiffs appeal from a judgment entered after the court sustained a demurrer to an amended complaint without leave to amend further.

In their complaint plaintiffs asked for a writ of mandate to compel the defendant city to rezone their property from " C" multiple dwelling to " E" commercial. They also sought declaratory relief, contending that the zoning ordinances of the City of Oakland are unconstitutional as applied to their property.

The complaint alleged in substance that plaintiffs owned a lot improved with a two flat building built about 1910; that the building had deteriorated with age and had become obsolete; that it was located in a neighborhood composed of like structures in varying degrees of obsolescence; that the cost of maintenance of the building is in excess of rental income; that it is not financially practicable to repair or reconstruct the building because no reasonable income could be obtained on the cost of reconstruction; that the only practical use to which the property can be devoted is a commercial use, which would harm no one and would be a benefit to the neighborhood; that plaintiffs made application to the city council to have the property rezoned, but such application was denied.

We consider first plaintiffs' request for the writ of mandate to compel the city council to rezone their property. (1) It is long settled law that the enactment of a zoning ordinance is purely a legislative act and a governmental function. (2) It is to be distinguished from the granting or denial of a variance, a conditional use permit or an exception to use, all of which call for administrative action, and none of which is involved here because the complaint alleges and the demurrer admits that plaintiffs have exhausted their administrative remedies. (3) Thus, the

complaint simply asks the court to issue the writ to compel the city council of the defendant city to perform a legislative act, namely, to pass an ordinance according to plaintiffs' plan, rezoning their property from " C" multiple dwelling to " E" commercial. It is elementary that the courts have no such power. (4) " The determination of whether or not to enact a zoning ordinance and the determination of its provisions and terms are entirely *612 within the discretion of the municipal legislative body or other zoning legislative authority, subject to such requirements as may exist relative to study and recommendation by zoning commissions, notices, hearings and initiative and referendum. (5) Such municipal discretion will not be interfered with by the courts except for clear abuse of the discretion or excess of power, and in case of doubt or if the question is fairly debatable, a court cannot substitute its judgment for that of the municipality. (6) In other words, a municipal corporation has a right to determine whether conditions or the public interests demand an exercise of the power to pass a zoning ordinance and to select the measures that are necessary for that purpose. A fortiori, the wisdom or good policy of a zoning ordinance is for a municipality to determine and the courts have nothing to do with it." (8 McQuillin, Municipal Corporations, (3d ed. rev.) pp. 119-122.) (Miller v. Board of Public Works, 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]; Day v. City of Los Angeles, 189 Cal.App.2d 415 [11 Cal.Rptr. 325]; Banville v. County of Los Angeles, 180 Cal.App.2d 563 [4 Cal.Rptr. 458]; Consolidated Rock Products Co. v. City of Los Angeles, 57 Cal.2d 515 [20 Cal.Rptr. 638, 370 P.2d 342].)

It appears from plaintiffs' amended complaint " that the area which surrounds the said realty of plaintiffs is what is commonly called a 'low rent area,' that is to say, almost all of the multiple dwelling buildings thereabouts are of approximately the same age as that on plaintiffs' property, ..." Thus, although the entire area in which plaintiffs' property is located suffers from the same condition of blight and deterioration, it is only the plaintiffs' property which the defendant city is requested to rezone. (7) The propriety of rezoning plaintiffs' single parcel from multiple dwelling to commercial while maintaining the remainder of the area in a multiple dwelling zone is a matter of legislative determination, and where, as here, there is room for difference of opinion on the subject, the courts will not interfere with the legislative determination. (Johnston v. City of

208 Cal.App.2d 609

208 Cal.App.2d 609, 25 Cal.Rptr. 429

**(Cite as: 208 Cal.App.2d 609)**

Page 3

*Claremont,* 49 Cal.2d 826 [323 P.2d 71]; *Zahn v. Board of Public Works,* 274 U.S. 325 [47 S.Ct. 594, 71 L.Ed. 1074]; *Miller v. Board of Public Works, supra*; Consolidated Rock Products Co. v. City of Los Angeles, supra; *Euclid v. Ambler Realty Co.,* 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016].)

(8) Plaintiffs further contend that their property is being destroyed by the effect of the present zoning ordinance *613 and hence the ordinance is invalid as applied to them This presents the question whether or not the ordinance in question is unreasonable or arbitrary in its effect as shown by the allegations of the complaint. We have heretofore set out the material allegations of the pleading from which it appears that plaintiffs' property is in no different situation than other property in the multiple dwelling zone. All are being treated alike, and have been for many years. We cannot say from the facts alleged in the complaint that the ordinance as applied to plaintiffs' property is unreasonable or arbitrary. The propriety of maintaining the present zoning scheme of the defendant city is, at least under the allegations of the complaint, a debatable matter. Where such is the case it is not the function of the court to substitute its determination for that of the legislative body, nor will the court declare the ordinance invalid where its application to the property in question is a subject upon which reasonable minds may differ. (*Wilkins v. City of San Bernardino,* 29 Cal.2d 332 [175 P.2d 542]; *Lockard v. City of Los Angeles,* 33 Cal.2d 453 [202 P.2d 38, 7 A.L.R.2d 990].)

Judgment affirmed.

Draper, P. J., and Devine, J., concurred.
Appellants' petition for a hearing by the Supreme Court was denied December 12, 1962.

Cal.App.1.Dist.
Tandy v. City of Oakland
208 Cal.App.2d 609, 25 Cal.Rptr. 429

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Tab 5**

Westlaw.

154 P.3d 759                                                                                          Page 1

211 Or.App. 437, 154 P.3d 759

(Cite as: 211 Or.App. 437, 154 P.3d 759)

C
Timberline Baptist Church v. Washington County
Or.App.,2007.

Court of Appeals of Oregon.
TIMBERLINE BAPTIST CHURCH, Petitioner,
v.
WASHINGTON COUNTY, Respondent.
2006058; A133320.

Argued and Submitted Oct. 23, 2006.
Decided March 28, 2007.

**Background:** Church sought judicial review of order
of the Land Use Board of Appeals (LUBA) which
affirmed county's decision granting special use and
development review approvals for church and day
care facility, but denying requested special use
approval for proposed school.

**Holding:** The Court of Appeals, Brewer, C.J., held
that county's decision denying special use approval
for weekday parochial school did not impose "
substantial burden" on church's religious exercise in
violation of the Religious Land Use and
Institutionalized Persons Act (RLUIPA).

Affirmed.

Breithaupt, J. pro tempore, concurred and filed
opinion.

Wollheim, P.J., dissented and filed opinion.
West Headnotes
[1] Civil Rights 78 ⊶1073

78 Civil Rights
    78I Rights Protected and Discrimination
Prohibited in General
        78k1073 k. Zoning, Building, and Planning;
Land Use. Most Cited Cases
Nothing in Religious Land Use and Institutionalized
Persons Act (RLUIPA) requires a religious
institution, in order to take advantage of its
provisions, to purchase only property on which the
desired use is permitted outright. Religious Land Use

and Institutionalized Persons Act of 2000, § 2, 42
U.S.C.A. § 2000cc.

[2] Civil Rights 78 ⊶1073

78 Civil Rights
    78I Rights Protected and Discrimination
Prohibited in General
        78k1073 k. Zoning, Building, and Planning;
Land Use. Most Cited Cases
County's decision denying special use approval for
weekday parochial school did not impose "
substantial burden" on church's religious exercise in
violation of the Religious Land Use and
Institutionalized Persons Act (RLUIPA); county
granted special use approvals for church and day care
facility on property, but denied approval for proposed
school, church failed to demonstrate that county's
decision would require it to forgo its religious
precepts because it could not reasonably locate and
acquire alternative site for its proposed combined
uses, and church did not clearly define its property
selection criteria or explain how failure to satisfy
criteria would require it to forgo its religious
exercise. Religious Land Use and Institutionalized
Persons Act of 2000, § 2, 42 U.S.C.A. § 2000cc(a).

**759 Ross Day, Portland, argued the cause for
petitioner. With him on the brief was Oregonians in
Action Legal Center.
Chris Gilmore, Assistant County Counsel, argued the
cause for respondent. With him **760 on the brief
was Office of Washington County Counsel.

Before WOLLHEIM, Presiding Judge, and
BREWER, Chief Judge, and BREITHAUPT, Judge
pro tempore.
BREWER, C.J.
*439 Petitioner, Timberline Baptist Church
(Timberline), sought approval from Washington
County for special uses of property for a church, a
day care facility, and a day school. The county
granted special use and development review
approvals for the church and the day care facility, but
denied the requested special use approval for the
proposed school. Petitioner appealed to the Land Use
Board of Appeals (LUBA), which affirmed the
county's decision. Petitioner now seeks judicial
review of LUBA's order, asserting that LUBA erred
in determining that denial of the special use approval

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 Or.App. 437, 154 P.3d 759

**(Cite as: 211 Or.App. 437, 154 P.3d 759)**

for a weekday parochial school did not impose a "substantial burden" on petitioner's religious exercise in violation of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5 (2000) (set out, in part, below).[FN1] We conclude that the county's decision did not impose a substantial burden under RLUIPA and therefore affirm.

> FN1. RLUIPA provides that the substantial burden provision of 42 U.S.C. 2000cc(a)(1) applies when:
> " the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved."
> 42 U.S.C. 2000cc(a)(2)(C). The parties have not addressed that issue in this case. For the purposes of this opinion, we assume without deciding that the application of the county's decision constituted an individualized assessment as that term is used in 42 U.S.C. 2000cc(a)(2)(C).

We take the relevant facts from LUBA's order and the record. Timberline Baptist Church was founded in 2001. At the relevant time, it had 267 members and held weekly services attended by 150 to 200 persons. The majority of the members resided in the City of Sherwood. The church used a converted single-family dwelling within Sherwood for its offices and for small meetings and rented space in the local high school and in other churches for Sunday and midweek services. In 2005, the church began operating a school for the congregation's children in a separate leased facility; the school had 19 students.

*440 In 2004, the church purchased the subject property of slightly more than seven acres for $500,000. The property is located in Washington County, outside the urban growth boundary (UGB) of the City of Sherwood. It is zoned AF-5 (Agriculture-Forest, 5-acre minimum lot size), as is land to the east and south. Land to the east is developed with rural residences and agriculture, and land to the west is in farm use in an AF-20 zone. Land to the north includes a dwelling, is in farm use, and is zoned for future development.

The AF-5 zone allows schools, churches, and accessory day care centers as permitted uses, subject to " special use" standards. One of those special use standards is established in Washington County Development Code (CDC) § 430-121.3, which provides that " [s]chools outside an urban growth boundary shall be scaled to serve the rural population." That provision was in effect when the church purchased the property.

The purchased property is developed with a manufactured dwelling and outbuildings. In 2005, petitioner began the process of seeking approval to build a 20,570-square-foot, single-story building that would serve as a combined church sanctuary, day care facility, and school.[FN2] Petitioner indicated that the school would serve 50 children from kindergarten through grade 12, would have five staff members, would be housed in a large multipurpose room within the proposed church building, and would operate from Monday through Friday, from 8:00 a.m. to 4:00 p.m. County staff recommended approval of special uses of the property for a church and a day care facility. However, **761 relying on evidence that the prospective students of the proposed school would be children of church members and that church members primarily resided within the UGB, and applying a " rebuttable rule of thumb" that, in order for a school to be " scaled to serve the rural population" within the meaning of CDC § 430-121.3, at least 75 percent of its student body must be students residing in rural areas, county staff concluded that the proposed school use did not comply with that ordinance provision.[FN3] Staff therefore recommended denial of the school use.

> FN2. Petitioner's use of leased facilities for its school operation continued at all pertinent times.

> FN3. The 75 percent rule of thumb is not an express requirement under any county regulation cited by the parties. The hearings officer's order explained that, " the county hearings officer and Board of Commissioners have construed CDC 430-121.3 to require that at least 75 [percent] of the students attending a school in the rural area must reside in the rural area, in the absence of another basis for complying with that section." In other words, the rule of thumb reflects the county's interpretation of its ordinance. Petitioner does not assert that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that interpretation has been applied to it in a discriminatory manner.

*441 After a hearing, the county land use hearings officer agreed that the proposed school failed to meet the criterion in CDC § 430-121.3. The hearings officer also determined that application of that code provision did not violate RLUIPA. The hearings officer first concluded that application of the criterion did not impose a " substantial burden" on petitioner's religious practice because petitioner had failed to demonstrate that it had made a " sufficiently diligent effort" to locate suitable property within the UGB, where the school use would be permitted outright. The hearings officer also concluded that petitioner had failed to show that operating the school on a site separate from the church imposed a substantial burden on its religious practice, because evidence in the record showed that the church and the school currently were operating in separate locations. The hearings officer issued a decision approving the application as to the church and the day care facility, subject to conditions of approval, and denying it as to the school.

Petitioner appealed to LUBA, arguing that the county's denial of special use approval for a school violated RLUIPA by reason of imposing a substantial burden on its religious practice and not furthering any compelling interest of the county. Pointing to its evidence in the record with respect to the availability of properties within the UGB at the time that it purchased the property, petitioner argued that the county therefore failed to demonstrate that petitioner did not make a " sufficiently diligent effort" to purchase such property. Petitioner also challenged the " sufficiently diligent effort" standard itself, arguing that it was sufficient that it acted reasonably in searching for suitable properties and arguing, alternatively, that the existence of alternative sites is irrelevant.

Notwithstanding that it continued its operations utilizing leased facilities, petitioner argued that the denial of its application imposed a substantial burden, asserting that the current separation of its church and school facilities was *442 intended to be only temporary and that location of the school within the church building was important to the church's religious mission. Finally, relying on _Corp. of Presiding Bishop v. City of West Linn_, 338 Or. 453, 111 P.3d 1123 (2005), and cases cited therein (discussed below), petitioner argued that those issues

were, in effect, " academic" because the county's denial met the test stated in that case: it forced petitioner to choose between forgoing or modifying an expression of its religious belief and obtaining a government benefit.

LUBA affirmed the county's decision. As pertinent to petitioner's arguments under RLUIPA,[FN4] LUBA first determined that, on the record presented, operation of the proposed school was a religious exercise for the purpose of that statute. LUBA then considered whether application of CDC § 430-121.3 imposed a substantial burden on that exercise.**762 LUBA concluded that evidence of the availability of alternative property that met the conditions was relevant to the question whether the inability to operate the school at the same location as the church constituted a substantial burden.

> FN4. Preliminarily, LUBA noted that, in an earlier proceeding, it had determined that denial of a proposed church school under CDC § 430-121.3 did not violate the Free Exercise Clause of the First Amendment to the United States Constitution. _Cf. Corp. of Presiding Bishop_, 338 Or. at 461-64, 111 P.3d 1123 (explaining that RLUIPA is interpreted to embody jurisprudence under Free Exercise Clause). LUBA also noted, however, that the RLUIPA substantial burden test is fact-specific and is therefore not controlled by LUBA's Free Exercise analyses in other cases.

As LUBA explained, the evidence on that issue consisted, initially, of a list of 16 properties in the Sherwood area that are greater than three acres in size and were on the market in January 2006. The list was generated by a real estate broker who represented petitioner during its acquisition of the subject property in 2004. In a memorandum that accompanied the list, the broker stated that most of the identified properties were already developed with residences, and none of the remaining properties had " ease of access off a main thoroughfare."

In addition, petitioner submitted a list of 28 parcels in the Sherwood area that were sold during the last half of 2004. Petitioner also submitted a list of 29 properties that were on the market in January 2006. For both lists, the broker used a filter of four acres and a $10 million upper price *443 limit. All but one of the parcels on the first list were located outside the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UGB and apparently were rejected for that reason. The remaining listed property bore only the notation " 11/05/02 Property Pending Sale." The second list, consisting of properties on the market in January 2006, included notations that rejected each of the 29 properties for various reasons, including " outside the [UGB]," " limited access to the property," " limited exposure of property," " out of price range," and " parcel size too small."

In response, the county submitted a memorandum identifying 16 parcels within the UGB that were located near the subject property that, it asserted, appeared to meet petitioner's size requirements (although the list did not give an acreage count for any of the listed properties). Petitioner responded that, for 12 of the 16 properties, " no market data" was available. According to petitioner, the remaining four properties previously had been sold or listed in the price range of $1.9 million to $2.7 million. Petitioner asserted that those four properties were not acceptable based on access, visibility, or price. Finally, the county identified two additional properties in the area that had been sold in mid-2005 for $125,000 to $160,000 per acre and that appeared to meet petitioner's " criteria." FN5

> FN5. As elaborated below, one of the analytical challenges in this case arises from the paucity of evidence pertaining to the nature and particulars of petitioner's property selection criteria. The two properties sold apparently were included in the list of 16 properties that petitioner's broker furnished. County staff stated that the properties were 13 acres and 13.5 acres in size, respectively. County staff also stated that the properties were subject to the FD-20 zone and indicated that, after being annexed to the city, the properties could be partitioned and any unneeded portion could be sold to a developer. The " FD" designation refers to Future Development.

LUBA concluded that petitioner had made an inadequate showing that it could not acquire alternative property in the same area that met its requirements and, therefore, had failed to demonstrate a substantial burden. LUBA noted that petitioner had submitted lists of available properties intended to demonstrate that there were no suitable properties for sale within the UGB and that the county in turn had submitted evidence of suitable

parcels within the UGB. Although LUBA declined to adopt the county's " sufficiently diligent effort" test, LUBA determined that, in order to demonstrate a substantial burden, petitioner " must do more than *444 present a * * * list of properties * * * and attempt to disqualify" the properties " based on ill-defined ' criteria.' " Rather, LUBA reasoned, it would not substantially burden petitioner to seek out properties that were not listed for sale or take other steps that land developers commonly take.

LUBA also reasoned that it was " immaterial" at that point that petitioner already owned the subject property. Relying on *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 n. 11 (11th Cir.2004), *cert. den.*, 543 U.S. 1146, 125 S.Ct. 1295, 161 L.Ed.2d 106 (2005), for the proposition that RLUIPA does not require local governments to " shield" religious entities from the " sometimes ' harsh reality' of the market," LUBA concluded that it was not a substantial burden on petitioner's religious practice to require petitioner to sell its existing property **763 and purchase other property that was already zoned to allow both a church and a school, even if such property exceeded petitioner's financial capabilities or required petitioner to trade off some other desired characteristic such as access or visibility; according to LUBA, the only proper criteria for disqualifying property from consideration for RLUIPA purposes were criteria related to religious exercise.FN6

> FN6. LUBA explained, in part, that, in the absence of evidence that particular property has religious significance, it regarded undeveloped land as " relatively fungible" ; it also noted that petitioner knew or should have known at the time it purchased the property that it was subject to CDC § 430-121.3.

Finally, having concluded that requiring petitioner to purchase some other property was not a substantial burden on petitioner's religious exercise, LUBA explained that it need not decide whether evidence in the record that petitioner already was " successfully" operating a school at a separate site from the site where it held religious services provided an alternative basis for affirming the county's decision or, conversely, whether petitioner's evidence regarding the necessity of locating the church and the school on the same premises was sufficient to require a different result under the " substantial burden"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 P.3d 759                                                                                                Page 5

211 Or.App. 437, 154 P.3d 759

(Cite as: 211 Or.App. 437, 154 P.3d 759)

test.[FN7] As noted, LUBA affirmed the county's decision.

> FN7. LUBA noted that petitioner's pastor, Lindsey, had testified that church doctrine requires church school students to have access to church staff and requires a church sanctuary to be " adjacent to the classrooms." According to LUBA, that testimony established only that the church and school were required to be " in relatively close proximity." Again, however, LUBA determined that it was not required to resolve that issue.

*445 On judicial review, petitioner again renews its argument that the county's application to it of CDC § 430-121.3 imposed a substantial burden on its religious exercise in violation of RLUIPA. Specifically, petitioner asserts that LUBA gave improper weight to the fact that petitioner currently operates a school at a separate location from the location at which it conducts religious services; petitioner asserts that it presented sufficient evidence that the ability to offer classroom instruction and worship within the same building is critical to its religious mission.[FN8] Petitioner also emphasizes that it already has obtained permission to construct a church building and operate a day care facility on the subject property and urges us to consider that context in determining the extent of the burden imposed by the county's denial of the school use; according to petitioner, it is being forced to choose between adhering to its religious precepts and forgoing the government benefit of building the church, on the one hand, or building the church and forgoing its religious mission of operating a church school, on the other. Relying on the analysis in *Sts. Constantine, Helen Greek Orth. v. New Berlin,* 396 F.3d 895 (7th Cir.2005), petitioner argues that merely requiring an applicant to purchase alternative property, considered in combination with the additional application proceedings that the new property would require, imposes a substantial burden on its religious practice and that it therefore was not required to show either that this specific property has " religious significance" to it or that there were no other suitable properties available.[FN9] Alternatively, petitioner argues that the subject property has religious significance to it because it already has obtained permission to construct a church thereon. Finally, petitioner argues that LUBA's " additional requirements," including the requirement that

petitioner make offers for properties not *446 currently on the market, considered in light of LUBA's conclusion that unaffordability is not relevant, themselves impose substantial burdens on petitioner.

> FN8. Again, as noted, the record includes testimony by the church's pastor that it is important for students to have access during the school day to church staff and the church sanctuary; petitioner reiterated those points during oral argument before this court.

> FN9. Petitioner also cites a committee report for the Religious Liberty Protection Act of 1999, the findings for which were incorporated into the record in support of RLUIPA, for the proposition that Congress intended for RLUIPA to apply to properties currently owned by a religious entity. H.R. Rep. No. 219, 106th Cong., 1st Sess. (1999).

In its response, the county first asks us to strike petitioner's arguments based on the **764 ostensible fact that a church will be built on the subject property; as we understand the county's argument, that fact should not be assumed because the decision that is at issue in this judicial review proceeding-and therefore is not final-included the approval of the church use. The county also contends that petitioner failed to raise below the issue whether the delay and expense associated with seeking other properties constitutes a substantial burden.

Turning to the merits, the county argues that the record demonstrates that locating the school within the church building was a matter of mere practical convenience and not a matter of religious belief. The county also argues that, in any event, the issue is whether it substantially burdens petitioner's religious exercise to deny the requested school use *on the subject property.* The county argues that it does not, because there is no evidence that this particular property has religious significance or that seeking out and purchasing other property would be a substantial burden; the county also notes that, aside from the initial purchase of the property, petitioner has not yet made an extensive investment in it such as by constructing the church building.

In addition, the county argues that RLUIPA's protections do not apply " where the property owner's choice creates the alleged burden" -here, the choice

to buy less expensive rural property rather than urban property where a school would be allowed outright. Relatedly, the county also contends that LUBA correctly concluded that petitioner failed to make a sufficient search for other properties and urges us to follow the reasoning of LUBA that petitioner's choice of property cannot be based on mere convenience or practical concerns and that, as a matter of law, the difficulty and costs of acquiring suitable property are not a substantial burden. The county contends that denial of the permit also does not constitute a substantial burden because it does not force petitioner to forgo providing religious education, but *447 merely prohibits it from providing it to an urban population in a rural location. Finally, the county contends that it has not denied petitioner's application while approving applications of other entities similarly situated, applied vague standards, acted for political reasons, or otherwise engaged in invidious discrimination or unfair treatment. Conversely, the county argues that interpreting RLUIPA to require approval of petitioner's school use when a nonreligious entity would not be entitled to approval would violate the Establishment Clause of the First Amendment to the United States Constitution.

Before turning to the applicable analysis, we address the county's initial points. First, we decline to " strike" petitioner's arguments purportedly based on the assumption that a church will be built on the subject property. The county has approved petitioner's requested church use. We also conclude that petitioner did not fail to preserve the issue whether the delay and costs associated with seeking an alternative property constitutes a substantial burden. Petitioner's submission of evidence and arguments pertaining to the availability of alternative property at the time of the hearing, as well as at the time it purchased the subject property, sufficed to raise that issue.

We turn to RLUIPA. 42 U.S.C. section 2000cc provides, in part:
" (a) Substantial burdens

" (1) General rule

" No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-
" (A) is in furtherance of a compelling governmental interest; and
" (B) is the least restrictive means of furthering that compelling governmental interest."

Under RLUIPA, " religious exercise" includes " any exercise of religion, whether or not compelled by, or central to, a system *448 of religious belief." 42 U.S.C. § 2000cc-5(7)(A). RLUIPA expressly defines " religious exercise" to include " [t]he use, building, or conversion of real property for the purpose**765 of religious exercise * * *." 42 U.S.C. § 2000cc-5(7)(B). See also 42 U.S.C. § 2000cc-2(b) (plaintiff has burden to show that regulation substantially burdens religious exercise; where plaintiff produces prima facie evidence, burden shifts to government as to other elements of claim).[FN10]

> FN10. In a separate provision, RLUIPA also provides that no governmental body " shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution," 42 U.S.C. § 2000cc(b)(1), and that no governmental body " shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). This case involves only the " substantial burden" provision of RLUIPA set out at 42 U.S.C. § 2000cc(a).

The United States Supreme Court has not yet had occasion to address the proper interpretation and application of the land use provisions of RLUIPA.[FN11] The Oregon Supreme Court has done so, however. In Corp. of Presiding Bishop, a city denied a church's application for a conditional use permit *449 for a new church building, on the grounds that the application did not meet various requirements for buffer zones and screening of the building. 338 Or. at 459, 111 P.3d 1123. The Supreme Court first explained that a person asserting that implementation of a land use regulation violates RLUIPA must demonstrate that a government actor has implemented the regulation in a manner that imposes a " substantial burden" on the person's religious exercise; if the person does so, the land use regulation must yield, unless the record shows that the regulation furthers a compelling governmental

interest and does so in the least restrictive manner possible. *Id.* at 462, 111 P.3d 1123. The court further explained that, in enacting RLUIPA, Congress intended the term " substantial burden" to be interpreted by reference to the United States Supreme Court's jurisprudence relating to the Free Exercise Clause of the First Amendment. *Id.* at 464, 111 P.3d 1123.

> FN11. The United States Supreme Court has addressed the facial validity of provisions of RLUIPA pertaining to the imposition of substantial burdens on the religious exercise of institutionalized persons. 42 U.S.C. § 2000cc-1(a)(1), (2). In *Cutter v. Wilkinson,* 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), after inmates of Ohio state institutions sought accommodation of the exercise of their " nonmainstream" religious practices, prison officials mounted a facial challenge to the relevant portion of RLUIPA, arguing, in part, that it improperly advances religion in violation of the Establishment Clause. In unanimously rejecting that challenge, the Court explained that the Establishment and Free Exercise clauses of the First Amendment " express complementary values [but] often exert conflicting pressures" and that its previous decisions had recognized that the clauses provide " space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause." *Id.* at 719, 125 S.Ct. 2113. The Court concluded that the relevant provisions of RLUIPA constitute a " permissible legislative accommodation of religion" that is not barred by the Establishment Clause. *Id.* at 720, 125 S.Ct. 2113. The Court recognized that a government entity properly applying the law must take adequate account of the burdens that a " requested accommodation" may impose on nonbeneficiaries; it also must ensure that the law is " administered neutrally among different faiths" and does not single out a particular religious sect for special treatment. *Id.* The Court also noted that, in the institutionalized-person's context, it did not understand RLUIPA to " elevate accommodation of religious observances over an institution's need to maintain order and safety" and that it had " no cause to

believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns." *Id.* at 722, 125 S.Ct. 2113. Concluding that RLUIPA " confers no privileged status on any particular religious sect, and singles out no bona fide faith for disadvantageous treatment," the Court held that, on its face, RLUIPA does not violate the Establishment Clause. *Id.* at 724, 125 S.Ct. 2113.

After reviewing that jurisprudence, as well as considering then-existing interpretations of RLUIPA by lower federal courts, the court determined that a land use regulation imposes a substantial burden on religious exercise for the purpose of RLUIPA " only if it ' pressures' or ' forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning one or more of those precepts in order to obtain the benefits, on the other." *Id.* at 465-66, 111 P.3d 1123. *See also Guru Nanak Sikh Soc. v. County of Sutter,* 456 F.3d 978, 988-89 (9th Cir.2006) (a land use regulation imposes a substantial burden on religious exercise when it is " ' oppressive' to a ' significantly great' extent" and imposes a " significantly great restriction or onus upon **766 such exercise" ) (quoting *San Jose Christian College v. Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir.2004)); *Midrash Sephardi, Inc.,* 366 F.3d at 1227 (determining that a " substantial burden" on religious exercise is more than an inconvenience and is " akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly," that is, pressure to forgo religious precepts or pressure that mandates religious conduct); *Civil Lib. for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir.2003), *cert. den.,* 541 U.S. 1096, 124 S.Ct. 2816, 159 L.Ed.2d 262 (2004) (holding that, in context of RLUIPA's broad definition of religious exercise, a land use regulation that imposes a substantial burden on religious *450 exercise is one that renders that exercise " effectively impracticable" ). *See generally* Daniel P. Lennington, *Thou Shalt Not Zone: The Overbroad Applications and Troubling Implications of RLUIPA's Land Use Provisions,* 29 Seattle U. L. Rev. 805 (2006) (reviewing history of RLUIPA; collecting cases interpreting and applying " substantial burden" test in land use context).

The Oregon Supreme Court then assessed the consequences of the city's denial of a conditional use permit in that case. The court determined that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 P.3d 759

Page 8

211 Or.App. 437, 154 P.3d 759

**(Cite as: 211 Or.App. 437, 154 P.3d 759)**

city's denial did not impose a substantial burden on the church because the further action required by the denial-submission by the church of a new permit application-although it would involve costs and delays, would not pressure the church to forgo or modify the expression of a religious belief. *Corp. of Presiding Bishop,* 338 Or. at 467, 111 P.3d 1123. Finally, the court noted that, because the city's denial did not constitute a substantial burden on religious exercise, the court needed not consider whether the denial was justified by a compelling governmental interest or was the least restrictive means of furthering that interest. *Id.* at 467-68, 111 P.3d 1123.

We turn to the application of RLUIPA to petitioner's property. Again, the county approved petitioner's requested special use of its property for a church and an associated day care facility. However, because petitioner's proposed school did not meet the criterion established in CDC § 430-121.3-requiring that rural schools " be scaled to serve the rural population," in that the proposed student body primarily would be taken from urban areas-it denied petitioner's requested special use of the property for a school to be attended by petitioner's members' children. Specifically, the county and, subsequently, LUBA concluded, in effect, that it was incumbent on petitioner to purchase property on which its desired use would be permitted outright and that the cost of selling its existing property in order to now do so was not a substantial burden.

[1] We disagree with the first part of that reasoning and reject it with dispatch. Nothing in RLUIPA requires a religious institution, in order to take advantage of its provisions, *451 to purchase only property on which the desired use is permitted outright.[FN12]

> FN12. By its terms, RLUIPA provides that " [n]o government shall *impose or implement a land use regulation* in a manner that imposes a substantial burden on the religious exercise of a person[.]" 42 U.S.C. § 2000cc(a) (emphasis added). Logically, in an as-applied challenge, the prohibition stated in the emphasized phrase pertains to the property owner's currently owned property, that is, the property as to which the governing body is seeking to " impose or implement" the regulation. Nothing in the Oregon Supreme Court's discussion of RLUIPA in *Corp. of Presiding Bishop*

indicates otherwise.

It follows that the dispositive question is whether implementation of CDC § 430-121.3 in relation to petitioner's property imposes a substantial burden on petitioner's religious exercise for the purpose of RLUIPA, that is, whether it forces petitioner to choose between adhering to a religious practice and obtaining a desired government benefit. We understand the relevant religious practice to be the operation of a school that is to be attended by petitioner's members' children and that is located on the same property as petitioner's church. The government benefit at issue is, of course, approval of that school use.

[2] In this case, the county has attempted to apply a special use standard that would prevent petitioner, as it would any other applicant, from building a school on its rural **767 property, where the school would serve a predominantly urban population. To the extent that other land that would have accommodated the desired combined uses was available within the area when petitioner applied for its permit, that factor logically is important to the determination whether, by applying the special use standard in this case, the county imposed a substantial burden on petitioner's religious exercise. However, there is no persuasive evidence in the record to suggest that such land was not available. As we now explain, we agree with LUBA's conclusion that petitioner failed to make an adequate showing that it could not reasonably acquire other property that met its requirements and, therefore, failed to demonstrate a substantial burden.

The departure point for our analysis is the Supreme Court's decision in *Corp. of Presiding Bishop.* In that case, the court described the pressure required to establish a substantial burden with reference to the Second Circuit's decision in *452*Westchester Day v. Village of Mamaroneck,* 386 F.3d 183 (2d Cir.2004), where a religiously affiliated school challenged, on RLUIPA grounds, the village's denial of a permit that would allow the school to construct a new building and renovate others. In *Westchester Day,* the Second Circuit found that the denial did not create a substantial burden on the school's religious exercise because the village
" did not purport to pronounce the death knell of the School's proposed renovations in their entirety, but rather to deny only the application submitted, leaving open the possibility that a modification of the proposal, coupled with the submission of satisfactory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

data found to have been lacking in the earlier proceedings, would result in approval."

*Id.* at 188. The court noted that the denial of a specific proposal may constitute a substantial burden when the denial seems disingenuous, when curing the problems that formed the basis for the denial " would impose so great an economic burden as to make amendment unworkable," or when the cure itself directly affected religious exercise. *Id.* at 188 n. 3. However, the court found that in that case a mere denial, without more, did not constitute a substantial burden.

In *Corp. of Presiding Bishop,* the court also discussed *Midrash Sephardi, Inc.,* and stated that " the city sought to enjoin synagogues from holding services in a hotel meeting room and a conference room leased from a bank. The injunction would have required the synagogues to relocate farther away from their congregants. The synagogues argued that the injunction would constitute a substantial burden because the religious beliefs of the congregants required them to walk to synagogue. The Eleventh Circuit held that requiring the congregants to walk the extra blocks did not constitute a substantial burden."

338 Or. at 466, 111 P.3d 1123. The court continued:" We agree with the reasoning of the cases discussed above, and, on that basis, we conclude that a government regulation imposes a substantial burden on religious exercise only if it ' pressures' or ' forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning one or more of those precepts in order to obtain the benefits, on the other. See *453Sherbert [v. Verner* ], 374 U.S. [398,] 404, [83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) ] (stating that test)."

*Id.*

*Corp. of Presiding Bishop* is highly instructive but it, alone, does not resolve the present case without reference to the federal decisions, and their progeny, on which the court relied. That is so, for among other reasons, because this case, unlike *Corp. of Presiding Bishop,* involves an outright denial of a proposed land use based on the application of an objectively framed special use standard.

The cases addressing alleged infringements of free exercise rights may be usefully categorized into two

groups. On the one hand, courts routinely find substantial burdens where compliance with a statute itself violates the individual's religious beliefs and noncompliance may subject him or her to criminal sanctions or the loss of a significant **768 government privilege or benefit. See *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (compulsory high school attendance law contrary to Amish religious beliefs); *Sherbert,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (denial of unemployment benefits to Seventh Day Adventist who refused to work on Saturday Sabbath). On the other hand, courts often have been more reluctant to find a violation where compliance with the challenged regulation makes the practice of one's religion more difficult or expensive, but the regulation is not inherently inconsistent with the litigant's beliefs. See *Lakewood, Ohio Cong. of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F.2d 303, 306 (6th Cir.), *cert. den.,* 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983) (holding that " [i]nconvenient economic burdens on religious freedom do not rise to a constitutionally impermissible infringement of free exercise" ); *see also Episcopal Student Foundation v. City of Ann Arbor,* 341 F.Supp.2d 691, 706 (E.D.Mich.2004) (quoting *Lakewood,* 699 F.2d at 307).

In view of those distinct branches of authority, it is useful to review the Supreme Court decisions that have shaped free exercise jurisprudence. In *Sherbert,* the Supreme Court considered whether the denial of unemployment benefits to a Seventh Day Adventist whose employment was terminated for refusing to work on her Sabbath constituted a substantial burden on her religious free exercise. 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965. *454 The Court concluded that it did because the state's denial " force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other[.]" 374 U.S. at 403-04, 83 S.Ct. 1790. The Court held that " to condition the availability of benefits upon this applicant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." *Id.* at 406, 83 S.Ct. 1790.

In *Yoder,* 406 U.S. at 218, 92 S.Ct. 1526, the Supreme Court addressed the issue of whether a compulsory school attendance law that conflicted with Amish religious beliefs, and that imposed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 P.3d 759

211 Or.App. 437, 154 P.3d 759

(Cite as: 211 Or.App. 437, 154 P.3d 759)

criminal sanctions for noncompliance, violated the Free Exercise Clause. The Court held in the affirmative. In particular, the Court stated that " [t]he impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." [FN13] *Id.*

> FN13. Applying the same principles, more recently the Supreme Court declined to find a substantial burden in *Lyng v. Northwest Indian Cemetery Prot. Assn.,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988), and *Locke v. Davey,* 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004). In *Lyng,* various Native American groups challenged the construction of a paved road through federal public land, asserting that the construction would harm sacred areas traditionally used for religious rituals. Although the road " would interfere * * * with [the plaintiffs'] ability to pursue spiritual fulfillment according to their own religious beliefs," 485 U.S. at 449, 108 S.Ct. 1319, the Court concluded it would neither coerce the plaintiffs into violating their religious beliefs, nor " penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Id.* In *Locke,* 540 U.S. at 720-21, 124 S.Ct. 1307, the Supreme Court held that a state scholarship program that prohibited the use of scholarship funds for students pursuing theology degrees did not violate the Free Exercise Clause. In so holding, the Court noted that the program " impose [d] neither criminal nor civil sanctions on any type of religious service or rite," and did not " require students to choose between their religious beliefs and receiving a government benefit."

Applying the principles set out in *Sherbert* and *Yoder,* in *Lakewood,* the Sixth Circuit addressed a congregation's challenge to its city's comprehensive zoning plan, which prohibited the congregation from constructing a place of worship on land owned by the congregation. 699 F.2d at 305-08. Under the zoning plan, only 10 percent of the city's *455 property was designated as land on which a church could be built.

The Sixth Circuit observed that the *Lakewood* ordinance did not prohibit the congregation, or any other faith, from worshiping in the city altogether. The congregation remained free to practice its faith through worship " whether the worship be in homes, schools, other churches, or **769 meeting halls throughout the city." *Id.* at 307.

The court also rejected the congregation's claim that the zoning ordinance imposed a substantial burden because land in commercial zoning districts (in which churches were permitted uses) was more expensive and less conducive to worship than the lot owned by the church. Although the " lots available to the Congregation may not meet its budget or satisfy its tastes," the Sixth Circuit held that the Free Exercise Clause " does not require the City to make all land or even the cheapest or most beautiful land available to churches." *Id.* The court summarized its conclusion that the zoning ordinance did not impose a substantial burden on the congregation's free exercise by stating: " [The ordinance] does not pressure the Congregation to abandon its religious beliefs through financial or criminal penalties. Neither does the ordinance tax the Congregation's exercise of its religion. Despite the ordinance's financial and aesthetical imposition on the Congregation, we hold that the Congregation's freedom of religion * * * has not been infringed."

*Id.* at 307-08.

Of similar import is *Christian Methodist Episcopal Church v. Montgomery,* CV22322, 2007 WL 172496, at *8-9 (D.S.C. Jan. 18, 2007). In that case, the court held that a municipal zoning ordinance that required a property owner or its tenant assignee to apply for a special land use approval did not impose a substantial burden under RLUIPA. In reaching its conclusion, the court relied on a Fourth Circuit decision that was decided under the First Amendment before the passage of RLUIPA. What the court said about that case bears emphasis here:
" In *Christ College, Inc., et al. v. Board of Supervisors, Fairfax Co., et al.,* 944 F.2d 901, 1991 WL 179102 (4th Cir.1991) (unpublished) [*cert. den.* *456502 U.S. 1094, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992)* ], Christ College alleged that the Board of Supervisors of Fairfax County violated the College's free exercise of religion as a result of the Board's denial of the College's application for a special exception to the County's zoning laws to build and operate a schoolhouse in an area zoned residential. The County permitted a school to operate on a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

property zoned for commercial or industrial use as a matter of right; however, it required a school to obtain a special exception to the zoning laws before it located in a[n] area zoned for residential use.

" The Fourth Circuit held that the College failed to establish the first element of a free exercise claim; it did not prove that the zoning laws burdened its exercise of religion. The Court determined that the County's zoning provisions did not absolutely prohibit operation of private or parochial schools because the provisions permitted such a school to be located in either commercial or industrial zones without any special exception. Additionally, with a special exception, such schools could locate within residential zones. The College did not show that conformance to the County's zoning regulations would impair any aspect of its free exercise of religion. ' They have not shown how their rights may only be exercised in a facility located in a residential zone, nor that conforming to the special exception requirements laid down by Fairfax would in any constitutionally significant way burden those rights.' 1991 WL 179102 at *4.

" The Court acknowledged that the County zoning laws made it more difficult for the College to be located on the property of its choice; however the fact that local regulations limit the geographical options of a religious school * * * does not prove that any party's right to free exercise is thereby burdened. There must at least be some nexus between the government regulation-here, a zoning law-and impairment of ability to carry out a religious mission. It is not enough that an entity conducting a religious program of mission would prefer to be located on residential property. That preference must be linked to religious imperative. No such [link] was proved here and the court was correct in concluding the zoning regulations did not burden appellants' free exercise of religion."

*Montgomery,* 2007 WL 172496 at *8-9.

Also pertinent is the Seventh Circuit's observation that:

**770 *457 " Application of the substantial burden provision to a regulation inhibiting or constraining *any* religious exercise * * * would render meaningless the word ' substantial,' because the slightest obstacle to religious exercise incidental to the regulation of land use-however minor the burden it were to impose-could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental

interest by the least restrictive means."

*Civil Lib. for Urban Believers,* 342 F.3d at 761 (emphasis in original). In that case, an association of area churches challenged a city ordinance, alleging that it violated RLUIPA. *Id.* at 755. The court decided that the plaintiffs had not met the requirement of showing a substantial burden and held that a regulation must bear " direct, primary, and fundamental responsibility for rendering religious exercise * * * effectively impracticable" in order to impose a substantial burden. *Id.* at 761.

The Seventh Circuit's standard for showing a substantial burden under RLUIPA apparently was relaxed somewhat in *New Berlin.* In that case, the court held that the defendant municipality had created a substantial burden by requiring a church to " search[ ] around for other parcels of land" rather than rezone property the church already owned. *New Berlin,* 396 F.3d at 901. Other churches had facilities in the same area as the subject land. However, the city in that case was concerned that, if the property were rezoned, a subsequent owner might build a school or other nonreligious facility, and the church thus agreed to a restrictive covenant disallowing such an arrangement. *Id.* at 900-01. The court concluded that the city had no legitimate concerns on which to base its denial of the rezoning but that it nevertheless had swamped the petitioner with a tide of " incompetent" red tape that the court excoriated as unjustified. *Id.* at 900 (describing the city as " flaunting as it were its own incompetence" ). Bluntly, the court was concerned that the municipality had given the petitioner the bureaucratic run around and that the standardless discretion that inhered in its decisional process could mask a discriminatory motive. *Id.*

The Seventh Circuit recently distinguished that circumstance from one where the local government's " discretion *458 is narrowly circumscribed by [its] Zoning Regulations, which set forth the various factors to be considered by [it] in addressing an application for a special use permit." *Vision Church v. Village of Long Grove,* 468 F.3d 975, 990-91 (7th Cir.2006) (distinguishing *New Berlin* ). The same distinction applies here, where the applicable use standard is clear and not subject to ad hoc manipulation. Nor is there any claim of incompetence or bad faith on the county's part in this case.

It is true that, in *New Berlin,* the Seventh Circuit

implied that RLUIPA affords religious institutions greater protection than secular institutions. *Id.* at 900 (" A separate provision of the Act forbids government to ' impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.' "). However, it is easy to overstate the significance of that point; it has limits, and the question is where they lie in cases like the present one.

The United States District Court for the Northern District of Illinois noted in a recent case interpreting *Civil Lib. for Urban Believers* and *New Berlin* that RLUIPA does not entitle religious groups to establish houses of worship anywhere they want. *Petra Presbyterian Church v. Village of Northbrook,* 409 F.Supp.2d 1001, 1007 (N.D.Ill.2006). In that case, a church was not permitted to open in an industrial area, because that was prohibited by the zoning laws of the defendant city, and the church sued the city under RLUIPA. *Id.* at 1003. In holding for the defendant, the court noted that the plaintiff had failed to " account for other areas of Northbrook where churches are allowed," including the " availability of land in * * * commercial districts where churches are allowed with a permit." *Id.* at 1007. Other courts also have considered the availability of other land in the area as a factor in determining whether a substantial burden existed. *See Lakewood,* 699 F.2d at 307 (although " [t]he lots available **771 to the Congregation may not meet its budget or satisfy its tastes," the Free Exercise Clause " does not require the City to make all land or even the cheapest * * * land available to churches" ); *see also Lighthouse for Evangelism v. City of Long Branch,* 100 Fed.Appx. 70 (3rd Cir.2004), *on remand,* 406 F.Supp.2d 507 (D.N.J.2005) (finding no substantial burden where the institution was not completely *459 excluded from the city and could have operated in other districts within the city by right, such as in a commercially zoned district); *Episcopal Student Foundation,* 341 F.Supp.2d at 706; *Christ College, Inc.,* 1991 WL 179102.

The foregoing cases are consistent with the standard adopted by the Oregon Supreme Court in *Corp. of Presiding Bishop,* 338 Or. 453, 111 P.3d 1123. Here, as noted, the county ultimately denied petitioner's application, whereas, in *Corp. of Presiding Bishop,* the court determined that further applications were not foreclosed but were, indeed, encouraged. However, the court's formulation of the substantial

burden standard suggests that, at the least, it would require petitioner to demonstrate that it could not reasonably locate and acquire an alternative site for its desired combined uses. *See Corp. of Presiding Bishop,* 338 Or. at 465-66, 111 P.3d 1123. Although it is not possible to articulate a bright line test for what might constitute a sufficient showing that no reasonable alternatives existed in every case, such a showing must, at the least, demonstrate that a land use decision has forced the applicant to forgo its religious precepts.

That determination is made more difficult in this case because petitioner made little effort to clearly define its property selection criteria or to explain how the failure to satisfy those criteria would require it to forgo its religious precepts. For example, there was no evidence in the record that, in the absence of a particular " access to the property" or " exposure of property" -or, for that matter, a particular price or parcel size-petitioner would be required to forgo its religious precepts. Said another way, there was insufficient evidence that petitioner's religious exercise would have been substantially burdened by buying one of the 29 properties on the market in January 2006 or one of the 16 parcels identified by the county.

Rather than undertake the task of clearly defining its property selection criteria and explaining how the failure to satisfy them would require it to forgo its religious precepts, petitioner essentially has taken the position that the need to look for and acquire other property is itself a substantial burden, because such a search would be time consuming and costly. However, such a showing is insufficient. There was no *460 evidence that a reasonable search and acquisition would have required the interruption or cessation of the church's present activities; it merely would have required a delay and some unknown expense. Moreover, a reasonable search and acquisition that would not require petitioner to forgo religious precepts might entail a balancing of petitioner's preferences with respect to the size and location of potential sites, a not uncommon compromise in all property selection processes. In addition, it might be reasonable to seek out properties that were not listed for sale or take other steps that land developers commonly take in locating property. But the record does not elaborate on those or any other material factors in this case.

Because petitioner failed to demonstrate that

upholding the county's land use decision would force petitioner to forgo its religious precepts, we conclude that petitioner failed to show that the county has imposed a substantial burden under RLUIPA.

We conclude with a brief examination of the dissent's treatment of the issues in this case. We confine our focus to four definitive problems.

First, we and the dissent divide over the issue whether a religious institution is substantially burdened merely because, in order to comply with an applicable land use regulation, it may be required to sell existing property and purchase alternative property. The dissent is somewhat inconsistent about the issue. At one point, the dissent states that it " do[es] not mean to suggest that implementation of a land use regulation in a manner necessitating the purchase of alternative property will always constitute imposition of **772 a substantial burden * * *." 211 Or.App. at 483 n.10, 154 P.3d at 784 n.10 (Wollheim, P.J., dissenting). However, the dissent never explains what would make purchasing alternative property a burden in some cases but not others. It cites a number of cases that recognize the significance of being required to sell existing property and purchase alternative property. *Id.* at 481-83, 154 P.3d at 783-84 (Wollheim, P.J., dissenting). But most of those cases are distinguishable on their facts from the circumstances here.

*461 As discussed, the most sensible way to understand *New Berlin* focuses on the court's concern that the municipality in that case improperly had exercised standardless discretion in its decisional process; any other understanding of the decision is difficult to square with the same court's (albeit a different panel's) decision in *Civil Lib. for Urban Believers.* [FN14]

> FN14. The court in *New Berlin* was satisfied with the following explanation:
> " The district judge inferred from language in our [*Civil Lib. for Urban Believers* ] decision * * * that to satisfy this requirement the Church would have to show that there was no other parcel of land on which it could build its church. But in [*Civil Lib. for Urban Believers* ] the plaintiff churches were challenging Chicago's zoning ordinance, which-unlike New Berlin's-

allows churches to build in areas zoned residential, though it requires them to obtain a permit to build in areas zoned commercial. The requirement of seeking a permit, given that churches don't need one to build in a residential zone, seemed to the panel majority in [*Civil Lib. for Urban Believers* ] not to place a substantial burden on the churches. *Id.* at 761-62. The Church in our case doesn't argue that having to apply for what amounts to a zoning variance to be allowed to build in a residential area is a substantial burden. It complains instead about having either to sell the land that it bought in New Berlin and find a suitable alternative parcel *or be subjected to unreasonable delay by having to restart the permit process to satisfy the Planning Commission about a contingency for which the Church has already provided complete satisfaction.*"
> 396 F.3d at 899-900 (emphasis added)." In light of the emphasized language, we adhere to our understanding of the essential differences between the two cases.

The dissent also relies on the Ninth Circuit's decision in *Guru Nanak Sikh Soc.* As the dissent points out, that case stands for the proposition that, to prove a substantial burden, a religious group need not show that there was *no other* parcel of land on which it could carry out the relevant religious exercise. We agree. However, that proposition does not resolve the issue at hand, which is what showing is required. As elaborated below, the dissent does not provide any assistance in that regard.

Most of the remaining cases on which the dissent relies are distinguishable because the petitioning religious institutions showed that locating and purchasing alternative property on which their proposed uses were permitted would create an unreasonable economic burden. *See Living Water Church v. Charter Tp. Of Meridian,* 384 F.Supp.2d 1123, 1133-34 (W.D.Mich.2005) (substantial burden found where the petitioner was " a small church with limited funds" ); *see also Greater Bible Way Temple v. Jackson,* 268 Mich.App. 673, 708 N.W.2d 756, 762 (2005), *rev. allowed,* *462*474 Mich. 1133, 712 N.W.2d 728 (2006) (substantial burden found where applicant submitted evidence showing that it could not afford to purchase different property).[FN15]

FN15. The dissent also relies on *Vision Church.* 211 Or.App. at 482, 154 P.3d at 784 (Wollheim, P.J., dissenting). Although, as the dissent notes, the Seventh Circuit in that case observed that the municipality merely had required modifications to, not ultimately denied, the church's application, 468 F.3d at 1000, its primary rationale for rejecting the church's substantial burden argument undercuts the dissent's reasoning. The court said:

" Lastly, we turn to Vision's contention that the enactment of the Assembly Ordinance constitutes a ' substantial burden' on its right to the free exercise of religion. The Assembly Ordinance is facially neutral; it applies to the new construction of *all* public use buildings, regardless of their purpose, including not only ' religious institutions,' but also ' aquariums, libraries, museums, private schools, and other similar uses,' * * *. According to Vision, despite its neutrality, the Ordinance was passed for the sole purpose of forcing Vision to reduce the size of its proposed complex, which, in turn, substantially burdens Vision's potential success. Besides temporal proximity between Vision's dispute with the Village over a special use permit and the enactment of the Ordinance, there is no evidence in the record to support this claim. Even if Vision was targeted by the Assembly Ordinance, this does not mean that it was targeted *because of religion:* The Plan Commission was concerned about the size of the church complex and its effect on the character of the Village, concerns separate and independent from the religious affiliation (or lack thereof) of the institution seeking to build on the land."

*Id.* at 999 (emphasis in original). Thus, *Vision Church* is consistent with our rationale for distinguishing *New Berlin* from the circumstances here.

**773 The dissent labors to distinguish some of the cases that we discuss because those cases, in turn, cited the Supreme Court's decision in *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). As the dissent sees it, the effect of the regulation in *Braunfeld* (a Sunday business ban case), " was more ' indirect' * * * than the direct effect of the [one] at issue here." 211 Or.App. at 477, 154

P.3d at 781 (Wollheim, P.J., dissenting). The dissent pursues that theme for several pages, but its criticism perplexes us. We have not cited *Braunfeld,* because we appreciate that it is sensible to steer more closely to the land use problem at hand. The fact that some courts facing similar circumstances have seen fit to discuss *Braunfeld* is not, to our thinking, especially informative. Unlike the dissent, we see no benefit in speculating about which effect is more " indirect," the effect in *Braunfeld* or the effect of the regulation in this case. Such a detour only serves to mask the evidentiary shortcomings in petitioner's case.

*463 Its failure to adequately confront that proof deficiency is the second definitive problem with the dissent's analysis. At various points the dissent concludes that petitioner has been pressured or forced to forgo its religious precepts, 211 Or.App. at 472-73, 483-84, 154 P.3d at 778-79, 784-85 (Wollheim, P.J., dissenting), and that " locat[ing] and purchas[ing] new property where the school use is not conditioned on the criterion imposed under [the regulation is] a significant burden in and of itself * * *." *Id.* at 483, 154 P.3d at 784 (Wollheim, P.J., dissenting). Yet the dissent never articulates what the record actually shows in that regard, that is, what evidence petitioner has offered to demonstrate the burden on its religious practices and the " pressure" or " force" that results from that burden. The dissent also appears to ignore the fact that petitioner rejected properties without clearly defining its criteria. In short, the dissent never confronts the vacuum of proof in the record that searching for or relocating to other property would require petitioner to forgo its religious beliefs.

Third, the dissent overplays the notion that implementation of the county's regulation " has the effect of forcing Timberline Baptist Church to forgo or modify its religious practice of operating a school for the benefit of its members' children at the same location as its approved church." 211 Or.App. at 483, 154 P.3d at 784 (Wollheim, P.J., dissenting). In a real sense, the consequences of the implementation of the regulation are merely *economic.* There is no evidence that petitioner must forgo operating a school for the benefit of its members' children in the same location as petitioner's church; at most it may have to pay more money to do so. As LUBA pointed out, there is nothing of particular religious significance about the subject parcel of land; it merely was less expensive because it is not located within the UGB. The dispositive issue-despite the dissent's focus on the impact of operating the school and church

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

separately-is whether petitioner carried its burden of showing a substantial burden in the absence of a reasonable search for alternative properties where a school *and* church could be built.

Fourth, and finally, the dissent makes one further effort to surmount the foregoing problems. It asserts that, in addition to the burden of seeking and purchasing alternative property, the application of the county's special use standard *464 would result in another burden on petitioner's religious precepts. Specifically, the dissent asserts:

" Timberline Baptist Church's religious precept is the operation of a religious school on the same property as its church. The benefit is the county's approval of the special use permit for the church and day care facility. Timberline Baptist Church is being ' pressured' or ' forced' to give up the approved church and day care facility on the property it owns, or, to ' abandon' its religious precept of operating a church and religious school on the same property and **774 keep the approval of building a church on its property."

211 Or.App. at 473, 154 P.3d at 779 (Wollheim, P.J., dissenting). Later, the dissent characterizes the " forfeit[ure]" of petitioner's " previously obtained church use approval" as a substantial burden that would result from the separate burden associated with looking for and purchasing alternative property. *Id.* at 483, 154 P.3d at 784 (Wollheim, P.J., dissenting). FN16 As the dissent apparently sees things, getting some benefits from the applicable land use regulations pertaining to a particular parcel of property, but not everything that it wants, would cause petitioner to forgo the precept that all of its desired uses should converge in a single facility and thereby would cause it to suffer a substantial burden under RLUIPA. We disagree.

> FN16. The dissent also may think of the following hypothetical scenario as describing a substantial burden as " [s]pecifically, in order to obtain the requested special use approval, Timberline Baptist Church must either operate a school primarily for children other than the children of its members or must arrange for most of its members to move outside the [UGB]." 211 Or.App. at 483, 154 P.3d at 784 (Wollheim, P.J., dissenting). Because there is no evidence that petitioner would, under any circumstance, do either of those things,

we assume that the dissent raises that prospect only to emphasize that it is important for petitioner to operate in a facility that accommodates all three of its desired uses. Because there is no evidence that it is a realistic scenario, we do not address it further.

The dissent's argument is a bootstrap. By purchasing the subject parcel for the purpose of co-locating all three of its desired uses, even though only two of those uses were authorized under the county's special use standard, petitioner has undertaken to unilaterally determine the portions of the law with which it must comply. But things are not that simple. As it relates to the subject property, the benefit to which petitioner is entitled under the county's special use standard is a limited one. That benefit is the right to build a *465 facility that will accommodate two, not three, of petitioner's desired uses. The fact that petitioner would like to treat the limits of that benefit as a substantial burden does not make it proper to do so. Neither petitioner nor the dissent has cited a single case in which a court has allowed a land use applicant to successfully characterize the limits of a land use benefit as a substantial burden in circumstances such as these. FN17 It follows that the dissent's effort to characterize " the forfeiture of petitioner's previously-obtained church use approval" as a separately cognizable substantial burden is misplaced.

> FN17. There is a Free Exercise principle that bears some, albeit only partial, resemblance to the dissent's argument, but which actually undercuts that argument. Although the dissent has not mentioned it, that principle was discussed in *Episcopal Student Foundation.* The court in that case explained *Sherbert* and *Lakewood* in this way:
> " In *Sherbert,* the Supreme Court considered whether the denial of unemployment benefits to a Seventh Day Adventist whose employment was terminated for refusing to work on her Sabbath constituted a substantial burden on her religious free exercise. The Court concluded that it did because the state's denial ' force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning the precepts of her religion in order to accept work, on the other[.]' *Sherbert,* [374 U.S. at 399-401, 83

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 P.3d 759

211 Or.App. 437, 154 P.3d 759

(Cite as: 211 Or.App. 437, 154 P.3d 759)

S.Ct. 1790]. The Court went on to hold, ' [*to*
*] condition the availability of benefits upon*
*this applicant's willingness to violate a*
*cardinal principle of her religious faith*
*effectively penalizes the free exercise of her*
*constitutional liberties.' [Id.* at 404-06, 83
S.Ct. 1790]. *The Sixth Circuit later*
*characterized the infringement found in*
*Sherbert as ' severe, life-threatening*
*economic sanctions.' Lakewood,* 699 F.2d
at 306."
*Episcopal Student Foundation,* 341
F.Supp.2d at 702 (emphasis added). Of
course, the emphasized principle makes
sense as it was applied in *Sherbert* and as it
was explained in *Lakewood.* However,
nothing that would trigger its application has
occurred in this case.

As discussed, petitioner offered no proof
that it would suffer an unreasonable
economic consequence by searching for or
purchasing other property that would
accommodate all three of its desired uses.
Assuming without deciding that the *Sherbert*
principle otherwise might apply to the
present circumstances, in the absence of
proof of such an unreasonable economic
consequence, petitioner failed to show that
the county conditioned the availability of
two approved uses of the subject property on
petitioner's willingness to forgo a precept of
its religious faith.

To summarize, in order to establish that the county's
application of the county's special use standard
substantially burdened petitioner's free exercise of its
religious beliefs, petitioner had to demonstrate that
the county's**775 decision would require it to forgo
its religious precepts because it could not reasonably
locate and acquire an alternative site for its proposed
combined uses. Petitioner failed to make such a
showing. More fundamentally, petitioner did not
*466 clearly define its property selection criteria or
explain how the failure to satisfy those criteria would
require it to forgo its religious exercise. Accordingly,
petitioner failed to establish that the application of
the county's standard imposed a substantial burden
under RLUIPA.

Affirmed.

BREITHAUPT, J. pro tempore, concurring.
WOLLHEIM, P.J., dissenting.BREITHAUPT, J. pro

tempore, concurring.
I concur with the majority in all respects and write
only to call attention to certain matters of interest in
cases such as this.

First, RLUIPA is a federal statute and, as such, the
first inquiry must be whether Congress had the power
to adopt the statute. In RLUIPA, Congress has
constrained the application of the statute so that the
bases of congressional authority are stated as
preconditions to the application of the statute.
RLUIPA specifies that the section at issue here, 42
U.S.C. section 2000cc(a)(2) (2000), applies only to
cases in which, summarizing the statute:
(A) the substantial burden is imposed in a program or
activity that receives federal financial assistance;
(B) the substantial burden affects, or removal of that
substantial burden would affect, commerce with
foreign nations, among the several states, or with the
Indian tribes; or
(C) the substantial burden is imposed in the
implementation of a land use regulation as part of
which individualized assessments are made.

The majority notes that it is assumed that the
predicate listed in (C) above is present in this case.
However, if that assumption were not made, it would
be necessary for the party seeking the benefit of the
federal statute to establish one of the other two bases
for application of the statute. At least one court has
expressed the view that the " Commerce Clause"
predicate found in (B) above itself constitutes an
extension of federal power beyond the limits of the
United States Constitution. *Elsinore Christian Center*
*v. City of Lake Elsinore,* 291 F.Supp.2d 1083
(C.D.Cal.2003). It will always be helpful to courts for
counsel in cases such as this to address *467 the
preconditions for application and the related issues of
congressional power.

Second, petitioner seeks to gain some benefit from
the fact that it purchased the property in question and
might suffer an economic penalty if it had to sell the
property and locate within the urban growth
boundary. However, petitioner presumably knew or
could have determined what the zoning rules were
that applied to this property. Further, petitioner did
not need to purchase the property in order to
determine if it could proceed with its plans. RLUIPA
applies even in cases where the claimant's interest is
only an option or contract right to acquire the land
affected by a land use regulation. 42 U.S.C. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 Or.App. 437, 154 P.3d 759

(Cite as: 211 Or.App. 437, 154 P.3d 759)

2000cc-5(5) (2000). The record here indicates that the land in question is essentially fungible farm land. Accordingly, an option to acquire such property would be, presumably, relatively inexpensive and a condition to closing under a purchase contract relating to zoning approval would, presumably, have been available. In any case, absent a showing by the petitioner that such an inexpensive option or closing condition was not available, I would not give petitioner any credit for having proceeded with a purchase that may have produced damage of petitioner's own making.

WOLLHEIM, P.J., dissenting.
After acquiring property outside the urban growth boundary (UGB) of the City of Sherwood, Timberline Baptist Church sought approval from Washington County for special uses of the property for a church, a day care facility, and a religious school. The proposed facilities were intended to serve the church's members, the majority of whom lived within the UGB. The county granted special use and development review approvals for construction**776 of the church and use as a day care facility. However, based on one of several requirements in the county ordinance pertaining to school uses-that at least 75 percent of the student body of a rural school must be students residing in rural areas-the county denied the requested special use of the property for a religious school. The Land Use Board of Appeals (LUBA) affirmed the county's decision.

*468 On judicial review, the issue is whether LUBA correctly determined that Washington County's denial of a special use permit for a religious school, while at the same time approving a special use permit for both a church and day care facility in the same building, did not constitute a " substantial burden" on Timberline Baptist Church's religious exercise for the purpose of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5 (2000). The majority concludes that the county's denial of a special use permit to use the approved church for a religious school did not constitute a substantial burden under RLUIPA. For the reasons set out below, I would conclude that the county's decision constituted a substantial burden under RLUIPA and would reverse and remand for a determination of whether denial of the special use permit for a religious school furthers a compelling governmental interest and is the least restrictive means of doing so. I, therefore, respectfully dissent.

*Substantial Burden under RLUIPA*

In *Corp. of Presiding Bishop v. City of West Linn, 338 Or. 453, 111 P.3d 1123 (2005)*, the Oregon Supreme Court considered whether a city's denial of a conditional use permit to build a new church meetinghouse constituted a substantial burden for RLUIPA purposes. The court explained that, in enacting RLUIPA, Congress intended the term " substantial burden" to be interpreted by reference to the United States Supreme Court's jurisprudence relating to the Free Exercise Clause of the First Amendment to the United States Constitution. 338 Or. at 464, 111 P.3d 1123. The court reviewed three such cases-*Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 140-41, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); Thomas v. Review Board, 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); and Sherbert v. Verner, 374 U.S. 398, 403-08, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)*-and determined that, under the Free Exercise Clause analyses therein, a " substantial burden" is one that " pressure[s] someone to forgo or modify the expression of a religious belief." *Corp. of Presiding Bishop, 338 Or. at 465, 111 P.3d 1123*.

Because of their " similarity" to the case before it, the Oregon Supreme Court also found instructive the analyses in *469 several federal circuit court cases.[FN1] First, the court noted that, in *Westchester Day v. Village of Mamaroneck, 386 F.3d 183 (2d Cir.2004)*, the Second Circuit found no substantial burden where the government's denial of a permit application was not the " death knell" of the application, but left open the possibility that the government would approve a modified application. The Second Circuit also explained that a denial is more likely to constitute a substantial burden when it is " disingenuous" or when curing the problems on which the denial was based would impose a great financial burden or would directly affect religious practice. See *Corp. of Presiding Bishop, 338 Or. at 465-66, 111 P.3d 1123* (citing and quoting *Westchester Day, 386 F.3d at 188, 188 n. 3*). Next, in *San Jose Christian College v. Morgan Hill, 360 F.3d 1024 (9th Cir.2004)*, the Ninth Circuit held that the mere requirement that the applicant submit a new and more complete application did not impose a substantial burden. See *Corp. of Presiding Bishop, 338 Or. at 466, 111 P.3d 1123* (citing and quoting *San Jose Christian College, 360 F.3d at 1035*). Finally, in *Midrash Sephardi, Inc. v. Town of*

*Surfside,* 366 F.3d 1214 (11th Cir.2004), *cert.* **777 *den.,* 543 U.S. 1146, 125 S.Ct. 1295, 161 L.Ed.2d 106 (2005), two synagogues had challenged a zoning ordinance that excluded religious institutions from the town's business district, and the town sought to enjoin synagogue members from meeting in leased space within the district. The Eleventh Circuit held that requiring congregants to walk farther to attend services did not constitute a substantial burden. *See Corp. of Presiding Bishop,* 338 Or. at 466, 111 P.3d 1123 (citing *Midrash Sephardi, Inc.,* 366 F.3d at 1228.)

> FN1. Decisions from the various federal circuit or district courts are helpful only to the extent that their analyses are persuasive; those decisions are not controlling. We are, of course, bound by our Supreme Court's interpretation of RLUIPA. Additionally, we would be bound by the United States Supreme Court's interpretation of RLUIPA, if the Supreme Court had interpreted the land use provisions of RLUIPA.

The Oregon Supreme Court explained that it " agree[d] with the reasoning" of those federal circuit court cases. It thus concluded that, for purposes of RLUIPA, a land use regulation imposes a substantial burden on religious exercise " only if it ' pressures' or ' forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning one or more of those precepts *470 in order to obtain the benefits, on the other." 338 Or. at 465, 111 P.3d 1123. The court applied that test to the facts before it:

" We agree with the church that the denial of the [conditional use permit] has several adverse consequences for the church's effort to build a meetinghouse. The city's decision requires the church to submit a new permit application that reflects the use of a greater portion of an available lot, provides for additional buffering, and includes all of the required noise studies. That resubmission necessarily will impose additional expenses on the church. It also will create delay, during which church members will continue to face crowded conditions at their [current] meetinghouse and the longer drive required to get there.

" Those hardships, however, do not constitute ' substantial burden[s]' under RLUIPA. The church already has indicated that it would be possible to acquire more land to provide the necessary buffering space between the parking lot and Shannon Lane that

the city has requested. The expenses associated with submitting a new application do not constitute a substantial burden in and of themselves, nor does the requirement of submitting the application. The siting of a large building often involves multiple applications by the builder, changes requested by a city planning commission or city council based on zoning and similar requirements, and related legal, architectural, and engineering costs. The city gave specific reasons for denying the first application, and nothing in the record indicates that the city would not approve a revised application that met its concerns. There is no evidence in the record to suggest that the crowded conditions at the meetinghouse have forced the church to turn away anyone who wished to attend church or to eliminate or reduce church activities. Nor is there any evidence in the record to suggest that the city's denial was motivated by religious animus. In short, nothing in the record suggests that requiring the church to submit a new application would pressure the church to forgo or modify the expression of a religious belief, as described in *Sherbert, Thomas,* and *Hobbie.* Moreover, the hardships imposed on the church are likely to be relatively short-lived."

338 Or. at 467, 111 P.3d 1123 (third brackets in original). Finally, the court noted that, because the denial of the permit did not constitute a substantial burden on the church's religious exercise, it needed not consider whether the denial served a compelling *471 governmental interest, whether the denial was the least restrictive means of furthering that interest, or whether RLUIPA violates the First Amendment. *Id.* at 467-68, 111 P.3d 1123.

As does the majority, I treat the Oregon Supreme Court's decision in *Corp. of Presiding Bishop* as the " departure point" for analysis of this case. *See* 211 Or.App. at 451, 154 P.3d at 766. I agree with the majority that *Corp. of Presiding Bishop* is " instructive," but not dispositive. *See Id.* at 453, 154 P.3d at 767. As the majority notes, *Corp. of Presiding Bishop* did not involve a *final and outright denial,* whereas here, the county's denial of the special use permit for a religious school is a *final and outright denial.* I respectfully disagree with the majority's application of *Corp. of Presiding Bishop* to the facts here.

**778 As noted, the county approved Timberline Baptist Church's requested special use of its property for a church and an associated day care facility.

However, because Timberline Baptist Church's proposed religious school did not meet the special use criterion established in Washington County Development Code (CDC), § 430-121.3, it denied Timberline Baptist Church's requested special use of the property for a religious school to be attended solely by Timberline Baptist Church's members' children.[FN2] The county argued, and then LUBA agreed, that it was incumbent on Timberline Baptist Church to purchase property on which its desired use would be permitted outright and that the cost of selling its existing property in order to now do so was not a substantial burden.

> FN2. Timberline Baptist Church's permit application stated that the religious school was " closed," that is, only children of members would be allowed to attend the religious school.

I agree with the majority that the county's argument and LUBA's agreement with that argument were not correct. Timberline Baptist Church was not required to purchase property that permitted outright the building of a church, day care facility, and religious school. *See* 211 Or.App. at 450, 154 P.3d at 766. [FN3] As the majority states, the dispositive question becomes *472 whether implementation of CDC § 430-121.3 in relation to Timberline Baptist Church's property imposes a substantial burden on Timberline Baptist Church's religious exercise for the purpose of RLUIPA, that is, whether the development code forces Timberline Baptist Church to choose between adhering to a religious practice and obtaining a desired government benefit. As does the majority, I understand the relevant religious practice to be the operation of a religious school to be attended by Timberline Baptist Church's members' children, the vast majority of whom reside within the UGB, and that the religious school be located on the same property as Timberline Baptist Church's church; and the relevant benefit is approval of the special use permit for the religious school. In my view, one the majority does not share, the relevant benefit also includes the county's approval of the church and day care facility.

> FN3. The concurrence notes that Timberline Baptist Church knew or could have known what land use ordinances applied to the property before it purchased the property. 211 Or.App. at 466, 154 P.3d at 775 (Breithaupt, J. pro tempore, concurring). I

agree on this point. Likewise, Timberline Baptist Church knew or should have known that the provisions of RLUIPA also applied to this property at the time of purchase.

Particularly after the county approved the special use permit for a church and day care facility, the implementation of CDC § 430-121.3 imposes a substantial burden on the identified religious practice. That is, because, in order to obtain approval of the religious school, by meeting the criterion that the school be scaled for rural use, Timberline Baptist Church will be required to forgo or modify its practice of operating the religious school solely for the children of its members. Alternatively, if Timberline Baptist Church operated the religious school at some other location, it would have been forced to forgo its religious practice of operating its religious school in physical conjunction with its church building. The Supreme Court held that, for purposes of RLUIPA, a land use regulation imposes a substantial burden on religious exercise " if it ' pressures' or ' forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning one or more of those precepts in order to obtain the benefits, on the other." 338 Or. at 466, 111 P.3d 1123. Implementation of CDC § 430-121.3 pressures or forces Timberline Baptist Church to make such a choice here.

To restate my position, the court in *Corp. of Presiding Bishop* stated that a land use regulation imposes a substantial burden on religious exercise " only if it ' pressures' or ' forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning *473 one or more of those precepts in order to obtain the benefits, on the other." 338 Or. at 466, 111 P.3d 1123. The land use regulation here is CDC § 430-121.3. Timberline Baptist Church's religious precept is the operation of a religious school on the same property as its church. The benefit is the county's approval of the special use permit for the church and day care facility. Timberline Baptist Church **779 is being " pressured" or " forced" to give up the approved church and day care facility on the property it owns, or to " abandon" its religious precept of operating a church and religious school on the same property and keep the approval of building a church on its property. Under the Supreme Court's interpretation of RLUIPA in *Corp. of Presiding Bishop,* CDC § 430-121.3 imposes a substantial burden on Timberline Baptist Church.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The " adverse consequences" to Timberline Baptist Church of not receiving a special use approval for not complying with CDC § 430-121.3 are in sharp contrast to the consequences at issue in *Corp. of Presiding Bishop.* There, the court expressly determined that none of the adverse consequences of the city's denial of the building permit application related to any of the church's religious practices. The consequences, therefore, did not cause the church to forgo or modify any such practice. 338 Or. at 467, 111 P.3d 1123. Rather, the adverse consequences concerned the need to comply with conditions relating to the design of the proposed facility, the need to submit a further application incorporating such conditions, and the necessity of incurring the expense and delay associated with taking those actions. The Supreme Court indicated that those types of requirements do not, in and of themselves, constitute substantial burdens but are, instead, typical costs-in both time and money-of obtaining land use approvals. Moreover, the cases deemed instructive by the Supreme Court also involved primarily those types of burdens. *See Westchester Day,* 386 F.3d at 188 (substantial burden not likely where the governing body denied " only the application submitted, leaving open the possibility that a modification of the proposal * * * would result in approval" ; reversing grant of summary judgment); *San Jose Christian College,* 360 F.3d at 1035 (governing body's request that religious entity provide additional required information with its application did not impose a substantial burden); *see also* \*474*Civil Lib. for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir.2003), *cert. den.,* 541 U.S. 1096, 124 S.Ct. 2816, 159 L.Ed.2d 262 (2004) (expenditure of even " considerable" time and money to engage in permit approval process was not a substantial burden).

Here, in order to meet the criterion in CDC § 430-121.3 and still adhere to its religious practice of having its church and religious school at the same location, Timberline Baptist Church apparently will be required to arrange for most of its members to move outside the UGB. Alternatively, it must sell its current property and purchase other property. Those consequences are different in both nature and extent from those present in *Corp. of Presiding Bishop.*

The consequences of the denial relate directly to Timberline Baptist Church's adherence to its religious

practice of operating a religious school for the benefit of its members' children in the same location as the church. The denial imposes a " significantly great restriction or onus" on Timberline Baptist Church's religious exercise of operating a combined church and religious school on the subject property. *See Guru Nanak Sikh Soc. v. Sutter County,* 456 F.3d 978, 988 (9th Cir.2006) (a land use regulation imposes a substantial burden on religious exercise when it is " oppressive to a significantly great extent" and imposes a " significantly great restriction or onus upon such exercise" (citing and quoting *San Jose Christian College,* 360 F.3d at 1034 (internal quotation marks omitted))); *Midrash Sephardi, Inc.,* 366 F.3d at 1227 (determining that a " substantial burden" on religious exercise is " more than an inconvenience" and is " akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly," that is, pressure to forgo religious precepts or pressure that mandates religious conduct).

In determining that the burden at issue here is not substantial, the majority relies on Free Exercise Clause cases that draw a distinction between regulations that directly compel an individual to violate his or her religious beliefs, or noncompliance with which may subject an individual to criminal sanctions or to the loss of a significant government benefit, on the one hand, *see, e.g., Sherbert;* \*475*Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); and regulations that merely make the practice of \*\*780 religion more difficult or expensive, on the other, *see, e.g., Lakewood, Ohio Cong. of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F.2d 303, 306-07 (6th Cir.1983). *See also Episcopal Student Foundation v. City of Ann Arbor,* 341 F.Supp.2d 691, 701-02 (E.D.Mich.2004) (drawing that distinction for purposes of interpreting and applying RLUIPA). From those cases, the majority concludes that imposition of a land use regulation ordinarily cannot be deemed to impose a substantial burden on religious exercise when the impact is essentially economic. 211 Or.App. at 453-55, 154 P.3d at 767-69.[FN4] For several reasons, I believe that those cases are either inapposite or distinguishable.

> FN4. In one sense, I agree with the majority that " the consequences of the implementation of the regulation are merely *economic.*" *See* 211 Or.App. at 463, 154 P.3d at 773 (emphasis in original). But *all*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

decisions concerning the development of real property, at some level, are economic. If there were unlimited financial resources available to Timberline Baptist Church, there would not be this dispute.

First, although *Sherbert* and *Yoder* involved regulations that subjected a religious adherent to, respectively, loss of a government benefit (unemployment compensation) and criminal sanctions (for failure to send children under age 16 to school), neither case holds that economic burdens-regulations that " merely" make the practice of religion more expensive-always are insufficient to implicate the Free Exercise Clause.

Second, the majority's reliance on *Lakewood*, a Free Exercise Clause case, and *Episcopal Student Foundation*, which, in turn, rely on *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (plurality opinion), is misplaced. In *Braunfeld*, a state statute criminalized the retail sale of certain commodities on Sunday. 366 U.S. at 600, 81 S.Ct. 1144. Several Orthodox Jews who operated retail stores challenged enforcement of the statute, alleging that their religion required them to close their businesses on Saturday and that the statutorily required Sunday closing forced them to choose between giving up their observance of the Sabbath or suffering a " serious economic disadvantage" by being closed on both days. *Id.* at 601, 81 S.Ct. 1144. The Court rejected the challenge. It explained that the statute *476 " does not make unlawful any religious practices of appellants; the Sunday law simply regulates a secular activity and, as applied to [the religious adherents], operates so as to make the practice of their religious beliefs more expensive. Furthermore, the law's effect does not inconvenience all members of the Orthodox Jewish faith but only those who believe it necessary to work on Sunday. And even these are not faced with as serious a choice as forsaking their religious practices or subjecting themselves to criminal prosecution. Fully recognizing that the alternatives open to appellants and others similarly situated-retaining their present occupations and incurring economic disadvantage or engaging in some other commercial activity which does not call for either Saturday or Sunday labor-may well result in some financial sacrifice in order to observe their religious beliefs, still the option is wholly different than when the legislation attempts to make a religious practice itself unlawful.

•

" To strike down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, *i.e.*, legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature. * * *

" * * * Consequently, it cannot be expected, much less required, that legislators enact no law regulating conduct that may in some way result in an economic disadvantage to some religious sects and not to others because of the special practices of the various religions. We do not believe that such an effect is an absolute test for determining whether the legislation violates the freedom of religion protected by the First Amendment.

" Of course, to hold unassailable all legislation regulating conduct which imposes solely an indirect burden on the observance of religion would be a gross oversimplification. If the purpose or effect of a law is to impede the observance of one or **781 all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect. But if the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose such a burden."

*477 366 U.S. at 605-07, 81 S.Ct. 1144 (omitted).

*Braunfeld*, which was decided almost 40 years prior to the adoption of RLUIPA, does not compel the result here. The statute at issue " simply regulate[d]" the religious adherents' conduct of a " secular activity." 366 U.S. at 605, 81 S.Ct. 1144. By comparison, the regulation at issue here prevents Timberline Baptist Church from conducting the religious activity itself-operation of a religious school-in the desired manner. Concomitantly, the economic burden on the adherents in *Braunfeld* resulted from the impairment of their secular, nonreligious activities. *Id.* at 606, 81 S.Ct. 1144. The statute in *Braunfeld* affected only those Orthodox Jews who operated retail businesses. The statute did not affect Orthodox Judaism as a whole. *Id.* at 605, 81 S.Ct. 1144. By contrast, here, the entire congregation arguably is affected by the inability of Timberline Baptist Church to operate a religious school for the benefit of members' children. In short, the effect of the statute in *Braunfeld* was more "

indirect," _366 U.S. at 606, 81 S.Ct. 1144,_ than the direct effect of the ordinance at issue here. [FN5] " If the purpose _or effect_ of a law is to impede the observance of one or all religions * * *, that law is constitutionally invalid even though the burden may be characterized as being _only indirect._" (Emphasis added.) _Braunfeld,_ 366 U.S. at 607, 81 S.Ct. 1144. _See also Sherbert,_ 374 U.S. at 404, 83 S.Ct. 1790.

> FN5. In addition, the result in _Braunfeld_ was due at least in part to the significant state interest in " provid[ing] a weekly respite from all labor." _See id._ at 607-09, 81 S.Ct. 1144 (discussing purpose of Sunday closing law); _see also Sherbert,_ 374 U.S. at 408, 83 S.Ct. 1790 (explaining that the statute at issue in _Braunfeld_ was " saved by * * * a strong state interest in providing one uniform day of rest for all workers" ).

The majority also quotes at length from the federal district court's opinion in _Christian Methodist Episcopal Church v. Montgomery,_ CV22322, 2007 WL 172496 (D.S.C. Jan. 18, 2007). _See_ 211 Or.App. at 455-56, 154 P.3d at 769-70. In that case, the town conditionally permitted churches in certain zones and required landowners to obtain the necessary permission. After tenants of a building began holding worship services in the building, the town notified the landowners of the need to comply with town ordinances. The owners took no action. Eventually, the tenants brought a _42 U.S.C. section 1983_ claim against the town, asserting, among other claims, a violation of RLUIPA and seeking money damages. The district court granted summary judgment to the town on three alternative **478 bases: first, that RLUIPA is a remedial statute and that a _section 1983_ claim for money damages does not lie under RLUIPA; second, that, even if the tenants had properly pleaded RLUIPA as an independent cause of action, the case was not ripe because the landowners had not applied for any permits; and third, that, in any event, the tenants had not demonstrated a substantial burden on their religious exercise.

In the latter context, the district court relied in part on _Civil Liberties for Urban Believers_ for the proposition that no substantial burden is present where zoning regulations present only " ordinary difficulties" attendant on any permitting process. The district court also relied extensively on the Fourth Circuit's unpublished opinion in a 1991 Free Exercise Clause case, _Christ College v. Fairfax_

_County,_ 944 F.2d 901 (4th Cir.1991), _cert. den.,_ 502 U.S. 1094, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992). In the latter case, the Fourth Circuit had concluded that, where several of the relevant county's zones permitted the requested use outright and the zone in which the religious entity wished to locate its facility permitted the use with a " special exception" ; where the religious entity had not shown either why its members could exercise their religious beliefs only in the desired zone or how the need to comply **782 with the " special exception" requirements and with applicable fire and safety regulations would impair their religious practice; and where the religious entity had failed to show any " nexus" between the challenged regulation and the impairment of its members' religious practice, the religious entity had failed to demonstrate a substantial burden. Applying those same tests, the district court in _Christian Methodist Episcopal Church_ concluded that the religious entity in that case could not prove that the relevant regulations substantially burdened its members' religious exercise, because the landowners had never applied for the desired use.

The procedural and factual differences between _Christian Methodist Episcopal Church_ and this case make the former distinguishable and not persuasive. That is because, as previously explained, I believe that the burden on petitioner in this case amounts to more than the " ordinary difficulties" of the land use permitting process and that petitioner has both justified the desire to locate its religious *479 school on its church property and demonstrated that compliance with the 75 percent rule will impair that religious practice-that is, petitioner has shown a " nexus" between the regulation and that impairment. No such nexus was established in _Christian Methodist Episcopal Church._

Nor does _Corp. of Presiding Bishop_ suggest that the fact that a burden can be an economic consequence means that it cannot be a substantial burden, as a matter of law. Again, that case, as well as two of the cases relied on by the Oregon Supreme Court in that case-_Westchester Day_ and _San Jose Christian College_-turned on quite different burdens from those at issue here: the requirement that the applicants, at some expense, submit additional applications that met the substantive or procedural conditions or requirements implicated in the governmental entity's denial of the existing applications, such as the modification of building plans or the submission of additional information.[FN6]

FN6. *See also* *Konikov v. Orange County, Fla.,* 410 F.3d 1317, 1323-24 (11th Cir.2005) (requiring submission of applications does not itself offend RLUIPA; where zoning ordinance at issue required application for " special exception" but did not prohibit engaging in religious activity, ordinance did not impose substantial burden).

Another group of cases that suggest that economic consequences-particularly, market forces affecting the price of property-do not constitute a substantial burden under RLUIPA are distinguishable for a different reason: they involve facial challenges to exclusionary zoning ordinances, in which the applied-for uses were prohibited, not conditionally permitted, ones. *See, e.g., Civil Lib. for Urban Believers,* 342 F.3d 752; *Petra Presbyterian Church v. Village of Northbrook,* 409 F.Supp.2d 1001, 1007 (N.D.Ill.2006). RLUIPA may indeed fail to protect a religious institution from the " harsh" economic reality that land in zones in which religious practice is permitted outright is relatively more expensive. However, those cases do not stand for the proposition that economic hardships *never* constitute a substantial burden. Nor do they apply with equal force in a case where an applicant received approval of a permitted use for a church and failed to meet one condition out of several for an associated religious school.[FN7]

FN7. It is worth noting that, in *Civil Lib. for Urban Believers,* the Seventh Circuit based its determination that RLUIPA does not protect religious adherents from the " harsh reality of the marketplace" in part on *Braunfeld. Civil Lib. for Urban Believers,* 342 F.3d at 761-62. As discussed above, that result in *Braunfeld* is more properly attributable to the significantly indirect nature of the economic burden imposed on the religious adherents in that case, as well as to what the court identified as the strong governmental interest in the relevant regulation.

*480 The majority acknowledges that, although there is no bright line test as to what showing an applicant must make in that regard, such a showing " must, at the least, demonstrate that a land use decision has forced the applicant to forgo its religious precepts."

211 Or.App. at 459, 154 P.3d at 771. *Corp. of Presiding Bishop* does not address any requirement relating to the availability of *alternative* property. Neither case presented any facts or analysis relating to such availability.[FN8] In my view, Timberline **783 Baptist Church in this case presented sufficient evidence of the substantial burdens, economic and otherwise, that such a requirement would impose.

FN8. In *Corp. of Presiding Bishop,* the petitioner proposed to construct its meetinghouse on 3.85 acres of its 5.64-acre parcel. 338 Or. at 456, 111 P.3d 1123. The Supreme Court noted that submission of a new application would entail the church's " use of a greater portion of an available lot" and noted that the church had " indicated that it would be possible to acquire more land" for required buffer space. *Id.* at 467, 111 P.3d 1123. Neither of those references implicate a requirement that a church sell its existing property and purchase, or demonstrate the infeasibility of purchasing, *alternative* property.

The fact that the ordinance at issue here is facially neutral and uniformly applicable to all applicants does not mean that the ordinance cannot impose a substantial burden. First, by its terms, the " substantial burden" provision of RLUIPA expressly prohibits specified effects; it does not exempt facially neutral regulations from that prohibition. *See Sts. Constantine, Helen Greek Orth. v. New Berlin,* 396 F.3d 895, 900 (7th Cir.2005) (where RLUIPA includes both a " substantial burden" provision and an " equal treatment" provision, the substantial burden provision must mean something other than a mere requirement to treat a religious entity on equal terms with other land use applicants). Second, as the Oregon Supreme Court explained in *Corp. of Presiding Bishop,* RLUIPA was enacted by Congress in response to the United States Supreme Court's decision in *Employment Div., Ore. Dept. of Human Res. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)-in which the Court had held that government enforcement of valid and neutral laws of general applicability that incidentally restrict religious exercise do not violate the Free Exercise Clause *481 even if they burden religious exercise-specifically to embody, and thus restore, the " heightened scrutiny" test set out in *Sherbert. See also Yoder,* 406 U.S. at 220, 92 S.Ct. 1526 (" A regulation neutral on its face may, in its application,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." (citing *Sherbert* )). Thus, both the express terms of the statute and its legislative history indicate that neither the facial neutrality of a land use regulation, nor its ostensibly uniform application to both secular and religious applicants, is dispositive of the lawfulness under RLUIPA of the governmental implementation of the regulation.

To be perfectly clear, I believe that RLUIPA *requires* giving preference to a religious institution over a secular institution so long as Congress acted in the " space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause." *Cf. Cutter v. Wilkinson*, 544 U.S. 709, 719-20, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (institutionalized-persons provision of RLUIPA is a " permissible legislative accommodation of religion" that operates in the " space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause" ).

*Burden of Providing Sufficient Evidence*

I also respectfully disagree with the majority that Timberline Baptist Church failed to meet its burden to demonstrate a substantial burden by reason of its failure to provide sufficient evidence of the unavailability of other property. The need to sell one's existing property and to locate and purchase alternative property is a burden unlike that of merely meeting design conditions or submitting additional applications relating to one's existing property. At least two federal courts have recognized the significance of being required to sell existing property and purchase alternative property. In *New Berlin,* the plaintiff church acquired a 40-acre parcel in a residential zone that did not allow churches outright. At the time that the church purchased the property, it was bordered on one side by a parcel owned by a second church and on the other side by a parcel owned by a *482 third church that had already sought and obtained a rezoning of its property and approval of a church building. 396 F.3d at 898. Approximately five years after acquiring the property, the plaintiff church sought rezoning and permission to build a church. After the city expressed concern that the plaintiff church might use the property for other uses allowed by the requested new zoning classification, the church modified its application to seek only a **784 planned unit

development overlay ordinance, which specifically allowed only a church. *Id.* The city nevertheless denied approval, suggesting that the church instead seek a conditional use permit. The church demurred out of concern that it could not begin the building process within the relevant time period allowed under that form of permit. *Id.* at 898-99.

The plaintiff church then initiated an action under RLUIPA. The district court granted summary judgment for the city, concluding that, where the church failed to show that there was no other parcel on which it could build the church, the denial did not impose a substantial burden. *Id.* at 899-900.

The Seventh Circuit reversed, determining that the burden in that case-consisting of either " search[ing] around for other parcels of land" or filing additional applications relating to the existing property-was substantial. 396 F.3d at 901. As particularly pertinent here, in regard to the burden of searching for other property, the court noted that, in *Sherbert,* the fact that the plaintiff may eventually have found employment that did not require her to work on her Sabbath, did not make the denial of unemployment benefits insubstantial. *Id.* (citing *Sherbert,* 374 U.S. at 399 n. 2, 83 S.Ct. 1790). The Seventh Circuit therefore reversed the grant of summary judgment in favor of the city and remanded for the parties to negotiate acceptable conditions of approval. *Id.* That court again noted the distinction between the submission of modified applications, on the one hand, and *New Berlin,* involving the location and purchase of a new parcel, on the other, in *Vision Church v. Village of Long Grove,* 468 F.3d 975, 999-1000 (7th Cir.2006). The Ninth Circuit apparently also recognizes that distinction. *See Guru Nanak Sikh Soc.,* 456 F.3d at 989 (noting with approval the reasoning in *New Berlin* that, in order to prove a substantial burden under RLUIPA, a *483 religious organization need not show that there was no other parcel of land on which it could carry out the relevant religious exercise).[FN9]

> FN9. *See also Lighthouse Community Church v. City of Southfield,* 2007 WL 30280 (Jan. 3, 2007) (E.D.Mich.) (selling current property and searching for another is not a " mere inconvenience" but is a substantial burden); *Living Water Church of God v. Charter Tp. of Meridian,* 384 F.Supp.2d 1123, 1132-34 (W.D.Mich.2005) (substantial burden means " something more

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

than an incidental effect on religious exercise" ; finding a substantial burden where the plaintiff was " a small church with limited funds" and the denial of the requested special use would require it to search for and acquire alternative property); *Greater Bible Way Temple v. Jackson*, 268 Mich.App. 673, 708 N.W.2d 756 (2005), *rev. allowed*, 474 Mich. 1133, 712 N.W.2d 728 (2006) (where applicant submitted evidence showing that it could not afford to purchase different property, and there was no dispute that the value of the existing property and the applicant's investment in it were substantial, implementation of ordinance so as to preclude requested religious use of property imposed substantial burden under RLUIPA).

In summary, I would conclude that CDC § 430-121.3, as applied to Timberline Baptist Church, has the effect of forcing Timberline Baptist Church to forgo or modify its religious practice of operating a school for the benefit of its members' children at the same location as its approved church. Specifically, in order to obtain the requested school use approval, Timberline Baptist Church must either operate a school primarily for children other than the children of its members or must arrange for most of its members to move outside the urban growth boundary. Alternatively, Timberline Baptist Church must locate and purchase new property where the school use is not conditioned on the criterion imposed under CDC § 430-121.3, a significant burden in and of itself and, here, one that also will cause Timberline Baptist Church to forfeit its previously obtained church use approval.

In the circumstances presented here, I would conclude that each of those alternative adverse consequences constitutes a substantial burden within the meaning of RLUIPA.[FN10] Accordingly, I would reverse LUBA's contrary decision and remand for consideration of whether CDC § 430-121.3 furthers a compelling**785 governmental interest of the *484 county and is the least restrictive means of doing so. 42 U.S.C. § 2000cc(a)(1)(A)-(B). That disposition also would obviate the necessity to consider at this time whether, as applied to the county's denial of Timberline Baptist Church's requested school use, RLUIPA violates the Establishment Clause of the First Amendment to the United States Constitution.

FN10. I emphasize that I do not mean to suggest that implementation of a land use regulation in a manner necessitating the purchase of alternative property will always constitute imposition of a substantial burden for the purpose of RLUIPA. I conclude only that the specific circumstances at issue here constitute such a burden.

I respectfully dissent.

Or.App.,2007.
Timberline Baptist Church v. Washington County
211 Or.App. 437, 154 P.3d 759

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Tab 6**

Westlaw.

733 N.W.2d 734                                                    Page 1

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

**H**
Greater Bible Way Temple of Jackson v. City of
Jackson
Mich.,2007.

Supreme Court of Michigan.
THE GREATER BIBLE WAY TEMPLE OF
JACKSON, Plaintiff-Appellee,
v.
CITY OF JACKSON, Jackson Planning
Commission, and Jackson City Council,
Defendants-Appellants.
**Docket Nos. 130194, 130196.**
**Calendar No. 5.**

Argued Nov. 13, 2006.
Decided June 27, 2007.

**Background:** Religious organization filed suit
against city, planning commission, and city council
for an alleged violation of the Religious Land Use
and Institutionalized Persons Act (RLUIPA) after
city denied landowner's rezoning request. The
Circuit Court, Jackson County, Chad C. Schmucker,
J., entered judgment in favor of organization. City
appealed. The Court of Appeals, 268 Mich.App.
673, 708 N.W.2d 756, affirmed. Defendants
appealed by leave granted.

**Holdings:** The Supreme Court, Markman, J., held
that:

(1) city's refusal to rezone religious organization's
property was not an "individualized assessment"
required for application of RLUIPA;

(2) assuming RLUIPA was applicable, building of
an apartment complex by a religious organization
was not a "religious exercise;"

(3) assuming that religious organization's building
of an apartment complex was a "religious exercise,"
city's refusal to rezone property was not a "

substantial burden" on that religious exercise;

(4) city's action was in furtherance of a compelling
governmental interests in maintaining character of
single-family residential neighborhood; and

(5) city used least restrictive means of furthering its
compelling governmental interest.

Judgment reversed and remanded.

Cavanagh, J., filed a concurring opinion.

Kelly, J., filed a concurring opinion.
West Headnotes
**[1] Appeal and Error 30 ⟜893(1)**

30 Appeal and Error
  30XVI Review
    30XVI(F) Trial De Novo
      30k892 Trial De Novo
        30k893 Cases Triable in Appellate
Court
          30k893(1) k. In General. Most
Cited Cases
A trial court's ruling on a summary disposition
motion is a question of law that the Supreme Court
reviews de novo.

**[2] Appeal and Error 30 ⟜893(1)**

30 Appeal and Error
  30XVI Review
    30XVI(F) Trial De Novo
      30k892 Trial De Novo
        30k893 Cases Triable in Appellate
Court
          30k893(1) k. In General. Most

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

733 N.W.2d 734                                                                                              Page 2

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

Cited Cases
Questions of statutory interpretation are questions
of law that the Supreme Court reviews de novo.

**[3] Constitutional Law 92 🔗3851**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(A) In General
         92k3848 Relationship to Other
Constitutional Provisions; Incorporation
         92k3851 k. First Amendment. Most
Cited Cases
The protections provided by the First Amendment,
including the Free Exercise Clause, have been
incorporated and extended to the states and to their
political subdivisions by the Fourteenth
Amendment. U.S.C.A. Const.Amends. 1, 14.

**[4] Civil Rights 78 🔗1403**

78 Civil Rights
   78III Federal Remedies in General
      78k1400 Presumptions, Inferences, and
Burdens of Proof
         78k1403 k. Property and Housing. Most
Cited Cases
A plaintiff has the burden to prove that Religious
Land Use and Institutionalized Persons Act
(RLUIPA) is applicable and that the government
has implemented a land use regulation that imposes
a substantial burden on the exercise of religion;
once the plaintiff has proven this, the burden shifts
to the government to prove that the imposition of
such burden is in furtherance of a compelling
governmental interest and constitutes the least
restrictive means of furthering that interest.
Religious Land Use and Institutionalized Persons
Act of 2000, § 4(b), 42 U.S.C.A. § 2000cc-2(b).

**[5] Civil Rights 78 🔗1032**

78 Civil Rights
   78I Rights Protected and Discrimination
Prohibited in General
      78k1030 Acts or Conduct Causing
Deprivation
         78k1032 k. Particular Cases and Contexts.
Most Cited Cases

Religious Land Use and Institutionalized Persons
Act (RLUIPA) applies only if one of three
jurisdictional tests set forth in the Act is first met.
Religious Land Use and Institutionalized Persons
Act of 2000, § 2(a)(2), 42 U.S.C.A. § 2000cc(a)(2).

**[6] Civil Rights 78 🔗1073**

78 Civil Rights
   78I Rights Protected and Discrimination
Prohibited in General
      78k1073 k. Zoning, Building, and Planning;
Land Use. Most Cited Cases
The threshold issue under the Religious Land Use
and Institutionalized Persons Act (RLUIPA) is
whether a substantial burden has been imposed in
the implementation of a land use regulation under
which a government is permitted to make an
individualized assessment of the proposed uses for
the property involved. Religious Land Use and
Institutionalized Persons Act of 2000, § 2(a)(2), 42
U.S.C.A. § 2000cc(a)(2).

**[7] Civil Rights 78 🔗1032**

78 Civil Rights
   78I Rights Protected and Discrimination
Prohibited in General
      78k1030 Acts or Conduct Causing
Deprivation
         78k1032 k. Particular Cases and Contexts.
Most Cited Cases
An "individualized assessment" required for
application of Religious Land Use and
Institutionalized Persons Act (RLUIPA) is an
assessment based on one's particular circumstances.
Religious Land Use and Institutionalized Persons
Act of 2000, § 2(a)(2)(C), 42 U.S.C.A. §
2000cc(a)(2)(C).

**[8] Civil Rights 78 🔗1032**

78 Civil Rights
   78I Rights Protected and Discrimination
Prohibited in General
      78k1030 Acts or Conduct Causing
Deprivation
         78k1032 k. Particular Cases and Contexts.
Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Religious Land Use and Institutionalized Persons Act (RLUIPA) applies when the government makes an assessment based on one's particular or specific circumstances or has in place procedures or practices that would allow the government to make an assessment based on one's particular or specific circumstances. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(2)(C), 42 U.S.C.A. § 2000cc(a)(2)(C).

**[9] Civil Rights 78 ☞1073**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1073 k. Zoning, Building, and Planning; Land Use. Most Cited Cases
The Religious Land Use and Institutionalized Persons Act (RLUIPA) applies when the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(2)(C), 42 U.S.C.A. § 2000cc(a)(2)(C).

**[10] Civil Rights 78 ☞1073**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1073 k. Zoning, Building, and Planning; Land Use. Most Cited Cases
Neither city's decision to adopt zoning ordinance that applied to entire community nor its refusal to rezone religious organization's property from single-family residential to multiple-family residential was an "individualized assessment" required for application of Religious Land Use and Institutionalized Persons Act (RLUIPA). Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(2)(C), 42 U.S.C.A. § 2000cc(a)(2)(C).

**[11] Zoning and Planning 414 ☞151**

414 Zoning and Planning
    414III Modification or Amendment
        414III(A) In General
            414k151 k. Power to Modify or Amend in General. Most Cited Cases

A decision whether to rezone property does not involve consideration of only a particular or specific user or only a particular or specific project; rather, it involves the enactment of a new rule of general applicability, a new rule that governs all persons and all projects.

**[12] Civil Rights 78 ☞1073**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1073 k. Zoning, Building, and Planning; Land Use. Most Cited Cases
Assuming Religious Land Use and Institutionalized Persons Act (RLUIPA) was applicable, building of an apartment complex by a religious organization was a commercial exercise, not a "religious exercise" under RLUIPA that was burden by city's decision not to rezone the property; fact that apartment complex would be owned by a religious institution did not transform the building of apartment complex into a "religious exercise." Religious Land Use and Institutionalized Persons Act of 2000, § 8(7)(A, B), 42 U.S.C.A. § 2000cc-5(7)(A, B).

**[13] Civil Rights 78 ☞1032**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1030 Acts or Conduct Causing Deprivation
            78k1032 k. Particular Cases and Contexts. Most Cited Cases
A "religious exercise," under the Religious Land Use and Institutionalized Persons Act (RLUIPA), consists of a specific type of exercise, an exercise of religion, and this is not the equivalent of an exercise by a religious body. Religious Land Use and Institutionalized Persons Act of 2000, § 8(7)(A, B), 42 U.S.C.A. § 2000cc-5(7)(A, B).

**[14] Civil Rights 78 ☞1073**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1073 k. Zoning, Building, and Planning;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

733 N.W.2d 734                                                                          Page 4

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

Land Use. Most Cited Cases
Assuming that religious organization's building of an apartment complex was a "religious exercise," under Religious Land Use and Institutionalized Persons Act (RLUIPA), city's refusal to rezone property to allow apartment complex was not a " substantial burden" on that religious exercise; city was not forbidding organization from building an apartment complex, but was simply regulating where that apartment complex could be built. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[15] Civil Rights 78 ☞1032**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1030 Acts or Conduct Causing Deprivation
            78k1032 k. Particular Cases and Contexts. Most Cited Cases
A "substantial burden" on one's religious exercise exists, for purposes of the Religious Land Use and Institutionalized Persons Act (RLUIPA), where there is governmental action that coerces one into acting contrary to one's religious beliefs by way of doing something that one's religion prohibits or refraining from doing something that one's religion requires; a "substantial burden" exists when one is forced to choose between violating a law, or forfeiting an important benefit, and violating one's religious tenets. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[16] Civil Rights 78 ☞1032**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1030 Acts or Conduct Causing Deprivation
            78k1032 k. Particular Cases and Contexts. Most Cited Cases
A mere inconvenience or irritation does not constitute a "substantial burden" on one's religious exercise, for purposes of the Religious Land Use and Institutionalized Persons Act (RLUIPA).

Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[17] Civil Rights 78 ☞1032**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1030 Acts or Conduct Causing Deprivation
            78k1032 k. Particular Cases and Contexts. Most Cited Cases
Something that simply makes it more difficult in some respect to practice one's religion does not constitute a "substantial burden" on one's religious exercise, under the Religious Land Use and Institutionalized Persons Act (RLUIPA); rather, a " substantial burden" is something that coerces individuals into acting contrary to their religious beliefs. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[18] Civil Rights 78 ☞1073**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1073 k. Zoning, Building, and Planning; Land Use. Most Cited Cases

**Zoning and Planning 414 ☞167.1**

414 Zoning and Planning
    414III Modification or Amendment
        414III(A) In General
            414k167 Particular Uses or Restrictions
                414k167.1 k. In General. Most Cited Cases
Assuming that city's refusal to rezone religious organization's property from single-family residential to multiple-family residential was a " substantial burden" on organization's "religious exercise," for purposes of the Religious Land Use and Institutionalized Persons Act (RLUIPA), city's action was in furtherance of a compelling governmental interests in regulating where apartment complexes could be built within the city and in maintaining character of single-family

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

733 N.W.2d 734

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

residential neighborhood. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).

**[19] Zoning and Planning 414 ☜6**

414 Zoning and Planning
    414I In General
        414k5 Source and Scope of Power
            414k6 k. Police Power. Most Cited Cases
All property is held subject to the right of the government to regulate its use in the exercise of the police power so that it shall not be injurious to the rights of the community or so that it may promote its health, morals, safety, and welfare; therefore, a municipal body clearly has a compelling interest in enacting and enforcing fair and reasonable zoning regulations.

**[20] Civil Rights 78 ☜1073**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1073 k. Zoning, Building, and Planning; Land Use. Most Cited Cases
Assuming city's refusal to rezone religious organization's property from single-family residential to multiple-family residential was a " substantial burden" on organization's "religious exercise," for purposes of the Religious Land Use and Institutionalized Persons Act (RLUIPA), city's action was least restrictive means of furthering its compelling governmental interest in maintaining character of single-family residential neighborhood. Religious Land Use and Institutionalized Persons Act of 2000, § 2(a)(1), 42 U.S.C.A. § 2000cc(a)(1).
West CodenotesRecognized as Unconstitutional42 U.S.C.A. § 2000bb-1

**\*737** Hubbard, Fox, Thomas, White & Bengston, P.C. (by Mark T. Koerner), Lansing, for the plaintiff.
Julius A. Giglio, City Attorney, Susan G. Murphy, Deputy City· Attorney, and Secrest Wardle (by Gerald A. Fisher, Thomas R. Schultz, and Shannon K. Ozga), Jackson, Farmington Hills, for the defendants.
David S. Parkhurst, Washington, D.C., for amici

curiae National League of Cities and International Municipal Lawyers Association.
Miller, Canfield, Paddock and Stone, P.L.C. (by William J. Danhof and Bree Popp Woodruff), Lansing, for Michigan Municipal League Legal Defense Fund.
MARKMAN, J.
We granted leave to appeal to consider whether the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. 2000cc *et seq.,* entitles plaintiff to the rezoning of its property from single-family residential to multiple-family residential to allow plaintiff to build an apartment complex. The lower courts held that RLUIPA does entitle plaintiff to the rezoning of its property. We conclude that a refusal to rezone does not constitute an "individualized assessment," and, thus, that RLUIPA is inapplicable. Further, even if RLUIPA is applicable, the building of an apartment complex does not constitute a "religious exercise," and even if it does constitute a "religious exercise," the city of Jackson's refusal to rezone plaintiff's property did not substantially burden plaintiff's religious exercise, and even if it did substantially burden plaintiff's religious exercise, the imposition of that burden is in furtherance of a compelling governmental interest and constitutes the least restrictive means of furthering that interest. Therefore, even assuming that RLUIPA is applicable, it has not been violated. For these reasons, we reverse the judgment of the Court of Appeals and remand this case to the trial court for the entry of a judgment in favor of defendants.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff wants to build an apartment complex across the street from its church on property that it owns in the city of Jackson. The property consists of eight lots totaling 1.13 acres. The property is zoned single-family residential (R-1). One of the lots contains a single-family residence, and the remaining lots are vacant. There are single-family residences on each side of the property. Plaintiff petitioned the city to change the zoning of the property\*738 to multiple-family residential (R-3) so that it could construct an apartment complex.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Region 2 Planning Commission recommended denying plaintiff's rezoning petition. After a public hearing, the city planning commission also voted to recommend that the city council deny plaintiff's rezoning petition. Pursuant to these recommendations, and following another public hearing, the city council voted to deny plaintiff's rezoning petition.

Plaintiff then filed a complaint against defendants, containing two counts: count one directly challenged the city's zoning decision and count two alleged a violation of RLUIPA. The trial court granted defendants' motion for summary disposition with regard to count one, which decision was not appealed. With regard to count two, the trial court denied defendants' motion for summary disposition and granted plaintiff's motion for summary disposition in part. Specifically, the trial court ruled that RLUIPA did apply because the city's zoning decision constituted an "individualized assessment," and the refusal to rezone plaintiff's property imposed a "substantial burden" on the exercise of religion. The trial court then ordered a trial on the issue whether the city had a compelling interest for its refusal to rezone. After a bench trial, the trial court ruled that defendants had failed to demonstrate such an interest. Therefore, it determined that defendants had violated RLUIPA and that plaintiff was entitled to the requested rezoning of its property. The trial court enjoined defendant from interfering in any manner with plaintiff's efforts to construct an apartment complex on its property. After the final order was issued, plaintiff filed a motion for attorney fees and costs and the trial court awarded plaintiff over $30,000 in attorney fees and costs.

The Court of Appeals affirmed the trial court in all respects. 268 Mich.App. 673, 708 N.W.2d 756 (2005). The Court of Appeals also held that the application of RLUIPA to compel the requested rezoning did not render the statute unconstitutional. We granted defendants' application for leave to appeal. 474 Mich. 1133, 712 N.W.2d 723, 728 (2006).

## II. STANDARD OF REVIEW

[1][2] A trial court's ruling on a summary disposition motion is a question of law that this Court reviews de novo. *Haynes v. Neshewat*, 477 Mich. 29, 34, 729 N.W.2d 488 (2007). Questions of statutory interpretation are also questions of law that that this Court reviews de novo. *Id.*

## III. ORIGINS OF RLUIPA

[3] The First Amendment of the United States Constitution provides, in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const., Am. I. The second clause of this amendment is commonly known as the Free Exercise Clause. The protections provided by the First Amendment, including the Free Exercise Clause, have been "incorporated" and extended to the states and to their political subdivisions by the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 301, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000).

In *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the plaintiff, a member of the Seventh-Day Adventist Church was discharged by her employer because she would not work on Saturday, the Sabbath Day of her faith. She was unable to obtain other employment because she would not work on Saturdays. The South Carolina Unemployment*739 Compensation Act, S.C. Code, Tit. 68, § 68-1 *et seq.*, provided that a claimant was ineligible for benefits if the claimant had failed "without good cause" to accept available suitable work. The Employment Security Commission determined that the plaintiff's religious belief against working on Saturdays did not constitute "good cause." The United States Supreme Court held that denying the plaintiff unemployment compensation benefits solely because of her refusal to accept employment in which she would have to work on Saturdays contrary to her religious belief imposed a substantial burden on her exercise of her religion that was not justified by a compelling state interest, and, thus, violated the Free Exercise Clause.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the United States Supreme Court held that Oregon's prohibition of the use of peyote in religious ceremonies, and the denial of unemployment benefits to persons discharged for such use, does not violate the Free Exercise Clause of the First Amendment. The Court explained that generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified, under the Free Exercise Clause, by a compelling governmental interest.[FN1]

> FN1. *Smith, supra* at 884, 110 S.Ct. 1595 held that *Sherbert* was distinguishable because *Sherbert* involved an " individualized governmental assessment"; that is, the "good cause" standard at issue in *Sherbert* allowed the government to consider the plaintiff's "particular circumstances." See pp. 15-17 *infra*. That is, *Smith* held that while the " compelling governmental interest" test may be applicable to laws allowing for an " individualized governmental assessment," it is not applicable to generally applicable laws that do not allow for an " individualized governmental assessment."

In response to *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA),[FN2] prohibiting the government from substantially burdening a person's exercise of religion, even by means of a generally applicable, religion-neutral law, unless the government could demonstrate that the burden imposed furthers a compelling governmental interest and that it constitutes the least restrictive means of furthering such interest.

> FN2. RFRA provides, in pertinent part:
> (a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

> (b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person-
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest. [42 U.S.C. 2000bb-1.]

However, in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the United States Supreme Court held that Congress, in enacting RFRA, had exceeded its powers under § 5 of the Fourteenth Amendment to enact legislation enforcing the Free Exercise Clause of the First Amendment because RFRA proscribes state conduct that the First Amendment itself does not proscribe.[FN3] The Court explained:

> FN3. Section 5, the Enforcement Clause of the Fourteenth Amendment, provides:
> The Congress shall have power to enforce, by appropriate legislation, the provisions of this article. [U.S. Const., Am. XIV, § 5.]

Congress' power under § 5, however, extends only to "enforcing" the provisions of the Fourteenth Amendment. The Court has described this power as "remedial ...." The design of the *740 Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."
While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect. [ *Id.* at 519-520, 117 S.Ct. 2157.]

The Supreme Court then concluded that the substantial costs that RFRA exacted through its " compelling governmental interest" test "far exceed any pattern or practice of unconstitutional conduct under the Free Exercise Clause as interpreted in *Smith*." *Id.* at 534, 117 S.Ct. 2157. Thus, "the Court invalidated RFRA as applied to the states, finding it an unconstitutional exercise of Congress' Enforcement Clause powers because Congress had not shown a pattern of religious discrimination meriting such a far-reaching remedy ...." Galvan, *Beyond worship: The Religious Land Use and Institutionalized Persons Act of 2000 and religious institutions' auxiliary uses,* 24 Yale L. & Policy R. 207, 218 (2006).[FN4]

> FN4. Although RFRA no longer applies to the states, it still applies to the federal government. See *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal,* 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) (holding that, under RFRA, the Controlled Substances Act, 21 U.S.C. 801 *et seq.,* cannot prohibit a religious sect from receiving communion by drinking *hoasca,* a tea that contains a hallucinogen).

In response to *City of Boerne,* Congress enacted RLUIPA. Unlike RFRA, RLUIPA does not attempt to bar all laws that substantially burden religious exercise. Instead, it focuses on land use regulations [FN5] and provides, in pertinent part:

> FN5. RLUIPA also focuses on regulations pertaining to institutionalized persons, but that portion of RLUIPA is not applicable here.

(a) Substantial burdens.
(1) General rule. No government [FN6] shall impose or implement a land use regulation [FN7] in a manner that imposes a *741 substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-

> FN6. "Government" is defined as:
> (i) a State, county, municipality, or other governmental entity created under the authority of a State;
> (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and
> (iii) any other person acting under color of State law; and
> (B) for the purposes of sections 4(b) and 5 [ 42 U.S.C. 2000cc-2(b) and 2000cc-3], includes the United States, a branch, department, agency, instrumentality, or official of the United States, and any other person acting under color of Federal law. [ 42 U.S.C. 2000cc-5(4).]

> FN7. "Land use regulation" is defined as a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest. [42 U.S.C. 2000cc-5(5).]
> That the city's denial of plaintiff's petition to rezone its property here constitutes a " land use regulation" is uncontested.

(A) is in furtherance of a compelling governmental interest; and
(B) is the least restrictive means of furthering that compelling governmental interest.
(2) Scope of application. This subsection applies in any case in which-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

\* \* \*

(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved. [42 U.S.C. 2000cc(a).] [FN8]

> FN8. RLUIPA further provides:
> (b) Discrimination and exclusion.
> (1) Equal terms. No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.
> (2) Nondiscrimination. No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.
> (3) Exclusions and limits. No government shall impose or implement a land use regulation that-
> (A) totally excludes religious assemblies from a jurisdiction; or
> (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction. [42 U.S.C. 2000cc(b).]
> Plaintiff does not argue that 42 U.S.C. 2000cc(b) was violated.

[4] "Religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. 2000cc-5(7)(A). RLUIPA specifically provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. 2000cc-5(7)(B). A plaintiff asserting a RLUIPA violation has the burden of presenting prima facie evidence to support the assertion. 42 U.S.C. 2000cc-2(b).[FN9] That is, the plaintiff has the burden to prove that

RLUIPA is applicable and that the government has implemented a land use regulation that imposes a substantial burden on the exercise of religion. *Id.* Once the plaintiff has proven this, the burden shifts to the government to prove that the imposition of such burden is in furtherance of a compelling governmental interest and constitutes the least restrictive means of furthering that interest. *Id.* As the United States Supreme Court has explained, " RLUIPA is [a] congressional effort[ ] to accord religious exercise heightened protection from government-imposed burdens, consistent with this Court's precedents." *\*742Cutter v. Wilkinson,* 544 U.S. 709, 714, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). Therefore, it is clearly appropriate to examine the United States Supreme Court's precedents when analyzing RLUIPA.

> FN9. RLUIPA provides, in pertinent part:
> If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2 [42 U.S.C. 2000cc], the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion. [42 U.S.C. 2000cc-2(b).]

IV. ANALYSIS

A. INDIVIDUALIZED ASSESSMENT

[5][6] The threshold question is whether RLUIPA is applicable to this dispute. The burden is on plaintiff to prove that RLUIPA is applicable. 42 U.S.C. 2000cc-2(b). RLUIPA "applies only if one of three jurisdictional tests is first met ...." *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1225 (C.A.11, 2004); see also *Prater v. City of Burnside,* 289 F.3d 417, 433 (C.A.6, 2002) ("the Church may not rely upon RLUIPA unless it first demonstrates that the facts of the present case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trigger one of the bases for jurisdiction provided in that statute"); *Shepherd Montessori Ctr. Milan v. Ann Arbor Charter Twp.,* 259 Mich.App. 315, 326-327, 675 N.W.2d 271 (2003) ( "[i]n order to establish a claim under RLUIPA, a party must establish at least one of these three jurisdictional elements exists"). RLUIPA states that it "applies in any case in which,"
(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, *individualized assessments* of the proposed uses for the property involved. [42 U.S.C. 2000cc(a)(2) (emphasis added).] [FN10]

> FN10. RLUIPA also "applies in any case in which,"
> (A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;
> (B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability .... [42 U.S.C. 2000cc(a)(2).]
> However, it is uncontested that A and B are not applicable to the instant case.

Therefore, the issue is whether a substantial burden has been imposed in the implementation of a land use regulation under which a government is permitted to make an individualized assessment of the proposed uses for the property involved.

This is not the first time that the phrase " individualized assessment" has been employed. The United States Supreme Court distinguished its decision in *Bowen v. Roy,* 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), from its decisions in *Sherbert* and *Thomas v. Review Bd. of Indiana Employment Security Div.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), on the basis that the

latter decisions, unlike *Bowen,* involved " individualized assessments." [FN11] "The statutory conditions at issue in [*Sherbert* and *Thomas* ] provided that a person was not eligible for unemployment compensation benefits if, 'without good cause,' he had quit work or refused available work. The 'good cause' standard created a mechanism for individualized**743** exemptions." *Roy, supra* at 708, 106 S.Ct. 2147. In *Sherbert* and *Thomas,* the Court held that when the government applies individualized exemptions, but refuses to extend an exemption to an instance of genuine " religious hardship," the government must demonstrate a compelling reason for denying the requested exemption. *Id.*

> FN11. In *Sherbert,* as discussed above, the United States Supreme Court held that South Carolina's denial of unemployment compensation benefits to a member of the Seventh-Day Adventist Church who could not find work because her religious convictions prevented her from working on Saturdays abridged her right to the free exercise of her religion. In *Thomas,* the United States Supreme Court held that Indiana's denial of unemployment compensation benefits to a Jehovah's Witness who terminated his employment because his religious beliefs prevented him from participating in the production of weapons abridged his right to the free exercise of his religion.

In *Smith, supra* at 884, 110 S.Ct. 1595 the United States Supreme Court again emphasized the distinction between governmental action requiring and not requiring individualized assessments.
The *Sherbert* test, it must be recalled, was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct.... [A] distinctive feature of unemployment compensation programs is that their eligibility criteria invite consideration of the particular circumstances behind an applicant's unemployment.... [O]ur decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exemptions, it may not refuse to extend that system to cases of "religious hardship" without compelling reason. [*Id.,* quoting *Bowen, supra* at 708, 106 S.Ct. 2147.]

In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 527, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the United States Supreme Court, against the backdrop of a ritualistic practice of animal sacrifice by practitioners of the Santerian faith, held that a city ordinance that prohibits a person from "unnecessarily ... kill[ing] ... an animal" violates the Free Exercise Clause of the First Amendment. The Court explained:
[B]ecause it requires an evaluation of the particular justification for the killing, this ordinance represents a system of "individualized governmental assessment of the reasons for the relevant conduct ... ." As we noted in *Smith,* in circumstances in which individualized exemptions from a general requirement are available, the government "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." [*Id.* at 537, 113 S.Ct. 2217 (citations omitted).]

[7][8][9]  "Individualize" is defined as "to ... consider individually; specify; particularize." *Random House Webster's College Dictionary* (1991). Therefore, an "individualized assessment" is an assessment based on one's particular circumstances. Accordingly, RLUIPA applies when the government makes an assessment based on one's particular or specific circumstances or has in place procedures or practices that would allow the government to make an assessment based on one's particular or specific circumstances. As the Ninth Circuit Court of Appeals recently held, " RLUIPA applies when the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use." *Guru Nanak Sikh Society of Yuba City v. Sutter Co.,* 456 F.3d 978, 986 (C.A.9, 2006).

[10][11]  In the instant case, the city adopted a zoning ordinance that applied to the entire community, not just to plaintiff. See *West v. City of Portage,* 392 Mich. 458, 469, 221 N.W.2d 303

(1974) (" '[Z]oning ordinances ... are classified as general policy decisions which apply to the entire community.' ") (Citation omitted.) Concomitantly, if the city had granted plaintiff's request to rezone the property, such rezoning would also have applied to the entire community, not just plaintiff.[FN12] A *744 decision whether to rezone property does not involve consideration of only a particular or specific user or only a particular or specific project; rather, it involves the enactment of a new rule of general applicability, a new rule that governs all persons and all projects. See *Sherrill v. Town of Wrightsville Beach,* 81 N.C.App. 369, 373, 344 S.E.2d 357 (1986) ("it is the duty of the zoning authority to consider the needs of the entire community when voting on a rezoning, and not just the needs of the individual petitioner"). Thus, if the city had granted plaintiff's request to rezone the property from single-family residential to multiple-family residential, plaintiff could then have sold the property to any third party and that third party could have sold the property to any other third party and any of these parties could have built an apartment complex or any other conforming building on that property. Therefore, the city's decision whether to rezone the property would not have been predicated on plaintiff's particular circumstances or plaintiff's particular project.[FN13] Even if the city had affirmatively wanted plaintiff to build an apartment complex on its property, it could not have granted the requested zoning change unless it was also prepared to accommodate all projects falling within the scope of the rezoning. Plaintiff's particular circumstances were simply not determinative of the city's decision whether to rezone, and, thus, the city's decision did not constitute an "individualized assessment" within the meaning of that term.[FN14] Plaintiff has cited no cases in support of its position that a refusal to rezone property constitutes an "individualized assessment," and we have found none.

> FN12. Although a request to rezone a particular piece of property " 'may be differentiated on the basis that such a determination is narrowly confined to a particular piece of property,' " *West, supra* at 469, 221 N.W.2d 303 (citation omitted),

it still applies to the "entire community." That is, the "entire community" would be bound by the city's decision to rezone or not rezone the property.

FN13. Plaintiff's counsel told the trial court that "even at the planning commission level, they don't care what's being built"; "they don't consider a site plan"; "the site plan itself is irrelevant when it comes to requesting rezoning from R-1 to R-3." Appellant's appendix at 238a, 523a.

FN14. Possibly, if plaintiff had requested a variance and the city had refused that request, this might constitute an "individualized assessment." See *Shepherd, supra* at 320, 675 N.W.2d 271 (holding that "[w]hen the Ann Arbor Charter Township Zoning Board of Appeals examined and subsequently denied plaintiff's petition for a variance, an individualized assessment pursuant to 42 USC 2000cc(a)(2)(C) occurred"). A request for a variance is significantly different from a request to rezone. When one requests a variance, one is requesting permission to use the property for a *specific use.* By contrast, when one requests a rezoning, one is asking the city for permission to use the property for *any use* that would be permitted under the new classification. Therefore, when the city considers a request for a variance, it does consider the specific site plan proposed by the landowner. But, when the city considers a request for rezoning, it considers the numerous different uses that would be permitted under the new classification, and it does not consider a specific site plan.

Moreover, plaintiff has presented no evidence to suggest that the city has in place procedures or practices that would permit the city to make "individualized assessments" when determining whether to rezone property.

Because the city's refusal to rezone the property did not constitute an "individualized assessment," and because there is no evidence that the city has in place procedures or practices that would permit it to make "individualized assessments" when determining whether to grant requests to rezone property, RLUIPA is not applicable here.

**\*745 B. RELIGIOUS EXERCISE**

[12][13] Assuming that RLUIPA is applicable here, the next question is whether the building of an apartment complex constitutes a "religious exercise. " The burden is on plaintiff to prove that the building of an apartment complex constitutes a " religious exercise." 42 U.S.C. 2000cc-2(b). RLUIPA provides in pertinent part:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the *religious exercise* of a person, including a religious assembly or institution, unless .... [42 U.S.C. 2000cc(a)(1) (emphasis added).]

"Religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. 2000cc-5(7)(A). RLUIPA specifically provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. 2000cc-5(7)(B). A " religious exercise" consists of a specific type of exercise, an exercise of *religion,* and this is not the equivalent of an exercise-any exercise-by a religious body. "The term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will." *Davis v. Beason,* 133 U.S. 333, 342, 10 S.Ct. 299, 33 L.Ed. 637 (1890), overruled on other grounds in *Romer v. Evans,* 517 U.S. 620, 634, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). The United States Supreme Court has explained that "[t]he 'exercise of religion' often involves not only belief and profession but the performance of ... physical acts [such as] assembling with others for a worship

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

service [or] participating in sacramental use of bread and wine ...." *Cutter, supra* at 720, 125 S.Ct. 2113 quoting *Smith, supra* at 877, 110 S.Ct. 1595. FN15 The Supreme Court has further held that " [a]lthough RLUIPA bars inquiry into whether a particular belief or practice is 'central' " to a prisoner's religion, see 42 U.S.C. § 2000cc-5(7)(A), the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity. Cf. *Gillette v. United States,* 401 U.S. 437, 457, 91 S.Ct. 828, 28 L.Ed.2d 168, (1971) ("The 'truth' of a belief is not open to question"; rather, the question is whether the objector's beliefs are " 'truly held.' " (quoting *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965))). *Cutter, supra* at 725 n. 13, 125 S.Ct. 2113. Nor, obviously, does RLUIPA bar inquiry into whether a particular belief or practice constitutes an aspect, central or otherwise, of a person's religion.

> FN15. In *Cutter, supra* at 718, 125 S.Ct. 2113 the United States Supreme Court held that "RLUIPA's institutionalized-persons provision, § 3 of the Act, is consistent with the Establishment Clause of the First Amendment." The Court also made clear that "Section 2 of RLUIPA [the land use regulation provision] is not at issue here. We therefore express no view on the validity of that part of the Act." *Id.* at 716 n. 3, 125 S.Ct. 2113.

The question that we must answer is whether plaintiff is seeking to use its property for the purpose of religious exercise.FN16 *746 Obviously, not everything that a religious institution does constitutes a "religious exercise." Plaintiff bears the burden of establishing that its proposed use of the property constitutes a "religious exercise." 42 U.S.C. 2000cc-2(b). In the instant case, the only evidence that plaintiff has presented to establish that its proposed use of the property constitutes a "religious exercise" is an affidavit signed by the bishop of the Greater Bible Way Temple. The affidavit states that plaintiff's mission is set forth in its letterhead as follows:

> FN16. Notwithstanding the inquiry required by RLUIPA into what constitutes a "religious exercise," this Court is extremely cognizant of the difficulties inherent in a judicial body's evaluating the practices of particular religious faiths or assessing the "centrality" of particular religious precepts. In accord, *Smith, supra* at 890, 110 S.Ct. 1595 ("It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious practices that are not widely engaged in; but that unavoidable consequence of democratic government must be preferred to a system in which each ... judge[ ] weigh [s] the social importance of all laws against the centrality of all religious beliefs."); *Lemon v. Kurtzman,* 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (expressing concern about fostering an " 'excessive government entanglement with religion' ") (citation omitted).

The Greater Bible Way Temple stands for truth, the promotion of the Gospel of Jesus Christ through the Apostolic Doctrine, and an exceptional level of service to the community. This includes housing, employment, consulting and supports as determined appropriate in fulfilling our Mission.

The affidavit further states that plaintiff "wishes to further the teachings of Jesus Christ by providing housing and living assistance to the citizens of Jackson." FN17

> FN17. The bishop's affidavit proceeds to state that "there is a substantial need in the City of Jackson for clean and affordable housing, especially for the elderly and disabled." However, because there is no evidence that the proposed complex would either be limited to housing elderly and disabled persons or be designed to accommodate elderly and disabled persons to any particular extent, it is unnecessary to address whether the building of such a complex would constitute a "religious exercise."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

No evidence has been presented to establish that the proposed apartment complex would be used for religious worship or for any other religious activity. Instead, it appears that the only connection between the proposed apartment complex and "religious exercise" is the fact that the apartment complex would be owned by a religious institution.

Generally, the building of an apartment complex would be considered a commercial exercise, not a religious exercise. The fact that the apartment complex would be owned by a religious institution does not transform the building of an apartment complex into a "religious exercise," unless the term is to be deprived of all practical meaning. Something does not become a "religious exercise" just because it is performed by a religious institution. Because plaintiff has not shown that the building of the apartment complex constitutes an exercise in religion, the city's decision not to rezone the property cannot be said to have burdened plaintiff's "religious exercise," and, thus, RLUIPA has not been violated.

### C. SUBSTANTIAL BURDEN

[14] Assuming, however, that the building of an apartment complex does constitute a "religious exercise," the next question is whether the city's refusal to rezone the property to allow the apartment complex constitutes a "substantial burden" on that "religious exercise." The burden is on plaintiff to prove that the city's refusal to rezone the property constitutes a "substantial burden" on plaintiff's exercise of religion. 42 U.S.C. 2000cc-2(b). RLUIPA provides in pertinent part:

No government shall impose or implement a land use regulation in a manner that imposes a *substantial burden* on the religious exercise of a person, including a religious assembly or institution, unless .... [42 U.S.C. 2000cc(a)(1) (emphasis added).]

RLUIPA does not define the phrase "substantial burden." However, this is not the *747 first time that the phrase "substantial burden" has been used.

Before deciding *Smith,* the United States Supreme Court held that a "substantial burden" on one's

religious exercise that was not justified by a compelling governmental interest violated the Free Exercise Clause. *Jimmy Swaggart Ministries v. Bd. of Equalization of California,* 493 U.S. 378, 384-385, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990), quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) ( "Our cases have established that 'the free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden.' "). The United States Supreme Court's definition of "substantial burden" in its free exercise cases is instructive in determining what Congress understood "substantial burden" to mean in RLUIPA.

In *Sherbert, supra* at 404, 83 S.Ct. 1790 the United States Supreme Court held that a "substantial burden " exists when an individual is "force[d] ... to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion ... on the other hand."

In *Thomas, supra* at 717-718, 101 S.Ct. 1425 the Supreme Court explained:

Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

In *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988), the United States Supreme Court explained that "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not constitute " substantial burdens." [FN18]

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

FN18. Relying on *Lyng,* our Court of Appeals held that "for a burden on religion to be substantial, the government regulation must compel action or inaction with respect to the sincerely held belief; mere inconvenience to the religious institution or adherent is insufficient." *Shepherd, supra* at 330, 675 N.W.2d 271.

Several federal circuit courts of appeal have also defined the term "substantial burden." Although we are not bound by these decisions, *Abela v. Gen. Motors Corp.,* 469 Mich. 603, 606, 677 N.W.2d 325 (2004), we find them persuasive.

In *Civil Liberties for Urban Believers v. Chicago,* 342 F.3d 752 (C.A.7, 2003), the Seventh Circuit Court of Appeals held that a Chicago zoning ordinance that allows churches as a matter of right in residential zones, but requires them to obtain special use permits in other zones, does not violate RLUIPA. That court explained:
Application of the substantial burden provision to a regulation inhibiting or constraining *any* religious exercise, including the use of property for religious purposes, would render meaningless the word " substantial," because the slightest obstacle to religious exercise incidental to the regulation of land use-however minor the burden it were to impose-could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental interest by the least restrictive means. We therefore hold that, in *748 the context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise-including the use of real property for the purpose thereof within the regulated jurisdiction generally-effectively impracticable.[FN19]

FN19. In *Lighthouse Institute for Evangelism Inc. v. City of Long Branch,* 100 Fed.Appx. 70 (C.A.3, 2004), the Third Circuit Court of Appeals adopted this same definition of "substantial burden."

While [the ordinance] may contribute to the ordinary difficulties associated with location (by any person or entity, religious or nonreligious) in a large city, [it does] not render impracticable the use of real property in Chicago for religious exercise, much less discourage churches from locating or attempting to locate in Chicago. *See, e.g., Love Church v. City of Evanston,* 896 F.2d 1082, 1086 (7th Cir.1990) ("Whatever specific difficulties [plaintiff church] claims to have encountered, they are the same ones that face all [land users]. The harsh reality of the marketplace sometimes dictates that certain facilities are not available to those who desire them") .... Otherwise, compliance with RLUIPA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations. Unfortunately for Appellants, no such free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious exercise. [*Id.* at 761-762 (emphasis in the original).]

In *San Jose Christian College v. City of Morgan Hill,* 360 F.3d 1024 (C.A.9, 2004), the Ninth Circuit Court of Appeals held that there was no RLUIPA violation where the city denied the plaintiff's rezoning application. [FN20] That court explained:

FN20. We note that the court did not address the preliminary question whether RLUIPA was even applicable to the denial of the rezoning application.

A "burden" is "something that is oppressive." BLACK'S LAW DICTIONARY 190 (7th ed.1999). "Substantial," in turn, is defined as "considerable in quantity" or "significantly great." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1170 (10th ed.2002). Thus, for a land use regulation to impose a "substantial burden," it must be "oppressive" to a "significantly great" extent. That is, a "substantial burden" on " religious exercise" must impose a significantly great restriction or onus upon such exercise.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

478 Mich. 373, 733 N.W.2d 734
(Cite as: 478 Mich. 373, 733 N.W.2d 734)

* * *

[W]hile the PUD ordinance may have rendered College unable to provide education and/or worship at the Property, there is no evidence in the record demonstrating that College was precluded from using other sites within the city. Nor is there any evidence that the City would not impose the same requirements on any other entity seeking to build something other than a hospital [FN21] on the Property. [*Id.* at 1034, 1035.]

> FN21. A city task force concluded that the city urgently needed a hospital and this particular piece of property was the only suitable location in the city for a hospital.

In *Midrash Sephardi,* the Eleventh Circuit Court of Appeals held that an ordinance that prohibits churches and synagogues in the town's business district does not impose a "substantial burden" on the exercise of religion. That court explained:

*749 [A] "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct. [ *Midrash Sephardi, supra* at 1227.]

In *Adkins v. Kaspar,* 393 F.3d 559 (C.A.5, 2004), the Fifth Circuit Court of Appeals held that requiring the presence of a qualified outside volunteer at prison congregations did not impose a "substantial burden" on the plaintiff's exercise of religion. That court explained:

[A] government action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs. [T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some

generally available, non-trivial benefit, and, on the other hand, following his religious beliefs. On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed. [*Id.* at 570.]

In *Spratt v. Rhode Island Dep't of Corrections,* 482 F.3d 33 (C.A.1, 2007), which involved a blanket ban against all preaching activities by prison inmates, the First Circuit Court of Appeals asserted: The district court decided that a "substantial burden" is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," citing *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); see also *Lovelace v. Lee,* 472 F.3d 174, 187 (4th Cir.2006) (applying the *Thomas* standard in a RLUIPA case). Assuming arguendo that *Thomas* applies, ... Spratt has made a prima facie showing that his religious exercise has been substantially burdened. [*Id.* at 38 .]

In *Grace United Methodist Church v. City of Cheyenne,* 451 F.3d 643 (C.A.10, 2006), the Tenth Circuit Court of Appeals held that the city's denial of the plaintiff church's request for a variance from an ordinance prohibiting any entity from operating a commercial day care center in a residential zone did not violate RLUIPA. That court explained:

[T]he incidental effects of otherwise lawful government programs "which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not constitute substantial burdens on the exercise of religion. [*Id.* at 662 (citation omitted).] [FN22]

> FN22. In *Murphy v. Missouri Dep't of Corrections,* 372 F.3d 979, 988 (C.A.8, 2004), the Eighth Circuit Court of Appeals

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

held that, to constitute a substantial burden, the government policy or actions must "significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion." [Citation omitted.]

Although the Sixth Circuit Court of Appeals has applied the same test when applying RFRA, *Miller-Bey v. Schultz,* 1996 WL 67941, 1996 U.S. App. LEXIS 6541 (C.A.6, 1996), it has not yet addressed the meaning of "substantial burden" under RLUIPA. The *Murphy* definition of "substantial burden" seems inconsistent with RLUIPA because RLUIPA specifically defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. 2000cc-5(7)(A).

*750 [15][16][17] After reviewing the above decisions, we believe that it is clear that a " substantial burden" on one's "religious exercise" exists where there is governmental action that coerces one into acting contrary to one's religious beliefs by way of doing something that one's religion prohibits or refraining from doing something that one's religion requires. That is, a " substantial burden" exists when one is forced to choose between violating a law (or forfeiting an important benefit) and violating one's religious tenets. A mere inconvenience or irritation does not constitute a "*substantial* burden." Similarly, something that simply makes it more difficult in some respect to practice one's religion does not constitute a "*substantial* burden." Rather, a " substantial burden" is something that "coerce[s] individuals into acting contrary to their religious beliefs ...." *Lyng, supra* at 450, 108 S.Ct. 1319. [FN23]

FN23. We recognize that some courts have held that a "substantial burden" exists where there is "delay, uncertainty, and expense." See, for example, *Sts Constantine & Helen Greek Orthodox Church v. City of New Berlin,* 396 F.3d 895, 901 (C.A.7, 2005), and *Living Water Church of God v. Meridian Charter Twp.,* 384 F.Supp.2d 1123, 1134 (W.D.Mich., 2005). However, we reject this definition of "substantial burden" both because it is inconsistent with the United States Supreme Court's definition of the phrase and because it is inconsistent with the common understanding of the phrase " *substantial* burden."

In the instant case, plaintiff argues that the city's refusal to rezone its property to allow it to build an apartment complex constitutes a "substantial burden " on its "religious exercise." Even assuming that the building of an apartment complex constitutes a " religious exercise," the city's refusal to rezone the property so plaintiff can build an apartment complex does not constitute a "substantial burden" on that exercise. The city is not forbidding plaintiff from building an apartment complex; it is simply regulating where that apartment complex can be built. If plaintiff wants to build an apartment complex, it can do so; it just has to build it on property that is zoned for apartment complexes. If plaintiff wants to use the property for housing, then it can build single-family residences on the property. In other words, in the realm of building apartments, plaintiff has to follow the law like everyone else. [FN24]

FN24. Plaintiff was aware when it purchased the property that it was zoned single-family residential. Thus, plaintiff's claim that the city's refusal to rezone the property will cause it to lose the money that it invested in the property is meritless.

"While [the zoning ordinance] may contribute to the ordinary difficulties associated with location (by any person or entity, religious or nonreligious) in a large city," *Civil Liberties for Urban Believers,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

*supra* at 761, it does not prohibit plaintiff from providing housing. "Whatever specific difficulties [plaintiff church] claims to have encountered, they are the same ones that face all [land users]." *Id.,* quoting *Love Church, supra* at 1086. The city has not done anything to coerce plaintiff into acting contrary to its religious beliefs, and, thus, it has not substantially burdened plaintiff's exercise of religion. *751Lyng, supra* at 450, 108 S.Ct. 1319.
FN25

FN25. We note that the lower courts' interpretation of the "substantial burden" provision of RLUIPA would seem to render the "discrimination and exclusion" provision of RLUIPA effectively meaningless because it will almost always be easier to prove a "substantial burden" on one's "religious exercise," as those terms are defined by the lower courts, than it will be to prove discrimination or exclusion. See n. 8 *supra.*

### D. COMPELLING GOVERNMENTAL INTEREST

[18] Assuming that the city's refusal to rezone the property constitutes a "substantial burden" on plaintiff's "religious exercise," the next question is whether it is "in furtherance of a compelling governmental interest." The burden is on defendant to prove that the imposition of the burden on plaintiff is in furtherance of a compelling governmental interest. 42 U.S.C. 2000cc-2(b). RLUIPA provides in pertinent part:
No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-
(A) is in furtherance of a *compelling governmental interest* .... [42 U.S.C. 2000cc(a)(1) (emphasis added).]

[19] After a bench trial on this issue, the trial court

held that "this mere concern over zoning [does not] establish[ ] a compelling State interest." We respectfully disagree. It has long been recognized that "local governments have a compelling interest in protecting the health and safety of their communities through the enforcement of the local zoning regulations." *Murphy v. Zoning Comm. of the Town of New Milford,* 148 F Supp 2d 173, 190 (D.Conn., 2001). " 'All property is held subject to the right of the government to regulate its use in the exercise of the police power so that it shall not be injurious to the rights of the community or so that it may promote its health, morals, safety and welfare.' " *Austin v. Older,* 283 Mich. 667, 677, 278 N.W. 727 (1938), quoting *State v. Hillman,* 110 Conn. 92, 105, 147 A. 294 (1929). Therefore, a municipal body "clearly has a compelling interest in enacting and enforcing fair and reasonable zoning regulations." *First Baptist Church of Perrine v. Miami-Dade Co.,* 768 So.2d 1114, 1118 (Fla.App., 2000). "A government's interest in zoning is indeed compelling." *Konikov v. Orange Co.,* 302 F Supp 2d 1328, 1343 (M.D.Fla., 2004); see also *Midrash Sephardi v. Town of Surfside,* 2000 U.S. Dist LEXIS 22629, *51 (S.D.Fla., 2000) (holding that " the zoning interests of Surfside may properly be characterized as compelling"). "The compelling state interest and, hence, the municipal concern served by zoning regulation of land use is promotion of health, safety, morals or general welfare." *Home Bldg. Co. v. Kansas City,* 609 S.W.2d 168, 171 (Mo.App., 1980). "[T]he ordinance serves a compelling state interest; the City['s] ... police power to regulate the private use of the land." *Lyons v. City of Fort Lauderdale,* 1988 U.S. Dist. LEXIS 17646, *5-*6 (S.D.Fla., 1988). "The city has a cognizable compelling interest to enforce its zoning laws.... Reserving areas for commercial activity both protects residential areas from commercial intrusion and fosters economic stability and growth." *Chicago Hts. v. Living Word Outreach Full Gospel Church and Ministries, Inc.,* 302 Ill.App.3d 564, 572, 236 Ill.Dec. 208, 707 N.E.2d 53 (1998); see also *Daytona Rescue Mission, Inc. v. City of Daytona Beach,* 885 F.Supp. 1554, 1560 (M.D.Fla., 1995) (holding that "the City's interest in *752 regulating homeless shelters and food banks is a compelling interest").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

In the instant case, the city has a compelling interest in regulating where apartment complexes can be built within the city. As the United States Supreme Court has explained:

The matter of zoning has received much attention at the hands of commissions and experts, and the results of their investigations have been set forth in comprehensive reports. These reports, which bear every evidence of painstaking consideration, concur in the view that the segregation of residential, business, and industrial buildings will make it easier to provide fire apparatus suitable for the character and intensity of the development in each section; that it will increase the safety and security of home life; greatly tend to prevent street accidents, especially to children, by reducing the traffic and resulting confusion in residential sections; decrease noise and other conditions which produce or intensify nervous disorders; preserve a more favorable environment in which to rear children, etc. With particular reference to apartment houses, it is pointed out that the development of detached house sections is greatly retarded by the coming of apartment houses, which has sometimes resulted in destroying the entire section for private house purposes; that in such sections very often the apartment house is a mere parasite, constructed in order to take advantage of the open spaces and attractive surroundings created by the residential character of the district. Moreover, the coming of one apartment house is followed by others, interfering by their height and bulk with the free circulation of air and monopolizing the rays of the sun which otherwise would fall upon the smaller homes, and bringing, as their necessary accompaniments, the disturbing noises incident to increased traffic and business, and the occupation, by means of moving and parked automobiles, of larger portions of the streets, thus detracting from their safety and depriving children of the privilege of quiet and open spaces for play, enjoyed by those in more favored localities-until, finally, the residential character of the neighborhood and its desirability as a place of detached residences are utterly destroyed. Under these circumstances, apartment houses, which in a different environment would be not only entirely unobjectionable but highly desirable, come very near to being nuisances. [*Village of Euclid v. Ambler Realty Co.,* 272 U.S.

365, 394-395, 47 S.Ct. 114, 71 L.Ed. 303 (1926).]

See also *Kropf v. Sterling Hts.,* 391 Mich. 139, 159-160, 215 N.W.2d 179 (1974) (adopting the above analysis in addressing "why the local zoning board could reasonably restrict multiple dwellings in a residential area"). That a court will defer to zoning authorities and will only overturn a zoning ordinance excluding other uses from a single-family residential area if it is arbitrary or capricious is evidence of the magnitude of the municipalities' interest in such zoning ordinances. *Kropf, supra* at 161, 215 N.W.2d 179 (holding that "[i]t is not for this Court to second guess the local governing bodies in the absence of a showing that that body was arbitrary or capricious in its exclusion of other uses from a single-family residential district").

In this case, much testimony was presented regarding the city's interest in preserving single-family neighborhoods. Charles Reisdorf, the Executive Director of the Regional Planning Commission, testified:

*753 [I]n an area where you have a large number of single-family residences, people have made purchases with the expectation that there will be some stability in the neighborhood. For most of us, the purchase of a home is the major expense of our life .... And so when you-when you have something that's incompatible interjected into a neighborhood area, it creates problems and often results in a blighting situation ....

Dennis Diffenderfer, a planner who has been with the city's Department of Community Development for nearly 20 years, testified:

[A]ny time you even add a duplex or a three- or four-unit or a number of buildings that convert to rental, it does have a negative effect on the adjoining neighbors. I can speak not only as a housing professional, but from experiences.

Charles Aymond, who has served as the chairman of the Jackson Planning Commission for over ten years, testified:

[T]he City has experienced a great deal of blight and destabilization as the result of commercial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

enterprises ... or different residential uses coming into what is generally referred to as a higher residential use.

Plaintiff's own architect, James Pappas, testified that if the property was rezoned multiple-family residential, as the plaintiff desires, a 45-foot apartment complex would be permitted and this would be "inappropriate with that neighborhood."

Given the city's general interest in zoning, and the city's specific interest in maintaining the character of this single-family residential neighborhood, we conclude that the city has a compelling interest in maintaining single-family residential zoning and in not rezoning this area of the city.

### E. LEAST RESTRICTIVE MEANS

[20] Given that the imposition of the burden on plaintiff is in furtherance of a compelling governmental interest, the final question is whether a particular governmental action constitutes the " least restrictive" means of furthering that interest. 42 U.S.C. 2000cc(a)(1)(B). The burden is on defendant to prove that an action constitutes the least restrictive means of furthering the compelling governmental interest. 42 U.S.C. 2000cc-2(b). RLUIPA provides in pertinent part:
No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-
(A) is in furtherance of a compelling governmental interest; and
(B) is the *least restrictive means* of furthering that compelling governmental interest. [42 U.S.C. 2000cc(a)(1) (emphasis added).]

In the instant case, plaintiff asked the city to rezone the property from single-family residential to multiple-family residential. In response, the city could have done one of two things-it could have

granted or it could have denied plaintiff's request to rezone the property. The city decided to deny plaintiff's request to rezone the property. That is, the city decided to maintain the single-family residential zoning. There do not appear to be any less restrictive means of maintaining the single-family residential zoning.

For these reasons, we conclude that any burden placed on plaintiff's exercise of religion is in furtherance of a compelling governmental interest and constitutes the least restrictive means of furthering that *754 compelling governmental interest.[FN26] Therefore, even assuming that RLUIPA is applicable in the instant case, it has not been violated.[FN27]

FN26. 42 U.S.C. 1988(b) provides, "In any action or proceeding to enforce a provision of ... the Religious Land Use and Institutionalized Persons Act of 2000 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ...." For the reasons discussed herein, plaintiff is not a "prevailing party," and, therefore, is not entitled to attorney fees.

FN27. As discussed above, in *City of Boerne,* the United States Supreme Court held that Congress, in enacting RFRA, had exceeded its power under § 5 of the Fourteenth Amendment to enact legislation enforcing the Free Exercise Clause because RFRA proscribes state conduct that the First Amendment itself does not. In *Smith,* the United States Supreme Court held that generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified under the Free Exercise Clause by a compelling governmental interest. However, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Smith, supra* at 884, 110 S.Ct. 1595. Proponents of RLUIPA argue that Congress has the authority to enact RLUIPA because it merely codifies *Smith.* However, the lower courts in the instant case held that, under RLUIPA, a religious institution need not abide by a generally applicable, religion-neutral zoning ordinance unless it is justified by a compelling governmental interest. This seems inconsistent with the Free Exercise Clause as interpreted in *Smith,* which held that a generally applicable, religion-neutral law does *not* have to be justified by such an interest. Whenever possible, courts should construe statutes in a manner that renders them constitutional. *People v. Bricker,* 389 Mich. 524, 528, 208 N.W.2d 172 (1973). Because the lower courts' interpretation of RLUIPA would render RLUIPA unconstitutional, we reject their interpretation and instead adopt the interpretation set forth in this opinion.

## V. CONCLUSION

RLUIPA applies to burdens imposed by governmental bodies on "religious exercises" in the course of implementing land use regulations under which "individualized assessments" may be made of the proposed uses for the land. An " individualized assessment" is an assessment based on one's particular or specific circumstances. A decision concerning a request to rezone property does not involve an "individualized assessment." Therefore, RLUIPA is not applicable here.

A "religious exercise" constitutes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. 2000cc-5(7)(A). However, something does not become a "religious exercise" just because it is carried out by a religious institution. Because the only connection between religion and the construction of the apartment complex in this case is the fact that the apartment complex would be owned by a religious institution, the building of the apartment complex does not constitute a "religious exercise."

A "substantial burden" on one's "religious exercise" exists where there is governmental action that coerces one into acting contrary to one's religious beliefs by way of doing something that one's religion prohibits or refraining from doing something that one's religion requires. A mere inconvenience or irritation does not constitute a " *substantial* burden"; similarly, something that simply makes it more difficult in some respect to practice one's religion does not constitute a " substantial burden." Because the city has not done anything to coerce plaintiff into acting contrary to its religious beliefs, the city has not substantially burdened plaintiff's religious exercise.

Even if the city did substantially burden plaintiff's religious exercise, imposition of *755 that burden here is in furtherance of a compelling governmental interest, namely, the enforcement of local zoning ordinances, and constitutes the least restrictive means of furthering that compelling governmental interest. Therefore, even assuming that RLUIPA is applicable, RLUIPA was not violated. For these reasons, we reverse the judgment of the Court of Appeals and remand this case to the trial court for the entry of a judgment in favor of defendants.

CLIFFORD W. TAYLOR, MAURA D. CORRIGAN, ROBERT P. YOUNG, JR., JJ., concur.MICHAEL F. CAVANAGH, J. (*concurring* ).
I agree with part IV(B) of the majority opinion. I write separately because I believe it is unnecessary to determine whether defendants made an individualized assessment in this case or whether the statutory test of strict scrutiny was met, because plaintiff failed to show that its petition for rezoning was related to plaintiff's exercise of religion. Thus, I would reverse the Court of Appeals judgment on that basis and remand to the trial court for dismissal of plaintiff's claim.

ELIZABETH A. WEAVER, J., concurs.MARILYN J. KELLY, J. (*concurring*).
I agree with the order in which the majority opinion interprets the relevant provisions of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. 2000cc *et seq.* I concur in the majority's holding that there was no individualized assessment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

478 Mich. 373, 733 N.W.2d 734
**(Cite as: 478 Mich. 373, 733 N.W.2d 734)**

in this case and therefore that RLUIPA is not applicable.

I write separately because I believe it is unnecessary to discuss (1) whether the building of an apartment complex was a religious exercise, (2) whether the refusal to rezone plaintiff's property substantially burdened the alleged religious exercise, and (3) whether the alleged burden was in furtherance of a compelling governmental interest and constituted the least restrictive means of furthering that interest. The majority's discussion of these issues is mere dicta.

I would reverse the Court of Appeals judgment because RLUIPA is inapplicable in the instant case.

Mich.,2007.
Greater Bible Way Temple of Jackson v. City of Jackson
478 Mich. 373, 733 N.W.2d 734

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.