**EXHIBIT F**

# City of San Leandro
# Community Development Department
# Planning Services Division
# Staff Report

**DATE:**       February 22, 2007

**TO:**         Planning Commission

**FROM:**       Debbie Pollart, Planning Manager

**SUBJECT:**    Matter of consideration of amendments to Article 3 – Definitions, Article 5 – Residential, Article 13 – Special Review Overlay District, and Article 17 – Off-street Parking & Loading Regulations of the Zoning Code; and consideration of amendments to the Zoning Map. Zoning Code amendments will include deleting definitions for 'Clubs & Lodges' and 'Religious Assembly' and replacing them with 'Assembly Uses', and making changes to Article 5 for consistency with the new definitions; creating a new Assembly Uses Overlay District; and modifying the parking standards for consistency with 'Assembly Uses'. The Zoning Map will be modified to include 197 properties with an Assembly Use (-AU) Overlay District, which would allow assembly uses to be conditionally permitted on these properties.

## SUMMARY AND RECOMMENDATION

In response to an application by a church to re-locate to a non-residential district, staff analyzed the possibility of allowing assembly uses on appropriate non-residential sites, and expanding the land use options for assembly uses.

Staff recommends that the Planning Commission review the proposed Zoning Code text and map amendments, the findings for the proposed rezone, and the associated environmental documentation, and forward a recommendation of approval for the amendments and adoption of the Negative Declaration, and findings for approval of the rezone, to the City Council. The City Council meeting is tentatively scheduled for March 19.

## BACKGROUND

Faith Fellowship Church (FFC) recently purchased the property at 14600 Catalina (formerly occupied by MDL). On May 18, 2006, staff received an application from FFC requesting a Zoning Code amendment to conditionally permit Assembly uses in Industrial Limited (IL) zones, and to rezone their property from Industrial Professional (IP) to IL (thus setting up the possibility for review of a use permit for an assembly use at the 14600 Catalina site).

F-1

Although not currently codified in Article 3 – Definitions of the Zoning Code, assembly uses include the following two uses that are currently defined separately: Clubs and Lodges; Religious Assembly.

Currently, the Zoning Code conditionally permits Religious Assembly uses in R districts, and Faith Fellowship's current location at 577 Manor is zoned RS (PD), Residential Single-Family, Planned Development Overlay District.

A joint worksession with the Board of Zoning Adjustments and Planning Commission was held on October 19. Based upon policy and criteria set forth in the General Plan, staff presented two options for consideration: 1) Amend the Zoning Code to allow Assembly Uses as conditionally permitted in the IL zone; and 2) Apply an Assembly Use Overlay to identified areas. The direction given by the Board and Commission was for staff to move forward with consideration of Option 2. Subsequent to the joint work session, this option was presented to several advisory committees, including the West San Leandro/MacArthur Boulevard Redevelopment Area Advisory Committee, the Chamber of Commerce Government Affairs Committee, and the Joint Redevelopment Area Advisory Committee. At the December 7, 2006 Board of Zoning Adjustments meeting, the refined proposal for an Assembly Use Overlay was presented to the Board for comment. Available meeting minutes are attached.

## DRAFT ORDINANCE

The proposed amendments may be summarized with the following changes:

- Amend *Article 3 – Definitions*, delete 'Clubs and Lodges' and 'Religious Assembly' definitions and replace with new 'Assembly Use' definition;

- Amend *Article 5 – Residential*, to delete separate 'Religious Assembly' and 'Clubs and Lodges' terms and replace with 'Assembly Uses' (to be conditionally permitted in all R zones);

- Amend *Article 13 – Special Review Overlay District*, to include new sections addressing formation and applicability of an Assembly Use Overlay;

- Amend *Article 17 – Off-Street Parking and Loading Regulations*, to make consistent with other amendments;

- Amend the Zoning Map to show an Assembly Use (-AU) designation for those properties designated for the Assembly Use Overlay (underlying zoning designations will not change).

A current copy of the applicable Zoning Code sections, with proposed changes shown in strike-out and italics, and a map showing the proposed Assembly Use Overlay areas is included as an attachment to this report.

*F·2*

**DISCUSSION**

In evaluating the policy issue of expanding the locations where assembly uses could locate in the City, staff notes that analyzing this matter raises larger General Plan policy issues. Staff looked at the following overriding General Plan Policies for guidance:

▸ "The areas most suitable for conversion to non-industrial uses are those located adjacent to existing housing, or in areas which lack the amenities to meet the needs of modern industry. Such areas exist along San Leandro Boulevard, Alvarado Street, and Marina Boulevard" (Page 3-52 of the General Plan);

▸ General Plan Policy 10.04 *Industrial Sanctuary* – Protect the City's major industrial areas from encroachment by uses that are potentially incompatible with existing viable industrial activities, or which may inhibit the ability of industry to operate effectively; and

▸ General Plan Policy 33.04 *Separation from Sensitive Uses* – Provide adequate and safe separation between areas where hazardous materials are present and sensitive uses such as schools, residences and public facilities.

The following General Plan policies were also considered:

▸ Policy 7.09 – Build upon the locational strengths and transportation features of West San Leandro to support the area's continued development as a major industrial, technology, and office employment center. In accordance with the West San Leandro Plan, limit the encroachment of incompatible residential and retail uses into the area, and promote additional development and redevelopment with manufacturing, technology, warehouse and distribution, office/flex, and similar uses.

▸ Policy 7.10 – Facilitate the gradual transition of the South-of-Marina (SOMAR) area into a cohesive light industrial district characterized by light manufacturing, office/flex, research and development, bio-medical, e-commerce, and similar uses, along with complementary business services and employee amenities.

▸ Policy 13.01 – Ensure that future land use development decisions are in balance with the capacity of the City's transportation system.

In addition, Article 1 of the Zoning Code stipulates that the broad purpose of the Zoning Code is to protect and promote the public health, safety, and general welfare, and to implement the policies of the City of San Leandro General Plan. More specifically, the Zoning Code is intended to:

▸ Provide a precise guide for the physical development of the City in accord with the policies of the General Plan;

▸ Preserve the character and quality of residential neighborhoods and commercial and industrial areas consistent with the character of the development districts of the City;

F. 3

▸ Promote the economic stability of existing land uses that are consistent with the development policies of the General Plan and protect them from intrusions by inharmonious or harmful land uses;

Article 7 – Industrial District indicates the following specific purposes:

▸ Provide appropriately located areas consistent with the General Plan for a broad range of manufacturing, distribution and storage, and service areas;

▸ Strengthen the City's economic base, and provide employment opportunities close to home for residents of the City and surrounding communities;

▸ Provide a suitable environment for various types of industrial uses, and protect them from the adverse impacts of inharmonious uses;

Based on General Plan policies such as those noted above, area specific policies and plans, and Zoning Code purposes, the following criteria were developed for evaluating appropriate locations for assembly uses, with the express objective of expanding the opportunities for assembly uses beyond the residential zoning districts:

- *Site is not located along a major commercial corridor* (identified as E. 14th Street and Marina Boulevard between San Leandro Boulevard and Merced Street);

- *Site is not located within the following General Plan Focus Areas: Downtown, Bayfair, Marina Blvd/SOMAR, or West San Leandro* (each of these Focus Areas is governed by one or more of the following, which governs future development – special study/guidelines, special overlay district, or location within a redevelopment area);

- *Site is not located in a regional-serving retail area* (identified as Greenhouse Marketplace, Westgate, Marina Square, and 'old' Target site);

- *Site is not located inside the ½-mile study area identified for the Downtown Transit-Oriented Development (TOD) Strategy*;

- *Site abuts or is within ¼ mile of an arterial street* (as identified in the Circulation Element of the General Plan);

- *Site is not located in a Residential Zone* (Assembly uses are already conditionally permitted in residential zones, so would not produce new areas for assembly uses to locate if considered);

- *Site is not considered public land, and is not zoned Public Service (PS), Open Space (OS), or Commercial Recreation (CR); property is not owned by an Exempt Public Agency, or leased/owned by a public utility* (these areas represent properties and uses that are unlikely to change);

*F-4*

- *Overlay Area must allow a contiguous area greater than or equal to two acres.* (This figure was derived from research indicating that large assembly uses require a minimum 2-acre site to accommodate bigger building size and to allow for adequate on-site parking. Staff is not recommending that a minimum acreage be included as part of the Zoning Code text amendments, and suggests that future applications for amendments to
- the Assembly Use overlay that may be less than 2-acres in size be given flexibility in a manner that would conform to the Religious Land Use and Institutionalized Persons Act [RLUIPA].)

After inputting General Plan policy and Zoning Code criteria, several potential overlay areas, located throughout the City, were derived where staff recommends assembly uses could be conditionally permitted. This would be accomplished via a Zoning Code text amendment to define the Assembly Use Overlay and then a Zoning Map amendment designating all of the applicable areas with the new Assembly Use Overlay. Under this proposal, the underlying zoning designations for each of the individual properties would not change, similar to how the -S and -PD Overlay Districts are utilized. In addition, implementation of the Assembly Use Overlay would not affect the existing use of the property, or the current list of permitted uses. It would allow the property owner to apply for a conditional use permit for an assembly use in the future, where such uses are not currently permitted. With this option, a total of 197 properties, encompassing approximately 211.1 acres, would be rezoned with the Assembly Use overlay.

Staff notes that Religious Assembly and Clubs & Lodges uses (to be re-defined as Assembly Uses) would continue to remain conditionally permitted in R Districts.

In order to keep the Zoning Code up-to-date, staff has provided a new definition in Article 3 for Assembly Uses that encompasses the previous separate definitions for 'Religious Assembly' and 'Clubs and Lodges'. These two definitions would be deleted and the new Assembly Use definition would take its place. Article 5 would be amended to account for the new terminology. Article 17, related to off-street parking standards would also be amended to account for the new single 'Assembly Uses' definition. The new section added to Article 13 would outline the purpose of the 'Assembly Use' overlay, and provide additional performance standards that would be considered under future conditional use applications for an assembly use.

## ENVIRONMENTAL ANALYSIS

A Negative Declaration and Initial Study Checklist has been prepared for the proposed ordinance to amend the Zoning Code for inclusion of an Assembly Use Overlay District, as well as rezoning individual properties identified with the overlay, in order to meet the requirements of the California Environmental Quality Act (CEQA). The mandated 20-day public review period established for the Negative Declaration is February 1 – February 20, 2007. As of the writing of this report, no comments on the environmental document have been received.

*F-5*

## PUBLIC OUTREACH

Legal requirements for notification of this meeting included posting of the meeting agenda at City Hall a minimum of 72 hours in advance of the meeting date. In addition, a legal ad was placed in the Daily Review and courtesy notices were sent to all property owners identified for the proposed Assembly Use Overlay areas.

## RECOMMENDATION

Staff recommends that the Planning Commission review the proposed Zoning Code text and map amendments, the findings for the proposed rezone, and the associated environmental documentation, and forward a recommendation of approval for the amendments and adoption of the Negative Declaration, and findings for approval of the rezone, to the City Council. The City Council meeting is tentatively scheduled for March 19.

## ATTACHMENTS

- Proposed Zoning Code Amendments (Draft Ordinance)
- Proposed Zoning Map Amendments
- Recommended Findings for Approval of Rezone
- Negative Declaration and Initial Study Checklist
- Excerpt of Minutes from December 7, 2006 Board of Zoning Adjustments meeting
- Excerpt of Draft Minutes from the December 20, 2006 West San Leandro/MacArthur Boulevard RAC meeting
- Excerpt of Draft Minutes from the January 17, 2007 Joint RAC meeting
- Excerpt of Minutes from October 19, 2006 joint Board of Zoning Adjustments/Planning Commission work session

F. 6

IN THE CITY COUNCIL OF THE CITY OF SAN LEANDRO

ORDINANCE NO. 2007-_____

AN ORDINANCE OF THE CITY OF SAN LEANDRO AMENDING: PART I, ARTICLE 3, DELETING DEFINITIONS FOR 'CLUBS & LODGES' AND 'RELIGIOUS ASSEMBLY' AND ADDING A NEW DEFINITION FOR 'ASSEMBLY USES'; PART II, ARTICLE 5, AMENDING SECTIONS 2-504, 2-506, 2-508, AND 2-510 FOR CONSISTENCY WITH NEW DEFINITIONS; PART III, AMENDING ARTICLE 13;  AND  PART IV, ARTICLE 17, AMENDING SECTION 4-1704.


The City Council of the City of San Leandro does ORDAIN as follows:

SECTION 1: Part I, Article 3 of the Zoning Code is hereby amended to read as follows:

**Assembly Uses.** Meeting, recreational, social facilities of a private or non-profit organization primarily for use by member or guests, or facilities for religious worship and incidental religious education (but not including schools as defined in this section). This classification includes union halls, social clubs, fraternal organizations, and youth centers.

**Assembly Uses, Temporary.** Meeting, recreational, social facilities of a private or non-profit organization primarily for use by member or guests, or facilities for religious worship and incidental religious education (but not including schools as defined in this section) on a site that is not permanently occupied by an assembly use, for a period of not more than thirty (30) days.

~~**Clubs and Lodges.** Meeting, recreational, or social facilities of a private or non-profit organization primarily for use by members or guests. This classification includes union halls, social clubs, fraternal organizations, and youth centers.~~

~~**Religious Assembly.** Facilities for religious worship and incidental religious education, but not including private schools as defined in this section.~~

~~**Religious Assembly, Temporary.** Religious services conducted on a site that is not permanently occupied by a religious assembly use, for a period of not more than thirty (30) days.~~

SECTION 2:  Part II, Article 5 of the Zoning Code is hereby amended to read as follows:

*F-7*

-1-

**2-504   RO District -- Use Regulations**

B.    RO District -- Conditionally Permitted Uses.

The following uses are allowed in the RO District, subject to the approval of a conditional use permit. (Certain uses are subject to special requirements and/or limitations, as prescribed following the individual use classifications.)

1.    Accessory uses when in conjunction with a conditionally permitted use.
2.    *Assembly Uses.*
2.    ~~Clubs and Lodges.~~
3.    Day Care, General.
4.    Park and Recreation Facilities, Private Noncommercial.
5.    Public Safety Facilities.
6.    ~~Religious Assembly.~~

C.    RO District -- Temporary Uses Requiring Administrative Review.

The following temporary uses are allowed in the RO District, subject to the regulations of Section 5-2222: Temporary Use Permits.

1.    *Assembly Uses, Temporary.*
2.    Commercial Filming, Limited.
2.    ~~Religious Assembly, Temporary.~~

**2-506   RS District -- Use Regulations**

B.    RS District -- Conditionally Permitted Uses.

The following uses are allowed in the RS District, subject to the approval of a conditional use permit. (Certain uses are subject to special requirements and/or limitations, as prescribed following the individual use classification.)

1.    Accessory uses when in conjunction with a conditionally permitted use.
2.    *Assembly Uses.*
3.    Day Care, General.
4.    Park and Recreation Facilities, Private Noncommercial.
5.    Public Safety Facilities.
6.    ~~Religious Assembly.~~

F. 8

C.    RS District – Temporary Uses Requiring Administrative Review.

The following temporary uses are allowed in the RS District, subject to the regulations of Section 5-2222: Temporary Use Permits.

1.    *Assembly Uses, Temporary.*
2.    Commercial Filming, Limited.
3.    ~~Religious Assembly, Temporary.~~

## 2-508    RD District – Use Regulations

B.    RD District – Conditionally Permitted Uses.

The following uses are allowed in the RD District, subject to the approval of a conditional use permit. (Certain uses are subject to special requirements and/or limitations, as prescribed following the individual use classification.)

1.    Accessory uses when in conjunction with a conditionally permitted use.
2.    *Assembly Uses.*
3.    Day Care, General.
4.    Park and Recreation Facilities, Private Noncommercial.
5.    Public Safety Facilities.
6.    ~~Religious Assembly.~~

C.    RD District – Temporary Uses Requiring Administrative Review.

The following temporary uses are allowed in the RD District, subject to the regulations of Section 5-2222: Temporary Use Permits.

1.    *Assembly Uses, Temporary.*
2.    Commercial Filming, Limited.
3.    ~~Religious Assembly, Temporary.~~

## 2-510    RM District – Use Regulations

B.    RM District – Conditionally Permitted Uses.

The following uses are allowed in the RM District, subject to the approval of a conditional use permit. (Certain uses are subject to special requirements and/or limitations, as prescribed following the individual use classification.)

F-9

1. Accessory uses when in conjunction with a conditionally permitted use.
2. *Assembly Uses.*
3. Bed and Breakfast Inns.
4. ~~Clubs and Lodges.~~
4. Day Care, General.
5. Group Housing.
6. Manufactured Home Parks.
7. Park and Recreation Facilities, Private Noncommercial.
8. Public Safety Facilities.
9. ~~Religious Assembly.~~

D. RM District – Temporary Uses Requiring Administrative Review.

The following temporary uses are allowed in the RM District, subject to the regulations of Section 5-2222: Temporary Use Permits.

1. *Assembly Uses, Temporary.*
2. Commercial Filming, Limited.
3. ~~Religious Assembly, Temporary.~~

**SECTION 3:** Part III, Article 13 of the Zoning Code is hereby amended to read as follows:

# Article 13  S Special Review *and AU Assembly Uses* Overlay Districts

**Sections:**

### S Special Review Overlay District

3-1300    Specific Purposes and Applicability
3-1302    Applicability and Zoning Map Designation
3-1304    Land Use and Property Development Regulations
3-1306    Use Permit Required
3-1308    Review Criteria
3-1310    Conditions of Approval
3-1312    Procedures

### AU Assembly Use Overlay District

*3-1320    Specific Purposes and Applicability*
*3-1322    Applicability and Zoning Map Designation*
*3-1324    Land Use and Property Development Regulations*
*3-1326    Use Permit Required*

-4-

*F-10*

**3-1328**     **Review Criteria and Conditions of Approval**
**3-1330**     **Procedures**

**S Special Review Overlay District [No Changes Proposed]**

**AU Assembly Use Overlay District**

**3-1320     Specific Purposes and Applicability**

In addition to the general purposes listed in Article 1, the specific purpose of the AU Assembly Use Overlay District is to provide for discretionary review of assembly uses on certain non-residentially zoned properties which may be designated by the City Council, consistent with General Plan policies. This allows Assembly Uses, as defined in Article 3, to be considered on non-residentially zoned properties on a conditional use basis, beyond the residential-zoned properties for which they are already conditionally permitted.

**3-1322     Applicability and Zoning Map Designation**

The AU Assembly Use Overlay District may be combined with any zoning district. It may be initiated by the City Council or Planning Commission under the procedures established by Article 27: Amendments. Each AU Overlay District shall be shown on the zoning map by adding an "-AU" to the base district designation. The zoning map also shall include a reference to the adopting ordinance establishing the AU Overlay District.

**3-1324     Land Use and Property Development Regulations**

The land use and development regulations applicable in an AU Overlay District shall be those of the base zoning district with which the AU Overlay District is combined unless modified by another overlay district or by the ordinance establishing the AU Overlay District. The requirements of the applicable AU Overlay District shall govern where conflicts arise.

**3-1326     Use Permit Required**

A use permit is required for any of the following actions within an AU Overlay District:

A.    Establishment of any new assembly use.

B.    Substantial expansion or alteration of any existing assembly use and/or structure.

C.    In addition to or in lieu of a use permit, the City Council may establish other review procedures or requirements at the time of establishment of an AU Overlay District or necessary to assure conformance of uses and buildings with purposes and objectives of the AU District.

F-11

D.   *Exceptions.* The Zoning Enforcement Official may waive the requirement for a use permit or other specified discretionary approval for the following activities, provided that any such waiver is not inconsistent with any policy directive or review criteria incorporated in the legislation establishing the AU Overlay District. These exceptions include alterations of existing structures that are minor in nature or that do not add more than ten percent (10%) to existing floor area, and maintenance or repair of existing structures.

**3-1328      Review Criteria and Conditions of Approval**

The review criteria and conditions of approval shall be as required in Sections 5-2212 and 5-2214.

**3-1330      Procedures**

An application for approval of a use permit in an AU Overlay District shall be processed in accord with the procedures established by Sections 5-2206 and 5-2208 and any additional requirements applicable to that AU district.

**SECTION 4:** Part IV, Article 17 of the Zoning Code is hereby amended to read as follows:

**4-1704 Off-Street Parking and Loading Spaces Required**

**OFF-STREET PARKING AND LOADING SPACES REQUIRED**

| Use Classification | Off-Street Parking Spaces | Off-Street Loading Spaces Per Group Classification (See Table A, Page 16) |
|---|---|---|
| **Public and Semipublic** | | |
| Assembly Uses | 1 space per 50 sq. ft. used for assembly uses. | C |
| ~~Clubs and Lodges~~ | ~~1 space per 50 sq. ft. used for assembly purposes~~ | ~~C~~ |
| ~~Religious Assembly~~ | ~~1 space per 100 sq. ft of main seating area~~ | ~~C~~ |

F-12

**SECTION 5:** If any section, subsection, subdivision, paragraph, sentence, clause or phrase of the Ordinance is for any reason held to be unconstitutional, invalid, or ineffective by any court of competent jurisdiction, such decision shall not affect the validity or effectiveness of the remaining portions of this Ordinance or any part hereof. The City Council hereby declares that it would have passed each section, subsection, subdivision, paragraph, sentence, clause and phrase of the Ordinance irrespective of the fact that one or more of them would be declared unconstitutional or invalid. To this end, the provisions of the Ordinance are declared to be severable.

**SECTION 6:** This Ordinance shall take effect thirty (30) days after adoption. The City Clerk is directed to publish the title once and post a complete copy thereof on the City Council chamber bulletin board for five (5) days prior to adoption.

Introduced by Councilmember _____ on this _____ day of _____, 2007, and passed to print by the following vote:

Members of the Council:

AYES:        Councilmembers

NOES:        Councilmember

ABSENT:      Councilmember

ABSTAIN:     Councilmember

ATTEST:      _____
             Marian Handa, City Clerk


Passed and adopted this _____ day of _____, 2007, after publication on _____  ____, 2007, by the following vote:

Members of the Council:

AYES:        Councilmembers

NOES:        Councilmember

ABSENT:      Councilmember

ATTEST:      _____
             Marian Handa, City Clerk

-7-

F-13

F-14



Legend

- Church - Existing
- Major Commercial Corridor
- Arterial Street
- 1/4 Mile Buffer - Arterial Street
- 1/2 Mile TOD Buffer Area
- Faith Fellowship Foursquare Church - Existing Location
- Faith Fellowship Foursquare Church - Proposed Location
- Potential Assembly Use Overlay Parcels

Criteria Description:

A. Site is not located along a major commercial corridor.
B. Site is not located within the following General Plan Focus Areas: Downtown, Bayfair, Marina Blvd/Somar or West San Leandro.
C. Site is not located in a regional-serving retail area.
D. Site is not located inside 1/2 Mile TOD buffer area.
E. Abuts or is within 1/4 mile of an arterial street.
F. Site is not located in a Residential Zone.
G. Site is not considered Public Land, nor in a PS, OS or CR zone.
H. Site must allow a contiguous area >= 2 acres.
I. Parcels cannot have an Assessor usecode of 03, 04 or 05 (Exempt Public Agencies, Property leased or owned by a public utility).



# CITY OF SAN LEANDRO
## Assembly Use Overlay Criteria Study



F-15

F-16

## Recommended Findings of Fact for Approval

**Rezone of Various Properties (list attached) with an Assembly Use (-AU) Overlay.**

<u>**Rezone**</u>

1.  **The proposed rezone must be in general agreement with the adopted General Plan of the City.**

    The General Plan Land Use Map designates the subject properties with various designations, including Corridor Mixed Use, Light Industrial, General Industrial, and General Commercial. The properties would be rezoned to a zoning designation that is consistent with the General Plan, to retain their underlying designation but have an Assembly Use (-AU) Overlay applied.

    The rezoning of the sites to include an Assembly Use Overlay does not include any changes to the subject properties. Although no development is proposed as part of this action, the rezone would facilitate future development of Assembly Uses with approval of a conditional use permit.

2.  **The uses permitted by the proposed zoning district must be compatible with existing and proposed uses in the general neighborhood.**

    The properties proposed for the Assembly Use Overlay exist throughout the City and have both commercial and industrial zoning designations. With the addition of the Assembly Use Overlay, permitted and conditionally permitted uses under the various zoning districts would remain, and assembly uses would be considered conditionally permitted where they were previously prohibited on these properties. Because an assembly use would require a use permit, compatibility with existing and proposed uses in the general neighborhood of a future site would be considered.

3.  **The property subject to the rezone will be served by streets, utilities and other public facilities of sufficient capacity to properly serve it without overloading and without detriment to other areas presently zoned in contemplation of full use and availability of such facilities.**

    The sites are currently served by streets and utilities. The proposed project involves only a rezoning of properties with an Assembly Use Overlay, with no development included. No impacts would therefore result to public service providers.

E-17

List of Properties Proposed for the Assembly Use Overlay

| APN | ADDRESS |
|---|---|
| 075 0065 009 02 | 854 Williams St |
| 075 0045 004 00 | 753 Williams St |
| 075 0045 011 00 | 748 Castro St |
| 075 0105 028 00 | 2028 Alvarado St |
| 075 0105 027 00 | 2042 Alvarado St |
| 077A 0639 004 00 | 916 Williams St |
| 075 0045 010 00 | 736 Castro St |
| 077A 0639 005 00 | 932 Williams St |
| 075 0066 005 00 | 1823 Alvarado St |
| 077A 0639 006 00 | 940 Williams St |
| 075 0065 010 00 | 886 Williams St |
| 075 0065 001 03 | 845 Thornton St |
| 075 0065 001 04 | 857 Thornton St |
| 075 0105 008 00 | 703 Castro St |
| 075 0066 007 08 | 810 Castro St |
| 077A 0639 008 00 | 972 Williams St |
| 075 0078 007 03 | 549 Harlan St |
| 075 0105 002 00 | 783 Castro St |
| 075 0078 006 02 | 555 Harlan St |
| 075 0105 001 00 | 795 Castro St |
| 075 0078 005 03 | 563 Harlan St |
| 076 0350 008 00 | 1051 Macarthur Blvd |
| 075 0078 007 04 | 545 Harlan St |
| 075 0105 003 00 | 771 Castro St |
| 075 0103 011 00 | 2050 Orchard Ave |
| 075 0103 010 00 | 2090 Orchard Ave |
| 075 0105 025 01 | 2070 Alvarado St |
| 075 0105 006 00 | 743 Castro St |
| 075 0105 005 00 | 755 Castro St |
| 075 0066 007 07 | Castro St |
| 075 0077 015 00 | 527 Harlan St |
| 075 0105 004 00 | 763 Castro St |
| 075 0224 002 03 | 300 San Leandro Blvd |
| 075 0105 030 02 | 2000 Alvarado St |
| 075 0105 022 02 | 2102 Alvarado St |
| 075 0103 009 00 | 940 Estabrook St |
| 075 0045 003 00 | 775 Williams St |
| 075 0103 005 00 | 2077 Alvarado St |
| 075 0103 007 00 | 864 Estabrook St |
| 075 0103 008 00 | 870 Estabrook St |
| 075 0103 006 00 | 2091 Alvarado St |
| 075 0105 034 00 | 1954 Alvarado St |
| 075 0105 033 00 | 1968 Alvarado St |
| 075 0065 004 00 | 807 Thornton St |
| 075 0065 011 00 | 896 Williams St |
| 075 0065 003 00 | 815 Thornton St |
| 075 0065 002 00 | 823 Thornton St |
| 075 0065 001 02 | 839 Thornton St |
| 075 0065 005 00 | 804 Williams St |
| 075 0065 006 00 | 824 Williams St |
| 075 0045 007 00 | 705 Williams St |
| 075 0065 007 02 | 830 Williams St |
| 075 0045 006 00 | 719 Williams St |
| 075 0065 008 00 | 840 Williams St |
| 075 0066 007 09 | 830 Castro St |
| 075 0045 005 00 | 735 Williams St |
| 075 0045 002 00 | 795 Williams St |
| 077A 0639 002 00 | 904 Williams St |
| 075 0045 009 01 | 712 Castro St |
| 077A 0639 003 00 | 912 Williams St |
| 075 0105 007 00 | 727 Castro St |
| 075 0045 013 00 | 766 Castro St |
| 075 0045 012 00 | 754 Castro St |
| 075 0105 032 00 | 1982 Alvarado St |
| 075 0078 002 00 | 572 Estabrook St |
| 075 0078 003 02 | 596 Estabrook St |
| 075 0045 014 00 | 1860 Alvarado St |
| 077A 0639 007 00 | 964 Williams St |
| 075 0066 006 00 | 1835 Alvarado St |
| 075 0066 004 00 | 855 Williams St |
| 075 0066 003 00 | 869 Williams St |
| 075 0066 007 05 | 1849 Alvarado St |
| 077A 0639 009 00 | 1776 Orchard Ave |
| 075 0105 031 02 | 1996 Alvarado St |
| 075 0066 019 01 | 903 Williams St |
| 075 0105 010 01 | 2035 Martinez St |
| 075 0105 009 00 | 2009 Martinez St |
| 075 0105 029 00 | 2014 Alvarado St |
| 075 0105 026 00 | 2056 Alvarado St |
| 075 0103 004 03 | 2023 Alvarado St |
| 075 0105 023 00 | 2098 Alvarado St |
| 076 0350 003 00 | Macarthur Blvd |
| 076 0350 007 01 | 1041 Macarthur Blvd |
| 076 0350 004 01 | 1029 Macarthur Blvd |
| 076 0350 005 01 | 1037 Macarthur Blvd |
| 075 0224 010 00 | 265 Park St |
| 077 0556 062 00 | 2274 Washington Ave |
| 075 0224 004 08 | 299 Park St |
| 076 0350 010 00 | 1079 Macarthur Blvd |
| 075 0224 001 00 | 250 San Leandro Blvd |
| 077 0556 064 02 | 2242 Washington Ave |
| 075 0224 004 06 | 350 San Leandro Blvd |
| 075 0224 006 00 | 415 Park St |
| 075 0224 007 00 | 435 San Leandro Blvd |

*Assembly Use Overlay Rezone Findings*                    *Page 2 of 4*    F - 18

List of Properties Proposed for the Assembly Use Overlay

| | | | |
|---|---|---|---|
| 075  0224 004 02 | 420 San Leandro Blvd | 077D 1437 015 01 | 1124 139th Ave |
| 075  0224 012 00 | 295 Park St | 077D 1437 014 03 | 139th Ave |
| 075  0224 011 00 | 289 Park St | 077C 1230 001 03 | 14074 Washington Ave |
| 077  0556 069 03 | 2150 Washington Ave | 077B 1222 001 05 | 344 139th Ave |
| 076  0446 012 00 | 1057 Macarthur Blvd | 077D 1440 001 21 | 143rd Ave |
| 077  0556 068 01 | Washington Ave | 077D 1443 002 02 | 833 143rd Ave |
| 077  0556 001 00 | 193 Estabrook St | 077B 1225 003 04 | 295 139th Ave |
| 077  0556 067 00 | 2166 Washington Ave | 077B 1222 004 03 | 14173 Washington Ave |
| 412  0006 011 00 | Washington Ave | 077C 1232 006 07 | 501 143rd Ave |
| 077  0556 065 01 | 2240 Washington Ave | 077C 1235 001 02 | 640 143rd Ave |
| 077  0556 063 00 | 2260 Washington Ave | 077B 1222 005 03 | 14193 Washington Ave |
| 077D 1410 025 00 | 2436 Washington Ave | 077B 1222 006 17 | Washington Ave |
| 412  0006 003 00 | 698 Lewelling Blvd | 077B 1222 006 15 | 14251 Washington Ave |
| 412  0006 010 00 | 674 Lewelling Blvd | 077C 1235 002 28 | 143rd Ave |
| 412  0009 005 07 | Lewelling Blvd | 077C 1235 002 18 | 14330 Washington Ave |
| 412  0009 006 03 | 534 Lewelling Blvd | 077C 1235 002 24 | 534 143rd Ave |
| 412  0009 006 02 | 534 Lewelling Blvd | 077B 1222 006 18 | 14231 Washington Ave |
| 077C 1280 004 00 | 15285 Hesperian Blvd | 077B 1222 007 17 | 14305 Washington Ave |
| 077B 1139 006 02 | 250 Floresta Blvd | 077C 1235 002 20 | 14332 Washington Ave |
| 077C 1310 008 04 | 14400 Washington Ave | 077C 1230 004 06 | 14110 Washington Ave |
| 077B 1139 008 00 | 256 Floresta Blvd | 077B 1225 005 05 | 295 139th Ave |
| 077B 1222 007 10 | 14349 Washington Ave | 077C 1230 004 04 | 14160 Washington Ave |
| 412  0009 006 05 | 534 Lewelling Blvd | 077C 1232 001 04 | 635 143rd Ave |
| 412  0011 004 00 | Lewelling Blvd | 077B 1222 003 04 | 14127 Washington Ave |
| 080G 1099 001 00 | 1960 Lewelling Blvd | 077B 1222 003 03 | 14143 Washington Ave |
| 077C 1240 002 00 | 2780 Halcyon Dr | 077C 1232 005 02 | 601 143rd Ave |
| 077D 1424 005 08 | 777 139th Ave | 077C 1235 002 16 | 14336 Washington Ave |
| 077C 1228 001 02 | 13940 Washington Ave | 077C 1240 001 06 | 100 Halcyon Dr |
| 077B 1225 002 04 | 13951 Washington Ave | 077B 1222 007 14 | 14315 Washington Ave |
| 077D 1440 002 00 | 790 139th Ave | 077B 1222 007 19 | 14327 Washington Ave |
| 077D 1440 001 18 | 760 139th Ave | 077B 1222 007 20 | 14335 Washington Ave |
| 077B 1222 002 02 | 14111 Washington Ave | 077B 1163 011 02 | 555 Floresta Blvd |
| 077C 1230 005 02 | 14200 Washington Ave | 077B 1163 016 03 | 14391 Washington Ave |
| 077B 1222 006 19 | 14205 Washington Ave | 077B 1163 008 10 | 555 Floresta Blvd |
| 077B 1222 007 18 | 14281 Washington Ave | 077C 1310 001 16 | Washington Ave |
| 077C 1235 002 22 | 14340 Washington Ave | 077B 1139 007 00 | 300 Floresta Blvd |
| 077C 1235 003 03 | 14388 Washington Ave | 412  0009 005 04 | 552 Lewelling Blvd |
| 077C 1235 002 14 | 14320 Washington Ave | 412  0011 005 00 | Lewelling Blvd |
| 080G 1178 007 02 | 2505 Grant Ave | 080D 0559 003 04 | 15420 Hesperian Blvd |
| 080G 0910 016 00 | 2561 Grant Ave | 080D 0559 005 03 | 15444 Hesperian Blvd |
| 080G 0910 017 00 | 2505 Grant Ave | 077C 1310 001 17 | Washington Ave |
| 077D 1440 001 23 | 750 139th Ave | 077B 1139 002 04 | 14595 Washington Ave |
| 077C 1228 002 02 | 14000 Washington Ave | 077C 1310 009 01 | 14602 Washington Ave |
| 075  0087 001 02 | 400 Hudson Ln | 077C 1310 002 06 | 14610 Washington Ave |
| 075  0084 015 02 | 2485 Washington Ave | 077C 1310 003 01 | 14664 Washington Ave |
| 075  0087 008 00 | 400 Hudson Ln | 077B 1139 002 06 | 14601 Washington Ave |
| 075  0084 014 05 | 2481 San Leandro Blvd | 077C 1310 004 04 | 14680 Washington Ave |
| 077D 1424 006 07 | 1111 139th Ave | 077C 1310 003 04 | 14662 Washington Ave |
| 077D 1437 013 04 | 1090 139th Ave | 077C 1280 006 03 | 15311 Hesperian Blvd |

*F-19*

List of Properties Proposed for the Assembly Use Overlay

| | |
|---|---|
| 077C 1280 007 00 | Hesperian Blvd |
| 412  0001 007 01 | Greenhouse Mall |
| 077B 1125 004 04 | 14805 Washington Ave |
| 077C 1280 005 01 | 15299 Hesperian Blvd |
| 075  0078 001 07 | Estabrook St |



# CITY OF SAN LEANDRO
## Community Development Department

## NEGATIVE DECLARATION

Notice is hereby given that the City of San Leandro finds that no significant effect on the environment as prescribed by the California Environmental Quality Act of 1970, as amended will occur for the following proposed project:

## I.    *PROJECT DESCRIPTION*:

The City has initiated a process to rezone approximately 197 identified properties with a new Assembly Use Overlay. The existing underlying zoning designation for each property would not change, but the –AU (Assembly Use) Overlay designation would be added. In doing so, assembly uses that may wish to locate on one of these properties would be able to apply for a conditional use permit for such a use. Currently, assembly uses (including clubs/lodges and religious assembly) are only conditionally permitted in certain residential zones. Article 13 of the Zoning Code would be amended to include language regarding an Assembly Use Overlay District, and Article 3 (Definitions) would be modified to delete 'Clubs & Lodges' and 'Religious Assembly' and insert a new definition for 'Assembly Uses'.

## II.    *DECLARATION THAT PROJECT WILL NOT SIGNIFICANTLY AFFECT ENVIRONMENT*:

The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. The overlay designation would not affect existing uses, or the list of permitted uses. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. All of the affected properties exist within an urban environment. The proposed project will have no significant effect on the area's resources, cumulative or otherwise.

## III.    *FINDINGS SUPPORTING DECLARATION*:

A.    The project involves a zoning text and map amendment, to include a new overlay designation for 197 identified properties. No physical changes would directly occur with the proposed text and map amendments.

B.    The proposed project has been reviewed according to the standards and requirements of the California Environmental Quality Act (CEQA) and an Initial Study Environmental Evaluation Checklist has been prepared with a determination that the project will not have a significant impact on the environment.

*F-21*

## IV.    PERSON WHO PREPARED INITIAL STUDY:

Debbie Pollart, Planning Manager

Dated: _____ January 29, 2007 _____


## V.    REVIEW PERIOD:

The 20-day public review period is from February 1 through February 20, 2007. All written comments regarding this Negative Declaration must be received by the City of San Leandro, Planning Services Division, 835 E. 14th Street, San Leandro, California 94577, no later than 5:00 P.M., February 20, 2007.

A Planning Commission meeting has been tentatively set for February 22, 2007. Written and oral comments on the Negative Declaration may also be made during this public meeting.

## COPY OF INITIAL STUDY IS ATTACHED

_____

For additional information, please contact the City of San Leandro, Planning Services Division, 835 East 14th Street, San Leandro, CA 94577, telephone (510) 577-3327, or e-mail dpollart@ci.san-leandro.ca.us.

_____



# CITY OF SAN LEANDRO
## COMMUNITY DEVELOPMENT DEPARTMENT
### Planning Services Division

# INITIAL STUDY CHECKLIST FORM

**Project title:** Assembly Uses Overlay – Rezone; Zoning Code text amendment to Article 3 (Definitions); and Zoning Code text amendment to Article 13 to include language for an Assembly Use Overlay District

**Lead agency name and address:** City of San Leandro, 835 E. 14th Street, San Leandro, CA 94577

**Contact persons and phone numbers:** Debbie Pollart, Planning Manager
(510) 577-3327

**Project location:** Approximately 197 properties located throughout the City (see attached list for Assessor Parcel Numbers).

**Project sponsor's name and address:** City of San Leandro, 835 E. 14th Street, San Leandro, CA 94577

**General Plan:** Various

**Zoning:** Various

**Description of site and proposed project:** The City has initiated a process to rezone the identified properties with a new Assembly Use Overlay. The existing underlying zoning designation for each property would not change, but the –AU (Assembly Use) Overlay designation would be added. In doing so, assembly uses that may wish to locate on one of these properties would be able to apply for a conditional use permit for such a use. Currently, assembly uses (including clubs/lodges and religious assembly) are only conditionally permitted in certain residential zones. Article 13 of the Zoning Code would be amended to include language regarding an Assembly Use Overlay District, and Article 3 (Definitions) would be modified to delete 'Clubs & Lodges' and 'Religious Assembly' and insert a new definition for 'Assembly Uses'.

**Other public agencies whose approval is required:** None

*F. 23*

**ENVIRONMENTAL FACTORS POTENTIALLY AFFECTED**:

The environmental factors checked below would be potentially affected by this project, involving at least one impact that is a "Potentially Significant Impact" as indicated by the checklist on the following pages.

| ☐ Land Use and Planning | ☐ Transportation/Circulation | ☐ Public Services |
|---|---|---|
| ☐ Population and Housing | ☐ Biological Resources | ☐ Utilities and Service Systems |
| ☐ Geological Problems | ☐ Energy and Mineral Resources | ☐ Aesthetics |
| ☐ Water | ☐ Hazards | ☐ Cultural Resources |
| ☐ Air Quality | ☐ Noise | ☐ Recreation |
| ☐ Mandatory Findings Of Significance | | |

**DETERMINATION**: (To be completed by the Lead Agency)

On the basis of this initial evaluation:

☒  I find that the proposed project COULD NOT have a significant effect on the environment, and a NEGATIVE DECLARATION will be prepared.

☐  I find that although the proposed project could have a significant effect on the environment, there will not be a significant effect in this case because the mitigation measures described on an attached sheet have been added to the project. A MITIGATED NEGATIVE DECLARATION will be prepared.

☐  I find that the proposed project MAY have a significant effect on the environment, and an ENVIRONMENTAL IMPACT REPORT is required.

☐  I find that the proposed project MAY have a significant effect(s) on the environment, but at least one effect 1) has been adequately analyzed in an earlier document pursuant to applicable legal standards, and 2) has been addressed by mitigation measures based on the earlier analysis as described on attached sheets, if the effect is a "potentially significant impact" or "potentially significant unless mitigated." An ENVIRONMENTAL IMPACT REPORT is required, to analyze only the effects that remain to be addressed.

☐  I find that although the proposed project could have a significant effect on the environment, there WILL NOT be a significant effect in this case because all potentially significant effects (a) have been analyzed adequately in an earlier EIR pursuant to applicable standards, and (b) have been avoided or mitigated pursuant to that earlier EIR, including revisions or mitigation measures that are imposed upon the proposed project.

_____        _____January 29, 2007_____
*Signature*                                                          *Date*

_____Debbie Pollart, Planning Manager_____        ___City of San Leandro_____
*Printed name*

_F-24_

Assembly Uses Overlay - IS/ND                    2                    January 2007

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | POTENTIALLY SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| **1. LAND USE AND PLANNING. Would the project:** | | | | | |
| a. Physically divide an established community? | | | | X | 2 |
| b. Conflict with any applicable land use plan, policy, or regulation of an agency with jurisdiction over the project (including, but not limited to the general plan, specific plan, local coastal program, or zoning ordinance) adopted for the purpose of avoiding or mitigating an environmental effect? | | | | X | 2, 4, 5 |
| c. Conflict with any applicable habitat conservation plan or natural community conservation plan? | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. This action would allow assembly uses (clubs, lodges and religious assemblies) to be conditionally permitted on the identified properties. This would be in addition to their status as conditionally permitted uses in certain Residential districts. The overlay designation would not affect existing uses, or the list of permitted uses. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. The proposed project would not physically divide an established community and would not conflict with the General Plan or Zoning Code. There is no identified habitat conservation plan or natural community conservation plans. No impacts to land use and planning are anticipated.

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | POTENTIALLY SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| **2. POPULATION AND HOUSING. Would the project:** | | | | | |
| a. Induce substantial population growth in an area either directly (e.g., by proposing new homes and businesses) or indirectly (e.g. through projects in an undeveloped area or major infrastructure)? | | | | X | 2 |
| b. Displace substantial number of existing housing, necessitating the construction of replacement housing elsewhere? | | | | X | 7 |
| c. Displace substantial numbers of people, necessitating the construction of replacement housing elsewhere? | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to population and housing are anticipated.

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | POTENTIALLY SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| **3. GEOLOGY AND SOILS. Would the project:** | | | | | |
| a. Expose people or structures to potential substantial adverse effects, including the risk of loss, injury, or death involving: | | | | X | 7 |
| i) Rupture of a known earthquake fault, as delineated on the most recent Alquist-Priolo Earthquake Fault Zoning Map issued by the State Geologist for the area or based on other substantial evidence of a known fault? | | | | X | 7 |
| ii) Strong seismic ground shaking? | | | | X | 7 |
| iii) Seismic-related ground failure, including liquefaction? | | | | X | 7 |
| iv) Landslides? | | | | X | 7 |
| b. Result in substantial soil erosion or the loss of topsoil? | | | | X | 7 |

F-25

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| c. | Be located on a geologic unit or soil that is unstable, or that would become unstable as a result of the project, and potentially result in on- or off-site landslide, lateral spreading, subsidence, liquefaction or collapse: | | | | X | 7 |
| d. | Be located on expansive soil, creating substantial risks of life or property? | | | | X | 7 |
| e. | Have soils capable of adequately supporting the use of septic tanks or alternative waste water disposal systems where sewers are not available for the disposal of waste water? | | | | X | 7 |
| f. | Any increase in wind or water erosion of soils, either on- or off-site? | | | | X | 7 |
| g. | Changes in deposition or erosion of beach, sands, or changes in siltation, deposition or erosion which may modify the channel of a river or stream or the bed of the ocean or any bay, inlet or lake? | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to geology are anticipated.

| 4. HYDROLOGY AND WATER QUALITY. Would the project: | | | | | | |
|---|---|---|---|---|---|---|
| a. | Violate any water quality standards or waste discharge requirements? | | | | X | 7 |
| b. | Substantially deplete groundwater supplies or interfere substantially with groundwater recharge such that there would be a net deficit in aquifer volume or a lowering of the local groundwater table level (e.g., the production rate of pre-existing nearby wells would drop to a level which would not support existing land uses or planned uses for which permits have been granted? | | | | X | 7 |
| c. | Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site? | | | | X | 7 |
| d. | Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, or substantially increase the rate or amount of surface runoff in a manner which would result in flooding on- or off-site? | | | | X | 7 |
| e. | Create or contribute runoff water which would exceed the capacity of existing or planned stormwater drainage systems or provide substantial additional sources of polluted runoff? | | | | X | 7 |
| f. | Otherwise substantially degrade water quality? | | | | X | 7 |

F.26

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | POTENTIALLY SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| g. Place housing within a 100-year flood hazard area as mapped on a federal Flood Hazard Boundary or Flood Insurance Rate Map (FIRM) or other flood hazard delineation map? | | | | X | 7 |
| h. Place within a 100-year flood hazard area structures which would impede or redirect flood flows? | | | | X | 7 |
| i. Expose people or structures to a significant risk of loss, injury or death involving flooding, including flooding as a result of the failure of a levee or dam? | | | | X | 7 |
| j. Inundation by seiche, tsunami, or mudflow? | | | | X | 7 |
| k. Exposure of people property to water related hazards such as tidal waves? | | | | X | 7 |

EXPLANATION: The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to hydrology and water quality are anticipated.

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | POTENTIALLY SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| **5. AIR QUALITY. Where available, the significance criteria established by the applicable air quality management or air pollution control district may be relied upon to make the following determinations. Would the project:** | | | | | |
| a. Conflict with or obstruct implementation of the applicable air quality plan? | | | | X | 7 |
| b. Violate any air quality standard or contribute substantially to an existing or projected air quality violation? | | | | X | 7 |
| c. Result in a cumulatively considerable net increase of any criteria pollutant for which the project region is non-attainment under an applicable federal or state ambient air quality standard (including releasing emissions which exceed quantitative thresholds for ozone precursors)? | | | | X | 7 |
| d. Expose sensitive receptors to substantial pollutant concentrations? | | | | X | 7 |
| e. Create objectionable odors affecting a substantial number of people? | | | | X | 7 |

EXPLANATION: The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to air quality are anticipated.

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | POTENTIALLY SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| **6. BIOLOGICAL RESOURCES. Would the project:** | | | | | |
| a. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special status species in local or regional plans, policies, or regulations, or by the California Department of Fish and Game or U.S. Fish and Wildlife Service? | | | | X | 4 |

*F. 27*

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | POTENTIALLY SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| b. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations or by the California Department of Fish and Game or US Fish and Wildlife Service? | | | | X | 4 |
| c. Have a substantial adverse effect on federally protected wetlands as defined by Section 404 of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means? | | | | X | 4 |
| d. Interfere substantially with the movement of any resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites? | | | | X | 4 |
| e. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance? | | | | X | 4 |
| f. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan or other approved local, regional, or state habitat conservation plan? | | | | X | 4 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. All of the properties are located within an urban environment, with no rare/endangered species or protected habitats identified. No impacts to biological resources are anticipated.

| **7. MINERAL RESOURCES. Would the project:** | | | | | |
|---|---|---|---|---|---|
| a. Result in the loss of availability of a known mineral resource that would be of value to the region and the residents of the state? | | | | X | 7 |
| b. Result in the loss of availability of a locally, important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan? | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to mineral resources are anticipated.

| **8. HAZARDS AND HAZARDOUS MATERIALS. Would the project:** | | | | | |
|---|---|---|---|---|---|
| a. Create a significant hazard to the public or the environment through the routine transport, use, or disposal of hazardous materials? | | | | X | 7 |
| b. Create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment? | | | | X | 7 |

F - 28

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | POTENTIALLY SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| c. Emit hazardous emissions or handle hazardous or acutely hazardous materials, substances, or waste within one-quarter mile of an existing or proposed school? | | | | X | 7 |
| d. Be located on a site which is included on a list of hazardous materials sites and, as a result, would it create a significant hazard to the public or the environment? | | | | X | 7 |
| e. For a project located within an airport land use plan, would the project result in a safety hazard for people residing or working in the project area? | | | | X | 2, 6 |
| f. For a project within the vicinity of a private airstrip, would the project result in a safety hazard for people residing or working in the project area? | | | | X | 7 |
| g. Impair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan? | | | | X | 7 |
| h. Expose people or structures to a significant risk of loss, injury or death involving wildland fires, including where wildlands are adjacent to urbanized areas or where residences are intermixed with wildlands? | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. None of the project sites are located within the boundaries of the Alameda County Airport Land Use Plan. No impacts to hazards and hazardous materials are anticipated.

| 9. NOISE. Would the project result in: | | | | | |
|---|---|---|---|---|---|
| a. Exposure of persons to or generation of noise levels in excess of standards established in the local general plan or noise ordinances, or applicable standards of other agencies? | | | | X | 7 |
| b. Exposure of persons to or generation of excessive groundborne vibration of groundborne noise levels? | | | | X | 7 |
| c. A substantial permanent increase in ambient noise levels in the project vicinity above levels existing without the project? | | | | X | 7 |
| d. A substantial temporary or periodic increase in ambient noise levels in the project vicinity above levels existing without the project? | | | | X | 7 |
| e. For a project located within an airport land use plan, would the project expose people residing or working in the project area to excessive noise levels? | | | | X | 2 |
| f. For a project within the vicinity of a private airstrip, would the project expose people residing or working in the project area to excessive noise levels? | | | | X | 7 |

*F-29*

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to noise are anticipated.

| 10. TRANSPORTATION/CIRCULATION. Would the project: | | | | | |
|---|---|---|---|---|---|
| a. | Cause an increase in traffic which is substantial in relation to the existing traffic load and capacity of the street system (i.e., result in a substantial increase in either the number of vehicle trips, the volume to capacity ratio on roads, or congestion at intersections)? | | | | X | 7 |
| b. | Exceed, either individually or cumulatively, a level of service standard established by the county congestion management agency for designated roads or highways? | | | | X | 7 |
| c. | Result in a change in air traffic patterns, Including either an increase in traffic levels or a change in location that results in substantial safety risks? | | | | X | 7 |
| d. | Substantially increase hazards due to a design feature (e.g., sharp curves or dangerous intersections) or incompatible uses (e.g., farm equipment)? | | | | X | 7 |
| e. | Result in inadequate emergency access? | | | | X | 7 |
| f. | Result in inadequate parking capacity? | | | | X | 7 |
| g. | Conflict with adopted policies, plans, or Programs supporting alternative transportation (e.g., bus turnouts, bicycle racks)? | | | | X | 7 |
| h. | Trigger CMA Review? (GPA involving more than 100 p.m. peak hour trips generated over existing GP) | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. One of the criteria used for selection of the overlay sites, was that they abut or be within ¼ mile of an arterial roadway, in order to facilitate better traffic flow and not be a burden on local residents and businesses. In addition, traffic generated by assembly uses is typically made at off-peak hours. No impacts to transportation and circulation are anticipated.

| 11. PUBLIC SERVICES. Would the project result in substantial adverse physical impacts associated with the provision of new or physically altered governmental facilities, need for new or physically altered governmental facilities, the construction of which could cause significant environmental impacts, in order to maintain acceptable service ratios, response times or other performance objectives for any of the public services: | | | | | |
|---|---|---|---|---|---|
| a. | Fire protection? | | | | X | 7 |
| b. | Police protection? | | | | X | 7 |
| c. | Schools? | | | | X | 7 |
| d. | Parks? | | | | X | 7 |
| e. | Other public facilities? | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to public services are anticipated.

F-30

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | POTENTIALLY SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| **12. UTILITIES AND SERVICE SYSTEMS. Would the project:** | | | | | |
| a. Exceed wastewater treatment requirements of the applicable Regional Water Quality Control Board? | | | | X | 7 |
| b. Require or result in the construction of new water or wastewater treatment facilities or expansion of existing facilities, the construction of which could cause significant environmental effects? | | | | X | 7 |
| c. Require or result in the construction of new storm water drainage facilities or expansion of existing facilities, the construction of which could cause significant environmental effects? | | | | X | 7 |
| d. Have sufficient water supplies available to serve the project from existing entitlements and resources, or are new or expanded entitlements needed? | | | | X | 7 |
| e. Result in a determination by the wastewater treatment provider which serves or may serve the project that it has adequate capacity to serve the project's projected demand in addition to the provider's existing commitments? | | | | X | 7 |
| f. Be served by a landfill with sufficient permitted capacity to accommodate the project's solid waste disposal needs? | | | | X | 7 |
| g. Comply with federal, state, and local statutes and regulations related to solid waste? | | | | X | 7 |
| h. Comply with federal, state, and local statutes and regulations related to discharge of storm waters? | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to utilities and service systems are anticipated.

| | | | | | |
|---|---|---|---|---|---|
| **13. RECREATION.** | | | | | |
| a. Would the project increase the use of existing neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of the facility would occur or be accelerated? | | | | X | 7 |
| b. Does the project include recreational facilities or require the construction or expansion of recreational facilities which might have an adverse physical effect on the environment? | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to recreation are anticipated.

| | | | | | |
|---|---|---|---|---|---|
| **14. AESTHETICS. Would the project:** | | | | | |
| a. Have a substantial adverse effect on a scenic vista? | | | | X | 7 |

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| b. Substantially damage scenic resources, including, but not limited to, trees, rock outcroppings, and historic buildings within a state scenic highway? | | | | X | 7 |
| c. Substantially degrade the existing visual character or quality of the site and its surroundings? | | | | X | 7 |
| d. Create a new source of substantial light or glare which would adversely affect day or nighttime views in the area? | | | | X | 7 |
| e. Create significant shadow effects on adjacent buildings? | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to aesthetics are anticipated.

| 15. CULTURAL RESOURCES. Would the project: | | | | | |
|---|---|---|---|---|---|
| a. Cause a substantial adverse change in the significance of a historical resource as defined in section 15064.5? | | | | X | 7 |
| b. Cause a substantial adverse change in the significance of an archaeological resource pursuant to section 15064.5? | | | | X | 7 |
| c. Directly or indirectly destroy a unique paleontological resource or site or unique geologic feature? | | | | X | 7 |
| d. Disturb any human remains, including those interred outside of formal cemeteries? | | | | X | 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No impacts to cultural resources are anticipated.

| 16. AGRICULTURE RESOURCES. Would the project: | | | | | |
|---|---|---|---|---|---|
| a. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Farmland), as shown on the maps prepared pursuant to the Farmland Mapping and Monitoring Program of the California Resources Agency, to non-agricultural use? | | | | X | 4, 7 |
| b. Conflict with existing zoning for agricultural use, or a Williamson Act contract? | | | | X | 4, 7 |
| c. Involve other changes in the existing environment which, due to their location or nature, could result in conversion of Farmland, to non-agricultural use? | | | | X | 4, 7 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. There are no Farmland properties, or identified agricultural uses/zoning in the City. No impacts to agricultural resources are anticipated.

E-32

| ISSUES | POTENTIALLY SIGNIFICANT ISSUES | POTENTIALLY SIGNIFICANT UNLESS MITIGATION INCORPORATED | LESS THAN SIGNIFICANT IMPACT | NO IMPACT | SOURCES |
|---|---|---|---|---|---|
| **17. MANDATORY FINDINGS OF SIGNIFICANCE.** | | | | | |
| a. Does the project have the potential to degrade the quality of the environment, substantially reduce the habitat of a fish or wildlife species, cause a fish or wildlife population to drop below self-sustaining levels, threaten to eliminate a plant or animal community, reduce the number or restrict the range of a rare or endangered plant or animal or eliminate important examples of the major periods of California history or prehistory? | | | | X | 4, 5 |
| b. Does the project have impacts that are individually limited, but cumulatively considerable? ("Cumulatively considerable" means the incremental effects of a project that are considerable when viewed in connection with the effects of the past projects, the effects of other current projects, and the effects of probable future projects.) | | | | X | 4, 5 |
| c. Does the project have environmental effects which will cause substantial adverse effects on human beings, either directly or indirectly? | | | | X | 4, 5 |

**EXPLANATION:** The proposed project involves a Zoning Code text and map amendment, which would add an Assembly Use (-AU) overlay to the affected properties. No physical changes would directly occur with the text and map amendment, and any future assembly uses that may request entitlement, would undergo their own environmental review. No cumulative impacts are anticipated.

| **17. SOURCE REFERENCES** | |
|---|---|
| 1. | Determination based on location of project |
| 2. | Determination based on staff office review |
| 3. | Determination based on field review |
| 4. | Determination based on San Leandro General Plan |
| 5. | Determination based on San Leandro Zoning Code |
| 6. | Other – Alameda County Airport Land Use Plan |
| 7. | Not Applicable |

ATTACHMENTS

1. Regional Map
2. Proposed Assembly Uses Overlay Map
3. List of Affected Parcel Numbers and Addresses

F-33



All rights reserved. Use Subject to License/Copyright

This map is informational only. No representation is made or warranty given as to its content. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

F-34

| Parcel Number | Address |
|---|---|
| 077 0556 067 00 | 2166 Washington Ave |
| 412 0006 011 00 | Washington Ave |
| 077 0556 065 01 | 2240 Washington Ave |
| 077 0556 063 00 | 2260 Washington Ave |
| 077D 1410 025 00 | 2436 Washington Ave |
| 412 0006 003 00 | 698 Lewelling Blvd |
| 412 0006 010 00 | 674 Lewelling Blvd |
| 412 0009 005 07 | Lewelling Blvd |
| 412 0009 006 03 | 534 Lewelling Blvd |
| 412 0009 006 02 | 534 Lewelling Blvd |
| 077C 1280 004 00 | 15285 Hesperian Blvd |
| 077B 1139 006 02 | 250 Floresta Blvd |
| 077C 1310 008 04 | 14400 Washington Ave |
| 077B 1139 008 00 | 256 Floresta Blvd |
| 077B 1222 007 10 | 14349 Washington Ave |
| 412 0009 006 05 | 534 Lewelling Blvd |
| 412 0011 004 00 | Lewelling Blvd |
| 080G 1099 001 00 | 1960 Lewelling Blvd |
| 077C 1240 002 00 | 2780 Halcyon Dr |
| 077D 1424 005 08 | 777 139th Ave |
| 077C 1228 001 02 | 13940 Washington Ave |
| 077B 1225 002 04 | 13951 Washington Ave |
| 077D 1440 002 00 | 790 139th Ave |
| 077D 1440 001 18 | 760 139th Ave |
| 077B 1222 002 02 | 14111 Washington Ave |
| 077C 1230 005 02 | 14200 Washington Ave |
| 077B 1222 006 19 | 14205 Washington Ave |
| 077B 1222 007 18 | 14281 Washington Ave |
| 077C 1235 002 22 | 14340 Washington Ave |
| 077C 1235 003 03 | 14388 Washington Ave |
| 077C 1235 002 14 | 14320 Washington Ave |
| 080G 1178 007 02 | 2505 Grant Ave |
| 080G 0910 016 00 | 2561 Grant Ave |
| 080G 0910 017 00 | 2505 Grant Ave |
| 077D 1440 001 23 | 750 139th Ave |
| 077C 1228 002 02 | 14000 Washington Ave |
| 075 0087 001 02 | 400 Hudson Ln |
| 075 0084 015 02 | 2485 Washington Ave |
| 075 0087 008 00 | 400 Hudson Ln |
| 075 0084 014 05 | 2481 San Leandro Blvd |
| 077D 1424 006 07 | 1111 139th Ave |
| 077D 1437 013 04 | 1090 139th Ave |
| 077D 1437 015 01 | 1124 139th Ave |
| 077D 1437 014 03 | 139th Ave |
| 077C 1230 001 03 | 14074 Washington Ave |
| 077B 1222 001 05 | 344 139th Ave |
| 077D 1440 001 21 | 143rd Ave |
| 077D 1443 002 02 | 833 143rd Ave |
| 077B 1225 003 04 | 295 139th Ave |
| 077B 1222 004 03 | 14173 Washington Ave |
| 077C 1232 006 07 | 501 143rd Ave |
| 077C 1235 001 02 | 640 143rd Ave |
| 077B 1222 005 03 | 14193 Washington Ave |
| 077B 1222 006 17 | Washington Ave |
| 077B 1222 006 15 | 14251 Washington Ave |
| 077C 1235 002 28 | 143rd Ave |
| 077C 1235 002 18 | 14330 Washington Ave |
| 077C 1235 002 24 | 534 143rd Ave |
| 077B 1222 006 18 | 14231 Washington Ave |
| 077B 1222 007 17 | 14305 Washington Ave |
| 077C 1235 002 20 | 14332 Washington Ave |
| 077C 1230 004 06 | 14110 Washington Ave |
| 077B 1225 005 05 | 295 139th Ave |
| 077C 1230 004 04 | 14160 Washington Ave |
| 077C 1232 001 04 | 635 143rd Ave |
| 077B 1222 003 04 | 14127 Washington Ave |
| 077B 1222 003 03 | 14143 Washington Ave |
| 077C 1232 005 02 | 601 143rd Ave |
| 077C 1235 002 16 | 14336 Washington Ave |
| 077C 1240 001 06 | 100 Halcyon Dr |
| 077B 1222 007 14 | 14315 Washington Ave |
| 077B 1222 007 19 | 14327 Washington Ave |
| 077B 1222 007 20 | 14335 Washington Ave |
| 077B 1163 011 02 | 555 Floresta Blvd |
| 077B 1163 016 03 | 14391 Washington Ave |
| 077B 1163 008 10 | 555 Floresta Blvd |
| 077C 1310 001 16 | Washington Ave |
| 077B 1139 007 00 | 300 Floresta Blvd |
| 412 0009 005 04 | 552 Lewelling Blvd |
| 412 0011 005 00 | Lewelling Blvd |
| 080D 0559 003 04 | 15420 Hesperian Blvd |
| 080D 0559 005 03 | 15444 Hesperian Blvd |
| 077C 1310 001 17 | Washington Ave |
| 077B 1139 002 04 | 14595 Washington Ave |
| 077C 1310 009 01 | 14602 Washington Ave |
| 077C 1310 002 06 | 14610 Washington Ave |
| 077C 1310 003 01 | 14664 Washington Ave |
| 077B 1139 002 06 | 14601 Washington Ave |
| 077C 1310 004 04 | 14680 Washington Ave |
| 077C 1310 003 04 | 14662 Washington Ave |
| 077C 1280 006 03 | 15311 Hesperian Blvd |
| 077C 1280 007 00 | Hesperian Blvd |
| 412 0001 007 01 | Greenhouse Mall |
| 077B 1125 004 04 | 14805 Washington Ave |
| 077C 1280 005 01 | 15299 Hesperian Blvd |
| 075 0078 001 07 | Estabrook St |
| 080G 0933 022 01 | 14600 Catalina Street |
| 080G 0933 021 00 | 14600 Catalina Street |
| 080G 0933 020 00 | 14850 Catalina Street |

*F-35*

THESE 3 PROPERTIES ARE OWNED
BY FAITH FELLOWSHIP CHURCH AND
ARE INCLUDED IN THE ANALYSIS,
BUT ARE NOT PROPOSED FOR THE OVERLAY

# Proposed Assembly Use Overlay – List of Parcel Numbers and Addresses

| APN | ADDRESS | APN | ADDRESS |
|---|---|---|---|
| 075 0065 009 02 | 854 Williams St | 075 0045 007 00 | 705 Williams St |
| 075 0045 004 00 | 753 Williams St | 075 0065 007 02 | 830 Williams St |
| 075 0045 011 00 | 748 Castro St | 075 0045 006 00 | 719 Williams St |
| 075 0105 028 00 | 2028 Alvarado St | 075 0065 008 00 | 840 Williams St |
| 075 0105 027 00 | 2042 Alvarado St | 075 0066 007 09 | 830 Castro St |
| 077A 0639 004 00 | 916 Williams St | 075 0045 005 00 | 735 Williams St |
| 075 0045 010 00 | 736 Castro St | 075 0045 002 00 | 795 Williams St |
| 077A 0639 005 00 | 932 Williams St | 077A 0639 002 00 | 904 Williams St |
| 075 0066 005 00 | 1823 Alvarado St | 075 0045 009 01 | 712 Castro St |
| 077A 0639 006 00 | 940 Williams St | 077A 0639 003 00 | 912 Williams St |
| 075 0065 010 00 | 886 Williams St | 075 0105 007 00 | 727 Castro St |
| 075 0065 001 03 | 845 Thornton St | 075 0045 013 00 | 766 Castro St |
| 075 0065 001 04 | 857 Thornton St | 075 0045 012 00 | 754 Castro St |
| 075 0105 008 00 | 703 Castro St | 075 0105 032 00 | 1982 Alvarado St |
| 075 0066 007 08 | 810 Castro St | 075 0078 002 00 | 572 Estabrook St |
| 077A 0639 008 00 | 972 Williams St | 075 0078 003 02 | 596 Estabrook St |
| 075 0078 007 03 | 549 Harlan St | 075 0045 014 00 | 1860 Alvarado St |
| 075 0105 002 00 | 783 Castro St | 077A 0639 007 00 | 964 Williams St |
| 075 0078 006 02 | 555 Harlan St | 075 0066 006 00 | 1835 Alvarado St |
| 075 0105 001 00 | 795 Castro St | 075 0066 004 00 | 855 Williams St |
| 075 0078 005 03 | 563 Harlan St | 075 0066 003 00 | 869 Williams St |
| 076 0350 008 00 | 1051 Macarthur Blvd | 075 0066 007 05 | 1849 Alvarado St |
| 075 0078 007 04 | 545 Harlan St | 077A 0639 009 00 | 1776 Orchard Ave |
| 075 0105 003 00 | 771 Castro St | 075 0105 031 02 | 1996 Alvarado St |
| 075 0103 011 00 | 2050 Orchard Ave | 075 0066 019 01 | 903 Williams St |
| 075 0103 010 00 | 2090 Orchard Ave | 075 0105 010 01 | 2035 Martinez St |
| 075 0105 025 01 | 2070 Alvarado St | 075 0105 009 00 | 2009 Martinez St |
| 075 0105 006 00 | 743 Castro St | 075 0105 029 00 | 2014 Alvarado St |
| 075 0105 005 00 | 755 Castro St | 075 0105 026 00 | 2056 Alvarado St |
| 075 0066 007 07 | Castro St | 075 0103 004 03 | 2023 Alvarado St |
| 075 0077 015 00 | 527 Harlan St | 075 0105 023 00 | 2098 Alvarado St |
| 075 0105 004 00 | 763 Castro St | 076 0350 003 00 | Macarthur Blvd |
| 075 0224 002 03 | 300 San Leandro Blvd | 076 0350 007 01 | 1041 Macarthur Blvd |
| 075 0105 030 02 | 2000 Alvarado St | 076 0350 004 01 | 1029 Macarthur Blvd |
| 075 0105 022 02 | 2102 Alvarado St | 076 0350 005 01 | 1037 Macarthur Blvd |
| 075 0103 009 00 | 940 Estabrook St | 075 0224 010 00 | 265 Park St |
| 075 0045 003 00 | 775 Williams St | 077 0556 062 00 | 2274 Washington Ave |
| 075 0103 005 00 | 2077 Alvarado St | 075 0224 004 08 | 299 Park St |
| 075 0103 007 00 | 864 Estabrook St | 076 0350 010 00 | 1079 Macarthur Blvd |
| 075 0103 008 00 | 870 Estabrook St | 075 0224 001 00 | 250 San Leandro Blvd |
| 075 0103 006 00 | 2091 Alvarado St | 077 0556 064 02 | 2242 Washington Ave |
| 075 0105 034 00 | 1954 Alvarado St | 075 0224 004 06 | 350 San Leandro Blvd |
| 075 0105 033 00 | 1968 Alvarado St | 075 0224 006 00 | 415 Park St |
| 075 0065 004 00 | 807 Thornton St | 075 0224 007 00 | 435 San Leandro Blvd |
| 075 0065 011 00 | 896 Williams St | 075 0224 004 02 | 420 San Leandro Blvd |
| 075 0065 003 00 | 815 Thornton St | 075 0224 012 00 | 295 Park St |
| 075 0065 002 00 | 823 Thornton St | 075 0224 011 00 | 289 Park St |
| 075 0065 001 02 | 839 Thornton St | 077 0556 069 03 | 2150 Washington Ave |
| 075 0065 005 00 | 804 Williams St | 076 0446 012 00 | 1057 Macarthur Blvd |
| 075 0065 006 00 | 824 Williams St | 077 0556 068 01 | Washington Ave |
| | | 077 0556 001 00 | 193 Estabrook St |

F-36

F-37



Legend
- Church - Existing
- - - - Major Commercial Corridor
· · · · · Arterial Street
1/4 Mile Buffer - Arterial Street
1/2 Mile TOD Buffer Area
Faith Fellowship Foursquare Church - Existing Location
Faith Fellowship Foursquare Church - Proposed Location
Potential Assembly Use Parcels

Criteria Description:
A. Site not located along a major commercial corridor.
B. Site not located within the following General Plan Focus Areas: Downtown, Bayfair, Marina Blvd/Somer or West San Leandro.
C. Site is not located in a regional-serving retail area.
D. Site is not located inside 1/2 Mile TOD buffer area.
E. Abuts or is within 1/4 mile of an arterial street.
F. Site is not located in a Residential Zone.
G. Site is not considered Public Land, nor in a PS, OS or CR zone.
H. Site must allow a contiguous area >= 2 acres.
I. Parcels cannot have an Assessor usecode of U3, U4 or U5 (Exempt Public Agencies, Property leased or owned by a public utility).



0  500 1,000    2,000    3,000    4,000    5,000 Feet

# CITY OF SAN LEANDRO
## Assembly Use Criteria Study



F-38

# Item 6: Public Hearing

**(b)    Matter of consideration of amendments to the Zoning Code, including: Article 3 – Definitions, deleting the Clubs and Lodges and Religious Assembly definitions and providing a new Assembly Use definition; and adding new Article 13.1 Assembly Use Overlay District.**

**Planning Manager Pollart** stated that staff had received an application from Faith Fellowship Church to amend the zoning code to conditionally permit assembly uses in the IL Industrial Limited District. The church was in contract to purchase a site in an Industrial Professional District, but desired to change it to IL, based upon discussions with staff concerning the best way to proceed with the application. Currently, assembly uses were indicated as Clubs and Lodges and Religious Assembly. At the work session, two options were presented:

- Option 1:   Allow assembly uses as conditionally permitted in IL Zones, effective citywide.

- Option 2:  Apply assembly use overlay to identified areas.

Option 2 was identified as the desired option at the joint work session. Several General Plan policies were used as a base for the amendments. The criteria were:

- Not located along commercial corridors to preserve the commercial characters
- Properties not identified as IG Industrial General or IP Industrial Professional
- Industrial zones could be used if the site was near the periphery of the industrial uses to avoid breaking up the industrial bases
- Minimum two-acre sites to address large assembly uses
- Properties that abutted or were one-quarter mile from an arterial streets to avoid impacting residential neighborhoods
- Vacant or underutilized properties that might be available in the future

She passed a large map to the Board that showed the entire city with existing religious assembly uses, IL zoned properties (Option 1), 13 overlay areas, and the existing Faith Fellowship Church site and its new proposed site. She described each area. Clubs and Lodges and Religious Assembly Uses would be deleted and all would be under Assembly Uses, which would be conditionally permitted in R Districts.

Article 13 would allow establishing an Assembly Use Overlay District. Additional criteria were being considered that would address impacts that larger assembly uses might have on parking and transportation.

Article 17 would, essentially, be a cleanup that would delete Clubs and Lodges and replace with Assembly Use. The parking requirement would be modified to provide the ability to require more parking, if needed.

All of the identified areas on the map would be rezoned with the special Assembly Use Overlay, with the exceptions noted. If the Assembly Use Overlay were instituted, it would not change the underlying zoning of the individual parcels or the current use of a property. The overlay would

F-39

affect the ability of adult oriented businesses to locate in certain of the areas, which could not locate in any I District or be within 1,000 feet of religious assemblies or any other adult oriented business. An Initial Study and Negative Declaration would have to be performed, which required a 20-day public review period. The West San Leandro-MacArthur Redevelopment Advisory Committee was scheduled to hear this on December 20th. Planning Commission would review it after the Negative Declaration was prepared, tentatively scheduled for January 11th. It should be ready for review by the City Council sometime in late February.

**Member Eliason** asked if a religious organization could rent space within a shopping center or would the whole site be redeveloped.

**Planning Manager Pollart** replied that a religious organization would be allowed to rent a tenant space.

**Chair Raposo** asked if there would be any size limits within the Assembly Use.

**Planning Manager Pollart** answered that he was correct. A possibility was to differentiate between small and large assembly use.

**Chair Raposo** expressed concern about mega church or mega theater assemblies. He would like staff to look into limiting the size of such establishments. He wondered how parking would be tailored to the size of the assembly, which he understood was the situation with the church that was previously mentioned.

**Planning Manager Pollart** stated that activities outside of the main assembly area but would affect the parking situation, would fall under the catch-all "or as required by the use permit." Additional parking could be required beyond the standard that was being proposed.

**Chair Raposo** opened the public hearing.

**Gary Mortara**, 577 Manor Boulevard, Pastor of the Faith Fellowship Church, stated that he was confused about how what had been discussed would affect the building his church wished to purchase on January 1st.

**Planning Manager Pollart** replied that the proposed amendments did not speak specifically to the property the speaker was in contract with. That site was zoned IP, rather than IL. This was a clean-up of the CZC.

**Pastor Mortara** asked what the church had to do to address the property on Catalina Street that they were concerned with.

**Planning Manager Pollart** suggested that he request that the site be included as one of the overlay areas.

**Pastor Mortara** asked if that was something he could do at this time. He had understood that was something that he had already requested.

F-40

**Planning Manager Pollart** told him that his application had opened up a lot of questions that staff had to consider from a city-wide standpoint, not only as it affected the property he wished to purchase. She offered to talk with him after the meeting.

**Chair Raposo** clarified that these zoning changes came about as a result of the speaker's application. However, his case was isolated and it would take special attention from staff. He asked **Planning Manager Pollart** to clarify what the speaker's next step could be.

**Planning Manager Pollart** stated that it would be appropriate to make his request to the Board, which would allow the future site of his church to be included in the overlay areas.

**Member Marr** stated that she knew the speaker had attended the joint work session and she asked when the speaker's original application was filed.

**Pastor Mortara** replied that the application was filed May 18th. He had originally contacted staff in March when they were first considering making an offer on the property.

**Member Marr** agreed that it would be appropriate for the applicant to make his request to the Board tonight. She recalled that he had mentioned that he had a deposit on the site, which he could lose by a certain date.

**Vice Chair Goldt** reiterated that this hearing tonight did not address the speaker's specific situation, so this was not the venue for his topic. She wondered how he could "still be out on a limb, somewhere."

**Planning Manager Pollart** stated that an application had been submitted regarding the site on Catalina for modifying the zoning code that would allow religious assembly use. The site was currently zoned IP. Originally, staff considered rezoning the IL site, then changing the zoning to allow the church to occupy the property. However, the application opened up the need to review all IL sites in the city. The Business Development Subcommittee were met with for direction to staff, the options were presented during the joint work session in October; and the amendments were created and brought forward.

**Member Marr** asked if staff had been communicating with Faith Fellowship all along.

**Planning Manager Pollart** responded that staff had stayed in communication with the applicant and his other representatives. They had been apprised of all the meetings and they had attended them.

**Vice Chair Goldt** asked if the applicant's purchase of a new site was entirely on hold until this was settled city-wide.

**Member Eliason** defended staff by reminding everyone that the applicant wanted to relocate where, currently, it was not allowed. Staff could have brought this application to the Planning Commission for denial, rather than working with this applicant to try to work with the Zoning Code to allow them to relocate in this location. Yes, the applicant was caught up, but he was asking for something that the Code did not allow at this time. The industrial base was very large and profitable and it should be protected. Much consideration should be taken before other uses

*E - 41*

were allowed. She reminded the applicant that when his January 1st deadline arrived, he would not have surety, because the timeline was longer than that.

**Planning Manager Pollart** asked if the Board would want to consider that individual area to be included in the Overlay Area. It had not been included because it did not meet the criteria that had been developed for assessing assembly use. However, the Board could recommend that it be looked at as an overlay area, which could move on to the Planning Commission and the City Council.

**Vice Chair Goldt** asked if the Kaiser facility would be in that area and she wondered if the two facilities would impact each other.

**Planning Manager Pollart** stated that the Kaiser site would be at Marina and Merced. She displayed the map, which showed the two sites.

**Chair Raposo** asked if the city had been consulted about relocating in this location before agreeing to the purchase.

**Pastor Mortara** stated that he had met with staff about it in March. The growth of his church had started to cause problems in the neighborhood, so they had found a building that would fit their needs. It was away from residences and no one was there on Sunday mornings. His understanding was that the BZA would approve the rezoning and his application would move on to Planning Commission and City Council.

**Chair Raposo** asked if the Board wished to add the site to the overlay area.

**Vice Chair Goldt, Member Pearson and Chair Raposo** agreed that they did not have enough information to make that decision at this meeting.

**Member Marr** asked if this site could be added to the overlay district after the proposal had been heard by the Commission and Council.

**Planning Manager Pollart** replied that it could be added at the Planning Commission hearing. She would include it with the environmental analysis when this proposal was heard by the Planning Commission. She asked if the Board wanted to review the applicant's proposal. If so, the Board would have to hear it before it went to Planning Commission.

**Member Eliason** suggested that the applicant's proposal be added to the environmental review, which would allow it to be analyzed versus the criteria and analyzed for its environmental impacts. Then, it would be ready to be added for a decision by the Planning Commission or the City Council.

**Pastor Mortara** asked for clarification on how the above suggestion would affect his application.

**Member Eliason** explained that an environmental review would need to be performed on the environmental impacts of the locations that had been identified for the overlay. Traffic, air quality, biological and other impacts would be studied to identify how the assembly use could

F-42

impact the adjoining uses from being in that location. If his application was a part of that environmental review, an assessment of those environmental impacts would be available to the Commission and Council to allow them to add his proposal to the other proposed overlay districts and to make an informed opinion.

**Ed Bullok**, 25103 Vista Greens Court, Hayward, stated that he was a member of Faith Fellowship Church. He disagreed with staff that the proposed new site for the church did not fit the criteria for rezoning. He read the listed criteria (above, under Option 2) starting on page 2, which he believed were met by the proposed site.

**Planning Manager Pollart** stated that at the bottom of page 2, it stated that properties were not be designated IG or IP; this property was designated IP.

A discussion ensued concerning zoning, city overlays and the two options that had been presented at the joint work session in October, of which Option 2 had been chosen. It was recommended that the speaker meet with staff to clear up the confusion about the church's proposal and the city's wide ranging proposals.

---

### Motion to Close the Public Hearing
### (Marr/Eliason; 5 Ayes, 0 Noes, 2 Absent-Chin, Sidari)

---

**Member Eliason** believed in protecting the city's industrial areas and she expressed concerned about allowing incompatible land uses in those areas. However, she was more concerned with allowing churches to locate in vacant tenant spaces in the two marginal shopping centers. In her opinion, those spaces would slowly contribute to the further decline of the centers, because they were largely unused except on Sundays.

**Planning Manager Pollart** stated that all of the comments made would be forwarded to the Planning Commission.

F. 44

# MEETING OF THE
# WEST SAN LEANDRO/MACARTHUR BOULEVARD
# REDEVELOPMENT ADVISORY COMMITTEE

## DECEMBER 20, 2006 MEETING SUMMARY

| | |
|---|---|
| Members Present: | Dale Reed, Gary Naman, Carole Rinaldi, Jake Francisco, John Faria, Douglas Federighi, Linda Lazzeretti, Larry Norry, Patricia Raposo, and Dan Walters |
| Members Absent (excused): | Larry Norry |
| City Staff Present: | Luke Sims, Ryan Evans, Tim Ricard, Cynthia Battenberg, Debbie Pollart, Keith Cooke, and Reh-Lin Chen. |

---

<u>Proposed Zoning Text Amendment to Allow General Assembly in Industrial Limited (IL) Zones.</u>

Debbie Pollart, Planning Manager, provided the RAC with a PowerPoint Presentation (attached) which provided an overview of the proposed zoning text amendment which would allow general assembly uses in industrially-zoned areas in San Leandro. Pollart explained that one of the catalysts for this proposed amendment was an application from Faith Fellowship Church (FFC) to occupy a site at 14600 Catalina (currently zoned as Industrial Park (IP)), as well as a request from FFC to rezone the site to Industrial Limited (IL). In response to this request, the Community Development Department considered two options; the first of which would allow assembly uses to be conditionally permitted in IL zones, and the second of which would consider a zoning overlay option much like the (S) overlay district in the City's commercial corridors. Pollart explained that it was recommended at a joint meeting of the Planning Commission and Board of Zoning Adjustments (BZA) that the creation of a special review overlay district (the second option considered) was the best way to address the issue and that 13 areas (further described in the attached PowerPoint presentation) would be considered for designation as a special review overlay district. Pollart then proceeded by describing some of the criteria developed for the overlay area's which include, but are not limited to: a site not being located along a major commercial corridor, a site not designated Industrial General (IG) or IP, a site which is a minimum of two acres in size, a site which abuts or is within ¼ mile of an arterial street, and a site which is vacant or currently underutilized. Pollart then continued by stating that the next step in addressing this issue would be for City staff to prepare an Initial Study/Negative Declaration for rezoning of identified properties within the Assembly Use Overlay District and that this issue would then go before the Planning Commission and the City Council at meetings tentatively scheduled in January and February, respectively.

At this point, discussion ensued among RAC members during which a number of questions were asked and statements were made. RAC member Faria stated that, as he understood the issue, FFC would still not be able to use the Catalina site for an assembly use as it is currently zoned

*F-45*

IP. Pollart responded by stating that he was correct. Luke Sims, Business Development Manager, added that it is important for the RAC to remember that 14600 Catalina is actually not in the West San Leandro/Macarthur Boulevard Redevelopment Project area, but that this issue comes before the RAC because a change in the zoning code would trigger a change in the redevelopment project area plan. RAC member Federighi echoed and supported Sims' comments as he stated it was important for the RAC to consider the issue as a whole, rather than specifically concentrating on the application filed by FFC.

RAC member Federighi continued by stating that he was supportive of the BZA recommendation that a special overlay district would be most effective in addressing proposed assembly-type uses in San Leandro. RAC member Walters also stated that he supported the recommendation of the BZA and also voiced concern regarding the precedent which would be set if the site at Catalina were rezoned to IL. In response to this, Pollart also added that a rezone of the Catalina site could also potentially set precedent for spot-zoning in industrial areas.

At this point, the RAC deemed it appropriate to make two separate motions to address what they saw as two separate issues relating to the proposed zoning text amendment. In this, RAC member Walter moved for a motion that the RAC sees "no harm" in the BZA-recommended approach which would create a special overlay district for assembly uses.

**M/ Dan Walters; S/ John Faria; Motion Carried Unanimously**

RAC member Faria moved for a second motion in which the RAC did not support assembly uses as a conditionally permitted use in any areas which are zoned industrial.

**M/ John Faria; S/ Gary Naman; Motion Carried Unanimously with Dale Reed Abstaining**

F-46

# ALAMEDA COUNTY - CITY OF SAN LEANDRO REDEVELOPMENT ADVISORY COMMITTEE JOINT REDEVELOPMENT PROJECT AREA

## January 17, 2007 MEETING SUMMARY

Members Present:    Charles Gilcrest (chair), Jim Begier (co-chair), Tom Dlugosh, Dan Gatto, Dave Jorgenson, Robert Battinich, Robert A. Lindstrom, Robert Kvam and Sally Kellman

Members Excused:    Charles Pershing

City Staff Present:    Luke Sims, Ryan Evans, Debbie Pollart and Tim Ricard

---

## I.    Roll Call

The meeting began at approximately 5:00 PM with roll call.

## II.    Public Comment

None.

## III.    Action Items

Approval of November 15, 2006 Meeting Summary

**M/Gilcrest, S/Begier; Motion Carried**

Proposed Zoning Text Amendment to Allow General Assembly in Industrial Limited (IL) Zones.

Debbie Pollart, Planning Manager, provided the RAC with a PowerPoint Presentation which provided an overview of the proposed zoning text amendment to allow general assembly uses in some industrially-zoned areas in San Leandro. Pollart explained that one of the catalysts for this proposed amendment was an application from Faith Fellowship Church (FFC) to occupy a site at 14600 Catalina (currently zoned as Industrial Park [IP]), as well as a request from FFC to rezone the site to Industrial Limited (IL).

In response to this request, the Community Development Department considered two options. Option 1 would allow assembly uses to be conditionally permitted in IL zones. Option 2 would consider a zoning overlay option much like the (S) overlay district in the City's commercial corridors. Pollart reported the recommendation of a joint meeting of the Planning Commission (PC) and Board of Zoning Adjustments (BZA) was Option 2,

F-47

the creation of a special review overlay district, was the best way to address the issue. Staff identified 13 areas for consideration for designation as a special review overlay district. Pollart described the criteria developed for the overlay area which include, but are not limited to: 1) a site not located along a major commercial corridor; 2) a site not designated Industrial General (IG) or IP; 3) a site which is a minimum of two acres in size; 4) a site which abuts or is within ¼ mile of an arterial street; and 5) a site which is vacant or currently underutilized. Pollart stated that the next step in addressing this issue will be for City staff to prepare an Initial Study/Negative Declaration for rezoning of identified properties within the Assembly Use Overlay District and schedule this issue for Planning Commission and City Council consideration at meetings tentatively scheduled in January and February, respectively.

An extensive discussion then ensued among RAC members, focusing on five main issues. These issues included how the zoning code amendment would affect San Leandro's industrial base, the legal issues involving limiting Religious Assembly uses, the noticing of the affected businesses, which study areas should or should not be included in the overlay and how to deal with the a property after a non-profit use has vacated.

RAC Chair Gilcrest stated the proposed zoning amendments could affect property owners by potentially changing the character of industrial areas but also pointed out that these changes would provide property owners with more options for potential purchasers of their property. RAC Member Jorgensen stated that the due to the legal requirements surrounding religious uses, the overlay district was important in order to provide sufficient locations of churches. However, if the property owners do not want the overlay on their property, those properties should be removed from the zoning amendment. Pollart explained that staff had created a specific set of criteria and that consistency when applying the criteria was important.

The RAC made three separate motions to address distinct issues which had come to light through the discussions.

**M/Jorgenson, S/Kellman that the RAC concurs with the PC/BZA recommended approach to create a special overlay district for assembly uses. Carried 8-0 with Dlugosh abstaining.**

**M/Gilcrest, S/Battinich to recommend that properties which are occupied by a non-profit assembly use relocating within the City be encouraged to return to a taxable use once the property is vacated. Carried 8-0 with Dlugosh abstaining.**

**M/Battinich, S/Jorgenson to recommend that Overlay Area #5 (Washington Ave) be removed from the proposed zoning code amendment. Carried 5-1 with Dlugosh and Kellman abstaining.**

---

| **Assembly Uses** |
| --- |

**Planning Manager Pollart** explained the situation regarding the potential of Zoning Code amendments that would permit Assembly uses in certain industrial districts. For clarification, she pointed out that while Religious Assembly and Clubs and Lodges have separate definitions in the Zoning Code, they must be treated equally as Assembly uses under the provisions of RUILPA, the law requiring equal treatment for all manner of assembly uses. Currently, she explained, Religious Assembly is permitted conditionally in any R District. By way of background, Ms. Pollart said that earlier this year, Faith Fellowship requested a modification of the Zoning Code to also conditionally permit assembly uses in the IL District. Faith Fellowship has outgrown its current facility in Washington Manor and is looking at the former MDL building on Catalina. The Faith Fellowship application prompted the Planning Department to look at the General Plan, which suggests that the areas most suitable for conversion from industrial to non-industrial are a) those located adjacent to existing housing, or b) in areas which lack amenities to meet needs of modern industry – San Leandro Boulevard north of Davis Street, Alvarado Street, and Marina Boulevard west of the Auto Row area. She indicated that the General Plan also discusses adaptive reuse (i.e., keeping the industrial base up-to-date), tax-base enhancement, the industrial sanctuary, and also of the separation of industrial uses from sensitive uses, such as schools, churches and the like. Based on General Plan considerations, the Planning Department developed several criteria to evaluate potential areas for additional assembly uses.

- Not located along major commercial corridor, to preserve the commercial sections of East 14th Street, for example, and the Auto Row area along Marina Boulevard;
- Not in a designated IG or IP District, except possibly on the periphery, to preserve the industrial core;
- Size of parcels (Planning looked at sites or areas encompassing at least two acres);
- Abuts or within a quarter-mile of an arterial (direct access to and from freeways and other arterials would minimize traffic wending its way through neighborhoods to reach an assembly site);
- Vacant/underutilized property; some of the so-called "underutilized" properties, Ms. Pollart explained, are currently occupied but there might be a higher, better use for them some years down the road.

With that as the framework, Staff identified 13 potential areas, indicating which of the five criteria each area meets (map included). The areas:

| | |
| --- | --- |
| 1 | East part of town, off of Grand Avenue near Interstate 580 |
| 2 | Park Street Island near Siempre Verde Park and San Leandro Boulevard; much of the adjacent property is currently zoned IL |
| 3 | North of Marina Boulevard in the area of Williams Street, Alvarado Street and Martinez Street |
| 4-5-6 | Along the Washington Avenue corridor, beginning at about San Leandro Boulevard and going southeast |
| 7 | Along Washington Avenue, south of Halcyon Drive/Floresta Boulevard |
| 8 | Along Hesperian west of Bayfair Center |
| 9 | Off Lewelling Boulevard near Interstate 880 |
| 10 | The Wicks Boulevard/Merced Street area |
| 11 | The Marina Faire Shopping Center area along Doolittle Drive |
| 12 | The Windsor Square Shopping Center |

F. 49

13   The southwestern corner of the City, including the Frito Lay property and an existing industrial park in the Grant Avenue area

Staff developed two options for Commissioners to consider:

- Option 1 – Amend Zoning Code via a text amendment to conditionally permit Assembly uses in IL Zones. To address the issue of insufficient parking, base development standards could be derived for Assembly uses. Option 1 would affect 94 acres (including railroad right-of-way).

- Option 2 – Apply an Assembly Overlay District, akin to the 'S' Overlay District and PD Overlay Districts, where the underlying zoning would remain whatever it is but Assembly uses would be allowed via a use permit in the 13 specified areas. This option would apply to approximately 218 acres, including some railroad right-of-way.

Neither option would affect the current standards that conditionally permit Religious Assembly uses in R Districts. In addition, staff would prepare a new definition for Assembly uses, to avoid future confusion over how Religious Assembly and Clubs/Lodges are regulated. Ms. Pollart said that the City Council's Business Development Sub-Committee has requested the Commissioners' feedback on this issue, after which the Planning Department will submit recommendations to Board of Zoning Adjustments, the Planning Commission, and, ultimately, the City Council.

**Commissioner Dlugosh** asked whether the criteria would apply to applications for Assembly use permits, because some of the 13 properties clearly are too small to fit the two-acre criterion.

**Planning Services Manager Pollart** replied that the two acres would not necessarily be a requirement, but came to the list of criteria via research on "mega" churches. These churches, she explained, tend to have congregations of 1,500 to 2,000 or more, with some sort of activity going on every day, with a building of 50,000 square feet or more, and a site of two-plus acres.

**Commissioner Dlugosh** followed up by asking whether Staff has a definitive set of criteria on which to evaluate applications; Ms. Pollart said that standards could be developed. Mr. Hom added that if the City takes the overlay approach, it would need development standards and criteria such as those that were created for the S Overlay District for Auto Row, in order for Staff, the Board of Zoning Adjustments and/or the Planning Commission to determine compliance. Mr. Hom also indicated that Staff is trying to recognize the trend toward larger churches, and accordingly was looking for options that may have less neighborhood impact in a semi-industrial area than in a residential district, without compromising the City's industrial base, its employment base, and economic development codes.

**Commissioner Wohltmann** asked whether it was possible to proceed with both options, rather than choosing one or the other. Ms. Pollart indicated that going ahead with both is certainly feasible; they are not mutually exclusive. Mr. Hom pointed out, however, that some IL parcels may not be suitable for assembly uses.

**Commissioner Wohltmann** also asked whether Staff had discussed the options with any other religious use representatives, to which Ms. Pollart replied no, only to the applicant himself. In fact, she added, the property that interests Faith Fellowship is zoned IP, and thus is not in any of the 13 identified areas. If Option 1 were enacted, the church would have to request a re-zone of the property from IP to IL. If Option 2 were enacted, the applicant would have to request that

F-50

their subject property be included in the new Assembly Overlay District to conditionally permit Assembly uses.

**Commissioner Collier** suggested that Option 2 seems to be the most logical and most generous of the two, because large churches would have far less impact on commercial and industrial areas on Sundays than they currently do in residential areas.

**Planning Services Manager Pollart** then emphasized the importance of developing good definitions of Assembly use, because a club or a lodge may have a meeting once a month, whereas a large church may have activities going on every day.

**Commissioner Collier** agreed that churches often do have daily activities, but the need for ample parking on the weekends far exceeds weekday requirements, a condition that is more conducive to Assembly uses in industrial areas, where most of the businesses would be closed on weekends, at least on Sundays.

**Planning Services Manager Pollart** asked how the Commissioners would like the Planning Department to proceed. Mr. Hom asked if there were suggestions for areas to add or delete.

**Commissioner Dlugosh** wondered if the areas listed might be an acceptable starting point, but could be revised later, to which Ms. Pollart replied that the City can initiate a rezone process at any time.

**Chair Raposo** requested information regarding parking at a large church. Suppose, he said, the site has at least two acres. A small church would have plenty of room for parking; a large church might not. Mr. Hom clarified that the two acres is not intended as a minimum, but gave the staff a basis on which to start looking at potential areas. Ms. Pollart added that the current parking standard calls for one parking place for each 100 square feet of main seating area – the church's sanctuary area – and that square footage devoted to classrooms, day care and other such uses does not count in terms of required parking. In the context of other communities, San Leandro's requirement is on the low side, which is another issue that staff is looking at.

**Commissioner Dlugosh** said that he favors Option 2, because it provides a definitive area to start with.

**Commissioner Wohltmann** said that he favors pursuing both options simultaneously, or combining them, because including Option 1 adds more potential sites to the equation.

**Planning Services Manager Pollart** pointed out that the only overlap between Options 1 and 2 is in Areas 2 and 3, but that there is a stretch of IL Zone along Doolittle Drive south of Area 11 that would come in if the two options were combined.

**Community Development Director Hom** noted that the only conflict with combining the two options would be in the 'S' Overlay District along Marina Boulevard. Pollart pointed out that she believes only one overlay district can apply at a time, so Area 3 would exclude the 'S' Overlay District parcels on Marina Boulevard.

**Gary Mortara**, head pastor of Faith Fellowship, said that he has gone to all the surrounding businesses near the former MDL building to determine whether they had any issues with Faith Fellowship coming into the area. He reported having personally received "an agreed-upon thumbs up," and that one of the fire captains deems it a perfect place for a church because of the ample parking and the limited weekend traffic. The church uses its buildings on a large scale on Wednesday nights and Sunday mornings, with small groups (up to 50 people) on some other evenings. Noting that the property has been in escrow since February, with a $50,000 deposit

F-51

holding it until October 31, he urged the Boardmembers and Commissioners to help. Pastor Mortara also said the only reason that Faith Fellowship wants to move is because the congregation has outgrown its current site. Going from 65 to more than 1,500 people has created a parking and traffic nightmare. Faith Fellowship, he said, wants to sell its current church to a congregation that is one-ninth the size of theirs.

**Boardmember Chin** asked whether Option 1 might be pursued now, with Option 2 tabled for possible future adoption.

**Community Development Director Hom** indicated hearing three suggestions: Option 1; Option 2; and combined, to an extent, both Options 1 and 2.

**Commissioner Wohltmann** concurred with Boardmember Chin. His point, he reiterated, was to create as large a pool of potential sites as possible. Commissioner Wohltmann also asked how Option 1 helps Faith Fellowship, with its October 31 deadline.

**Planning Services Manager Pollart** replied that neither option is feasible within Faith Fellowship's deadline. Hom indicated that the MDL site does not meet the criteria that staff laid out; specifically, it is not on the edge, but rather entirely surrounded by industrial properties.

**Boardmember Marr** asked whether Faith Fellowship is coming before BZA or the Planning Commission for this. Pollart explained that the church requested modifying the Zoning Code text to conditionally permit assembly uses in the IL Zone, followed by a request for a re-zone from IP to IL. Either way, the City cannot act by the church's October 31 deadline.

**Commissioner Dlugosh** suggested a straw vote to give Staff some direction on the option or options to pursue.

**Chair Raposo** conducted a straw poll.

- Option 1 – 1 Aye
- Option 2 – 7 Ayes
- Combined Options 1 and 2 – 1 Aye

**Planning Services Manager Pollart** said that when the recommendation is formulated for the City Council's Business Development Sub-Committee, the group would be informed about Option 1 but also told that the straw vote favored Option 2.

F-52