**EXHIBIT L**

# SAN LEANDRO PLANNING COMMISSION
# CITY COUNCIL CHAMBERS
### 835 East 14th Street
### San Leandro, CA 94577

**MINUTES FOR AGENDA NO. 07-07**                    **April 12, 2007**

## 7:00 P.M. Regular Meeting

| Item 1:  Roll Call |
|---|

**Present:**    Acting Chair/Vice Chair Reed; Commissioners Dlugosh, Collier, Abero, Nardine.

**Excused:**    Commissioners Ponder, Wohltmann.

**Staff:**    Debbie Pollart, Planning Services Manager and Secretary to the Planning Commission; Sally Barros, Planner II; Stephanie Stuart, Assistant City Attorney; Barbara Templeton, Recording Secretary.

**Secretary Pollart** asked attendees either to turn off cell phones or to put them on "vibrate." She explained that Fire Department regulations allow no standing or sitting in aisles in the Council chambers. She pointed out that there is overflow standing room in the back of chambers as well as in the gallery room, where the proceedings are piped in.

| Item 2:  Public Comments |
|---|

None.

| Item 3:  Minutes for the February 22, 2007 Regular Meeting |
|---|

Lacking a quorum of Commissioners who were present at the time, minutes of the February 22, 2007 meeting carry over for approval to the next meeting at which such a quorum is present.

| Item 4:  Correspondence |
|---|

**Secretary Pollart** indicated that she had placed correspondence relating to Public Hearings in the Commissioners' packets. Two of the items relate to PLN2006-00104, and three, including a memorandum from the City Attorney's office, relate to PLN2006-00049.

| Item 5:  Oral Communications |
|---|

None.

2-1

---

| **Item 6: Public Hearings** |

(a) **Matter of PLN2006-00104**; Planned Development, Zoning Map Amendment and Tentative Map; to rezone the properties at 311-335 MacArthur Boulevard/Herma Court from CC Commercial Community and RS Residential Single-Family Districts to CC (PD) and RS (PD), respectively. The project is a proposed residential development with 23 three-story townhouses at the corner of MacArthur Boulevard and Herma Court. Proposed amenities include a private roadway, an internal park area, attached one- and two-car garages, and 6 guest parking spaces on the site. The site is zoned CC Commercial Community District and RS Residential Single-Family. Assessor's Parcel Numbers 76-311-1-1, 76-311-1-3, 76-311-3, 76-311-4, and 76-311-5; 331-335 MacArthur Boulevard/Herma Court; David Ruffin (applicant); Reed Settlemier (property owner). [Barros]

The project to construct 23 townhomes on a site that is less than five acres is categorically exempt from the California environmental Quality Act (CEQA) per CEQA Guidelines article 19, Categorical Exemption, Section 15332. Furthermore, the rezoning is exempt from CEQA, per CEQA Guideline, Section 15061 (b) (3), where it can be seen with certainty that there is no possibility that the rezoning in question may have a significant effect on the environment.

**Acting Chair/Vice Chair Reed** recused himself from the hearing, so **Commissioner Dlugosh** assumed the role of Acting Chair for this item.

**Planner Sally Barros** explained that the staff report includes two Tentative Vesting Maps for this Planned Development (PD), because the applicant was attempting to arrange a lot-swap with one of the adjacent property owners on Herma Court. One of the maps ("Proposed") assumes completion of the lot-swap; the other, the "Alternate Site Plan," does not. Although Planner Barros included both maps for purposes of comparison, she emphasized that because no agreement on a lot-swap has been reached, the City Attorney advised that the Planning Commission could act only on the Alternate Site Plan at tonight's hearing. If the swap proves successful, the applicant must return to the Commission.

She explained that Zoning Code Article 10 provides for the PD process, which gives developers additional leeway and opportunity for creativity in how large sites (10,000 square feet minimum) are assembled and used. It thus encourages comprehensive site planning and design in developments that would otherwise necessitate variances.

This MacArthur Boulevard/Herma Court PD proposed development consists of five different parcels comprising approximately one acre. It also includes slightly more than 1,000 square feet that would be vacated by the City and incorporated into the site. She noted that some driveways will be abandoned and diagonal spaces will be added to the MacArthur Boulevard frontage to increase street parking in the area. There is a narrow lot on the site, 25x110 feet, that fronts on Herma Court and is proposed as open space for the project in the Alternate Site Plan.

The plans call for 16 townhomes across the MacArthur Boulevard frontage, a "five-plex" at the southerly end of the interior, and a duplex on Herma Court. Although the initial

proposal included a circular commercial space at the MacArthur/Herma/Broadmoor corner, after a July 2006 Planning Commission Work Session on the subject property, the developer revised the proposal to make it a residential-only. If the developer wants to modify the PD at some future date to incorporate "flex" space, he would first have to come back to the Planning Commission for review.

20 of the 23 units have two-car garages, some of which have tandem setups. Three units, which are identified as the development's inclusionary housing units, have one-car garages. There are six guest parking spaces within the confines of the development.

Architectural detailing reflects the craftsman style characteristic of the neighborhood, and it has been revised since the Work Session to incorporate more differentiation into the roof lines. Floor plans for the units include playrooms on the ground floor, second-floor bedrooms (or studies that the Building Code classifies as bedrooms) and common space including living, dining and kitchen; and a set-back third floor with two bedrooms and two full baths. Units range from 1,151-2,042 square feet.

Landscaping and vegetation would help screen interior traffic, some of which will make a right-turn-only exit onto Herma Court. The landscape plan incorporates flowering accent trees and screening around the perimeter, as well as a private "passive" park with an adjacent tot lot and greenery but not barbecue pits and other gathering places that might create noise problems with neighbors on each side. Times of use in the park also will be restricted in deference to concerns that neighbors have expressed. The proposed development in this case calls for exceptions to the underlying zoning standards for floor area ratio (FAR), setbacks, landscaping provisions, minimum parking requirements, and fence height.

- FAR – The total cumulative FAR is approximately 75%, where the underlying CC District standard is 50%. Typically, only about 22,000 of livable area would be permitted on an acre (43,000-square-foot) lot. In this case, there is about 30,000 square feet of livable area.
- Setbacks –The duplex is set back 13 or more feet, whereas 20 feet is the typical setback in RS Districts. Setbacks for the townhome units meet or exceed standards except for the corner side at the northernmost edge, where there is a zero setback proposed while the standard calls for a 10-foot corner setback.
- Landscaping – The 10-foot setback in the front of the property is only partially landscaped, because the patio portion is not considered landscaping.
- Parking – Standards call for 58 spaces, whereas the project proposes 49 (2.5 per unit required; 2.13 provided.) Parking standards also requires exceptions for 10 of the development's 23 units – seven residences with tandem arrangements and three with one-car garages. The project also is expected to add 10 spaces to the street parking supply.
- Fence walls – 5-foot fence/walls in the front setbacks exceed the typical maximum by 2 feet.

As for density, the portions of the properties designated in the General Plan as "low residential" and "corridor mixed use" combined allow up to 25.3 units on the acre site. This proposal includes 23 units. In comparison with other projects, the MacArthur/Superior development has 22 units per acre, and a new Davis Street

L-3

development has 16.6 units per acre. The average roof height overall for the MacArthur/Herma development is 34.5 feet, below the 50-foot maximum.

Neighbors have expressed concerns about traffic and parking; the City's Traffic Engineering determined that the new proposed use does not represent a significant increase over the past use of the properties.

Staff's recommended conditions of approval include:
- Limits on uses allowed and hours for open space.
- Installation of decorative pavement for the interior driveways.
- Limitations on hours of construction.
- Standard requirements from the Engineering Department as well as others provided by the Alameda Count Public Works Agency, for utility upgrades, stormwater and erosion control; in-lieu fees for streets, parks, and schools.
- Provision for three affordable units (two for moderate income and one for low-income homeowners).

In terms of General Plan conformance, Planner II Barros noted that the desire for higher-density projects along traffic corridors support the exceptions that the Planning Department recommends. Among those who have reviewed the proposal:
- The City Council Business Development Subcommittee (June 8, 2006) determined that the mixed-use concept meets goals for MacArthur corridor.
- MacArthur/West SL RAC (June 21, 2006) found the proposed commercial use somewhat troublesome in light of parking issues.
- Planning Commission Work Session (July 27, 2006) surfaced questions as to the viability of commercial space and associated parking, as well as objections to the proposal's inclusion of a "skinny" house on a narrow lot.
- Broadmoor HOA (June 14 and November 8, 2006) members took a favorable view of project, but expressed concerns over parking and density.
- A neighborhood meeting (March 29, 2007) at Stepping Stones, which currently occupies most of the site, produced general agreement that the architectural design is attractive but also raised concerns over potential traffic impact, location of open space, and glare from cars leaving the site after dark.

Staff recommends that the Planning Commission forward to the City Council a recommendation for Council approval in about a month's time:
- Rezoning the property to RS (PD) Residential Single-Family, Planned Development Overlay District.
- Planned Development to construct 23-unit residential townhouse development.
- Vesting Tentative Map, Tract 7875 to subdivide the subject property according to the Alternate Site Plan.

**Acting Chair/Commissioner Dlugosh** invited comments and questions from the Commissioners.

**Commissioner Collier** is pleased that the developer eliminated the "trailer" house, the skinny house on the narrow piece of property. She asked whether there would be a gate or other opening from Herma Court to the open space.

**Planner Barros** said that the architect might comment on access to the open space from Herma Court, although her understanding is that it will be visually open (with an open wrought iron fence, for example) but physically closed, with neither a gate nor a walkway.

**Commissioner Collier** also repeated a concern about tandem parking that she raised during the Work Session. She said she would not buy a residence with it, and noted that those on Davis Street aren't selling too well, and perhaps the tandem parking is not such a good idea. She asked about the three affordable housing units, noting that on the plans it appears there are four 739-square-foot units.

**Planner Barros** said that she the units range from 1,000-2,000 square feet. The affordable units are 1,376 square feet.

**Commissioner Collier** asked whether the affordable are mixed within the project.

**Planner Barros** confirmed that they are.

**Commissioner Collier** added that she hopes at some point the lot swap occurs, because the resulting open space would be more useful and more appealing for the residents to use it.

**Commissioner Abero** noted a typographical error in the staff report, a "21car garage."

**Planner Barros** acknowledged the error and thanked Commissioner Abero for the opportunity to clarify. She added that one of the conditions of approval, on fencing, was repeated, and the second one is incorrect. (Point C on page 3 of 16 of the conditions of approval should have been eliminated.)

**Commissioner Abero** also expressed concerns about parking as a potential issue, and, like Commissioner Collier, prefers the open space on the non-alternate plan if the lot-swap could be worked out.

**Acting Chair/Commissioner Dlugosh** invited additional input from the Commissioners. There being none, he invited the architect and/or owner to make a statement if they wished.

**Reed Settlemier**, owner and developer of the project complimented Planner II Barros on her presentation of the project, its features, and changes incorporated to respond to community concerns. He said a lot of time has been spent massaging this project to make it as good as it can be. To get acceptance from the neighborhood, his group met twice with the Broadmoor Neighborhood Association, held a general neighborhood meeting at Stepping Stones, the current tenant in the office building, and met individually with some of the neighbors on numerous occasions. His notices for the neighborhood meeting went

L-5

out to all residents within 300 feet. He said that they've worked through a lot of the potential problems that neighbors aired, including a right-turn-only exit onto Herma Court, elimination of the "skinny" house, changes to improve traffic flow, shading and screening additions to prevent headlight glare disrupting neighbors after dark, variations in the roof line and other things to make it look really nice, adding value to neighborhood.

**Dave Ruffin**, project architect, is with Ruffin Architecture. With Planner II Barros having laid the foundation, he said he would focus on how the design came about and what's going on with the basic project. The main entry/exit will remain where it is, off MacArthur Boulevard, with the secondary entrance/exit on Herma Court, where there is also an existing driveway. Three units have four bedrooms; the others have three. Most of the units have two-car garages with two floors of living space above. The existing bus stop will remain on MacArthur Boulevard, but the parallel parking places – retained to accommodate Stepping Stones buses, will revert to the original City design for diagonal parking, a move that will produce 10 or 11 additional parking places.

He noted that some of the fine older homes on Herma Court are vernacular craftsman-type structures inspired the forms and shapes of the project. These include relatively low-sloped roofs, cantilevered beams, overhangs and eaves, steps up to the front porch, solid wood front doors, and gables. They also went beyond the immediate neighborhood to bring in other detailed architectural features such as contemporary versions of porch columns, light-colored trim, and articulated brackets. The design employs alternated types of garage doors to add variety, different colors for the buildings, and a heavily articulated building face. Most of the third floor roofs are fire-resistant Hardy Shake (probably reddish-brown); similar in appearance to traditional shingles but lightweight concrete and long-lasting. Mr. Ruffin said the use of shingles on the top floor will tend to diminish the height from the Herma Court direction. No final decision on windows has been made, but the project probably will use Milgard vinyl windows.

To mitigate problems of headlight glare from traffic within the project as well as screening vehicles within, the existing hedge will be extended, with an eight-foot evergreen wall behind it. He said that his group has offered to take the back portion of one of the adjacent properties to make a better open space and replace the homeowner's garage, and although he said the owners have been favorable, there has been no final response. His group suggested that another neighbor who is concerned about headlights might add a screening hedge or trellis, but they don't want to change their property. He said this is the only issue he is aware of that remains unresolved.

**Acting Chair/Commissioner Dlugosh** asked whether Commissioners had any questions of Mr. Ruffin or Mr. Settlemier.

**Commissioner Collier** is pleased to see the specification for Hardy Shakes, which are a lot more durable than the real shakes.

**Acting Chair/Commissioner Dlugosh** asked for a show of hands to gauge how many in the audience want to speak on this matter. Consequently, he indicated that each person would be limited to five minutes. He invited the first speaker to come forward.

**Jamilla Cox and Venita Cruz, 323 Herma Court,** said that they have been working closely with Dave (Ruffin) and Reed (Settlemier). Ms. Cruz said they are trying to work things out, but they do have some objections. Ms. Cox had questions about the small lot that remain unresolved, which she described as a big concern for the neighborhood. They said they are unclear about whether the corner unit could be converted to commercial use at some point. Ms. Cox also reported objections to the tall fences, because most of the street-side fences are only three feet in height.

**Acting Chair/Commissioner Dlugosh** asked for an answer to the question about the corner lot.

**Planner Barros** indicated that the action tonight and the PD in question would be residential only. If any office or commercial use were desired later, a PD modification would be required.

**Roy H. Gregg,** 341 Herma Court, said that he and his neighbors have been talking about this project. He said he did not receive a lot of notices about the community meetings, and therefore was unable to attend. He did receive a staff report, and a blueprint of the proposed development. He noticed the nice fronts and entryways on the blueprints, but he did not notice any porches that are supposedly about 120 square feet that count toward each unit's open space. Nor did he see these porches in the renderings shown tonight or those posted in the neighborhood. To provide a voice from the majority of those in the neighborhood, including those unable to attend tonight's meeting, a petition went around to determine who favored the project and who opposed it. The "against" version is entitled "Neighbors for a Neighborhood." In his one canvass, he found one person who didn't care, and one who had no say-so either way. He described the canvass results as a representation of those in the 300-foot radius of the project, renters and homeowners alike. He turned the papers over to **Planner Barros,** who handed them to **Acting Chair/Commissioner Dlugosh.** Mr. Gregg referenced the staff report's analysis, citing "primary issues under consideration with this proposal are whether the configuration of the site, parking supply, and placement of the open space in the two alternatives is appropriate." He said that the last time he checked with the owner of the property invited to do the lot-swap, he did not accept the idea of taking the back half of his property and turning it into a tot's lot and guest parking. Another issue that concerns Mr. Gregg under the "Land Use/Density" heading involves "Low Density Residential for the portions along Herma Court (0.16 acres, zoned RS Residential Single-Family)." Other concerns that Mr. Gregg passed along from his efforts in gathering signatures involve privacy as well as parking and traffic. A lot of the Herma Court residents want a 10-foot offset from existing property lines. Lots on that side of Herma Court are rather deep, he said, and have nice-sized back yards. Three stories up 10 feet away means that people using the top floors of the new units could look right down into their neighbors' back yards.

**Acting Chair/Commissioner Dlugosh** asked Mr. Gregg to wrap up his comments because his five minutes were up.

**Mr. Gregg** indicated that there is apparently no basis for comparing parking needs and traffic generated by Stepping Stones. The current tenant approximately 20 employees and perhaps 50 people using their services daily. Off-street Herma Court parking has always been a big issue, he added, and families with children live right across the street from where a lot of the traffic from the development would exit.

**Acting Chair/Commissioner Dlugosh** asked whether any Commissioners had any questions of Mr. Gregg.

**Mr. Gregg** asked if there's somewhere he might send the rest of the concerns that he did not have time to address.

**Acting Chair/Commissioner Dlugosh** replied yes, to the Planning Department, for consideration when the City Council meets.

**Sue Chen**, 980 Victoria Avenue. She urged Commissioners not to approve mitigation on the parking. Just because the architect or builder hopes buyers will do so, she said, does not mean they will park tandem. She also noted that there is barely any parking on Herma Court now. Ten spaces for 23 units on an acre is not realistic. She also noted that she has heard nothing about contributions to the San Leandro tax base. With no retail space, she asked, is the increased cost of providing school, police, traffic and other services going to offset the tax loss? She understands that high-density is needed, and she has no problem with that, but this is too much density. She objects to an exception on the FAR, observing that fewer units would be much more acceptable. She also agrees (with Mr. Gregg) that there will be no privacy in any of the adjacent back yards. She indicated that "tremendous cooperation" would be needed for people to get in and out of their garages. She even questions whether there is enough space for neighbors to get around someone washing their car.

**William Artz**, 1044 Broadmoor Boulevard, said that he is quite concerned about the number of parking spaces planned to go on MacArthur – 16 in front and an undetermined number across the street by the Imperial Garden. He says that 50% to 60% of the vehicles on MacArthur travel well over the posted speed limit, with enforcement officers seldom in the area to slow them down. It's a concern with family units going in. There are a lot of children with very little play space, which poses another density problem and possibly another reason to reduce the unit count from 23 to 22, and use the additional space for more play areas or more parking within the complex rather than on the street. He considers erosion control and utility upgrades in lieu of taxes "ludicrous." Such things are standard for any type of new construction and should be a standard cost for the builder. It should not allow the developer to get out of paying taxes for schools, parks and streets. He also noted that although he lives within the 300-foot radius of the site, he recalls seeing only the notice for the March 29 meeting.

**Planner Barros** clarified the issue of in-lieu fees. The developer is charged for streets, parks and school fees. There is no relief in that, and those are within the conditions of approval.

**Karen Clarkson**, 1044 Broadmoor, who also lives within 300 feet of the site, stated her concerns about parking, open space, the neighborhood, traffic impact and the general noise level. She has owned a house on Broadmoor for 15 years, and while she agrees that an upgrade for the site is in order and that the proposed units look good, those considerations should not overwhelm the fact that they are too dense, and putting all of these units in with diagonal parking presents a problem. Backing out of diagonal slots on MacArthur brings traffic to a halt. As people leave via the right-turn-only northern end, instead of going down MacArthur they'll probably turn down Broadmoor, which is where she, and a lot of families, live. Ms. Clarkson said when she envisions the number of people living in the new project, she estimates at least 50 children, she wonders where they will play, where they will go. If they stay in their fenced off porched areas, she is concerned about the noise level, particularly at night. In addition, Ms. Clarkson shares Commissioner Collier's opinions about tandem parking, and considers six visitor parking spaces insufficient for the density of the development. She says she wants to see progress, but not at as much of a cost that this project represents.

**Rick Murray**, 346 Herma Court, said he lives beside the vacant lot that the proposal includes as its open space. He is not happy with the idea of a park three feet outside his bedroom window. He also considers the parking provisions insufficient.

**Kimberly McLellan**, 636 Sybil Avenue, favors the design, the inclusionary provisions, and the developer's attempts to develop neighborhood concerns, but she pointed out that 1991 ADA guidelines call for 10% of units to be handicapped-accessible.

**Acting Chair/Commissioner Dlugosh** invited a motion to close the public hearing.

> ### Motion to Close Public Hearing
> ### Collier / Abero; 4 Ayes, 0 Noes

**Acting Chair/Commissioner Dlugosh** invited Commissioners' comments and questions.

**Commissioner Collier** indicated that parking is one of her big concerns also. The Tentative Vesting Map for the Alternate Site Plan suggests there may be a possibility of adding two more guest parking spaces. She noted there are a lot of units and very limited guest parking spots, furthermore, the only development of which she is aware that guest parking is enforced is Seagate. She reiterated her concerns about tandem parking; she would not buy a unit with tandem parking. She would prefer to see the unit count reduced by one or two homes, but she does not suppose that at this stage it would be economically feasible for the developer to do so. She asked if there is a way the developer can be asked to go back and make additional changes? She said she likes the project enough that she does not want to totally deny it, but she would like to see some of those possible changes before sending the proposal forward to Council. She asked whether the first Planning commission in May might be feasible?

Document 50-13    Filed 08/15/2007    Page 10 of 24

**Secretary Pollart** said the next meeting is April 26.

**Commissioner Collier** indicated that that is probably too short notice for any plan revisions.

**Secretary Pollart** thought the minor plan revision might be accommodated by the architect. However, she said that early on, staff discussed parking spaces near the park, but the Engineering Department had some concerns. In addition, Planning felt that having parking on both sides of the entry to the play area might be problematic from a safety and aesthetic standpoint.

**Commissioner Collier** said that she envisioned perhaps one place next to the fence, and the other next to the existing three places. Thus, the entry to the open space would not have cars on both sides.

**Secretary Pollart** suggested the architect might be asked about the plan change.

**Acting Chair/Commissioner Dlugosh** invited the applicant to address the issue.

**Mr. Ruffin** said they had the same idea, which is why they tried to do the lot swap. Concerns about children's safety were expressed by both Engineering and Community Development. Some landscaping could be removed to accommodate one additional car, but it would be much harder to get the second space.

**Commissioner Collier** indicated that two would come closer to preferences for a project of this magnitude.

**Mr. Ruffin** said that is one of the reasons they worked with Traffic Engineering to get the 10 additional diagonal spaces on MacArthur Boulevard, which the City prefers because it helps slow down traffic.

**Commissioner Collier** commented that the effect on slowing traffic is theoretical.

**Mr. Ruffin** said that with enough cars in those spaces, traffic would slow.

**Commissioner Collier** added that she dislikes diagonal parking, but that's another issue. She asked about possibly eliminating one of the smaller units.

**Mr. Settlemier** said that is not financially feasible. Returning to the parking issue – on the one hand is parking, he said, and on the other is open space. A number of neighbors have indicated that they need to have some open space. From a health and safety standpoint, he said he did not think any more parking would work. From a pragmatic standpoint, if another parking place were added to the Alternative Site Plan, it would be near the entry to the open space, where there should be a tot lot, and children playing. He reiterated that the project is adding 10 parking spaces on MacArthur, right in front. He said that after 3 p.m., there are no cars on MacArthur. There just isn't a parking problem in this area, he asserted. There's going to be 16 parking places in front that the developer doesn't get credit for because they're on the street. That's three-fourths of a space per

guest parking right in front. That's one space per home right on MacArthur, he said, and there's also parking across the street. Any more onsite parking would detract from the project.

**Acting Chair/Commissioner Dlugosh** said that the Commission has pretty much vetted the parking issue and what the restrictions and strengths are.

**Commissioner Collier** added that she wanted to let the applicant know that she would like to have it.

**Mr. Ruffin** said they understand, but the inclusionary housing units make it impossible to reduce the unit count. He said two would be sold at cost, and on the third they would lose money.

---

### *Motion to Forward PLN2006-00104,*
### *a Planned Development*
### *with Related Rezone and Alternative Tentative Vesting Map*
### *to the City Council with a Recommendation for Approval*

#### *Collier / Abero; 4 Ayes, 0 Noes,*
#### *Reed (recused), Ponder, Wohltmann (excused)*

#### *Motion passed*

---

**Acting Chair/Commissioner Dlugosh** called a five-minute break. When the meeting resumed, **Acting Chair/Vice Chair Reed** continued with the next agenda item.

---

## Item 6: Public Hearings

(b) **Matter of PLN2006-00049**; Rezone and Zoning Map Amendment to rezone the properties identified as 14600 and 14850 Catalina Street from Industrial Park (IP) to Industrial Park, Assembly Use Overlay (IP-AU). No physical changes to the properties are proposed as part of this entitlement. The project site is located at the southeast corner of Catalina Street and Farallon Drive and is comprised of three separate parcels; Assessor's Parcel Numbers 80G-933-20, 21, and 22-1; International Church Foursquare Gospel (property owner and applicant). [Pollart]

Environmental Review: A Negative Declaration covering the proposed Assembly Use Overlay properties had its 20-day public review period from February 1-20, 2007, and was adopted by the City Council on March 19. In anticipation of the applicant's desire to have his properties rezoned with the Assembly Use Overlay, staff included the Catalina Street properties in the analysis of the Negative Declaration. No further environmental review is required.

**Secretary Pollart** explained that the applicant, also known as Faith Fellowship Foursquare Gospel Church, purchased three parcels at 14600/14850 Catalina, at the southeast corner of Farallon, for assembly use, and wants the City to rezone the property from Industrial Park (IP) to IP-AU (Assembly Use Overlay) and amend the Zoning Map accordingly. No physical changes are involved in the proposal. In May 2006, the applicant had requested modification of the Zoning Code to include Assembly Uses as conditionally permitted in IL zones, and to rezone the property to IL. In October 2006, following a joint Work Session of the Board of Zoning Adjustments and the Planning Commission, staff developed a proposal for an Assembly Use Overlay in identified areas. City Council approved amendments creating the AU Overlay District in March 2007; it becomes effective in early May 2007. The overlay encompasses 196 sites on 221 acres of commercial and industrial properties. The sites were selected using eight criteria based on General Plan policies that provide a framework for Zoning Code policies, including not being located within a regional-serving retail area and abutting or being within a quarter mile of an arterial to ensure adequacy of the street system to accommodate assembly use. According to Planning Department Staff, the applicant's property fails to meet those two criteria, in that the property is located within the West San Leandro General Plan Focus Area, and has no arterial within the quarter-mile radius. Furthermore, staff analysis suggested that the presence of hazardous materials and activities in the vicinity of the church's site render it inappropriate for rezoning. In addition to communications included in the Commissioners' packets, letters concerning the matter came from Peter MacDonald (an applicant representative), Betty Bailey and Mr. & Mrs. Sharma, a Marina Faire HOA representative and Belvedere residents, respectively, who oppose the rezone. In recommending denial of the application to rezone, staff based the recommendation on the fact that the site does not meet all of the AU Overlay District criteria and that land use decisions, including rezones, must be consistent with the General Plan. Secretary Pollart

noted that Planning Commission denial would be final but may be appealed to City Council within 15 calendar days. Approval of a rezone would require preparation of Findings for Approval, with action at a subsequent Planning Commission meeting (recommendation to City Council). She also noted that anticipating approval of the rezone application, the applicant has filed a Conditional Use Permit application, which is currently under staff review.

**Acting Chair/Vice Chair Reed** invited questions from the Commissioners.

**Commissioner Abero** requested clarification of the quarter-mile area on the map designating nearby arterials, which **Secretary Pollart** provided.

**Commissioner Collier** commented that she is concerned that Faith Fellowship has been told all along about concerns over their current location in regards to parking and weekend operations. She also noted that neighbors have been complaining regularly to the City Council and Planning Commission and others. In Commissioner Collier's opinion, the church has done everything they could to relieve that situation, but it has not been enough. The City approved that site in late '90s, when the congregation was small, but complaints about parking began emerging not long afterward, including complaints about when, where and how long congregants were parking, and how much traffic they brought to a tight corner. Now, she said, they want to move to an area with virtually no weekend traffic, and the site meets six out of eight criteria. Collier views that area as one of the best places to put a church because the church would be the only traffic-generator, the site is surrounded by parking lots for businesses that are closed on weekends. Thus, even if onsite and street parking were insufficient, there is a lot of parking around, and businesses already have agreed to do parking swaps with the church. The back-and-forth and conversations over the last year or so have led the church on a "garden path with no end." She hopes that the City did not have this end – denial – in mind. She believes that meeting six of eight compliance points is "pretty darn good."

**Commissioner Nadine** referenced a communication from Mr. MacDonald's office. She's hearing that the peak times are Sundays and after hours when no commercial activity is taking place in the industrial area. However, the architectural design she saw shows 10 offices and at least 12 classrooms. She asked whether this was being set up for later modification into perhaps a private school or day care.

**Secretary Pollart** said that would be an issue discussed in conjunction with the application for a use permit. However, she added, at this time church officials have indicated there is no proposal for a school. If they were to get a use permit approval, and later decided to have a school, they would have to come back to modify the use permit for a school use.

**Acting Chair/Vice Chair Reed** invited the applicants to begin their three-part presentation.

**Gary Mortara**, senior pastor, asked those in the audience to stand to show their support of the application; most of those present came to their feet. He said the supporters would

not speak, and would handle themselves in an orderly fashion. He said the Manor Boulevard neighbors like the church – except for about three hours on Sunday mornings, due to the parking problems and traffic generated by the three services now held to accommodate the large congregation. The restaurant across the street has even threatened a lawsuit. The exponential growth of the church, he said, is a wonderful thing, but they realize that it presents a problem. They began looking for properties, and found the one on Catalina. Talking with the staff and understanding that the proposal would probably be workable, they followed staff's advice. We were canceled in June and July, he said, adding that it's dark in August and they were canceled in September. We came en masse in October to plead their case, and finally came before the BZA in November. He said they were canceled again for the next three months, and then the issue came as an overlay proposal, which the City Council last month. The only problem, he said, we don't fit into the criteria, which were created around their building, not with their building in mind. He said that's he is hurt by the staff recommendation for denial, and said it does not seem fair. Pastor Mortara added several points about how Faith Fellowship serves the community with a number of different free ministries – drug and alcohol rehabilitation, a youth program that serves hundreds of boys and girls, marriage counseling, family counseling, feeding programs, single parents. We do it because we're here to serve the community and love it, and don't ask the City for anything, he said. He added that the length of time involved in pursuit of zoning approval has been arduous and costly – more than $40,000 per month for each delay and postponement. The issue of the health hazards on the site, he said, has just come up for the first time. Had that been stated as a potential problem at the start, he said the church probably would not have purchased the building. He said there are more than 1,000 employees in area, working in those companies. And now it's a health hazard?" he asked. Halfway through this process, he stated, City Manager John Jermanis personally told him that if he were to get letters of acceptance by other businesses in the area, it would greatly favor the church. Pastor Mortara said that he did, obtaining letters from Richard Spratling (Kennerley-Spratling), Scott Hess (KS Automotive), Dave Clare (Challenge Dairy Products), Richard [last name not audible on tape] (NCCI), and Steve Sodeberg (Otis Spunkmeyer). According to Pastor Mortara, the fire captain described the site as a perfect place for a church. He concluded by saying, "We have followed the due process. I have done everything that has been asked of me. And now the staff sends a letter saying we want you to deny them... I'm appealing to you tonight on behalf of the thousands of people that come to our church... That property fits us perfectly... It's a win-win for everybody... We need your approval."

**Peter MacDonald** of Pleasanton, a former urban planner and former city attorney who now practices land use law, said he would address the nitty-gritty zoning issues. The issue, he said, isn't whether the site will work for the church, because he described it as a "fabulous" location. Rather, he said, the issue is whether the zoning is in the City's best interest. San Leandro wants land uses that fit together so that it is a functional community for people to live and work. The City needs places for churches, because a substantial number of residents participate in religious communities. The problem is more acute for large congregations, and it is important as a community member for a church to recognize when it has outgrown its facility. In the current location, when church services are held, church-goers fill every available parking place for blocks around its Manor Boulevard site. It is not fair, he said, for a large congregation to be forced into that

residential setting. Mr. MacDonald pointed out on a map the hundreds of locations from which residents signed a petition asking the City to let the church move to the location the church selected. Recognizing the problem, he credited the planning staff for creating the AU Overlay District. Had the AU Overlay existed before Faith Fellowship started to search for a new site, they might have found a property on one of the suitable locations. Of the two criteria that staff established for consideration of AU Overlay is proximity to an arterial street to ensure adequate access. However, he said that the City's computer model inaccurately failed to classify Farallon as an arterial. It is identified as such in the General Plan maps, he said, as well as MapQuest. Both show Farallon as an arterial. It was designed and built with extra width and a middle left-turn lane, and Farallon connects nearby to arterials in every direction, including Doolittle, Merced, Wickes, Manor, Lewelling, Marina and the freeways. The issue is whether access to the proposed site is adequate, and he said that arterial access to the Catalina/Farallon property is superb. The second criterion involves the site being in the West San Leandro General Plan Focus Area, the SoMar (South of Marina) area. The driving force, Mr. MacDonald indicated, is the need to preserve high quality light industrial locations, and churches have a long history of coexisting successfully with quality flex office/warehouse developments typical of the SoMar area. He cited examples of churches in light industrial districts in Pleasanton, Concord, Dublin, Livermore and Fremont, all with no serious problems to report. Among the reasons is that the church and industrial activities tend to be symbiotic, with industrial activity peaking weekdays and church activities peaking on weekends and evenings. He likened a church in an industrial area to having a night watchman, with eyes on the street when weekday uses are not present. Also, the church would give industrial users overflow parking during the weekdays when they need it, and churchgoers would have additional nearby parking at the industrial locations evenings and weekends. Jane Jacobs, the great advocate of mixed uses, would support this mix, Mr. MacDonald added. Another potential concern he cited is that churches might preempt too much industrial space, thus constraining the supply of job-creating businesses. But that has not been a problem in other communities. A related concern is the permanent loss of job-creating structures. The General Plan addresses the danger of having retail and residential uses encroaching on industrial areas. But churches only need interior tenant improvements, and can readily convert back to flex office uses, and Mr. MacDonald said he has seen this happen numerous times in Valley Business Park in Pleasanton. As for the safety hazards cited near the property, he said that planners can change an imaginary problem into a real one by prohibiting churches near any businesses that have hazmat plans. That would exclude nearly every area recently approved for AU Overlay if that is the criteria. There would be nowhere for large congregations to go in San Leandro. This application for a rezone, he contended, is consistent with the General Plan because churches and light industrial uses are both harmonious and complementary.

**Commissioner Nardine** did not think the traffic issue had yet been completely addressed. She inquired about the future plans for the property where the church is currently located.

**Pastor Mortara** said they plan to sell, and the initial thought is to sell to a church that is nine times smaller. However, at this time, the church is not on the market. He said they also talked to the City about offering the property to a developer to convert to housing to

create revenue for the City. He said they are willing to do with it whatever they need to and the City wants them to, but the idea is to put it on the market immediately.

**Commissioner Nardine** suggested that if another assembly goes in, it doesn't solve the traffic problem.

**Pastor Mortara** indicated that the average-size church – in the City as well as the country – it's 150 people or fewer. He said Faith Fellowship is an anomaly, somewhat like St. Felicitas, so the odds against that happening again are great. Of the 41 churches in San Leandro, only two have congregations of over 1,000.

**Commissioner Nardine** said there are three churches on Manor Boulevard – Faith Fellowship, St. Felicitas, and Hope Lutheran. If Faith Fellowship goes to Farallon and Catalina, the nearest exit besides 880 would be the 238 exit off Beatrice, going into Washington Manor. Thus, she says, traffic would increase if yet another church were to go in to Faith Fellowship's current site. From that perspective, she does not see how the traffic issue is being addressed.

**Pastor Mortara** said Faith Fellowship's new location would generate pass-through traffic on Manor Boulevard, rather than stop-and-go, pulling into driveways and exiting from driveways. In addition, he said that most people would exit at Marina, turn left onto Doolittle, and approach Catalina/Farallon from that direction.

**Commissioner Nardine** said that one of the church members said an after-school program will be going in.

**Pastor Mortara** said there is not. What was considered was for members of the church youth group who needed a place to do their homework, they could come by the church instead of being on the street, but that would be at 3:30 or 4 p.m., and they would be out by 5 p.m.

**Commissioner Nardine** pointed out that that would fall between commercial and industrial and work hours.

**Pastor Mortara** concurred, and said they could drop the idea. It was just an idea of a way to better serve the community.

**Commissioner Nardine** said that her concern is that during work hours, it is not particularly safe for children in a commercial/industrial area to be coming and going. She also asked what would happen if the church were to outgrow the new Catalina/Farallon facility.

**Pastor Mortara** said they could take over the Coliseum.

**Commissioner Nardine**, alluding to Mr. MacDonald's remark that the traffic/parking situation should not be forced on the Manor area, asked if they are not now planning to force it on the Marina Faire area instead. It's a concern about the size of the Faith Fellowship assembly.

**Mr. MacDonald** pointed out that the issue is relative impact. The impact in the middle of that industrial area on a Sunday morning or Wednesday evening as a practical matter would be zero. Moving Faith Fellowship would mean an immediate positive impact for the Manor neighborhood, but not a negative impact when it goes into the industrial area with big streets in every direction and nobody around.

**Pastor Mortara** added that 10 people in the Marina Faire have written letters welcoming Faith Fellowship into the community.

**Commissioner Nardine**, in preparing for the meeting, indicated that she ran across two cities with similar Assembly Overlay issues, including Sunnyvale and Dixon. She wondered whether staff might see what resolutions came in those situations, what the impact was on the communities, and what sort of modifications may have been made.

**Pastor Mortara** submitted 200 petitions from neighbors who are not members of the congregation, as well as 1,700 church members.

**Commissioner Nardine** asked whether the church conducts seminars, and how many attend.

**Pastor Mortara** said he holds seminars on Saturdays, 9 a.m. to 2:30 p.m. twice a year, with attendance ranging from 100 to 350 people.

**Acting Chair/Vice Chair Reed** invited the third of the speakers to address the Commission.

**Paul Gant**, President of Safety Compliance Management Inc. explained that there is neither an objective safety problem nor a statutory problem. His background and experience include 15 years in the fire service, working in four jurisdictions as firefighter, paramedic, training officer, battalion chief, fire marshal, and deputy fire chief. In 1992, he became President of his own firm, providing environmental and occupational health and safety training services and consulting services in both private and public sectors across the U.S. His firm also helps businesses comply with various regulatory requirements, including those involving hazardous material storage and hazardous waste handling and disposal. He is a Certified Safety Professional, a Cal/EPA Registered Environmental Assessor, and is also qualified as an expert witness in various states, providing testimony and services on topics of safety, hazardous materials and regulatory compliance. As part of his work with the Faith Fellowship project, he made note of the general conditions of the neighborhood, including a relatively new firehouse across the street from the Catalina Street property. He reviewed correspondence from the City regarding placement of the church in that area. Based on the concerns expressed, he obtained records from the sites that were storing the hazardous materials, and reviewed those records in an attempt to understand the issues outlined in the staff reports. He concluded that the issues should not compel the City to deny the church's request to be sited at the Catalina Street location. This is based on several factors. The presence of a haz-mat business plan (HMBP) or haz-mat management plan does not in itself identify sites that are significantly hazardous. In fact, the HMBP is filed when minimum amounts

of hazardous are present at a site; as little as a single 55-gallon drum of oil or 200 cubic feet of gases, less than what would be in a typical welding cart. He said he would not be surprised to drive down the street and find a number of HMBP occupancies near the City Offices on East 14th Street. Further, he said, the filing of an HMPB for a business imposes certain conditions to provide safety programs to effectively manage the hazardous materials that are present in a compliant manner on a daily basis, and dispose of hazardous wastes. These provisions protect employees as well as people in adjacent businesses. He found the hazardous materials present in the neighborhood similar to those found everywhere in the country. These include combustibles such as glycol, an antifreeze solution; oils and lubricants; propane cylinders for forklifts – the same as we use in gas-fired backyard grills; gases such as argon, helium, nitrogen, oxygen, and acetylene, some in very small amounts. While these substances can pose hazards, the various layers of regulations from the California Fire Code to the EPA regulations for storage to Cal-OSHA regulations governing employee health and safety, and to local HMBP programs require effective and safe management of those materials. This is all to protect visitors to the site and the surrounding community as well as employees. There are a couple thousand people in the area now, and the programs in place are protecting them now on a daily basis. Those same programs would also protect the congregants of the assembly during their evening and weekend church services. He concluded by saying that he and his family attend Crosswinds Church, a mega-church in Dublin. It is located in an industrial building in an industrial complex, with a number of his company's clients nearby, clients with greater hazards than those present around the Catalina Street site. He contended that church uses are compatible when the community has a well-established and well-managed program such as San Leandro does, and said it was well within the Planning Commission's discretion to allow the project to move forward.

**Acting Chair/Vice Chair Reed** opened the public hearing, after asking Secretary Pollart to make an announcement about how it would be handled in light of the large crowd.

**Secretary Pollart** asked for a show of hands of people who wanted to speak on this matter.

**Acting Chair/Vice Chair Reed** said that each speaker would be allowed a maximum of five minutes each.

**Jeff McGallian**, 13985 Tahiti Road, represents Faith Fellowship. He said he is a former Board of Zoning Adjustments member, and has made decisions such as this many times. Addressing the issue of traffic, he said it is one of the biggest concerns when putting a new development in. The Davis Street corridor when Wal-Mart and Costco went in created a major issue, but it was a need that required addressing, because it meant a lot of money, and the City took extra measures to make it happen. Traffic is a nightmare there, he acknowledged, but we're living with it because the San Leandro economy requires it. The Catalina/Farallon area has access to 880 via Marina via Doolittle. Catalina leads to Fairway, which leads to Merced, which leads to Marina, which also leads to 880. Pike is also nearby, which leads to Merced to Marina to 880. And Farallon, he added, goes to Doolittle, Catalina, Pike, Merced, Manor and down to Lewelling, which feeds a large network of streets that take overflow and makes easy access in and out. He mentioned

traffic around the Coliseum, which affects many people, but it serves a purpose. He said that Faith Fellowship, likewise, serves a purpose, and the traffic impact would be so minimal as to make it a non-issue. On the contrary, he said, it would enhance the area and bring more people in to patronize the restaurants and increase exposure for Marina Faire. He described the proposed rezone as a "plus-plus," a "win-win," with the increased traffic actually an enhancement in this situation.

**Kathy Sanchez**, 14723 Doolittle Drive, is President of the Marina Garden Homeowners Association, located at Doolittle Drive and Belvedere Avenue. She favors denial of the application for rezone. She referenced a letter in the Commissioners' packets that she and Ed Jaramillo, President of the Marina West Homeowners Association, sent to the Planning Commission and the City Council. The volume of traffic generated by the 1,500-plus members of the congregation would greatly impact their neighborhood, she said. In her area, Doolittle Drive is two lanes, with the speed limit just increased to 40 mph, which she does not understand because it is residential on her side. It is the direct route to access Catalina via Farallon. There is a STOP sign at Farallon, so it would be constant start-and-stop in the one lane turning left there. Farallon also is near the dead end of Doolittle Drive, which in the past has been used as a turnaround, which also creates problems. Residents on Doolittle Drive and the surrounding neighborhoods would have difficulty entering and exiting their property, in addition to experiencing more noise, congestion and pollution during peak traffic, and from the STOP at Farallon. The church traffic would also hamper access to Doolittle from other streets, such as Belvedere and Bermuda. The church could continue to increase its membership exponentially, which would exacerbate the traffic, congestion, and pollution problems. She said that noise pollution from the airport, truck traffic, industry, the 880 freeway and the railroads, and added that ongoing parking problems are already an issue with residents and business owners at the current church location. She also is concerned that if churches and other tax-exempt organizations take over industrial property not zoned for their use, the City will lose tax revenue and experience additional burdens on its infrastructure and services, with financial deficits made up by all San Leandro residents. Ms. Sanchez pointed out that while Faith Fellowship talked to business owners in the area, no one came to the neighborhood and asked the homeowners about the impacts they would have.

**Ed Jaramillo**, 2209 Belvedere Avenue, reiterated Ms. Sanchez concerns about traffic and congestion, which are problematic even without the church. Parking is another concern. The building site does not appear to have adequate parking, so church members would park at other private industrial sites nearby, and if those sites decided against allowing church parking, the vehicles will spread into the residential community. He believes this move would just shift the parking problem from the Manor to Marina Faire.

**Sharon Collins** has lived in the Marina Faire area for 43 years. She does not understand why, if the City is having financial problems, it would consider using property that could produce tax revenue and put in a church instead. She also wonders if this might set a precedent for opening other industrial areas giving way to churches, thus losing more tax money.

With no other speakers coming forward, **Acting Chair/Vice Chair Reed** invited a motion to close the public hearing.

---

### *Motion to Close Public Hearing,*
### *with Proviso That Applicant Returns to Speak*
### *Dlugosh / Collier; 5 Ayes, 0 Noes*

---

**Pastor Mortara** said they would work with Marina Faire and whomever necessary to make it feasible for everybody. He emphasized that they will do everything they can to work with the community.

**Acting Chair/Vice Chair Reed** opened the meeting to Commissioners' discussion.

**Commission Nardine** returned to the issues of parking and traffic. She appreciates the fact that there is a neighborly agreement between the church and existing business, but that would not be binding if a business were sold, and the new owner might not want church members to park there. Some of those businesses, she noted, do work three shifts. Businesses on Merced, Pike and Wickes were not invited to give input, and she is not sure that they want weekend traffic, which might create a need for additional security and policing.

**Commissioner Collier** said that she took her children to the area to learn to park and drive, because no one was in the area. She finds it no different now than it was 20 years ago. There is still no one down there on the weekends, not even parking, she said. On a Friday afternoon, she saw about 15 cars parked at about 3:30 p.m. No one was parking on the streets. She takes this route as a shortcut from North San Leandro when she drives to the Manor, because there's no traffic. People probably would come in to the church from Lewelling down Wickes to Farallon and never even hit Doolittle. They also could go from Farallon to Catalina and help revive Marina Faire, which would be delighted to have business any day of the week, because there's no foot traffic and no car traffic at this time. In comparison to Davis Street, she noted, traffic on Doolittle is not a problem. It can be busy, but the traffic moves. In addition, there are many alternate ways to get to the Catalina/Farallon site.

**Commissioner Dlugosh** considered all the arguments, both pro and con, very compelling. If they were the only things to consider, this issue would be a no-brainer. But what it comes back to is what he calls a "spot zone," where you put something in there just because. As he sees it, this is not good planning. Even though he feels empathy and sympathy for arguments made in favor of the rezone, he is reluctant to stray from good planning policy.

**Commissioner Abero** observed that extensive work and a lot of analysis went into creating the General Plan, which targeted the area in question as a business park. She questions the wisdom of putting a nonconforming use in the middle of a specifically designated area.

**Acting Chair/Vice Chair Reed** echoed the thought that that this is a tough decision. He agreed that a lot of people worked long and hard on updating the General Plan, examining all the aspects and viewing it as a complete package rather than a piecemeal or shot-in-the-dark approach to planning. Considerable time and input also went into creating the AU Overlay District, to accommodate the needs for assembly uses throughout the City. He is sympathetic to the church's position, but said that it is appropriate to support the staff recommendation for denial. He requested a motion.

**Acting Chair/Vice Chair Reed** then invited Commissioners to discuss the proposal. There was no further discussion.

**Secretary Pollart** clarified that denials are final actions of the Planning Commission and do not need forwarding to the City Council.

---

*Motion to Deny Request*
*to Rezone 14600-14850 Catalina Street Properties*
*from IP to IP-AU*

*Dlugosh / Nardine; 4 Ayes, 1 No – Collier*
*Ponder, Wohltmann (excused)*

*Motion passed*

---

**Acting Chair/Vice Chair** Reed commended the Faith Fellowship congregants in the crowd for the way they handled themselves.

## Item 7: Miscellaneous

**Secretary Pollart** said that at the February 22, 2007 meeting of the Planning Commission, Vice Chair Reed raised the issue of fence heights in the RS-VP District (Bay-O-Vista). The City Attorney indicated that the item would have to be on the agenda in order for the Planning Commission to make a recommendation to the City Council to direct staff to examine the issue and determine whether Zoning Code amendment(s) might address this issue.

**Commissioner Collier** said it is an important issue that should have been included in RS-VP District when it was first developed, but apparently no one thought about how a fence could interfere with views.

**Acting Chair/Vice Chair Reed** favors having staff analyze the situation and propose potential solutions.

L-2/

> ### *Motion to Forward a Recommendation to City Council*
> ### *to Direct Staff to Analyze the Issue of Fence Heights*
> ### *in the RS-VP District*
> #### *Dlugosh / Collier; 5 Ayes, 0 Noes*
> #### *Ponder, Wohltmann (excused)*
> #### *Motion passed*

## Item 8:  Commissioners' Comments

None.

## Item 9:  Staff Updates/Project Status Report

**Secretary Pollart** had three items:

Since there are no items for the April 26, 2007 agenda, the next Planning Commission meeting will be May 10, 2007.

The Commissioners' packets include the Crystal Reports, which will be provided to the Commissioner each month. The report is cumulative, growing throughout the year as more projects come in and are added. The report lists projects by Council District and shows the status of each (under review, scheduled for a hearing, approved, appealed, withdrawn, etc.).

**The Planning Department** has been approached by a firm that specializes in doing training sessions for board members and commissioners – i.e., "Planning 101" – that the City will pay for. Some of the topics may have been covered at he Planners Institute conference (held in San Diego in March 2007), and some are as basic as how to make a motion, conforming to Brown Act and CEQA requirements and so forth. No date has been set at this stage, but Secretary Pollart wanted to poll Commissioners as to their preferences, either for a single four-hour Saturday session or a split session including two hours in conjunction with a BZA meeting and another two hours at a Planning Commission meeting. Participation is not mandatory.

**Commissioner Abero** prefers split evening sessions, but would attend on a Saturday if that works best for the others.

**Acting Chair/Vice Chair Reed** asked for a show of hands of those who favor a split session. All but one of the Commissioners responded. Commissioner Nardine prefers a Saturday session.

**Commissioner Collier** inquired about two projects on the Crystal Report – 2103 East 14th Street at Estabrook and 14875 Bancroft Avenue.

L-22

**Secretary Pollart** said the East 14th/Estabrook project is the Eden Housing proposal for 51 units of affordable senior housing, three stories with surface parking. Because the proposal falls five parking spaces short of requirement, the project will go to BZA for a site plan review and parking exception. A BZA Work Session for that project is scheduled in May. The Bancroft Avenue/E. 14th Street site is the current location of the Dollar Rent-A-Car business, next to the Flyers' service station. It is a Planned Development proposal for 44 for-sale townhouses that will come to the Planning Commission for a Work Session in late May. Both of these items have just gone to the Business and Housing Development Subcommittee for their first look at it.

---

## Item 10:  Adjourn

---

### *Motion to Adjourn*
### *Collier / Dlugosh; 5 Ayes, 0 Noes*

---

**Acting Chair/Vice Chair Reed** adjourned the meeting at 10:00 p.m.

Respectfully Submitted,

Debbie Pollart, Secretary
Recording Secretary, Barbara Templeton

L-23