United States District Court

For the Northern District of California

1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                          NORTHERN DISTRICT OF CALIFORNIA

8

9

10

11    INTERNATIONAL CHURCH OF THE
      FOURSQUARE GOSPEL,

12
                    Plaintiff,                    No. C 07-3605 PJH
13
             v.                                   **ORDER DENYING MOTION FOR**
14                                                **PRELIMINARY INJUNCTION**
      CITY OF SAN LEANDRO, et al.,
15
                    Defendants.
16    _____/

17          Plaintiff's motion for a preliminary injunction came on for hearing before this court on

18    September 5, 2007.  Plaintiff appeared by its counsel Matthew B. McReynolds, Peter

19    MacDonald, and Kevin J. Snider, and defendants appeared by their counsel Peter S.

20    Hayes, Jayne W. Williams, and Deborah J. Fox.  Having read the parties papers and

21    carefully considered their arguments and the relevant legal authority, and good cause

22    appearing, the court hereby DENIES the motion as follows and for the reasons stated at

23    the hearing.

24                                      **INTRODUCTION**

25          This is a case alleging violations of the Religious Land Use and Institutionalized

26    Persons Act, 42 U.S.C. § 2000cc ("RLUIPA"), and also asserting claims under 42 U.S.C.

27    § 1983 for First and Fourteenth Amendment violations and violations of RLUIPA.

28          Plaintiff is the International Church of the Foursquare Gospel ("ICFG"), a Christian

**United States District Court**
For the Northern District of California

1   church.  ICFG holds title to the property that is at issue in this action.  ICFG asserts that the

2   real party in interest is Faith Fellowship Foursquare Church ("the Church"), a congregation

3   affiliated with ICFG, and located in San Leandro.  According to ICFG, the Church pays the

4   mortgage on the property, submits applications to local governments for development and

5   use of the property, plans and pays for the development of the property, and wants to

6   occupy and use the property for its religious activities.

7       Defendants are the City of San Leandro ("the City"); Tony Santos – Mayor of San

8   Leandro and a member of the San Leandro City Council; Surlene G. Grant, Diana M.

9   Souza, Joyce R. Starosciack, Bill Stephens, and Jim Prola – all members of the San

10   Leandro City Council; John Jermanis ("Jermanis") – San Leandro City Manager; and

11   Debbie Pollart ("Pollart") – Planning Manager of the City of San Leandro.

12       ICFG filed this action on July 12, 2007, alleging that defendants violated the

13   Church's constitutional rights and rights under RLUIPA by refusing to re-zone an industrial

14   property in San Leandro ("the Catalina property" or "the property") to allow the Church to

15   expand its operations.

16       ICFG seeks an order preliminarily enjoining the City of San Leandro from preventing

17   the Church from using the property for religious purposes; from delaying the processing of

18   the conditional use permit application of ICFG and the Church while this case is pending;

19   and from using any criteria, in processing the conditional use permit application, that would

20   not be applied to any nonreligious assembly for the Catalina property.

21                                    **BACKGROUND**

22       The Church was originally founded in 1947.  Gary Mortara, the present senior

23   pastor, took over running the Church in September 1993.  At that time, according to Rev.

24   Mortara, there were only 65 people attending, and they were meeting in the Church's

25   present location in San Leandro.  The Church grew rapidly after 1993, soon expanding the

26   number of Sunday services.  In April 2003, the Church completed construction of a new

27   sanctuary on an adjacent property, with 650-700 seats.

28       By the end of 2005, the Church had again outgrown its space.  The Church

United States District Court

For the Northern District of California

1  presently conducts three religious services each Sunday for a total of more than 1700

2  attendees, and also runs numerous programs throughout the week, for children, the

3  disadvantaged, women, youth, and persons struggling with addictions.  The parking lot has

4  space for only 154 vehicles, and members of the congregation are forced to park on nearby

5  residential streets, as much as a 20-minute walk away from the Church.  The Church's

6  small kitchen is being used to feed between 300 and 400 people each Wednesday night.

7      In January 2006, the Church decided to look for a larger property.  In February 2006,

8  the Church found a site located on two parcels at 14600 and 14850 Catalina Street in San

9  Leandro, comprising 3.56 acres and 188 parking spaces.  The Catalina property is  zoned

10 "Industrial Park" ("IP"), and is situated in the "West San Leandro Focus Area," which was

11 set aside in the City's General Plan to preserve an environment for industrial and

12 technological activity.  The property is adjacent to a plastic-parts manufacturer, and is

13 surrounded by numerous other industrial and light-industrial uses.

14     The Catalina property is developed with a single-story office building of

15 approximately 46,000 square feet, which was formerly occupied by a software company.

16 The Church claims that the property can accommodate 1100 people in the sanctuary and

17 an additional 500 in other activities (e.g., Sunday school and adult Bible studies) per

18 service.  The Church also contends that there is room for nearly 500 parking spaces, that

19 the commercial zone where the property is located is largely vacant on week-ends, and that

20 the kitchen and food preparation area is five times as large as the present kitchen.  The

21 Church contends that moving the Church to the Catalina property will enable the

22 congregation to more fully follow their sincerely held beliefs.

23     At the time that ICFG identified the Catalina property as a potential site for the

24 Church, the City's zoning ordinance did not allow "assembly uses" – churches, clubs,

25 lodges – to locate in the IP district or other industrial or commercial districts of the City, but

26 did allow them to locate in residential districts if they obtained a conditional use permit.

27     According to ICFG, Church representatives first met with City Planning Staff in

28 March 2006 to discuss using the property for religious activities.  The Church claims that

United States District Court
For the Northern District of California

these officials (Development Director Hansom Hom, Planning Manager Pollart, and Business Development Director Luke Simms) advised the Church to apply for re-zoning of the property from IP to "Industrial Limited" ("IL"). The officials also allegedly assured the Church that while zoning for industrial districts precluded an assembly use for church activities, several assembly uses for commercial recreation and entertainment in IL zones were allowed via a conditional use permit. However, the Church claims that this advice was incorrect, unbeknownst to the Church representatives, as churches can be located only on land that is zoned "residential."[1]

The City's version is that when Church representatives met with the Planning Staff to express the Church's desire to relocate to the Catalina property, the Planning Staff advised the Church that the City Council preferred to maintain existing industrial districts, and was typically reluctant to convert industrial land to non-industrial use. When the Church nonetheless indicated an interest in pursuing the relocation, the Planning Staff advised that ICFG would need to request the City Council to amend the zoning ordinance to allow the proposed use at the Catalina site. Specifically, the Planning Staff advised the Church that two changes to the zoning ordinance would be required – an amendment of the zoning map to designate the Catalina property as IL, and an amendment of the zoning code to make assembly uses allowable in the IL district.[2]

On March 24, 2006, the Church signed a purchase and sales agreement for the property, and paid $50,000, half of a nonrefundable fee applicable to the purchase price of $5.375 million, giving the Church eight days to decide whether to complete the purchase of the property. On March 31, 2006, the Church paid the other $50,000 of the nonrefundable fee.

---

[1] ICFG seems to be suggesting that the City misled the Church, but doesn't clearly articulate what the alleged misrepresentation was.

[2] According to defendants, the Planning Staff advised the Church to apply for a rezone from IP to IL because, from a staff perspective, the IL zoning district (meant to provide areas of low- to moderate-density industrial uses which are capable of being located adjacent to residential areas) was more amenable to "assembly" use than the IP zoning district (meant to serve commerce, high technology, factory production and assembly, retail, and related uses).

United States District Court

For the Northern District of California

1    On May 19, 2006, the ICFG filed a planning permit application for a zoning map

2 amendment on the Catalina property from IP to IL, to allow a subsequent application for a

3 conditional use permit for an assembly use.  On the same day that it filed the permit

4 application, ICFG signed an amendment to the purchase and sales agreement and paid a

5 further $50,000 nonrefundable fee, applicable to the purchase price, to extend the

6 agreement to July 6, 2006.

7    On June 8, 2006, the City Council's Business Development Committee met and

8 discussed the Church's application to use the Catalina property.  They expressed concerns

9 over the policy implications of allowing an assembly use in an industrial zone.

10    According to defendants, the Church's rezoning application raised a broader policy

11 issue for the City – determining which non-residential areas were appropriate for an

12 expansion of assembly use.  Because the Church's proposed rezoning would allow

13 assembly use in all IL properties throughout the City, the Planning Staff advised the Church

14 that the request would require careful analysis by Staff and consideration at public hearings

15 by numerous civic advisory bodies, the Planning Commission, and ultimately the City

16 Council, to ensure that any such change was consistent with the City's General Plan.    On

17 June 29, 2006, the City advised the Church that a rezoning of the nature proposed in its

18 application would require thorough analysis by the Planning Staff, the Planning

19 Commission, the Board of Zoning Adjustments, and, ultimately, the City Council.  In the

20 June 29, 2006, letter, the City stated that "[g]iven current staff commitments, vacation

21 schedules, and the fact that the [Business Development] Subcommittee does not meet

22 during the month of August, staff is anticipating returning to the Subcommittee with this

23 matter in September," and "[a] public hearing before the Planning Commission is

24 anticipated in October/November, followed by the City Council hearing in

25 November/December."

26    On July 11, 2006, the Church signed an amendment to the purchase and sales

27 agreement and paid an additional $50,000 nonrefundable fee, applied to the purchase

28 price, to extend the agreement to October 31, 2006.

United States District Court

For the Northern District of California

1    On October 10, 2006, Church representatives addressed the City Council during the

2    "public comment" portion of the Council meeting, informing the Council about the proposed

3    purchase of the Catalina property and the delays that defendants had allegedly caused in

4    the review process.

5    On October 12, 2006, the Business Development Committee met and discussed the

6    Church's application.  Church representatives attended the meeting.  The members of the

7    Committee expressed concern over the lack of tax revenue that would result from

8    permitting a religious assembly use on land zoned "industrial."  They decided that more

9    research was needed.

10    According to Planning Manager Pollart, by October 2006, the Planning Staff had

11    developed two legislative options by which the City could expand the accommodation of

12    assembly uses in non-residential districts.  Option 1 would allow assembly use on all

13    parcels within the IL district, which would increase the area in which assemblies were

14    allowable by about 90 acres.  Option 2 would create a new "Assembly Use Overlay

15    District," which, when applied to any non-residential property, would make assemblies an

16    allowable use in addition to those allowed under the pre-existing zoning.  Option 2 would

17    also apply the Assembly Use Overlay designation to certain non-residential properties

18    identified by the Planning Staff as suitable for assembly use, according to criteria Staff had

19    developed from the City's General Plan.  Option 2 would increase the area in which

20    assemblies are allowable by over 200 acres.

21    On October 19, 2006, the Board of Zoning Adjustments and the Planning

22    Commission held a "Joint Work Session," at which time the Church's application was

23    discussed.  At the meeting, Pollart explained the two options, and stated that they were

24    designed to lay the groundwork for accommodating religious and secular assembly uses in

25    non-residential areas throughout the City, though neither option would immediately affect

26    the Catalina property.  If Option 1 were approved, ICFG would need to obtain rezoning of

27    the property to IL.  If Option 2 were approved, ICFG would need to obtain rezoning of the

28    property to "Assembly Use Overlay."

United States District Court

For the Northern District of California

1    Rev. Mortara urged the City to act quickly, pleading that the Catalina property had

2    been "in escrow" since February, and that ICFG was obliged to complete its purchase by

3    October 31, 2006.  In response, Pollart explained that under either option, ICFG's use of

4    the Catalina property could not feasibly be made allowable by October 31.  At the close of

5    the meeting, the City decision-makers expressed a preference for Option 2.

6    On October 23, 2006, the Church signed an amendment to the purchase and sales

7    agreement and paid an additional $50,000 nonrefundable fee, applicable to the purchase

8    price, to extend the agreement to December 31, 2006.

9    On November 1, 2006, one of ICFG's attorneys wrote a letter to the members of the

10    Planning Commission, advising them that any denial of the Church's application for a

11    Zoning Map Amendment would violate RLUIPA, and that there could be no possible

12    governmental interest that would justify denial of the application.

13    On December 7, 2006, the Board of Zoning Adjustments met and reviewed the

14    proposal for the "Assembly Use Overlay."  The Planning Staff had recommended that the

15    Board review the proposed amendments and make comments that would be forwarded to

16    the Planning Commission, so that the Planning Commission could hold a hearing after the

17    required environmental analysis by Staff.  It appears that the proposal was then forwarded

18    to the Planning Commission.

19    On December 29, 2006, the Church closed escrow on the Catalina property, making

20    a final down payment of $53,903.39.  ICFG claims that Church representatives believed

21    there was a "good chance" that the application would be approved by the City, based on

22    statements of City officials that other amendments for assembly uses by commercial

23    recreation and entertainment businesses had been previously approved, and also based on

24    supportive statements by City officials at public meetings.

25    On January 2, 2007, the deed of trust was recorded in Alameda County Recorder's

26    Office, in the names of ICFG and the Church.

27    On February 22, 2007, the Planning Staff presented the Planning Commission with

28    proposed amendments to the zoning ordinance that would replace all references to

7

United States District Court

For the Northern District of California

"religious assembly" and "clubs and lodges" with a religiously neutral category of "assembly use," and would also create the new Assembly Use Overlay District.  The Planning Staff further indicated that it had identified nearly 200 properties as suitable for Assembly Use Overlay designation, using eight criteria developed by the Staff after consulting applicable General Plan policies:

1)    Site is not located along a major commercial corridor;

2)    Site is not located within certain General Plan Focus Areas (Downtown, Bayfair, Marina Blvd/SOMAR, or West San Leandro);

3)    Site is not located in regional-serving retail area (Greenhouse Marketplace, Westgate, Marina Sq., or "old" Target site);

4)    Site is not located inside the one-half mile study area defined for the Downtown Transit-Oriented Development Strategy;

5)    Site abuts or is within one-quarter mile of an arterial street;

6)    Site is not located in a Residential zone;

7)    Site is not considered public land, and is not zoned Public Service, Open Space, or Commercial Recreation; is not owned by and Exempt Public Agency or leased/owned by a public utility;

8)    Overlay area must allow a contiguous area greater than or equal to two acres.

During the Planning Commission's public hearing, Pollart stated that the proposed amendments would not immediately make religious assembly use allowable at the Catalina property, as the Planning Staff had not identified it as suitable for Assembly Use Overlay designation.  She further explained, however, that if the City Council enacted the proposed amendments, the Church's application to rezone the Catalina property would be modified by the Planning Staff to a request that it be added to the Assembly Use Overlay District.  At the close of the public hearing, the Planning Commission unanimously recommended that the City Council approve the proposed amendments.

On March 19, 2007, the City Council approved the Assembly Use Overlay District

United States District Court

For the Northern District of California

1  and Map amendments, effective on May 1, 2007, passing an ordinance (San Leandro

2  Ordinance No. 2007-005) that consolidated and equalized treatment of secular and

3  religious assembly uses.  The City Council applied the new Assembly Use Overlay District

4  designation to the 196 properties (over 200 acres total) that the Planning Staff had

5  identified as suitable.

6      ICFG claims, however, that the few parcels rezoned to "Assembly Use Overlay

7  District" that were of adequate size for a congregation of 1500 persons were generally

8  located between two railroad tracks near heavier industry, lacking in infrastructure, and

9  adjacent to old strip commercial "blight" or residential development.

10      The Church's rezoning application was modified to request that the Assembly Use

11  Overlay designation be applied to the Catalina property.  In addition, on March 28, 2007,

12  the Church submitted an application for a conditional use permit for a proposed assembly

13  use at the Catalina property, under the existing zoning.  The application stated, "We are

14  applying for an existing permitted use, entertainment activities – some [or same] church

15  use conditional use permit."  In a cover letter, the Church described the application as "a

16  parallel application to the existing zone code amendment we have in process currently."

17  The Church submitted a site plan with the conditional use permit application.

18      Pollart reviewed the application for the conditional use permit, and determined that it

19  was incomplete and could not be processed.  On April 25, 2007, she wrote the Church,

20  advising them that the application was missing information regarding the square footage of

21  the proposed sanctuary area; information regarding the number of parking spaces required

22  vs. the number provided; the dimensions for standard, compact, and handicap spaces;

23  clarification as to whether the 188 on-site parking spaces shown on the map included

24  diagonal spaces located within an access easement, and parking spaces on adjacent

25  property; information as to the height of the existing concrete screen wall, the square

26  footage for all proposed uses within the building, and whether the chairs in the main

27  sanctuary were fixed or not; information regarding potential uses for the triangular-shaped

28  areas at the rear of the sanctuary, any existing or proposed lighting standards in the

United States District Court

For the Northern District of California

1    parking lot, and whether roof-mounted equipment (HVAC, etc.) would be installed.

2    Pollart also noted that the City had received conflicting information from the Church

3    regarding the intended hours/days of operation for the assembly use – as the application

4    stated "four hours on Sunday," while previous communications from the Church had

5    indicated that the facility would be used every day except Saturday.  Moreover, the

6    application stated that the facility would be made available to other organizations, such as

7    the Boy Scouts, the Girl Scouts, and 4-H Clubs "at the sole discretion of Faith Fellowship

8    Church."  Pollart advised the Church that the Planning Department needed the intended

9    days/hours of the activities for which the conditional use permit was being sought.

10    Pollart states that the Church did not respond to any of the issues raised in her

11    letter, and did not submit the required information.  Thus, she took no further action

12    regarding the application.[3]  In addition, because the Planning Department never processed

13    the conditional use permit application, it never had occasion to consider or approve the

14    Church's proposed assembly use, other uses, tenant improvements, or development of the

15    property.  Thus, according to Pollart, it is unclear what exists on the property now, what

16    would be required to accommodate the Church's desired activities, and what uses might be

17    appropriate or safely handled on the property today.

18    Meanwhile, Pollart submitted a Staff Report to the Planning Commission prior to its

19    meeting of April 12, 2007.  Pollart stated that the Planning Staff had recommended that the

20    Planning Commission deny the Church's application for an amendment for the Assembly

21    Overlay on the Catalina property.  In making its recommendation, the Staff considered the

22    eight criteria based on the City's General Plan and Policies, which criteria the City had used

23    to produce the already approved Assembly Overlay District covering 196 properties.

24    The Staff Report stated that the Catalina property did not meet two of the criteria –

25    _____

26    [3] ICFG submits that it did not provide the requested information because it determined,
      after the City Council denied the rezoning application, that pursuing the conditional use permit
27    would be "futile."  ICFG contends that if the court orders the City to "process" the conditional
      use permit and to treat this religious use equally to an "entertainment use," the Church
28    "stand[s] ready to provide the additional information requested by the City" in Pollart's April 25,
      2007, letter.

United States District Court

For the Northern District of California

1    No. 2, because the property is located within one of the General Plan Focus Areas, and No.

2    5, because the property does not abut or is not located within one-quarter mile of an

3    arterial.  The report went on to say that the site failed to meet additional criteria of public

4    health and safety, because the presence and the potential future presence of hazardous

5    materials and activities in the vicinity of the Church's proposed assembly use rendered it

6    inappropriate for re-zoning within the Assembly Use Overlay.  This last conclusion was

7    based on the fact that there are eight businesses operating under a Hazardous Materials

8    Business Plan within 500 feet of the Church's site, and an additional 13 businesses

9    between 500 feet and one-quarter mile of the site.

10    On April 9, 2007, Peter MacDonald, an attorney representing the Church, wrote to

11    the Planning Commission, addressing the proposed negative findings of the Planning Staff

12    report prepared by Pollart and her recommendation that the Planning Commission deny the

13    Church's application.

14    Mr. MacDonald made five arguments – that the Catalina property has "ready

15    access" to all major arterials in the area; that church uses are compatible with light

16    industrial uses, and any users of hazardous materials bear the burden of providing a

17    system that prevents migration of those materials off their property; that churches, unlike

18    residential and retail uses, do not displace industrial uses if they are permitted in areas

19    zoned "industrial;" that traffic will not be a concern, as the heaviest traffic will be on Sunday

20    mornings and in the evenings when the industrial uses are minimized; that the presence of

21    a church on the premises will provide other advantages, such as providing a sort of security

22    when industrial businesses are closed; and that churches are a community amenity.

23    ICFG also submitted a declaration by Paul Gantt, a fire and safety expert, to the

24    Planning Commission, in an attempt to respond to Pollart's comments about the "health

25    and safety" concerns.  Mr. Gantt, who has 15 years' experience in the "Fire Service" and

26    now owns his own consulting firm, states that he "toured" the "area in question," and

27    reviewed records of the site, and concluded that the fact that adjacent businesses filed

28    Hazardous Materials Business Plans should not disqualify the Catalina property from being

11

1    used as a church, because, variously, there probably aren't that many hazardous materials

2    actually present; any that are present do not appear to be particularly dangerous; the City

3    seems to have good hazardous materials controls in place; the members of the Church

4    would be just as safe as the 2000 or so employees that probably work in the area during

5    the week; that he and his family attend "Crosswinds Church" in Dublin, which is located in

6    an industrial park that includes some tenants who use hazardous materials; and that he is

7    aware of other congregations that meet in industrial areas in Livermore and Dublin.

8        On April 12, 2007, the Planning Commission held a hearing on the Church's

9    assembly use amendment application.  The Commission heard statements, pro and con.

10   Although one Commissioner spoke in favor of the rezoning, the other Commissioners

11   expressed reservations, including concerns that the rezoning would constitute "spot

12   zoning," or "putting a non-conforming use in the middle of a specifically designated area,"

13   and would result in "piecemeal or shot-in-the-dark approach to planning," inconsistent with

14   the considerable time and effort the City had put into the creation of the Assembly Use

15   Overlay District.  The Commission then voted 4-1 to deny the application.  The decision did

16   not require concurrence by the City Council, but appeal to the City Council was permitted.

17       On May 2, 2007, an attorney for ICFG wrote the City Council stating that denial of

18   the Church's application would be a violation of RLUIPA.

19       On May 7, 2007, the City Council met to consider the appeal.  The same speakers

20   appeared as at the Planning Commission meeting – Mr. Brantt, Mr. MacDonald, Rev.

21   Mortara, and other supporters of the Church, as well as San Leandro residents who spoke

22   in opposition on their own behalf and on behalf of local homeowners' associations.  The

23   City Council, in a unanimous vote of the six members present, denied the Church's appeal.

24       The minutes of the meeting reflect the comments of only one councilmember, who is

25   reported as commenting that ICFG had bought the property knowing that it was zoned for

26   industrial use, and as expressing concern about taking the property out of the tax base.  In

27   addition, he noted that the presidents of all three homeowners' associations in the area had

28   sent letters opposing granting the application.  He expressed the concern that two major

United States District Court

For the Northern District of California

1   arterials were already heavily impacted on Wednesday evenings, and that the Church's

2   plan to hold a weekly Wednesday evening service for 400 people would have a direct

3   negative effect on the neighborhood.  He expressed the hope that the Church would

4   choose one of the other 196 sites in San Leandro that had already been designated for

5   assembly use.

6       Following the denial of the appeal, the City immediately offered assistance to ICFG

7   to locate an alternative site within the City's Assembly Use Overlay District, and ICFG

8   offered to work with the City toward that end in the context of settlement negotiations.

9   ICFG apparently accepted the offer, but nevertheless filed the present lawsuit on July 12,

10  2007, and now seeks a preliminary injunction requiring the City to allow the Church to

11  install itself at the Catalina property, and conduct religious services there.

12      ICFG asserts that the denial of the Church's application for use of the Catalina

13  property has caused, and continues to cause, economic damage to the Church.  In addition

14  to the $100,000 payment the Church made with the purchase and sales agreement on

15  March 24, 2006, it had to make three additional payments of $50,000, while it waited for a

16  response to its application.  Since January 2, 2007, when it completed the purchase, the

17  Church has made monthly mortgage payments of $33,809.88 – more than $1100 a day –

18  without being able to use the property.  The Church was also forced to hire an attorney to

19  facilitate the application with the City.  ICFG contends that the Church has spent over

20  $460,000 in down payments and mortgage payments (as of the time of the filing of the

21  complaint in July 2007).

22      ICFG alleges that defendants Jermanis and Pollart "intentionally delayed" the review

23  of the Church's application for fourteen months, knowing that such delay was substantially

24  burdening the Church's religious exercise and violating the Church's rights to freedom of

25  speech, freedom of assembly, and free exercise of religion under the First Amendment, its

26  right to equal protection under the Fourteenth Amendment, and its rights under RLUIPA.

27      The complaint asserts eleven causes of action:

28      (1)    a cause of action for a preliminary and permanent injunction, requiring

13

1  defendants to "immediately process the conditional use permit application" of the Church

2  for the Catalina property, against all defendants;

3      (2)    a claim of violation of RLUIPA, 42 U.S.C. § 2000cc(a), alleging that the City's

4  land restrictions place a "substantial burden on religious exercise," against all defendants;

5      (3)    a claim of violation of RLUIPA, 42 U.S.C. § 2000cc(b)(1), alleging that the

6  City's denial of the Church's application constitutes "treatment of religious assembly on less

7  than equal terms with nonreligious assembly," against all defendants.

8      (4)    a claim of violation of RLUIPA, 42 U.S.C. § 2000cc(b)(3), alleging that the

9  City's denial of the Church's use of the Catalina property constitutes "total exclusion from

10  jurisdiction or unreasonable limits on religious assemblies within jurisdiction," against all

11  defendants;

12      (5)    a claim under 42 U.S.C. § 1983, for violation of the right to free exercise of

13  religion under the First and Fourteenth Amendments, against defendants Jermanis and

14  Pollart;

15      (6)    a claim under 42 U.S.C. § 1983, for violation of the right to freedom of speech

16  under the First and Fourteenth Amendments, against defendants Jermanis and Pollart;

17      (7)    a claim under 42 U.S.C. § 1983, for violation of the right to freedom of

18  assembly under the First and Fourteenth Amendments, against defendants Jermanis and

19  Pollart;

20      (8)    a claim under 42 U.S.C. § 1983, for violation of the right to freedom of

21  association under the First and Fourteenth Amendments, against defendants Jermanis and

22  Pollart;

23      (9)    a claim under 42 U.S.C. § 1983, for violation of the right to equal protection

24  under the Fourteenth Amendment, against defendants Jermanis and Pollart;

25      (10)    a claim under 42 U.S.C. § 1983, for violation of the right to due process under

26  the Fourteenth Amendment, against defendants Jermanis and Pollart;

27      (11)    a claim under 42 U.S.C. § 1983, for violation of rights under RLUIPA, against

28  defendants Jermanis and Pollart.

**United States District Court**
For the Northern District of California

1

**DISCUSSION**

2  A.    Legal Standard

3        1.    Motions for Preliminary Injunction

4        To prevail on a motion for preliminary injunction, plaintiff must show (1) a strong

5  likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if

6  preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and

7  (4) advancement of the public interest (in certain cases).  See Rodde v. Bonta, 357 F.3d

8  988, 994 (9th Cir. 2004).  Alternatively, injunctive relief can be granted if the plaintiff merely

9  "demonstrate[s] . . . a combination of probable success on the merits and the possibility of

10 irreparable injury."  Id.  Because a preliminary injunction is an extraordinary remedy, courts

11 require the movant to carry its burden of persuasion by a "clear showing."  Mazurek v.

12 Armstrong, 520 U.S. 968, 972 (1997).

13       In addition, because the basic function of a preliminary injunction is to preserve the

14 status quo pending a determination of the action on the merits, Chalk v. U.S. Dist. Court,

15 840 F.2d 701, 704 (9th Cir. 1988), courts generally require a movant to meet a higher

16 degree of scrutiny where the movant seeks to alter rather than maintain the status quo, or

17 where issuance of the injunction will provide the movant with substantially all of the relief

18 that would be available after a trial on the merits.  See Schwarzer, Tashima & Wagstaffe,

19 Federal Civil Procedure Before Trial (2007) § 13:78 (citing Tom Doherty Assocs., Inc. v.

20 Saban Entm't, Inc., 60 F.3d 27, 33-34 (2nd Cir. 1995)).

21       In short, requests for mandatory (as opposed to prohibitory) preliminary injunctions

22 that would alter the status quo are "subject to a heightened scrutiny and should not be

23 issued unless the facts and law clearly favor the moving party."  Dahl v. HEM Pharms.

24 Corp., 7 F.3d 1399, 1403 (9th Cir. 1993); see also Stanley v. Univ. of S. Cal., 13 F.3d 1313,

25 1319 (9th Cir. 1994); Anderson v. United States, 612 F.2d 1112, 1114-15 (9th Cir. 1979).

26       2.    RLUIPA

27       RLUIPA is Congress' most recent effort "to protect the free exercise of religion

28 guaranteed by the First Amendment from government regulation."  Guru Nanak Sikh Soc.

United States District Court

For the Northern District of California

of Yuba City v. County of Sutter, 456 F.3d 978, 985 (9th Cir. 2006).  RLUIPA was enacted in response to the Supreme Court's invalidation of the Religious Freedom and Restoration Act ("RFRA"), which the Court found to be an unconstitutional exercise of congressional power under the Fourteenth Amendment because of a "lack of proportionality or congruence between the means adopted that the legitimate end to be achieved."  City of Boerne v. Flores, 521 U.S. 507, 533, quoted in Guru Nanak, 456 F.3d at 985.

RLUIPA replaced the void provisions of RFRA, and prohibits the government from imposing "substantial burdens" on "religious exercise" unless there exists a compelling government interest and the burden is the "least restrictive means of satisfying the governmental interest."  San Jose Christian College v. City of Morgan Hill, 360 F.3d 1024, 1033-34 (9th Cir. 2004).  To avoid RFRA's fate, Congress wrote RLUIPA to apply only to regulations regarding land use and prison conditions.  Cutter v. Wilkinson, 544 U.S. 709, 714-15 (2005).

RLUIPA applies only if one of three conditions exists – (1) the state program receives Federal financial assistance, 42 U.S.C. § 2000cc(a)(2)(A); or (2) the substantial burden imposed by local law affects or would affect commerce with foreign nations, commerce among the states, or commerce with Indian tribes, id. § 2000cc(a)(2)(B); or (3) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which the government makes or is permitted under the law to make, individualized assessments of the proposed uses for the property involved, id. § 2000cc(a)(2)(C).

Thus, under the third of these conditions, which pertains to the present case, the court must determine whether the challenged action involves an individualized land use assessment, and if it does, must then determine whether the City's action imposes a substantial burden under RLUIPA.  RLUIPA provides, in relevant part, that

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution –

United States District Court

For the Northern District of California

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

The plaintiff in a land use case challenging the denial of a conditional use permit bears the burden of proving that the governmental authority's denial of the application imposes a substantial burden on its religious exercise. Guru Nanak, 456 F.3d at 988. A "'substantial burden' must place more than an inconvenience on religious exercise." Id. (citation omitted). To impose a substantial burden, a land use regulation "'must be oppressive to a significantly great extent. That is, a substantial burden on religious exercise must impose a significantly great restriction or onus upon such exercise.'" Id. at 988-89 (quoting San Jose Christian, 360 F.3d at 1034). If the plaintiff establishes that the land use regulation or denial of conditional use permit imposes a substantial burden, the governmental authority must then show that the restrictions are narrowly tailored to accomplish a compelling government interest. Id. at 992.

RLUIPA also prohibits "discrimination" and "exclusion." Subsection (b)(1) provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). Subsection (b)(3) provides that "[n]o government shall impose or implement a land use regulation" that either "totally excludes religious assemblies from a jurisdiction" or "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C.A. § 2000cc(b)(3).

B.    ICFG's Motion for Preliminary Injunction

ICFG seeks a preliminary injunction, based on the second cause of action ("substantial burden" claim) and the third cause of action ("equal terms" claim). ICFG argues that the Church is likely to succeed on the merits, and already has suffered irreparable harm. With regard to the merits, ICFG first argues that the City's actions violate RLUIPA's "equal terms" provision because the City allows entertainment and recreational

17

United States District Court

For the Northern District of California

1  assembly uses but denies religious assembly use, and because the City has imposed a

2  hazardous materials burden on the Church but not on any of the 196 properties approved

3  under the Assembly Use Overlay.

4      Second, ICFG contends that the City's actions have imposed a "substantial burden"

5  on the Church's religious exercise because without the additional space the new facility will

6  provide, the Church's ministry and outreach efforts will be severely limited.  In addition,

7  ICFG argues that the Church has already suffered irreparable harm, as it has been

8  compelled to pay out a significant sum of money for a property it cannot use, and because

9  the City's actions have had the effect of restricting the Church's First Amendment religious

10 and associative rights.

11     Defendants oppose the motion, arguing that ICFG is seeking a mandatory injunction

12 that would alter the status quo and afford ICFG nearly all the relief it seeks before there has

13 been full determination on the merits.  Defendants also assert that ICFG has failed to show

14 a likelihood of success on the merits because it has failed to establish that the City's refusal

15 to rezone the Catalina property placed a substantial burden on ICFG's religious exercise,

16 and because it has failed to show that the City's zoning ordinances treats any similarly

17 situated secular assembly use more favorably than it does ICFG's assembly use.

18     Defendants argue further that ICFG has failed to show irreparable injury, since the

19 hardships of which it complains consist either of the monetary carrying costs of the

20 purchase of the property, or of operational difficulties, such as inadequate parking at the

21 present facility, neither of which were caused by the City's actions.  Finally, defendants

22 assert that the preliminary injunction would prevent the City from protecting the public

23 interest, as the City has no basis upon which to determine whether the property is

24 adequate as a place of assembly, with regard to seismic integrity, fire safety, exits, lighting,

25 seating, ventilation, disability accommodations, bathrooms, or hallways.

26     The court finds that the motion must be DENIED.  As an initial matter, the court

27 notes that granting the motion would essentially provide ICFG with complete relief on the

28 merits, with the exception of the damages and attorneys' fees sought in the complaint, as

United States District Court

For the Northern District of California

1   the purpose of ICFG's lawsuit is to obtain an order compelling the City to allow the Church

2   to use the Catalina property for religious assembly purposes.  In other words, ICFG would

3   achieve what it wants without any trial on the merits.

4         As for the likelihood of success on the merits, it appears that ICFG is challenging

5   two decisions by the City – the City's failure to proceed with the conditional use application,

6   and the City's denial of the application to rezone the property as part of the Assembly Use

7   Overlay District.  It is clear, both from the parties' papers and from the arguments at the

8   hearing, that ICFG did not complete the requirements for the conditional use application

9   (which ICFG unilaterally determined would be "futile").  As stated at the hearing, the court is

10  not in a position to determine the likelihood of success of an incomplete conditional use

11  application, and will not rule on that question.

12        With regard to the challenge to the City's denial of the rezoning application, the court

13  finds that ICFG has made an insufficient showing of likelihood of success – both as to

14  "substantial burden" and to "equal terms."  With regard to the "substantial burden," ICFG

15  argues in its moving papers that the burden consists of the Church having to continue to

16  operate at its present location.  However, ICFG provides no evidence in its moving papers

17  that there are no other options available to the Church.  In the reply, ICFG provides

18  declarations purporting to establish that none of the 196 properties in the Assembly Use

19  Overlay District is suitable for the Church's needs.  But, for the reasons argued by the

20  defendants, that evidence is not competent, and in any event cannot be considered

21  because it was first presented with the reply, as part of an argument not raised in the

22  moving papers.

23        While it is true that under Guru Nanak, a religious group need not show that there is

24  no other possible location where it could build its church, it is not true that there is no need

25  for any showing at all.  In that case, the plaintiff, a Sikh organization, sought a conditional

26  use permit to build a temple on a 1.9 acre parcel of land zoned "low-density residential."

27  The temple would be used by no more than 75 people at a time.  The "low density

28  residential" zoning classification allowed churches, with a conditional use permit.  The Sikh

19

United States District Court

For the Northern District of California

1   group applied for a conditional use permit, but was refused, based on the neighbors' fears

2   about noise and traffic.  The group then acquired a 28.8 acre parcel zoned "general

3   agricultural."  As with the "low-density residential," a church could be built on "general

4   agricultural" land only with a conditional use permit.  The group applied for a conditional

5   use permit, which was granted by the Planning Commission, after the group had agreed to

6   implement a number of mitigating measures. However, that decision was reversed by the

7   County Board of Supervisors, based on their concerns that the land should remain

8   agricultural.

9        The Ninth Circuit specifically did <u>not</u> decide that "failing to provide a religious

10  institution with a land use entitlement for a new facility for worship necessarily constitutes a

11  substantial burden pursuant to RLUIPA," <u>Guru Nanak</u>, 456 F.3d at 989, which is essentially

12  what ICFG is arguing here.  What the Ninth Circuit did decide was that under the facts of

13  the case, the defendant County had imposed a substantial burden on the plaintiff, based on

14  the County's broad reasons for its denials, which the court found could easily be applied to

15  all future applications by the group, and also based on the fact that the group had readily

16  agreed to every mitigating measure suggested by the County's planning division, but had

17  still been denied without any substantive explanation.

18       Here, by contrast, ICFG has not previously applied for a conditional use permit or

19  rezoning and been denied.  Moreover, the reasons given by the City for its denial of the

20  proposed amendment of the zoning designation are more specific than the reasons given in

21  <u>Guru Nanak</u>.  In addition, the court notes that the City's reasons for the denial are not the

22  same as the "stated interests" – which ICFG identifies as maximizing tax revenues,

23  preventing traffic congestion, and protecting health and safety.  These considerations may

24  have been raised at public hearings, by both City officials and citizens attending the

25  hearing, but they were not among the eight criteria that the City used to evaluate ICFG's

26  application.

27       With regard to the "equal terms" violation, ICFG does not focus its argument on the

28  two criteria that formed the basis of the City's denial of the application.  Rather, ICFG

**United States District Court**

For the Northern District of California

1    focuses almost entirely on the "health and safety" issue, which was added as a secondary

2    consideration following the City's discussion of the two determinative factors.  Moreover,

3    ICFG has not conclusively shown that there are no other suitable properties available, or

4    that the City allows other similar assembly uses in areas where churches are not allowed.

5    While the court is not entirely persuaded by defendants' "equal terms" argument, the court

6    finds that plaintiffs have not met their burden of showing that the Church was treated on

7    "less than equal terms" than other, non-religious assembly uses.

8         Nor is the court persuaded that the alleged harm is irreparable.  ICFG suggests that

9    the Church was promised some type of re-zoning by the City, and that the City

10   subsequently reneged.  However, the record is clear that the Planning Staff advised the

11   Church that any zoning amendment process would take a long time, and made no

12   guarantees that the Church's application would be granted.  ICFG was aware when it

13   bought the property that it was zoned industrial.

14        Finally, the court SUSTAINS defendants' objections to the evidence submitted by

15   ICFG with its reply.

16                              **CONCLUSION**

17        In accordance with the foregoing, the court DENIES plaintiff's motion for preliminary

18   injunction.

19

20   **IT IS SO ORDERED.**

21   Dated: October 2, 2007

22                              _____
                                PHYLLIS J. HAMILTON

23                              United States District Judge

24

25

26

27

28