Jayne W. Williams, Esq. (SBN:63203)
jwilliams@meyersnave.com
Deborah J. Fox, Esq. (SBN: 110929)
dfox@meyersnave.com
Philip A. Seymour (SBN: 116606)
pseymour@meyersnave.com
Kimberly M. Drake, Esq. (SBN: 209090)
kdrake@meyersnave.com
MEYERS, NAVE, RIBACK, SILVER & WILSON
555 12th Street, Suite 1500
Oakland, California 94607
Telephone: (510) 808-2000
Facsimile: (510) 444-1108

Attorneys for Defendant
CITY OF SAN LEANDRO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL CHURCH OF THE FOURSQUARE GOSPEL,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN LEANDRO, a municipal corporation,<br><br>Defendant. | Case No. C07-03605-PJH<br><br>DEFENDANT CITY OF SAN LEANDRO'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION OF CLAIMS<br><br>Hearing:<br>Date:         October 1, 2008<br>Time:         9:00 a.m.<br>Courtroom:    3 |
| FAITH FELLOWSHIP FOURSQUARE CHURCH,<br><br>Real Party in Interest. | Honorable Phyllis J. Hamilton<br>Complaint Filed: 7/12/07 |

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION AND BACKGROUND FACTS.......................................................1

II.   THE CITY HAS NOT IMPOSED A "SUBSTANTIAL BURDEN" ON
      PLAINTIFF'S EXERCISE OF RELIGION UNDER RLUIPA ................................3

      A.    The City's Actions Did Not Impose a Substantial Burden on the
            Religious Activities of the Church.............................................................3

            1.    The "Substantial Burden" Test .........................................................3

            2.    Churches, Like Other Uses, Are Not Entitled to Rezoning
                  Upon Demand Under RLUIPA...................................................................5

            3.    The City's Decision Not to Rezone the Catalina Street
                  Property Does Not Amount to a Substantial Burden on the
                  Exercise of Religion ............................................................................7

            4.    The City's Actions Have Not Imposed a Substantial Financial
                  Burden on The Church...............................................................................11

      B.    The City's Actions Served a Compelling Governmental Interest and
            Were The Least Restrictive Means of Protecting That Interest....................11

III.  THE CITY'S REGULATIONS DO NOT VIOLATE THE "EQUAL
      TERMS" PROVISIONS OF RLUIPA.................................................................12

      A.    Background Law.........................................................................................12

      B.    Commercial Recreation and Entertainment Business are Not
            "Assemblies or Institutions" Nor Are They Similar to Church Uses ...........13

      C.    Hazardous Waste Criteria ........................................................................16

IV.   THE CITY'S REGULATIONS DO NOT TOTALLY EXCLUDE OR
      UNREASONABLY RESTRICT RELIGIOUS ASSEMBLIES IN SAN
      LEANDRO .........................................................................................................18

i

1

TABLE OF CONTENTS cont.

2

Page(s)

3   V.   *THE CHURCH'S CONSTITUTIONAL CLAIMS PRESENT NO TRIABLE*

4        *ISSUE* ................................................................................................... 19

5        A.   *The City Has Not Unconstitutionally Interfered with the Church's*
             *First Amendment Right to the Free Exercise of Religion* ............................ 19

6

7        B.   *The City Has Not Interfered with the Church's Freedom of Speech* ............ 20

8        C.   *The City Has Not Interfered with The Church's or Its Members*
             *Freedom to Assemble or Freedom of Association* ........................................ 22

9

10       D.   *The City Has Not Denied the Church Equal Protection of the Law* ............. 23

11       E.   *The City Did Not Violate the Church's Right to Due Process* .................... 23

12            1.   *The Vagueness Claim* ........................................................................ 24

13            2.   *The Claim for Unreasonable Delay* .................................................. 25

14  VI.  *CONCLUSION* ...................................................................................... 25

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Arnel Development Co. v. City of Costa Mesa,*
5
    28 Cal.3d 511, 169 Cal.Rptr. 904 (1980) ................................................................... 24

6

*Board of Regents of State Colleges v. Roth,*
7
    408 U.S. 564, 92 S.Ct. 2701 (1972) ........................................................................... 24

8

*Christian Gospel Church, Inc. v. City and County of San Francisco,*
    896 F.2d 1221 (9th Cir. 1990), *cert den.* 498 U.S. 999 (1990) .................................... 23
9

10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520, 113 S.Ct. 2217 (1993) ........................................................................ 4, 5
11

12

*City of Renton v. Playtime Theatres, Inc.,*
    475 U.S. 41, 106 S.Ct. 925 (1986) ................................................................ 10, 21, 22

13

*Civil Liberties for Urban Believers v. City of Chicago,*
14
    342 F.3d 752 (7th Cir. 2003) ................................................................... 3, 6, 11, 23

15

*Congregation Kol Ami v. Abington Township,*
16
    309 F.3d 120 (3rd Cir. 2002) .................................................................................... 23

17

*Episcopal Student Foundation v. City of Ann Arbor,*
18
    341 F.Supp.2d 691 (E.D. Mich. 2004) ..................................................................... 7, 9

19

*Grace United Methodist Church v. City Of Cheyenne,*
20
    451 F.3d 643 (10th Cir. 2006) ................................................................ 7, 19, 20, 21

21

*Guru Nanak Sikh Soc. of Yuba City v. County of Sutter,*
    456 F.3d 978 (9th Cir. 2006) ..................................................................................... 3, 4
22

23

*Guru Nanak Sikh Society of Yuba City v. County of Sutter,*
    326 F.Supp.2d 1140 (E.D. Cal. 2003) ....................................................................... 13
24

25

*Hale O Kaula Church v. Maui Planning Com'n.,*
    229 F.Supp.2d 1056 (D. Hawaii 2002) ..................................................................... 13

26

*Konikov v. Orange County, Fla.,*
27
    410 F.3d 1317 (11th Cir. 2005) ................................................................................ 25

28

TABLE OF AUTHORITIES cont.

Page(s)

**Cases** *cont.*

*Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v.*
*City of Lakewood, Ohio,*
  699 F.2d 303 (6th Cir. 1983) ........................................................................ 19

*Lighthouse Institute for Evangelism, Inc. v. City of Long Branch,*
  510 F.3d 253 (3rd Cir. 2007) ......................................................... 5, 13, 19, 20

*Lyng v. Northwest Indian Cemetery Protective Ass'n,*
  485 U.S. 439, 108 S.Ct. 1319 (1988) .............................................................. 4

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent,*
  466 U.S. 789, 104 S.Ct. 2118 (1984) ............................................................ 22

*Messiah Baptist Church v. County of Jefferson, State of Colo.,*
  859 F.2d 820 (10th Cir. 1988) ......................................................... 5, 19, 20

*Midrash Sephardi, Inc. v. Town of Surfside,*
  366 F.3d 1214 (11th Cir. 2004) .................................................................. 4, 13

*Petra Presbyterian Church v. Village of Northbrook,*
  489 F.3d 846 (7th Cir. 2007) ..................................................................... 6, 7, 11

*Prima Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County,*
  450 F.3d 1295 (11th Cir. 2006) .................................................................. 13, 18

*San Jose Christian College v. City of Morgan Hill,*
  360 F.3d 1024 (9th Cir. 2004) ................................................................. *passim*

*Sts. Constantine and Helen Greek Orthodox Church v. City of New Berlin,*
  396 F.3d 895 (7th Cir. 2005) ...................................................................... 4, 7

*The Lighthouse Institute for Evangelism, Inc. v. The City of Long Branch,*
  406 F.Supp.2d 507 (D.N.J. 2005) ..................................................................... 7

*Topanga Press, Inc. v. City of Los Angeles,*
  989 F.2d 1524 (9th Cir. 1993) ................................................................... 10, 22

*Ventura County Christian High School v. City of San Buenaventura,*
  233 F.Supp.2d 1241 (C.D. Cal. 2002) ............................................................ 13

TABLE OF AUTHORITIES cont.

Page(s)

**Cases** *cont.*

*Vietnamese Buddhism Study Temple In America v. City of Garden Grove,*
  460 F.Supp.2d 1165 (C.D. Cal. 2006) ...................................................................... 13

*Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.,*
  455 U.S. 489, 102 S.Ct. 1186 (1982)......................................................................... 25

*Vision Church v. Village of Long Grove,*
  468 F.3d 975 (7th Cir. 2006) .............................................................................. *passim*

*Ward v. Rock Against Racism,*
  491 U.S. 781, 109 S.Ct. 2746 (1989)......................................................................... 21

*Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.,*
  24 F.3d 56 (9th Cir. 1994)......................................................................................... 24

*Westchester Day School v. Village of Mamaroneck,*
  386 F.3d 183 (2nd Cir. 2004) .................................................................................... 10

*Westchester Day School v. Village of Mamaroneck,*
  504 F.3d 338 (2nd Cir. 2007) ............................................................................... 4, 5, 7

**Statutes**

42 U.S.C. § 1983........................................................................................................... 19

42 U.S.C. § 2000cc ............................................................................................... *passim*

1133758.3
136.5016

I.       *INTRODUCTION AND BACKGROUND FACTS*

The Faith Fellowship Church is the local affiliate of the International Church of the Foursquare Gospel (collectively "the Church"). The Church has been extraordinarily successful growing from a congregation of 65 in 1993 to an estimated total of 1300-1550 in 2008 with allegedly as many as 1700 attendees at the Church's current location at 577 Manor Boulevard on a single day. First Amended Complaint ("FAC"), ¶ 12; Mortara Depo., Exhibit 30, p. 534, ln. 24 to p. 535, ln 1; p. 536, lns. 15-16. The Church has also undertaken to provide numerous charitable, social and educational services at its current facilities, including youth ministries, feeding the disadvantaged, weight management classes and other programs. FAC ¶¶ 59, 68, 69. According to the Church, the 577 Manor Boulevard property is hampered by lack of adequate parking and the need to juggle the scheduling of its support facilities on its existing church campus. The Church believes all these problems would be resolved, however, were it allowed to relocate its church operations to an larger property with existing buildings consisting of 3 adjoining parcels at 14600-14850 Catalina Street (the "Catalina Street Property") in a prime industrial zoned area of San Leandro. Sims Depo., Exhibit 29, p. 526, lns. 19-25.

Several City representatives met with Church representatives in early 2006 to discuss the Church's relocation plans. The Church was advised that the Catalina Street property was zoned "IP" (Industrial Park), and that assembly uses such as churches were not allowed in that zone. To pursue relocation to that site, the Church would have to apply for amendments to the Zoning Code text to allow churches with a conditional use permit; City staff advised that the Church could also apply to change the zoning from IP to IL (Industrial Limited) since this was a more appropriate zone. Declaration of Debbie Pollart, ¶¶ 15-17. The Church filed its land us application on May 19, 2006 (Exhibit 26) some sixty plus days after it had already entered into an escrow on the Catalina property. Exhibits 36 and 37. City staff quickly recognized that the proposed amendments raised City-wide policy considerations about locating assembly uses in industrial zones. This precipitated a lengthy evaluation of potential options for expanding potential locations for

1

1   assembly uses, which were at that time only allowed in residential zones with a conditional

2   use permit.  Pollart Decl., ¶¶ 18, 20-24.  After obtaining policy direction at public meetings

3   of the Business Development Sub-Committee of the City Council and a joint meeting of

4   the City Planning Commission and Board of Zoning Adjustments, City staff proceeded to

5   prepare draft zoning amendments to create a new Assembly Use Overlay zone which

6   would allow assembly uses with a CUP on suitable properties in industrial and commercial

7   zones.  Pollart Decl., ¶¶ 25-30.  Ultimately some 196 properties, ranging in size from .12

8   to 27.15 acres in size were selected based on 8 objective criteria adopted from the City's

9   General Plan.  The Assembly Use Overlay zoning amendments were presented to and

10  approved by the City Planning Commission (Exhibits 15, 16) and then by the City Council

11  on March 19, 2007.  Pollart Decl., ¶¶ 31-35; Exhibits 17, 18.

12        Meanwhile, with no encouragement from the City, and against sound business

13  practices (Exhibit 34, p. 581), the Church proceeded to enter into a contract to purchase the

14  Catalina Street property.  Pollart Decl., ¶¶ 15, 18.  The sale was completed on December

15  29, 2006.  FAC ¶¶ 16, 22, 30, 33.  However, the Catalina Street property was not among

16  those selected for inclusion in the Assembly Use Overlay zone.  On March 30, 2007 the

17  Church applied for a zoning amendment to include its property in the Assembly Use

18  Overlay zoning.  City staff recommended against the amendment primarily based on the

19  site's inconsistency with 2 of the established 8 criteria that had been used to systematically

20  select properties for the recently completed comprehensive Assembly Use Overlay zone.

21  The Planning Commission voted to deny the application on April 12, 2007.  Pollart Decl.,

22  ¶ 38; Exhibits 21, 22.  The City Council denied the Church's appeal following a full public

23  hearing on May 7, 2007.  Pollart Decl., ¶ 40; Exhibits 23, 24.

24        This action was commenced by the Church on July 12, 2007.  This Honorable Court

25  denied the Church's application for a preliminary injunction on October 2, 2007.

26  ///

27  ///

28  ///

2

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                                    [C07-03605-PJH]

1    II.      *THE CITY HAS NOT IMPOSED A "SUBSTANTIAL BURDEN" ON PLAINTIFF'S*

2            *EXERCISE OF RELIGION UNDER RLUIPA*

3       Plaintiff's First Cause of Action is brought under 42 U.S.C. § 2000cc(a)(1),

4 generally known as the "substantial burden" provision of RLUIPA. The Church alleges

5 that the City has imposed a "substantial burden" on it by, in a nutshell, denying the

6 rezoning requests that would have allowed the Church to relocate to a new larger site

7 where it believes its operation would not be hampered by parking overflow or scheduling

8 issues for its various ancillary outreach activities. The FAC also includes obligatory

9 allegations to the effect that the City's regulations are not supported by compelling

10 governmental interests, and that the City failed to select the least restrictive means for

11 achieving the City's interests, as well as allegations concerning the financial costs the

12 Church has endured in its efforts to secure City approval for new, larger facilities at

13 Catalina. FAC ¶¶ 71-81.

14       The Church's substantial burden claim fails for several reasons. First, the Church

15 cannot establish that the City's refusal to rezone a particular parcel of industrial land at the

16 Church's request amounts to a "substantial burden" on religion versus mere incidental

17 limitations. Second, even if the Church has been "substantially burdened," the City's

18 actions furthered a compelling public interest and adopted the least restrictive means.

19      A.      *The City's Actions Did Not Impose a Substantial Burden on the Religious*

20           *Activities of the Church.*

21         1.      *The "Substantial Burden" Test.*

22       It is generally agreed that the term "substantial burden" in RLUIPA is to be

23 construed in light of the term "substantial burden on religion" as employed in Supreme

24 Court and appellate court jurisprudence involving the Free Exercise clause of the First

25 Amendment. *Guru Nanak Sikh Soc. of Yuba City v. County of Sutter*, 456 F.3d 978, 988

26 (9th Cir. 2006); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 996-997 (7th Cir.

27 2006); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760-761 (7th

28 Cir. 2003) ("*C.L.U.B.*").

3

1          Two interrelated elements must be considered in determining whether a particular

2    government action or regulation inflicts a "substantial burden" on religion.  *See*

3    *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 348-350 (2nd Cir.

4    2007).  The first issue is the *impact* on religious activity.  The Ninth Circuit and other

5    circuits have made it clear that the impact must directly impinge upon the plaintiff's ability

6    to practice religion, and must be truly substantial.  "[F]or a land use regulation to impose a

7    'substantial burden,' it must be 'oppressive' to a 'significantly great extent.'  That is, a

8    'substantial burden' on 'religious exercise' must impose a significantly great restriction or

9    onus upon such exercise.'"  *Guru Nanak*, 456 F.3d at 988, quoting *San Jose Christian*

10   *College v. City of Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir. 2004).  A "substantial

11   burden" is thus one which "exert[s] substantial pressure on an adherent to modify his

12   behavior and to violate his beliefs."  *Id.*; *see also Midrash Sephardi, Inc. v. Town of*

13   *Surfside,* 366 F.3d 1214, 1226 (11th Cir. 2004) ["significant pressure which directly

14   coerces the religious adherent to conform his or her behavior accordingly."]; *C.L.U.B*, 342

15   F.3d 752, 761 ["a land use regulation which imposes a substantial burden on religious

16   exercise is one that necessarily bears direct, primary and fundamental responsibility for

17   rendering religious exercise … effectively impractical."].

18         The second issue that must be considered is the nature or context of the challenged

19   governmental actions.  *Westchester*, 504 F.3d at 350; *see Lyng v. Northwest Indian*

20   *Cemetery Protective Ass'n*, 485 U.S. 439, 451, 108 S.Ct. 1319 (1988) [validity of action

21   cannot be determined from effect alone].  Governmental action that is specifically targeted

22   upon core religious activities will almost invariably be found to impose a substantial

23   burden, if for no other reason than such conduct is almost necessarily oppressive and places

24   an "onus" on religion.  *See, e.g. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

25   508 U.S. 520, 532, 113 S.Ct. 2217 (1993).  Actions that are purely arbitrary or fail to serve

26   any valid purpose are also suspect and likely to be found to impose a substantial burden.

27   *Westchester*, 504 F.3d at 350-351; *see, e.g., Sts. Constantine and Helen Greek Orthodox*

28   *Church v. City of New Berlin*, 396 F.3d 895, 900-901 (7th Cir. 2005).

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                                    [C07-03605-PJH]

1    At the other end of the spectrum are facially neutral regulations of general

2 applicability adopted for purposes unrelated to religion.  *See Lukumi*, 508 U.S. at 531;

3 *Westchester*, 504 F.3d at 350-351.  Burdens imposed on religious activities by this type of

4 regulation are considered *incidental* burdens which must be borne by religious

5 organizations on the same footing as non-religious parties, and not "substantial burdens on

6 religion" absent extraordinary facts.  Zoning regulations, absent abuse or arbitrary

7 application, generally fall within the "generally applicable" category of regulation.

8 *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 275-76

9 (3rd Cir. 2007). "A law is one of neutrality and general applicability if it does not aim to

10 "infringe upon or restrict practices because of their religious motivation, and if it does not

11 'in a selective manner impose burdens only on conduct motivated by religious belief.'"

12 *San Jose Christian College*, 360 F.3d at 1032, quoting *Lukumi*, 508 U.S. at 533, 543.

13 Because incidental burdens, no matter how significant, do not trigger strict scrutiny,

14 "courts confronting free exercise challenges to zoning restrictions rarely find the

15 substantial burden test satisfied *even when the resulting effect is to completely prohibit a*

16 *religious congregation from building a church on its own property*."  *Westchester*, 504

17 F.3d at 350, emphasis added; *see Lighthouse Institute for Evangelism*, 510 F.3d at 274-

18 275; *Messiah Baptist Church v. County of Jefferson, State of Colo.*, 859 F.2d 820, 824-825

19 (10th Cir. 1988).

20    2.    *Churches, Like Other Uses, Are Not Entitled to Rezoning Upon*

21        *Demand Under RLUIPA.*

22    Applying the foregoing principles, the Ninth Circuit and other circuits have

23 squarely rejected the proposition that refusal to rezone a particular site for religious uses,

24 without considerably more, may constitute a substantial burden on religious exercise.  In

25 simplest terms, RLUIPA does not exempt churches from the realities of the real estate

26 market or the necessity of making reasonable efforts to accommodate themselves to valid

27 zoning provisions before claiming they have been "substantially burdened" in violation of

28 RLUIPA.

5

1    The Ninth Circuit first addressed a "substantial burden" claim in *San Jose Christian*

2  *College*, 360 F.3d at 1033-1035. The plaintiff sued after the city denied an application to

3  rezone property for use as a religious college on procedural grounds. *Id.* at 1027-1028. The

4  Ninth Circuit affirmed a summary judgment in favor of the city, finding that denial of the

5  rezoning application did not impose a substantial burden. The Court went on to note that

6  even if the applicable ordinance may have rendered the plaintiff unable to provide worship

7  or education services at the proposed site, "there is no evidence in the record demonstrating

8  that College was precluded from using other sites within the city." *Id.* at 1035.

9    In *C.L.U.B* , 342 F.3d 752, the Seventh Circuit upheld summary judgment for the

10  city and rejected the RLUIPA and constitutional free exercise claims of five churches, each

11  of which had applied for and were denied "special use" permits. The Court noted that the

12  alleged "scarcity of affordable land" and costs of navigating the municipal permitting

13  requirements did not constitute a substantial burden on religion where viable sites

14  ultimately existed and, in that case, were ultimately located by the plaintiffs. The Court

15  noted that neither RLUIPA or the Free Exercise clause require cities to grant churches

16  preferential rights over other land uses, nor insulate churches from "the harsh reality" that

17  "the marketplace sometimes dictates that certain facilities are not available to those who

18  desire them." *Id.* at 761-762.

19    In *Petra Presbyterian Church v. Village of Northbrook*, 489 F.3d 846 (7th Cir.

20  2007), the church contracted to purchase an industrially zoned property containing buildings

21  that it wanted to convert to a church and religious classrooms. However, churches were not

22  allowed in the zone. After the town planning commission responded negatively to the

23  church's rezoning application, the church withdrew its application but then proceeded to

24  buy the property and use it for church purposes anyway. The village secured an injunction

25  against continued church use of the property. The 7th Circuit rejected the church's

26  subsequent RLUIPA substantial burden claim, finding that a prohibition on churches in

27  industrial zones was neither unreasonable nor a substantial burden on religion. *Id.* at 850-

28  851. The Court noted "When there is plenty of land on which religious organizations can

6

1  build churches (or, as is common nowadays, convert to churches buildings previously

2  intended for some other use) in a community, the fact that they are *not permitted to build*

3  *everywhere* does not create a substantial burden." *Id.* at 851; emphasis added.

4       In *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 654-655

5  (10th Cir. 2006) the court rejected a Free Exercise claim that denial of a permit for a

6  religious day care center imposed a substantial burden on the plaintiff, noting that the

7  plaintiff could apply to locate the facility at a site properly zoned for it, or simply operate

8  its existing religious facilities on a "less grandiose" scale.  And, in *The Lighthouse Institute*

9  *for Evangelism, Inc. v. The City of Long Branch*, 406 F.Supp.2d 507, 515-516 (D.N.J.

10  2005) the Court found that adoption of a redevelopment plan and rezoning that required

11  the plaintiff to relocate their existing church did not impose a substantial burden on the

12  plaintiff where there was evidence that alternate locations were available in the city.

13       Similarly, in *Episcopal Student Foundation v. City of Ann Arbor*, 341 F.Supp.2d

14  691, 705 (E.D. Mich. 2004), the Court found that the plaintiff could not claim a substantial

15  burden in the absence of evidence that it was impractical to lease or sublease alternate

16  facilities that would allow it to conduct some or all of its religious activities elsewhere.

17              3.    *The City's Decision Not to Rezone the Catalina Street Property Does*

18                    *Not Amount to a Substantial Burden on the Exercise of Religion.*

19       Under the foregoing standard, the Church clearly cannot establish that it has been

20  "substantially burdened" by the City's actions challenged here.  While religious assemblies

21  are not allowed on the Church's Catalina Street property, any burden this imposes on the

22  Church is clearly an incidental result of the City's larger zoning provisions and plaintiff's

23  core religious activities are not burdened.  There is no evidence of intentional

24  discrimination or arbitrary conduct toward the Church.  *See Westchester*, 504 F.3d at 350-

25  351; *Sts. Constantine and Helen Greek Orthodox Church*, 396 F.3d at 900-901.  Instead,

26  the record shows a good faith effort by the City to *expand* opportunities for religious

27  assembly uses in the wake of the Church's initial application.  Pollart Decl., ¶ 20; Exhibits

28  11-20, inclusive.  The fact that the Church's property ultimately was not included in this

1  expansion based on objective and reasonable planning criteria does not entitle the Church

2  to relief under RLUIPA.  Pollart Decl., ¶ 36.

3       There can also be little dispute that the City's zoning provisions as a whole provide

4  adequate sites for religious assemblies.  Churches (and other Assembly Uses) have been

5  allowed with a CUP in *all* City residential zones for many years.  Pollart Decl., ¶ 7; *see*

6  Zoning Code, Article 5, §§ 2-504.B.2, 2-506.B.2, 2-508.B.2, 2-510.B.2; City's RFJN,

7  Exhibit 3, pp. 013-016, 018.  These zones comprise approximately 52% of the City.

8  Pollart Decl., ¶ 8.  The enactment of the Assembly Use Overlay zoning amendments in

9  early 2007 added an *additional* 196 properties of various sizes located in both industrial

10  and commercial zones.  Pollart Decl., ¶ 35; Exhibit 20.  These numbers are not

11  disproportionate to the actual demand for church space in the City.  There are currently a

12  total of 45 churches in the City.  Pollart Decl., ¶ 5.  Only two applications for new church

13  facilities were received by the City in the last five years.  *Id.*, ¶ 13. According to the

14  Church's own pastor, no new churches were built in the City in the 17 years preceding

15  these applications.  Exhibit 30, Mortara Depo., p. 537, lns. 1-3.

16       The Church has previously offered a number of arguments as to why the City's

17  actions should still be deemed to impose a substantial burden.  None have merit.

18       First and foremost, the Church apparently contends that there are no available sites

19  other than its Catalina Street property that are large enough to accommodate the size of

20  congregation and the range of additional social, charitable and educational activities it

21  claims are also important to its exercise of religion.  The evidence, however, does not

22  support a conclusion that no other similarly sized sites are available.  There are, to begin

23  with, approximately 78 sites over 3.5 acres in the City's residential zones.  Pollart Decl., ¶

24  8.  Of the parcels subject to the Assembly Use Overlay, four are over 10 acres in size; eight

25  are over 5 acres in size; 24 are over 2 acres in size and the largest is 27.15 acres.  Pollart

26  Decl., ¶ 10; Exhibit 9.  Beyond this, the AU Overlay zone was deliberately applied only to

27  areas containing a minimum of 2 acres of contiguous land, precisely so that smaller parcels

28  ///

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                    [C07-03605-PJH]

1    could be aggregated to allow larger assembly uses, as is the case with the 3 adjoining

2    parcels that comprise the Church's Catalina Street property.  Pollart Decl., ¶ 10.

3        The second problem with the Church's argument is that the Church cannot show

4    that its various religious activities must occur at a single location.  While the Church may

5    *wish* to assemble its entire congregation in a single facility for worship services, it cannot

6    seriously argue that conducting services in two smaller locales, or conducting multiple

7    services *as it does now* would effectively prevent the Church's members from practicing

8    their religion.  The Church's all-in-one-place argument is even weaker with respect to the

9    many other activities the Church wishes to include under its umbrella of operations.  Many

10    counseling services include its weight-management classes and various educational

11    activities, clearly could be accomplished at other smaller locations, some of which may

12    require no discretionary City approvals at all, *e.g.* leased office space.  *See Episcopal*

13    *Student Foundation*, 341 F.Supp.2d at 704-705.  And, some activities such as the Church's

14    food programs, might well be conducted more effectively at a separate new location with

15    adequate kitchen, storage or other specialized facilities, and with greater accessibility to

16    their intended beneficiaries and less conflict with other Church activities and less impact to

17    affected neighbors.  It is clear that the Church has adequate financial resources to lease or

18    acquire additional property for these purposes.  In 2005, for example, it purchased a single

19    family residential parcel adjacent to its present facilities simply to acquire additional

20    parking spaces.  Exhibit 30, Mortara Depo., p. 540, lns. 5-11, p. 541, lns. 20-23.

21        The Church cannot avoid these alternatives by insisting it must have a single large

22    property of its own choosing, no matter how sincere that belief may be.  As noted

23    previously, burdens placed on religious exercise are deemed incidental burdens rather than

24    substantial burdens when they result from the neutral operation of a rational zoning

25    scheme.  In allocating space among the various uses necessary to any functioning society,

26    municipalities also often face limited choices constrained by topography, past development

27    patterns, natural and political boundaries, environmental and transportation constraints, and

28    the planning rationale of maintaining reasonable separation between incompatible uses.

9

1    Having made reasonable efforts to accommodate religious uses – as the City clearly has – a

2    municipality cannot be faulted under RLUIPA for failing to anticipate or accommodate

3    demands by a religious organization for a particular property deemed specially suited to its

4    individual goals, ambitions or budget.  This would not only exceed RLUIPA's goal of

5    securing equality – not special privileges – for religious assemblies, but also exceed

6    constitutional limits on preferences that may be given for religion.  *Westchester Day*

7    *School v. Village of Mamaroneck*, 386 F.3d 183, 189-190 (2nd Cir. 2004).  The fact that

8    the Church wishes to build an extraordinary size church and religious complex does not

9    obligate a moderate size and largely already-built-out city such as San Leandro to jettison

10   its adopted zoning plans to accommodate this demand.

11        It may be noted that the courts have extensively dealt with similar land use issues in

12   the context of the Free Speech clause.  The rule that has developed there is that local

13   governments must zone a sufficient number of properties to accommodate the reasonably

14   anticipated demand for First Amendment uses.  *City of Renton v. Playtime Theatres, Inc.*,

15   475 U.S. 41, 106 S.Ct. 925 (1986); *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d

16   1524 (9th Cir. 1993).  Municipalities are *not* required to guarantee that these properties

17   will actually be for sale, nor pre-equipped with buildings and improvements or visual

18   settings deemed desirable for First Amendment uses.  *Id.*  While the Church may bridle at

19   comparison with cases involving some less wholesome forms of First Amendment activity,

20   there is no reason to believe the same rules do not apply to all forms of free speech,

21   including those clearly on a parity with religious expression.  Under these rules, were

22   Borders to sue the City simply because there were no commercially zoned parcels left in

23   the City that were large enough to accommodate its particular demands, the suit would

24   clearly fail.  The result is the same here.  The Church cannot unilaterally define its needs

25   and resulting alleged burdens on its practice of religion in a manner which trumps the

26   City's ability to make and adhere to otherwise reasonable zoning decisions.

27   ///

28   ///

10

1    4.    *The City's Actions Have Not Imposed a Substantial Financial Burden*
2        *on The Church.*

3    The Church also complains that costs associated with purchasing and holding the

4    Catalina Street property have imposed a substantial burden.  FAC ¶ 84.  The costs of

5    acquiring real estate and of pursuing necessary government approvals are, of course,

6    inherent costs incidental to any acquisition and development or reuse of property, and not

7    normally cognizable as a burden on religion.  *San Jose Christian College*, 360 F.3d at 1035

8    ["the costs, procedural requirements, and inherent political aspects of the permit approval

9    process were 'incidental to any high-density urban land use' and thus '[did] not amount to

10   a substantial burden on religious exercise.'"]; *C.L.U.B.*, 342 F.3d at 760-761.  While the

11   Church rather unwisely paid non-refundable deposits and then purchased the Catalina

12   Street property before any zoning approvals were obtained, it did not do so on the advice

13   of the City, or even in the best judgment of its own advisors.  Pollart Decl., ¶¶ 15, 18;

14   Exhibit 36.  The Church's financial burden is one entirely of the Church's own choosing,

15   not a burden imposed by the City.  *See Petra Presbyterian*, 489 F.3d at 851 [no substantial

16   burden where church purchased property knowing it was subject to restrictions].

17   Of note, the original offer made by the Church was specifically conditioned "upon

18   Buyer in its sole judgment determining that the subject real property is suitable for *and*

19   *approved for use as a church.*  This condition shall remain in full force and effect until

20   removed in writing by Buyer."  Exhibit 36, Commercial Property Purchase Agreement and

21   Joint Escrow Instructions of March 24, 2006, p. 634; emphasis added.  Just 4 days later

22   this contingency was deleted by the Church (Exhibit 37, p. 648) and the Church now tries

23   to shoulder the City with the effects of its poor business planning.

24   B.    *The City's Actions Served a Compelling Governmental Interest and Were*
25        *The Least Restrictive Means of Protecting That Interest.*

26   Even assuming the Church has shown a substantial burden, the City's actions are

27   lawful under RLUIPA if supported by a compelling governmental interest and is the "least

28   restrictive" means of furthering that interest.  42 U.S.C. § 2000cc(a)(1)(A), (B).  In

11

1  determining whether an asserted governmental interest is sufficiently compelling, the court

2  looks at the specific facts of the case, not general propositions. *Westchester*, 504 F.3d at

3  353. The City's principal reason for refusing to rezone the Catalina Street property was

4  that the property is considered a core property for maintaining the City's industrial base, as

5  evidenced in the City's General Plan. Pollart Decl., ¶ 20; Exhibit 7. The City may or may

6  not have a compelling interest in preserving *every* industrially zoned parcel for industrial

7  uses, but it certainly has a compelling interest in preserving some land for industrial use.

8  The Catalina Street site historically employed some 400 persons. Exhibit 28, Jermanis

9  Depo., p. 518, lns. 10-19. The evidence further shows that the Catalina Street property is

10  in fact uniquely important by reason of its location and current accommodations to the

11  preservation of a viable industrial base in the City. Exhibit 29, Sims Depo., p. 526, lns. 6-

12  28; pp. 529, ln. 18 to 530, ln. 10. Denial of the rezoning was also indisputably the only

13  practical – and therefore least restrictive – means of achieving the City's legitimate goal.

14  Approval of Church use with conditions would not preserve the property for industrial use.

15  III.    *THE CITY'S REGULATIONS DO NOT VIOLATE THE "EQUAL TERMS"*

16        *PROVISIONS OF RLUIPA*

17        42 U.S.C. § 2000cc(b)(1), known as the "Equal Terms" provision of RLUIPA,

18  provides that "[n]o government shall impose or implement a land use regulation in a

19  manner that treats a religious assembly or institution on less than equal terms with a

20  nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

21        The Church's Second Cause of Action asserts that the City violated section

22  2000cc(b)(1) by: (1) allegedly failing to treat the Church the same as commercial

23  recreation and entertainment businesses; and (2) rejecting the Church's rezoning

24  application because its property was located within a 1/4 mile of businesses operating with

25  hazardous materials business plans. FAC ¶¶ 92-94. Neither claim has merit.

26        A.    *Background Law.*

27        The Ninth Circuit has not yet addressed the Equal Terms provision of RLUIPA.

28  Lower courts in this circuit, however, have construed this provision as a codification of

12

1  "existing Supreme Court decisions under the Free Exercise and Establishment Clauses of

2  the First Amendment as well as under the Equal Protection Clause of the Fourteenth

3  Amendment." *Ventura County Christian High School v. City of San Buenaventura,* 233

4  F.Supp.2d 1241, 1246 (C.D. Cal. 2002); *Guru Nanak Sikh Society of Yuba City v. County*

5  *of Sutter,* 326 F.Supp.2d 1140, 1155 (E.D. Cal. 2003); *Hale O Kaula Church v. Maui*

6  *Planning Com'n.,* 229 F.Supp.2d 1056, 1070-1071 (D. Hawaii 2002).

7          Therefore, "in evaluating plaintiffs' claims under either [the equal terms provision

8  of] RLUIPA or the Equal Protection Clause of the Fourteenth Amendment, the Court must

9  first inquire as to whether defendants have treated plaintiffs in an unequal manner to

10  *similarly situated* entities." *Ventura County,* 233 F.Supp.2d at 1247 (emphasis added); *see*

11  *also Vietnamese Buddhism Study Temple In America v. City of Garden Grove,* 460

12  F.Supp.2d 1165, 1173-1174 (C.D. Cal. 2006); *Guru Nanak,* 326 F.Supp.2d at 1155.

13          Other circuits are divided on application of the "similarly situated" standard to Equal

14  Terms claims.  *See Lighthouse Institute,* 510 F.3d at 264-268; *Vision Church,* 468 F.3d 975,

15  1003; *Midrash Shephardi,* 366 F.3d 1214, 1230; *Prima Iglesia Bautista Hispana of Boca*

16  *Raton, Inc. v. Broward County,* 450 F.3d 1295, 1311 (11th Cir. 2006) ["similarly situated"

17  requirement applicable to "as applied" claims].  At a minimum, however, it is clear than

18  section 2000cc(b)(1), by its express terms, allows a claim based only on alleged differential

19  treatment of a "nonreligious assembly or institution."  *Midrash Sephardi,* 366 F.3d at 1230.

20          B.     *Commercial Recreation and Entertainment Business are Not "Assemblies or*

21                 *Institutions" Nor Are They Similar to Church Uses.*

22          The Church's first Equal Terms claim is apparently based on the fact that the City's

23  current Zoning Code allows "Commercial Recreation" and "Entertainment Activities" in

24  the IP and IL industrial zones with a CUP, whereas churches (and other Assembly Uses)

25  are permitted in these zones (also with a CUP) only in areas subject to the Assembly Uses

26  Overlay District.  *See* RFJN, Exhibit 4, Zoning Code, Article 7, §§ 2-708.B.5, 2-708.B.9.

27  ///

28  ///

1    This claim fails because Commercial Recreation and Entertainment Activities are

2    not similar to religious assemblies or institutions in any relevant respect, nor do they

3    qualify as "assemblies" or "institutions."

4    "Assembly Uses" are defined in the City's Zoning Code as "Meeting, recreational,

5    social facilities of a private or non-profit organization primarily for use by members or

6    guests, or facilities for religious worship and incidental religious education (but not

7    including schools as defined in this section). This classification includes union halls,

8    social clubs, fraternal organizations, and youth centers." RFJN, Exhibit 2, 008.

9    "Entertainment Activities," in contrast, are defined in the Zoning Code to include

10   specified types of recurring performing events, plus dancing and electronically displayed

11   events), but to *exclude* activities "for the non-profit, charitable or educational [purposes] of

12   public or private institutional uses." RFJN, Exhibit 2, p. 010. While "Commercial

13   Recreation" is defined as "Provision of participant or spectator recreation or

14   entertainment," and includes "amusement parks, bowling alleys, ice/roller skating rinks,

15   golf courses, miniature golf courses, and scale-model courses." RFJN, Exhibit 2, p. 009.

16   These uses cannot reasonably be classified as "assemblies" or "institutions."

17   The terms "assembly" and "institution" are not defined in RLUIPA. The Court

18   therefore must construe the terms "in accordance with [their] 'ordinary, contemporary

19   common meaning.'" *San Jose Christian College*, 360 F.3d at 1034. While dictionary

20   definitions may be helpful, common usage is normally the best guide to legislative intent.

21   It cannot seriously be contended that Congress intend the terms "non-religious assembly"

22   and "institution" to be equated with common types of commercial for profit types of uses

23   (such as bars, nightclubs, sports stadiums, amusement parks, etc.) when this is so

24   obviously inconsistent with the common usage of these terms.

25   Turning to the dictionary, the term "assembly" is defined in Webster's New

26   Universal Unabridged Dictionary as "a number of persons gathered together, usually for a

27   particular purpose, whether religious, political, educational, or social." RFJN, Exhibit 32.

28   On its face, this definition conveys a group of persons voluntarily gathered for

14

1    associational purposes, not a group whose common denominator is that they paid the price

2    of admission.  The dictionary definition can perhaps be literally stretched to any activity

3    involving an aggregation of persons for similar purposes.  Such an interpretation proves

4    too much.  Under this interpretation, shoppers gathered for a sales event, workers

5    assembled in a factory or an office to work, or bar patrons gathered for a drink could all be

6    described as an "assembly."  There is nothing in RLUIPA or its legislative history,

7    however, which suggests that Congress intended such a far-reaching result, which would

8    essentially abolish all permissible distinctions between conventionally recognized (and

9    typically non-profit) assembly uses and common commercial activities involving

10   aggregations of people.  Whatever ambiguity may adhere to the term "assembly," it cannot

11   seriously be argued that the term is commonly employed to refer to commercial

12   businesses, including those involving paid-for entertainment or recreational activity.

13        The term "institution" is assigned 8 different meanings in Webster's New Universal

14   Unabridged Dictionary.  RFJN, Exhibit 33.  It can literally, if euphemistically, be applied

15   to almost any human organization or even informal activities such as a weekly pick-up

16   basketball game in a local park.  The primary meaning assigned by Webster's, however, is

17   "an organization, establishment, foundation, society, or the like, devoted to the promotion

18   of a particular object, esp. one of public, educational, or charitable character."  RFJN,

19   Exhibit 33.  This is a common sense usage and while it is true that the term "institution"

20   can be employed to refer to business enterprises of a venerable nature, *e.g.* a bank or other

21   financial "institution," the term is seldom employed to refer to ordinary commercial

22   enterprises such as skating rinks or movie theaters.

23        Since Entertainment Activities and Commercial Recreation as defined by the City

24   are not "assemblies" or "institutions" within the meaning of RLUIPA, the City believes it

25   is unnecessary to further consider whether these uses should be "similarly situated" with

26   Assembly Uses.  In any event, while some assembly uses and some commercial

27   entertainment or recreation businesses may have *some* commonalities, there are also

28   typically substantial differences in intensity of use, hours of operation and resulting traffic,

15

1    impacts on neighboring uses and locational preferences, to say nothing of profit motive.
2    Given these factors and the longstanding historical distinctions between assembly and
3    institutional uses versus commercial uses generally, the City could clearly lawfully
4    determine that Assembly Uses as defined in the City's Zoning Code are not "similarly
5    situated" to commercial entertainment and recreational uses.

6        C.    *Hazardous Waste Criteria.*

7        The Church's second Equal Terms claim is that the City has imposed a standard on
8    the Church's proposed Catalina Street church that has not been applied to any other
9    assembly use, *i.e.* a separation requirement preventing the church from be located within a
10   "¼ mile circumference" of any business operating under a hazardous materials business
11   plan.  FAC ¶ 42.  The short answer to this claim is that the City has not enacted any such
12   standard, let alone selectively applied it to the Church.

13       The apparent basis for this claim is the fact that the staff reports for the City Planning
14   Commission and City Council hearings on the Church's 2007 rezoning application
15   recommended denial of the application *in part* upon the presence of some eight businesses
16   with Hazardous Materials Business Plans ("HMBPs") *within 500 feet* of the Catalina Street
17   property, and a total of 13 such businesses within ¼ mile.  Pollart Decl., ¶¶ 43-46; Exhibit
18   21, pp. 403-404.  The record, however, does not indicate that the City Council actually
19   relied on this criteria in making the decision to reject the rezoning.  Instead, the minutes,
20   hearing transcript and the staff reports themselves make it clear that the primary ground for
21   denial of the rezoning was the fact that the Catalina Street property did not satisfy two of the
22   criteria used to select all other properties in the Assembly Use Overlay zone, *i.e.* the
23   property was more than ¼ mile from a designated arterial street, and in a "focus area"
24   reserved by the General Plan for industrial and commercial development.  Pollart Decl., ¶¶
25   41, 45; Exhibits 22, 24, 35.

26       The Church's Equal Terms claim here fails for three reasons.  First, the "Equal
27   Terms provision of RLUIPA by its terms provides that governments shall not "impose or
28   implement a *land use regulation in a manner that treats a religious assembly or institution*

16

1  *on less than equal terms with a nonreligious assembly or institution.*"  42 U.S.C. §

2  2000cc(b)(1), emphasis added.  Contrary to the Church's implication, the City has not

3  adopted – much less "imposed" on the Church  any regulation requiring a "1/4

4  circumference" (or any other specific separation) between assembly uses and sites with

5  HMBPs.  No such regulation or standard appears in the City's General Plan, zoning code,

6  assembly use overlay criteria, or any other city regulation.  Pollart Decl., ¶ 46.

7          What the Church is apparently objecting to is the consideration of the proximity of

8  hazardous wastes as a public health and safety issue affecting the Catalina Street property.

9  The statute, however, is addressed at discriminatory application of actual regulations. There

10  appears nothing in the statute or commonly accepted principles of law that would allow the

11  Court to hold municipalities liable for merely *considering* new information on a zone change

12  application.

13          Even were one to assume that consideration of new criteria were actionable under

14  RLUIPA, there remains the issue of causation.  Clearly a plaintiff cannot claim relief under

15  RLUIPA if it has suffered no actual harm from the agency's alleged errant analysis.  At a

16  minimum then, the Church must show that consideration of the HMBP was actually

17  responsible for the denial of its rezoning application.  The evidence simply does not support

18  any such argument.  While the subject of HMBPs was indeed considered by City staff and

19  the City Planning Commission, the record does not show that the final City Council

20  decision was actually affected by this consideration.  Representatives of the Church testified

21  extensively, and apparently persuasively, that the mere possession of HMBPs by nearby

22  businesses was not in and of itself sufficient to justify denial of the rezoning application.

23  Exhibit 35.  The City Council apparently agreed.  No mention of the issue was made by any

24  Councilmember voting on the rezoning.  Exhibit 35.  The record further affirmatively

25  indicates that the primary ground for rejection of the rezoning at all stages of consideration

26  was the fact that the Catalina Street property did not meet two of the eight specific criteria

27  utilized in selecting all other properties in the Assembly Use Overlay zone.  Pollart Decl., ¶

28  ///

17

1  44; Exhibit 23, p. 447.  The failure of this parcel to satisfy the 8 established criteria (which

2  all of the 196 parcels satisfied) was the basis for denying the rezoning application.

3      A final problem with the Church's HBMP argument is that there is no evidence that

4  the City has applied different criteria to similarly situated applicants, of either a religious

5  or non-religious nature.  *See Prima Iglesia*, 450 F.3d at 1311 [plaintiff in as applied Equal

6  Terms must show differential application to *similarly situated* parties].  To sustain its

7  HBMP claim, the Church would have to show that the City intentionally ignored the

8  presence of HBMPs in the context of another similar *rezoning* application.  *Id.* at 1311-

9  1313 [no Equal Terms claim where plaintiff sought "markedly different forms of zoning

10  relief."].  The Church cannot do this.  No other applicant has ever requested rezoning of

11  industrial land to accommodate an assembly use.  Pollart Decl., ¶ 44.  There is also no

12  basis for suspecting actual discrimination.  Faced with the prospect of a massive assembly

13  use in an industrial zone, the City prudently considered public safety issues posed by the

14  close proximity of hazardous materials.

15  IV.    *THE CITY'S REGULATIONS DO NOT TOTALLY EXCLUDE OR*

16         *UNREASONABLY RESTRICT RELIGIOUS ASSEMBLIES IN SAN LEANDRO*

17      The Church's Third Cause of Action is based on 42 USC § 2000cc(b)(3), which

18  prohibits state or local land use regulations which either totally exclude religious

19  assemblies from a jurisdiction, or unreasonably limit such uses.  There is little case law

20  construing this provision of RLUIPA.  However, it is clear that the City's regulations do

21  not totally exclude religious uses from the City.

22      Aside from the 45 existing religious uses, including the Church's own existing

23  campus, the City regulations allow churches with a CUP in all residential zones, and also

24  on the 196 sites in other commercial and industrial zones in the Assembly Use Overlay.

25  *See* Zola Decl.; Exhibit 34.  *Vision Church*, 468 F.3d at 990 [no "total exclusion" where

26  churches allowed with special permit in residential zones].  The same evidence on its face

27  precludes any claim that the City's regulations "unreasonably restrict" such uses.  With 45

28  ///

1 existing churches in the City there is no evidence of any unmet demand for Church space

2 in the City.  Pollart Decl., ¶ 5.

3 V.    *THE CHURCH'S CONSTITUTIONAL CLAIMS PRESENT NO TRIABLE ISSUE*

4        The Church's Fourth through Ninth Causes of Action present various constitutional

5 claims under 42 U.S.C. § 1983.  If the Church cannot sustain a claim under RLUIPA, its

6 claims must also fail under the standards governing its Free Exercise, Free Speech and

7 other constitutional claims.

8        A.    *The City Has Not Unconstitutionally Interfered with the Church's First*

9              *Amendment Right to the Free Exercise of Religion.*

10       Plaintiff's Fourth Cause of Action seeks relief under the Free Exercise Clause of the

11 First Amendment.  FAC ¶¶ 103-104.  The claim is based on the same facts as the Church's

12 RLUIPA "substantial burden" claim, and fails for essentially the same reasons.  In

13 addition, the constitutional claims suffers from another threshold problem.  Federal courts

14 have not recognized a First Amendment right to practice religion *on any particular parcel*

15 *of land*, absent a showing that the proposed site itself possesses some special religious

16 significance.  *Lighthouse Institute for Evangelism*, 510 F.3d at 273-274; *Grace United*

17 *Methodist*, 451 F.3d at 654-655; *Messiah Baptist Church*, 859 F.2d at 824-825; *Lakewood,*

18 *Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio*, 699 F.2d 303,

19 306-307 (6th Cir. 1983).  Although the Church's claims are premised on the City's refusal

20 to rezone its Catalina Street property for church use, the Church does not claim this

21 property has any intrinsic religious significance.  There is no claim that the City has taken

22 any actions to interfere with religious activities at the Church's current operations at 577

23 Manor Boulevard.

24       Even were the Church's Free Exercise rights deemed implicated by the denial of the

25 Catalina Street rezoning, the Church cannot show that the City's actions inflicted a

26 substantial burden for reasons stated in Section II above.  In addition, courts evaluating Free

27 Exercise claims in the zoning context generally apply only a rational basis test.  Under the

28 rational basis test, so long as the challenged zoning actions are of general application and

19

1   neutral towards religious activity itself, they need not be narrowly tailored nor justified by a

2   compelling governmental interest, regardless of any incidental restrictions they may impose

3   on religious activities. *San Jose Christian College,* 360 F.3d at 1030-1031; *Lighthouse*

4   *Institute for Evangelism,* 510 F.3d at 277; *Grace United Methodist,* 451 F.3d at 649; *Vision*

5   *Church,* 468 F.3d at 1001.  The First Amended Complaint does not allege any facts

6   suggesting that the City zoning regulations affecting the Church or churches generally are

7   targeted at religious activity.  The Church also has not made any such claim in discovery.

8   The City's regulations are clearly neutral on their face.  The evidence shows that the City's

9   actions were based on legitimate public policy considerations, *i.e.* the need to preserve the

10  City's industrial base.  Pollart Decl., ¶ 20; Exhibit 13.  Nothing more is required to survive

11  scrutiny under the Free Exercise clause.  *See, e.g., Lighthouse Institute for Evangelism,* 510

12  F.3d at 273-277 [upholding exclusion of churches from redevelopment zone]; *C.L.U.B,* 342

13  F.3d 752, 763-764; *Messiah Baptist Church,* 859 F.2d at 823-826.

14          B.      *The City Has Not Interfered with the Church's Freedom of Speech.*

15          The Church's Fifth Cause of Action alleges that the City has violated the Church's

16  First Amendment right to free speech by discriminating against the Church "by restricting

17  its speech rights and the congregants' corresponding right to hear."  FAC ¶ 106.  The

18  complaint further alleges that these restrictions result from the "crowded facilities,

19  inadequate parking, and traffic congestion at the CHURCH's present location," which

20  alleged hinder or deter Church members from entering the current facilities to exercise their

21  rights.  *Id.*  Plaintiff does not allege, however, that the City has taken any affirmative actions

22  to hinder or suppress any speech activities undertaken at their current church site.  Neither

23  does the Church claim, nor could it, that any of the City actions challenged in this case were

24  motivated by a desire to suppress religious (or other) speech activity.  The Church's claim

25  thus boils down to the proposition that City has denied free speech by precluding the

26  Church and its members from expanding by relocating to the Catalina Street property.

27          In these circumstances, zoning regulations will be upheld against a free speech

28  challenge notwithstanding any incidental effects on speech activity so long as they meet

20

1    the common First Amendment test for time, place and manner regulations. *San Jose*

2    *Christian College*, 360 F.3d at 1032, citing *City of Renton*, 475 U.S. 41; *Grace United*, 451

3    F.3d at 657. Under this test, zoning regulations must be upheld so long as they are

4    "designed to serve a substantial governmental interest," "do not unreasonably limit

5    alternative avenues of communication," and are "narrowly tailored" in the sense that they

6    are directed only at the particular class of activities or land uses reasonably believed to

7    generate the type of impacts regulated by the ordinances. *City of Renton*, 475 U.S. at 47

8    and 52; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746 (1989).

9         The City's zoning regulations are clearly content neutral with respect to religious

10   speech and expression. They do not provide for granting or withholding permits on the

11   basis of the applicant's speech or viewpoint, religious or otherwise. Where a zoning

12   regulation serves legitimate purposes unrelated to the regulation of speech, it is deemed

13   content neutral even if it has some incidental effects on speech activities. *San Jose*

14   *Christian College*, 360 F.3d at 1033; *City of Renton*, 475 U.S. at 48-49.

15        It is beyond serious dispute that zoning regulations generally advance substantial

16   governmental interests. *City of Renton*, 475 U.S. at 50 ["a city's interest in attempting to

17   preserve the quality of urban life is one that must be accorded high respect."]; *Grace*

18   *United*, 451 F.3d at 657. Municipalities have a legitimate interest in regulating the

19   location of assembly uses, including churches, so as to avoid or minimize conflicts with

20   other uses. *Vision Church*, 468 F.3d at 1000.

21        The regulations, however, need not be the least restrictive means available for

22   addressing potential problems. *Ward*, 491 U.S. at 797-798. The "narrow tailoring"

23   requirement is satisfied "so long as the regulation promotes a substantial governmental

24   interest that would be achieved less effectively absent the regulation." *Id.* at 799. Here,

25   the City's regulations allow Assembly Uses in all residential zones, and prohibit them in

26   commercial and industrial zones only where necessary to further specific goals and

27   policies reflected in the criteria utilized in establishing the Assembly Use Overlay zone.

28   Pollart Decl., ¶ 7; Exhibit 3. Nothing more is required to satisfy the narrow tailoring

21

1  requirement.  *See Members of City Council of City of Los Angeles v. Taxpayers for*

2  *Vincent*, 466 U.S. 789, 808, 104 S.Ct. 2118 (1984) [upholding total ban on private signs on

3  public rights-of-way on grounds that "By banning these signs, the City did no more that

4  eliminate the exact source of the evil it sought to remedy."].

5      Zoning regulations also may not "unreasonably limit alternative avenues of

6  communication," meaning that they may not unreasonably restrict the total amount of land

7  available for expressive uses.  *City of Renton*, 475 U.S. at 53-54.  As discussed previously,

8  Assembly Uses are allowed in over half the total area of the City, and many, many more

9  properties than the apparent demand for religious uses requires.  Pollart Decl., ¶ 12;

10 Exhibit 9.  The City is not required to guarantee that all of these sites are currently

11 available for sale and development or conversion for churches or other First Amendment

12 uses.  *City of Renton*, 475 U.S. at 53-54 ["That respondents must fend for themselves in the

13 real estate market, on an equal footing with other prospective purchasers and lessees, does

14 not give rise to a First Amendment violation."]; *Topanga Press*, 989 F.2d 1524, 1536.

15     C.    *The City Has Not Interfered with The Church's or Its Members Freedom to*

16           *Assemble or Freedom of Association.*

17     The Church's Sixth and Seventh Causes of Action allege in conclusory fashion that

18 the City has deprived the Church of its "right to freely assemble" and "right to freely

19 associate" for the "purposes of religious worship and expression."  FAC ¶¶ 109, 112.

20 Again, the Church does not allege that the City has taken any actions to interfere with or

21 deter participation in activities at the Church's current Manor location.  These claims

22 therefore fail for much the same reasons as the Church's Free Exercise and Free Speech

23 claims.  *See San Jose Christian College*, 360 F.3d at 1033; *Grace Church*, 451 F.3d at 658;

24 *C.L.U.B*, 342 F.3d 752, 765; *Lighthouse Institute*, 406 F.Supp.2d 507, 521-522.  While the

25 City has declined to approve a proposed new Assembly Use on the vacant Catalina Street

26 property, this does not violate the Constitution.

27 ///

28 ///

1      D.     *The City Has Not Denied the Church Equal Protection of the Law.*

2      The Church's Eighth Cause of Action asserts a denial of the Church's right to Equal

3 Protection. The claim incorporates and is presumably based on the same allegations as the

4 Church's Equal Terms claim under RLUIPA. FAC ¶¶ 114-115.

5      Absent allegations of such invidious intentional discrimination – and none are

6 presented – the Church's Equal Protection claim is reviewed under the rational basis test.

7 *C.L.U.B.*, 342 F.3d at 766; *Congregation Kol Ami v. Abington Township*, 309 F.3d 120,

8 133 (3rd Cir. 2002). To sustain the claim, the Church must show (1) that it has been

9 treated differently (and less favorably) than other *similarly situated* individuals or entities;

10 and (2) that the dissimilar treatment is irrational, *i.e.* bears no reasonable relationship to a

11 legitimate governmental purpose. *Christian Gospel Church, Inc. v. City and County of*

12 *San Francisco*, 896 F.2d 1221, 1225-1226 (9th Cir. 1990), *cert den.* 498 U.S. 999 (1990);

13 *Congregation Kol Ami*, 309 F.3d at 133-134, 136-137.

14      In light of the previous discussion of the Church's Equal Terms claim, the Church's

15 Equal Protection claims also fail on this basis. The City may rationally distinguish

16 between religious and other assembly uses on the one hand, and commercial recreational

17 and entertainment uses on the other. *See* section III, *supra.* Although the Church

18 complains that the proximity of businesses with HMBPs was not considered in the initial

19 site selection process for the Assembly Use Overlay zone, the Church cannot show any of

20 the following; (1) that its rezoning application was actually rejected on this ground, as

21 opposed to other legitimate grounds; (2) that the City has or will fail to consider HMBPs in

22 other cases involving site-specific applications for Assembly Uses; (3) that consideration

23 of HMBPs was arbitrary and failed to serve any legitimate public purpose.

24      E.     *The City Did Not Violate the Church's Right to Due Process.*

25      The Church's Ninth and final Cause of Action alleges that the City denied the

26 Church due process of law by (1) denying the Church the use of the Catalina Street property

27 based on vague and indefinite General Plan, zoning and other criteria; and (2) "intentionally

28 prolonging the Assembly Use Permit application process in order to obstruct, delay and

1  prevent the CHURCH's use of the CATALINA property."  FAC ¶ 118.  Neither of these

2  claims asserts a legally colorable due process claim, nor is supported by fact.

3      To state any kind of due process claim, the plaintiff must allege the deprivation of

4  some legally protected interest in life, liberty or property.  *Board of Regents of State*

5  *Colleges v. Roth*, 408 U.S. 564, 570-572, 92 S.Ct. 2701 (1972); *Wedges/Ledges of*

6  *California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994); *Prater v City of*

7  *Burnside, Ky.*, 289 F.3d 417, 431-432 (6th Cir. 2002).  The extent of legally protected

8  property rights is generally defined by "existing rules or understandings that stem from an

9  independent source such as state law."  *Roth*, 408 U.S. at 577.  The Church does not have a

10  protected property or liberty interest in constructing religious assembly facilities on the

11  Catalina Street property.  This use of the property has never been legally authorized or

12  actually occurred.  *Wedges/Ledges*, 24 F.3d at 62.

13      The Church here cannot claim a deprivation of property under either a vested rights

14  or entitlement theory.  It is undisputed that the Church's Catalina Street property has never

15  been zoned to allow assembly uses, either with or without a CUP.  Although the Church

16  *applied* for rezoning of the property, rezoning is under California law a purely legislative

17  act.  *Arnel Development Co. v. City of Costa Mesa*, 28 Cal.3d 511, 516, 169 Cal.Rptr. 904

18  (1980).  Legislative decisions are in turn generally constrained by no substantive criteria at

19  all beyond the minimum constitutional requirement that such actions be rationally related

20  to legitimate governmental interests.  *Id.*  The Church therefore clearly has no protected

21  property interest in its applications to rezone the Catalina Street property.

22      While the Church might also conceivably claim a liberty interest in its right to

23  conduct religious activities, any claim based on this theory must also fail.  There is no

24  recognized liberty interest in building a church on property that has never been devoted to

25  such use and has never been zoned for it.

26          1.    *The Vagueness Claim.*

27      The Church's vagueness claim necessarily fails for lack of a protected liberty

28  property interest.  Moreover, the reach of a due process challenge based on the vagueness

24

1  doctrine is inapplicable here.  The concerns implicated by overly vague laws are (1) that

2  they fail to give persons "of ordinary intelligence" fair notice of what the law requires and

3  to conform their conduct accordingly, and (2) they invite arbitrary, subjective and

4  inconsistent enforcement by failing to establish ascertainable standards.  *Village of Hoffman*

5  *Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186 (1982); *Konikov v.*

6  *Orange County, Fla.*, 410 F.3d 1317, 1329-1331 (11th Cir. 2005).  A void-for-vagueness

7  challenge, however, necessarily contemplates a statute or ordinance that directly regulates

8  conduct, and whose violation gives rise to potential loss of life, liberty or property, *i.e.*

9  criminal or civil prosecution.  The due process clause does not restrict the factors that a

10  governmental agency may consider when deciding whether or not *to adopt or amend* an

11  existing regulation, as opposed to apply it to particular conduct.

12              2.        *The Claim for Unreasonable Delay.*

13        The Church's claim for undue delay also fails for lack of a protected liberty or

14  property interest.  There is no constitutional provision that requires a City to meet time

15  limits when considering zoning or rezoning measures.  The record further does not establish

16  any arbitrary or unreasonable delay.  Pollart Decl., ¶¶ 15, 18, 20, 24.  The City was

17  confronted with a major policy issue by the Church's initial application.  It nevertheless

18  moved forth deliberately and completed a major amendment to its existing zoning scheme

19  within one year, and acted upon the Church's subsequent rezoning application in little more

20  time than necessary to process the application, prepared staff reports and notice public

21  hearings.  Pollart Decl., ¶ 20, 24-35.  There is no basis for a claim of unreasonable delay.

22  VI.    *CONCLUSION*

23        In light of the foregoing, City respectfully requests this Honorable Court grant its

24  motion for summary judgment.

25  Dated: August 27, 2008          MEYERS, NAVE, RIBACK, SILVER & WILSON

26

27                                        By_____/s/_____

28                                             DEBORAH J. FOX
                                             Attorneys for Defendant
                                             CITY OF SAN LEANDRO

25