1   Jayne W. Williams, Esq. (SBN: 63203)
    jwilliams@meyersnave.com
2   Deborah J. Fox, Esq. (SBN: 110929)
    dfox@meyersnave.com
3   Philip A. Seymour (SBN: 116606)
    pseymour@meyersnave.com
4   Kimberly M. Drake, Esq. (SBN: 209090)
    kdrake@meyersnave.com
5   MEYERS, NAVE, RIBACK, SILVER & WILSON
    555 12th Street, Suite 1500
6   Oakland, California  94607
    Telephone: (510) 808-2000
7   Facsimile: (510) 444-1108

8   Attorneys for Defendant
    CITY OF SAN LEANDRO
9

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13  INTERNATIONAL CHURCH OF THE          Case No.  C07-03605-PJH
    FOURSQUARE GOSPEL,
14                                        DECLARATION OF DEBBIE
15                  Plaintiff,            POLLART IN SUPPORT OF CITY'S
                                          MOTION FOR SUMMARY
16  v.                                    JUDGMENT

17                                        Hearing:
    CITY OF SAN LEANDRO, a municipal      Date:        October 1, 2008
18  corporation,                          Time:        9:00 a.m.
19                                        Courtroom:   3
                    Defendant.
20
    FAITH FELLOWSHIP FOURSQUARE           Honorable Phyllis J. Hamilton
21  CHURCH,                               Complaint Filed: 7/12/07
22
23               Real Party in Interest.
24
25
26
27
28

---

Declaration of Debbie Pollart in Support of Motion for Summary Judgment          [C07-03605-PJH]

1    I, Debbie Pollart, declare as follows:

2    1.    The following facts are within my personal knowledge and, if called upon to
3    testify, I could and would testify competently with respect thereto.

4    2.    I was Planning Manager for the City of San Leandro ("the City") from
5    November 2002 through May 2007. I worked as a consultant for the City from 1998 to
6    2000 and was hired as a full-time employee in 2000. I have been a full-time employee
7    with the City of San Leandro for the past eight years. I am currently the Facilities & Open
8    Space Manager in the City's Public Works Department.

9    3.    In my capacity as Planning Manager, I also served as the Secretary to the
10    San Leandro Planning Commission ("Planning Secretary"). As the Planning Secretary, I
11    reviewed all minutes, prepared the agenda and furnished all members of the Commission
12    with a copy of the agenda and copies of all correspondence and other papers relating to
13    items appearing on the agenda.

14    4.    In my capacity as Planning Manager, I also personally dealt with Faith
15    Fellowship Foursquare Church and its representatives (hereinafter the "Church") on a
16    number of different occasions, in connection with their current location at 577 Manor
17    Boulevard, and their property located at 14600 and 14850 Catalina Street.

18    PERMITTED RELIGIOUS ASSEMBLY USES IN SAN LEANDRO

19    5.    At the present time, and based on information known to the City, there are a
20    total of 45 churches operating within the City of San Leandro, including the religious
21    assembly facilities operated by the Church at 577 Manor Boulevard.

22    6.    Under the City's current zoning, churches and other religious assemblies
23    generally are classified as an "Assembly Use," which is defined in Article 3 of the Zoning
24    Code as follows:

25    "Assembly Uses. Meeting, recreational, social facilities of a private or non-
26    profit organization primarily for use by member or guests, or facilities for
27    religious worship and incidental religious education (but not including
28    schools as defined in this section). This classification includes union halls,

1

1    social clubs, fraternal organizations, and youth centers." Zoning Code,

2    Article 3, Exhibit 2, 008.

3        7.    Churches and religious assemblies are and have been allowed in the City's

4    residential zones with a conditional use permit ("CUP") for many years.  As a result, most

5    existing churches located in the City are located in residential zones.  Exhibit 3 is a true

6    and correct copy of Article 5 of the City of San Leandro Zoning Code, which sets forth the

7    zoning regulations for residential zoning districts.  As indicated in sections 2-504.B, 2-

8    506.B, 2-508.B and 2-510.B of Article 5, Assembly Uses are conditionally permitted uses

9    (*i.e.* permitted with a CUP) in all residential zones.

10       8.    Exhibit 8 is a true and correct copy of the zoning map of the City showing the

11   residential zones in which churches are permitted with a CUP.  As indicated on the legend,

12   residential zones are shown in colors in the yellow-tan-orange spectrum.  These areas

13   comprise about 52% of the City's total land area, with the RS single family residential zone

14   comprising the great majority of that area.  Based on a review of the zoning map and parcel

15   information in the City's information system, approximately 78 parcels in the City's

16   residential zones are over 3.5 acres in size.

17       9.    Since March 2007 Assembly Uses, including churches, are also permitted

18   with a CUP in industrial and commercial zones that are also designated with the Assembly

19   Use Overlay.  The Assembly Use Overlay zoning regulations were adopted as the result of

20   events described elsewhere below.  Exhibit 9 is a map entitled "City of San Leandro

21   Assembly Use Criteria Study" showing the location and extent of properties included in

22   the Assembly Use Overlay Zone.

23       10.   A total of 196 individual parcels ranging in size from .11 to 27.15 acres are

24   located in the Assembly Use Overlay zone.  Of these individual parcels, four are over 10

25   acres in size, eight are over 5 acres in size and 24 are over 2 acres in size.  The remaining

26   parcels are smaller parcels which could be individually developed with a religious facility

27   or other assembly use, or could be aggregated into larger parcels to accommodate larger

28   facilities.  All parcels within the Assembly Use Overlay zone are located in areas

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                    [C07-03605-PJH]

1    containing 2 or more contiguous acres of land subject to the Assembly Use Overlay
2    zoning. As shown on Exhibits 9, 10, there are a total of thirteen such areas in industrial
3    and commercially zoned areas of the City. The Assembly Use Overlay zoning has been
4    deliberately applied only to areas of two or more contiguous acres of land to accommodate
5    larger churches where the financial resources exist to acquire the land and develop these
6    churches.

7        11.    Exhibit 10 to this declaration is a true and correct copy of a printout of a
8    computer generated listing of all individual parcels included in the Assembly Use Overlay
9    zone, showing the parcel number, address, current zoning, and size in square feet and in
10   acres for each. The information was produced by the GIS data system maintained by the
11   City and used for all zoning and other City matters concerning property locations and
12   boundaries.

13       12.    The total amount of land included in the Assembly Use Overlay zone is
14   approximately 220 acres. The total number of acres of land in which Assembly Uses are
15   conditionally permitted in the City (*i.e.* the sum of residential areas and areas zoned with
16   the Assembly Use Overlay) is approximately 4,650 acres, or 54.6% of the total area of the
17   City.

18       13.    During the time I have been employed by the City, the City has received
19   applications to open a total of two new churches in the City. The first of these was
20   approved by the City in 2000. The second sequence of applications were for the proposed
21   relocation of the Faith Fellowship Foursquare Church to 14600-14850 Catalina Street
22   which is the subject of this legal action.

23       14.    I understand that few or no new churches were opened in the City of San
24   Leandro in the decade prior to my employment with the City. This is consistent with the
25   general development status and population characteristics of the City. As indicated in the
26   City's General Plan, the City is almost entirely built out, and there are only a few scattered
27   parcels of vacant developable land left in San Leandro. Almost all new construction is the
28   result of redevelopment activity involving improvements on existing developed properties,

1 | or demolition and replacement of older structures and improvements with newer

2 | development. The 2000 census placed the total population of the City at 79,462 persons.

3 | THE ICFG APPLICATION AND

4 | ADOPTION OF THE ASSEMBLY USE OVERLAY ZONING

5 | 15.     On May 3, 2006, in my capacity as Planning Manager, I, along with then-

6 | acting Community Development Director Hanson Hom and then-acting Economic

7 | Development Director Luke Sims, met with Church representatives regarding their desire

8 | to relocate to a non-residential district. The Church representatives informed us that they

9 | wanted to relocate to 14600 and 14850 Catalina Street (the "Catalina Street property"),

10 | which is within the City's Industrial Park ("IP") zoning district, and adjacent to several

11 | manufacturing plants such as Kennerly Spratling, a manufacturer of plastics, Otis

12 | Spunkmeyer, a large scale frozen/baked goods manufacturer, Coast Crane, which sells,

13 | leases and/or services construction cranes, and Challenge Dairy, a manufacturer of dairy

14 | products. During the May 3rd meeting, staff informed the Church representatives that,

15 | pursuant to the San Leandro Zoning Code (the "Zoning Code"), religious assembly uses

16 | were conditionally permitted uses in the City's Residential zoning district only. We

17 | further informed the Church representatives that the current Zoning Code did not allow

18 | assembly uses within the IP district. We advised the Church representatives that in order

19 | to relocate to the Catalina Street property, two changes to the Zoning Code were needed:

20 | (1) amendment of the Zoning Code to make assembly a conditionally permitted use in the

21 | Industrial Limited ("IL") zoning district, and (2) an amendment of the zoning map to

22 | designate the Catalina Street property as IL.

23 | 16.     At this time (and until the present) the City's Zoning Code had three

24 | industrial zoning classifications, *i.e.* the IL (Industrial Limited) zone; the IP (Industrial

25 | Park) zoning district; and the IG (Industrial General) zoning district. Exhibit 4 is a true

26 | and correct copy of Article 7 of the Zoning Code which contains the basic Zoning Code

27 | regulations for industrial zones.

28 | ///

4

1            a.     The IL (Industrial Limited) zoning is intended to provide areas

2    appropriate for low- to moderate- intensity industrial uses and commercial services uses

3    and light manufacturing capable of being located near residential areas without excessive

4    impacts.  This zoning is also intended to protect the permitted industrial and commercial

5    uses from competition for space and potential conflicts with different types of commercial,

6    industrial, and other uses. *See* Exhibit 4, Article 7, Section 2-700, p. 021.  The IL zone is

7    thus typically employed on the City's zoning map as a buffer area between residential uses

8    and more intensive industrial uses, or in areas where more intensive industrial use is not

9    appropriate due to proximity of residential of other sensitive uses.

10            b.     The IG (Industrial General) zoning is intended to "provide and protect

11    existing industrial sites and allow for continued operation of existing general industry,

12    subject to performance standards and buffering requirements to minimize potential

13    environmental impacts.  Certain types of retail sales are permitted under specified

14    limitations." Exhibit 4, Article 7, § 2-700, p. 021.  This zone serves traditional and newer

15    industrial uses which often have impacts or operating characteristics that make them

16    unsuitable for location near residences, traditional commercial uses and other sensitive

17    uses, *e.g.* high volumes of truck traffic, noise, releases of smoke, dust, diesel fumes or

18    other pollutants, night lighting.

19            c.     The IP (Industrial Park) zone is intended to "provide and protect lands

20    for the development in a landscaped setting of communities of high technology, research

21    and development facilities, limited industrial activities (including production and assembly

22    but not raw materials processing or bulk handling), small scale warehousing and

23    distribution, industrial office centers, certain types of specified retail sales, and related

24    uses." Exhibit 4, Article 7, § 2-700, p. 021.  The IP zoning is intended to attract and

25    maintain newer high technology light industrial, office and service uses that are important

26    to maintaining the economic and job base for the community in the 21st century economy.

27        17.    At the time of the May 3, 2006 meeting, City staff advised the Church

28    representatives to apply for a rezone from IP to IL because, from a staff perspective, the IL

5

1   zoning district was more amenable to assembly use than the IP zoning district.  More
2   specifically, the IL district's purpose is to provide areas of low-to-moderate intensity
3   industrial uses which are capable of being located adjacent to residential areas and serve as
4   a buffer between residential areas and light industry.  In contrast, the IP zoning designation
5   is meant to serve commerce, high technology, production and assembly, retail and related
6   uses.

7           18.    At the May 3, 2006 meeting neither I, Mr. Hom nor Mr. Sims made any
8   representation to the Church representatives present about the likelihood of approval of the
9   rezone request or a conditional use permit for the proposed church at the Catalina Street
10  properties.  Approval of these measures would require discretionary action by the City
11  Planning Commission and City Council after consideration of all relevant factual and
12  policy considerations, and could not be predicted.  I also did not at any subsequent time
13  advise Church representatives that approval of their application was likely to occur, nor to
14  my knowledge did any other person associated with the City.  I am certain that neither I or
15  anyone else associated with the City at any time advised Church representatives that it
16  would be safe or prudent to purchase the Catalina Street property before a final decision
17  had been made on the Assembly Use Overlay zoning, or before a final decision on the
18  Church's subsequent application for a zoning amendment to have the property included in
19  the Assembly Use Overlay zone.

20          19.    On May 19, 2006 I received and processed the Church's application to
21  rezone the Catalina Street property from IP to IL, and to amend the Zoning Code to allow
22  religious assembly use in the IL zoning district.  A true and correct copy of the rezoning
23  application subsequently filed by the Church is attached hereto as Exhibit 26.

24          20.    After meeting with Church representatives and receiving the application, I
25  and other City staff began discussing some of the larger planning and policy issues, and
26  particularly issues of consistency with the City's legally adopted General Plan, raised by
27  the proposed zoning amendment.  The amendment to the text of the Zoning Code to allow
28  assembly uses in the IL zone would apply to all properties zoned IL, and therefore had

6

1   City-wide implications. The expansion of assembly uses outside of residential zoning

2   districts presented a major shift in policy regarding location of assembly uses in the City.

3   The proposed expansion of assembly uses outside of residential districts would therefore

4   require input and analysis and eventual final action from the City Council, Planning

5   Commission, and Board of Zoning Adjustments. Matters of particular concern were the

6   potential for conflicts between industrial and assembly uses, and potential effects on the

7   City's industrial employment and economic base.

8         21.    Under California law, zoning ordinances must be consistent with the City's

9   General Plan. (Government Code § 65860.) A true and correct copy of relevant portions

10   of the City's current General Plan is attached as Exhibit 7 to this declaration. The location

11   of assembly uses in industrial zones posed two sets of issues with respect to consistency

12   with the General Plan and also generally sound planning practices. The first set of issues

13   related to ensuring compatibility between assembly uses and industrial uses, *i.e.* avoiding

14   unacceptable impacts such as noise, dust or constant truck traffic on permitted assembly

15   uses, and, conversely, avoiding unacceptable constraints on industrial operations in order

16   to avoid potential impacts on, or complaints from, permitted assembly uses. The second

17   set of concerns related to potential displacement of industrial and commercial uses by

18   assembly uses, thereby affecting employment opportunities and the economic base of the

19   City. Both of these potential problem sets are recognized in the General Plan. *See* General

20   Plan Land Use Element, Exhibit 7, pp. 118-121.

21         22.    The General Plan contains a number of policies and provisions where were

22   directly relevant to these two sets of issues. These include the following:

23         a.    The Land Use Element of the General Plan provides, Exhibit 7 at 119:

24      "The areas most suitable for conversion to non-industrial uses are those

25      located adjacent to existing housing, or in areas which lack the amenities to

26      meet the needs of modern industry. Such areas exist along San Leandro

27      Boulevard, Alvarado Street, and Marina Boulevard."

28

7

1        b.      General Plan Policy 10.04 (Exhibit 7, Land Use Element, p.
2    141) provides:
3        "*Industrial Sanctuary* – Protect the City's major industrial areas from
4        encroachment by uses that are potentially incompatible with existing viable
5        industrial activities, or which may inhibit the ability of industry to operate
6        effectively."
7        c.      General Plan Policy 33.04 (Exhibit 7, Environmental Hazards
8    Element, p. 180) provides:
9        "*Separation from Sensitive Uses*.  Provide adequate and safe separation
10   between areas where hazardous materials are present and sensitive uses such as
11   schools, residences and public facilities."
12       d.      General Plan Policy 7.09 (Exhibit 7, Land Use Element, p.
13   129) establishes the following policy:
14       "Build upon the locational strengths and transportation features of West San
15       Leandro to support the area' continued development as a major industrial,
16       technology, and office employment center.  In accordance with the West San
17       Leandro Plan, limit the encroachment of incompatible residential and retail
18       uses into the area, and promote additional development and redevelopment
19       with manufacturing, technology, warehouse and distribution, offices/flex and
20       similar uses."
21       e.      General Plan Policy 7.10 (Exhibit 7, Land Use Element, 130)
22   provides:
23       "Facilitate the gradual transition of the South-of-Marina (SOMAR) area into
24       a cohesive light industrial district characterized by light manufacturing,
25       office/flex, research and development, bio-medical, e-commerce, and similar
26       uses, along with complementary business services and employee amenities."
27       f.      General Plan Policy 13.01 (Exhibit 7, Transportation Element, 179)
28   provides:

8

1    "Ensure that future land use development decisions are in balance with the
2    capacity of the City's transportation system."

3    23.    The City's Zoning Code also contains similar general policies requiring the
4    City to generally balance and maintain compatibility between adjoining uses to the extent
5    possible. Section 1-104.A of Zoning Code, for example, states that a basic goal of the
6    Zoning Code is to "Preserve the character and quality of residential neighborhoods and
7    commercial and industrial areas consistent with the character of the development districts
8    of the City." Zoning Code, Article 1, RFJN Exhibit 1, p. 005.

9    24.    As a result of these internal discussions, City staff advised the Church by
10   letter dated June 29, 2006, that a rezoning of the nature proposed in their application would
11   require thorough analysis by staff, the Planning Commission, the Board of Zoning
12   Adjustments, and, ultimately the City Council. A true and correct copy of the City's letter
13   to Jim Lee on behalf of the Church, dated June 29, 2006, is submitted concurrently as
14   Exhibit 25. This would in turn prevent any prompt action on their application for a
15   rezoning.

16   25.    After further discussion and evaluation of the relevant planning
17   considerations and City policies in the General Plan, staff identified two principal
18   alternatives for expanding permissible areas for assembly uses.

19   26.    The first alternative was to make assembly uses a conditionally permitted use
20   in all areas zoned IL. This alternative would have allowed about 94 acres of additional
21   property available for assembly uses in the City, although some of this property included
22   railroad rights-of-way.

23   27.    The second alternative was to create an overlay zoning designation that
24   could be applied to properties that were potentially suitable for assembly uses in any non-
25   residential zone.

26   28.    To develop the second alternative, staff identified a number of initial site
27   selection criteria based on General Plan policies and relevant planning considerations.
28   Among these criteria were that the sites (1) would not be located along major commercial

9

1  corridors, in order to preserve the commercial character of these areas; (2) the overlay
2  would apply only to contiguous industrially zoned areas of 2 acres or more, in order to
3  allow for development of larger churches; and (3) the site would abut on or be within ¼
4  mile of a designated arterial street. The ¼ mile distance specification in this last criterion
5  was adopted on the basis of a recommendation of the Engineering & Transportation
6  Department. The application of these initial selection criteria resulted in identification of
7  some 13 potential new areas, totaling some 218 acres, for assembly uses in City industrial
8  zones.

9       29.    On October 12, 2006 the two alternatives developed by staff were presented
10 to the Business Development Sub-Committee of the City Council at its regular meeting of
11 that date. The Business Development Sub-Committee is a standing sub-committee of the
12 City Council intended to monitor matters affecting the economic development and welfare
13 of the City and to provide consultation and direction to staff on pending matters where
14 policy guidance is desirable. After the staff presentation and discussion, the members of
15 the Sub-Committee expressed a strong preference for the second alternative, *i.e.* the
16 overlay zoning approach, because it appeared to provide greater opportunities for
17 expansion of religious and other assembly uses in the City. A true and correct copy of the
18 staff report prepared for the Business Development Sub-Committee meeting is submitted
19 as Exhibit 11. A true and correct copy of the Minutes of the October 12, 2006 Business
20 Development Sub-Committee meeting is submitted as Exhibit 12.

21      30.    On October 19, 2006 the City Planning Commission and Board of Zoning
22 Adjustments conducted a joint work session to discuss three major planning issues being
23 addressed by the City, including the issue of assembly uses in industrial zones. At this
24 meeting City staff again presented the two planning alternatives developed by staff for
25 consideration, *i.e.* the options of (1) allowing assembly uses as conditionally permitted
26 uses in the IL (light industrial) zone; or (2) applying an overlay zoning to suitable
27 properties in all industrial zones. At the conclusion of the work session, the Board and
28 Commission members voted 7-1-1 to support pursuit of the second option, *i.e.* the overlay

1  zoning approach.  The comments of the Commissioners and Board members indicated that
2  the second alternative was preferred because it would allow for greater expansion of
3  religious and non-religious assembly uses in the City while also being consistent with
4  other established goals and policies in the General Plan.  A true and correct copy of the
5  staff report prepared for the October 19, 2006 joint workshop is submitted as Exhibit 13 to
6  this declaration.  A true and correct copy of the Minutes of the joint workshop is submitted
7  as Exhibit 14 to this declaration.
8      31.    After the October 19, 2006 joint workshop, staff continued to refine the
9  criteria for selection of properties for inclusion in the assembly use overlay zone, and
10  began drafting proposed text for the actual Zoning Code amendments that would create the
11  Assembly Use Overlay zoning classification and regulations.  The eight (8) criteria used to
12  finally select industrial zoned properties for inclusion in the proposed Assembly Use
13  Overlay zone were the following:
14      •    The site was not located along a major commercial corridor.
15      •    The site was not located in the Downtown, Bayfair, Marina
16          Boulevard/SOMAR or West San Leandro General Plan special "Focus
17          Areas."
18      •    The site was not located in a regional-serving retail area.
19      •    The site was not located inside the Downtown Transit-Oriented
20          Development Strategy ("TOD") study area.
21      •    The site abuts or was within ¼ mile of an arterial street.
22      •    The site was not located in a residential zone.  (Churches are already
23          permitted with a CUP in all City residential zones.)
24      •    The site was not public land or zoned Public Service ("PS"), Open Space
25          ("OS") or Commercial Recreation ("CR"), or owned by an Exempt Public
26          Agency or public utility.
27      •    The site was within a contiguous overlay area of 2 or more acres.
28  ///

11

1   32.    The eight selection criteria were all based on General Plan policies and goals
2   discussed previously in this declaration.

3   33.    The foregoing criteria resulted in selection of 196 individual properties in 13
4   contiguous areas for inclusion in the Assembly Use Overlay zone.

5   34.    On February 22, 2007 the City's Planning Commission conducted a public
6   hearing on the proposed Assembly Use Overlay zoning amendments.  After receiving
7   public testimony, including extensive testimony from representatives and supporters of the
8   Church, the Planning Commission voted to recommend approval of the Assembly Use
9   Overlay zoning amendments to the City Council.  A true and correct copy of a Staff Report
10  for a regular meeting of the Planning Commission on February 22, 2007 is submitted as
11  Exhibit 15 to this declaration.  A true and correct copy of the Minutes from the February
12  22, 2007 Planning Commission meeting is submitted as Exhibit 16 to this declaration.

13  35.    On March 19, 2007 the City Council conducted its public hearing on the
14  proposed Assembly Use Overlay zoning amendments.  After hearing public testimony,
15  which again included extensive testimony from representatives and supporters of the
16  Church, the City Council voted unanimously (7-0) to adopt Ordinance Nos. 2007-005 and
17  2007-006 which, respectively, amended the text of the Zoning Code to add the Assembly
18  Use Overlay zoning designation and standards, and amend the zoning map to apply the
19  Assembly Use Overlay zoning designation to 196 parcels in City industrial zones.  A true
20  and correct copy of a Staff Report for the City Council meeting of March 19, 2007 is
21  submitted as Exhibit 17 to this declaration.  A true and correct copy of the Minutes of the
22  March 19, 2007 City Council meeting is submitted as Exhibit 18 to this declaration.   True
23  and correct copies of Ordinance No. 2007-005 and Ordinance No. 2007-006 are submitted
24  as Exhibits 19 and 20 to this declaration.

25  THE CHURCH'S SUBSEQUENT REZONING APPLICATIONS

26  36.    Based on the eight selection criteria that had been utilized to select properties
27  for inclusion in the Assembly Use Overlay zone, the Catalina Street property purchased by
28  the Church had not been included in the Assembly Use Overlay zone.  Representatives of

12

1   the Church were aware of this as the proposed Assembly Use Overlay zoning amendments
2   went through the public hearing process, and had communicated their requests to have the
3   Catalina Street property included in the overlay zone, or to be otherwise allowed to
4   develop a church on the property, to City staff, to the Planning Commission and to City
5   Councilmembers both at public hearings and through other communications.  City staff
6   consistently advised Church representatives that the staff recommendation concerning the
7   properties to be included in the Assembly Use Overlay zone would be based strictly on the
8   objective planning criteria developed from the General Plan, and would not be changed on
9   a case-by-case basis for individual properties that did not meet all the criteria.  Staff also
10  advised Church representatives, however, that the final decision as to which properties
11  were included in the Assembly Use Overlay zone would be made by the City Council, and
12  that they had the right to apply for an amendment to the zoning map to include their
13  property in the Assembly Use Overlay zone if they chose to do so.  However, neither I nor
14  any other member of the City staff to my knowledge advised Church representatives that
15  staff would support the amendment, or that the amendment was likely to be approved by
16  the Planning Commission or City Council.

17          37.     On March 20, 2007, the day following the City Council hearing on the
18  Assembly Use Overlay zoning amendments, representatives of the Church filed an
19  application to amend the zoning of their Catalina Street property from IP to IP with the AU
20  (Assembly Use) Overlay.  A true and correct copy of this application is submitted as
21  Exhibit 26 to this declaration.

22          38.     On April 12, 2007 the Planning Commission conducted a public hearing on
23  the rezoning application.  Following the close of the public hearing, the Planning
24  Commission voted to deny the application for rezoning.  A true and correct copy of a Staff
25  Report for the Planning Commission of April 12, 2007 is submitted as Exhibit 21 to this
26  declaration.  A true and correct copy of the Minutes of the April 12, 2007 Planning
27  Commission meeting is submitted as Exhibit 22 to this declaration.
28  ///

13

1    39.    The Church appealed the Planning Commission decision to the City Council

2    on April 16, 2007.

3    40.    On May 7, 2007 the City Council conducted a public hearing on the appeal.

4    After hearing public testimony from the Church's representatives and supporters, the City

5    Council closed the public hearing and voted to deny the appeal.  A true and correct copy of

6    a Staff Report for the City Council hearing of May 7, 2007 is submitted as Exhibit 23 to

7    this declaration.  A true and correct copy of the Minutes of the March 7, 2007 City Council

8    meeting is submitted as Exhibit 24 to this declaration.

9    41.    The primary grounds for denial of the rezoning application was that the

10   Catalina Street property did not meet two of the eight criteria previously used in selecting

11   properties for inclusion in the Assembly Use Overlay zone.  Specifically, the Catalina

12   Street property was located in a general plan "focus area" (the West San Leandro Business

13   District), and was located more than ¼ mile from a designated arterial street.  Policy 7.09

14   of the City's General Plan, quoted in paragraph 22.d above, establishes a policy of

15   developing the West San Leandro industrial area as major industrial, technology, and

16   office employment center, and accordingly promoting additional development and

17   redevelopment of such uses while limiting encroachment of incompatible uses in the area.

18   Continued industrial development of this area is one of the key elements of the General

19   Plan strategy for maintaining a viable economic and employment base in the City.  *See*

20   Exhibit 7, General Plan Land Use Element, pp. 111-121.  It was the belief of City staff,

21   and apparently the Planning Commission and City Council, that preservation of this area

22   and the Catalina Street property in particular, for some form of industrial or service use

23   consistent with the goals of Policy 7.09 was important to the City's welfare and to

24   maintaining the integrity of the General Plan.

25   42.    The staff recommendation also reflected the fact that City staff did not

26   believe it was appropriate to abandon the objective criteria that had been used to determine

27   the extent of the Assembly Use Overlay zone in the immediately preceding Assembly Use

28   Overlay zoning amendment process.  During the process of developing the Assembly Use

14

1    Overlay zone, staff had considered alternate site selection approaches under which
2    properties might be included if they met fewer than all 8 of the selection criteria developed
3    from the General Plan. Staff had rejected this approach because it quickly led to arbitrary
4    and inconsistent results. Staff was not presented with any new information during the
5    Church's rezoning application process that suggested that the selection criteria relied on in
6    preparing the City-wide Assembly Use Overlay zoning amendments should be modified or
7    abandoned so soon after completion of that process.

8        43.    The staff report for the Planning Commission and City Council hearings on
9    the rezoning application also notes that staff recommended denial in part on the ground
10   that the Catalina Street property is located in proximity to a significant number of nearby
11   sites operating with Hazardous Materials Business Plans ("HMBPs"). HMBPs are
12   required by California law for any industrial, commercial, or other facility that uses, stores,
13   produces or generates quantities of hazardous materials exceeding certain minimum
14   threshold amounts. The amounts and types of hazardous materials actually present on any
15   property subject to a HMBP varies considerably, and may range, by way of example, from
16   possession of very small amounts of radioactive or biologically hazardous materials
17   through use and storage of significant amounts of industrial chemicals through storage of
18   large quantities of volatile petroleum products.

19       44.    Staff had not previously considered potential site-specific conflicts between
20   assembly uses and hazardous material handlers during the process of preparing the City-
21   wide Assembly Use Overlay zoning amendments because the analysis conducted for the
22   City-wide amendments was directed at City-wide planning and policy concerns.
23   Accordingly, the criteria used in selecting areas for the Assembly Use Overlay zone were
24   based on more generally applicable planning principles rather than site-by-site analysis.
25   Consideration of site-specific factors is generally done at the time application is made for
26   specific use of a particular parcel, *i.e.* at the time a CUP application is filed. Site-specific
27   factors are also typically considered when, as in this case, a rezoning or a general plan
28   amendment application is made for a particular use of a particular parcel. In this particular

1   case, it was understood that if the rezoning was granted, the Church would continue to
2   process and invest further money in an application for a CUP for the Church.  It was
3   therefore staff's conclusion that it was appropriate to consider the number of nearby
4   properties operating with HMBPs at the time of the rezoning decision.  Information
5   gathered for the staff reports indicated that there were eight (8) businesses with HMBPs
6   within 500 feet of the Catalina Street property, and thirteen (13) businesses with HMBPs
7   within ¼ mile of the property.  The primary basis for the staff recommendation for denial
8   of the rezoning application, however, was inconsistency with two of the planning criteria
9   applied to all other sites in the Assembly Use Overlay zone.

10       45.    Based on discussion at the May 7, 2007 City Council hearing on the rezoning
11   application, it does not appear that the presence of nearby facilities operating under
12   hazardous materials plans was considered by the City Council to be a ground for denial of
13   the rezoning application.

14       46.    Neither the City Council, Planning Commission nor City planning staff has
15   adopted any policy or regulation preventing location of Assembly Uses within ¼ mile (or
16   any other specific radius) of one or any other number of sites operating with HMBPs.
17   Generally as a matter of public responsibility City planners and decisionmakers will
18   consider any potential public health or safety issue that comes up in connection with any
19   development proposal, and certainly would do so with respect to assembly uses where
20   there is a high potential for large numbers of untrained individuals of all ages to be
21   exposed in the event of a release of hazardous materials.  Whether the nearby presence of
22   hazardous materials affects the final decision requires consideration of a number of highly
23   site-specific factors, including the types, locations, volatility and quantities of nearby
24   hazardous materials; the potential for actual release of hazardous materials; the numbers,
25   ages and health status of persons potentially exposed; adequacy of access and egress in the
26   event of a release of materials; type and quality of construction of the assembly building;
27   factors affecting dispersal patterns such as the presence or absence of natural or man made
28   barriers and prevailing wind patterns; and any other site-specific factor that could affect

1    the degree of exposure in the event of a release of hazardous materials. The decision
2    would also likely take into account the feasibility of reducing exposure through project-
3    specific mitigation measures, *e.g.* alarm systems, emergency evacuation plans, training of
4    permanent staff, or enhanced construction standards or buffer zones to reduce potential
5    exposure. The degree to which these considerations would affect any future decision to
6    approve a new Assembly Use in any area thus depends on a variety of complex factual
7    issues that cannot be assessed in the abstract, as well as the discretion of the City's elected
8    and appointed decisionmakers, *i.e.* the Planning Commission and the City Council.

9                              THE CHURCH'S CUP APPLICATION

10        47.    On or about March 28, 2007, shortly after the Church submitted its
11    application for rezoning of the Catalina Street property into the Assembly Use Overlay
12    zone, representatives of the Church submitted an application for a CUP for their proposed
13    assembly use of the Catalina Street property. After an initial review, I determined that the
14    CUP application was incomplete and could not be processed. On April 25, 2007, I notified
15    Church representatives that their application was incomplete by a letter addressed to Jim
16    Lee, the designated representative of the Church. The letter also listed the specific
17    additional information that would be necessary to make the application complete. A true
18    and correct copy of my letter to Jim Lee, on behalf of the Church, is attached hereto as
19    Exhibit 27.

20        48.    I did not receive any response to the incomplete letter during my remaining
21    tenure as Planning Manager for the City. I understand that a complete application was
22    eventually submitted and processed by the City at the Church's request even though the
23    rezoning to allow Assembly Uses on the Catalina Street property with a CUP had been
24    denied. The CUP application was eventually denied by the City Planning Commission and
25    City Council on appeal due to inconsistency with the zoning and additional factors such as
26    inadequate parking space.
27    ///
28    ///

17

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct. Executed on this _26_ day of August 2008 in San Leandro,

3    California.

4                                                        _____

5                                                                Debbie Pollart

6    1133707.2
     136.5016

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18