**EXHIBIT 29**

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   INTERNATIONAL CHURCH OF THE
    FOURSQUARE GOSPEL,

5
                      Plaintiff,

6
          vs.                        No. C 07-03605 PJH

7
    CITY OF SAN LEANDRO, et al.,

8
                      Defendants,

9
    _____/

10

11  FAITH FELLOWSHIP FOURSQUARE
    CHURCH,

12
        Real Party in Interest.

13  _____/

14

15

16                  DEPOSITION OF LUKE SIMS

17

    DATE:              MAY 19, 2008

18

19  TIME:              10:50 A.M.

20

21  LOCATION:          MEYERS NAVE RIBACK SILVER & WILSON
                       555 13th Street

22                     Suite 150
                       Oakland, California 94607

23

    Reported By:       Jane H. Stuller

24                     Certified Shorthand Reporter
                       License Number 7223, RPR

25

                                                    Page 1

```
 1                          APPEARANCES

 2

 3      For the Plaintiff:

 4              LAW OFFICE OF PETER MacDONALD
                BY:   PETER MacDONALD
 5              400 Main Street
                Suite 210
 6              Pleasanton, California 94566
                (925) 462-0191
 7              pmacdonald@macdonaldlaw.com

 8                      and

 9              PACIFIC JUSTICE INSTITUTE
                BY:  MATTHEW B. McREYNOLDS
10              Sacramento Office
                9851 Horn Road
11              Sacramento, California 95827-6600
                (916) 857-6900 ext 203
12              mattmcreynolds@pacificjustice.org

13

        For Defendant CITY OF SAN LEANDRO:
14
                MEYERS NEVES RIBACK SILVER & WILSON
15              By:   DEBORAH J. FOX
                333 South Grand Avenue
16              Suite 1678
                Los Angeles, California 90071
17              (213) 626-2906
                dfox@meyersnave.com
18

19

20

21

22

23

24

25
                                                    Page 2
```

1    accommodate the flow of people in and out of a church.

2    There was also a concern about the loss of this office

3    building as a resource for economic development and

4    jobs.  And that's all I can recall.

5    BY MR. MacDONALD:

6        Q.  Does the loss of a particular building -- one

7    building in a city of San Leandro's size have an impact

8    on the overall economic viability of a city?

9            MS. FOX:  Objection; irrelevant, vague and

10   ambiguous as to "one building."

11           THE WITNESS:  I can say this:  A unique

12   building would potentially have that impact, yes.

13   BY MR. MacDONALD:

14       Q.  And you consider this to be a unique building?

15       A.  This building is unique in San Leandro, yes.

16       Q.  How would you describe the building in terms of

17   what type of building it is and what is it that makes it

18   unique?

19       A.  It is a clean modern, one-level office building

20   that is very attractive and very conducive to certain

21   users that would like to be in an industrial area with

22   both office and research and development and a loading

23   dock, which this building has; and there are just

24   literally maybe three or four buildings in all of San

25   Leandro that have those characteristics.

Page 28

1    Q.   In your role as economic development director,

2    are you aware of -- kind of the range at which vacant

3    industrial land sells for in San Leandro?

4    A.   Generally, yes.

5    Q.   Generally, what would that range be?

6    A.   Well, it would depend a great deal on the

7    characteristics of the site.  The value of real estate

8    -- particularly industrial real estate in San Leandro

9    varies quite widely.

10    Q.   So if there weren't a building on this site,

11    what would the approximate range of the value be on the

12    Catalina site?

13         MS. FOX:  Objection; vague as to time.

14         MR. MacDONALD:  The time would be 2006.

15         MS. FOX:  January 1st, 2006?

16         MR. MacDONALD:  Actually --

17         MS. FOX:  Mr. Sims --

18         MR. MacDONALD:  Actually, May 18th, 2006.

19         MS. FOX:  Counsel, we need to take another

20    break.

21         (Recess.)

22    BY MR. MacDONALD:

23    Q.   You mentioned that there were three or four

24    other office buildings of the kind of quality equal or

25    similar to the building at Catalina Court that were

Page 29

1    available for potential employers.

2           What are those buildings that you're aware of?

3        A.   Well, just to clarify.  Not that they were

4    available for potential employers.  I meant to say

5    earlier that there were three or four buildings that I

6    can think of, period, that would be of similar nature to

7    this.  And those would be a -- there's a building at 27

8    or 2500 Merced Street, which is a business-park type of

9    building, heavy office.  There is a building at 2040

10   Williams Street, again, mixed with a heavy office; and

11   then a large building at 1717 Doolittle Drive, which is

12   very heavy office, but also large manufacturing space as

13   well.

14           I will say that this particular building where

15   it's 40-plus thousand square feet of -- of single-floor

16   office with very little manufacturing associated with

17   it, is -- I cannot actually think of another building

18   quite exactly like that building --

19       Q.   Okay.

20       A.   -- anywhere in San Leandro.

21       Q.   Would it surprise you if I told you I talked to

22   the MDL personnel director, and she told me that they

23   relocated from San Leandro to San Ramon because they did

24   not want to be in an industrial district?

25       A.   Yes.

Page 30

1              "I would have to say no."

2              "Question:  Would $200 per square.

3         foot sound like numbers -- a number

4         that's close to what your estimate would

5         be?")

6         THE WITNESS:  I don't know.

7    BY MR. MacDONALD:

8    Q.  If someone told you it was $200 per square

9    feet, would that surprise you or would you think it was

10   higher or lower?

11        MS. FOX:  Objection; lacks foundation.

12        MR. MacDONALD:  $200 per square foot for

13   construction of the kind of office building that is

14   located at Catalina Court.

15        THE WITNESS:  That would strike me as being

16   high.

17   BY MR. MacDONALD:

18   Q.  Okay.  San Leandro puts a fair amount of

19   emphasis on economic development; is that correct?

20   A.  Yes.

21   Q.  Why is that?

22   A.  I think it's because of a tradition that goes

23   back several decades where we had our roots after the

24   turn of the century as an industrial center serving a

25   largely agricultural economy, and then up through the

Page 34

Golden Gate Reporting

1    post-World War II era where California's population

2    rapidly expanded and the city became a large

3    manufacturing center to serve that growing population;

4    and that tradition continues on through today where I

5    think the community felt very proud of that heritage of

6    manufacturing and employment and its status as a major

7    manufacturing employment center, and that it felt that

8    that was an important public policy goal to maintain

9    that employment base and the jobs and the industrial

10    activity that's associated with it.

11    Q.   Since you took over as economic development

12    director in 1998, how has -- how has San Leandro

13    performed in terms of metrics that you're aware of,

14    numbers of jobs, tax base and those kinds of things?

15    A.   Generally speaking, because obviously I can't

16    recall specific statistics, in terms of employment, I

17    think it's generally the case that it has been stabled I

18    would say over that ten-year period to maybe slight --

19    slight increase perhaps, but generally stable.

20         In terms of -- of occupancy of industrial

21    buildings, it has -- occupancy has increased rather

22    dramatically from a vacancy rate close to 20 percent in

23    the early 1990s to what we have today of generally

24    between -- it varies quarter to quarter, but generally

25    between 3 and 5 percent.  So the level of activity as

415.499.DEPO ~ 866.936.DEPO
www.GoldenGateReporting.com                    ©2008

530

Golden Gate Reporting

```
 1        A C K N O W L E D G E M E N T   O F   D E P O N E N T

 2

 3        I, LUKE SIMS, do hereby acknowledge I have read and

 4   examined the foregoing pages of testimony, and the same

 5   is a true, correct and complete transcription of the

 6   testimony given by me, and any changes or corrections,

 7   if any, appear in the attached errata sheet signed by

 8   me.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   06/24/2008

25   Date                        LUKE SIMS
```

Page 63

531

1   Golden Gate Reporting
    35 Mitchell Boulevard, Suite 8
2   San Rafael, California 94903
    (415) 499-DEPO (3376)

3

4                    E R R A T A   S H E E T

5   Case Name:  INTERNATIONAL CHURCH OF THE FOURSQUARE
    GOSPEL VS. City OF SAN LEANDRO, et al.
6   Witness Name:  LUKE SIMS
    DEPOSITION DATE: MAY 19, 2008

7
       Page No.     Line No.          Change
8         4           22         "Pox" to "Fox"

9         5           19         Capitalize "Business Development
                                 Committee" throughout document
10
         10           2-3        "in master of" to "a master of
11                                arts in"

12       10           13         "portable" to "affordable"

13       10           22         "1991" to "1998"

14       12           5          "That's specific area." To "That
                                 specific area?"
15
         12           15         "they're" to "they were"
16
         13           21         "a" to "in"
17
         15           25         "Holm" to "Hom"
18
         16           1          "Matora" to "Mortara"
19
         27           18         "concerned" to "concern"

         35           17         "stabled" to "stable"
20
         41           11         "Mia Lorenz" to "Amalia Lorentz"
21

22                                         06/24/2008

23   Signature                            Date

                                             Page 64

532

**EXHIBIT 30**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INTERNATIONAL CHURCH OF THE
FOURSQUARE GOSPEL,

        Plaintiff,

vs.

CITY OF SAN LEANDRO, a municipal
corporation, DOES 1-50,

        Defendants.

/

**CERTIFIED COPY**

No. C07-03605

DEPOSITION OF GARY MORTARA

VOLUME I

(PAGES 1 - 148)

Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 018667

State of California

Tuesday, May 20, 2008

EMERICK & FINCH (925) 831-9029

Page 1

EXHIBIT 30

533

1            MR. SNIDER:  I should have been a smoker, but I

2    never bothered taking it up.

3            MS. FOX:  No, no, no, you shouldn't have.

4            That Oakland Foursquare facility, was that

5    located in what some would term a strip commercial

6    building?

7       A.   No.

8       Q.   Would it be accurate to describe it as a

9    storefront church?

10      A.   Some might.  I wouldn't.

11      Q.   Was it in a standalone building?

12      A.   Uh-huh.

13      Q.   That's a "yes"?

14      A.   Yes.  I'll get it.

15      Q.   We'll give you a little more coffee and then your

16   verbal responses will improve, I'm sure.

17      A.   I'll get it.

18      Q.   The first time is always difficult.

19           How big was the building?

20      A.   Square footage?

21      Q.   Yes.

22      A.   It was small.  Gosh, I'm going to guess 2 to

23   3,000 square feet.

24      Q.   And how many members did you have in July -- in

25   or about July 1993?

1          A.   About 65.

2          Q.   And how many services were you having on Sundays?

3          A.   One.

4          Q.   Is your wife also a pastor?

5          A.   She is a nurse.

6          Q.   And what is her name, please?

7          A.   Tisha, T-I-S-H-A, Mortara.

8          Q.   All right.  The first church was Oakland

9    Foursquare.  Was the second church Faith Fellowship?

10         A.   Yes.

11         Q.   And when did you move to Faith Fellowship?

12         A.   September of 1993.

13         Q.   And you have been there ever since?

14         A.   Yep -- yes.

15         Q.   Was there any break in your tenure?  By that I

16   mean did you take a year sabbatical?  Did you go someplace

17   else and regain your demonstrative good life for a period

18   of time?

19         A.   No.

20         Q.   In September 1993, where was the location of

21   Faith Fellowship?

22         A.   577 Manor Boulevard, San Leandro, California.

23         Q.   Why did you move to Faith Fellowship?

24         A.   The previous pastor resigned in August of '93

25   because the constituency had dropped down to about -- I

Page 30

1  keeping with your then average weekly attendance or were

2  you hoping to and planning for accommodating growth?

3       A.  I think we knew that we would continue to grow

4  to some degree, yes.

5       Q.  Do you have a figure -- a best estimate you can

6  give me, Pastor Gary, of your average weekly attendance

7  today?

8       A.  It fluctuates between 1,300 and 1,550 in

9  attendance.

10      Q.  All right.  And do you have any projections for

11  what type of growth you hope to obtain in the next two to

12  three years?

13      A.  At this building or at Catalina?

14      Q.  At this building.

15      A.  We can't grow much beyond 1,700 people at this

16  site.

17      Q.  And what is your hope for the growth numbers at

18  the Catalina site?

19      A.  We want to reach as many people for Jesus

20  Christ as we possibly can.

21      Q.  Do you have an estimated figure that you had in

22  mind for the Catalina site?

23      A.  3 to 5,000.

24      Q.  Weekly attendance?

25      A.  Uh-huh.

Page 50

1    A.  Well, you have to remember that there wasn't a

2    church built in San Leandro for over 17 years until they

3    built Faith Fellowship the original site.  So there was

4    no real awareness of what the rules were for churches.

5        Q.  My question is was there a person at Faith

6    Fellowship who was supposed to become aware of what the

7    rules were so you all could know the rules of the game?

8        A.  That's why I personally went to the meeting

9    with Sam Millicek and somebody else to find out:  Okay.

10   We found a building.  How can we make this a usable site

11   for assembly?  It fits all our criteria.

12       Q.  So were you the person who was going to figure

13   out the rules of the zoning and how one would move

14   forward?

15       A.  No.  I was going to ask.

16       Q.  So you were looking to the city folks to give you

17   that direction?

18       A.  Uh-huh.

19       Q.  That's a "yes"?

20       A.  Yes.

21           MS. FOX:  I'm sorry.  I am going to have to

22   take a break.

23               (A recess was taken from 11:23 a.m.

24               to 11:30 a.m.)

25   BY MS. FOX:

Page 75

1        Q.   Pastor Gary, do you ever recall Ed Bullok telling

2   you that John Jermanis cautioned that Faith Fellowship

3   should not go buy that site?

4        A.   He may have.

5        Q.   Do you recall that?

6        A.   Vaguely.

7        Q.   Do you recall that you were advised by Ed Bullok

8   or anyone else that John Jermanis cautioned you shouldn't

9   go hard, so to speak, with dollars that become

10  nonrefundable on that site?

11       A.   I don't remember that.

12       Q.   When Ed Bullok would report to you on what

13  happened with this meeting with John Jermanis, did he do

14  that in writing?  Did he do that by email or did he do

15  that verbally or all of the above?

16       A.   I remember verbally.  I don't remember anything

17  officially in a document.

18       Q.   During the course of this transaction, did you

19  communicate via email with Ed Bullok?

20       A.   I may have.

21       Q.   Did you ever make any effort to check your email

22  accounts for production of any documents in connection

23  with this litigation?

24       A.   I checked my emails all the time so --

25       Q.   So opposed to just checking your emails, which at

Page 76

1             their statements."

2    BY MS. FOX:

3        Q.  So Pastor Gary, can you answer that for me?  What

4    was the conversation and who was it with about those

5    issues?

6        A.  Again, the way it was worded was "asked."  I

7    don't remember asking them if they thought I should put

8    deposit money down.  I think it was a conversation that

9    they brought up and my response to them was:  We just

10   need to be heard.  You told us to file an application

11   but nobody is hearing our case, and, you know, we were

12   in negotiations on this building.

13       Q.  I understand that you were having conversations

14   with the City staff where you were telling them:  We need

15   to get this process moving; correct?

16       A.  Uh-huh -- yes.

17       Q.  But at any time, did you have conversations with

18   the staff where you told them that you had monies that you

19   were now going to have to make nonrefundable in this

20   transaction?

21       A.  Yes, I'm sure we did.

22       Q.  All right.  Who do you recall telling that to?

23       A.  I would guess that it was Debbie Pollart

24   because she was the point person, but I don't remember.

25       Q.  And is it your recollection that Ms. Pollart at

Page 82

1    any time assured you that your transaction would have

2    smooth sailing and you shouldn't worry about your

3    nonrefundable deposits?

4        A.   No.   She didn't say that.

5        Q.   Did you ever purchase a single-family residence

6    at the Manor site?

7        A.   Yes.

8        Q.   And where was that located?

9        A.   Directly next door to the church.

10       Q.   And was that purchased for parking?

11       A.   Parking.

12       Q.   And when did that occur --

13       A.   I don't --

14       Q.   -- that purchase?

15       A.   I don't have the date on that.

16       Q.   I know we have been at it for a fair amount of

17   time this morning, Pastor Gary, but even though you have

18   been very diligent, I am happy to take a break if you want

19   to take an early lunch.  I am entitled to your best

20   recollection.  So this is my day to ask questions.

21       A.   Okay.

22       Q.   So if you can take a moment to reflect.  We know

23   when you bought the hardware store.  You've told us the

24   dates of the new facility opening.  Can you help me,

25   please, place when the purchase of that single-family home

Page 83

1   occurred.

2        A.   I am going to have to guess.  2005.

3        Q.   And how large was the piece of property upon

4   which the single-family home sat?

5        A.   I do not know.

6        Q.   Originally we were talking about the fact that

7   you had originally had a one-acre site.  You added a 1.4

8   acre site to it for a total of 2.4.

9             As we sit here today, what is the total acreage

10  of the Manor property?

11       A.   2.4.  And then there is a house next door

12  that's not contiguous because there is a street --

13  cul-de-sac there.

14       Q.   And is that now paved over for parking?

15       A.   What paved over?

16       Q.   Sorry.  The single-family home that was purchased

17  at or about 2005.  Was that home then demolished?

18       A.   No.  Still sitting there.

19       Q.   All right.  What is being used at that location?

20       A.   We park in the driveway, on the street, on the

21  front lawn, and on the cul-de-sac.  We purchased the

22  house strictly so a neighbor wouldn't tie us up and take

23  more parking from us.

24       Q.   All right.  And did you make any use of the

25  interior of the house itself?

Page 84

1      A.   Yes.

2      Q.   And do you know whose handwriting that is that

3    says:   This offer is further subject --

4      A.   It's pretty good writing so it's not mine.

5      Q.   And I can stipulate it's not James Lee's.

6      A.   Yeah, I'm not sure who wrote that.

7      Q.   How about condition F?

8      A.   This agreement is specifically conditioned upon

9    buyer, in buyer's sole judgment, determining that the

10   subject real property is suitable for and approved for

11   use as a church.   This condition shall remain in full

12   force and effect until removed in writing by buyer.

13   What about it?

14     Q.   Do you know who drafted that condition?

15     A.   I'm assuming -- it would be an assumption -- Ed

16   Bullok, if this is his document.

17     Q.   Do you recall discussing this offer with Ed

18   Bullok before it was submitted?

19     A.   Yes.

20     Q.   And did Ed Bullok advise you that it is prudent

21   practice in a land use transaction to make sure you have

22   land use entitlement approved before you move forward with

23   a large purchase?

24     A.   Something to that effect.

25     Q.   Do you recall whether or not this condition, 36F,

Page 87

1      A.  We did.

2           MS. FOX:  All right.  Counsel, we have come to

3    the bewitching hour for me.  I need to terminate our

4    deposition to be reset to finish up.  I appreciate you

5    coming early today.  It ends up that my son is receiving

6    an award tonight so I need to be there.  So I appreciate

7    your accommodation of that.  And so we need to conclude.

8           There are some documents perhaps we can have

9    before day two.  I suggest we confer by email for a

10   convenient time for day two that meets everybody's

11   schedule.

12          MR. SNIDER:  Okay.

13          THE REPORTER:  Counsel, to confirm, you are

14   ordering a copy with a disk?

15          MR. SNIDER:  Yes.

16          THE REPORTER:  A condensed also?

17          MR. SNIDER:  Yes.

18          THE REPORTER:  Thank you.

19          (The deposition was adjourned at 2:49 p.m.)

20

21

22                    _____
                           GARY MORTARA

23

24

25

Page 144

1              CERTIFICATE OF REPORTER

2

3        I, LORI A. YOCK, CSR No. 5801, a Certified

4   Shorthand Reporter in and for the State of California,

5   do hereby certify:

6        That prior to being examined, the witness named

7   in the foregoing deposition was by me duly sworn to

8   testify to the truth, the whole truth, and nothing but

9   the truth.

10       That said deposition was taken before me at the

11   time and place set forth and was taken down by me in

12   shorthand and thereafter reduced to computerized

13   transcription under my direction and supervision, and I

14   hereby certify the foregoing deposition is a full, true

15   and correct transcript of my shorthand notes so taken.

16       And I further certify that I am neither counsel

17   for nor related to any party to said action nor in any

18   way interested in the outcome thereof.

19       IN WITNESS WHEREOF, I have hereunto subscribed

20   my name this 1st day of June, 2008.

21

22   _____

23   LORI A. YOCK
     CSR No. 5801

24

25

EMERICK & FINCH (925) 831-9029

145

544

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


INTERNATIONAL CHURCH OF THE
FOURSQUARE GOSPEL,

                    Plaintiff,

vs.                                    No. C07-03605

CITY OF SAN LEANDRO, a municipal
corporation, DOES 1-50,

                    Defendants.

                         /


            DEPOSITION OF GARY MORTARA

                   VOLUME II

               (PAGES 149 - 214)



        Taken before LORI A. YOCK, CSR, RPR

      Certified Shorthand Reporter No. 5801

    Registered Professional Reporter No. 018667

              State of California

              Friday, June 6, 2008



         EMERICK & FINCH (925) 831-9029

**CERTIFIED
COPY**

1  research and find it.

2      Q.  Did you talk to Jim Lee about whether or not he

3  remembered if condition 36F, the typewritten condition,

4  had, in fact, been deleted from the transaction?

5      A.  I may have.

6      Q.  And do you recall what he said?

7      A.  He didn't know what happened to it.

8      Q.  When you all proposed the new sanctuary back in

9  2003 that opened in Easter 2003, do you recall who the

10  planning person was that you primarily dealt with in that

11  regard with the City?

12      A.  I don't, but John Jermanis said he was there at

13  that time and he was part of the approval process.

14      Q.  Do you recall whether or not the City discouraged

15  you in any fashion from moving forward with that new

16  sanctuary?

17      A.  My initial plan of a 1,200 seat auditorium they

18  shot down.  When I came back with this auditorium, they

19  immediately approved it.

20      Q.  Do you recall why the 1,200 person auditorium was

21  shot down, as you described it?

22      A.  Two reasons.  One was parking.  The

23  neighborhood couldn't accommodate the parking.  Two,

24  where I envisioned the sanctuary sitting would have been

25  up against the houses, and the neighbors weren't in

Page 180

1    favor of that.

2        Q.   Ultimately did you think you got fair treatment

3    in the approval of your CUP in 2003 by the City?

4        A.   Yes, my second request for this particular

5    building.  We downsized the square footage of the

6    sanctuary so we wouldn't need as many parking places,

7    and we moved the building towards the freeway instead of

8    the houses.  So they were very accommodating of that.

9        Q.   Now, we talked a little bit last time about the

10   numbers of folks that attend services.  Those gold sheets

11   -- in your mind, do those gold sheets represent membership

12   numbers or is that a separate issue or separate records

13   that are kept in that regard?

14       A.   Separate.

15       Q.   All right.  And how are the membership figures

16   kept?  Are they on a particular document?

17       A.   I believe so.  My secretary keeps all of that.

18   We don't make a real big push for church membership.

19       Q.   Is there a particular requirement of what you

20   have to do to be a member of Faith Fellowship?

21       A.   Yes.

22       Q.   And what is that?

23       A.   You have to be nine years old.  You have to be

24   a born-again believer in the Lord Jesus Christ and

25   preferably baptized in water.

Page 181

1    play here?

2         A.   Yeah.   We believe the City is violating the

3    law.

4              MS. FOX:  All right.  I have no further

5    questions.

6              THE REPORTER:  Counsel, are you ordering a

7    copy?

8              MR. SNIDER:  Yes.

9              THE REPORTER:  Thank you.

10             (The deposition was concluded at 12:10 p.m.)

11

12

13                    _____
                            GARY MORTARA

14

15

16

17

18

19

20

21

22

23

24

25

Page 210

1                CERTIFICATE OF REPORTER

2

3         I, LORI A. YOCK, CSR No. 5801, a Certified

4    Shorthand Reporter in and for the State of California,

5    do hereby certify:

6         That prior to being examined, the witness named

7    in the foregoing deposition was by me duly sworn to

8    testify to the truth, the whole truth, and nothing but

9    the truth.

10        That said deposition was taken before me at the

11   time and place set forth and was taken down by me in

12   shorthand and thereafter reduced to computerized

13   transcription under my direction and supervision, and I

14   hereby certify the foregoing deposition is a full, true

15   and correct transcript of my shorthand notes so taken.

16        And I further certify that I am neither counsel

17   for nor related to any party to said action nor in any

18   way interested in the outcome thereof.

19        IN WITNESS WHEREOF, I have hereunto subscribed

20   my name this 18th day of June, 2008.

21

22

23                    _____
                              LORI A. YOCK
24                            CSR No. 5801

25

EMERICK & FINCH (925) 831-9029

211

Intentionally
Omitted

**EXHIBIT 31**