**EXHIBIT 32**

# WEBSTER'S
## NEW UNIVERSAL
# UNABRIDGED
# DICTIONARY

EXHIBIT 32

# WEBSTER'S
## NEW UNIVERSAL
# UNABRIDGED
# DICTIONARY



More than a quarter of a million entries

Based on the First Edition of
*The Random House Dictionary of the English Language*

1644 pages, over 2,000 illustrations

11 specialized Dictionaries, Reference Books,
and Supplements

BARNES
&NOBLE
BOOKS
NEW YORK

ACKNOWLEDGMENTS AND PERMISSIONS:

The "A Dictionary of the English Language" section of this book (*Webster's New Universal Unabridged Dictionary*) is based on the first edition of *The Random House Dictionary of the English Language, the Unabridged Edition*, copyright © 1983.

*A Manual of Style*, copyright © 1986 by Crown Publishers, Inc. Excerpted and reprinted by arrangement with Crown Publishers, Inc.

Krevisky, Joseph and Jordan L. Linfield—*The Bad Speller's Dictionary*, copyright © 1967, 1963 by Innovation Press. Reprinted by arrangement with Random House, Inc.

Stein, Jess, Ed.—*Rhyming Dictionary*, copyright © 1960 by Random House, Inc. Reprinted by arrangement with Random House.

*Webster's Crossword Puzzle Dictionary*, 1986 edition, copyright © 1963 by Fawcett Publications, Inc. and copyright © 1964 by Ottenheimer Publishers, Inc. Reprinted by arrangement with Ottenheimer Publishers, Inc.

Copyright © 1989 by dilithium Press, Ltd.
All rights reserved.

This edition published by Barnes & Noble, Inc., by arrangement with
The Outlet Book Co., 40 Englehard Ave., Avenel, N. J. 07001

1992 Barnes & Noble Books

ISBN 1-56619-147-5

Printed and bound in the United States of America

M  9  8  7  6  5  4  3  2  1

**as·per·sion** (ə-spûr′zhən, -shən), *n.* **1.** a damaging imputation; a derogatory criticism; to campaign by casting aspersions on the opponent. **2.** the act of slandering; vilification; defamation; calumniation; denigration: *Such vehement aspersions cannot be ignored.* **3.** act of aspersing; to baptize by aspersion. **4.** *Archaic.* a shower or spray. [< L *aspersiōn-* (s. of *aspersiō*) a sprinkling. See ASPERSE, -ION]
—Syn. 1. reflection, reproach.

**as·per·so·ri·um** (as′pər sôr′ē əm, -sōr′-), *n., pl. sa-ri·a* (-sôr′ē ə, -sōr′-), *so-ri·ums. Rom. Cath. Ch.* 1. a vessel for holding holy water. See illus. under stoup. 2. aspergillum. [< ML; see ASPERSE, -ORIUM]

**as·phalt** (as′fôlt, -falt), *n.* **1.** any of various dark-colored, solid bituminous substances, native in various areas of the earth and composed mainly of hydrocarbon mixtures. **2.** a similar artificial substance, the by-product of petroleum-cracking operations. **3.** a mixture of such substance with gravel, crushed rock, or the like, used for paving. —*v.t.* **4.** to cover or pave with asphalt. [ADJ; 5. of, pertaining to, or containing asphalt: *asphalt tile.* (*asthic asphaltos*, orig. *t. < Gk asphaltos, -ou, *] akin to *sphállein* to make firm, to secure; r. ME *aspaltoun*) < Gk *aspháltos*] —as·phal′tic, *adj.*

**as·phal·tene** (as fôl′tēn, -fal′-), *n. Chem.* any of the constituents of a bitumen, as asphalt, that are insoluble in pentane, hexane, or naphthalene. Cf. petrolene. [ASPHALT + -ENE]

**as·phal·tite** (as fôl′tīt, -fal′-; as′fôl tīt′, -fal-), *n.* a natural, solid hydrocarbon having a melting point higher than that of asphalt. [< Gk *asphaltítē*(s). See ASPHALT, -ITE]

**as·phalt pa·per,** paper treated with asphalt, as to increase toughness, water resistance, etc.

**as·phalt rock**[f.], *Geol.* a rock formation, usually of limestone or sandstone, containing large amounts of bitumen.

**as·phal·tum** (as fôl′təm, -fal′-), *n.* asphalt. [< NL < Gk *asphalton* ASPHALT]

**as·pher·i·cal** (ā sfer′ə kəl), *adj. Optics.* (of a reflecting surface or lens) deviating slightly from an exactly spherical shape and relatively free from aberrations. Also **a·spher·ic** [A- + SPHERICAL]

**as·pho·del** (as′fə del′), *n.* **1.** any of various liliaceous plants of the genera *Asphodelus* and *Asphodeline*, native to southern Europe, having white, pink, or yellow flowers. **2.** any of various other plants, as the daffodil. [< L *asphodelus* < Gk *asphódelos* the asphodel. See DAFFODIL]

**Asphodel Fields,** *Class. Myth.* a meadow where the shades of dead heroes wandered sadly.

**as·phyx·i·a** (as fik′sē ə), *n. Pathol.* the extreme condition caused by lack of oxygen and excess of carbon dioxide in the blood, produced by sufficient interference with respiration, as in choking. [< NL < Gk *asphyxía* a stopping of the pulse, equiv. to *a-* A-[6] + *sphyxis* pulse + *-ia*] —**as·phyx′i·al,** *adj.*

**as·phyx·i·ant** (as fik′sē ənt), *adj.* **1.** asphyxiating or tending to asphyxiate. —*n.* **2.** an asphyxiating agent or substance. **3.** an asphyxiating condition. [ASPHYXI(A) + -ANT]

**as·phyx·i·ate** (as fik′sē āt′), *v., -at·ed, -at·ing.* —*v.t.* **1.** to produce asphyxia in. **2.** to cause to die or lose consciousness by impairing normal breathing, as by gas or other noxious agents; choke; suffocate; smother. —*v.i.* **3.** to become asphyxiated. [ASPHYXI(A) + -ATE[1]] —as·phyx′i·a′tion, *n.* —as·phyx′i·a′tor, *n.*

**as·pic**[1] (as′pik), *n.* **1.** a savory jelly usually made with meat or fish stock and gelatin, chilled and used as a garnish and coating for meats, seafoods, eggs, etc. **2.** Also called tomato aspic. a similar jelly made with spiced tomato juice and gelatin, chilled and served as a salad. [< F; said to be so called because cold like an asp. See ASPIC[2]]

**as·pic**[2] (as′pik), *n. Obs., var.* [< F perch. equiv. to OF *espi*(c) sort of -6, modeled after MF *basilique* BASILISK]

**as·pic**[3] (as′pik), *n.* the great lavender, *Lavandula latifolia,* yielding an oil used in perfumery. [< F; OF *espi-* < ML *spic*(us) spikenard, L *spīcus,* var. of *spīca.* spikenard]

**as·pi·dis·tra** (as′pi dis′trə), *n.* a smooth, stemless Asian herb, *Aspidistra elatior,* having large evergreen leaves often striped with white, grown as a house plant. [< NL, equiv. to Gk *aspíd-* (s. of *aspís* shield) + *-istra,* extracted from *Tupistra* genus of liliaceous plants < Gk *-istra* parallels + L *-tra* pl. of *-trum* n. suffix denoting instrument]

**As·pin·wall** (as′pin wôl′), *n.* a town in SW Pennsylvania. 2737 (1960).

**as·pi·rant** (ə spīr′ənt, as′pər ənt), *n.* **1.** one who aspires, as one who seeks or desires a career, advancement, status, etc.: *Each of the aspirants for the available grant has yet to prove himself.* —*adj.* 2. aspiring. [< L *aspīrāns,* prp. of *aspīrāre.* See ASPIRE, -ANT]

**as·pi·ra·ta** (as′pi rā′tə), *n., pl. -tae* (-tē). *Gk. Gram.* a strongly fricated voiceless plosive, as φ, θ, χ. [< NL, equiv. to L *aspīrāt*(us) (see ASPIRATE) + *-a* fem. suffix]

**as·pi·rate** (v. as′pə rāt′; *n., adj.* as′pər it), *v., -rat·ed, -rat·ing, n., adj.* —*v.t.* **1.** Phonet. a. to articulate (a speech sound, esp. a stop) so as to produce audible friction, as with the first *t* of *total,* the second *t* being unaspirated. b. to articulate (the beginning of a word or syllable) with an h-sound, as in which, pronounced (hwich), which as opposed to witch (wich). **2.** to remove (a fluid) from a cavity by use of an aspirator. b. to inhale (fluid) into the bronchi and lungs, often after vomiting. **3.** to draw or remove by suction. —*n.* **4.** Phonet. a speech sound having an obvious combinant audible frication, as initial stop consonants with h-sounds, etc. —*adj.* 5. Phonet. (of a speech sound) pronounced with or accompanied by aspiration; aspirated. [< L *aspīrāt*(us) breathed upon (ptp. of *aspīrāre;* see ASPIRE, -ATE[1])]

**as·pi·ra·tion** (as′pə rā′shən), for 1-5; Fr. a spē rã syõn′ for 6), *n.* **1.** strong desire, longing, or aim; ambition; intellectual aspirations. **2.** the goal or objective desired: *The presidency is the traditional aspiration of young American boys.* **3.** act of aspiring; aspiration. **4.** Phonet. a. articulation accompanied by audible frication, as in the h-sound of *how,* or of *when* (hwen), or in the release of initial stops, as in the s-sound of key. b. the use of an aspirate in pronunciation. **5.** Med. a. the act of removing a fluid, as pus or serum, from a cavity of the body, by a hollow needle or trocar connected with a suction syringe. b. the act of inhaling fluid into the bronchi and lungs, often after vomiting. **6.** Music. an accompaniment consisting of a rise in pitch at the end of a held note sung, esp. in the music of the 17th and 18th centuries. [< L *aspīrātiōn-* (s. of *aspīrātiō*). See ASPIRATE, -ION]
—Syn. 1. yearning.

**as·pi·ra·tor** (as′pə rā′tər), *n.* **1.** an apparatus or device employing suction. **2.** a suction pump that operates by the pressure differential created by the high-speed flow of a fluid past an intake orifice. **3.** *Med.* an instrument for removing body fluids by suction. [ASPIRATE + -OR]

**as·pi·ra·to·ry** (ə spīr′ə tôr′ē, -tōr′ē), *adj.* pertaining to or suited for respiration. [ASPIRATE + -ORY]

**as·pire** (ə spīr′), *v.i., -pired, -pir·ing.* **1.** to long, aim, or seek ambitiously; be eagerly desirous, esp. for something great or of high value (usually fol. by to, after, or an infinitive): *to aspire after immortality; to aspire to be a doctor.* **2.** *Archaic.* to rise up; soar; mount; tower. [late ME < L *aspīrāre* (to) breathe upon, pant after, equiv. to *a-* A-[5] + *spīrāre* to breathe, blow] —**as·pir′er,** *n.* —**as·pir′ing·ly,** *adv.*
—Syn. 1. yearn. See ambitious.

**as·prin** (as′prin, -pər in), *n., pl. -rin, -rins.* 1. *Pharm.* a white, crystalline derivative of salicylic acid, C₉H₈O₄, used to relieve the pain of headache, rheumatism, gout, neuralgia, etc.; acetylsalicylic acid. **2.** an aspirin tablet: *I took four aspirins and went right to bed.* [orig. G trademark, equiv. to A(cetyl) ACETYL + Spir(säure) salicylic acid (see SPIRAL) + -in]

**a·sprawl** (ə sprôl′), *adv., adj.* being in a sprawling state or posture: *The body lay asprawl among the wreckage.* [A-[1] + SPRAWL]

**a·squint** (ə skwint′), *adv., adj.* with an oblique glance or squint; askance; slyly; dubiously. [A-[1] + SQUINT (< ?)]

**As·quith** (as′kwith), *n.* Herbert Henry (1st Earl of Oxford and Asquith), 1852–1928, British statesman; prime minister 1905–16.

**b·sra·ma** (ä′shrə mə), *n. Hinduism.* 1. any of the four phases of the ideally conducted life: education, work, withdrawal from society, or life as a hermit. 2. ashram. [< Skt]

**ass**[1] (as), *n.* 1. a long-eared, slow, patient, surefooted domesticated mammal, *Equus asinus,* related to the horse, used chiefly as a beast of burden. 2. any wild species of the genus *Equus,* as the onager. 3. a fool; a blockhead. [ME *asse,* OE *assa,* prob. hypocoristic form based on OIr *asan* < L *asinus;* akin to Gk *ónos* ass] —**ass·like′,** *adj.*


Ass, Equus asinus
(3½ ft. high at shoulder)

**ass**[2] (as), *n.* 1. Slang. the buttocks. 2. Slang (vulgar). rectum. 3. Slang (vulgar). coitus; a woman considered as an object of coitus. [var., esp. of S Midland and dial. speech, of ARSE]

**A.S.S.,** 1. Assistant in Secretarial Science. 2. Associate in Secretarial Studies.

**as·sa·fet·i·da** (as′ə fet′i də), *n.* asafetida. Also, **as·sa·foet·i·da.**

**as·sa·gai** (as′ə gī′), *n., pl. -gais,* v.t., -gaied, -gai·ing. assegai.

**as·sai**[1] (ä sī′, It. äs sä′ē), *adv. Music, very: allegro assai* (very quick). [< It; lit., enough < L *ad* (up) to + *satis* enough. See ASSETS]

**as·sai**[2] (ə sī′), *n.,* var. of several slender Brazilian palms of the genus *Euterpe,* esp. *E. edulis,* a species bearing a purple fruit from which a beverage is made by infusion. [< Pg < Tupí]

**as·sail** (ə sāl′), *v.t.* 1. to set upon with violence; attack; assault. 2. to attack with arguments, criticism, ridicule, abuse, etc.: *to assail one's opponent with slander.* 3. to undertake with the purpose of mastering: *He assailed his studies with new determination.* 4. to impinge upon: *noise so loud that it numbs; their ears: His mind was assailed by conflicting arguments. The light assailed his eyes.* [ME *asayle*(n) < OF *asail(i)r < LL assalīre,* equiv. to L *as-* AS- + *salīre* to leap, spring] —**as·sail′a·ble,** *adj.* —**as·sail′er,** *n.* —**as·sail′ment,** *n.*
—Syn. 1. See attack. 2. asperse, malign.

**as·sail·ant** (ə sāl′ənt), *n.* 1. one who attacks. —*adj.* 2. attacking; assailing; assaulting; hostile. [< MF *assaillant.* See ASSAIL, -ANT]

**As·sam** (as sam′), *n.* a state in NE India. 12,299,330 (1961); 30,012 sq. mi. *Cap.:* Shillong.

**As·sa·mese** (as′ə mēz′, -mēs′), *adj., n., pl. -mese.* —*adj.* 1. of or pertaining to Assam, its inhabitants, or their language. —*n.* 2. a native or inhabitant of Assam. 3. the Indic language of Assam. [ASSAM + -ESE]

**Assam′ States′,** a group of former states in NE India, most of which are now part of the present state of Assam.

**As·sa·ra·cus** (ə sar′ə kəs), *n.* (in the *Iliad*) a son of Tros and founder of the royal house to which Anchises and Aeneas belonged.

**as·sas·sin** (ə sas′in), *n.* 1. murderer; killer, esp. one who kills for fanatical or monetary reasons: often restricted in usage to the murderer of a prominent person. 2. (cap.) one of an order of Muslim fanatics, active in Persia and Syria from about 1090 to 1272, whose chief object was to assassinate Crusaders. [< ML *assassīn* (pl.) < Ar *ḥashshāshīn* eaters of HASHISH]

**as·sas·si·nate** (ə sas′ə nāt′), *v.t., -nat·ed, -nat·ing.* 1. to kill suddenly or secretly, murder premeditatedly and treacherously. 2. to destroy or denigrate treacherously and viciously: *to assassinate a person's character.* [ASSASSIN + -ATE[1]] —**as·sas′si·na′tion,** *n.* —**as·sas′si·na′tor,** *n.*
—Syn. 1. murder, slay.

**as·sas·sin bug**[f.], any of numerous hemipterous insects of the family Reduviidae, feeding chiefly on other insects but including some forms that are bloodsucking parasites of mammals.

**as·sault** (ə sôlt′), *n.* 1. a violent attack; onslaught. 2. *Mil.* the stage of close combat in an attack. 3. *Law.* an unlawful physical attack upon another; an attempt or offer to do violence to another, with or without battery, as by holding a stone or club in a threatening manner. 4. rape. —*v.t.* 5. to make an assault upon; attack; assail. [ME *assaut* < OF < LL *assalt*(us) (< *assalīre;* see ASSAIL), replacing ME *asaut,* in use of typ. of *satire* (said-lean) a leap, in use of typ. of *satire* (salt) -tus. ptp. suffix)] —**as·sault′a·ble,** *adj.* —**as·sault′er,** *n.*
—Syn. 1. onset, charge; invasion, aggression. 5. See attack.

**assault′ and bat′tery,** *Law,* an assault with an actual touching or other violence upon another.

**assault′ boat′,** *Mil.* a portable boat used for landing troops on beaches and for crossing rivers. Also called storm boat.

**as·say** (v. ə sā′; n. ə sā′, as′ā), *v.t.* 1. to try or test; put to trial: *to assay one's strength; to assay one's debating abilities.* 2. *Metall.* to analyze (an ore, alloy, etc.) in order to determine the quantity of gold, silver, or other metal in it. 3. *Pharm.* to subject (a drug) to an analysis for the determination of its potency. 4. to examine or analyze; to assay a situation; to assay an event. 5. to judge the quality of; assess; evaluate: *to assay someone's efforts.* 6. to attempt; endeavor; to make or do; try; *assay to assay a chance.* —*v.i.* 7. *Metall.* to contain, as shown by analysis, a certain proportion of metal, precious metal. —*n.* 8. *Metall.* determination of the amount of metal, esp. of gold or silver, in an ore, alloy, etc. 9. a substance undergoing analysis or trial. 10. a detailed report of the findings in assaying a substance. 11. *Obs.* examination; trial; attempt; essay. [ME < AF *assai,* OF *essai* ESSAY] —**as·say′a·ble,** *adj.* —**as·say′er,** *n.*

**assay′ cup′,** a small wine cup for tasting wine to be offered to another person.

**assay′ groove′,** (in silverwork) a furrow left in a piece by the digging out of metal for assay.

**assay′ of′fice,** a local testing station for assaying ore, as gold, silver, etc., esp. a government station maintained in connection with registration of mineral claims, purchases of gold, and the like.

**as·say′ ton′,** a unit of weight used in assaying ore, equivalent to 29.167 grams.

**as·se·gai** (as′ə gī′), *n., pl. -gais,* v., -gaied, -gai·ing. —*n.* 1. the slender javelin or spear of the Bantu-speaking people of southern Africa. 2. a South African coniferous tree, *Curtisia faginea,* from whose wood such spears are made. —*v.t.* 3. to pierce with an assegai. Also, **assagai.** [earlier *azagaia* < Pg < Ar *az zaghāyah,* Also, **as·sa·gai,** to al the < Berber *zaghāyah* spear]

**as·sem·blage** (ə sem′blij; for 3, 4 also Fr. ä säN blázh′), *n.* 1. a number of persons or things assembled; an assembly; collection; aggregate. 2. act of assembling. 3. *Fine Arts.* a. a sculptural technique of organizing or composing into a unified whole a group of unrelated and often fragmentary or discarded objects. b. a work of art produced by this technique. *Cf.* collage, found object, ready-made (def. 4). 4. *Architol.* the aggregate of artifacts and other remains found on a site, considered as material evidence in support of a theory concerning the culture or cultures inhabiting it. [< F; see ASSEMBLE, -AGE]

**as·sem·ble** (ə sem′bəl), *v., -bled, -bling.* —*v.t.* 1. to bring together; gather into one place, company, body, or whole. 2. to put or fit together; put together the parts of: *to assemble information for a report; to assemble a toy from a kit.* 3. *Computer Technol.* compile (def. 4). —*v.i.* 4. to come together; gather; meet. [ME < OF *assembler* (< VL *assimulāre* to bring together, equiv. to L *as-* + *simul* together + -āre thematic vowel + -re inf. suffix]
—Syn. 1. convene, convoke. See gather. 2. connect. See manufacture. 4. congregate, convene. —Ant. 1, 4. disperse.

**as·sem·bled** (ə sem′bəld), *adj.* composed of several pieces, each of which (the cheaper throws one leg on), springs of the other, and lands with both feet together. [< F; prp. of *assembler* to ASSEMBLE]

**as·sem·bled** (ə sem′bəld), *adj.* noting an artificial gem formed of two or more parts, as a doublet or triplet, at least one of which is a true gemstone. [ASSEMBLE + -ED[2]]

**as·sem·bler** (ə sem′blər), *n.* 1. one who or that which assembles. 2. *Computer Technol.* compiler (def. 2). [ASSEMBLE + -ER[1]]

**as·sem·bly** (ə sem′blē), *n., pl. -blies.* 1. a number of persons gathered together, usually for a particular purpose, whether religious, political, educational, or social. 2. (cap.) (in a legislative body, esp. a lower house of a legislature. 3. act of assembling; state of being assembled. 4. *Mil.* a. a signal, as by drum or bugle, for troops to fall into ranks or otherwise assemble. b. the movement of forces, tanks, soldiers, etc., scattered by battle or battle drill, toward and into a small area. 5. the putting together of complex machinery, as airplanes, from interchangeable parts of standard dimensions. 6. a group of machine parts, esp. one forming a self-contained, independently mounted unit. *Cf.* subassembly. 7. (*Computer Technol.*) the act, as by an assembler, of compiling. 8. a coming together of bits. (that which is) assembled, (in. ptp. of *assembler* to ASSEMBLE]
—Syn. 1. assemblage, through gathering, congress, company, meeting. See convention. 2. congress, representatives.

**assem′bly dis′trict,** U.S. Govt. one of a number of districts into which a State is divided, each district electing one member to the lower house of the State legislature. *Cf.* congressional district, senatorial district.

**assem′bly line′,** an arrangement of machines, tools, and workers in which a product is assembled by having each portion a specific, successive operation on an incomplete unit as it passes by in a series of stages organized in a direct line. [ASSEMBLY + LINE[1]]

**as·sem·bly·man** (ə sem′blē mən), *n., pl. -men.* U.S. 1. a member of a State legislature, esp. of a lower house. [ASSEMBLY + MAN[1]]

**Assem′bly of the No′tables,** notable (def. 5).

**assem′bly rou′tine,** *Computer Technol.* compiler (def. 2).

**as·sent** (ə sent′), *v.i.* 1. to agree or concur; subscribe to (often fol. by *to*): *to assent to a statement.* 2. to allow or yield; concede: *Assenting to his demands, she did as she was told.* —*n.* 3. agreement, as to a proposal; concurrence; compliance. [ME *assent*(e), v., < OF *assent*(e)r, < L *assentīrī* (s. of *assentīrī*). See SENTIENT] —**as·sen′tive,** *adj.* —**as·sent′er, as·sen′tor,** *n.*

SHORT PRONUNCIATION KEY: act, āble, dâre, ärt; ebb, ēqual; if, īce; hot, ōver, ôrder, oil, bŏŏk, ōōze, out; up, ûrge; chief; sing; shoe; thin, that; zh as in measure. ə = a in alone, e in system, i in easily, o in gallop, u in circus; ʹ as in button (but′ən), fire (fīʹr). cradle (krādʹ'l). See the full key inside the front cover.

553

**EXHIBIT 33**

# WEBSTER'S
## NEW UNIVERSAL
# UNABRIDGED
# DICTIONARY



EXHIBIT 33

# WEBSTER'S
## NEW UNIVERSAL
# UNABRIDGED
# DICTIONARY



More than a quarter of a million entries

Based on the First Edition of
*The Random House Dictionary of the English Language*

1644 pages, over 2,000 illustrations

11 specialized Dictionaries, Reference Books,
and Supplements

BARNES
&NOBLE
B O O K S
NEW YORK

ACKNOWLEDGMENTS AND PERMISSIONS:

The "A Dictionary of the English Language" section of this book *(Webster's New Universal Unabridged Dictionary)* is based on the first edition of *The Random House Dictionary of the English Language, the Unabridged Edition,* copyright © 1983.

*A Manual of Style,* copyright © 1986 by Crown Publishers, Inc. Excerpted and reprinted by arrangement with Crown Publishers, Inc.

Krevisky, Joseph and Jordan L. Linfield—*The Bad Speller's Dictionary,* copyright © 1967, 1963 by Innovation Press. Reprinted by arrangement with Random House, Inc.

Stein, Jess, Ed.—*Rhyming Dictionary,* copyright © 1960 by Random House, Inc. Reprinted by arrangement with Random House.

*Webster's Crossword Puzzle Dictionary,* 1986 edition, copyright © 1963 by Fawcett Publications, Inc. and copyright © 1964 by Ottenheimer Publishers, Inc. Reprinted by arrangement with Ottenheimer Publishers, Inc.

Copyright © 1989 by dilithium Press, Ltd.
All rights reserved.

This edition published by Barnes & Noble, Inc., by arrangement with
The Outlet Book Co., 40 Englehard Ave., Avenel, N. J. 07001

1992 Barnes & Noble Books

ISBN 1-56619-147-5

Printed and bound in the United States of America

M  9  8  7  6  5  4  3  2  1

*in sta·tu quo* (in stā′tōō kwō′; Eng. in stā′tyōō kwō′, stach′ōō), *Latin*. in the state in which (anything was or is).

**in·stau·ra·tion** (in′stô rā′shən), *n.* 1. *Archaic.* renewal; restoration; renovation; repair. 2. *Obs.* an act of instituting, or inaugurating, something; establishment. [< L *instaurātiōn-* (s. of *instaurātiō*) a rebuilding, renewing. See IN-², STORE, -ATION] —**in·stau·ra·tor** (in′stô rā′tər), *n.*

**in·stead** (in sted′), *adv.* 1. in preference; as a preferred or accepted alternative: *The city has its pleasures, but she wished instead for the quiet of country life.* 2. as a replacement; in the place or stead of someone or something: *We asked for the father, but they sent the son instead.* 3. instead of, in place of; in lieu of: *You may use milk instead of cream in this recipe.* [orig. phrase *in stead* in place]

**in·step** (in′step′), *n.* 1. the arched upper surface of the foot of man between the toes and the ankle. 2. the part of a shoe, stocking, etc., covering the instep. 3. the front of the hind leg of a horse, cow, etc., between the hock and the pastern joint. [appar. IN-¹ + STEP]

**in·sti·gate** (in′stə gāt′), *v.t.*, -gat·ed, -gat·ing. 1. to urge, provoke, or incite to some action or course: *to instigate the people to revolt.* 2. to bring about by incitement; foment: *to instigate a quarrel.* [< L *instīgāt(us)* goaded on (ptp. of *instīgāre*), equiv. to IN- IN-² + -*stīg-* (var. s. of *stig·an*), equiv. to G. *stigein*) + -*āre* -ATE¹] —**in′sti·ga′tive**, *adj.* —**in′sti·ga′tor**, *n.*

—Syn. 1. induce, stimulate, encourage, push; initiate, start. 2. arouse, provoke.

**in·sti·ga·tion** (in′stə gā′shən), *n.* 1. act of instigating. 2. state of being instigated. 3. an incentive [< L *instīgātiōn-* (s. of *instīgātiō*). See INSTIGATE, -ION]

**in·still** (in stil′), *v.t.*, -stilled, -still·ing. instill. —in·still′ment, *n.*

**in·still** (in stil′), *v.t.* 1. to infuse slowly or by degrees into the mind; inculcate; insinuate; inject: *Courtesy must be instilled in childhood.* 2. to put in drop by drop. [< L *instillāre*), equiv. to IN- IN-² + *stillāre* to drip. See INSTILL] —**in·stil′lment**, *n.*

—Syn. 1. inculcate, introduce.

**in·still·la·tion** (in′stə lā′shən), *n.* 1. act of instilling. 2. something instilled. [< L *instīllātiōn-* (s. of *instīllātiō*), equiv. to *instīllāt(us)* instilled (ptp. of *instīllāre*) + -*tiōn-* -ION]

**in·stil·la·tor** (in′stə lā′tər), *n.* *Med.* an apparatus for putting liquid drop by drop into a cavity. [< L *instillātus* (see INSTILLATION) + -or -OR²]

**in·stinct**¹ (in′stiŋkt), *n.* 1. *Psychol.* an inborn pattern of activity or tendency to action common to a given biological species. 2. a natural or innate impulse, inclination, or tendency. 3. a natural aptitude or gift for something: *an instinct for art.* 4. natural intuitive power. [< L *instinctus* impulse, instigation; see INSTINCT²]

**in·stinct**² (in stiŋkt′), *adj.* 1. infused or filled with some animating principle (usually fol. by *with*): *Instinct with life.* 2. *Obs.* urged or animated by some inner force. [< L *instinct(us)* incited, instigated (ptp. of *instinguere*), equiv. to IN- IN-² + *-stinctus*, as in *distinctus* DISTINCT]

**in·stinc·tive** (in stiŋk′tiv), *adj.* 1. of, pertaining to, or of the nature of instinct. 2. prompted by or resulting from instinct. Also, **in·stinc·tu·al** (in stiŋk′chōō əl). [INSTINCT + -IVE] —**in·stinc′tive·ly**, *adv.* —**in·stinc′tu·al·ly**, *adv.*

—Syn. 2. spontaneous, intuitive, unpremeditated.

**in·sti·tute** (in′sti tōōt′, -tyōōt′), *v.*, -tut·ed, -tut·ing, *n.* —*v.t.* 1. to set up; establish; to institute a government. 2. to inaugurate; initiate; set under way: *to institute a new course in American literature.* 3. to set in operation; to institute a lawsuit. 4. to bring into use or practice; *to institute laws.* 5. to establish in an office or position. 6. *Eccles.* to assign to or invest with a spiritual charge. —*n.* 7. a society or organization for carrying on a particular work, as of literary, scientific, or educational character. 8. the building occupied by such a society. 9. *Educ.* a. an institution, generally beyond the secondary school level, devoted to instruction in technical subjects, usually separate but sometimes organized as a part of a university. b. a unit within a university organized for advanced instruction and research in a relatively narrow field of subject matter. c. a short instructional program set up for a special group interested in some specialized type of activity. 10. an established principle, law, custom, or organization. 11. institutes, a. an elementary textbook of law designed for beginners. b. (*cap.*) also called *Institutes of Justinian (Lat.* INSTITUTA), elementary treatises on Roman law in four books, forming one of the four divisions of the Corpus Juris Civilis. 12. something instituted. [ME < L *īnstitūt(us)* placed, built, set up (ptp. of *īnstituere*), equiv. to IN- IN-² + *-stitū-* (var. of *statū-* see STATUS) + -tus ptp. suffix]

**in·sti·tut·er** (in′sti tōō′tər, -tyōō′-), *n.* Institutor.

**in·sti·tu·tion** (in′sti tōō′shən, -tyōō′-), *n.* 1. an organization, establishment, foundation, society, or the like, devoted to the promotion of a particular object, esp. one of a public, educational, or charitable character. 2. the building devoted to such work. 3. a concern engaged in some activity, as a retail store, insurance company, etc. 4. *Sociol.* a well-established and structured pattern of behavior or of relationships that is accepted as a fundamental part of a culture, as marriage: *the institution of the family; the institution of slavery.* 5. any established law, custom, etc. 6. any familiar practice or object. 7. an act of instituting or setting up; the institution of fine institution of laws. 8. *Eccles.* a. the origination of the Eucharist, and enactment of his observance, by Christ. b. the investment of a clergyman with a spiritual charge. [ME < L *īnstitūtiōn-* (s. of *īnstitūtiō*). See INSTITUTE, -ION]

**in·sti·tu·tion·al** (in′sti tōō′shə nl, -tyōō′-), *adj.* 1. of, pertaining to, or established by institution. 2. of or pertaining to organized societies or to the buildings devoted to their work. 3. of the nature of an institution. 4. characterized by the blandness, drabness, uniformity, and lack of individualized attention attributed to large organizations that serve many people: *institutional food; institutional furniture.* 5. (of advertising) having as the primary object the establishment of good will and a favorable reputation rather than the immediate sale of the product. 6. pertaining to principles or ineptitudes; jurisprudence. [INSTITUTION + -AL¹] —**in·sti·tu′tion·al·ly**, *adv.*

**in·sti·tu·tion·al·ise** (in′sti tōō′shə nl īz′, -tyōō′-), *v.t.*, -ised, -is·ing. *Chiefly Brit.* institutionalize. —*in′sti·tu′tion·al·i·sa′tion, n.*

**in·sti·tu·tion·al·ism** (in′sti tōō′shə nl iz′əm, -tyōō′-), *n.* 1. the system of institutions or organized societies devoted to public, charitable, or similar purposes. 2. strong attachment to established institutions, as of religion. 3. the belief or theory that society must establish and maintain public institutions. 4. the belief or policy that a church must maintain institutions of education, welfare, etc., for its members. [INSTITUTIONAL + -ISM]

**in·sti·tu·tion·al·ize** (in′sti tōō′shə nl īz′, -tyōō′-), *v.t.*, -ized, -iz·ing. 1. to make institutional. 2. to make into or treat as an institution. 3. to place or confine in an institution, esp. one for the special care of mental illnesses, alcoholism, etc. Also, esp. *Brit.,* institutionalise. [< L; see INSTITUTE, -IZE] —**in·sti·tu′tion·al·i·za′tion**, *n.*

**in·sti·tu·tion·ar·y** (in′sti tōō′shə ner′ē, -tyōō′-), *adj.* 1. of or pertaining to an institution or institutions; institutional. 2. of or pertaining to institution, esp. ecclesiastical institution. [INSTITUTION + -ARY]

**in·sti·tu·tive** (in′sti tōō′tiv, -tyōō′-), *adj.* tending or intended to institute or establish. [INSTITUTE + -IVE] —**in′sti·tu′tive·ly**, *adv.*

**in·sti·tu·tor** (in′sti tōō′tər, -tyōō′-), *n.* 1. one who institutes or founds. 2. *Prot. Episc. Ch.* one who institutes a minister into a parish or church. Also, instituter. [< LL; see INSTITUTE, -OR²]

**instr.,** 1 instructor. 2. instrument. 3. instrumental.

**in·stroke** (in′strōk′), *n.* 1. a stroke in an inward direction. 2. (in an engine) the stroke during which the piston moves into the cylinder. [IN + STROKE]

**in·struct** (in strukt′), *v.t.* 1. to direct or command; furnish with orders or directions: *The doctor instructed me to diet.* 2. to furnish with knowledge, esp. by a systematic method; teach; train; educate. 3. to furnish with information; inform; apprise. 4. *Law.* (of a judge) to guide (a jury) by outlining the legal principles involved in the case under consideration. [late ME < L *instruct(us)* equipped, informed (ptp. of *instruere*), equiv. to IN- IN-² + *-struc-* (var. s. of *struere* to put together) + -tus ptp. suffix] —**in·struct′i·ble**, *adj.* —**in·struc′tor·like′**, *adj.*

—Syn. 1. prescribe. 2. tutor, coach; drill, discipline; indoctrinate; school. 3. enlighten.

**in·struc·tion** (in struk′shən), *n.* 1. act or practice of instructing or teaching; education. 2. knowledge or information imparted. 3. an item of such knowledge or information. 4. Usually, instructions, orders or directions: *The instructions are on the back of the box.* 5. act of furnishing with authoritative directions. 6. *Computer Technol.* a character or set of characters which together with one or more operands defines an operation and which, when taken as a unit, causes a computer to operate on the indicated quantities. [ME *instruccioun* < L *instructiōn-* (s. of *instructiō*). See INSTRUCT, -ION] —**in·struc′tion·al**, *adj.*

—Syn. 1. teaching; pedagogy; training, drill, exercise; indoctrination; schooling. 5. command, mandate.

**in·struc·tive** (in struk′tiv), *adj.* 1. serving to instruct or inform; conveying instruction, knowledge, or information. 2. *Gram.* noting a case, as in Finnish, whose distinctive function is to indicate means by which. —*n.* 3. *Gram.* the instructive case. [INSTRUCT + -IVE] —**in·struc′tive·ly**, *adv.* —**in·struc′tive·ness**, *n.*

**in·struc·tor** (in struk′tər), *n.* 1. one who instructs; a teacher. 2. a teacher in a college or university who ranks below an assistant professor. Also, *referring to a woman,* **in·struc·tress** (in struk′tris). [late ME < L *instructor*, equiv. to *instruct-* (var. s. of *instruere*; see INSTRUCT) + -or -OR²] —**in·struc′tor·ship**, *n.* —**in·struc′tor·ly**, *adj.*

—Syn. 1. tutor, schoolmaster, preceptor, pedagogue.

**in·stru·ment** (in′strə mənt), *n.* 1. a mechanical device or contrivance; tool; implement; *a surgeon's instruments.* 2. a contrivance for producing musical sounds: *a stringed instrument.* 3. that with or by which something is effected; means; agency; *an instrument of government.* 4. a formal legal document, as a contract, promissory note, deed, grant, etc. 5. a person used by another merely as a means to some private end. 6. a device for measuring the present value of the quantity under observation. 7. a mechanical or electronic measuring device, esp. one used in navigation: *landing a plane by instruments.* —*adj.* 8. *Aeron.* relying on only instruments for navigation: *instrument flying; instrument landing.* 9. controlled (def. 10). —*v.t.* 10. to equip with instruments, as a machine, manufacturing process, etc. 11. to arrange a composition for musical instruments; orchestrate. [ME < L *instrūmentum* equipment, equiv. to *instru(ere)* (see INSTRUCT) + *-mentum* -MENT; see INSTRUCT]

—Syn. 1. See tool.

**in·stru·men·tal** (in′strə men′tl), *adj.* 1. serving as an instrument or means. 2. of or pertaining to an instrument. 3. performed on or written for a musical instrument or musical instruments: *instrumental music.* 4. *Gram.* a. (in certain inflected languages, as Old English and Russian) noting or pertaining to a case having as its distinctive function the indication of means or agency, as Old English *hwíle* during that while *hwíle* "looked with happy countenance." b. noting the affix or other element characteristic of this case, or a word containing such an element. c. similar to such a case form in function or meaning, as the Latin instrumental ablative, *gladiō,* "by means of a sword." 5. *Obs.* helpful; useful. —*n.* 6. *Gram.* the instrumental case. 7. a word in the instrumental case. 8. a construction of similar meaning. 9. a musical composition played by an instrument or a group of instruments. [ME < ML; cf. *vocal* (def. 8). [ME < ML *instrūmentālis*. See INSTRUMENT, -AL¹]

**in·stru·men·tal·ism** (in′strə mən′tl iz′əm), *n.* a pragmatic philosophy and theory of the function of thought in which thought is to be instrumental in controlling environment, and that the value of ideas is determined by their function in human experience or progress. [INSTRUMENTAL + -ISM]

**in·stru·men·tal·ist** (in′strə men′tl ist), *n.* 1. one who performs on a musical instrument. 2. an advocate of instrumentalism. —*adj.* 3. of, pertaining to, or advocating instrumentalism. [INSTRUMENTAL + -IST]

**in·stru·men·tal·i·ty** (in′strə men tal′i tē), *n.*, pl. -ties. 1. quality or state of being instrumental; agency. 2. a means, medium, or agency. 3. an instrument or thing with which something is done.

or function of serving some purpose. 3. a means or agency. [INSTRUMENTAL + -ITY]

**in·stru·men·tal·ly** (in′strə men′tl ē), *adv.* 1. by or with the use of an instrument. 2. with or as an instrument, esp. a musical instrument. [INSTRUMENTAL + -LY]

**in·stru·men·ta·tion** (in′strə men tā′shən), *n.* 1. the arranging of music for instruments, esp. for an orchestra. 2. the list of instruments for which a composition is scored. 3. the use of, or work done by, instruments. 4. instrumental agency; instrumentality. 5. the science of developing, manufacturing, and utilizing instruments, esp. those used in science and industry. [INSTRUMENT (v.) + -ATION]

**in·stru·ment pan·el,** *Auto.* dashboard (def. 1). Also called **in·strument board**.

**in·sub·or·di·nate** (in′sə bôr′dn it), *adj.* 1. not submitting to authority; disobedient: *an insubordinate soldier.* 2. not lower. —*n.* 3. one who is insubordinate. [IN-³ + SUBORDINATE] —**in·sub·or′di·nate·ly**, *adv.*

**in·sub·stan·tial** (in′səb stan′shəl), *adj.* 1. not substantial; slight. 2. without reality: *the lines in an insubstantial world of dreams.* [< LL *īnsubstantiāl(is)*. See IN-³, SUBSTANTIAL] —**in·sub·stan′ti·al′i·ty**, *n.* —**in·sub·stan′tial·ly**, *adv.*

**in·suf·fer·a·ble** (in suf′ər ə bəl), *adj.* not to be endured; intolerable; unbearable: *insufferable insolence.* [IN-³ + SUFFERABLE] —**in·suf′fer·a·ble·ness**, *n.* —**in·suf′fer·a·bly**, *adv.*

**in·suf·fi·cien·cy** (in′sə fish′ən sē), *n.*, pl. -cies or -ties. 1. deficiency in amount, force, or fitness; inadequateness; insufficiency of supplies. 2. an instance of this. Also, **in·suf′fi·cience**. [late ME < LL *īnsufficientia*. See INSUFFICIENT, -CY]

**in·suf·fi·cient** (in′sə fish′ənt), *adj.* 1. not sufficient; lacking in what is necessary or required: *an insufficient answer.* 2. deficient in force, quality, or amount; inadequate; insufficient protection. [ME < LL *īnsufficient-* (s. of *īnsufficiēns*). See IN-³, SUFFICIENT] —**in·suf·fi′cient·ly**, *adv.*

**in·suf·flate** (in suf′lāt, in′sə flāt′), *v.t.*, -flat·ed, -flat·ing. 1. to blow or breathe (something) in. 2. *Eccl.* to blow (air or a medicinal substance) into some opening or upon some part of the body. 3. *Eccles.* to breathe upon, esp. upon one being baptized or upon the water of baptism. [< LL *insufflāt(us)* blown into or upon. See IN-², SUFFLATE] —**in′suf·fla′tion**, *n.* —**in′suf·fla′tor**, *n.*

**in·su·la** (in′sə lə, ins′yə-), *n.*, *pl.* -lae (-lē). *Anat.* a group of convolutions situated at the base of the lateral fissure of the brain. Also called **island of Reil**. [< NL; L: island; see ISLE]

**in·su·lar** (in′sə lər, ins′yə-), *adj.* 1. of or pertaining to an island or islands: *insular possessions.* 2. dwelling or situated on an island. 3. forming an island: *insular rocks.* 4. detached; standing alone; isolated. 5. pertaining to, or characteristic of islanders. 6. narrowly exclusive; illiberal: *insular attitude toward foreigners.* 7. *Pathol.* occurring in or characterized by one or more isolated spots, patches, or the like. 8. *Anat.* pertaining to an island of cells or tissue, as the islets of Langerhans. —*n.* 9. an inhabitant of an island; islander. [< LL *īnsulār(is)*. See INSULA, -AR¹] —**in·su·lar′i·ty** (in′sə lar′i tē, ins′yə-), **in′su·lar·ness**, *n.* —**in′su·lar·ly**, *adv.*

**Insular Celt′ic,** a partly geographical, partly genetic grouping of Celtic languages that consists of those spoken in the British Isles in ancient times and those descended from them. Cf. Continental Celtic.

**in·su·lar·ize** (in′sə lə rīz′, ins′yə-), *v.t.*, -ized, -iz·ing. to make into an island or represent as insular. [INSULAR + -IZE]

**in·su·late** (in′sə lāt′, ins′yə-), *v.t.*, -lat·ed, -lat·ing. 1. to cover or surround an electric wire or the like with nonconducting material. 2. (in physics, electronics, etc.) to separate conductors by the interposition of a nonconductor in order to prevent or reduce the transfer of electricity, heat, or sound. 3. to place in an isolated situation or condition; segregate. [< L *insula(a)* made into an island. See ISOLATE]

**in·su·la·tion** (in′sə lā′shən, ins′yə-), *n.* 1. material used for insulating. 2. act of insulating. 3. state of being insulated. [INSULATE + -ION]

**in·su·la·tor** (in′sə lā′tər, ins′yə-), *n.* 1. *Elect.* a. a material or such low conductivity that the flow of current through it can usually be neglected. b. insulating material, often glass or porcelain, in a unit form so designed as to support a charged conductor and electrically isolate it. 2. one who or that which insulates. [INSULATE + -OR²]

**in·su·lin** (in′sə lin, ins′yə-), *n.* 1. *Biochem.* a hormone, produced by the islets of Langerhans of the pancreas, that regulates the metabolism of glucose and other carbohydrates. 2. *Pharm.* any of several commercial preparations of this substance, each of which allows a particular rate of absorption into the system: obtained from the pig or ox pancreas, and used in the treatment of diabetes to restore the normal ability of the body to utilize sugars and other carbohydrates. [INSUL(A) + -IN²]

**in·su·lin·ize** (in′sə lin īz′, ins′yə-), *v.t.*, -ized, -iz·ing. to treat with insulin. [INSULIN + -IZE] —**in′su·lin·i·za′tion**, *n.*

**insulin shock′,** *Pathol.* a state of collapse caused by a decrease in blood sugar resulting from the administration of excessive insulin. Also called **in·sulin coma′tion**.

**In·sull** (in′səl), *n.* **Samuel,** 1859–1938, U.S. public utilities magnate, born in England.

**in·sult** (v. in sult′; n. in′sult), *v.t.* 1. to treat insolently or with contemptuous rudeness; affront. 2. *Archaic.* to attack; assault. —*v.i.* 3. *Archaic.* to behave with insolent triumph; exult contemptuously (usually fol. by *on, upon,* or *over*). —*n.* 4. an insolent or contemptuously rude action or speech; affront. 5. something having the effect of an affront: *That book is an insult to one's intelligence.* 6. *Med.* an injury or trauma. 7. an agent that inflicts this. 7. *Archaic.* an attack or assault. [< L *insult(āre)* (v.) jump on, insult, equiv. to IN-² + *-sultāre,* var. of *saltāre* to jump; see SALTANT] —**in·sult′a·ble**, *adj.* —**in·sult′er**, *n.* —**in·sult′ing·ly**, *adv.*

—Syn. 1. offend, scorn, injure, abuse. 4. offense, outrage, indignity. INSULT, AFFRONT, INDIGNITY imply an act which injures another's dignity, self-respect, etc. See the full list inside the front cover.

**CONCISE PRONUNCIATION KEY:** *act,* ā*ble,* dâre, ärt; ĕbb, ēqual; ĭf, īce; hŏt, ōver, ôrder, oil, bŏŏk, ōoze, out; up, ûrge; chief; sĭng; shoe; thĭn, *that*; ʒh as in measure. ə = a as in *alone,* e as in *system,* i as in *easily,* o as in *gallop,* u as in *circus;* ᵊ as in button (but′ᵊn), fire (fī⁹r), cradle (krād′ᵊl). See the full key inside the front cover.

557

**EXHIBIT 34**

# EXPERT OPINIONS OF LLOYD ZOLA:

# INTERNATIONAL CHURCH OF THE FOURSQUARE GOSPEL v. CITY OF SAN LEANDRO

The attached report sets forth my opinions in the matter of International Church of the Foursquare Gospel v. City of San Leandro.

*[signature]*

June 30, 2008

EXHIBIT 34

# EXPERT OPINIONS OF LLOYD ZOLA IN THE MATTER OF INTERNATIONAL CHURCH OF THE FOURSQUARE GOSPEL v. CITY OF SAN LEANDRO

## *Introduction*

### Purpose of Report and Summary of Opinions

The purpose of this report is to set forth the expert opinions of Lloyd Zola in the matter of *International Church of the Foursquare Gospel v. City of San Leandro*. At the request of the City of San Leandro, Lloyd Zola has undertaken an independent review of the public record of the entitlement processing for the Faith Fellowship Foursquare Church (Faith Fellowship), as well as of the preparation and adoption of the Assembly Overlay zoning district, and is providing expert opinions regarding the preparation, processing, and approval of entitlements for Faith Fellowship and the City's Assembly Uses Overlay District.

The opinions set forth in this report are summarized as follows.

1. Overall, San Leandro's General Plan and zoning requirements provide ample opportunity for the establishment and expansion of religious assembly uses, including large churches, within the City, and provide for equal treatment of religious assembly uses and other assembly uses.

2. The City of San Leandro's Assembly Use overlay district reflects a reasonable set of criteria that are consistent with the City's General Plan. The overlay district is a better approach to expanding the number of sites available for religious assembly use than changing the Catalina site's zoning, and permitting religious assembly uses throughout the entirety of one or more industrial zones.

3. Approval of the Faith Fellowship's proposed use of the Catalina site for religious assembly would be inconsistent with the San Leandro General Plan. Modifications to the zoning code along could not make assembly use on the Catalina site consistent with the General Plan.

4. There was no reasonable expectation for zoning approval since neither the City's General Plan nor its zoning code would permit the Catalina site to be used for religious assembly use.

5. A prudent buyer who requires approval of discretionary actions by a City in order to establish their desired use of a property should make close of escrow contingent upon approval of the required discretionary actions by the City.

### Background into General Plans and Zoning

Key to understanding the City's actions in this matter is understanding the role of the City's General Plan and zoning ordinance. Simply stated, the City of San Leandro General Plan is the City's lead legal document setting forth its policies for the

development of land. The San Leandro Zoning Ordinance defines permitted and conditionally permitted uses and associated review/approval procedures, and sets forth specific development standards for permitted and conditionally permitted uses consistent with the provisions of the General Plan.

**State of California General Plan Requirements.** State law (Government Code Section 65302, et seq.) requires that every California city and county prepare and adopt a "comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." According to State guidelines for the preparation of general plans, the role of the General Plan is to establish a document that will "...act as a 'constitution' for development, the foundation upon which all land use decisions are to be based. It expresses community development goals and embodies public policy relative to the distribution of future land use, both public and private."

As further mandated by the State, the General Plan must serve to:

- Identify land use, circulation, environmental, economic, and social goals and policies for the City as they relate to land use and development;
- Provide a framework within which the City's decision-making bodies can make land use decisions;
- Provide citizens the opportunity to participate in the planning and decision-making process affecting the City; and
- Inform citizens, developers, decision-makers, and other agencies, as appropriate, of the City's basic rules that will guide land development decisions within the City.

The City's existing General Plan reflects this concept. As stated in the General Plan's Introduction:

> "The San Leandro General Plan is intended for use by all members of the community.
>
> *If you are a San Leandro resident,* the Plan indicates the general types of uses that are permitted around your home, the long-range plans and changes that may affect your neighborhood, and the policies the City will use to evaluate development applications that might affect you and your neighbors. The Plan identifies the actions the City will take to ensure that your neighborhood remains a great place to live.
>
> *If you are a San Leandro business,* the Plan outlines the measures the City will take to protect your investment and encourage your future success. Expectations for the City's business districts are spelled out, while policies ensure that business operations will be compatible with other businesses and nearby residential areas.

- 2 -

560

*If you are interested in moving your home or business to San Leandro* or developing land within the City, the General Plan will introduce you to our community. The Plan contains extensive background information about San Leandro, including long-range population and economic forecasts. The City Structure Diagram and the Land Use Diagram (Figures 3-1 and 3-2) are useful starting points. However, it is important to review maps and policies throughout this document and the San Leandro Zoning Code to get a complete perspective on how and where development may take place.

The General Plan is also a tool to help City staff, City Boards and Commissions, and the City Council make land use and public investment decisions. It provides the framework for the City's Zoning Code. It identifies the transportation improvements, community service and facility needs, and environmental programs needed to sustain and improve the quality of life in the City. Future development decisions must be consistent with the Plan. Finally, the Plan is intended to help other public agencies, from Caltrans to our local school districts, as they contemplate future actions in San Leandro."

State law requires that the General Plan include seven mandatory elements, but allows local jurisdictions to organize their General Plans in any manner as long as the required subjects of each of the following seven mandatory elements are addressed.

- The **Land Use Element** is required to designate the general distribution of uses of land for housing, business, industry, open space, education, public buildings and grounds, waste disposal facilities, and other categories of public and private uses. The Land Use Element is also required to set forth standards for population density and building intensity.

- The **Circulation Element** is required to be correlated with the land use element, and to identify the general location and extent of existing and proposed major thoroughfares, transportation routes, terminals, and other local public utilities and facilities. Overall, the objective of the Circulation Element is to promote the movement of people and goods.

- The **Housing Element** is required to include a comprehensive assessment of current and projected housing needs for all economic segments of the community. It embodies policy for providing adequate housing for all economic segments of the community, and includes a short-term action program.

- The **Conservation Element** is required to address the conservation, management, and use of natural resources, including water, soils, biological habitats, and mineral deposits.

- The **Open Space Element** is required to detail programs for preserving open space for natural resource protection, the managed production of resources, outdoor recreation, and protection of public health and safety.

- The **Noise Element** is required to evaluate present and projected noise levels within the community as a guide for establishing a pattern of land uses in the land use element that minimizes the exposure of community residents to excessive noise.

- The **Safety Element** is required to establish policies and programs to protect the community from risk associated with seismic, geologic, flood, and fire hazards, including identification of hazards, establishment of safety standards, and delineation of evacuation routes.

In addition to these mandatory elements, Government Code Section 65303 states that a community's General Plan "may include any other elements or address any other subjects which, in the judgment of the legislative body, relate to the physical development of the county or city." Once adopted, General Plan elements and provisions addressing issues beyond those required by State law have the same force and effect as policies related to the General Plan elements required by the State.

State law requires that the General Plan be internally consistent. In order to function as a useful statement of local policy, the various components of the General Plan need to "comprise an integrated, internally consistent and compatible statement of policies..."[1] The concept of internal General Plan consistency revolves around the following issues:

- **Equal Status among General Plan Elements**. All elements of a General Plan have equal legal status, and no General Plan Element is permitted to take precedence over any other.

- **Consistency among Elements and Within Individual Elements**. All General Plan elements and portions of the plan must be consistent with each other. An individual provision of the General Plan must not require or encourage an action to be taken that is prohibited or discouraged by another General Plan provision.

- **General Plan Text, Diagram, and Map Consistency**. Because General Plan text, diagrams, and maps are each integral parts of the General Plan, they must be consistent with one another. Thus, the diagrams and maps of the General Plan, including the land use and circulation maps, are a graphic reflection of the General Plan text, and must be consistent with written policies.

Because it is long range and comprehensive, a General Plan cannot address every detail. The General Plan must therefore establish a general framework, based on recognized trends, best available projections, and community values regarding the future that is desired by the community and how land use and development decisions are to be made in achieving that future. Although the General Plan is a "general" guide for decisionmaking it is the lead legal document within a community for planning and development decisions. California Government Code Section 65860 (a) requires that city and county

---

[1]    Government Code Section 65300.5.

zoning ordinances be consistent with the agency's General Plan. This section further states that the various land uses authorized by the zoning ordinance must be "compatible with the objectives, policies, general land uses, and programs specified in the (general) plan." Thus, the uses authorized by the City of San Leandro zoning ordinance, whether or not they require a conditional use permit, must by law be consistent with the City's General Plan, including the General Plan's objectives, policies, general land uses, and programs.

These requirements for General Plan consistency are recognized in the San Leandro General Plan. As stated in the Introduction chapter of the General Plan:

> "California law also requires that other local government programs are consistent with the general plan. The City's zoning and subdivision regulations, its capital improvement program, its redevelopment programs, its specific plans, its development agreements, its community standards and housing programs, and even its economic development activities, should further the achievement of general plan goals. Thus, this Plan provides guidance on how other City programs and activities should be changed or strengthened to best implement local policies. It also identifies new ordinances and programs to be developed."

**City of San Leandro General Plan.** The City's existing General Plan was adopted on May 6, 2002. The San Leandro General Plan provides citywide policies that apply uniformly throughout the City, as well as policies applicable only to ten individual "Focus Areas" within the City. The General Plan update program that led to adoption of the City's plan in May 2002 involved substantial input from the community.

The General Plan update was initiated with by the City Council in November 1998. In January 1999, about 125 San Leandro residents gathered for a "Town Meeting." At the same time, a citywide survey was conducted to determine local attitudes on land use and transportation matters. Nearly 600 surveys were returned, which the City concluded would allow a "reliable analysis of local preferences and priorities." In March 1999, the City Council appointed 59 San Leandro residents and business representatives to a General Plan Advisory Committee (GPAC), which was charged with developing a vision for San Leandro's future, and crafting General Plan goals, policies, and actions.

The GPAC was initially divided into four subcommittees: Residential Neighborhoods, Business and Industry, Transportation, and Community Services and Facilities. The Subcommittees met more than 50 times between May 1999 and July 2000. During that period of time, the full 59-member GPAC met 10 times to develop a vision statement, construct the Land Use Diagram, and address issues relating to particular parts of the City where changes were anticipated.

In November 1999, the City sponsored a General Plan Fair, inviting the public to comment on GPAC proposals, vote on various policy issues, and participate in small discussion groups. The General Plan reports that more than 250 persons attended.

563

Concurrent with the GPAC's work, the technical information necessary to support the General Plan was compiled and analyzed. According to the General Plan, a citywide land use inventory was prepared, updated traffic counts were assembled, a real estate market analysis was performed, and noise levels in different neighborhoods were monitored. Other reports documenting local demographics, visual conditions, safety hazards, and natural resources were drafted.

The second phase of the General Plan update was initiated in November 2000 and continued until June 2001. The GPAC was divided into three new subcommittees: Open Space, Parks, and Conservation; Safety and Noise (Environmental Hazards); and Historic Preservation and Community Design. During this period, more than 20 subcommittee meetings and four more meetings of the full GPAC were held.

As reported in the General Plan, shortly after this phase of the update was initiated, a poster summarizing the GPAC's recommendations was mailed to every household and business in the City. A reply card asked for community feedback on the proposals. More than 1,400 responses were received by the City. In January 2001, three community meetings were held to review GPAC work and obtain input on the issues being addressed by the new subcommittees.

Following review by City staff and GPAC members of an administrative draft of the General Plan and General Plan Environmental, the Plan was released for public review in November 2001. City Boards and Commissions were briefed on the document and presentations were made to groups throughout the community. Six public hearings on the Plan were held before the Planning Commission and City Council between November 2001 and May 2002.

**Zoning**. The San Leandro Zoning Code, sometimes informally referred to as the City's "zoning ordinance," sets forth the regulations that apply to the use and development of land in the City and the types of development review employed by the City to implement those regulations. The Zoning Code sets forth zoning classifications; identifies permitted and conditionally permitted uses, as well as applicable development standards for those uses as set forth in various industrial, commercial, residential, and other zones; defines requirements for parking and signs; and establishes review processes for various types of uses. As stated in Section 1-104 of the San Leandro Zoning Code:

> "The broad purposes of the Zoning Code are to protect and promote the public health, safety, and general welfare, and to implement the policies of the City of San Leandro General Plan and any adopted Specific Plan or Redevelopment Plan, as provided in the California Government Code, Title 7, Chapters 3 and 4 and in the California Constitution, Chapter 11, Section 7. More specifically, the Zoning Code is intended to:

- 6 -

A. Provide a precise guide for the physical development of the City in accord with the policies of the General Plan and any adopted Specific Plan or Redevelopment Plan in order to:

1. Preserve the character and quality of residential neighborhoods and commercial and industrial areas consistent with the character of the development districts of the City;

2. Foster convenient, harmonious, and workable relationships among land uses; and

3. Achieve progressively the land development described in the General Plan.

B. Promote the economic stability of existing land uses that are consistent with the development policies of the General Plan and protect them from intrusions by inharmonious or harmful land uses.

C. Prevent excessive population densities and overcrowding of land or buildings.

D. Ensure the provision of adequate open space for light, air, and fire safety.

E. Reduce the risk of injury or exposure to hazard of people and property.

F. Permit the development of office, commercial, industrial, and related land uses that are consistent with the General Plan in order to strengthen the City's economic base.

G. Require the provision of adequate off-street parking and loading facilities, and promote a safe, effective traffic circulation system.

H. Ensure that service demands of new development will not exceed the capacities of existing streets, utilities, or public services.

I. Conserve and enhance the City's architectural and cultural resources.

J. Conserve and enhance key visual features of San Leandro's setting, including the hillsides and bay front, consistent with the General Plan.

K. Improve the design and aesthetic quality of new and existing development.

L. Provide for the elimination, over time, of land uses and structures that are inconsistent with the policies of the General Plan and adversely affect other property or uses."

**Conditional Use Permits.** The San Leandro Zoning Code has long allowed places of religious assembly as "religious assembly" uses within its residential zones subject to approval of a conditional use permit. With the adoption of the Assembly Use Overlay Zone, the City now permits religious assembly uses as part of a more general "assembly uses" category within residential zones and within the Assembly Use Overlay Zone, subject to approval of a "conditional use permit."

As noted in Section 5-2202 of the San Leandro Zoning Code, the Board of Zoning Adjustments is authorized to approve or conditionally approve applications for use permits upon finding that the proposed use permit "is consistent with the General Plan, the general purposes of this Article (of the Zoning Code), the specific purposes of the base or overlay zoning district in which a development site is located, and all applicable requirements of the Municipal Code." The specific findings that the Zoning Code requires the Board of Zoning Adjustments to make for approval or conditional approval of use permits within the zones permitting religious assembly uses include:

"1.    That the proposed location of the use is in accord with the objectives of this Code and the purposes of the district in which the site is located;

2.    That the proposed location of the use and the proposed conditions under which it would be operated or maintained will be consistent with the General Plan; will not be detrimental to the public health, safety or welfare of persons residing, or working in, or adjacent to, the neighborhood of such use; and will not be detrimental to properties or improvements in the vicinity, or to the general welfare of the City;

3.    That the proposed use will comply with the provisions of this Code, including any specific condition required for the proposed use in the district in which it would be located; and

4.    That the proposed use will not create adverse impacts on traffic or create demands exceeding the capacity of public services and facilities, which cannot be mitigated."

**Overlay Zones.** The purpose of an overlay zone is to provide a means for applying specific zoning provisions (e.g., development requirements; performance standards; permitted, conditionally permitted, or prohibited uses) within specific portions of a community where such provisions would not appropriately apply throughout the entirety of any one or more zoning districts. The use of overlay zones provides communities with the ability to geographically tailor zoning provisions to specific circumstances within the community. Within an overlay district, both the provisions of the underlying zoning district and the overlay district apply. For example, in areas where the Assembly Uses Overlay District was applied to a property zoned IL (Industrial Limited), CC (Commercial Community), or IP (Industrial Park), in addition to the uses permitted and conditionally permitted within those zoning districts, assembly uses would be permitted subject to approval of a conditional use permit.

- 8 -

*Opinions*

1. **Overall, San Leandro's General Plan and zoning requirements provide ample opportunity for the establishment and expansion of religious assembly uses, including large churches, within the City, and provide for equal treatment of religious assembly uses and other assembly uses**

## Basis for this Opinion

**San Leandro Provides Ample Opportunities for New Religious Assembly Uses.**
Prior to adoption of the City's Assembly Use Overlay District, places of religious assembly were permitted only within the City's residential zoning districts subject to approval of a conditional use permit. With the adoption of the City's assembly uses overlay, places of religious assembly continue to be permitted within the City (subject to approval of a conditional use permit) on every parcel within each of the City's residential zones. These residential zones include:

- **RO Residential Outer District**, which is intended to provide opportunities for single- and two-family dwellings on larger lots.

- **RS Residential Single-Family District**, which is intended to provide opportunities for single-family residential land use in traditional neighborhoods. There are two sub-districts of the RS district. One of these subdistricts, indicated by a "-40" designation, is intended for areas where the minimum front yard setback is forty (40) feet. The other, indicated by a "–VP" designation, is intended for "view preservation", where the maximum height limit is eighteen (18) feet and all new homes and additions are subject to discretionary review to prevent unreasonable blockage of views.

- **RD Residential Duplex District**, which is intended to provide opportunities for two-family housing at appropriate locations.

- **RM Residential Multi-Family District**, which is intended to provide opportunities for multiple family residential uses, including town houses, condominiums, multi-dwelling structures, or cluster housing with landscaped open space for residents' use, and apartments. Single-family and duplex dwellings are permitted uses in these districts. Four types of multi-family districts are established, providing for maximum allowable densities of 14.5, 17.5, 22, and 24 dwellings per gross acre.

Providing for religious assembly uses within a community's residential zones is a common, traditional, and well accepted method of providing for such uses. In this system of zoning, religious assembly uses are located in close proximity to the residents they serve, do not compete for land with retail sales tax- and employment-generating uses, and avoid the potential land use compatibility issues of locating within industrial or commercial areas. Religious assembly uses would also typically have a large number of available residentially zoned sites on which to locate within a community as the community is developing. However, as a community nears a buildout condition, there

- 9 -

would be a fewer residentially zoned sites available within the community for new or expanded religious assembly uses.

According to City staff, there are currently 41 churches within San Leandro, two of which have congregations larger than 1000. With the exception of Faith Fellowship's desire to expand its facilities to accommodate 3000 congregants[2] and relocate to a site outside of the City's residential zones, there is no evidence that San Leandro's zoning, which has long permitted religious assembly uses only within residential zones, subject to approval of a conditional use permit, does not well serve the community. Expanding opportunities to locate places of religious assembly in San Leandro does not appear to have arisen as part of the extensive public outreach that was undertaken by the City as part of its General Plan update. In fact, the impetus for City staff to undertake studies of appropriate non-residential locations for religious assembly uses was specifically related to Faith Fellowship's request to relocate their facility to a non-residential property. As noted in the February 22, 2007 staff report to the Planning Commission on the proposed Assembly Use Overlay District, "In response to an application by a church to re-locate to a non-residential district, staff analyzed the possibility of allowing assembly uses on appropriate non-residential sites, and expanding the land use options for assembly uses."

The effect of the Assembly Uses Overlay District was to increase the area where religious assembly uses could be located within the City of San Leandro from areas zoned residential to an additional 196 properties included within the Assembly Use Overlay District, covering an area of approximately 211.1 acres.

Typically, the areas included within the Assembly Use Overlay District consist of older properties, a number of which are underutilized or in need of redevelopment. While some of the existing buildings within the Assembly Use Overlay District can be easily adapted to new uses, including assembly uses of various sizes, other properties within the Overlay District contain dated commercial or industrial buildings that might not be well suited to more productive use, whether or not that use is for religious assembly or a modern commercial or industrial use. However, it is not necessary for a use locating on such properties to use the existing building, which could be taken down to make way for a new use on the site. Such recycling of older buildings is common in mature communities such as San Leandro.

As noted above, the 196 properties within the Assembly Use Overlay District encompass an area of approximately 211.1 acres. The Overlay District was constructed such that, even though many parcels are smaller than 2 acres, each cluster of parcels within the District is a minimum of 2 acres, allowing potential assembly uses to combine one or more individual parcels within the Overlay District to create a development area of sufficient size to accommodate the larger assembly use.[3] Thus, even if some of the

---

[2] Faith Fellowship's current facility accommodated 1400 congregants.
[3] It should be noted that the 2-acre minimum is a minimum area to be zoned, and not a minimum parcel size for individual parcels within the Overlay District. As noted in the February 22, 2007 staff report for the Planning Commission public hearing on the Assembly Use Overlay District, the minimum 2-acre site

- 10 -

parcels within the Assembly Use Overlay District are too small to accommodate a larger assembly use, a potential use can acquire multiple parcels to create a large enough site.

Even if a potential assembly use cannot acquire a parcel or parcels of sufficient size to accommodate both the building and all required off-street parking, City ordinance provides for a use to locate its parking offsite. Section 4-1702 of the San Leandro Zoning code states:

> "Parking required to serve a nonresidential use may be on the same or a different site under the same or different ownership as the use served, provided that parking shall be within the following distances of the use served, measured from the near corner of the parking facility to the public entrance of the use served via the shortest pedestrian route:

| | |
|---|---|
| Customer/Visitor Spaces: 200 feet | Employee Spaces: 400 feet" |

This is essentially how Faith Fellowship has proposed to provide adequate offsite parking at the proposed Catalina site.

Some of the parcels within the Assembly Use Overlay District may be larger than any particular assembly use might want. Other sites within the District are located within multi-tenant facilities that might effectively preclude a user who insists on purchasing its own building, while providing opportunities for a user who does not wish to purchase a site and building, but would prefer a multi-year lease. Lease arrangements are often beneficial to non-residential users since they can facilitate the user's ability to move to a larger or smaller facility that better meets their needs at the end of the lease period.

One of the sites within the Assembly Use Overlay District is the Kraft Foods site. This site has long been used as a large-scale food processing plant. Its current buildings and structures are too large and too specialized to be readily usable for non-industrial use. This does not, however, eliminate this parcel as a potential future site for assembly uses. Large scale industrial uses have been converted to smaller uses. For example within the City of Pico Rivera, California, a former Ford manufacturing plant was sold to Northrup Grumman, which re-tooled, operated, and ultimately closed the plant. Subsequent to the plant closure by Northrup Grumman, the site was converted to a large business park, encompassing large and small commercial and industrial uses. The former Kaiser Fontana steel plat has been converted into the Auto Club (formerly California) Speedway, the Kaiser Commerce Center industrial park, and an office complex. A General Dynamics plant in Rancho Cucamonga, which was formerly used for assembly of naval missiles, has been converted to a multi-tenant office complex.

The Assembly Use Overlay District provided some important benefits to the City. Overall, it adds 196 parcels to the inventory of sites where assembly uses are permitted, subject to approval of a conditional use permit. This is a substantial increase for a City

---

area for the Overlay Zone was based on staff research "indicating that large assembly uses require a minimum 2-acre site to accommodate bigger building sites and to allow for adequate onsite parking."

569

which currently has 41 churches. In addition, the Assembly Use Overlay District provides an inventory of sites for larger assembly uses, substantially increasing opportunities for larger assembly uses in a City which has two churches with over 1000 congregants. By expanding areas where assembly uses could locate within the City, the City has simultaneously created new opportunities to upgrade existing development within areas lacking the amenities needed for modern industry, provided for larger religious assembly uses than could previously be accommodated within the community, and provided a larger list of uses that could serve as buffers between potentially incompatible industrial and residential uses, while at the same time protecting the community's industrial economic and employment base.

**The City's Zoning Code Provides for Equal Treatment between Religious Assembly and other Assembly Uses.** As part of the adoption of the Assembly Use Overlay District, the City of San Leandro incorporated the definitions of "Clubs and Lodges" and Religious Assembly" into a single "Assembly Uses" definition. Thus, religious assembly uses, as well as club and lodges are permitted within the same zoning districts, subject to approval of a conditional use permit and are subject to the same development standards. Because they have similar needs and generate similar impacts, this is a reasonable planning approach.

## 2. The City of San Leandro's Assembly Use Overlay District reflects a reasonable set of criteria that are consistent with the City's General Plan. The Overlay District is a better approach to expanding the number of sites available for religious assembly use than changing the Catalina site's zoning, and permitting religious assembly uses throughout the entirety of one or more industrial zones.

## Basis for this Opinion

In evaluating the effect of the City's Assembly Use Overlay District, it is important to recognize that, prior to the Overlay District, religious assembly uses were permitted subject to approval of a conditional use permit only within residential zones. Thus, religious assembly uses were not previously permitted on *any* of the sites that were considered by City staff during preparation of the Assembly Use Overlay District; religious assembly uses were not previously permitted on any of the 196 sites that were ultimately included in the Overlay District, nor were religious assembly uses previously permitted on any of the sites ruled out for inclusion within the Overlay District because of one or more of the criteria that were used to craft the ordinance. As a result, sites rejected for inclusion in the Assembly Use Overlay District did not lose the ability to accommodate religious assembly uses, since that use was not permitted prior to the Overlay District.

**Importance of a Strong Employment Base to a City's Economic Well-Being and Environmental Quality.** Maintaining a strong local industrial employment base is critical to a community's economic well-being. The employment base creates personal

- 12 -

wealth in the form of personal income that supports the community's retail base, and generates sales taxes, which is a critical source of revenue to California cities and counties. An industrial employment base also creates wealth in the community through business-to-business purchases that indirectly enhance personal income and sales tax revenues within the community. A local industrial employment base directly creates income to the City through property tax revenues, and also sometimes provides as points of sale for taxable sales that directly generate sales tax revenue.

The fiscal health of a community is often closely tied to the community's land uses and economic development activity. Generally, industrial and commercial uses generate greater revenues and require fewer services than residential uses. In California, residential uses typically do not pay for themselves as they consume more in services than they directly pay to a city in revenues. As noted in the San Leandro General Plan, "industry and commerce provide thousands of jobs, millions of dollars in annual sales and property tax revenues, and many critical services to San Leandro residents. The City is committed to keeping its economy healthy, maintaining a competitive edge within the region, and staying attractive to established and emerging businesses."

Maintaining a strong industrial employment base is also an important factor in achieving environmental quality. Much effort is being expended by local and regional planning agencies throughout the State to achieve balance between local employment and local housing (jobs-housing balance). If employed residents can work close to home, commute times and distances will be reduced, resulting in decreased air pollutant emissions, as well as reduced traffic congestion and transportation infrastructure needs. Achieving a numeric balance between jobs and housing is a common objective in local General Plans, although municipalities cannot ultimately dictate who works at local jobs. The existence of local employment increases the potential for (but does not guarantee that) employed residents will choose to work locally or that newly hired employees at a company will choose to move to the vicinity.

**San Leandro General Plan Policies.** San Leandro's commitment to its employment sector is summarized on page 3-45 of its General Plan, which states "while economic diversification is encouraged in San Leandro, the existing industrial base should also be strongly supported. Proposed changes to zoning, design review requirements, fees, taxes, and other ordinances must be carefully evaluated for their impacts on established businesses. Programs to nurture existing businesses, such as one-stop permitting, business development assistance funds for renovation, utility tax and personal property tax rebates, and design assistance should be sustained in the long run and expanded as funds allow."

The San Leandro General Plan recognizes that encroachment of non-residential uses into industrial areas had been occurring and that policies were needed to protect the City's industrial employment base. As stated on page 3-52 of the General Plan,

> Non-industrial uses have already made inroads into some of San
> Leandro's traditional manufacturing areas. As heavy industry declined

- 13 -

571

during the 1970s and 1980s, several manufacturing plants and warehouses were converted to big box shopping centers, furniture stores, and offices. A number of older industrial sites were cleared and redeveloped with housing. The outcome of these changes has generally been positive, resulting in more productive use of the land, reinvestment in the community, and new jobs and tax revenues for the City. However, unbridled conversion of industrial uses could eventually erode San Leandro's manufacturing base and make it more difficult for industry to operate. Such industrial "gentrification" may be logical in some locations, but should be strongly discouraged in others.

"The areas most suitable for conversion to non-industrial uses are those located adjacent to existing housing, or in areas which lack the amenities to meet the needs of modern industry. Such areas exist along San Leandro Boulevard, Alvarado Street, and Marina Boulevard. In the case of the discount furniture stores along Alvarado Street, the market has changed to the point where some may be converted back to industry; this time, for technology uses or office-flex space rather than warehouses.

This General Plan confirms a commitment to maintain some parts of the City, particularly the General Industrial areas shown on Figure 3-2, as industry-only zones. In such areas, commercial uses should be limited to those that are linked to manufacturing or which provide services to businesses and the local workforce. "Class A" type office buildings like those envisioned around the BART Station should be discouraged in these areas. Retail uses that appear to attract customers from outside the area likewise should be discouraged. This will benefit San Leandro's commercial districts, by concentrating future retail and service growth within established shopping districts."

As noted in staff reports for the assembly uses overlay zone, staff looked to this policy statement in developing criteria for determining appropriate non-residential areas where assembly uses might appropriately located within the community. Additional policies staff used as the basis for determining appropriate areas to expand opportunities for assembly uses within the community included:

- Policy 7.06, Adaptive Reuse: Encourage private reinvestment in vacant or underutilized industrial and commercial real estate to adapt such property to changing economic needs, including the creation of flex/office space.

- Policy 7.07, Tax Base Enhancement: Encourage business development that improves the City's ability to provide the public with high-quality services and which minimizes increases in the tax burden for existing businesses and residents.

- Policy 7.09, West San Leandro Business District: Build upon the locational strengths and transportation features of West San Leandro to support the area's continued development as a major industrial, technology, and office employment center. In accordance with the West San Leandro Plan, limit the encroachment of incompatible

- 14 -

residential and retail uses into the area, and promote additional development and redevelopment with manufacturing, technology, warehouse and distribution, office/flex, and similar uses.

- Policy 7.10, South of Marina Business District: Facilitate the gradual transition of the South-of-Marina (SOMAR) area into a cohesive light industrial district characterized by light manufacturing, office/flex, research and development, bio-medical, e-commerce, and similar uses, along with complementary business services and employee amenities.

- Policy 10.04, Industrial Sanctuary: Protect the City's major industrial areas from encroachment by uses that are potentially incompatible with existing viable industrial activities, or which may inhibit the ability of industry to operate effectively.

- Policy 13.01, Decision-Making (Balancing Land Use and Transportation): Ensure that future land use and development decisions are in balance with the capacity of the City's transportation system.

- Policy 33.04, Separation from Sensitive Uses: Provide adequate and safe separation between areas where hazardous materials are present and sensitive uses such as schools, residences, and public facilities.

Based on the policies and the General Plan and the stated purpose of the Zoning Code to implement the General Plan, City staff developed the following criteria to evaluate appropriate locations for assembly uses, "with the express objective of expanding the opportunities for assembly uses beyond the residential zoning districts."

1. *Site is not located along a major commercial corridor* (identified as E. 14th Street and Marina Boulevard between San Leandro Boulevard and Merced Street)

   As noted on page 3-46 of the City's General Plan, "Most of San Leandro's retail/service businesses are located in regional, community, and neighborhood shopping areas, and along commercial corridors such as East 14th Street. General Plan policies seek to establish a stronger identity and market niche for each retail/service area, thereby bolstering their economic performance." Given the importance of generating sales tax revenues, the fact that religious assembly uses were not previously permitted along these corridors, and the lack of a compelling reason to commit these commercial corridors to non–commercial uses, not expanding the locations where assembly uses could be permitted along San Leandro's major commercial corridors was reasonable.

2. *Site is not located within the following General Plan Focus Areas:  Downtown, Bayfair, Marina Boulevard/SOMAR, or West San Leandro*

   **Downtown.** The General Plan Land Use Element provides policy specific direction for ten "Focus Areas," which were identified as areas with "unique issues that require more detailed discussion than is provided in the rest of the General Plan. Some of the Focus Areas have been targeted for immediate land use changes or gradual transition during the next two decades; others have special challenges related to land use, resource conservation, transportation, urban design, and other planning issues." The

- 15 -

Downtown Focus Area was identified in the General Plan as the "heart of the City," and served as the community's hub of commerce and employment for over 140 years. The General Plan noted that although development during the 1960's, 70's, and 80's provided "a number of attractive and highly functional buildings... many of the qualities that made Downtown San Leandro unique were lost."

Page 3-44 of the General Plan states that Downtown's street environment "should define Downtown as "the" place in San Leandro where people want to be—a place to shop, eat, and relax." Page 3-84 of the General Plan provides a summary description of the City's vision for the Downtown area, including a "desire to restore the elements that once made Downtown the center of civic life in San Leandro" and to "promote economic vitality, improve aesthetics, protect and restore historic resources, and provide for the long-term maintenance of Downtown investment." As a result, "specialty retail shops, restaurants, and other community retail activities are envisioned Downtown, particularly those that would benefit from the unique ambiance offered by a pedestrian-friendly location. Offices, civic uses, and upper story residential uses (above retail space) also are envisioned. Key to the strategy are activities which "increase the daytime and evening population of Downtown, creating a more lively street environment and providing a strong market for new businesses." These statements are reinforced in General Plan Policy 6.02:

"Develop and implement business development strategies that improve the mix of retail and service businesses Downtown, with an emphasis on higher-end retail shops, sit-down restaurants, and entertainment uses."

Given the policy direction of the General Plan to promote daytime and evening population and the economic vitality of Downtown, the fact that religious assembly uses were not previously permitted within the Downtown area, and the lack of a compelling reason to commit lands within Downtown to assembly uses, not expanding the locations where assembly uses could be permitted into San Leandro's Downtown was reasonable.

**Bayfair**. The Bayfair Focus area includes the Bayfair Mall, which the General Plan describes as the "largest shopping center in San Leandro and the hub of a 130-acre retail area." Surrounding uses within the Focus Area include the Fashion Faire and Fairmont Plaza (Albertsons) shopping centers and freestanding retail and office uses. This Focus Area also encompasses the Bayfair BART Station. The General Plan (page 3-88) notes that the area has faced competition from newer competing areas, resulting in sales tax revenues from this area declining during the 1990's. "The recent opening of a 16-screen multiplex cinema, as well as emerging plans to comprehensively redesign the Mall, are positive signs that Bayfair will successfully adapt to the East Bay's changing retail market." The General Plan goes on to state "additional development in and around Bayfair Mall should promote a synergistic mix of uses, such as retail shops, restaurants, entertainment venues, and offices." These concepts are reinforced in the following two General Plan policies:

- 16 -

"**8.01    RETAIL HIERARCHY**

Maintain a range of retail uses in the City, consisting of:

- Regional shopping concentrated around the existing centers at Bayfair, Marina Square, and Westgate;

- Community retail uses centered in Downtown San Leandro, reinforcing the area's image as the City center; and

- Neighborhood shopping districts located within subareas of the City, providing basic goods and services within easy access of neighborhood residents.

**8.10 BAYFAIR MALL**

Promote the revitalization of Bayfair Mall and its environs by introducing new and compatible uses, including new shops, services, community facilities, restaurants, entertainment venues, and offices."

Given the policy direction of the General Plan to revitalize the commercial character of this Focus Area, the fact that religious assembly uses were not previously permitted within the Bayfair area, and the lack of a compelling reason to commit lands within this area to assembly uses, not expanding the locations where assembly uses could be permitted into the Bayfair Focus Area was reasonable.

**Marina Boulevard/SOMAR.** This Focus Area includes the Marina Boulevard corridor east of I-880 and a 300-acre area of mostly industrial and warehouse/distribution uses in the area south of Marina Boulevard along Alvarado and Teagarden Streets. The General Plan describes this area as "located at the geographic center of San Leandro" and having "excellent access to the regional freeway system, Downtown, BART, the Union Pacific Rail lines, and several of the City's major thoroughfares." In 1998, the City adopted a Special Overlay Zoning District for Marina Boulevard to redevelop "marginal industrial sites with more lucrative commercial uses" (General Plan, page 3-94). The General Plan noted that redevelopment of this area began with the redevelopment of a high school site into the Marina Square Shopping Center and continued with the development of several new car dealerships. "The replacement of the vacant Safeway Preserves Plant and General Motors training facility with auto dealerships should establish a stronger identity of this area as a regional auto center. Meanwhile, Marina Square has emerged as a retail powerhouse, drawing shoppers from throughout the East Bay and providing a strong anchor for complementary retail uses along this corridor." To complete the desired redevelopment of Marina Boulevard, "continued development of the Marina Boulevard frontage with new auto dealerships and regional retail uses is recommended. Uses should capitalize and build on the success of Marina Square and the existing dealerships" (General Plan page 3-94).

The area south of Marina Boulevard (SOMAR) is a major industrial employment center, providing some 4,000 jobs. As noted in the General Plan, "despite its locational amenities, the South-of-Marina Area… currently lacks a distinct image. The district has a more transitional quality than the expansive industrial area west of

- 17 -

575

I-880, with evidence of encroachment by non-industrial uses in several places. Some of the buildings along Alvarado Street have been converted to discount furniture stores, while others possess an industrial-shopping center hybrid design." The General Plan envisions the SOMAR area as an "energetic and attractive area of high-quality light industrial and research and development (R&D) buildings. A new identity for the area—characterized by attractive low-rise (one to three-story) buildings, campus-style green spaces, and pedestrian walkways…"

These concepts are reinforced in the following two General Plan policies:

### 7.10 SOUTH OF MARINA BUSINESS DISTRICT

Facilitate the gradual transition of the South-of-Marina (SOMAR) area into a cohesive light industrial district characterized by light manufacturing, office/flex, research and development, bio-medical, e-commerce, and similar uses, along with complementary business services and employee amenities.

### 8.12 MARINA BOULEVARD

Encourage the continued improvement of Marina Boulevard between I-880 and San Leandro Boulevard as a major City gateway, shopping area, and regional auto mall. Additional shopping opportunities for San Leandro residents should be encouraged here, with a focus on high-quality retail uses and higher-end auto dealerships. Particular care should be taken in this area to relate development approvals to road capacity and to minimize further congestion as development takes place.

Given the policy direction of the General Plan to revitalize the commercial character of Marina Boulevard, and to revitalize the SOMAR area as an important employment area, the fact that religious assembly uses were not previously permitted within the Marina Boulevard/SOMAR area, and the lack of a compelling reason to commit lands within this area to assembly uses, not expanding the locations where assembly uses could be permitted into the Marina Boulevard/SOMAR Focus Area was reasonable.

**West San Leandro.** The West San Leandro area is identified in the General Plan as one of the City's key employment areas, encompassing about 1,500 acres west of the I-880 freeway. "It is a working and dynamic industrial district, containing nearly half of San Leandro's jobs and many of its major employers" (General Plan page 3-96). The area is described as being "home to a diverse array of companies, including Albertsons, American National Can, Case Tractor, Coca Cola, Georgia Pacific, Goodyear Rubber, Maxwell Laboratories, and Otis Spunkmeyer." The General Plan reports that, in 1998, "the area provided 19,000 jobs, including 5,000 in manufacturing and 4,000 in wholesaling and distribution industries."

In 1997, the City Council appointed a committee of 21 residents and businesspersons to develop a strategic plan for the West San Leandro area. As reported in the General Plan, the West San Leandro Advisory Committee focused on five key areas: (1) Conflicts between industrial and residential uses; (2) Youth programs and facilities; (3) Noise; (4) Traffic and trucks; and (5) Revitalization of the industrial and business areas.

- 18 -

The General Plan emphasizes the West San Leandro area's opportunities for economic development, and its "potential for new employment-generating uses, particularly general industrial and business service type uses." The General Plan notes on page 3-97 that the "entire area is well positioned for development that takes advantage of its proximity to Oakland Airport, major rail infrastructure, and easy access to the I-880 freeway. Future development could encompass a broad range of uses, from hotels and offices to international trade and shipping enterprises."

The basic policy direction for the West San Leandro Focus Area is provided on page 3-97 as follows: "To preserve an environment suitable for industrial and technology activity, new retail and residential uses in the Focus Area should be strictly limited."

This policy direction is reinforced in the following General Plan policy:

"**7.09    WEST SAN LEANDRO BUSINESS DISTRICT**

Build upon the locational strengths and transportation features of West San Leandro to support the area's continued development as a major industrial, technology, and office employment center. In accordance with the West San Leandro Plan, limit the encroachment of incompatible residential and retail uses into the area, and promote additional development and redevelopment with manufacturing, technology, warehouse and distribution, office/flex, and similar uses."

Given the policy direction of the General Plan to revitalize the industrial and business character of the West San Leandro area as an important employment area and limit the encroachment of incompatible uses, the fact that religious assembly uses were not previously permitted within the West San Leandro area, and the lack of a compelling reason to commit lands within this area to assembly uses, not expanding the locations where assembly uses could be permitted into the West San Leandro Focus Area was reasonable

3. *Site is not located in a regional-serving retail area* (identified as Greenhouse Marketplace, Westgate, Marina Square, and 'old' Target site)

Page 3-46 of the General Plan notes that "retail and service uses represent a major part of San Leandro's economy," and that over 20,600 people were employed in the City's retail and service sectors in 2000. "General Plan policies seek to establish a stronger identity and market niche for each retail/service area, thereby bolstering their economic performance."

Given the importance of generating sales tax revenue, the fact that religious assembly uses were not previously permitted within the City's regional-serving retail areas, the potential for significant weekend traffic conflicts, and the lack of a compelling reason to commit these regional commercial areas to non–commercial uses, not expanding the locations where assembly uses could be permitted into San Leandro's regional serving commercial areas was reasonable.

- 19 -

**577**

4. *Site is not located inside the ½ mile study area identified for the Downtown Transit-Oriented Development (TOD) Strategy*

Concurrent with the development of the Assembly Use Overlay District, the City began work on a Downtown transit-oriented development (TOD) strategy. The TOD strategy would assist in implementing transit-oriented development policies in the General Plan, such as:

**"13.04 TRANSIT-ORIENTED DEVELOPMENT**

> Ensure that properties adjacent to the City's BART stations and along heavily used public transit routes are developed in a way that maximizes the potential for transit use. Such development should be of particularly high quality, include open space and other amenities, and respect the scale and character of nearby neighborhoods."

Typically, the uses that are employed to maximize the potential for transit use include a mix of high density residential, high intensity office-based employment uses, and supporting commercial development.

Given the fact that religious assembly uses were not previously permitted within areas that might be considered for transit-oriented development and the lack of a compelling reason to introduce religious assembly uses into this area, not expanding the locations where assembly uses could be permitted into San Leandro's regional serving commercial areas was reasonable.

5. *Site abuts or is within ¼ mile of an arterial street* (as identified in the Circulation Element of the General Plan)

Locating assembly uses within ¼ mile of arterial streets would tend to place these uses toward the periphery of industrial areas, and within areas functioning as transitions between residential and industrial development, rather than along local industrial streets within the interiors of industrial areas. Given the need for providing buffers and transitions between these potentially incompatible uses, the General Plan's expressed desire protect its industrial and commercial base, the fact that none of the properties that might be affected by this criteria had previously been permitted to accommodate assembly uses, and the large number of additional sites that could be made available for assembly use after applying this criteria, not expanding the locations where assembly uses could be permitted beyond ¼ miles from arterial streets was reasonable.

6. *Site is not located within a Residential Zone*

Because assembly uses were permitted within residentially zoned areas subject to approval of a conditional use permit prior to the Assembly Use Overlay Zone, use of this criterion was needed to focus on areas where new opportunities for locating assembly uses within San Leandro could be permitted.

- 20 -

7. *Site is not considered public land, and is not zoned Public Service (PS), Open Space (OS), or Commercial Recreation (CR); property is not owned by an Exempt Public Agency, or leased/owned by a public utility*

Realistically, parcels meeting this criterion would not be available for assembly uses, and its application in constructing the Assembly Use Overlay District was reasonable.

8. *Overlay Area must allow a contiguous area greater than or equal to two acres*

As noted on Page 10, Footnote 3, of this report, the criterion setting a 2-acre minimum area to be placed within the Assembly Use Overlay District is not a minimum parcel size for individual parcels within the Overlay District. As noted in the February 22, 2007 staff report for the Planning Commission public hearing on the Assembly Use Overlay District, the minimum 2-acre site area for the Overlay Zone was based on staff research "indicating that large assembly uses require a minimum 2-acre site to accommodate bigger building sites and to allow for adequate onsite parking." Given that a key purpose of the Assembly Use Overlay District was to provide locations for larger assembly uses, and lack of a minimum contiguous area criterion as part of the Overlay District could result in a patchwork of freestanding parcels throughout San Leandro's non-residential zones, application of this criterion was reasonable.

**Alternative Approach of Modifying an Industrial Zone to Allow Assembly Uses.** In addition to the use of an overlay zone to expand the areas in which the City of San Leandro could permit religious assembly uses and better accommodate larger religious assembly uses, staff explored the potential of amending the Zoning Code to permit Assembly Uses as a conditionally permitted use within the Industrial Limited (IL) zone. Staff presented both options to the Board of Zoning Adjustment and Planning Commission at a joint workshop on October 19, 2006. The direction given staff at that workshop was to proceed with the concept of an overlay district. The IL zone was selected for this analysis rather than the Industrial Park (IP) or General Industrial (IG) zones since the IL zone provides for a mix of uses that is more compatible with non-industrial uses than the other two industrial zones, and is often used to provide a transition between residential uses and the heavier industrial uses found within the IG and IP zones.

The use of the Overlay District is a superior approach to amending the IL zone to include Assembly Uses as a conditionally permitted use on all IL zoned properties. The Overlay District permitted the City to conditionally permit Assembly Uses anywhere in the City where an assembly use would be consistent with the provisions of the General Plan regardless of the sites' existing zoning. By comparison, amending the IL zone to include Assembly Uses as a conditionally permitted use on all IL zoned properties would have resulted in identifying assembly uses and being conditionally permitted in locations within the IL zone where assembly use would be inconsistent with the General Plan policies cited above. Thus, by crafting the criteria as staff did to prepare the Assembly Use Overlay District, findings could be made that permitting an assembly use, subject to approval of a conditional use permit, on any non-residentially zoned parcel consistent with the criteria used to prepare the Overlay district would also be consistent with the policies of the General Plan. In contrast, should the City have proceeded with the option

- 21 -

of permitting assembly uses subject to approval of a conditional use permit throughout the IL (or any other non-residential) zone, it would not have been able to make the finding that assembly use was consistent with General Plan policies on all parcels where such use was conditionally permitted, creating an inconsistency between the City's General Plan and Zoning Code.

### 3. Approval of the Faith Fellowship's proposed use of the Catalina site for religious assembly would be inconsistent with the San Leandro General Plan. Modifications to the Zoning Code alone could not make assembly use on the Catalina site consistent with the General Plan.

## Basis for this Opinion

As noted in the April 12, 2007 staff report on the proposed rezoning of the Catalina site from IP (Industrial Park) to IP-AU (Industrial Park, Assembly Use Overlay), Faith Fellowship's Catalina site was inconsistent with two of the criteria used to develop the Assembly Use Overlay District: The site was within a Focus Area (West San Leandro) and was not within ¼ mile of an arterial roadway.

In addition to inconsistency with two of the criteria used to craft the Assembly Use Overlay District, permitting assembly use of Faith Fellowship's Catalina site would have been inconsistent with the General Plan's statement that the "areas most suitable for conversion to non-industrial uses are those located adjacent to existing housing, or in areas which lack the amenities to meet the needs of modern industry," since the Catalina site was neither adjacent to the residential uses west of Doolittle Drive, nor did it lack the amenities of a modern industrial park. In fact, the Catalina site was located within one of the more modern industrial park areas within the City. Faith Fellowship's proposal for an assembly use on the Catalina site is also inconsistent with previously cited General Plan Policy 7.09 (West San Leandro Business District) and Policy 10.04 (Industrial Sanctuary).

Policy 7.09 calls for building upon the "locational strengths and transportation features of West San Leandro to support the area's continued development as a major industrial, technology, and office employment center." This policy also calls for limiting the encroachment of non-industrial uses into the area, and promoting "additional development and redevelopment with manufacturing, technology, warehouse and distribution, office/flex, and similar uses." Policy 10.04 calls for protecting the City's major industrial areas from "encroachment by uses that are potentially incompatible with existing viable industrial activities, or which may inhibit the ability of industry to operate effectively."

Ultimately, because State law requires that a community's zoning be consistent with its General Plan, the City of San Leandro did not have the option of modifying its Zoning Code to permit assembly use on Faith Fellowship's Catalina site – whether by rezoning the property to IL and permitting assembly uses within the IL zone subject to approval of

- 22 -

580

a conditional use permit or including the site within the Assembly Use Overlay District – since such action would result in the City's Zoning Code being inconsistent with its General Plan.

## 4. There was no reasonable expectation for zoning approval since neither the City's General Plan nor its zoning code would permit the Catalina site to be used for religious assembly use.

### Basis for this Opinion

Religious assembly use was not a permitted or conditionally permitted use of the Catalina site prior to or at the time that Faith Fellowship entered into a purchase agreement for the property Catalina site (March 24, 2006). To gain approval of its proposed use, Faith Fellowship had to request that the City change its longstanding rules on where religious assembly uses could locate within San Leandro. As noted above, such changes were inconsistent with the policies of the City's General Plan. While it is easily argued that an applicant has a reasonable expectation for approval of a permit request that is consistent with a City's adopted General Plan and zoning, such an expectation does not exist, and there is risk (often substantial) involved in asking a community to change its adopted rules to accommodate a use in a location where such use had not been previously contemplated.

## 5. A prudent buyer who requires approval of discretionary actions by a City in order to establish their desired use of a property should make close of escrow contingent upon approval of the required discretionary action by the City

### Basis for this Opinion

Where there are financial risks involved in the purchase or lease of property, a prudent buyer can enter into a contingent escrow. This is common in the housing market where homebuyers make the close of escrow on their new home contingent on the close of escrow of their existing home. Where a developer or other business entity is seeking permits from a public agency for a development or new use on a site, it is common for the purchase agreement or lease to be contingent upon approval by the public agency of the required permits. Such contingencies protect the buyer or lessee from "getting stuck" with property they cannot use for their intended purpose. Because of the inherent risks involved in asking San Leandro to change its longstanding rules regarding the location of religious assembly uses, it was important for a buyer such as Faith Fellowship to have such a contingency since it sought to place a religious assembly use within the IP zone when religious assembly uses were permitted, subject to approval of a conditional use permit, only within residential zones.

A review of the March 24, 2006 purchase agreement for the Catalina site indicates that Faith Fellowship did, in fact, have such a contingency. Section 36 F of Faith Fellowship's purchase agreement for the Catalina site states that "this agreement is

- 23 -

581

specifically conditioned upon Buyer, in Buyer's sole judgement, determining that the subject real property is suitable for and approved for use as a church. This shall remain in full force and effect until removed in writing by the Buyer." Thus, Faith Fellowship had managed its risk and protected itself from "getting stuck" with property it could not use as a church when it entered into escrow in March 2006. To close escrow on the Catalina property, Faith Fellowship had to waive the contingency set forth in Section 36F. By exercising its exclusive right to waive the contingency and close escrow prior to receiving the permits it needed to operate a church on the Catalina site, Faith Fellowship put itself needlessly at risk.

**Exhibit A:**

**Resume and Summary of Testimony within the Past Four Years**

583



ONE COMPANY │ *Many Solutions™*

# Lloyd Zola, Vice President
West Region Director of Community Planning

**Education**
Bachelor of Arts, Urban Studies,
California State University, Los
Angeles, 1974

**Professional Affiliations**
American Planning Association,
Member

**HDR Tenure**
3 years

**Industry Tenure**
33 years

## Expertise

As a consulting planner, Lloyd Zola provides expertise in resolution of complex planning and development issues; development feasibility analyses; general plans and public policy formulation; public participation programs; environmental research and documentation; and the coordination of environmental, project design, and policy tasks.

An accomplished researcher and technical writer, Mr. Zola has been retained as an expert witness in planning; assisting cities in defense of adult business ordinances, hillside ordinances, and inverse condemnation claims, and was called before the United States Supreme Court as an expert witness in planning. He has been retained by cities to conduct seminars on General Plans, specific plans and CEQA, and has significant experience with community participation programs. He is a frequent speaker at American Planning Association, California League of Cities, and other professional conferences.

Mr. Zola's planning expertise has evolved through the preparation of general plans, specific plans, and commercial/industrial development projects as a private consultant, public agency planner, and private development company project manager. He has considerable experience in "environmental strategy," assisting in the coordination of development design with up-front environmental analysis and mitigation. Mr. Zola has a unique ability to organize and manage public participation programs and consensus building efforts, and is a trained mediator. He has managed environmental analyses for large-scale residential commercial/industrial, recreation, and public works projects, as well as public community planning projects.

## *Education*

B.A. Urban Studies; California State University, Los Angeles; 1974
Graduate Studies in Public Administration; California State University, Fullerton

## *Awards*

- *Outstanding Planning Award – Small Jurisdiction*: Sixth Street Specific Plan. Awarded by the Inland Empire Section, American Planning Association, 2000.

- *Outstanding Planning Award – Small Jurisdiction*: Ojai General Plan Land Use and Circulation Elements. Awarded by the California Chapter, American Planning Association, 1998.

- *Outstanding Planning Award – Large Jurisdiction*: California Speedway and Speedway Business Park Sixth Street Specific Plan. Awarded by the Inland Empire Section, American Planning Association, 1996.

- *Outstanding Planning Award – Comprehensive Planning*: Calabasas General Plan. Awarded by the Los Angeles Section, American Planning Association, 1996.

- *Distinguished Leadership Award:* Awarded by the Inland Empire Section, American Planning Association, 1992.

## Professional Experience

*Environmental and Resource Management Program Manager, West Region Director of Community Planning, HDR, INC.,*
*Riverside, California*
*2005 - Present*

Responsible for management and preparation of planning and environmental documents for large, complex land and infrastructure development programs. Also responsible for organization development and strategic planning for HDR's Community Planning program throughout the western United States.

*Principal/Associate/Project Manager, LSA ASSOCIATES, INC.,*
*Riverside, California*
*1994 - 2005*

Responsible for management and preparation of planning documents for complex planning programs, including multi-jurisdictional planning efforts, community-wide General Plan efforts, and site-specific development plans. Served as project manager and primary author of the award-winning Ojai General Plan Land Use and Circulation General Plan Elements. Also served as project manager for the California Speedway on the former site of the Kaiser steel mill in Fontana, California.

*President, PLANNING NETWORK,*
*Rancho Cucamonga, California*
*1983 - 1994*

In addition to administrative responsibilities, responsible for overall project strategy and quality control, design and implementation of public participation programs, and presentations before administrative and legislative bodies. Directly prepared all or portions of planning documents and reports of unusual complexity, including General Plans, specific plans, and performance standards for new development. Served as project manager of general plans, specific plans, and environmental impact reports. Prepared hillside development guidelines for the cities of Lancaster, Hemet, and Calabasas as part of General Plan update programs. Served as project manager for the preparation of commercial/industrial specific plans in the cities of Ontario, Rancho Cucamonga, Palmdale, and Fontana.

*Project Manager/Director of Planning, L. D. KING ENGINEERING,*
*Ontario, California*
*1980 - 1983*

Responsible for management and preparation of planning documents, including specific plans and environmental impact reports. As Director of Planning, supervised staff of six project managers, planners, and graphic technicians. Prepared analysis and provided expert testimony for the Quechan Tribe of the Fort Yuma Indian Reservation as part of the adjudication of water rights along the Colorado River, including determination of those lands within the reservation which were "practicably irrigable" (could be commercially farmed).

*Lloyd Zola - Page 2*

HDR

*Project Manager, COVINGTON TECHNOLOGIES,*
*Fullerton, California*
*1979 - 1980*

Responsible for securing entitlements for residential developments ranging in size from 10 to 1,280 acres, including specific plans, tentative and final tract maps, infrastructure improvement plans, and building permits. Supervised and administered the contracts of civil engineers and other consultants.

*Senior Planner/Planner II, RIVERSIDE COUNTY, California*
*1976 - 1979*

Prepared and later supervised the preparation of area general plans as part of the County's overall general plan program. Prepared a manual for department use on the methodology for area general plan formulation. Responsible for review and recommendations on general plan amendments being processed by the County. Served as staff to the County Open Space Resources Committee whose responsibility was to review and make recommendations to the Board of Supervisors regarding the creation, enlargement, and cancellation of agricultural preserve contracts pursuant to the Williamson Act.

*Planner I, SAN JOAQUIN COUNTY, California*
*1975 - 1976*

Responsible for preparation of the Safety, Seismic Safety, and Scenic Highways elements of the County General Plan. Conducted detailed studies and provided land use recommendations for portions of the Land Use Element, which were later incorporated into the plan. Prepared analyses of proposed state legislation affecting agricultural land preservation.

*Junior Planner, CITY OF CONCORD, California*
*1974-1975*

Prepared a citywide neighborhood analysis to be used for evaluating Community Development Block Grant requests. As part of this analysis, conducted a demographic and land use analysis of the City to identify residential, commercial, and industrial planning areas and their distinguishing characteristics.

## Selected Project Experience

**Building Industry Association of Southern, San Bernardino County General Plan Update Review, San Bernardino, CA.** Program Manager. The Baldy View Chapter of the Building Industry Association (Baldy View BIA) retained Mr. Zola to represent Baldy View BIA in review of the 2007 County of San Bernardino General Plan Update. Mr. Zola was responsible for reviewing proposed updated General Plan, Community Plans, and Development Code. HDR represented the Baldy View BIA at meetings with County planning and Supervisors' staffs to discuss concerns and solutions to potential problems in the General Plan update program. Through a series of meetings, suggested revisions, and additional review, consensus was achieved concerning the General Plan update. Mr. Zola represented the Baldy View BIA at the public hearings before the Planning Commission and Board of Supervisors.

**California Speedway Corporation, California Speedway, Fontana, CA.** Project Manager. Mr. Zola served as the consultant project manager for planning, technical

HDR

studies, and entitlement efforts for the initial development of the California Speedway, a two-mile super speedway adjacent to the City of Fontana. In this effort, he was responsible for ensuring the timely completion of project architectural and engineering design; as well as water, sewer, traffic, noise, and air quality technical studies. He also prepared and processed planned development documents for the speedway. The project was awarded by the Inland Empire Section of the American Planning Association for attention to the early identification and resolution of project issues, resulting in completion of the design and entitlement process, including preparation of an EIR by San Bernardino County in less than 14 months. Mr. Zola and HDR were subsequently retained by the speedway to assist in modifications of noise standards from nuisance-based standards to health-based standards.

**City of Calabasas General Plan.** Mr. Zola served as the project manager and primary author for the City's first General Plan following Calabasas' incorporation. Eight years later, Calabasas elected officials desired to revisit the vision of the General Plan to determine whether the guidance and direction the 1995 General Plan still met the needs of existing and future residents; to identify important issues facing the community; and to determine whether the City's existing General Plan adequately addressed these issues. The City also wished to determine whether the General Plan needed to be updated; whether existing plans, policies, or ordinances needed to be modified; and whether any new plans, policies or ordinances were needed. Mr. Zola organized and conducted a daylong workshop for the citizens of Calabasas, its business community, City boards and commissions, and the City Council. The proceedings were televised for later presentation on cable television. A follow-up report concluding that the General Plan still reflected community issues, needs, and vision, was prepared for distribution to the participants and action by the City Council. In 2007, a member of Calabasas Planning Commission and a participant in the original General Plan Advisory Committee stated that the public is "quite satisfied with the plan completed twelve years ago."

**City of Chino, Eucalyptus Business Park Specific Plan, Chino, CA.** Mr. Zola served as the project manager and primary author for a commercial/industrial specific plan and EIR for the City of Chino. Included in the specific plan were customized zoning and development standards. Subsequent to preparation of the Specific Plan and EIR, Mr. Zola and HDR were retained to prepare an Addendum to the original EIR, addressing a proposed amendment to the specific plan and revision to the burrowing owl mitigation program created as part of the original specific plan.

**City of Fontana, Summit at Rosena Specific Plan.** Mr. Zola recently completed preparation of the 168-acre Summit at Rosena in the City of Fontana. The project includes 900 dwelling units, 25,000 square feet of commercial use, and development of a park within an existing SCE right-of-way. Specific Plan preparation efforts included developing a land use plan for the site, preparation of detailed design guidelines and zoning regulations for the development, and establishment of phasing requirements.

**City of Glendora, Hillside Ordinance Analysis, Glendora, CA.** Mr. Zola managed preparation of environmental and planning evaluations of a proposed Initiative Ordinance. The evaluation generally followed the outline of the City's CEQA Checklist and was prepared in a manner that was easily understandable by the non-technical reader. The report included a summary matrix that lent itself to easy public distribution. In preparing the report, Mr. Zola staff worked closely with the City Attorney's office and Glendora's Planning and Engineering staff to ensure that the report was factually accurate. He presented the report to the City Council in a public session attended by over 200 citizens, and the report was distributed to citizens throughout the city.

*Lloyd Zola - Page 4*

HDR

**City of Los Angeles Special Reorganization.** Following applications for special reorganizations of the City of Los Angeles to crate new cities in the San Fernando Valley, Hollywood, and Harbor areas out of existing lands within the City of Los Angeles, LAFCO determined that EIRs for these special reorganization proposals would be required. Mr. Zola served as the project director for three EIR documents, including assisting the EIR project manager define issues related to the proposed reorganization in a manner that could be evaluated for potential environmental impacts, conducting the public scoping session for the proposed EIRs, and providing environmental expertise at the public hearing for the proposed Hollywood reorganization.

**City of Malibu, Coastal Report, Malibu, CA.** The City of Malibu retained Mr. Zola to provide technical input and represent the City as Coastal Commission staff prepared the Local Coastal Program for the City. Subsequent to adoption of the Local Coastal Program, Mr. Zola assisted the City of Malibu to prepare an amendment package to resolve problems the City was having with implementation of the LCP prepared by Coastal Commission staff. He assisted the City in preparing six components of the technical amendment to the Malibu LCP and making presentations before the Planning Commission and City Council.

**City of Shafter, Shafter Park Fees, Shafter, CA.** Mr. Zola managed preparation of a Development Impact Fees ordinance for park facilities. This effort included: reviewing the City's General Plan for park development standards; identifying the specific purposes and allowable uses of the park fee; collecting park information from the City's Capital Improvement Program and the General Plan; calculating fair-share fees for future residential development; writing the Development Impact Fees Ordinance; and participating in public meetings and hearings.

**Loma Linda General Plan Amendment and Housing Element in Response to Measure V, Loma Linda, CA.** Project Manager. Mr. Zola served as project manager for a comprehensive update of the City's General Plan. In response to a ballot measure adopted by the voters, HDR and Lloyd Zola were subsequently retained to incorporate General Plan provisions necessitated by the growth initiative. Measure V altered hillside development standards, lowered residential development densities, modified residential development standards, and established more stringent traffic level of service standards. In addition, HDR was retained to prepare the City's 2006-2014 Housing Element update. The scope of work includes evaluation of the effects of the Measure V growth control measure on the City's ability to provide housing for all economic segments of the community, review and updating of information on the status of the City's housing programs, updating information on the affordability of housing in the community, analysis and documentation of household characteristics, and the creation of a parcel-specific land inventory using GIS. The scope also includes an analysis of potential and actual governmental constraints upon housing, updating of housing program descriptions, and additional public participation.

**Paradise Valley Specific Plan, Riverside, CA.** Lloyd Zola and HDR staff members are engaged in coordinating land use planning, community design, and community services planning; and overseeing preparation of a Specific Plan for a 6,000 acre new planned community new town east of the Coachella Valley. Mr. Zola is leading the entitlement processing team for the community.

**The Colonies Partnership, The Colonies at San Antonio, Upland, CA.** Mr. Zola was responsible for preparation of the Colonies at San Antonio Specific Plan, leading a multi-disciplinary team to plan and design the community. Included in the specific plan is a customized set of zoning standards prepared by Mr. Zola.

HDR

**City of Norco, Sixth Street Specific Plan.** Mr. Zola managed preparation of this award winning Specific Plan in the City of Norco. The Specific Plan addressed the need for revitalizing a two-mile long corridor housing the majority of the community's local equestrian-oriented businesses. The objective of the Specific Plan was to ensure that new development would reflect the City's identity as Horse Town, USA. The Specific Plan evaluated then identified opportunities and constraints within the corridor on a parcel-by-parcel basis, and incorporated an equestrian-themed economic development program. The community's equestrian identity was reflected in a western architectural theme and streetscape design.

**Riverside County Integrated Project, Riverside County, CA.** Mr. Zola served as the environmental director for this large-scale planning and environmental documentation program, overseeing a $5.0 million CEQA/NEPA documentation program. Mr. Zola was responsible for overall direction and coordination of four related environmental documents, including preparation of an integrated database for Riverside County, the EIR for Riverside County's comprehensive General Plan update (for which he also served as Project manager), an EIR/EIS for a multi-species habitat conservation plan (MSHCP) covering the western portion of the County (including incorporated cities), and CEQA/NEPA documents for two intra-county transportation corridors.

**Wal-Mart, Sam's Club, Various Locations, CA.** Mr. Zola has been involved in land planning and environmental documentation for several Wal-Mart and Sam's Club projects, including projects in Lancaster, San Jacinto, Santa Fe Springs, Glendora and Riverside.

## Expert Witness Experience: Planning Regulations and Environmental Issues

**Arizona v. California.** Mr. Zola was retained by the Quechan Indian Nation to assist in adjudicating water rights along the Colorado River. He identified lands within the reservation that were "practicably irrigable" and, therefore, eligible for water rights under the Winters Doctrine. Following depositions and trial testimony before a Special Master of the United States Supreme Court, the Special Master determined that the tribe should be granted water rights for approximately 90 percent of the lands it requested. The full Supreme Court set aside the recommendation of the Special Master, due to disputes over the legal boundaries of the reservation, without ruling on the merits of the identification of practicably irrigable lands. Work and testimony in this case occurred more than four years ago.

**Kawaoka v. Arroyo Grande.** Mr. Zola was retained by the City of Arroyo Grande, California in a federal civil rights suit challenging the City's General Plan. To assist the City, he prepared a declaration documenting Arroyo Grande's process for preparing and adopting its General Plan, focusing on the effects the process and provisions of the General Plan had on certain agricultural interests in the City. The City was awarded a summary judgement at the trial court, which was appealed. The Ninth District Court of Appeals cited Mr. Zola's declaration in its decision upholding the City's actions. Work and testimony in this case occurred more than four years ago.

**Madero v. El Paso.** Mr. Zola was retained by the City of El Paso, Texas as an expert to assist the City in defense of a landowner's taking claim resulting from the City's denial of a plat map within a hillside area. Following depositions, the plaintiff and the City agreed on a settlement. Work and testimony in this case occurred more than four years ago.

**NJD v. Glendora, NJD v. San Dimas.** Mr. Zola was retained by the cities of Glendora and San Dimas, California to assist in their defense of separate actions undertaken first

*Lloyd Zola - Page 6*

HDR

against San Dimas, and later against Glendora claiming inverse condemnation following denial of proposed hillside developments on each side of the cities' common boundary. The plaintiff also challenged the City's hillside development regulations. Depositions were taken in both cases, and both cities' ordinances and denials were upheld at trial. Work and testimony in this case occurred more than four years ago.

**Polygon v. Glendale.** Mr. Zola was retained by the City of Glendale, California in an inverse condemnation suit involving denial of a proposed hillside development and the City's hillside development regulations. Depositions were taken. As part of settlement discussions, Mr. Zola prepared an environmental review of the applicant's proposed reduced density alternative. Work and testimony in this case occurred more than four years ago.

**Riverbend Ranch v. County of Madera.** Mr. Zola was retained by Madera County, California in an inverse condemnation suit involving the application of flood protection standards and EIR mitigation measures to a proposed golf course project. Depositions were taken, and a settlement was eventually reached. Work and testimony in this case occurred more than four years ago.

**Serena v. Carpinteria.** Mr. Zola was retained by the City of Caprinteria, California in an inverse condemnation suit involving adoption of General Plan and local coastal program provisions for the Carpinteria Bluffs area. Depositions were taken, and the city's actions were upheld at trial. Work and testimony in this case occurred more than four years ago.

## Adult Business Expert Witness Experience

**Isbell v. San Diego.** Mr. Zola was retained by the City of San Diego in an action challenging the constitutionality of its adult entertainment ordinance. As part of this effort, he undertook field review of over 2,000 sites potentially meeting the locational criteria of the City's ordinance to update the identification of sensitive uses, and to determine which sites would also meet the criteria for being available as established in *Topanga Press*. Mr. Zola also analyzed the effect that the City's requirements for separation between adult businesses would have, and to prepare a report on his findings. The report has been prepared, and Mr. Zola provided trial testomony. The trial court ruled San Diego's ordinance to be unconstitutional as applied to the plaintiff's property.

**Alameda Books v. Los Angeles.** Mr. Zola has been retained by the City of LosAngeles in an action challenging the constitutionality of its adult use ordinance. As part of this effort, he undertook detailed research regarding existing studies on the secondary effects of adult businesses. He also conducted field review of over 5,000 sites meeting the locational criteria of the City's ordinance to confirm the city's mapping of sensitive uses, and to determine which sites would meet the provisions of City ordinance and also meet the availability criteria established in *Topanga Press*. Mr. Zola analyzed the effect that the City's requirements for separation between adult businesses would have, and prepared a report on his findings. Mr. Zola also provided testimony in deposition. The Plaintiff's expert is currently reviewing his report.

**Lim v. Long Beach.** Mr. Zola was retained by the City of Long Beach in an action challenging the constitutionality of its adult use ordinance. As part of this effort, he undertook field review of sites meeting the locational criteria of the City's ordinance to update the identification of sensitive uses, and to determine which sites would also meet in *Topanga Press* criteria. Mr. Zola analyzed the effect that the City's requirements for separation between adult businesses would have, and prepared a report on his findings, which was entered into evidence at trial. Mr. Zola also provided trial testimony. Trial was

*Lloyd Zola - Page 7*

HDR

completed, and the court ruled in the City's favor. An appeal was heard by the Ninth District Court of Appeals in February 2000, and the case was remanded to the trial court in regard to the issue of "long-term" leases. A settlement was subsequently reached. Work and testimony in this case occurred more than four years ago.

**Diamond v. Taft.** Mr. Zola was retained by the City of Taft, California in an action challenging the constitutionality of its adult business ordinance. As part of this effort, Mr. Zola identified the sites within the City of Taft which would meet the requirements of Taft's ordinance, and would also meet *Topanga Press* criteria. To do this, Mr. Zola undertook field review to identify the location of sensitive uses under the City's current, as well as previous ordinances, and conducted an analysis of the differences in the number of available sites pursuant to these ordinances. In addition, Mr. Zola undertook an analysis of the location of sensitive uses surrounding the plaintiff's proposed adult use site. Mr. Zola photographed each of the sites he determined to be available for adult business use, and prepared a report on his findings. The report was entered into evidence, and he provided testimony at trial. The court ruled that the City's ordinance was Constitutional. An appeal was heard by the Ninth District Court of Appeals in February 2000. The Court of Appeal upheld the trial court ruling. Work and testimony in this case occurred more than four years ago.

**Lake Forest v. PI Industries.** Mr. Zola was retained by the City of Lake Forest, California in an action challenging the constitutionality of its adult business ordinance. Mr. Zola identified the sites within the City which would meet the requirements of the City's ordinance, and would also meet *Topanga Press* criteria. To do this, Mr. Zola undertook field review to identify the location of sensitive uses under the City's ordinance. Mr. Zola's report was completed, and a settlement was reached in the matter. Work in this case occurred more than four years ago.

**Diamond v. Grover Beach.** Mr. Zola was retained by the City of Grover Beach, California in an action challenging the constitutionality of its adult business ordinance. As part of this effort, Mr. Zola identified the sites within the City which would meet the requirements of the City's ordinance, and would also meet *Topanga Press* criteria. To do this, Mr. Zola undertook field review to identify the location of sensitive uses under the City's ordinance. Mr. Zola photographed each of the sites he determined to be available for adult business use, and prepared a report on his findings. The report was entered into evidence, and he provided testimony at trial. Trial has been completed, and the court ruled that the City's ordinance was Constitutional. Work and testimony in this case occurred more than four years ago.

**Diamond v. Atascadero.** Lloyd Zola assisted the City of Atascadero, California to defend its adult business ordinance. As part of this effort, Mr. Zola identified the sites within the City which would meet the requirements of Atascadero's ordinance, and would also meet *Topanga Press* criteria. To do this, Mr. Zola undertook field review to identify the location of sensitive uses under the City's ordinance. The case was settled when an alternative site identified in Mr. Zola's report as bieng available for adult business use was secured by the plaintiff. Work in this case occurred more than four years ago.

**Smith v. Pico Rivera.** Mr. Zola was retained by the City of Pico Rivera, California in an action challenging the constitutionality of its adult business ordinance. In this case, Mr. Zola identified the sites within the City which would meet the requirements of Pico Rivera's ordinance, and would also meet *Topanga Press* criteria. To do this, Mr. Zola undertook field review to identify the location of sensitive uses under the City's adult business ordinance. In addition, Mr. Zola undertook an analysis of the location of sensitive uses surrounding the plaintiff's proposed adult use site. Mr. Zola photographed

each of the sites he determined to be available for adult business use, and prepared a report on his findings. The report was entered into evidence, and he provided testimony at trial.

**Advanced Entertainment v. Pomona.** Mr. Zola was retained by the City of Pomona in an action challenging the constitutionality of its adult use ordinance. As part of this effort, Mr. Zola undertook field review of sites meeting the locational criteria of the City's ordinance, including updating an identification of sensitive uses undertaken by City staff. Mr. Zola then identified the sites that would also meet the criteria for being available as established in *Topanga Press*, along with the effect that the City's requirements for separation between adult businesses would have. Mr. Zola's report was entered into evidence, and he provided testimony at trial. Trial was completed, and the court ruled in the plaintiff's favor due to errors on the City's part in processing the adult business application. The court did not rule on the constitutionality of the City's ordinance. Mr. Zola has subsequently been retained by the City of Pomona in *Baby Dolls Theater (Kozub) v. City of Pomona* to provide testimony regarding the City's adult business ordinance. Trial was held, and a settlement was reached. Work and testimony in these cases occurred more than four years ago.

**San Bernardino County v. New Unicorn.** Lloyd Zola was retained by the County of San Bernardino in a zoning enforcement action undertaken by the County. Mr. Zola was called upon to testify as to the typical secondary effects of adult business. Work and testimony in this case occurred more than four years ago.

**3540 East Foothill Boulevard v. City of Pasadena.** Lloyd Zola assisted the City of Pasadena in defending its adult business ordinance. As part of this effort, Mr. Zola undertook field review to confirm the availability of sites for adult business use as determined by City staff. In addition, he reviewed the public record regarding preparation of the East Pasadena Specific Plan to determine whether the Draft Specific Plan was in effect, and if not, whether it could be adopted in its present form. This determination was an important part of the City successfully gaining a summary judgement, since the draft Specific Plan proposed placing the plaintiff's a zone that would permit an adult business, whereas the site's prohibits adult business use. Work in this case occurred more than four years ago.

**211 Alpine Street.** To assist in an enforcement action against an adult enteritanment business, the City of Los Angeles retained Lloyd Zola to determine the availability of alternatives sites to the propety that was subject to the enforcement action. In this effort, Mr. Zola conducted a field review of an area within an approximately 2-mile radius surrounding the subject site to determine the number of alternatives sites available to which the existing adult business could be relocated. Mr. Zola completed his report, and a settlement was reached between the City and the adult business. Work in this case occurred more than four years ago.

**Gibboney v. Colton.** Mr. Zola was retained by the City of Colton, California in an action challenging the constitutionality of its adult business ordinance. Mr. Zola identified the sites that would meet the requirements of Colton's ordinance, and would also meet *Topanga Press* criteria. To do this, Mr. Zola undertook field review to identify the location of sensitive uses under the City's adult business ordinance. Mr. Zola prepared a report on his findings. A settlement between the City and Plaintiff was reached. Work in this case occurred more than four years ago.

HDR

*Religious Land Use and Institutionalized Persons Act (RLUIPA) Expert Witness Experience*

**Grace Church of North County v. San Diego.** Mr. Zola was retained by the City of San Diego to assist in a suit brought by Grace Church, which claimed that the time limitation placed on a conditional use permit approved by the City for operation of the church constituted a "substantial burden" under RLUIPA. Mr. Zola prepared a report reviewing the need for protecting the City's industrial employment base and the rationale behind requiring conditonal use permits for churches in industrial zones, the appropriateness of the City's zoning regulations as applied to churches and comparable assembly uses, the approrpiateness of the time limitations places on the church's conditional use permit, and whether Grace Church's conditional use permit approval was substantially different than permits approved for other churches and non-industrial uses within Rancho Bernardo's industrially zoned areas in the past 10 years.

HDR

**Exhibit B**

**Compensation for Lloyd Zola**

Lloyd Zola is being compensated on a time and materials basis at the following hourly rates:

- Research, report preparation, meetings, and other technical services: $235/hr.
- Depositions and courtroom testimony: $350/hr.

595