**EXHIBIT 35**

**05.07.07 - City Council Meeting - Item 3B**



Tigerfish®
Transcribing·Editing

203 Columbus Avenue · San Francisco  94133
toll-free 877-TIGERFISH

**www.tigerfish.com**

EXHIBIT 35

**05.07.07 - City Council Meeting - Item 3B**

[Beginning of recorded material]

Female Voice: The next item is Item 3B, the matter of appeal by International Church Forest Square Gospel.

Male Voice: Thank you very much. Comment, Mr. City Manager?

Male Voice: Yes, thank you, mayor and members of the city council. You all are familiar with the proposal of the Faith Fellowship Church to be allowed to relocate their facility over to Catalina. This matter has gone before the Planning Commission and I'm going to have city planner, Debbie [Paulert] to give you the overview of the findings and recommendations of the Planning Commission in this matter.

Male Voice: Excuse me one second. Madame City Clerk, do we have any [unintelligible] speaker cards for this item? Do we? Okay, thank you very much. It goes this way. Thank you. I'm sorry.

Debbie Paulert: That's all right. Okay, so this is the appeal hearing. A little bit of background -- the applicant purchased the property at 14600 -- 14850 Catalina with the intended use for an assembly use. Their application was to request a rezone of the property from industrial park to include the new assembly use overlay and to amend the zoning map. As part of their proposal, they aren't actually having any physical changes to the property. There's an existing building on site that they would be able to use with tenant improvements for their purposes. This is . . .

[Break in recording]

Debbie Paulert:    These properties are zoned IP. This is the new Fire Station 11. These properties up front onto Doolittle are zoned IL, and then the properties to the east are zoned IG which is Industrial General. And then further to the west are residential properties that also [front] on to Doolittle.

Planning Commission action that took place at the April 12th meeting, they did -- after the public hearing they did deny the application indicating that the rezone was not in conformance with the general planned policies zoning code and does not meet all of the criteria established for the assembly use overlay.

Quickly, the history of assembly use -- in May 2006, a year ago, the applicant applied for a modification of the zoning code to include assembly uses as being conditionally permitted in IL zones which is the property would then be rezoned from IP to IL. At that time, assembly uses were only conditionally permitted in our districts.

So we had a joint Planning Commission and BZA work session in October where staff presented two options for consideration. One was as the applicant had proposed, to allow assembly uses to be conditionally permitted in the IL zone. A second option was to look at formulating an assembly use overlay for identified areas. And the direction at that time from both the BZA and the Planning Commission was proceed with option two, the main reason being that that option provided a greater opportunity for the assembly use in

terms of total acreage and number of properties. The proposed
amendments were approved by council in March and they became
effective May 1. And the assembly use overlay encompasses 196
sites, approximately 220 acres. You have a small map, which is the
same map which is resting up there. The green properties on the map
are the ones that had been rezoned to include the assembly use. The
small map's sometimes a little bit hard to read so I have both there for
you. And those green properties include both properties that are zoned
commercial and industrial.

The criteria analysis in developing the assembly use overlay -- we
looked at the underlying general plan policies as they related to
suitable areas for conversion to non-industrial uses, the industrial
sanctuary, separation from sensitive uses, building upon the
transportation features in west San Leandro and insuring that the future
land uses decisions are in balance with the transportation system's
capacity.

Next level up is looking at the zoning code. It speaks to having
physical development in accord with the policies of the general plan,
preserving the character and quality of each of the zoning designations
-- residential, commercial and industrial, promoting economic stability
and protection from inharmonious uses.

After review of the general plan policies and the zoning code policies,
staff developed overlay criteria for the assembly use, and there are
eight of them. First is that the site is not located along a major
commercial corridor, that's mainly East 14th Street, McArthur, and

**599**

intended to preserve the commercial character of the city. Second criteria is that it's not located within certain general plan focus areas. There's a lengthy discussion in the general plan about the various focus areas and what is intended for those properties. Next is that we didn't want properties that were located in regional serving retail areas; that would include Bayfair Mall. Also we did not want to have the assembly use be applicable to the half-mile TOD -- downtown TOD study area. It's a little bit harder to see on the map. That's the larger blue circle that's centered on Davis and East 14th Street. The remaining criteria is that we wanted properties that either abutted or are within a quarter mile of an arterial street. That's to ensure adequacy of the street system. The gray area that you see outlined on that map shows the arterials and then that quarter mile around each of the arterials. We discounted properties that were already residentially zoned because assembly uses are already conditionally permitted in them and we were trying to create additional opportunities. We also discounted properties that were public land, open space, commercial recreation or owned by exempt public agencies such as PG&E, East Bay Regional Park District, etcetera. And lastly to address the idea of possibly having mega churches or the larger types of assembly uses. We looked at each of those green areas. It's not that the property itself has to be two acres, but each of the green areas in and of themselves have to be two or more acres in size.

The basis for inclusion in the assembly use is that the property meets all of the criteria, so all those green properties that you see there meet all of the eight preceding criteria. In reviewing the applicant's proposal, their property at Catalina does not meet two of the criteria.

One, the property is located in the west San Leandro Business District identified as one of the general plan focus areas. And the property does not abut or is not within a quarter mile of an arterial, and this is based on the classifications in the transportation element of the general plan. In this case, the closest arterials are Fairway to the north and Wicks to the east.

The recommendation for tonight, staff recommends denial based on that the project does not meet all of the assembly use overlay criteria which, again, were based on the general plan policies and zoning code and also related to potential health and safety hazards for the assembly use population that would be on site now that's surrounded by industrial properties. In making this recommendation, staff felt that the general plan goals and policies -- they do provide a framework for the city zoning code and that the general plan is a legal document and land use decisions including rezones must be consistent with the plan.

The denial does not place a substantial burden on the religious exercise of the applicant. They have their existing location remains viable for their use. And with the recent assembly use overlay, there are now 196 additional properties which have been rezoned for assembly use overlay as a conditionally permitted use.

The denial of the rezone would advance the city's compelling interest, in this case, safeguarding the congregants from exposure to potentially adverse health and safety impacts and also maintaining adherence to the policies provided in the general plan which provided the basis for development of the assembly use overlay criteria.

Next steps, in this case, the Planning Commission decision to deny
was a final action which the applicant has appealed that decision.  If
the city council denies the appeal, that is a final action.  If the council
decided that they wanted to approve the rezone, approve the appeal
and then also approve a rezone, this would require preparation of
findings for approval with action at a subsequent meeting.

And lastly, in anticipation of the rezone approval, the applicant has
filed a conditional use permit application which is currently under staff
review.

| | |
|---|---|
| Male Voice: | Any questions from the city council?  None?  Obviously this is a public hearing and we do have some . . . |
| Debbie Paulert: | I think the applicant has a presentation. |
| Male Voice: | Oh, I'm sorry.  Would the applicant come forward?  Applicant appellate, my apology. |
| Peter McDonald: | I answered all of the above.  Honorable Mayor Santos and members of the council, I'm Peter McDonald.  I'm a land use attorney, a former urban planner and a Golden State Warriors fan. [Laughs] I know what you have each given up to be here tonight and give up so often to come here in order to make your city a better city.  Pastor Gary [Martau] will talk about the wonderful things that go on in a church community.  A former fire chief, Paul Gant, will talk about the excitement of hazardous materials.  I get to talk about the nitty-gritty |

zoning issues. This proposed church relocation makes common sense
for the Manor Boulevard neighborhood and for the Catalina Court area
and for the people of San Leandro. A key aspect of being a good
neighbor as a church is to realize when you've outgrown your physical
facilities. In the Manor Neighborhood where Faith Fellowship is now
located, residential parking for blocks around is consumed by
churchgoers on Sunday mornings and Wednesday evenings. Our
Manor neighbors have been very tolerant of us, but it is just not fair to
the Manor neighborhood to force a large congregation into that
residential setting. And you have before you what it looks like at
10:00 a.m. on Sunday morning. Cars are parked blocks in every
direction with three church services, so it totally fills that
neighborhood up. The new location at 14600 Catalina Court has ideal
facilities, superb arterial access and parking for a congregation of over
1000 members.

Technology is always a challenge, so here you have -- this is the new
location at Catalina Court. This is [unintelligible] Avenue. This is
Catalina Court going this way. There are 188 parking spaces well in
excess of the city zoning requirements for churches. Inside the facility
there's room. There's room for Sunday schools, there's room for the
youth activities, for the sacristy, offices for the staff. It is truly -- the
facility fits the needs of this congregation.

Against this proposal which would substantially improve the quality of
life in two San Leandro neighborhoods, the staff report argues that the
AO zone would be inconsistent with the general plan. It takes some
serious manipulation of the plain words in the general plan to reach

that conclusion. The flawed premise of the staff report is the assumption that churches are incompatible with light industrial uses. Every well-planned city that I checked with including Dublin, Pleasanton, Livermore, Fremont, Santa Clara and Concord has concluded that churches are compatible with light industrial uses. All these cities have a history of churches coexisting successfully with light industrial uses. The reasons are simple. Churches in industrial uses are like ships passing in the fog. Industrial activity peaks during the day from Monday through Friday while church activity peaks on the evenings and the weekends. Having a church in the area is kind of like having a night watchman. The church puts eyes on the street when weekday uses are abandoned. Jane Jacobs, the great planning thinker who practically invented the new urbanism with the book "Life and Death of Great American Cities" in 1961 would love this mix. Uses are also symbiotic because the church gives industrial users overflow parking during the weekdays when they need it. And the industrial users have potential overflow parking during nights and weekends. Churches tend to provide ancillary services like babysitting, after-school programs, human support activities and the like which are also useful to nearby employees and employers. If the church were really incompatible with its industrial neighbors, these neighbors would not have expressed written support for the church relocation.

And we have a -- so here we have -- this is the south San Leandro area. Here is the current location. The black dots all represent neighbors in the Manor area who have said to the city council in writing, "Please support their request to relocate." The red dots are our new neighbors

on Catalina Court in that area who have said to the city council, "Please allow these -- this church to become our new neighbor. It works."

The general plan does express concern about encroachment of incompatible residential and retail uses into industrial areas. Churches are not excluded. A church use does not permanently displace industrial uses the way residential and retail uses do. The church use fits within an existing industrial building with primarily tenant improvements on the inside. The building is [immutable] to return to industrial use when the church use moves on. This has happened frequently at Valley Business Park in Pleasanton. One concern is the churches might preempt to much industrial space and thus constrain the supply of job-creating businesses. That has not been a problem in any other communities. Fortunately or unfortunately from Pastor Gary's point of view, there just aren't enough church-going people to use more than a tiny fraction of available warehouse space in any community.

The staff report argues that arterial access is inadequate to the Catalina Street location -- not so. Look at the Mapquest map. [Fairlawn] connects nearby to arterial streets in every direction including Doolittle, Merced, Wicks, Manor, [Lewelling], Marina and the freeways. Here's our location. There's Fairlawn, which Mapquest thinks is an arterial, and here are all those other streets.

The city engineers designed and built Fairlawn with extra width and a middle left turn lane. Because this is an industrial area, there's almost

no traffic on Sunday mornings. I think we counted less than 50 in an hour -- 10:00 a.m. Because this is an industrial area, arterial access is superb and far superior to the Manor Boulevard access. And here's what it looks like at 10:00 a.m. in the morning. This is looking east from our church location. There isn't a single car there now. When you look west, again, there happens to be one car way off in the distance. There are miles virtually going in several directions of on-street parking. If overflow were needed, we have enough onsite parking already. So former fire chief and hazardous materials expert, Paul Gant, will talk about hazardous materials. But I'd like to bring some common sense to the issue to start with. The staff report suggests that any business with a hazardous materials business plan within a quarter mile of the church is a threat to the health of the churchgoers. So any business with a welding torch or lubrication materials is supposedly a threat to a church. Mr. Gant will explain how this overestimates the threat from regulated hazardous materials. But more importantly it fails the test of arithmetic. On any given workday at 10:00 a.m., there are at least three times more workers which a quarter mile of this location than there are people in the church at 10:00 a.m. on Easter Sunday morning.

Mr. Gant has done some analysis and will talk about it, but basically a standard prohibiting assembly uses within a quarter mile from the Hazmat plan has the effect of making every -- your entire AO zone that you just adopted, that green point that they were showing, every single one of those is within a quarter of a mile of a hazardous materials plant. That's illegal. You have to plan for churches, and it's bad planning too. When you look closely at the arguments against

churches in industrial areas, they all fall apart. This proposed rezoning is consistent with the general plan because churches in light industrial are harmonious and complimentary uses. The city council should reject this staff recommendation. Your staff uses state-of-the-art computer programs and data manipulation to advocate a planning concept, monolithic industrial, which was state-of-the-art in 1960. The City of San Leandro should be embarrassed by the multi-year approval process these good people have been dragged through. No city with a people-oriented planning process can reasonably conclude churches are not compatible with industrial areas.

| | |
|---|---|
| Male Voice: | Mr. McDonald, actually you took up all the time and I apologize because I didn't enunciate. We generally give the . . . |
| Peter McDonald: | [Unintelligible]. |
| Male Voice: | Hang on, hang on, hang on. We normally give an applicant 10 minutes, and you superseded the 10 minutes. |
| Peter McDonald: | Right. |
| Male Voice: | I just ask you how much more time do you need? |
| Peter McDonald: | I have about one sentence. Paul Gant has about . . . |
| Male Voice: | I'll give Mr. Gant and others . . . |
| Peter McDonald: | And then Gary [Martoret]. |

Male Voice:          Yeah.

Peter McDonald:      But also when we talked we agreed we're not going to have all of our
                     church members trooping up here so that you can get kind of the case
                     and chief about hearing . . .

Male Voice:          Sir, take your minute and complete your statement.

Peter McDonald:      Okay, here we go.  A place without a place for churches is a place
                     without a soul.  Is that what kind of place San Leandro is?  I doubt it.
                     With your vote this evening, you will answer that question.

Male Voice:          Thank you.  Are there any questions of Mr. McDonald?  None?  Okay.
                     Council member Susan?

Susan:               You alluded to ancillary services that churches could provide.  Could
                     you tell me what you're currently providing as far as babysitting,
                     childcare, things you alluded to at the church you're at now?

Peter McDonald:      When Gary Martoret comes up we'll have him talk about the kinds of
                     services they're providing.  Clearly they have a lot of youth activities.

Susan:               I want to know -- but you alluded specifically to childcare-specific
                     things, so I want to specifically narrow to that, not broad youth
                     organizations.

Peter McDonald:     Yeah.  I'll let Gary kind of review what they do.  And one of the things
                    about getting into a decent size facility is what they like to do too.

Male Voice:         I have a question for you, Mr. McDonald.

Peter McDonald:     Yeah?

Male Voice:         If you transpose the photo you took on Manor Boulevard at
                    [Kesterson] over to Fairlawn's, you would have a similar situation
                    would you not with the number of vehicles coming to that area?  I
                    mean, if you were allowed to go there and you took a photograph at
                    10:00 on a Sunday morning on Fairlawns that you took at Manor
                    Boulevard, you would have a similar photograph would you not, sir?

Peter McDonald:     There were several things about it.  Because it's so congested at
                    Manor, it takes a very long time for that line to work its way through
                    and people to find their parking.  In Fairlawn, you have a middle and
                    left turn lane.  You have middle lanes going on both sides.  You have
                    big wide streets and you have all kinds of parking.  So it wouldn't
                    build up like that and the parking that did occur wouldn't be in front of
                    all these residences.

Male Voice:         I'm not certain of that, but let me just suggest again, if you took a
                    photograph on Fairlawns subsequent to moving in, you would have a
                    similar type of picture that you showed here on Manor Boulevard?

Peter McDonald:     No, the answer is no because people wouldn't have to wait 10 minutes
                    to work their way through a totally congested area.

| | |
|---|---|
| Male Voice: | Okay, you're not going to answer the question.  Thank you very much, sir.  Mr. Gant? |
| Peter McDonald: | You just don't like the answer. |
| Male Voice: | Maybe. |
| Paul Gant: | In the interest of time, I'll edit my slideshow on the board here. |
| Male Voice: | I will give you five minutes, sir. |
| Paul Gant: | Okay, that will work fine.  I'll move quickly.  My name is Paul Gant. Thank you for letting me speak with you about this important topic.  I spent 15 years in the fire service working four cities.  I worked as a fire marshal, ran [Coupas] and other related services and have done that on the regulatory side.  For the last 15 years I've been involved as a safety compliance professional.  I'm a president of my own firm.  I'm a certified safety professional, registered environmental assessor, qualified expert witness.  I or myself train your city staff in hazardous materials handling so I'm well-versed in the topic.  I personally planned and reviewed hundreds of the hazardous materials business plans.  I was asked to review the health and safety concerns because one of the issues with the siting of the Faith Fellowship operation at the Catalina Street site was the health and safety concerns, the relation to other businesses where hazardous materials were stored and then to provide an opinion as to the suitability of locating that church at that site.  I toured the neighborhood in the proposed location.  I reviewed |

**610**

things such as the businesses that were in the area, the brand new fire station that's directly across the street. I identified the businesses that were identified in the staff report and looked at their hazardous materials inventory. When you hear the word "hazardous materials" it can be awe-inspiring sometimes. People get concerned about that, but the business plans as I'll explain in a minute are designed to provide the protection that's required. I also reviewed the other locations within the overlay area. They're in light industrial areas and I found them to be very similar to what you find at the Catalina Street. My conclusion at the end of my study was that there's no rational reason to restrict the location of the site on the basis of those health and safety concerns.

Some background on hazardous materials business plans -- again, I don't know how much you know about them. They do not necessarily constitute a hazardous occupancy. Most of those facilities are located in buildings very much like this one that are not classified as Group H occupancies by the building of fire codes. Group H occupancy is a hazardous occupancy. You can put these things in manufacturing facilities, you can put them in business facilities, you can put them in retail. They're actually in the plethora of businesses or occupancy classes. What a business plan is is it's a program to identify what's present and a program to manage those materials. Business plans help ensure the safety of the workers, the site visitors and the surrounding community. They're part of the federal right-to-know, community right-to-know planning. As I mentioned, they're required for ordinary businesses, dry-cleaners. The dry-cleaning establishment right across the street is likely a hazardous-materials business plan site, certainly

not posing any particular hazard to us here tonight or the
congregations of folks that assemble here when you have controversial
issues like the last one. They are required when you have as little as
one 55-gallon drum of hazardous materials including oils or a welding
unit like you see there. That would trigger a business plan being filed.
They require that safety systems be put in place when you do have
those chemicals to protect those workers in those communities. They
mandate that employees receive the training so they can handle the
materials, so they can prevent accidents, so they know what to do in
case an accident occurs to reduce the consequences off site and so
forth. They also require continual updates. Every year the business
refiles with the city with the Coupa. And they also require that the
Coupa go out and inspect those facilities. Businesses with business
plans get more scrutiny and therefore have a better track record. In
addition to the business plan regulations that your city uses, there are
numerous other federal, state and local requirements. Cal/OSHA, if
you know anything about OSHA and OSHA safety, that's a big part of
what we do, has literally volumes of materials that relate to how
employees are protected in the workplace. And the employees are the
first people exposed to the hazard. So workers are safe enough to
work with the materials and certainly the population off-site would be
protected by those same regulations. The California Building and Fire
Code contains numerous regulations. There's a picture of some of my
bookcase that I took this afternoon of some of the different regulations
that would apply to this particular facility, all of which are well-
enforced by your COUPA folks, folks that we train at the [AVAC]
Center, and I know some of them personally. And then Cal/EPA
regulates the waste. They minimize the amount you can have on site,

the time that you can store them. They require inspections on a weekly basis and require properly-trained personnel.

My conclusion is pretty simple -- the safety of the workers, the visitors in the community is protected by those series of overlapping regulations with the state, the local, the federal locations regardless of where those businesses are located in the community. Those regulations are well-understood. Your city staff enforces them very well. I think that's something you should be proud of. As you were just told, those same safety systems that protect the thousands of employees that are in that immediate business park or I would argue any business park far exceeds per week what you would be protecting with those same safety systems protecting the Faith Fellowship Congregation. And all of the sites in your AO district are likely going to suffer similar consequences so you essentially, if that's the criteria for siting, you're going to make it real difficult and I can give you numerous examples of my research.

Again, the last thing I'll leave you with is other communities find such uses compatible. I personally attend a mega church in Dublin, Crosswinds, with my family on a weekly basis. We're literally down the street from far worse hazards because they're clients of ours that I'm very comfortable attending church with, again, because of the overlay of regulations.

| | |
|---|---|
| Male Voice: | Thank you very much, sir. |
| Paul Gant: | Okay. Any questions? |

Male Voice:              None. Pastor Martoret, please, followed by Mr. [unintelligible].

Pastor Martoret:         Thirteen and a half years ago I took over Faith Fellowship and had 65
                         people with kids. And today, last Sunday, I think we had 1700 people
                         come through our doors. Obviously we've outgrown the facility so
                         we've begun to look around the city for a site. We found the one on
                         Catalina. We presented it to the staff. We began to talk about what
                         we had to do to get there. They said file an application, pay the
                         money, we did. Fast-forward -- we went through all we went through
                         for the last 13 months. At the planning meeting when the paper came
                         out that they were recommending a denial, I felt sideswiped. We
                         didn't see that one coming because we had been working hand-in-hand
                         with them for 13 months trying to work this out and so the
                         recommended denial kind of caught us off guard. But what I guess
                         really got me that night was that they were saying it's a health hazard.
                         And I know the staff works hard. I know Debbie personally and
                         Hanson and Luke and all the rest, and I know they work very hard, but
                         I think they didn't do their homework on that one. Obviously Mr. Gant
                         just proved that it's not a health hazard here. And so that became one
                         of the stipulations for denial to the Planning Commission. Deny this
                         on the grounds that it's a health hazard and the other one was that it
                         didn't meet all eight criterias. They said we met six. We actually meet
                         seven of the eight. The eighth one was formed after our application
                         which said, "We're going to do everything about this certain line of --
                         geographic line in the city. Our building didn't fit in that line. We
                         need all seven of the other eight criteria. To answer your question, Mr.
                         Santos, I think it's a little bit obvious to say that the traffic would be a

little bit different on Fairlawn Street than on Manor.  Manor is a two-lane street with residential houses with street parking.  It would be a lot easier.  I wrote a letter personally to the housing associations saying that I personally will see to it that the people use Wicks Boulevard as an egress and not Doolittle to cause any kind of disturbance to the neighborhood there, and if it was, it would be very minimal and for a short time.  This property fits for us incredibly well, incredibly well.  I've looked at the properties around the city.  I went personally to the Davis Street Community Center, sat down with Rose, walked through her facility to see if we could work something out there.  It didn't work.  There wasn't enough square footage.  We thought about bringing her into our facility and she needed more square footage.  We could only give up about 4000 to her.  She needed about 11 to 15,000 just to say that I'm willing to do whatever we needed to do.  And she has a rezone on a much tighter street then we do.  To answer your question, Mrs. [Souza], we don't do babysitting.  We do do childcare for every service that we put on weeknights and on the weekends.  We have youth groups, Sunday schools and those kinds of things but we don't have paid babysitting and those kinds of issues.  Everything we do of course is free.  We feed the poor, we help people with their rent, we counsel for free, we work with youth.  We're thinking about starting up an after-school program to help kids do their homework free.  Our youth pastor's working on that.  This building just fits.  There is a scripture that I'm sure you guys are aware of in John, Chapter 2 where it says Jesus came in flipping over tables.  And they said, "Why are you doing this?"  And he said "Zero from my Father's house consumes me."  And this is about my passion.  This is what I do.  I'm a preacher.  I just need a bigger building.  I need a

22

05.07.07 - City Council Meeting - Item 3B
Page 20

street that can house the cars, and that facility works. And I really need you guys to reverse this decision because the grounds that it was set up to deny it; we've debunked it. There are no real grounds, and we need your help, and I would like to rebut at the end if I could.

Male Voice:        Oh, okay. I don't know that there's anything to rebut.

Pastor Martoret:   Okay.

Male Voice:        But should there be I will allow you a couple of minutes.

Pastor Martoret:   Thank you.

Male Voice:        You're quite welcome.

Pastor Martoret:   Any questions for me?

Male Voice:        Any questions? Okay, go ahead councilmember [Cola].

Male Voice:        Yes, Pastor Martoret, can you tell me what are the evening services that you provide and what time?

Pastor Martoret:   We have a midweek Wednesday night bible study where we feed everybody at 6:00 for free that comes, and then we have bible study at 7:00 till about 8:45. On Tuesday and Thursday night there's choir practice and band practice so those are pretty small things. On Friday nights we do have a Spanish ministry with about 35 Hispanic-speaking

|                    |                                                                                              |
|--------------------|----------------------------------------------------------------------------------------------|
|                    | people as well as every other Friday night a single's ministry that meets.  Those are pretty much our ministries. |
| Male Voice:        | How many people show up on Wednesday night?                                                  |
| Pastor Martoret:   | We have about 400 that come on a Wednesday night.                                            |
| Male Voice:        | Thank you.                                                                                   |
| Male Voice:        | Okay, thank you very much, Pastor.  Mr. [McGalleon]?                                         |
| Jeff McGalleon:    | I'm Jeff McGalleon representing Faith Fellowship.  Good late evening to you all members and Mr. Mayor.  One thing I just want to address -- some of you know that I went to Texas for Hurricane Rita recovery with the American Red Cross, and one thing that I found very compelling for me to go back there and literally do some redevelopment and bring the community back is I did make a commitment.  I made a commitment to God and promised the community that I would help them build their community.  But where that commitment came from was their church base.  Their church base is so strong that when there's a disaster, where do people go?  They go to the churches.  The churches there are so united that they have shelters.  One of the churches, a Baptist church, might do the meals.  The Catholic church might have a shelter.  Down the way the Methodist church will have first-responder housing, taking care of the National Guard while they're working with Red Cross.  Churches are what made and helped those people.  Every year during hurricane season the churches and the united pastors get together to determine |

who's going to do what at this period of time. Churches are what make this community. One of the things was their resiliency to be able to help one another in integrating. The bigger churches obviously were able to help out more because they were able to house and shelter and feed. It's churches that made Orange, Texas survive Hurricane Rita. Rita was stronger than Katrina. It took more force and there was more damage. The only thing is about Louisiana is they had failed levies because of their government. But they had to take on Katrina people as well as take care of themselves three weeks later when Rita hit. It was churches that helped the community and made the community strong. And the reason why is there's very little crime, there's very little crime. People are happier and it's churches that make this community work in Orange, Texas and in Beaumont, Port Arthur that got hit hard by hurricanes. Churches are what helped them survive.

Male Voice:    Thank you very much. I notice I have a card for Mr. [Tolipovich] to speak but I don't see him in the audience. I guess he's left.

Female Voice:    [Unintelligible].

Male Voice:    Oh, I just now notice it. Thank you very much. Reverend Diane -- boy, I can't pronounce that -- [Bagues], Bagues . . .

Rev. Diane Bagues:    Bagues.

Male Voice:    Bagues?

Rev. Diane Bagues:    Bagues, it's a final Spanish [unintelligible] name.

Male Voice:            Okay.  Oh, a couple of umlauts there though.

Rev. Diane Bagues:     Exactly.

Male Voice:            Okay.  Thank you very much.

Rev. Diane Bagues:     Short people.  Is this okay?  My name is Diane Bagues.  I live at 14965
                       Swenson Street.  It was on the map.  It's a long cul-de-sac.  My mother
                       -- my family moved there in 1952.  I was 8 years old and in the 4th
                       grade.  My mother has lived in that house for 55 years.  The church
                       has a huge building right behind my mom's back fence at this point.
                       And I just want to make six points very quickly.  Number one, the
                       bottom line, the church bought property knowing that it was zoned for
                       industrial use and not appropriate at that time, and common sense says
                       to me that if you want to do something with property, you darn well
                       ought to make sure you can do it before you buy the land instead of
                       after.  Number two, this church has a history of taking land out of the
                       industrial base.  Where it's located, when we moved there there was a
                       hardware store, there was at one point a dairy, and a vaguely
                       remember some other stores on that property although I don't
                       remember exactly when I was real young.  But that was the site of the
                       Old [Farea] Brothers hardware store and there was a dairy there
                       because my brother used to work there.  The quoting scripture, "I
                       believe that the petition to change the zoning reflects a very selfish
                       action on their part and a lack of concern for the people of Washington
                       Manor and of San Leandro as a whole.  The land available for
                       industrial use is limited.  It is a finite resource.  Industrial use provides

jobs and it provides a tax base that benefits all San Leandrans and all
of us pay a price when that land is taken out of that industrial tax base.
Number four, the change would set a precedent that would make it
virtually impossible to deny other churches the same zoning change.
If you do it for one you've got to do it for others. And the industrial
tax base would be decimated bit by bit by bit. Number five, aside
from sending warnings, congestion and impacts on parking are
minimal. That church has a huge parking lot. We live on Swenson
Street. They don't even come into our street and we're 100 yards from
their lot. [Chesterson], [Grenda], Manor, but aside from Sunday
mornings it's minimal. And number six, this flyer that they put around
I found in the dirt and on the front of our front porch the other day. It's
disingenuous because it encourages the illusion that if they move and
they leave then there's no more problem with traffic. What's left is a
huge church property. Another church could buy it and there we
would have the congestion on Sunday mornings or possibly Saturday
mornings if it's a Saturday worshipping church or we could have the
scenario that we saw earlier this evening where a developer could buy
that land and put in hundreds and hundreds of apartments or condos or
townhouses or whatever. Then we'd have congestion 24/7. So to sort
of imply by this flyer that if they move there's no more problem with
congestion is really -- it is disingenuous. If there was a dot on that
map for my house it doesn't belong there, and I don't know how those
dots got there. I know a couple of high school kids came by my house
and I made them listen while I told them a few things -- told them my
views. I said they interrupted my time. They were going to listen. A
few hours later an adult came by. I told them the same thing. I just
want to conclude by saying that Safe Fellowship in its flyer refers to

"its plight." Its plight is a situation of its own making and now it's acting the victim. And I urge the city council to again tell this church no for the sake of all of us who live and vote and work and play and love in San Leandro. Thank you.

Male Voice:          Thank you very much. Ed [Gerimilo]? I think he had to leave also. [Kathy Sanchez] is the last speaker.

Kathy Sanchez:       Good evening. I guess we can call it evening. My name is Kathy Sanchez, Marina Garden Home Owners Association.

Male Voice:          Ms. Sanchez, try to speak into the microphone. Move it up a little bit.

Kathy Sanchez:       Is this better?

Male Voice:          Yeah, thank you.

Kathy Sanchez:       My name is Kathy Sanchez, Marina Garden Home Owners Association located at Doolittle Drive and Belvedere Avenue. And I believe you already have a letter in your packet from myself and Ed Gerimilo, Marina West Home Owners Association, which is also located along Doolittle Drive and Belvedere Avenue expressing our concerns and requesting that city council deny permission for the industrial property at Catalina Street to utilize the church assembly usage. Unfortunately Ed had to leave. He went to an early morning class so he couldn't speak tonight. The volume of traffic generated by -- I had 1500 but I heard 1700 tonight -- members will greatly impact our neighborhood. Doolittle Drive is one lane whose speed limit was

just increased to 40 miles per hour and is a direct route to access
Catalina via Fairlawn. There's a stop at Fairlawn but no stoplight.
Fairlawn is also near the dead-end of Doolittle Drive which has been
used as a turnaround to bypass the stop at Fairlawn. Residents who
live along Doolittle Drive and in the surrounding neighborhoods will
have difficulty entering and exiting their property and will experience
added noise, congestion and [unintelligible] during peak traffic and
from the stop at Fairlawn. Access to Doolittle from other streets such
as Belvedere and Bermuda will be hampered. The church would just
[outrun] it's present location on Manorwood with 1700+ members
could exponentially increase its membership exacerbating these
problems. We already experience excessive noise and pollution from
the airport, truck traffic from industry and the [880] freeway and the
railroad. Ongoing parking problems are already an issue with the
residents and business owners at the current church location on Manor.
The city has had to mediated on behalf of the residents and business
owners and we can foresee problems in our neighborhood. I
understand there's a formula specified that a city for required parking
spaces such as based on the square footage of the sanctuary area
designated for assemblage. It is not based on the total number of
church members. The formula is on parking space per 50 square feet
of sanctuary area. The number of parking spaces required at the
current manor location is 150 parking spaces. The proposed Catalina
location would require 180 parking spaces, only 30 more than the
church's present location for 1700 church members. And church
representatives at the planning commission meeting of April 12th
spoke of expanding the membership. If churches and other tax exempt
organizations are allowed to take over industrial property not zoned for

their usage, the city's tax revenue will decrease and there will be additional burdens on the city's infrastructure and services. Any deficits will have to be made up by all San Leandro residents and business owners and the quality of our environment in the west end of San Leandro would decline further. I'd also like to mention that Pastor mentioned that he sent a letter. At the April 12th planning commission meeting I complained that while he contacted the industrial neighbors, he didn't contact any of the residents. And I received this Saturday late afternoon right -- this last Saturday before this Monday meeting. And I know Ed just got his today. It was actually sent to my house. I spoke with Betty Bailey who's the President of the Home Owners Association for Marina Fair, and she said she didn't get anything. But he does make some statements in here which I'm sure are well-intended, but he says he's going to keep his members from driving on Doolittle Drive. And he says, "We plan to do this by not driving or parking anywhere on Doolittle Drive when attending church." Well I don't see how you can prevent 1700+ members from driving that street. So that's the end of my presentation.

Male Voice:          Any questions for Ms. Sanchez? Thank you very much.

Kathy Sanchez:       Thank you.

Male Voice:          Pastor, I'll give you two minutes. Pastor Gary?

Pastor Gary:         Again, the traffic -- I think one of the planning commissioners had lived in that area for a long time and has driven down that street. There will probably be some cars that go down Doolittle driving out,

I'm sure, or in.  But we are going to direct traffic.  We have people that we assign to the parking lot, the street ministry, and so we'll be directing the bulk of the traffic down Wicks Boulevard.  So if that's the complaint, I'll work real hard at making sure that that works well for everybody.  I don't know what another issue would be at this point to rebut.  I'm willing to answer any questions though.

Male Voice:    No one has any questions, sir.  Do you have a question?  No, no one has any questions.  Thank you very much.  That pretty much closes the public hearing.  Can I have a motion from the council to close the public hearing?  Approved by councilmember [Frola].  Who seconded over there?  Was that the vice mayor?  And the vice mayor second.  Council, please go ahead and vote.  [Unintelligible] motion to close the public hearing.  Yeah, close the public hearing.

Female Voice:    To close the public hearing.

Male Voice:    Close the public hearing, yeah.  Yeah, we'll go ahead and vote on it.  [Laughs] Okay.

Female Voice:    [Unintelligible].

Male Voice:    Thank you.  Thank you very much.  The public hearing is closed.  Go ahead, councilmember [Frola].

Male Voice:    Would a motion be in order now?

Male Voice:    Yes.

| | |
|---|---|
| Male Voice: | Okay. I too lived in that area for 30 years, and I'm making a motion tonight to go along with the Planning Commission and staff's recommendation to uphold the denial of the rezone and deny the appeal. And if somebody will second that, I'd like to give my reasons why. |
| Female Voice: | Second. |
| Male Voice: | [Unintelligible] by councilmember Frola. |
| Male Voice: | And seconded by councilmember Souza. |
| Male Voice: | Yes. |
| Male Voice: | You wanted to comment? |
| Male Voice: | Yes. Sadly I made that motion because I believe churches have a place in San Leandro. I was put off a little bit that the church bought that property knowing it was zoned for industrial. It does take it out of the tax base. It seemed like that was a little heavy-handed that you would buy it knowing that it was industrial. There are -- another reason is that all three presidents of the Homeowners Associations in that area, the Marina Fair, Marina Gardens and Marina West, have all sent in letters of opposition to Faith Fellowship locating on Catalina Street. Why I asked the question about the nighttime use is I know in the evenings, and I didn't realize there were that many hundreds going there on Wednesday night, but I can tell you right now both Wicks and |

Doolittle are heavily impacted on Wednesday evenings. I mean, that is people going home. And that many hundreds of more cars would have a direct effect on the neighborhood. Lastly, I would hope that you would choose one of the 196 sites that were made available for assembly uses and that you stay in San Leandro.

Male Voice:          Okay, thank you. Councilmember Souza?

Councilmember Souza:                    Yeah, I'd just like to thank all the church members that showed up tonight to share their views and show their support. I believe -- I personally can say that I truly believe Faith Fellowship does wonderful things for the City of San Leandro and I hope they continue to do wonderful things for the City of San Leandro. Every day we're challenged by the things we don't get. We don't get everything we want, and we're challenged by understanding why we don't get those. And so tonight I ask you to challenge yourself and ask yourself why is this not happening and what good could I make of it.

Male Voice:          Any other comments? We have a motion and a second. Please go ahead and vote. Six ayes.

Female Voice:        [Noted] six ayes.

Male Voice:          Thank you very much.

[End of recorded material]