1   Jayne W. Williams, Esq. (SBN: 63203)
    jwilliams@meyersnave.com
2   Deborah J. Fox, Esq. (SBN: 110929)
    dfox@meyersnave.com
3   Philip A. Seymour (SBN: 116606)
    pseymour@meyersnave.com
4   MEYERS, NAVE, RIBACK, SILVER & WILSON
    555 12th Street, Suite 1500
5   Oakland, California  94607
    Telephone: (510) 808-2000
6   Facsimile: (510) 444-1108

7   Attorneys for Defendant
    CITY OF SAN LEANDRO
8

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12  INTERNATIONAL CHURCH OF THE            Case No.  C07-03605-PJH
    FOURSQUARE GOSPEL,
13

14              Plaintiff,                 CITY OF SAN LEANDRO'S
                                           EXHIBITS IN SUPPORT OF ITS
15  v.                                     OPPOSITION TO PLAINTIFF'S
                                           MOTION FOR PARTIAL
16                                         SUMMARY ADJUDICATION ON
    CITY OF SAN LEANDRO, a municipal       DEFENDANT'S AFFIRMATIVE
17  corporation,                           DEFENSES
                                           (Plaintiff's Motion No. 1)
18              Defendant.
19
                                           Hearing:
20                                         Date:        October 1, 2008
                                           Time:        9:00 a.m.
21                                         Courtroom:   3
22
    FAITH FELLOWSHIP FOURSQUARE            Honorable Phyllis J. Hamilton
23  CHURCH,                                Complaint Filed: 7/12/07
24              Real Party in Interest.
25

26

27

28

---

CITY'S EXHIBITS - OPP TO MTN FOR PARTIAL SUMMARY ADJ. (No. 1)          C07-03605-PJH

1

## TABLE OF EXHIBITS

| Exhibit | Description | Bates No. |
|---|---|---|
| Exhibit 29 | Excerpts, Deposition of John Jermanis, May 19, 2008 | 516 |
| Exhibit 30 | Excerpts, Deposition of Gary Mortara, May 20, 2008 and June 6, 2008 | 533 |
| Exhibit 36 | Commercial Property Purchase Agreement and Joint Escrow Instructions (Non-Residential), dated March 24, 2006 | 628 |
| Exhibit 37 | Addendum to Commercial Property Purchase Agreement and Joint Escrow Instructions (Non-Residential), dated March 28, 2006 | 638 |
| Exhibit 38 | Declaration of Debbie Pollart in Support of City's Motion for Summary Judgment, filed 8/27/08 (Document 128) | 654 |
| Exhibit 39 | Defendant City of San Leandro's Motion for Summary Judgment or in the Alternative Summary Adjudication of Claims, filed 8/27/08 (Document 126) | 673 |
| Exhibit 40 | Declaration of Senior Pastor Gary Mortara in Support of Plaintiff's Motion for Summary Judgment and Exhibit 1, manually filed 8/26/08 (Plaintiff's Motion No. 2) | 704 |
| Exhibit 41 | Plaintiff and Real Party in Interest's Notice of Motion for Summary Judgment; Plaintiff and Real Party in Interest's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, filed 8/26/08 (Plaintiff's Motion No. 2, Document 122) | 724 |

Dated: September 10, 2008          MEYERS, NAVE, RIBACK, SILVER & WILSON


By_____/s/_____

DEBORAH J. FOX
Attorneys for Defendant
CITY OF SAN LEANDRO

1145779.1
136.5016

1

**EXHIBIT 28**

**Golden Gate Reporting**

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4    INTERNATIONAL CHURCH OF THE
     FOURSQUARE GOSPEL,

5
                    Plaintiff,
6
            vs.                         No. C 07-03605 PJH
7
     CITY OF SAN LEANDRO, et al.,
8
                    Defendants,
9
     _____/
10
     FAITH FELLOWSHIP FOURSQUARE
11   CHURCH,

12       Real Party in Interest.
     _____/
13

14

15

16           DEPOSITION OF JOHN JERMANIS

17

18   DATE:          MAY 19, 2008

19   TIME:          2:35 P.M.

20

21   LOCATION:      MEYERS NAVE RIBACK SILVER & WILSON
                    555 13th Street
22                  Suite 150
                    Oakland, California 94607
23
     Reported By:   Jane H. Stuller
24                  Certified Shorthand Reporter
                    License Number 7223, RPR
25

                                              Page 1

**Golden Gate Reporting**

```
 1                          APPEARANCES

 2

 3    For the Plaintiff:

 4          LAW OFFICE OF PETER MacDONALD
            BY:  PETER MacDONALD
 5          400 Main Street
            Suite 210
 6          Pleasanton, California 94566
            (925) 462-0191
 7          pmacdonald@macdonaldlaw.com

 8              and

 9          PACIFIC JUSTICE INSTITUTE
            BY:  MATTHEW B. McREYNOLDS
10          Sacramento Office
            9851 Horn Road
11          Sacramento, California 95827-6600
            (916) 857-6900 ext 203
12          mattmcreynolds@pacificjustice.org

13    For Defendant CITY OF SAN LEANDRO:

14

15          MEYERS NEVES RIBACK SILVER & WILSON
            By:  DEBORAH J. FOX
            333 South Grand Avenue
16          Suite 1678
            Los Angeles, California 90071
17          (213) 626-2906
            dfox@meyersnave.com
18

19

20

21

22

23

24

25
```

Page 2

1       A.   For about 13 years.  So I was almost 26 years

2   within the finance department, about nearly half of that

3   as the assistant finance director, and then -- and then

4   the other half as the finance director.

5       Q.   Okay.  Luke Sims says that you opposed the

6   Faith Fellowship location at Catalina -- 14600 Catalina

7   Street.

8            MS. FOX:  That's the end of the question?

9            MR. MacDONALD:  Yes.

10           MS. FOX:  Objection; misstates the testimony of

11   the witness.  Vague and ambiguous as to "oppose."

12   BY MR. MacDONALD:

13       Q.   Did you oppose the location of the Faith

14   Fellowship Church at 14600 Catalina Street in San

15   Leandro --

16           MS. FOX:  Objection; vague.

17   BY MR. MacDONALD:

18       Q.   -- Catalina Court?  Excuse me.

19           MS. FOX:  Objection; vague and ambiguous as to

20   "opposed."

21           MR. MacDONALD:  Go ahead.

22           THE WITNESS:  I was concerned about the issues

23   related to the zoning, and for that reason I was against

24   it, yes.

25   BY MR. MacDONALD:

Page 7

Golden Gate Reporting

1        Q.   What were those issues?

2        A.   That the zoning did not allow assembly use at

3   that location.

4        Q.   Any other reasons?

5        A.   The -- the other reasons that I had were that I

6   felt that I wanted to see the area preserved for an

7   industrial business park -- it's actually the -- the

8   best of the business parks that the city has -- and

9   wanted to see if we can't retain that campus-like look

10  that other communities have; and that's attractive to

11  bring in business and retain business.

12       Q.   You mentioned that area was one of the best

13  areas you have.  Could you describe, during the time you

14  worked at San Leandro, when that area came into

15  existence as a business park?

16       A.   The area actually was developed prior to '71,

17  so it grew over a period of years.  It was built by the

18  Reynolds & Brown Development Company, and it's had a

19  variety of high quality industrial users, but I don't

20  believe -- I don't have the dates of when it was --

21       Q.   Sure.

22       A.   -- constructed.

23       Q.   You mentioned -- prior to '71 was there a

24  larger area that was developed or was it just Catalina

25  Court by Reynolds & Brown?

Page 8

Golden Gate Reporting

```
 1        A.  Well, actually over an extended period of time,

 2   going back, you know, into the '50s, that area developed

 3   as a variety of different industrial uses.  But Reynolds

 4   & Brown assembled a large tract to be able to bring

 5   together a variety of -- of principally construction --

 6   manufacturing-type businesses of a -- of an

 7   industrial-park-kind-of setting.  I think it was

 8   probably one of the earlier industrial-type parks in our

 9   area that had landscaping that was more than just a

10   functional manufacturing site; but it was rather, an

11   attractive business-park setting for both manufacturers

12   and, then on occasion, some offices too.

13        Q.  And going back to the question:  Did it consist

14   of more than just Catalina Court, or was that only --

15   the only area that developed that way?

16            MS. FOX:  Objection.  Can you define what you

17   mean by "Catalina Court," Counsel.

18            MR. MacDONALD:  I'll show you the map.

19            MS. FOX:  That would be good.

20            MR. MacDONALD:  Catalina Court is everything

21   south of Farralon Drive that on -- on Cata -- basically

22   Catalina.

23            THE WITNESS:  Well, actually Catalina Court

24   isn't very extensive beyond, you know, Farallon Drive.

25   I mean, there's Catalina itself.  And then Catalina
```

Page 9

1    Court is just an offshoot of Catalina.  But, you know,

2    that -- that area, I would say, Farallon and Catalina is

3    going towards Doolittle and up to Wicks is part of the

4    prime industrial-park setting that the city has, yes.

5        Q.  So going back to what Reynolds & Brown did, did

6    they do just the area south of Farallon, or did they do

7    other areas beyond that?

8        A.  Well, they did a lot of other areas as well.

9    They're one of the major developers within the city.

10   But the area that you're speaking of is one that they,

11   you know, particularly was -- were involved in.

12          I mean, there's other parts -- many parts of

13   the city, you go to find Reynolds & Brown developed.

14   Some are more of a commercial nature than an industrial.

15       Q.  Right.  So approximately when, in your general

16   understanding, what decade, for example, was the

17   building at 14600 Catalina Court built?

18       A.  Well, I would say it's in the '60s, '70s.  I'm

19   not sure exactly.

20       Q.  Okay.

21       A.  I think it was earlier.  You know, probably

22   late '60s, but I would have to look it up to see because

23   I don't know for sure.

24       Q.  Would -- I don't -- I don't have the

25   documentation, so I won't follow up, but I have a

Page 10

**Golden Gate Reporting**

1    recollection that it may have been built in the early

2    1980s.

3           Does that sound approximately correct?

4           A.  Well, as I said, I thought it was earlier, but

5    it could very well have been.

6           Q.  Okay.

7           A.  I was in the finance department, you know, at

8    that time.  I wasn't involved in any of the planning

9    related issues, so you may be correct.

10          Q.  Who was the prior occupant prior to Faith

11   Fellowship taking ownership of the parcel at Catalina

12   Court?

13          A.  It was occupied by MDL, which is a software

14   computer-related kind of a firm.  I don't know exactly

15   what they did but, I know they were a large employer and

16   used -- occupied the entire building.

17          Q.  Approximately how many employees would they

18   have?

19          A.  I believe they had in excess of 400.

20          Q.  And approximately how long were they in that

21   location?

22          A.  I don't know.

23          Q.  When did MDL leave the facility?

24          A.  I believe it was in 2006.  I don't know exactly

25   when.

Page 11

**Golden Gate Reporting**

1      Q.  When did you first become aware that Faith

2  Fellowship Church was interested in 14600 Catalina

3  Court?

4      A.  In April of 2006.

5      Q.  And what brought it to your awareness?

6      A.  Well, I had a -- I had had a meeting at that

7  time with Ed Bullock who came by to -- he set up an

8  appointment and came by to visit with me in April of

9  2006?

10      MS. FOX:  Gentlemen, we skipped the

11  admonitions.  I don't know if you want to do that.

12      MR. MacDONALD:  Oh, let's give an admonition

13  here.

14      MS. FOX:  But I will admonish --

15      MR. MacDONALD:  Sure.

16      MS. FOX:  -- 'cause I'm prone to do that, as

17  you know, Mr. MacDONALD.  You gentlemen --

18  Mr. MacDonald, you need to keep your voice up, and maybe

19  we should get you some water.  I know that you were

20  struggling there.

21      Mr. Jermanis, you need to wait.  Both of you

22  are speaking over each other periodically.  You need to

23  wait till he finishes his question to respond.  The

24  question can change by the addition of a word or two at

25  the end.

Page 12

**Golden Gate Reporting**

1          And as well, you need to extend the witness the

2    same courtesy, please, and let him finish his response.

3          Also you may want to slow down a touch,

4    Mr. Jermanis.  Our court reporter is great, but --

5          THE WITNESS:  Okay.

6          MS. FOX:  -- it can get difficult.  When you

7    speak of things you know very well, people tend to go

8    very fast.

9          And with that, I'll let you finish it up,

10   Mr. MacDonald.

11         MR. MacDONALD:  And no shrugs, no "huh-uhs" or

12   "uh-huhs."  You have to answer "yes" or "no," 'cause

13   those things don't show up on depositions.  We want full

14   and accurate answers.

15         Q.  So describe your conversation with Ed Bullock.

16         A.  Ed wanted to let me know that he was

17   representing the Faith Fellowship Church and that they

18   had an interest in acquiring the Catalina property to

19   relocate the church from Manor Boulevard to that

20   location.

21         Q.  Was it just Ed?

22         A.  Yes.

23         Q.  And what else -- what was your response or what

24   was your -- what else happened in the conversation that

25   you can recall?

Page 13

**Golden Gate Reporting**

```
 1        A.   What I recall is that I told Ed that that
 2   property was not selling for assembly use.  And I would
 3   have concerns about that because, again, I was trying to
 4   preserve the industrial-park setting of that location
 5   and felt that it should continue to be used by
 6   industrial manufacturing or business rather than a --
 7   than a church.
 8        Q.   Were you aware of a meeting that was scheduled
 9   by Ed Bullock and took place between Luke Sims, Hanson
10   Hom and Debbie Pollart on behalf of the city and Gary
11   Mortara, Dave Mortara and Ed Bullock on behalf Faith
12   Fellowship Church about May 3rd, 2006?
13        A.   I was -- I do remember them -- the staff saying
14   that there was a meeting that they had subsequent to the
15   meeting that I had with Ed, yes.
16        Q.   How do you communicate with your planning group
17   regarding involving projects that are coming up?
18             Do you have a regular monthly meeting with your
19   community development director and economic -- economic
20   development director?
21        A.   I meet with what I call my development team --
22   those people that are involved in any projects that are
23   going on within the city -- about twice a month.  And I
24   have to communicate with the development director and
25   then the business development director, who usually
```

Page 14

1    area?

2            MS. FOX:   Counsel, can you define the area?

3    All along the --

4            MR. MacDONALD:   It's the cluster of properties

5    that goes from there (indicating) -- which is -- I don't

6    know the geography of San Leandro -- to there on the

7    map, so we're describing this cluster right here.

8            THE WITNESS:   There is a combination of

9    industrial and commercial along that area, and there are

10   some sites that were formerly heavy industrial.

11   BY MR. MacDONALD:

12       Q.   Okay.   And there's some vacant land there too;

13   is that correct?

14       A.   Correct.

15       Q.   But you're not aware of any industrial park

16   land area that -- put it this way:   Are there any

17   buildings within this area that are equivalent to 14600

18   Catalina Court in terms of the quality and the setting?

19       A.   I don't believe so, no.

20       Q.   After -- after this -- basically after the

21   October 12th business development committee and -- did

22   you attend a planning commission board of zoning

23   adjustment workshop relating to the assembly use

24   overlay --

25       A.   No.

Page 42

**Golden Gate Reporting**

1    CERTIFICATION OF DEPOSITION OFFICER

2

3         I, JANE H. STULLER, duly authorized to

4    administer oaths pursuant to Section 2093(b) of the

5    California Code of Civil Procedure, hereby certify that

6    the witness in the foregoing deposition was by me sworn

7    to testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of the said witness was

11   thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe the same.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of this cause named in said

20   caption.

21

22

23

24        JANE H. STULLER, CSR 7223

25

Page 55

**Golden Gate Reporting**

```
1     A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3        I, JOHN JERMANIS, do hereby acknowledge I have read

4     and examined the foregoing pages of testimony, and the

5     same is a true, correct and complete transcription of

6     the testimony given by me, and any changes or

7     corrections, if any, appear in the attached errata sheet

8     signed by me.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     6-18-08

25     Date                          JOHN JERMANIS
```

Page 57

523

**EXHIBIT 30**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


INTERNATIONAL CHURCH OF THE
FOURSQUARE GOSPEL,

            Plaintiff,

vs.

                            No. C07-03605

CITY OF SAN LEANDRO, a municipal
corporation, DOES 1-50,

            Defendants.

                      /

CERTIFIED
COPY


DEPOSITION OF GARY MORTARA

VOLUME I

(PAGES 1 - 148)


Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 018667

State of California

Tuesday, May 20, 2008


EMERICK & FINCH (925) 831-9029

Page 1

1          MR. SNIDER:  I should have been a smoker, but I

2    never bothered taking it up.

3          MS. FOX:  No, no, no, you shouldn't have.

4          That Oakland Foursquare facility, was that

5    located in what some would term a strip commercial

6    building?

7      A.   No.

8      Q.   Would it be accurate to describe it as a

9    storefront church?

10     A.   Some might.  I wouldn't.

11     Q.   Was it in a standalone building?

12     A.   Uh-huh.

13     Q.   That's a "yes"?

14     A.   Yes.  I'll get it.

15     Q.   We'll give you a little more coffee and then your

16   verbal responses will improve, I'm sure.

17     A.   I'll get it.

18     Q.   The first time is always difficult.

19          How big was the building?

20     A.   Square footage?

21     Q.   Yes.

22     A.   It was small.  Gosh, I'm going to guess 2 to

23   3,000 square feet.

24     Q.   And how many members did you have in July -- in

25   or about July 1993?

Page 29

1        A.    About 65.

2        Q.    And how many services were you having on Sundays?

3        A.    One.

4        Q.    Is your wife also a pastor?

5        A.    She is a nurse.

6        Q.    And what is her name, please?

7        A.    Tisha, T-I-S-H-A, Mortara.

8        Q.    All right.    The first church was Oakland

9   Foursquare.    Was the second church Faith Fellowship?

10       A.    Yes.

11       Q.    And when did you move to Faith Fellowship?

12       A.    September of 1993.

13       Q.    And you have been there ever since?

14       A.    Yep -- yes.

15       Q.    Was there any break in your tenure?   By that I

16   mean did you take a year sabbatical?   Did you go someplace

17   else and regain your demonstrative good life for a period

18   of time?

19       A.    No.

20       Q.    In September 1993, where was the location of

21   Faith Fellowship?

22       A.    577 Manor Boulevard, San Leandro, California.

23       Q.    Why did you move to Faith Fellowship?

24       A.    The previous pastor resigned in August of '93

25   because the constituency had dropped down to about -- I

Page 30

1    keeping with your then average weekly attendance or were

2    you hoping to and planning for accommodating growth?

3        A.   I think we knew that we would continue to grow

4    to some degree, yes.

5        Q.   Do you have a figure -- a best estimate you can

6    give me, Pastor Gary, of your average weekly attendance

7    today?

8        A.   It fluctuates between 1,300 and 1,550 in

9    attendance.

10        Q.   All right.  And do you have any projections for

11    what type of growth you hope to obtain in the next two to

12    three years?

13        A.   At this building or at Catalina?

14        Q.   At this building.

15        A.   We can't grow much beyond 1,700 people at this

16    site.

17        Q.   And what is your hope for the growth numbers at

18    the Catalina site?

19        A.   We want to reach as many people for Jesus

20    Christ as we possibly can.

21        Q.   Do you have an estimated figure that you had in

22    mind for the Catalina site?

23        A.   3 to 5,000.

24        Q.   Weekly attendance?

25        A.   Uh-huh.

Page 50

1      A.  Well, you have to remember that there wasn't a

2  church built in San Leandro for over 17 years until they

3  built Faith Fellowship the original site.  So there was

4  no real awareness of what the rules were for churches.

5      Q.  My question is was there a person at Faith

6  Fellowship who was supposed to become aware of what the

7  rules were so you all could know the rules of the game?

8      A.  That's why I personally went to the meeting

9  with Sam Millicek and somebody else to find out:  Okay.

10  We found a building.  How can we make this a usable site

11  for assembly?  It fits all our criteria.

12      Q.  So were you the person who was going to figure

13  out the rules of the zoning and how one would move

14  forward?

15      A.  No.  I was going to ask.

16      Q.  So you were looking to the city folks to give you

17  that direction?

18      A.  Uh-huh.

19      Q.  That's a "yes"?

20      A.  Yes.

21      MS. FOX:  I'm sorry.  I am going to have to

22  take a break.

23              (A recess was taken from 11:23 a.m.

24              to 11:30 a.m.)

25  BY MS. FOX:

Page 75

```
 1          Q.   Pastor Gary, do you ever recall Ed Bullok telling

 2     you that John Jermanis cautioned that Faith Fellowship

 3     should not go buy that site?

 4          A.   He may have.

 5          Q.   Do you recall that?

 6          A.   Vaguely.

 7          Q.   Do you recall that you were advised by Ed Bullok

 8     or anyone else that John Jermanis cautioned you shouldn't

 9     go hard, so to speak, with dollars that become

10     nonrefundable on that site?

11          A.   I don't remember that.

12          Q.   When Ed Bullok would report to you on what

13     happened with this meeting with John Jermanis, did he do

14     that in writing?  Did he do that by email or did he do

15     that verbally or all of the above?

16          A.   I remember verbally.  I don't remember anything

17     officially in a document.

18          Q.   During the course of this transaction, did you

19     communicate via email with Ed Bullok?

20          A.   I may have.

21          Q.   Did you ever make any effort to check your email

22     accounts for production of any documents in connection

23     with this litigation?

24          A.   I checked my emails all the time so --

25          Q.   So opposed to just checking your emails, which at
```

Page 76

1                    their statements."

2    BY MS. FOX:

3        Q.  So Pastor Gary, can you answer that for me?  What

4    was the conversation and who was it with about those

5    issues?

6        A.  Again, the way it was worded was "asked."  I

7    don't remember asking them if they thought I should put

8    deposit money down.  I think it was a conversation that

9    they brought up and my response to them was:  We just

10   need to be heard.  You told us to file an application

11   but nobody is hearing our case, and, you know, we were

12   in negotiations on this building.

13       Q.  I understand that you were having conversations

14   with the City staff where you were telling them:  We need

15   to get this process moving; correct?

16       A.  Uh-huh -- yes.

17       Q.  But at any time, did you have conversations with

18   the staff where you told them that you had monies that you

19   were now going to have to make nonrefundable in this

20   transaction?

21       A.  Yes, I'm sure we did.

22       Q.  All right.  Who do you recall telling that to?

23       A.  I would guess that it was Debbie Pollart

24   because she was the point person, but I don't remember.

25       Q.  And is it your recollection that Ms. Pollart at

Page 82

```
1    any time assured you that your transaction would have

2    smooth sailing and you shouldn't worry about your

3    nonrefundable deposits?

4         A.  No.  She didn't say that.

5         Q.  Did you ever purchase a single-family residence

6    at the Manor site?

7         A.  Yes.

8         Q.  And where was that located?

9         A.  Directly next door to the church.

10         Q.  And was that purchased for parking?

11         A.  Parking.

12         Q.  And when did that occur --

13         A.  I don't --

14         Q.  -- that purchase?

15         A.  I don't have the date on that.

16         Q.  I know we have been at it for a fair amount of

17    time this morning, Pastor Gary, but even though you have

18    been very diligent, I am happy to take a break if you want

19    to take an early lunch.  I am entitled to your best

20    recollection.  So this is my day to ask questions.

21         A.  Okay.

22         Q.  So if you can take a moment to reflect.  We know

23    when you bought the hardware store.  You've told us the

24    dates of the new facility opening.  Can you help me,

25    please, place when the purchase of that single-family home
```

Page 83

540

1   occurred.

2       A.   I am going to have to guess.   2005.

3       Q.   And how large was the piece of property upon

4   which the single-family home sat?

5       A.   I do not know.

6       Q.   Originally we were talking about the fact that

7   you had originally had a one-acre site.   You added a 1.4

8   acre site to it for a total of 2.4.

9           As we sit here today, what is the total acreage

10  of the Manor property?

11      A.   2.4.   And then there is a house next door

12  that's not contiguous because there is a street --

13  cul-de-sac there.

14      Q.   And is that now paved over for parking?

15      A.   What paved over?

16      Q.   Sorry.   The single-family home that was purchased

17  at or about 2005.   Was that home then demolished?

18      A.   No.   Still sitting there.

19      Q.   All right.   What is being used at that location?

20      A.   We park in the driveway, on the street, on the

21  front lawn, and on the cul-de-sac.   We purchased the

22  house strictly so a neighbor wouldn't tie us up and take

23  more parking from us.

24      Q.   All right.   And did you make any use of the

25  interior of the house itself?

Page 84

1    A.  Yes.

2    Q.  And do you know whose handwriting that is that

3  says:  This offer is further subject --

4    A.  It's pretty good writing so it's not mine.

5    Q.  And I can stipulate it's not James Lee's.

6    A.  Yeah, I'm not sure who wrote that.

7    Q.  How about condition F?

8    A.  This agreement is specifically conditioned upon

9  buyer, in buyer's sole judgment, determining that the

10  subject real property is suitable for and approved for

11  use as a church.  This condition shall remain in full

12  force and effect until removed in writing by buyer.

13  What about it?

14    Q.  Do you know who drafted that condition?

15    A.  I'm assuming -- it would be an assumption -- Ed

16  Bullok, if this is his document.

17    Q.  Do you recall discussing this offer with Ed

18  Bullok before it was submitted?

19    A.  Yes.

20    Q.  And did Ed Bullok advise you that it is prudent

21  practice in a land use transaction to make sure you have

22  land use entitlement approved before you move forward with

23  a large purchase?

24    A.  Something to that effect.

25    Q.  Do you recall whether or not this condition, 36F,

Page 87

1        A.   David Mortara.

2        Q.   Before he joined about 14 months ago, who was in

3   charge of parking?

4        A.   Volunteers.

5        Q.   I know that you have identified someone as in

6   charge of facilities.   Was that Jim Lee?

7        A.   Yes.

8        Q.   Is parking part of facilities?

9        A.   No.

10        Q.   How about the Manor Bowl?   Did you ever have an

11   agreement with Manor Bowl for the provision of parking?

12        A.   Verbally.

13        Q.   And what was the verbal agreement you had with

14   Manor Bowl?

15        A.   Something to the effect of:   Can we park cars

16   here on Sunday mornings during our service times?

17        Q.   And they said yes at some point in time?

18        A.   Yes.

19        Q.   And can you place for me what point in time --

20   what time period you actually used Manor Bowl to park any

21   cars?

22        A.   I would say from the start of the opening of

23   the new building, 2003 April, for about maybe a year.

24        Q.   How much did you pay them for that?

25        A.   Nothing.

Page 129

1    Q.  Did you shuttle people from Manor Bowl or did
2  they walk?

3    A.  They mostly walked.

4    Q.  How far is it?

5    A.  .3 miles.

6    Q.  Did you have a shuttle bus?

7    A.  No.  But we do now.

8    Q.  And then at some point you stopped using Manor
9  Bowl for parking?

10    A.  Yes.

11    Q.  And who is the owner of Manor Bowl that you were
12  dealing with for the parking arrangement?

13    A.  I have no idea.

14    Q.  Who made the verbal representation that Faith
15  Fellowship could use that area for parking?

16    A.  I did.

17    Q.  Who made it on behalf of Manor Bowl?

18    A.  The owner's wife or the owner.  I forget which
19  at that time.

20    Q.  And do you recall that individual's name?

21    A.  No, I don't.  I couldn't even pick him out of a
22  crowd of two.

23    Q.  At some point in time, did Manor Bowl change
24  ownership?

25    A.  I'm not sure.

1       Q.   Approximately a year later, you stopped using

2   Manor Bowl for parking; correct?

3       A.   Uh-huh.

4       Q.   That's a "yes"?

5       A.   Yes.

6       Q.   And I understand that Manor Bowl no longer wanted

7   you all to use their facility for parking; is that

8   correct?

9       A.   Yes.

10      Q.   Did they tell you why?

11      A.   They didn't tell us why.  I heard other reasons

12  why.

13      Q.   All right.  How did you learn that you could no

14  longer use Manor Bowl for parking?  Did the owner call you

15  up and say:  I'm sorry, Gary, but you are just going to

16  have to stop doing that?

17      A.   No, it wasn't directly to me.  It was through

18  someone maybe on staff to me.

19      Q.   And how did that come to your attention?

20      A.   I forget now.

21      Q.   And they simply said:  Stop using our parking

22  facilities?

23      A.   Yes, something to the effect they have bowling

24  on Sunday mornings, and it was taking up from their

25  people -- parishioners -- what do they call it --

Page 131

1    A.  We did.

2         MS. FOX:  All right.  Counsel, we have come to

3    the bewitching hour for me.  I need to terminate our

4    deposition to be reset to finish up.  I appreciate you

5    coming early today.  It ends up that my son is receiving

6    an award tonight so I need to be there.  So I appreciate

7    your accommodation of that.  And so we need to conclude.

8         There are some documents perhaps we can have

9    before day two.  I suggest we confer by email for a

10   convenient time for day two that meets everybody's

11   schedule.

12        MR. SNIDER:  Okay.

13        THE REPORTER:  Counsel, to confirm, you are

14   ordering a copy with a disk?

15        MR. SNIDER:  Yes.

16        THE REPORTER:  A condensed also?

17        MR. SNIDER:  Yes.

18        THE REPORTER:  Thank you.

19        (The deposition was adjourned at 2:49 p.m.)

20

21

22                    _____
                           GARY MORTARA

23

24

25

Page 144

## CERTIFICATE OF REPORTER

1
2
3          I, LORI A. YOCK, CSR No. 5801, a Certified
4   Shorthand Reporter in and for the State of California,
5   do hereby certify:
6          That prior to being examined, the witness named
7   in the foregoing deposition was by me duly sworn to
8   testify to the truth, the whole truth, and nothing but
9   the truth.
10          That said deposition was taken before me at the
11   time and place set forth and was taken down by me in
12   shorthand and thereafter reduced to computerized
13   transcription under my direction and supervision, and I
14   hereby certify the foregoing deposition is a full, true
15   and correct transcript of my shorthand notes so taken.
16          And I further certify that I am neither counsel
17   for nor related to any party to said action nor in any
18   way interested in the outcome thereof.
19          IN WITNESS WHEREOF, I have hereunto subscribed
20   my name this 1st day of June, 2008.
21
22
23          _____
            LORI A. YOCK
24          CSR No. 5801
25

EMERICK & FINCH (925) 831-9029

145

544

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


INTERNATIONAL CHURCH OF THE
FOURSQUARE GOSPEL,

        Plaintiff,

vs.                         No. C07-03605

CITY OF SAN LEANDRO, a municipal
corporation, DOES 1-50,

        Defendants.

                      /

**CERTIFIED COPY**


DEPOSITION OF GARY MORTARA

VOLUME II

(PAGES 149 - 214)



Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 018667

State of California

Friday, June 6, 2008



EMERICK & FINCH (925) 831-9029

Page 149

1   research and find it.

2      Q.   Did you talk to Jim Lee about whether or not he

3   remembered if condition 36F, the typewritten condition,

4   had, in fact, been deleted from the transaction?

5      A.   I may have.

6      Q.   And do you recall what he said?

7      A.   He didn't know what happened to it.

8      Q.   When you all proposed the new sanctuary back in

9   2003 that opened in Easter 2003, do you recall who the

10  planning person was that you primarily dealt with in that

11  regard with the City?

12     A.   I don't, but John Jermanis said he was there at

13  that time and he was part of the approval process.

14     Q.   Do you recall whether or not the City discouraged

15  you in any fashion from moving forward with that new

16  sanctuary?

17     A.   My initial plan of a 1,200 seat auditorium they

18  shot down.  When I came back with this auditorium, they

19  immediately approved it.

20     Q.   Do you recall why the 1,200 person auditorium was

21  shot down, as you described it?

22     A.   Two reasons.  One was parking.  The

23  neighborhood couldn't accommodate the parking.  Two,

24  where I envisioned the sanctuary sitting would have been

25  up against the houses, and the neighbors weren't in

Page 180

1    favor of that.

2         Q.   Ultimately did you think you got fair treatment

3    in the approval of your CUP in 2003 by the City?

4         A.   Yes, my second request for this particular

5    building.  We downsized the square footage of the

6    sanctuary so we wouldn't need as many parking places,

7    and we moved the building towards the freeway instead of

8    the houses.  So they were very accommodating of that.

9         Q.   Now, we talked a little bit last time about the

10   numbers of folks that attend services.  Those gold sheets

11   -- in your mind, do those gold sheets represent membership

12   numbers or is that a separate issue or separate records

13   that are kept in that regard?

14        A.   Separate.

15        Q.   All right.  And how are the membership figures

16   kept?  Are they on a particular document?

17        A.   I believe so.  My secretary keeps all of that.

18   We don't make a real big push for church membership.

19        Q.   Is there a particular requirement of what you

20   have to do to be a member of Faith Fellowship?

21        A.   Yes.

22        Q.   And what is that?

23        A.   You have to be nine years old.  You have to be

24   a born-again believer in the Lord Jesus Christ and

25   preferably baptized in water.

Page 181

1  play here?

2      A.  Yeah.  We believe the City is violating the

3  law.

4          MS. FOX:  All right.  I have no further

5  questions.

6          THE REPORTER:  Counsel, are you ordering a

7  copy?

8          MR. SNIDER:  Yes.

9          THE REPORTER:  Thank you.

10         (The deposition was concluded at 12:10 p.m.)

11

12

13          _____
                     GARY MORTARA

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:07-cv-03605-    Document 132-23    Filed 08/27    8    Page 28 of 29

## CERTIFICATE OF REPORTER

1
2
3      I, LORI A. YOCK, CSR No. 5801, a Certified
4  Shorthand Reporter in and for the State of California,
5  do hereby certify:
6      That prior to being examined, the witness named
7  in the foregoing deposition was by me duly sworn to
8  testify to the truth, the whole truth, and nothing but
9  the truth.
10      That said deposition was taken before me at the
11  time and place set forth and was taken down by me in
12  shorthand and thereafter reduced to computerized
13  transcription under my direction and supervision, and I
14  hereby certify the foregoing deposition is a full, true
15  and correct transcript of my shorthand notes so taken.
16      And I further certify that I am neither counsel
17  for nor related to any party to said action nor in any
18  way interested in the outcome thereof.
19      IN WITNESS WHEREOF, I have hereunto subscribed
20  my name this 18th day of June, 2008.
21
22
23                          LORI A. YOCK
24                          CSR No. 5801
25

# EXHIBIT 36

**COMMERCIAL PROPERTY PURCHASE AGREEMENT
AND JOINT ESCROW INSTRUCTIONS
(NON-RESIDENTIAL)
(C.A.R. Form CPA, Revised 10/02)**

CALIFORNIA
ASSOCIATION
OF REALTORS®

Is __March 24, 2006__ , at _____ __San Leandro__ _____ , California.

**OFFER:**

A. THIS IS AN OFFER FROM _____ __San Leandro Fourplus #2__ _____ ("Buyer").
   ☐ Individual(s), ☒ A Corporation, ☐ A Partnership, ☐ An LLC, ☐ An LLP, or ☐ Other _____

B. THE REAL PROPERTY TO BE ACQUIRED is described as _____ __14600 Catlina__ _____
   _____ , Assessor's Parcel No. __080G-0933-020, 021 & 022-001__ , situated in
   __San Leandro__ , County of _____ __Alameda__ _____ California, ("Property").

C. THE PURCHASE PRICE offered is __Five Million Two Hundred Fifty Thousand__
   _____ Dollars $ __5,250,000.00__ .

D. CLOSE OF ESCROW shall occur on _____ (date) (or ☒ __120__ Days After Acceptance).
   FINANCE TERMS: Obtaining the loans below is a contingency of this Agreement unless: (i) either 2L or 2M is checked below; or (ii) otherwise agreed in writing. Buyer shall act diligently and in good faith to obtain the designated loans. Obtaining deposit, down payment and closing costs is not a contingency. Buyer represents that funds will be good when deposited with Escrow Holder.

A. INITIAL DEPOSIT: Buyer has given a deposit in the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ __50,000.00__
   to the agent submitting the offer (or to ☐ _____ ), by Personal Check
   (or ☐ _____ ), made payable to _____ __Old Republic Title Company__ _____ ,
   which shall be held uncashed until Acceptance and then deposited within 3 business days after Acceptance
   or ☒ _____ , with
   Escrow Holder, or ☐ Into Broker's trust account.

B. INCREASED DEPOSIT: Buyer shall deposit with Escrow Holder an increased deposit in the amount of . . . . . $ _____
   within _____ Days After Acceptance, or ☐ _____ .

C. FIRST LOAN IN THE AMOUNT OF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ __3,675,000.00__
   NEW First Deed of Trust in favor of ☒ Lender, ☐ Seller,
   OR ☐ ASSUMPTION of (or ☐ "subject to") Existing First Deed of Trust
   encumbering the Property, securing a note payable at maximum interest of __7.000__ % fixed rate, or
   _____ % initial adjustable rate with a maximum interest rate of _____ %, balance due in
   __25__ years, amortized over __25__ years. (If checked: ☐ and with a margin not to exceed _____ %,
   tied to the following index _____ .) Buyer shall pay loan fees/points not to exceed _____ .
   Additional terms _____

D. SECOND LOAN IN THE AMOUNT OF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
   NEW Second Deed of Trust in favor of ☐ Lender, ☐ Seller,
   OR ☐ ASSUMPTION of (or ☐ "subject to") Existing Second Deed of Trust
   encumbering the Property, securing a note payable at maximum interest of _____ % fixed rate, or
   _____ % initial adjustable rate with a maximum interest rate of _____ %, balance due in
   _____ years, amortized over _____ years. (If checked: ☐ and with a margin not to exceed _____ %,
   tied to the following index: _____ .) Buyer shall pay loan fees/points not to exceed _____ .
   Additional terms _____

E. ADDITIONAL FINANCING TERMS: _____ $ _____
   _____

F. BALANCE OF PURCHASE PRICE (not including costs of obtaining loans and other closing costs) in the amount of . . . . . . . $ __1,525,000.00__
   to be deposited with Escrow Holder within sufficient time to close escrow.

G. PURCHASE PRICE (TOTAL): . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ __5,250,000.00__

H. LOAN APPLICATIONS: Within 7 (or ☒ __21__ ) Days After Acceptance, Buyer shall provide Seller a letter from lender or mortgage loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified above.

I. VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS: Buyer (or Buyer's lender or loan broker pursuant to 2H) shall, within 7 (or ☐ __21__ ) Days After Acceptance, provide Seller written verification of Buyer's down payment and closing costs.

J. LOAN CONTINGENCY REMOVAL: (i) Within 17 (or ☐ _____ ) Days After Acceptance Buyer shall, as specified in paragraph 17, remove the loan contingency or cancel this Agreement; OR (ii) (if checked) ☒ loan contingency shall remain in effect until the designated loans are funded.

K. APPRAISAL CONTINGENCY AND REMOVAL: This Agreement is (OR, if checked, ☐ is NOT) contingent upon the Property appraising at no less than the specified purchase price. If there is a loan contingency, at the time the loan contingency is removed (or, if checked, ☐ within 17 (or _____ ) Days After Acceptance), Buyer shall, as specified in paragraph 17, remove the appraisal contingency or cancel this Agreement. If there is no loan contingency, Buyer shall, as specified in paragraph 17, remove the appraisal contingency within 17 (or _____ ) Days After Acceptance.

EXHIBIT
3
G. Mortara
5-20-08

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2002 CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

CPA REVISED 10/02 (PAGE 1 OF 10)

Buyer's Initials ( __Am__ )( _____ )
Seller's Initials ( _____ )( _____ )

Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 1 OF 10)**

Agent: C. Edward Builick   Phone: (510) 918-4100   Fax: (510) 881-8301   Prepared using WINForms® software
Broker: Danville Realty Corporation 21796 Hesperian Boulevard, Hayward CA 94541-7003

EXHIBIT 36

628

14600 Catlina

Property Address: __San Leandro, CA_____ Date: __March 24, 2006__

L. ☐ **NO LOAN CONTINGENCY** (if checked): Obtaining any loan in paragraphs 2C, 2D, 2E or elsewhere in this Agreement, is NOT a contingency of this Agreement. If Buyer does not obtain the loan and as a result Buyer does not purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.

M. ☐ **ALL CASH OFFER** (if checked): No loan is needed to purchase the Property. Buyer shall, within 7 (or ☐ _____ ) Days After Acceptance, provide Seller written verification of sufficient funds to close this transaction.

N. **SELLER FINANCING:** For any Seller financing designated above, Buyer is to execute a note secured by a deed of trust in favor of Seller, on the terms and conditions set forth in the attached addendum (C.A.R. Form SFA).

O. **ASSUMED OR "SUBJECT TO" FINANCING:** Seller represents that Seller is not delinquent on any payments due on any loans. Seller shall, within the time specified in paragraph 17, provide Copies of all applicable notes and deeds of trust, loan balances and current interest rates to Buyer. Buyer shall then, as specified in paragraph 17, remove this contingency or cancel this Agreement. Differences between estimated and actual loan balances shall be adjusted at Close Of Escrow by cash down payment. Impound accounts, if any, shall be assigned and charged to Buyer and credited to Seller. Seller is advised that Buyer's assumption of an existing loan may not release Seller from liability on that loan. If the Property is acquired subject to an existing loan, Buyer and Seller are advised to consult with legal counsel regarding the ability of an existing lender to call the loan due, and the consequences thereof.

4. **CLOSING AND OCCUPANCY:**

A. **Seller-Occupied or Vacant Units:** Occupancy shall be delivered to Buyer at ____11:59___ ☒ AM ☐ PM, ☐ on the date of Close Of Escrow, ☐ on _____ ; or ☐ no later than _____ Days After Close Of Escrow. (C.A.R. Form PAA, paragraph 2.) If transfer of title and occupancy do not occur at the same time, Buyer and Seller are advised to: (i) enter into a written occupancy agreement; and (ii) consult with their insurance and legal advisors.

B. **Tenant-Occupied Units:** Possession and occupancy subject to the rights of tenants under existing leases, shall be delivered to Buyer on Close Of Escrow.

C. At Close Of Escrow, Seller assigns to Buyer any assignable warranty rights for items included in the sale and shall provide any available Copies of such warranties. Brokers cannot and will not determine the assignability of any warranties.

D. At Close Of Escrow, unless otherwise agreed in writing, Seller shall provide keys and/or means to operate all locks, mailboxes, security systems, alarms and garage door openers. If the Property is a unit in a condominium or located in a common-interest subdivision, Buyer may be required to pay a deposit to the Owners' Association ("OA") to obtain keys to accessible OA facilities.

5. **SECURITY DEPOSITS:** Security deposits, if any, to the extent they have not been applied by Seller in accordance with any rental agreement and current Law, shall be transferred to Buyer on Close Of Escrow. Seller shall notify each tenant, in compliance with the Civil Code.

6. **ALLOCATION OF COSTS** (if checked ): Unless otherwise specified here, this paragraph only determines who is to pay for the report, inspection, test or service mentioned. If not specified here or elsewhere in this Agreement, the determination of who is to pay for any work recommended or identified by any such report, inspection, test or service is by the method specified in paragraph 17.

A. **INSPECTIONS AND REPORTS:**

(1) ☐ Buyer ☐ Seller shall pay for sewer connection, if required by Law prior to Close Of Escrow _____.

(2) ☐ Buyer ☐ Seller shall pay to have septic or private sewage disposal system inspected _____.

(3) ☐ Buyer ☐ Seller shall pay to have domestic wells tested for water potability and productivity _____.

(4) ☐ Buyer ☒ Seller shall pay for a natural hazard zone disclosure report prepared by _____.

(5) ☐ Buyer ☐ Seller shall pay for the following inspection or report _____.

(6) ☐ Buyer ☐ Seller shall pay for the following inspection or report _____.

B. **GOVERNMENT REQUIREMENTS AND RETROFIT:**

(1) ☐ Buyer ☒ Seller shall pay for smoke detector installation and/or water heater bracing, if required by Law. Prior to Close Of Escrow, Seller shall provide Buyer a written statement of compliance in accordance with state and local Law, unless exempt.

(2) ☐ Buyer ☒ Seller shall pay the cost of compliance with any other minimum mandatory government retrofit standards, inspections and reports if required as a condition of closing escrow under any Law.

(3) ☐ Buyer ☒ Seller shall pay for installation of approved fire extinguisher(s), sprinkler(s), and hose(s), if required by Law, which shall be installed prior to Close Of Escrow. Prior to Close Of Escrow Seller shall provide Buyer a written statement of compliance, if required by Law.

C. **ESCROW AND TITLE:**

(1) ☒ Buyer ☒ Seller shall pay escrow fee __50% Buyer/50% Seller_____.

Escrow Holder shall be __Old Republic Title Company_____.

(2) ☒ Buyer ☐ Seller shall pay for owner's title insurance policy specified in paragraph 16 _____.

Owner's title policy to be issued by: __Old Republic Title Company_____.

(Buyer shall pay for any title insurance policy insuring Buyer's lender, unless otherwise agreed in writing.)

D. **OTHER COSTS:**

(1) ☐ Buyer ☒ Seller shall pay County transfer tax or transfer fee _____.

(2) ☒ Buyer ☒ Seller shall pay City transfer tax or transfer fee __50% Buyer/50% Seller_____.

(3) ☐ Buyer ☒ Seller shall pay OA transfer fees _____.

(4) ☐ Buyer ☒ Seller shall pay OA document preparation fees _____.

(5) ☐ Buyer ☐ Seller shall pay for _____.

(6) ☐ Buyer ☐ Seller shall pay for _____.

Buyer's Initials ( GM )(_____)
Seller's Initials (_____)(_____)

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 2 OF 10)

Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 2 OF 10)**

Faith Fellowsh

629

Property Address: _San Leandro, CA_ Date: _March 24, 2005_

6. **SELLER DISCLOSURES:**

A. **NATURAL AND ENVIRONMENTAL DISCLOSURES:** Seller shall, within the time specified in paragraph 17, if required by Law: (i) deliver to Buyer earthquake guides (and questionnaire) and environmental hazards booklet; (ii) even if exempt from the obligation to provide an NHD, disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (Inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and (iii) disclose any other zone as required by Law and provide any other information required for those zones.

B. **ADDITIONAL DISCLOSURES:** Within the time specified in paragraph 17, Seller shall provide to Buyer, in writing, the following disclosures, documentation and information:

(1) RENTAL SERVICE AGREEMENTS: (i) All current leases, rental agreements, service contracts, and other agreements pertaining to the operation of the Property; and (ii) a rental statement including names of tenants, rental rates, period of rental, date of last rent increase, security deposits, rental concessions, rebates, or other benefits, if any, and a list of delinquent rents and their duration. Seller represents that no tenant is entitled to any concession, rebate, or other benefit, except as set forth in these documents.

(2) INCOME AND EXPENSE STATEMENTS: The books and records, including a statement of income and expense for the 12 months preceding Acceptance. Seller represents that the books and records are those maintained in the ordinary and normal course of business, and used by Seller in the computation of federal and state income tax returns.

(3) ☐ TENANT ESTOPPEL CERTIFICATES: (if checked) Tenant estoppel certificates (C.A.R. Form TEC) completed by Seller or Seller's agent, and signed by tenants, acknowledging: (i) that tenants' rental or lease agreements are unmodified and in full force and effect (or if modified, stating all such modifications); (ii) that no lessor defaults exist; and (iii) stating the amount of any prepaid rent or security deposit.

(4) SURVEYS, PLANS AND ENGINEERING DOCUMENTS: Copies of surveys, plans, specifications and engineering documents, if any, in Seller's possession or control.

(5) PERMITS: If in Seller's possession, Copies of all permits and approvals concerning the Property, obtained from any governmental entity, including, but not limited to, certificates of occupancy, conditional use permits, development plans, and licenses and permits pertaining to the operation of the Property.

(6) STRUCTURAL MODIFICATIONS: Any known structural additions or alterations to, or the installation, alteration, repair or replacement of, significant components of the structure(s) upon the Property.

(7) GOVERNMENTAL COMPLIANCE: Any improvements, additions, alterations or repairs made by Seller, or known to Seller to have been made, without required governmental permits, final inspections, and approvals.

(8) VIOLATION NOTICES: Any notice of violations of any Law filed or issued against the Property and actually known to Seller.

(9) MISCELLANEOUS ITEMS: Any of the following, if actually known to Seller: (i) any current pending lawsuit(s), investigation(s), inquiry(ies), action(s), or other proceeding(s) affecting the Property, or the right to use and occupy it; (ii) any unsatisfied mechanic's or materialman's lien(s) affecting the Property; and (iii) that any tenant of the Property is the subject of a bankruptcy.

7. ☒ **ENVIRONMENTAL SURVEY** (if checked): Within _____ Days After Acceptance, Buyer shall be provided a phase one environmental survey report paid for and obtained by ☐ Buyer ☐ Seller. Buyer shall then, as specified in paragraph 17, remove this contingency or cancel this Agreement.

8. **CONDOMINIUM/PLANNED UNIT DEVELOPMENT DISCLOSURES:**

A. SELLER HAS: 7 (or ☐ _____ ) Days After Acceptance to disclose to Buyer whether the Property is a condominium, or located in a planned unit development or other common interest subdivision.

B. If Property is a condominium, or located in a planned unit development or other common interest subdivision, Seller has 3 (or ☐ _____ ) Days After Acceptance to request from the OA (C.A.R. Form HOA): (i) Copies of any documents required by Law; (ii) disclosure of any pending or anticipated claim or litigation by or against the OA; (iii) a statement containing the location and number of designated parking and storage spaces; (iv) Copies of the most recent 12 months of OA minutes for regular and special meetings; and (v) the names and contact information of all OA's governing the Property. (Collectively, "CI Disclosures.") Seller shall itemize and deliver to Buyer all CI Disclosures received from the OA and any CI Disclosures in Seller's possession. Buyer's approval of CI Disclosures is a contingency of this Agreement as specified in paragraph 17.

9. **SUBSEQUENT DISCLOSURES:** In the event Seller, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information or representations previously provided to Buyer of which Buyer is otherwise unaware, Seller shall promptly provide a subsequent or amended disclosure or notice in writing, covering those items. However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies disclosed in reports ordered and paid for by Buyer.

10. **CHANGES DURING ESCROW:**

A. Prior to Close Of Escrow, Seller may only engage in the following acts, ("Proposed Changes"), subject to Buyer's rights in paragraph 17: (i) rent or lease any vacant unit or other part of the premises; (ii) alter, modify, or extend any existing rental or lease agreement; (iii) enter into, alter, modify or extend any service contract(s); or (iv) change the status of the condition of the Property.

B. At least 7 (or ☒ __15__ ) Days prior to any Proposed Changes. Seller shall give written notice to Buyer of any Proposed Changes.

11. **CONDITIONS AFFECTING PROPERTY:**

A. Unless otherwise agreed: (i) the Property is sold (a) in its PRESENT physical condition as of the date of Acceptance and (b) subject to Buyer's investigation rights; (ii) the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and (iii) all debris and personal property not included in the sale shall be removed by Close Of Escrow.

B. SELLER SHALL, within the time specified in paragraph 17, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS affecting the Property, including known insurance claims within the past five years, AND MAKE OTHER DISCLOSURES REQUIRED BY LAW.

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 3 OF 10)

Buyer's Initials (_GM_)(_____)
Seller's Initials (_____)(_____)
Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 3 OF 10)**

Faith Fellows

630

14600 Catlin

Property Address: San Leandro, CA

Date: March 24, 2006

C. NOTE TO BUYER: You are strongly advised to conduct investigations of the entire Property in order to determine its present condition since Seller may not be aware of all defects affecting the Property or other factors that you consider important. Property Improvements may not be built according to code, in compliance with current Law, or have had permits issued.

D. NOTE TO SELLER: Buyer has the right to inspect the Property and, as specified in paragraph 17, based upon information discovered in those inspections: (i) cancel this Agreement; or (ii) request that you make Repairs or take other action.

## 12. ITEMS INCLUDED AND EXCLUDED:

A. NOTE TO BUYER AND SELLER: Items listed as included or excluded in the MLS, flyers or marketing materials are not included in the purchase price or excluded from the sale unless specified in 12B or C.

B. ITEMS INCLUDED IN SALE:

(1) All EXISTING fixtures and fittings that are attached to the Property.

(2) Existing electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar systems, built-in appliances, window and door screens, awnings, shutters, window coverings, attached floor coverings, television antennas, satellite dishes, private integrated telephone systems, air coolers/conditioners, pool/spa equipment, garage door openers/remote controls, mailbox, in-ground landscaping, trees/shrubs, water softeners, water purifiers, security systems/alarms.

(3) A complete inventory of all personal property of Seller currently used in the operation of the Property and included in the purchase price shall be delivered to Buyer within the time specified in paragraph 17.

(4) Seller represents that all items included in the purchase price are, unless otherwise specified, owned by Seller. Within the time specified in paragraph 17, Seller shall give Buyer a list of fixtures not owned by Seller.

(5) Seller shall deliver title to the personal property by Bill of Sale, free of all liens and encumbrances, and without warranty of condition.

(6) As additional security for any note in favor of Seller for any part of the purchase price. Buyer shall execute a UCC-1 Financing Statement to be filed with the Secretary of State, covering the personal property included in the purchase, replacement thereof, and insurance proceeds.

C. ITEMS EXCLUDED FROM SALE: _____

## 13. BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:

A. Buyer's acceptance of the condition of, and any other matter affecting the Property is a contingency of this Agreement, as specified in this paragraph and paragraph 17. Within the time specified in paragraph 17, Buyer shall have the right, at Buyer's expense unless otherwise agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations"), including, but not limited to, the right to: (i) inspect for lead-based paint and other lead-based paint hazards; (ii) inspect for wood destroying pests and organisms; (iii) confirm the insurability of Buyer and the Property; and (iv) satisfy Buyer as to any matter of concern to Buyer. Without Seller's prior written consent, Buyer shall neither make nor cause to be made: (i) invasive or destructive Buyer Investigations; or (ii) inspections by any governmental building or zoning inspector, or government employee, unless required by Law.

B. Buyer shall complete Buyer Investigations and, as specified in paragraph 17, remove the contingency or cancel this Agreement. Buyer shall give Seller, at no cost, complete Copies of all Buyer Investigation reports obtained by Buyer. Seller shall make Property available for all Buyer Investigations. Seller shall have water, gas, electricity, and all operable pilot lights on for Buyer's investigations and through the date possession is made available to Buyer.

## 14. REPAIRS: Repairs shall be completed prior to final verification of condition unless otherwise agreed in writing. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that the work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. Seller shall: (i) obtain receipts for Repairs performed by others; (ii) prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and (iii) provide Copies of receipts and statements to Buyer prior to final verification of condition.

## 15. BUYER INDEMNITY AND SELLER PROTECTION FOR ENTRY UPON PROPERTY: Buyer shall: (i) keep the Property free and clear of liens; (ii) Repair all damage arising from Buyer Investigations; and (iii) indemnify and hold Seller harmless from all resulting liability, claims, demands, damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry policies of liability, workers' compensation and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain protections may be afforded Seller by recording a "Notice of Non-Responsibility" (C.A.R. Form NNR) for Buyer Investigations and work done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement.

## 16. TITLE AND VESTING:

A. Within the time specified in paragraph 17, Buyer shall be provided a current preliminary (title) report, which is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. Buyer's review of the preliminary report and any other matters which may affect title are a contingency of this Agreement as specified in paragraph 17.

B. Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except: (i) monetary liens of record unless Buyer is assuming those obligations or taking the property subject to those obligations; and (ii) those matters which Seller has agreed to remove in writing.

C. Within the time specified in paragraph 17, Seller has a duty to disclose to Buyer all matters known to Seller affecting title, whether of record or not.

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 4 OF 10)

| Buyer's Initials ( GM )( ) |
| Seller's Initials ( )( ) |
| Reviewed by ____ Date ____ |



COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 4 OF 10)

Faith Fellowsh

631

Property Address: San Leandro, CA _____   Date: March 24, 2006

D. At Close Of Escrow, Buyer shall receive a grant deed conveying title (or, for stock cooperative or long-term lease, an assignment of stock certificate or of Seller's leasehold interest), including oil, mineral and water rights if currently owned by Seller. Title shall vest as designated in Buyer's supplemental escrow instructions. THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.

E. Buyer shall receive a standard coverage owner's CLTA policy of title insurance. An ALTA policy or the addition of endorsements may provide greater coverage for Buyer. A title company, at Buyer's request, can provide information about the availability, desirability, coverage, and cost of various title insurance coverages and endorsements. If Buyer desires title coverage other than that required by this paragraph, Buyer shall instruct Escrow Holder in writing and pay any increase in cost.

17. TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS: The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph must be in writing (C.A.R. Form CR).

A. SELLER HAS: 7 (or ☒ _____14_____ ) Days After Acceptance to deliver to Buyer all reports, disclosures and information for which Seller is responsible under paragraphs 5, 6A and B, 8A, 11B, 12B (3) and (4) and 16.

B. BUYER HAS: 17 (or ☒ ___24___ ) Days After Acceptance, unless otherwise agreed in writing, to:
  (1) Complete all Buyer Investigations; approve all disclosures, reports and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property (including lead-based paint and lead-based paint hazards as well as other information specified in paragraph 6 and insurability of Buyer and the Property).
  (2) Within the time specified in 17B(1), Buyer may request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR). Seller has no obligation to agree to or respond to Buyer's requests.
  (3) By the end of the time specified in 17B(1) (or 2J for loan contingency or 2K for appraisal contingency), Buyer shall remove, in writing, the applicable contingency (C.A.R. Form CR) or cancel this Agreement. However, if the following inspections, reports or disclosures are not made within the time specified in 17A, then Buyer has 5 (or ☒ ___15___ ) Days after receipt of any such items, or the time specified in, whichever is later, to remove the applicable contingency or cancel this Agreement in writing: (i) government-mandated inspections or reports required as a condition of closing; (ii) Common Interest Disclosures pursuant to paragraph 6B; (iii) a subsequent or amended disclosure pursuant to paragraph 9; (iv) Proposed Changes pursuant to paragraph 10B; and (v) environmental survey pursuant to paragraph 7.

C. CONTINUATION OF CONTINGENCY OR CONTRACTUAL OBLIGATION; SELLER RIGHT TO CANCEL:
  (1) Seller right to Cancel: Buyer Contingencies: Seller, after first giving Buyer a Notice to Buyer to Perform (as specified below), may cancel this Agreement in writing and authorize return of Buyer's deposit if, by the time specified in the Agreement, Buyer does not remove in writing the applicable contingency or cancel this Agreement. Once all contingencies have been removed, failure of either Buyer or Seller to close escrow in time may be a breach of this Agreement.
  (2) Continuation of Contingency: Even after the expiration of the time specified in 17B, Buyer retains the right to make requests to Seller, remove in writing the applicable contingency or cancel this Agreement until Seller cancels pursuant to 17C(1). Once Seller receives Buyer's written removal of all contingencies, Seller may not cancel this Agreement pursuant to 17C(1).
  (3) Seller right to Cancel: Buyer Contract Obligations: Seller, after first giving Buyer a Notice to Buyer to Perform (as specified below), may cancel this Agreement in writing and authorize return of Buyer's deposit for any of the following reasons: (i) if Buyer fails to deposit funds as required by 2A or 2B; (ii) if the funds deposited pursuant to 2A or 2B are not good when deposited; (iii) if Buyer fails to provide a letter as required by 2H; (iv) if Buyer fails to provide verification as required by 2I or 2M; (v) if Seller reasonably disapproves of the verification provided by 2I or 2M. Seller is not required to give Buyer a Notice to Perform regarding Close Of Escrow.
  (4) Notice To Buyer To Perform: The Notice to Buyer to Perform (C.A.R. Form NBP) shall (i) be in writing; (ii) be signed by Seller; and (iii) give Buyer at least 24 (or ☒ ___72___ ) hours (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A Notice to Buyer to Perform may not be given any earlier than 2 Days Prior to the expiration of the applicable time for Buyer to remove a contingency or cancel the Agreement or meet a 17C(3) obligation.

D. EFFECT OF BUYER'S REMOVAL OF CONTINGENCIES: If Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in a separate written agreement between Buyer and Seller, Buyer shall conclusively be deemed to have: (i) completed all Buyer Investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; (ii) elected to proceed with the transaction; and (iii) assumed all liability, responsibility, and expense for Repairs or corrections pertaining to that contingency or cancellation right, or for inability to obtain financing.

E. EFFECT OF CANCELLATION ON DEPOSITS: If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, Buyer and Seller agree to Sign mutual instructions to cancel the sale and escrow and release deposits, less fees and costs, to the party entitled to the funds. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. Release of funds will require mutual Signed release instructions from Buyer and Seller, judicial decision or arbitration award.

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 5 OF 10)

Buyer's Initials ( Cym )( _____ )
Seller's Initials ( _____ )( _____ )
Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 5 OF 10)**

Faith Fellowsh

632

14600 Catina

Property Address: San Leandro, CA _____ Date: March 24, 2006

18. **FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final inspection of the Property within 5 (or ☐ _____ ) Days Prior to Close Of Escrow, NOT AS A CONTINGENCY OF THE SALE, but solely to confirm: (i) the Property is maintained pursuant to paragraph 11A; (ii) Repairs have been completed as agreed; and (iii) Seller has complied with Seller's other obligations under this Agreement.

19. **ENVIRONMENTAL HAZARD CONSULTATION:** Buyer and Seller acknowledge: (i) Federal, state, and local legislation impose liability upon existing and former owners and users of real property, in applicable situations, for certain legislatively defined, environmentally hazardous substances; (ii) Broker(s) has/have made no representation concerning the applicability of any such Law to this transaction or to Buyer or to Seller, except as otherwise indicated in this Agreement; (iii) Broker(s) has/have made no representation concerning the existence, testing, discovery, location and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Property; and (iv) Buyer and Seller are each advised to consult with technical and legal experts concerning the existence, testing, discovery, location and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Property.

20. **AMERICANS WITH DISABILITIES ACT:** The Americans With Disabilities Act ("ADA") prohibits discrimination against individuals with disabilities. The ADA affects almost all commercial facilities and public accommodations. The ADA can require, among other things, that buildings be made readily accessible to the disabled. Different requirements apply to new construction, alterations to existing buildings, and removal of barriers in existing buildings. Compliance with the ADA may require significant costs. Monetary and injunctive remedies may be incurred if the Property is not in compliance. A real estate broker does not have the technical expertise to determine whether a building is in compliance with ADA requirements, or to advise a principal on those requirements. Buyer and Seller are advised to contact an attorney, contractor, architect, engineer or other qualified professional of Buyer's or Seller's own choosing to determine to what degree, if any, the ADA impacts that principal or this transaction.

21. **LIQUIDATED DAMAGES:** If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to breach this Agreement. Release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award.

| Buyer's Initials (initials) / _____ | Seller's Initials _____ / |

22. **DISPUTE RESOLUTION:**

- A. **MEDIATION:** Buyer and Seller agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action. Paragraphs 22B(2) and (3) below apply to mediation whether or not the Arbitration provision is initialed. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.

- B. **ARBITRATION OF DISPUTES:** (1) Buyer and Seller agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration, including and subject to paragraphs 22B(2) and (3) below. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of real estate transactional Law experience, unless the parties mutually agree to a different arbitrator, who shall render an award in accordance with substantive California Law. The parties shall have the right to discovery in accordance with Code of Civil Procedure §1283.05. In all other respects, the arbitration shall be conducted in accordance with Title 9 of Part III of the California Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction. Interpretation of this agreement to arbitrate shall be governed by the Federal Arbitration Act.

  (2) EXCLUSIONS FROM MEDIATION AND ARBITRATION: The following matters are excluded from mediation and arbitration: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims, or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation and arbitration provisions.

  (3) BROKERS: Buyer and Seller agree to mediate and arbitrate disputes or claims involving either or both Brokers, consistent with 22A and B, provided either or both Brokers shall have agreed to such mediation or arbitration prior to, or within a reasonable time after, the dispute or claim is presented to Brokers. Any election by either or both Brokers to participate in mediation or arbitration shall not result in Brokers being deemed parties to the Agreement.

  "NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."

  "WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."

| Buyer's Initials (initials) / _____ | Seller's Initials _____ / |

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 6 OF 10)

| Buyer's Initials ( _____ )( _____ ) |
| Seller's Initials ( _____ )( _____ ) |
| Reviewed by _____ Date _____ |

Faith Fellowsh

14600 Catlina
Property Address: San Leandro, CA _____   Date: March 24, 2006

23. **ASSIGNMENT:** Buyer shall not assign all or any part of Buyer's interests in this Agreement without first having obtained the written consent of Seller. Such consent shall not be unreasonably withheld, unless otherwise agreed in writing. Any total or partial assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement.

24. **SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon, and inure to the benefit of, Buyer and Seller and their respective successors and assigns, except as otherwise provided herein.

25. **COPIES:** Seller and Buyer each represent that Copies of all reports, documents, certificates, approvals and other documents that are furnished to the other are true, correct and unaltered Copies of the original documents, if the originals are in the possession of the furnishing party.

26. **NOTICES:** Whenever notice is given under this Agreement, each notice shall be in writing, and shall be delivered personally, by facsimile, or by mail, postage prepaid. Notice shall be delivered to the address set forth below the recipient's signature of acceptance. Either party may change its notice address by providing notice to the other party.

27. **AUTHORITY:** Any person or persons signing this Agreement represent(s) that such person has full power and authority to bind that person's principal, and that the designated Buyer and Seller has full authority to enter into and perform this Agreement. Entering into this Agreement, and the completion of the obligations pursuant to this contract, does not violate any Articles of Incorporation, Articles of Organization, ByLaws, Operating Agreement, Partnership Agreement or other document governing the activity of either Buyer or Seller.

28. **GOVERNING LAW:** This Agreement shall be governed by the Laws of the state of California.

29. **PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless otherwise agreed in writing, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, rents, HOA regular, special, and emergency dues and assessments imposed prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special assessments that are now a lien but not yet due. Property will be reassessed upon change of ownership. Any supplemental tax bills shall be paid as follows: (i) for periods after Close Of Escrow, by Buyer; and (ii) for periods prior to Close Of Escrow, by Seller. TAX BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.

30. **WITHHOLDING TAXES:** Seller and Buyer agree to execute any instrument, affidavit, statement or instruction reasonably necessary to comply with federal (FIRPTA) and California withholding Law, if required (C.A.R. Form AS).

31. **MULTIPLE LISTING SERVICE/PROPERTY DATA SYSTEM:** If Broker is a participant of a Multiple Listing Service ("MLS") or Property Data System ("PDS"), Broker is authorized to report to the MLS or PDS a pending sale and, upon Close Of Escrow, the terms of this transaction to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS or PDS.

32. **EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local anti-discrimination Laws.

33. **ATTORNEY FEES:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 22A.

34. **SELECTION OF SERVICE PROVIDERS:** If Brokers refer Buyer or Seller to persons, vendors, or service or product providers ("Providers"). Brokers do not guarantee the performance of any Providers. Buyer and Seller may select ANY Providers of their own choosing.

35. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.

36. **OTHER TERMS AND CONDITIONS,** including attached supplements:
   A. ☒ Buyer Inspection Advisory (C.A.R. Form BIA)
   B. ☐ Seller Financing Addendum and Disclosure (C.A.R. Form SFA)
   C. ☐ Purchase Agreement Addendum (C.A.R. Form PAA paragraph numbers: _____)
   D. ☐ Buyer Intent To Exchange Supplement (C.A.R. Form BES)
   E. ☐ Seller Intent to Exchange Supplement (C.A.R. Form SES)
   F. _This Agreement is specifically conditioned upon Buyer, in Buyer's sole judgment, determining that the subject real property is suitable for and approved for use as a church. This condition shall remain in full force and effect until removed in writing by Buyer._

   _This offer is further subject to the approval of the I.C.F.G. Board of Directors._

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 7 OF 10)

Buyer's Initials ( _____ ) ( _____ )
Seller's Initials ( _____ ) ( _____ )
Reviewed by _____  Date _____

14600 Catlina

Property Address: San Leandro, CA

Date: March 24, 2005

17. **DEFINITIONS:** As used in this Agreement:
   A. "Acceptance" means the time the offer or final counter offer is accepted in writing by a party and is delivered to and personally received by the other party or that party's authorized agent in accordance with this offer or a final counter offer.
   B. "Agreement" means the terms and conditions of this accepted Commercial Property Purchase Agreement and any accepted counter offers and addenda.
   C. "C.A.R. Form" means the specific form referenced, or another comparable form agreed to by the parties.
   D. "Close Of Escrow" means the date the grant deed, or other evidence of transfer of title, is recorded. If the scheduled close of escrow falls on a Saturday, Sunday or legal holiday, then close of escrow shall be the next business day after the scheduled close of escrow date.
   E. "Copy" means copy by any means including photocopy, NCR, facsimile and electronic.
   F. "Days" means calendar days, unless otherwise required by Law.
   G. "Days After" means the specified number of calendar days after the occurrence of the event specified, not counting the calendar date on which the specified event occurs, and ending at 11:59 PM on the final day.
   H. "Days Prior" means the specified number of calendar days before the occurrence of the event specified, not counting the calendar date on which the specified event is scheduled to occur.
   I. "Electronic Copy" or "Electronic Signature" means, as applicable, an electronic copy or signature complying with California Law. Buyer and Seller agree that electronic means will not be used by either one to modify or alter the content or integrity of the Agreement without the knowledge and consent of the other.
   J. "Law" means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.
   K. "Notice to Buyer to Perform" means a document (C.A.R. Form NBP), which shall be in writing and Signed by Seller and shall give Buyer at least 24 hours (or as otherwise specified in paragraph 17C(4)) to remove a contingency or perform as applicable.
   L. "Repairs" means any repairs (including pest control), alterations, replacements, modifications and retrofitting of the Property provided for under this Agreement.
   M. "Signed" means either a handwritten or electronic signature on an original document, Copy or any counterpart.
   N. Singular and Plural terms each include the other, when appropriate.

18. **BROKERAGE:** Neither Buyer nor Seller has utilized the services of, or for any other reason owes compensation to, a licensed real estate broker (individual or corporate), agent, finder, or other entity, other than as specified in this Agreement, in connection with any act relating to the Property, including, but not limited to, inquiries, introductions, consultations and negotiations leading to this Agreement. Buyer and Seller each agree to indemnify, defend, and hold the other, the Brokers specified herein and their agents, harmless from and against any costs, expenses or liability for compensation claimed inconsistent with the warranty and representations in this paragraph.

19. **AGENCY:**
   A. **POTENTIALLY COMPETING BUYERS AND SELLERS:** Buyer and Seller each acknowledge receipt of a disclosure of the possibility of multiple representation by the Broker representing that principal. This disclosure may be part of a listing agreement, buyer-broker agreement or separate document (C.A.R. Form DA). Buyer understands that Broker representing Buyer may also represent other potential buyers, who may consider, make offers on or ultimately acquire the Property. Seller understands that Broker representing Seller may also represent other sellers with competing properties of interest to this Buyer.
   B. **CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction:
      Listing Agent _____ **TRI Commercial** _____ (Print Firm Name) is the agent
      of (check one): ☒ the Seller exclusively; or ☐ both the Buyer and Seller.
      Selling Agent _____ **Danville Realty Corporation** _____ (Print Firm Name) (if not same
      as Listing Agent) is the agent of (check one): ☒ the Buyer exclusively; or ☐ the Seller exclusively; or ☐ both the Buyer and Seller.
      Real Estate Brokers are not parties to the Agreement between Buyer and Seller.

20. **JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**
   A. The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and Seller to Escrow Holder, which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: 1, 2, 4, 5, 16, 17E, 29, 30, 35, 36B-F, 37, 40, 42, 45A, 46 and paragraph D of the section titled Real Estate Broker on page 10. If a Copy of the separate compensation agreement(s) provided for in paragraph 42 or 45A, or paragraph D of the section titled Real Estate Broker on page 10 is deposited with Escrow Holder by Broker, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned. Buyer and Seller will receive Escrow Holder's general provisions directly from Escrow Holder and will execute such provisions upon Escrow Holder's request. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller will execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow.

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
PA REVISED 10/02 (PAGE 8 OF 10)

Buyer's Initials ( ____ ) ( ____ )
Seller's Initials ( ____ ) ( ____ )
Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 8 OF 10)**

Faith Fellows

635

14600 Catlina

Property Address: San Leandro, CA                                                                    Date: March 24, 2006

**B.** A Copy of this Agreement shall be delivered to Escrow Holder within 3 business days after Acceptance (or ☐ _____ ). Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement.

**C.** Brokers are a party to the Escrow for the sole purpose of compensation pursuant to paragraphs 42, 45A and paragraph D of the section titled Real Estate Broker on page 10. Buyer and Seller irrevocably assign to Brokers compensation specified in paragraphs 42 and 45A, respectively, and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow, or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers. Escrow Holder shall immediately notify Brokers: (i) if Buyer's initial or any additional deposit is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or (ii) if Buyer and Seller instruct Escrow Holder to cancel escrow.

**D.** A Copy of any amendment that affects any paragraph for which Escrow Holder is responsible shall be delivered to Escrow Holder within 2 business days after mutual execution of the amendment.

**41. SCOPE OF BROKER DUTY:** Buyer and Seller acknowledge and agree that: Brokers: (i) do not decide what price Buyer should pay or Seller should accept; (ii) do not guarantee the condition of the Property; (iii) do not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; (iv) shall not be responsible for identifying defects that are not known to Broker(s); (v) shall not be responsible for inspecting public records or permits concerning the title or use of the Property; (vi) shall not be responsible for identifying location of boundary lines or other items effecting title; (vii) shall not be responsible for verifying square footage, representations of others or information contained in inspection reports, MLS or PDS, advertisements, flyers or other promotional material, unless otherwise agreed in writing; (viii) shall not be responsible for providing legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller in the course of this representation; and (ix) shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals.

**42. BROKER COMPENSATION FROM BUYER:** If applicable, upon Close Of Escrow, Buyer agrees to pay compensation to Broker as specified in a separate written agreement between Buyer and Broker.

**43. TERMS AND CONDITIONS OF OFFER:** This is an offer to purchase the Property on the above terms and conditions. All paragraphs with spaces for initials by Buyer and Seller are incorporated in this Agreement only if initialed by all parties. If at least one but not all parties initial, a counter offer is required until agreement is reached. Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance. Buyer has read and acknowledges receipt of a Copy of the offer and agrees to the above confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing.

**44. EXPIRATION OF OFFER:** This offer shall be deemed revoked and the deposit shall be returned, unless the offer is Signed by Seller, and a Copy of the Signed offer is personally received by Buyer, or by _____ C. Edward Bullok _____ , who is authorized to receive it by 5:00 PM on the third Day after this offer is signed by Buyer. (OR, if checked ☒ by ___ March 25, 2006 ___ (date), at ___ 11:59 ___ ☐ AM ☒ PM).

---

Buyer San Leandro Foursquare #2

By _____

Print name Pastor Gary Matons  MORTARA (GM)                              Date March 24, 2006

Address 577 Manor Boulevard                 City San Leandro          State CA          Zip 94579

Telephone (510) 773-8513    Fax (510) 614-0658    E-mail returnfaith@yahoo.com

Buyer _____

By _____

Print name _____                                          Date _____

Address _____          City _____    State _____    Zip _____

Telephone _____    Fax _____    E-mail _____

Notice Address, if Different _____

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 9 OF 10)

Buyer's Initials ( GM )( _____ )
Seller's Initials ( _____ )( _____ )

Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 9 OF 10)**                          Faith Fellowsh

636

Property Address: __San Leandro, CA 14600 Catlina__ Date: __March 24, 2006__

**45. BROKER COMPENSATION FROM SELLER:**
    A.  Upon Close Of Escrow, Seller agrees to pay compensation to Broker as specified in a separate written agreement between Seller and Broker.
    B.  If escrow does not close, compensation is payable as specified in that separate written agreement.

**46. ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property, or has the authority to execute this Agreement. Seller accepts the above offer, agrees to sell the Property on the above terms and conditions, and agrees to the above confirmation of agency relationships. Seller has read and acknowledges receipt of a Copy of this Agreement, and authorizes Broker to deliver a Signed Copy to Buyer.
☐ (If checked) SUBJECT TO ATTACHED COUNTER OFFER, DATED _____

Seller _____
By _____
Print name _____ Date _____
Address _____
Telephone _____ Fax _____ City _____ E-mail _____ State _____ Zip _____

Seller _____
By _____
Print name _____ Date _____
Address _____
Telephone _____ Fax _____ City _____ E-mail _____ State _____ Zip _____
Notice Address, If Different _____

( ___/___/___ ) **Confirmation of Acceptance:** A Copy of Signed Acceptance was personally received by Buyer or Buyer's authorized agent
(Initials) on (date) _____ at _____ ☐ AM ☐ PM. A binding Agreement is created when
a Copy of Signed Acceptance is personally received by Buyer or Buyer's authorized agent whether or not confirmed in
this document. Completion of this confirmation is not legally required in order to create a binding Agreement; it is
solely intended to evidence the date that Confirmation of Acceptance has occurred.

**REAL ESTATE BROKERS:**
A.  Real Estate Brokers are not parties to the Agreement between Buyer and Seller.
B.  Agency relationships are confirmed as stated in paragraph 39 above.
C.  If specified in paragraph 2A, Agent who submitted offer for Buyer acknowledges receipt of deposit.
D.  **COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker (Selling Firm) and Cooperating Broker agrees to accept, out of Listing Broker's proceeds in escrow: (i) the amount specified in the MLS or PDS, provided Cooperating Broker is a Participant of the MLS or PDS in which the property is offered for sale or a reciprocal MLS or PDS; or (ii) ☐ (if checked) the amount specified in a separate written agreement (C.A.R. Form CBC) between Listing Broker and Cooperating Broker.

Real Estate Broker (Selling Firm) __Danville Realty Corporation__
By _____
Address __21790 Hesperian Boulevard__ City __Hayward__    C. Edward Bullok Date __March 24, 2006__ State __CA__ Zip __94541__
Telephone __(510)582-2025__ Fax __(510)881-8301__ E-mail __edbullokf@comcast.net__

Real Estate Broker (Listing Firm) __TRI Commercial__
By _____
Address __One California Street, Suite 200__ City __San Francisco__    Anton Qui Date _____ State __CA__ Zip __94111__
Telephone __(415)268-2200__ Fax __(415)268-2299__ E-mail __aqui@tricommercial.com__

**ESCROW HOLDER ACKNOWLEDGMENT:**
Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked, ☐ a deposit in the amount of $ _____ )
counter offer numbers _____ and _____ , and agrees to act as Escrow Holder subject to paragraph 40 of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.
Escrow Holder is advised that the date of Confirmation of Acceptance of the Agreement as between Buyer and Seller is _____
Escrow Holder __Old Republic Title Company__ Escrow # _____
By _____    Kim Perry Date _____
Address __20960 Redwood Road, Suite 160, Castro Valley, CA 94546__
Phone/Fax/E-mail __(510 537-8000 Office (510) 888-8301__
Escrow Holder is licensed by the California Department of ☐ Corporations, ☒ Insurance, ☐ Real Estate. License # _____

( ___/___ ) **REJECTION OF OFFER:** No counter offer is being made. This offer was reviewed and rejected by Seller on
(Seller's Initials) _____ (Date)

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC,
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

SURE TRAC  The System For Success

Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 10 OF 10)**   **637**  Faith Fellowxsh

CPA REVISED 10/02 (PAGE 10 OF 10)