**EXHIBIT 37**

## ADDENDUM
## TO
## COMMERCIAL PROPERTY PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (NON-RESIDENTIAL)

This ADDENDUM TO COMMERCIAL PROPERTY PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (NON-RESIDENTIAL) (this "**Addendum**") shall constitute part of that certain Commercial Property Purchase Agreement and Joint Escrow Instructions (Non-Residential), dated as of March 24, 2006 (the "**Agreement**"), by and between LBCO INVESTMENT GROUP, LP, a California limited partnership ("**Seller**"), and SAN LEANDRO FOURSQUARE #2 ("**Buyer**"), and the terms hereof shall for all purposes be deemed incorporated in the Agreement.

1.    **Amendment to Section 1.C. of the Agreement -- Purchase Price.** Section 1.C. of the Agreement is hereby amended to delete Section 1.C. and in its stead replace Section 1.C. with the following:

"C. **THE PURCHASE PRICE** offered is Five Million Three Hundred Ninety-Nine Thousand Dollars ($5,399,000.00)."

2.    **Amendment to Section 1.D. of the Agreement -- Closing Date.** Section 1.D. of the Agreement is hereby amended to delete Section 1.D. and in its stead replace Section 1.D. with the following:

"D. **CLOSE OF ESCROW** shall occur on one-hundred twenty (120) days after the date of the Agreement."

3.    **Amendment to Section 2 of the Agreement -- Finance Terms.**

a.    **Amendment to Section 2.A. -- Initial Deposit.** Section 2.A. of the Agreement is hereby amended to increase the Initial Deposit from "$50,000.00" to "$100,000.00."

b.    **Amendment to Section 2.B. -- Increased Deposit.** Section 2.B. of the Agreement is hereby amended to make the "Increased Deposit" the amount "$400,000.00." The Increased Deposit shall be made on the Feasibility Expiration Date (defined hereinafter).

c.    **Amendment to Section 2.C. -- First Loan.** Section 2.C. of the Agreement is hereby amended to increase the principal amount of the "First Loan" from "$3,675,000.00."

d.    **Amendment to Section 2.D. -- Balance of the Purchase Price.** Section 2.D. of the Agreement is hereby amended to decrease the amount of the "Balance of the Purchase Price" from "$1,525,000.00" to "$1,224,000.00."

e.    **Amendment to Section 2.E. -- Purchase Price (Total).** Section 2.E. of the Agreement is hereby amended to increase the amount of the "Purchase Price (Total)" from "$5,250,000.00" to $5,399,000.00."

296634 v.1                                    1                    Addendum to Purchase and Sale Agreement

EXHIBIT 37


DEFENDANT'S EXHIBIT

638

4.     **Feasibility Period.**  Notwithstanding anything contained in the Agreement to the contrary, Buyer shall have until thirty (30) days after the date of the Agreement (the "**Feasibility Expiration Date**") to complete whatever approvals, inspections, financing, and such other investigations as Buyer deems necessary to proceed with the purchase of the Property.  If, as a result of Buyer's investigations, Buyer determines, in its sole and absolute discretion, to proceed with the purchase of the Property, Buyer shall deliver notice to Seller of its removal of the due diligence contingency and Buyer's election to proceed with the purchase of the Property (the "**Due Diligence Contingency Removal Notice**") on or before the Feasibility Expiration Date.  Buyer's failure to give such notice shall be deemed Buyer's election to not proceed with the purchase of the Property.  If such notice is not timely given, Seller shall direct the Title Company to promptly return the Initial Deposit to Buyer, subject to Seller's receipt of any third-party reports required to be delivered to Seller by Buyer, and neither party shall have any further liability hereunder except for those obligations that expressly survive the termination of the Agreement.  If Buyer timely delivers the Due Diligence Contingency Removal Notice, Buyer shall deposit the Increased Deposit (the Initial Deposit and the Increased Deposit shall thereafter become non-refundable) and Buyer have no further right to terminate this Agreement.

5.     **As Is.**  Except as otherwise and specifically provided in the Agreement, Seller disclaims the making of any representations or warranties, express or implied, regarding the Property or matters affecting the Property, including, without limitation, the physical condition of the Property, title to or the boundaries of the Property, pest control matters, soil condition, hazardous waste, toxic substance or other environmental matters, compliance with building, health, safety, land use and zoning laws, regulations and orders, structural and other engineering characteristics, traffic patterns, leasing and all other information pertaining to the Property.  Buyer, moreover, acknowledges (1) that Seller did not develop or construct the Property, (2) that Buyer has entered into this Agreement with the intention of making and relying upon its own investigation of the physical, environmental, economic and legal condition of the Property and (3) that Buyer is not relying upon any statement, representations or warranties made by Seller or, acknowledges that it has not received from Seller any accounting, tax, legal, architectural, engineering, property management or other advice with respect to this transaction and is relying solely upon the advice of its own accounting, tax, legal, architectural, engineering, property management and other advisors.  Buyer shall purchase the Property in its "as is and with all faults" condition on the Closing and assumes the risk that adverse physical, environmental, economic or legal conditions may not have been revealed by its investigation.

6.     **Release.**  Except as otherwise and specifically provided in the Agreement, including, without limitation, the representations and warranties provided in Section 12 of the Agreement, Buyer, for itself and its agents, affiliates, successors and assigns, hereby releases and forever discharges Seller, its agents, affiliates, successors and assigns from any and all rights, claims and demands at law or in equity, whether known or unknown at the time of this agreement, which Buyer has or may have in the future, arising out of the physical, environmental, economic or legal condition of the Property.  Buyer hereby specifically waives the provisions of section 1542 of the California Civil Code ("Section 1542") and any similar law of any other state, territory or jurisdiction.  Section 1542 provides:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known to him must have materially affected his settlement with the debtor.

Buyer hereby specifically acknowledges that Buyer has carefully reviewed this subsection and discussed its import with legal counsel and that the provisions of this subsection are a material part of the Agreement.

Buyer _____

7.   **Buyer's Remedies.** The parties covenant and agree that in the event of a breach or default by Seller under the Agreement or of any covenants, warranties, terms or conditions hereof, Buyer will have limited and very narrow rights of recourse against Seller. Accordingly, except as otherwise provided herein, in the event of a breach or default under the Agreement by Seller, Buyer's remedies shall be limited, at Buyer's option, only to one of the following two alternative remedies and none other: (a) the right to demand and have specific performance; the parties acknowledging that the Property is unique and for that reason, among others, Buyer will be irreparably damaged in the event that the Agreement is not specifically enforced, provided that such right of specific performance shall be limited to enforcing conveyance of the Property by grant deed to Buyer, subject to any unfulfilled warranties, terms or other provisions of the Agreement, by Seller, or (b) termination of the Agreement and return of the Deposit. Except for the alternative remedies set forth in this Section 7, Buyer shall have no further recourse or remedy of any kind against Seller whether in law, equity or arising from any other legal theory or for any general, special, consequential, compensatory or punitive damages of any kind.

8.   **Ratification.** Buyer and Seller hereby ratify and confirm all of the terms and provisions of the Agreement except as otherwise modified by Paragraph 1 through 7 above. .

9.   **Counterparts.** This Addendum may be executed in counterparts and by facsimile transmission by the parties and will become effective and binding upon the parties at such time as all of the signatories hereto have signed a counterpart of this Addendum. All counterparts so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all parties are not signatories to the original or the same counterpart.

10.   **Expiration of Offer.** This Agreement shall be deemed revoked, unless the Agreement is signed by Buyer and a copy of the signed Agreement is personally received by the Seller Violet W. Lee who is authorized to receive it by 11:00PM April 1, 2006 PST.

[SIGNATURES ON NEXT PAGE]

Mar-29-06   12:05   From-                                    T-659   P.804/816   F-773

IN WITNESS WHEREOF, Buyer and Seller have executed this Addendum to Commercial Property Agreement and Joint Escrow Instructions (Non-Residential) as of the date of the Agreement.

**BUYER:**

SAN LEANDRO FOURSQUARE #2

By _____

Its _____Senior Pastor____

**SELLER:**

LECO INVESTMENT GROUP, LP,
a California limited partnership

By      ARISTO PROPERTIES, INC.,
        a California corporation

        By _____

        Its ____President____

196884v.1                          4                    Addendum to Purchase and Sale Agreement

641



**CALIFORNIA
ASSOCIATION
OF REALTORS®**

# COMMERCIAL PROPERTY PURCHASE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS
### (NON-RESIDENTIAL)
(C.A.R. Form CPA, Revised 10/02)

Date _March 24, 2006_ , at _San Leandro_ , California.

**1. OFFER:**

**A. THIS IS AN OFFER FROM** _San Leandro Enterasgure #2_ _____ ("Buyer").
☐ Individual(s), ☒ A Corporation, ☐ A Partnership, ☐ An LLC, ☐ An LLP, or ☐ Other _____

**B. THE REAL PROPERTY TO BE ACQUIRED** is described as _14600 Catalina_ _____
_____ Assessor's Parcel No. 0802-0933-020, 021 & 022-001 , situated in
_San Leandro_ , County of _Alameda_ , California, ("Property").

**C. THE PURCHASE PRICE** offered is _Five Million Two Hundred Fifty Thousand_ _____
_____ Dollars $ _5,250,000.00_

**D. CLOSE OF ESCROW** shall occur on _____ (date) (or ☒ _120_ Days After Acceptance).

**2. FINANCE TERMS:** Obtaining the loans below is a contingency of this Agreement unless: (i) either 2L or 2M is checked below; or (ii) otherwise agreed in writing. Buyer shall act diligently and in good faith to obtain the designated loans. Obtaining deposit, down payment and closing costs is not a contingency. Buyer represents that funds will be good when deposited with Escrow Holder.

**A. INITIAL DEPOSIT:** Buyer has given a deposit in the amount of . . . . . . . . . . . . . . . . . . . . . . . $ _50,000.00_
to the agent submitting the offer (or to ☐ _____ ), by Personal Check
(or ☐ _____ ), made payable to _Old Republic Title Company_ .
which shall be held uncashed until Acceptance and then deposited within 3 business days after Acceptance
or ☒ _____ with
Escrow Holder, or ☐ into Escrow Holder's trust account.

**B. INCREASED DEPOSIT:** Buyer shall deposit with Escrow Holder an increased deposit in the amount of . . . . . . $ _____
within _____ Days After Acceptance, or ☐ _____

**C. FIRST LOAN IN THE AMOUNT OF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _9,675,000.00_
NEW First Deed of Trust in favor of ☒ Lender, ☐ Seller,
OR ☐ ASSUMPTION of (or ☐ "subject to") Existing First Deed of Trust
encumbering the Property, securing a note payable at maximum interest of _7.000_ % fixed rate, or
_____ % initial adjustable rate with a maximum interest rate of _____ %, balance due in
_25_ years, amortized over _25_ years. (If checked: ☐ and with a margin not to exceed _____ %,
tied to the following index _____ .) Buyer shall pay loan fees/points not to exceed _____
Additional terms _____

**D. SECOND LOAN IN THE AMOUNT OF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
NEW Second Deed of Trust in favor of ☐ Lender, ☐ Seller,
OR ☐ ASSUMPTION of (or ☐ "subject to") Existing Second Deed of Trust
encumbering the Property, securing a note payable at maximum interest of _____ % fixed rate, or
_____ % initial adjustable rate with a maximum interest rate of _____ %, balance due in
_____ years, amortized over _____ years. (If checked: ☐ and with a margin not to exceed _____ %,
tied to the following index: _____ .) Buyer shall pay loan fees/points not to exceed _____
Additional terms _____

**E. ADDITIONAL FINANCING TERMS:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
_____

**F. BALANCE OF PURCHASE PRICE** (not including costs of obtaining loans and other closing costs) in the amount of . . . . . $ _1,525,000.00_
to be deposited with Escrow Holder within sufficient time to close escrow.

**G. PURCHASE PRICE (TOTAL):** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _5,250,000.00_

**H. LOAN APPLICATIONS:** Within 7 (or ☒ _21_ ) Days After Acceptance, Buyer shall provide Seller a letter from lender or mortgage loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified above.

**I. VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Buyer (or Buyer's lender or loan broker pursuant to 2H) shall, within 7 (or ☐ _21_ ) Days After Acceptance, provide Seller written verification of Buyer's down payment and closing costs.

**J. LOAN CONTINGENCY REMOVAL:** (i) Within 17 (or ☐ _____ ) Days After Acceptance Buyer shall, as specified in paragraph 17, remove the loan contingency or cancel this Agreement OR (ii) (if checked, ☒ loan contingency shall remain in effect until the designated loans are funded.

**K. APPRAISAL CONTINGENCY AND REMOVAL:** This Agreement is (OR, if checked, ☐ is NOT) contingent upon the Property appraising at no less than the specified purchase price. If there is a loan contingency, the loan contingency is removed (or, if checked, ☐ within 17 (or _____ ) Days After Acceptance), Buyer shall, as specified in paragraph 17, remove the appraisal contingency or cancel this Agreement. If there is no loan contingency, Buyer shall, as specified in paragraph 17, remove the appraisal contingency within 17 (or _____ ) Days After Acceptance.

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

Buyer's Initials ( _____ ) ( _____ )
Seller's Initials ( _____ ) ( _____ )

Reviewed by _____ Date _____

CPA REVISED 10/02 (PAGE 1 OF 10)

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 1 OF 10)**

Agent: C. Edward Bullok    Phone: (510) 915-4100    Fax: (510) 681-8301    Prepared using WINForms® software
Broker: Danville Realty Corporation 21780 Hesperian Boulevard, Hayward CA 94541-7083

Property Address: **14600 Catlina**
**San Leandro, CA**                                                      Date: **March 24, 2006**

L. ☐ NO LOAN CONTINGENCY (if checked): Obtaining any loan in paragraphs 2C, 2D, 2E or elsewhere in this Agreement, is NOT a contingency of this Agreement. If Buyer does not obtain the loan and as a result Buyer does not purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.

M. ☐ ALL CASH OFFER (if checked): No loan is needed to purchase the Property. Buyer shall, within 7 (or ☐ _____ ) Days After Acceptance, provide Seller written verification of sufficient funds to close this transaction.

N. SELLER FINANCING: For any Seller financing designated above, Buyer is to execute a note secured by a deed of trust in favor of Seller, on the terms and conditions set forth in the attached addendum. (C.A.R. Form SFA).

O. ASSUMED OR "SUBJECT TO" FINANCING: Seller represents that Seller is not delinquent on any payments due on any loans. Seller shall, within the time specified in paragraph 17, provide Copies of all applicable notes and deeds of trust, loan balances and current interest rates to Buyer. Buyer shall then, as specified in paragraph 17, remove this contingency or cancel this Agreement. Differences between estimated and actual loan balances shall be adjusted at Close Of Escrow by cash down payment. Impound accounts, if any, shall be assigned and charged to Buyer and credited to Seller. Seller is advised that Buyer's assumption of an existing loan may not release Seller from liability on that loan. If the Property is acquired subject to an existing loan, Buyer and Seller are advised to consult with legal counsel regarding the ability of an existing lender to call the loan due, and the consequences thereof.

3. CLOSING AND OCCUPANCY:

A. Seller-Occupied or Vacant Units: Occupancy shall be delivered to Buyer at ___11:59___ ☒ AM ☐ PM, ☐ on the date of Close Of Escrow; ☐ on _____ ; or ☐ no later than _____ Days After Close Of Escrow. (C.A.R. Form PAA, paragraph 2.) If transfer of title and occupancy do not occur at the same time, Buyer and Seller are advised to: (i) enter into a written occupancy agreement; and (ii) consult with their insurance and legal advisors.

B. Tenant-Occupied Units: Possession and occupancy, subject to the rights of tenants under existing leases, shall be delivered to Buyer on Close Of Escrow.

C. At Close Of Escrow, Seller assigns to Buyer any assignable warranty rights for items included in the sale and shall provide any available Copies of such warranties. Brokers cannot and will not determine the assignability of any warranties.

D. At Close Of Escrow, unless otherwise agreed in writing, Seller shall provide keys and/or means to operate all locks, mailboxes, security systems, alarms and garage door openers. If the Property is a unit in a condominium or located in a common-interest subdivision, Buyer may be required to pay a deposit to the Owners' Association ("OA") to obtain keys to accessible OA facilities.

X4.  SECURITY DEPOSITS: Security deposits, if any, to the extent they have not been applied by Seller in accordance with any rental agreement and current law, shall be transferred to Buyer on Close Of Escrow. Seller and Buyer shall notify each tenant in compliance with the Civil Code.

5. ALLOCATION OF COSTS (if checked ): Unless otherwise specified here, this paragraph only determines who is to pay for the report, inspection, test or service mentioned. If not specified here or elsewhere in this Agreement, the determination of who is to pay for any work recommended or identified by any such report, inspection, test or service is by the method specified in paragraph 17.

A. INSPECTIONS AND REPORTS:
(1) ☐ Buyer ☐ Seller shall pay for sewer connection, if required by Law prior to Close Of Escrow _____
(2) ☐ Buyer ☐ Seller shall pay to have septic or private sewage disposal system inspected _____
(3) ☐ Buyer ☐ Seller shall pay to have domestic wells tested for water potability and productivity _____
(4) ☐ Buyer ☒ Seller shall pay for a natural hazard zone disclosure report prepared by _____
(5) ☐ Buyer ☐ Seller shall pay for the following inspection or report _____
(6) ☐ Buyer ☐ Seller shall pay for the following inspection or report _____

B. GOVERNMENT REQUIREMENTS AND RETROFIT:
(1) ☐ Buyer ☒ Seller shall pay for smoke detector installation and/or water heater bracing, if required by Law. Prior to Close Of Escrow, Seller shall provide Buyer a written statement of compliance in accordance with state and local Law, unless exempt.
(2) ☐ Buyer ☒ Seller shall pay the cost of compliance with any other minimum mandatory government retrofit standards, inspections and reports if required as a condition of closing escrow under any Law.
(3) ☐ Buyer ☒ Seller shall pay for installation of approved fire extinguisher(s), sprinkler(s), and hose(s), if required by Law, which shall be certified prior to Close Of Escrow. Prior to Close Of Escrow, Seller shall provide Buyer a written statement of compliance, if required by Law.

C. ESCROW AND TITLE:
(1) ☒ Buyer ☒ Seller shall pay escrow fee **50% Buyer/50% Seller** _____
Escrow Holder shall be **Old Republic Title Company** _____
(2) ☒ Buyer ☐ Seller shall pay for owner's title insurance policy specified in paragraph 15 _____
Owner's title policy to be issued by **Old Republic Title Company** _____
(Buyer shall pay for any title insurance policy insuring Buyer's lender, unless otherwise agreed in writing.)

D. OTHER COSTS:
(1) ☐ Buyer ☒ Seller shall pay County transfer tax or transfer fee _____
(2) ☒ Buyer ☒ Seller shall pay City transfer tax or transfer fee **50% Buyer/50% Seller** _____
(3) ☐ Buyer ☐ Seller shall pay OA transfer fees _____
(4) ☐ Buyer ☒ Seller shall pay OA document preparation fees _____
(5) ☐ Buyer ☐ Seller shall pay for _____
(6) ☐ Buyer ☐ Seller shall pay for _____

Buyer's Initials ( **GM** )( _____ )
Seller's Initials ( _____ )( _____ )
Reviewed by _____ Date _____

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 2 OF 10)

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 2 OF 10)**

Faith Fellowsh

14600 Catlina
Property Address: San Leandro, CA _____ Date: March 24, 2006

**6. SELLER DISCLOSURES:**

A. **NATURAL AND ENVIRONMENTAL DISCLOSURES:** Seller shall, within the time specified in paragraph 17, if required by Law: (i) deliver to Buyer earthquake guides (and questionnaire) and environmental hazards booklet; (ii) even if exempt from the obligation to provide an NHD, disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (Inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and (iii) disclose any other zone as required by Law and provide any other information required for those zones.

B. **ADDITIONAL DISCLOSURES:** Within the time specified in paragraph 17, Seller shall provide to Buyer, in writing, the following ~~fourteen~~ documents and information:

~~(1) RENTAL SERVICE AGREEMENTS: (i) All current lease, rental agreements, service contracts, and other agreements pertaining to the operation of the Property; and (ii) a rental statement including names of tenants, rental rates, period of rental, unit or last rent increase, security deposits, rental concessions, rebates, or other benefits, if any, and a list of delinquent rents and their duration. Seller represents that no tenant is entitled to any concession, rebate, or other benefit, except as set forth in these documents.~~

(2) **INCOME AND EXPENSE STATEMENTS:** The books and records, including a statement of income and expense for the 12 months preceding Acceptance. Seller represents that the books and records are those maintained in the ordinary and normal course of business, and used by Seller in the computation of federal and state income tax returns.

~~(3) TENANT ESTOPPEL CERTIFICATES: (if checked) Tenant estoppel certificates (C.A.R. Form TES) completed by Seller or Seller's agent, and signed by tenants, acknowledging: (i) that tenant's current rental or lease agreements are unmodified and in full force and effect (or, if modified, stating all such modifications); (ii) that no lessor defaults exist; and (iii) stating the amount of any prepaid rent or security deposit.~~

(4) **SURVEYS, PLANS AND ENGINEERING DOCUMENTS:** Copies of surveys, plans, specifications and engineering documents, if any, in Seller's possession or control.

(5) **PERMITS:** If in Seller's possession, Copies of all permits and approvals concerning the Property, obtained from any governmental entity, including, but not limited to, certificates of occupancy, conditional use permits, development plans, and licenses and permits pertaining to the operation of the Property.

(6) **STRUCTURAL MODIFICATIONS:** Any known structural additions or alterations to, or the installation, alteration, repair or replacement of, significant components of the structure(s) upon the Property.

(7) **GOVERNMENTAL COMPLIANCE:** Any improvements, additions alterations or repairs made by Seller, or known to Seller to have been made, without required governmental permits, final inspections, and approvals.

(8) **VIOLATION NOTICES:** Any notice of violations of any Law filed or issued against the Property and actually known to Seller.

(9) **MISCELLANEOUS ITEMS:** Any of the following, if actually known to Seller: (i) any current pending lawsuit(s), investigation(s), inquiry(ies), action(s), or other proceeding(s) affecting the Property, or the right to use and occupy it; (ii) any unsatisfied mechanic's or materialman's lien(s) affecting the Property; and (iii) that any tenant of the Property is the subject of a bankruptcy.

7. ☒ **ENVIRONMENTAL SURVEY** (if checked): Within _____ Days After Acceptance, Buyer shall be provided a phase one environmental survey report paid for and obtained by ☐ Buyer ☐ Seller. Buyer shall then, as specified in paragraph 17, remove this contingency or cancel this Agreement.

8. **CONDOMINIUM/PLANNED UNIT DEVELOPMENT DISCLOSURES:**

A. **SELLER HAS: 3 (or ☐ _____ ) Days After Acceptance** to disclose to Buyer whether the Property is a condominium, or located in a planned unit development or other common interest subdivision.

B. If Property is a condominium, or located in a planned unit development or other common interest subdivision, Seller has 3 (or ☐ _____ ) Days After Acceptance to request from the OA (C.A.R. Form HOA): (i) Copies of any documents required by Law; (ii) disclosure of any pending or anticipated claim or litigation by or against the OA; (iii) a statement containing the location and number of designated parking and storage spaces; (iv) Copies of the most recent 12 months of OA minutes for regular and special meetings; and (v) the names and contact information of all OA's governing the Property. (Collectively, "CI Disclosures.") Seller shall itemize and deliver to Buyer all CI Disclosures received from the OA and any CI Disclosures in Seller's possession. Buyer's approval of CI Disclosures is a contingency of this Agreement as specified in paragraph 17.

9. **SUBSEQUENT DISCLOSURES:** In the event Seller, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information or representations previously provided to Buyer of which Seller is otherwise unaware, Seller shall promptly provide a subsequent or amended disclosure or notice in writing, covering those items. However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies disclosed in reports ordered and paid for by Buyer.

10. **CHANGES DURING ESCROW:**

A. Prior to Close Of Escrow, Seller may only engage in the following acts ("Proposed Changes"), subject to Buyer's rights in paragraph 17: (i) rent or lease any vacant unit or other part of the premises; (ii) alter, modify, or extend any existing rental or lease agreement; (iii) enter into, alter, modify or extend any service contract(s); or (iv) change the status of the condition of the Property.

B. At least 7 (or ☐ ____15____ ) Days prior to any Proposed Changes, Seller shall give written notice to Buyer of any Proposed Changes.

11. **CONDITIONS AFFECTING PROPERTY:**

A. Unless otherwise agreed: (i) the Property is sold (a) in its PRESENT physical condition as of the date of Acceptance and (b) subject to Buyer's investigation rights; (ii) the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and (iii) all debris and personal property not included in the sale shall be removed by Close Of Escrow.

B. SELLER SHALL, within the time specified in paragraph 17, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS affecting the Property, including known insurance claims within the past five years, AND MAKE OTHER DISCLOSURES REQUIRED BY LAW.

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 3 OF 10)

Buyer's Initials ( GM )( _____ )
Seller's Initials ( J.T. )( _____ )
Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 3 OF 10)**    Faith Fellowsh

**14600 Catlina**

Property Address: **San Leandro, CA**                                                                           Date: **March 21, 2006**

C. NOTE TO BUYER: You are strongly advised to conduct investigations of the entire Property in order to determine its present condition since Seller may not be aware of all defects affecting the Property or other factors that you consider important. Property improvements may not be built according to code, in compliance with current Law, or have had permits issued.

D. NOTE TO SELLER: Buyer has the right to inspect the Property and, as specified in paragraph 17, based upon information discovered in those inspections: (i) cancel this Agreement; or (ii) request that you make Repairs or take other action.

12. **ITEMS INCLUDED AND EXCLUDED:**

A. NOTE TO BUYER AND SELLER: Items listed as included or excluded in the MLS, flyers or marketing materials are not included in the purchase price or excluded from the sale unless specified in 12B or C.

B. **ITEMS INCLUDED IN SALE:**

(1) All EXISTING fixtures and fittings that are attached to the Property.

(2) Existing electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar systems, built-in appliances, window and door screens, awnings, shutters, window coverings, attached floor coverings, television antennas, satellite dishes, private integrated telephone systems, air coolers/conditioners, pool/spa equipment, garage door openers/remote controls, mailbox, in-ground landscaping, trees/shrubs, water softeners, water purifiers, security systems/alarms.

(3) A complete inventory of all personal property of Seller currently used in the operation of the Property and included in the purchase price shall be delivered to Buyer within the time specified in paragraph 17.

(4) Seller represents that all items included in the purchase price are, unless otherwise specified, owned by Seller. Within the time specified in paragraph 17, Seller shall give Buyer a list of fixtures not owned by Seller.

(5) Seller shall deliver title to the personal property by Bill of Sale, free of all liens and encumbrances, and without warranty of condition.

(6) As additional security for any note in favor of Seller for any part of the purchase price, Buyer shall execute a UCC-1 Financing Statement to be filed with the Secretary of State, covering the personal property included in the purchase, replacement thereof, and insurance proceeds.

C. ITEMS EXCLUDED FROM SALE: _____

13. **BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**

A. Buyer's acceptance of the condition of, and any other matter affecting the Property is a contingency of this Agreement, as specified in this paragraph and paragraph 17. Within the time specified in paragraph 17, Buyer shall have the right, at Buyer's expense unless otherwise agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations"), including, but not limited to, the right to: (i) inspect for lead-based paint and other lead-based paint hazards; (ii) inspect for wood destroying pests and organisms; (iii) confirm the insurability of Buyer and the Property; and (iv) satisfy Buyer as to any matter of concern to Buyer. Without Seller's prior written consent, Buyer shall neither make nor cause to be made: (i) invasive or destructive Buyer Investigations; or (ii) inspections by any governmental building or zoning inspector, or government employee, unless required by Law.

B. Buyer shall complete Buyer Investigations and, as specified in paragraph 17, remove the contingency or cancel this Agreement. Buyer shall give Seller, at no cost, complete Copies of all Buyer Investigation reports obtained by Buyer. Seller shall make Property available for all Buyer Investigations. Seller shall have water, gas, electricity, and all operable pilot lights on for Buyer's Investigations and through the date possession is made available to Buyer.

~~14. REPAIRS: Repairs shall be completed prior to final verification of condition unless otherwise agreed in writing. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that the work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. Seller shall: (i) obtain receipts for Repairs performed by others; (ii) prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and (iii) provide Copies of receipts and statements to Buyer prior to final verification of condition.~~

15. **BUYER INDEMNITY AND SELLER PROTECTION FOR ENTRY UPON PROPERTY:** Buyer shall: (i) keep the Property free and clear of liens; (ii) Repair all damage arising from Buyer Investigations; and (iii) indemnify and hold Seller harmless from all resulting liability, claims, demands, damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry policies of liability, workers' compensation and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain protections may be afforded Seller by recording a "Notice of Non-Responsibility" (C.A.R. Form NNR) for Buyer Investigations and work done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement.

16. **TITLE AND VESTING:**

A. Within the time specified in paragraph 17, Buyer shall be provided a current preliminary (title) report, which is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. Buyer's review of the preliminary report and any other matters which may affect title are a contingency of this Agreement as specified in paragraph 17.

B. Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except: (i) monetary liens of record unless Buyer is assuming those obligations or taking the property subject to those obligations; and (ii) those matters which Seller has agreed to remove in writing.

C. Within the time specified in paragraph 17, Seller has a duty to disclose to Buyer all matters known to Seller affecting title, whether of record or not.

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 4 OF 10)

Buyer's Initials ( __GM__ )( _____ )
Seller's Initials ( __T__ )( _____ )

Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 4 OF 10)**                     Faith Fellows

Property Address: _14500 Catlina_ _San Leandro, CA_ _____ Date: _March 21, 2006_

D. **At Close Of Escrow,** Buyer shall receive a grant deed conveying title (or, for stock cooperative or long-term lease, an assignment of stock certificate or of Seller's leasehold interest), including oil, mineral and water rights if currently owned by Seller. Title shall vest as designated in Buyer's supplemental escrow instructions. THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.

E. Buyer shall receive a standard coverage owner's CLTA policy of title insurance. An ALTA policy or the addition of endorsements may provide greater coverage for Buyer. A title company, at Buyer's request, can provide information about the availability, desirability, coverage, and cost of various title insurance coverages and endorsements. If Buyer desires title coverage other than that required by this paragraph, Buyer shall instruct Escrow Holder in writing and pay any increase in cost.

17. **TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS:** The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph must be in writing (C.A.R. Form CR).

A. **SELLER HAS: 7 (or ☒ ____14____ )** Days After Acceptance to deliver to Buyer all reports, disclosures and information for which Seller is responsible under paragraphs 5, 6A and B, 8A, 11B, 12B (3) and (4) and 16.

B. **BUYER HAS: 17 (or ☒ ____24____ )** Days After Acceptance, unless otherwise agreed in writing, to:

(1) Complete all Buyer Investigations; approve all disclosures, reports and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property (including lead-based paint and lead-based paint hazards as well as other information specified in paragraph 6 and insurability of Buyer and the Property).

(2) Within the time specified in 17B(1), Buyer may request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR). Seller has no obligation to agree to or respond to Buyer's requests.

(3) By the end of the time specified in 17B(1) (or 2J for loan contingency or 2K for appraisal contingency), Buyer shall remove, in writing, the applicable contingency (C.A.R. Form CR), or cancel this Agreement. However, if the following inspections, reports or disclosures are not made within the time specified in 17A, then Buyer has 5 (or ☒ ___15___ ) Days after receipt of any such items, or the time specified in, whichever is later, to remove the applicable contingency or cancel this Agreement in writing: (i) government-mandated inspections or reports required as a condition of closing; (ii) Common Interest Disclosures pursuant to paragraph 8B; (iii) a subsequent or amended disclosure pursuant to paragraph 9; (iv) Proposed Changes pursuant to paragraph 10B; and (v) environmental survey pursuant to paragraph 7.

C. **CONTINUATION OF CONTINGENCY OR CONTRACTUAL OBLIGATION; SELLER RIGHT TO CANCEL:**

(1) **Seller right to Cancel; Buyer Contingencies:** Seller, after first giving Buyer a Notice to Buyer to Perform (as specified below), may cancel this Agreement in writing and authorize return of Buyer's deposit if, by the time specified in the Agreement, Buyer does not remove in writing the applicable contingency or cancel this Agreement. Once all contingencies have been removed, failure of either Buyer or Seller to close escrow in time may be a breach of this Agreement.

(2) **Continuation of Contingency:** Even after the expiration of the time specified in 17B, Buyer retains the right to make requests to Seller, remove in writing the applicable contingency or cancel this Agreement until Seller cancels pursuant to 17C(1). Once Seller receives Buyer's written removal of all contingencies, Seller may not cancel this Agreement pursuant to 17C(1).

(3) **Seller right to Cancel; Buyer Contract Obligations:** Seller, after first giving Buyer a Notice to Buyer to Perform (as specified below), may cancel this Agreement in writing and authorize return of Buyer's deposit for any of the following reasons: (i) If Buyer fails to deposit funds as required by 2A or 2B; (ii) if the funds deposited pursuant to 2A or 2B are not good when deposited; (iii) if Buyer fails to provide a letter as required by 2H; (iv) if Buyer fails to provide verification as required by 2I or 2M; (v) if Seller reasonably disapproves of the verification provided by 2I or 2M. Seller is not required to give Buyer a Notice to Buyer to Perform regarding Close Of Escrow.

(4) **Notice To Buyer To Perform:** The Notice to Buyer to Perform (C.A.R. Form NBP) shall (i) be in writing; (ii) be signed by Seller; and (iii) give Buyer at least 24 (or ☒ ___72___ ) hours (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A Notice to Buyer to Perform may not be given any earlier than 2 Days Prior to the expiration of the applicable time for Buyer to remove a contingency or cancel the Agreement or meet a 17C(3) obligation.

D. **EFFECT OF BUYER'S REMOVAL OF CONTINGENCIES:** If Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in a separate written agreement between Buyer and Seller, Buyer shall conclusively be deemed to have: (i) completed all Buyer Investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; (ii) elected to proceed with the transaction; and (iii) assumed all liability, responsibility, and expense for Repairs or corrections pertaining to that contingency or cancellation right, or for inability to obtain financing.

E. **EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, Buyer and Seller agree to Sign mutual instructions to cancel the sale and escrow and release deposits, less fees and costs, to the party entitled to the funds. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. Release of funds will require mutual Signed release instructions from Buyer and Seller, judicial decision or arbitration award.

Copyright © 1991-2006, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 5 OF 10)

Buyer's Initials ( _Gm_ )( _____ )
Seller's Initials ( _____ )( _____ )
Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 5 OF 10)**

Faith Fellowsh

14600 Catlinn
Property Address: San Leandro, CA _____  Date: March 24, 2006

18. **FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final inspection of the Property within 5 (or ☐ _____ ) Days Prior to Close Of Escrow, NOT AS A CONTINGENCY OF THE SALE, but solely to confirm: (i) the Property is maintained pursuant to paragraph 11A; (ii) Repairs have been completed as agreed; and (iii) Seller has complied with Seller's other obligations under this Agreement.

19. **ENVIRONMENTAL HAZARD CONSULTATION:** Buyer and Seller acknowledge: (i) Federal, state, and local legislation impose liability upon existing and former owners and users of real property, in applicable situations, for certain legislatively defined, environmentally hazardous substances; (ii) Broker(s) has/have made no representation concerning the applicability of any such Law to this transaction or to Buyer or to Seller, except as otherwise indicated in this Agreement; (iii) Broker(s) has/have made no representation concerning the existence, testing, discovery, location and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Property; and (iv) Buyer and Seller are each advised to consult with technical and legal experts concerning the existence, testing, discovery, location and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Property.

20. **AMERICANS WITH DISABILITIES ACT:** The Americans With Disabilities Act ("ADA") prohibits discrimination against individuals with disabilities. The ADA affects almost all commercial facilities and public accommodations. The ADA can require, among other things, that buildings be made readily accessible to the disabled. Different requirements apply to new construction, alterations to existing buildings, and removal of barriers in existing buildings. Compliance with the ADA may require significant costs. Monetary and injunctive remedies may be incurred if the Property is not in compliance. A real estate broker does not have the technical expertise to determine whether a building is in compliance with ADA requirements, or to advise a principal on those requirements. Buyer and Seller are advised to contact an attorney, contractor, architect, engineer or other qualified professional of Buyer's or Seller's own choosing to determine to what degree, if any, the ADA impacts that principal or this transaction.

21. **LIQUIDATED DAMAGES:** If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to breach this Agreement. Release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award.

| Buyer's Initials _Gm_ / _____ | Seller's Initials _____ / |

22. **DISPUTE RESOLUTION:**

A. **MEDIATION:** Buyer and Seller agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action, Paragraphs 22B(2) and (3) below apply to mediation whether or not the Arbitration provision is initialed. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. **THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.**

B. **ARBITRATION OF DISPUTES: (1)** Buyer and Seller agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration, including and subject to paragraphs 22B(2) and (3) below. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of real estate transactional Law experience, unless the parties mutually agree to a different arbitrator, who shall render an award in accordance with substantive California Law. The parties shall have the right to discovery in accordance with Code of Civil Procedure §1283.05. In all other respects, the arbitration shall be conducted in accordance with Title 9 of Part III of the California Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction. Interpretation of this agreement to arbitrate shall be governed by the Federal Arbitration Act.

**(2) EXCLUSIONS FROM MEDIATION AND ARBITRATION:** The following matters are excluded from mediation and arbitration: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims, or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation and arbitration provisions.

**(3) BROKERS:** Buyer and Seller agree to mediate and arbitrate disputes or claims involving either or both Brokers, consistent with 22A and B, provided either or both Brokers shall have agreed to such mediation or arbitration prior to, or within a reasonable time after, the dispute or claim is presented to Brokers. Any election by either or both Brokers to participate in mediation or arbitration shall not result in Brokers being deemed parties to the Agreement.

**"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."**

**"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."**

| Buyer's Initials _Gm_ / _____ | Seller's initials _____ / |

Copyright © 1991-2002, CALIFORNIA ASSOCIATION OF REALTORS, INC.
CPA REVISED 10/02 (PAGE 6 OF 10)

| Buyer's Initials ( _____ )( _____ ) |
| Seller's Initials ( _____ )( _____ ) |
| Reviewed by _____ Date _____ |

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 6 OF 10)**  Faith Fellows

Property Address: 14600 Catlina San Leandro, CA     Date: March 24, 2006

23. **ASSIGNMENT:** Buyer shall not assign all or any part of Buyer's interests in this Agreement without first having obtained the written consent of Seller. Such consent shall not be unreasonably withheld, unless otherwise agreed in writing. Any total or partial assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement.

24. **SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon, and inure to the benefit of, Buyer and Seller and their respective successors and assigns, except as otherwise provided herein.

25. **COPIES:** Seller and Buyer each represent that Copies of all reports, documents, certificates, approvals and other documents that are furnished to the other are true, correct and unaltered Copies of the original documents, if the originals are in the possession of the furnishing party.

26. **NOTICES:** Whenever notice is given under this Agreement, such notice shall be in writing, and shall be delivered personally, by facsimile, or by mail, postage prepaid. Notice shall be delivered to the address set forth below the recipient's signature of acceptance. Either party may change its notice address by providing notice to the other party.

27. **AUTHORITY:** Any person or persons signing this Agreement represent(s) that such person has full power and authority to bind that person's principal, and that the designated Buyer and Seller has full authority to enter into and perform this Agreement. Entering into this Agreement, and the completion of the obligations pursuant to this contract, does not violate any Articles of Incorporation, Articles of Organization, ByLaws, Operating Agreement, Partnership Agreement or other document governing the activity of either Buyer or Seller.

28. **GOVERNING LAW:** This Agreement shall be governed by the Laws of the state of California.

29. **PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless otherwise agreed in writing, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, rents, HOA regular, special, and emergency dues and assessments imposed prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special assessments that are now a lien but not yet due. Property will be reassessed upon change of ownership. Any supplemental tax bills shall be paid as follows: (i) for periods after Close of Escrow, by Buyer; and (ii) for periods prior to Close Of Escrow, by Seller. TAX BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.

30. **WITHHOLDING TAXES:** Seller and Buyer agree to execute any instrument, affidavit, statement or instruction reasonably necessary to comply with federal (FIRPTA) and California withholding Law, if required (C.A.R. Form AS).

31. ~~MULTIPLE LISTING SERVICE/PROPERTY DATA SYSTEM: If Broker is a participant of a Multiple Listing Service ("MLS") or Property Data System ("PDS"), Broker is authorized to report to the MLS or PDS a pending sale and, upon Close Of Escrow, the terms of this transaction, to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS or PDS.~~

32. ~~EQUAL HOUSING OPPORTUNITY: The Property is sold in compliance with federal, state and local anti-discrimination Laws.~~

33. **ATTORNEY FEES:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 22A.

34. **SELECTION OF SERVICE PROVIDERS:** If Brokers refer Buyer or Seller to persons, vendors, or service or product providers ("Providers"), Brokers do not guarantee the performance of any Providers. Buyer and Seller may select ANY Providers of their own choosing.

35. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.

36. **OTHER TERMS AND CONDITIONS, including attached supplements:**

A. ☒ Buyer Inspection Advisory (C.A.R. Form BIA)

B. ☐ Seller Financing Addendum and Disclosure (C.A.R. Form SFA)

C. ☐ Purchase Agreement Addendum (C.A.R. Form PAA paragraph numbers: _____)

D. ☐ Buyer Intent To Exchange Supplement (C.A.R. Form BES)

E. ☐ Seller Intent to Exchange Supplement (C.A.R. Form SES)

F. _This Agreement is specifically conditioned upon Buyer & Sole judgement, determining that the subject real property is suitable for and approved for new construction. This condition shall remain in full force and effect until removed in writing by Buyer._

_This offer is further subject to the approval of the I.C.E.C. Board of Directors._

Copyright © 1981-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 7 OF 10)

Buyer's Initials (_____)(_____)
Seller's Initials (_____)(_____)
Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 7 OF 10)**

Faith Fellows

14600 Catlina
Property Address: San Leandro, CA                                                                Date: March 24, 2006

**37. DEFINITIONS: As used in this Agreement:**
   **A.** "Acceptance" means the time the offer or final counter offer is accepted in writing by a party and is delivered to and personally received by the other party or that party's authorized agent in accordance with the offer or a final counter offer.
   **B.** "Agreement" means the terms and conditions of this accepted Commercial Property Purchase Agreement and any accepted counter offers and addenda.
   **C.** "C.A.R. Form" means the specific form referenced, or another comparable form agreed to by the parties.
   **D.** "Close Of Escrow" means the date the grant deed, or other evidence of transfer of title, is recorded. If the scheduled close of escrow falls on a Saturday, Sunday or legal holiday, then close of escrow shall be the next business day after the scheduled close of escrow date.
   **E.** "Copy" means copy by any means including photocopy, NCR, facsimile and electronic.
   **F.** "Days" means calendar days, unless otherwise required by Law.
   **G.** "Days After" means the specified number of calendar days after the occurrence of the event specified, not counting the calendar date on which the specified event occurs, and ending at 11:59 PM on the final day.
   **H.** "Days Prior" means the specified number of calendar days before the occurrence of the event specified, not counting the calendar date on which the specified event is scheduled to occur.
   **I.** "Electronic Copy" or "Electronic Signature" means, as applicable, an electronic copy or signature complying with California Law. Buyer and Seller agree that electronic means will not be used by either one to modify or alter the content or integrity of the Agreement without the knowledge and consent of the other.
   **J.** "Law" means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.
   **K.** "Notice to Buyer to Perform" means a document (C.A.R. Form NBP), which shall be in writing and Signed by Seller and shall give Buyer at least 24 hours (or as otherwise specified in paragraph 17C(4)) to remove a contingency or perform as applicable.
   **L.** "Repairs" means any repairs (including pest control), alterations, replacements, modifications and retrofitting of the Property provided for under this Agreement.
   **M.** "Signed" means either a handwritten or electronic signature on an original document, Copy or any counterpart.
   **N.** Singular and Plural terms each include the other, when appropriate.

**38. BROKERAGE:** Neither Buyer nor Seller has utilized the services of, or for any other reason owes compensation to, a licensed real estate broker (individual or corporate), agent, finder, or other entity, other than as specified in this Agreement, in connection with any act relating to the Property, including, but not limited to, inquiries, introductions, consultations and negotiations leading to this Agreement. Buyer and Seller each agree to indemnify, defend, and hold the other, the Brokers specified herein and their agents, harmless from and against any costs, expenses or liability for compensation claimed inconsistent with the warranty and representation in this paragraph.

**39. AGENCY:**
   **A. POTENTIALLY COMPETING BUYERS AND SELLERS:** Buyer and Seller each acknowledge receipt of a disclosure of the possibility of multiple representation by the Broker representing the principal. This disclosure may be part of a listing agreement, buyer-broker agreement or separate document (C.A.R. Form DA). Buyer understands that Broker representing Buyer may also represent other potential buyers, who may consider, make offers on or ultimately acquire the Property. Seller understands that Broker representing Seller may also represent other sellers with competing properties of interest to this Buyer.
   **B. CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction:
     Listing Agent _____**TRI Commercial**_____ (Print Firm Name) is the agent
     of (check one): ☒ the Seller exclusively; or ☐ both the Buyer and Seller.
     Selling Agent _____**Danville Realty Corporation**_____ (Print Firm Name) (if not same
     as Listing Agent) is the agent of (check one): ☒ the Buyer exclusively; or ☐ the Seller exclusively; or ☐ both the Buyer and Seller.
     Real Estate Brokers are not parties to the Agreement between Buyer and Seller.

**40. JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**
   **A.** The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and Seller to Escrow Holder, which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: 1, 2, 4, 5, 16, 17E, 29, 30, 35, 36B-F, 37, 40, 42, 43A, 46 and paragraph D of the section titled Real Estate Broker on page 10. If a Copy of the separate compensation agreement(s) provided for in paragraph 42 or 45A, or paragraph D of the section titled Real Estate Broker on page 10 is deposited with Escrow Holder by Broker, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned. Buyer and Seller will receive Escrow Holder's general provisions directly from Escrow Holder and will execute such provisions upon Escrow Holder's request. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller will execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow.

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 8 OF 10)

Buyer's Initials ( _____ ) ( _____ )
Seller's Initials ( _____ ) ( _____ )
Reviewed by _____ Date _____

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 8 OF 10)**     Faith Fellowsh

Property Address: __14600 Catlina_____ Date: __March 21, 2006___
__San Leandro, CA__

B. A Copy of this Agreement shall be delivered to Escrow Holder within 3 business days after Acceptance (or ☐ _____ ). Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement.

C. Brokers are a party to the Escrow for the sole purpose of compensation pursuant to paragraphs 42, 45A and paragraph D of the section titled Real Estate Broker on page 10. Buyer and Seller irrevocably assign to Brokers compensation specified in paragraphs 42 and 45A, respectively, and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow, or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers. Escrow Holder shall immediately notify Brokers: (i) if Buyer's initial or any additional deposit is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or (ii) if Buyer and Seller instruct Escrow Holder to cancel escrow.

D. A Copy of any amendment that effects any paragraph for which Escrow Holder is responsible shall be delivered to Escrow Holder within 2 business days after mutual execution of the amendment.

41. SCOPE OF BROKER DUTY: Buyer and Seller acknowledge and agree that: Brokers: (i) do not decide what price Buyer should pay or Seller should accept; (ii) do not guarantee the condition of the Property; (iii) do not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; (iv) shall not be responsible for identifying defects that are not known to Broker(s); (v) shall not be responsible for inspecting public records or permits concerning the title or use of the Property; (vi) shall not be responsible for identifying location of boundary lines or other items affecting title; (vii) shall not be responsible for verifying square footage, representations of others or information contained in inspection reports, MLS or PDS, advertisements, flyers or other promotional material, unless otherwise agreed in writing; (viii) shall not be responsible for providing legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller in the course of this representation; and (ix) shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals.

42. BROKER COMPENSATION FROM BUYER: If applicable, upon Close Of Escrow, Buyer agrees to pay compensation to Broker as specified in a separate written agreement between Buyer and Broker.

43. TERMS AND CONDITIONS OF OFFER: This is an offer to purchase the Property on the above terms and conditions. All paragraphs with spaces for initials by Buyer and Seller are incorporated in this Agreement only if initialed by all parties. If at least one but not all parties initial, a counter offer is required until agreement is reached. Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance. Buyer has read and acknowledges receipt of a Copy of the offer and agrees to the above confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing.

44. EXPIRATION OF OFFER: This offer shall be deemed revoked and the deposit shall be returned, unless the offer is Signed by Seller, and a Copy of the Signed offer is personally received by Buyer, or by _____ C. Edward Bullok _____, who is authorized to receive it by 5:00 PM on the third Day after this offer is signed by Buyer (OR, if checked ☒ by ___March 25, 2006___ (date), at __11:59__ ☐ AM ☒ PM).

Buyer __San Leandro Foursquare #2_____
By __[signature]_____ Date __March 24, 2006__
Print name __Pastor Gary Mortara__ M O R T A R A (Gm)
Address __577 Manor Boulevard__ City __San Leandro__ State __CA__ Zip __94579__
Telephone __(510)773-8513__ Fax __(510)614-0660__ E-mail __pastoralithifi@yahoo.com__

Buyer _____
By _____ Date _____
Print name _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____
Notice Address, if Different _____

Copyright © 1991-2005, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
CPA REVISED 10/02 (PAGE 9 OF 10)

Buyer's Initials ( GM )( _____ )
Seller's Initials ( _____ )( _____ )
Reviewed by _____ Date _____

COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 9 OF 10)    Faith Fellowsh

**14600 Catlina**

Property Address: San Leandro, CA                                     Date: March 24, 2006

**45. BROKER COMPENSATION FROM SELLER:**

A. Upon Close Of Escrow, Seller agrees to pay compensation to Broker as specified in a separate written agreement between Seller and Broker.

B. If escrow does not close, compensation is payable as specified in the t separate written agreement.

**46. ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property, or has the authority to execute this Agreement. Seller accepts the above offer, agrees to sell the Property on the above terms and conditions, and agrees to the above confirmation of agency relationship. Seller has read and acknowledges receipt of a Copy of this Agreement, and authorizes Broker to deliver a Signed Copy to Buyer.
☒ (If checked) SUBJECT TO ATTACHED COUNTER OFFER, DATED *Referred to as "Addendum" signed by Seller.*

Seller ECO INVESTMENT GROUP LP

By ARISTO PROPERTIES INC                                     Date 3/28/06

Print name

Address _____ City _____ State _____ Zip _____

Telephone _____ Fax _____ E-mail _____

Seller _____

By _____ Date _____

Print name _____

Address _____ City _____ State _____ Zip _____

Telephone _____ Fax _____ E-mail _____

Notice Address, if Different _____

( _____ / _____ ) Confirmation of Acceptance: A Copy of Signed Acceptance was personally received by Buyer or Buyer's authorized agent
(initials) on (date) _____ at _____ ☐ AM ☐ PM. A binding Agreement is created when a Copy of Signed Acceptance is personally received by Buyer or Buyer's authorized agent whether or not confirmed in this document. Completion of this confirmation is not legally required in order to create a binding Agreement; it is solely intended to evidence the date that Confirmation of Acceptance has occurred.

**REAL ESTATE BROKERS:**

A. Real Estate Brokers are not parties to the Agreement between Buyer and Seller.

B. Agency relationships are confirmed as stated in paragraph 39 above.

C. If specified in paragraph 2A, Agent who submitted offer for Buyer acknowledges receipt of deposit.

D. COOPERATING BROKER COMPENSATION: Listing Broker agrees to pay Cooperating Broker (Selling Firm) and Cooperating Broker agrees to accept, out of Listing Broker's proceeds in escrow: (i) the amount specified in the MLS or PDS, provided Cooperating Broker is a Participant of the MLS or PDS in which the property is offered for sale or a reciprocal MLS or PDS; or (ii) ☐ (if checked) the amount specified in a separate written agreement (C.A.R. Form CBC) between Listing Broker and Cooperating Broker.

Real Estate Broker (Selling Firm) Danville Realty Corporation

By _____ C. Edward Bullok Date March 24, 2006

Address 21780 Hesperian Boulevard City Hayward State CA Zip 94541

Telephone (510)582-2025 Fax (510)881-8301 E-mail edbullok@comcast.net

Real Estate Broker (Listing Firm) TRI Commercial

By _____ Anton Qui Date _____

Address One California Street, Suite 200 City San Francisco State CA Zip 94111

Telephone (415)268-2200 Fax (415)268-2299 E-mail aqui@tricommercial.com

**ESCROW HOLDER ACKNOWLEDGMENT:**

Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked, ☐ a deposit in the amount of $_____ ),
counter offer numbers _____ and _____, and agrees to act as Escrow Holder subject to paragraph 40 of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.

Escrow Holder is advised that the date of Confirmation of Acceptance of the Agreement as between Buyer and Seller is _____

Escrow Holder Old Republic Title Company Escrow # _____

By _____ Kim Perry Date _____

Address 20960 Redwood Road, Suite 160, Castro Valley, CA 94546

Phone/Fax/E-mail (510 537-8000 Office (510) 889-8303 _____

Escrow Holder is licensed by the California Department of ☐ Corporations, ☒ Insurance, ☐ Real Estate, License # _____

( _____ / _____ ) REJECTION OF OFFER: No counter offer is being made. This offer was reviewed and rejected by Seller on
(Seller's Initials) _____ (Date) _____

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

CPA REVISED 10/02 (PAGE 10 OF 10)

**COMMERCIAL PROPERTY PURCHASE AGREEMENT (CPA PAGE 10 OF 10)**

Faith Fellowah



**CALIFORNIA
ASSOCIATION
OF REALTORS®**

## BUYER'S INSPECTION ADVISORY

(C.A.R. Form BIA, Revised 10/02)

Property Address: __14600 Catina, San Leandro  CA__ _____ ("Property").

**A. IMPORTANCE OF PROPERTY INVESTIGATION:** The physical condition of the land and improvements being purchased is not guaranteed by either Seller or Brokers. For this reason, you should conduct thorough investigations of the Property personally and with professionals who should provide written reports of their investigations. A general physical inspection typically does not cover all aspects of the Property nor items affecting the Property that are not physically located on the Property. If the professionals recommend further investigations, including a recommendation by a pest control operator to inspect inaccessible areas of the Property, you should contact qualified experts to conduct such additional investigations.

**B. BUYER RIGHTS AND DUTIES:** You have an affirmative duty to exercise reasonable care to protect yourself, including discovery of the legal, practical and technical implications of disclosed facts, and the investigation and verification of information and facts that you know or that are within your diligent attention and observation. The purchase agreement gives you the right to investigate the Property. If you exercise this right, and you should, you must do so in accordance with the terms of that agreement. This is the best way for you to protect yourself. It is extremely important for you to read all written reports provided by professionals and to discuss the results of inspections with the professional who conducted the inspection. You have the right to request that Seller make repairs, corrections or take other action based upon items discovered in your investigations or disclosed by Seller. If Seller is unwilling or unable to satisfy your requests, or you do not want to purchase the Property in its disclosed and discovered condition, you have the right to cancel the agreement if you act within specific time periods. If you do not cancel the agreement in a timely and proper manner, you may be in breach of contract.

**C. SELLER RIGHTS AND DUTIES:** ~~Seller is required to disclose to you material facts known to him/her that affect the value or desirability of the Property. However, Seller may not be aware of some Property defects or conditions.~~ Seller does not have an obligation to inspect the Property for your benefit nor is Seller obligated to repair, correct or otherwise cure known defects that are disclosed to you or previously unknown defects that are discovered by you or your inspectors during escrow. The purchase agreement obligates Seller to make the Property available to you for investigations.

**D. BROKER OBLIGATIONS:** Brokers do not have expertise in all areas and therefore cannot advise you on many items, such as soil stability, geologic or environmental conditions, hazardous or illegal controlled substances, structural conditions of the foundation or other improvements, or the condition of the roof, plumbing, heating, air conditioning, electrical, sewer, septic, waste disposal, or other system. The only way to accurately determine the condition of the Property is through an inspection by an appropriate professional selected by you. If Broker gives you referrals to such professionals, Broker does not guarantee their performance. You may select any professional of your choosing. In sales involving residential dwellings with no more than four units, Brokers have a duty to make a diligent visual inspection of the accessible areas of the Property and to disclose the results of that inspection. However, as some Property defects or conditions may not be discoverable from a visual inspection, it is possible Brokers are not aware of them. If you have entered into a written agreement with a Broker, the specific terms of that agreement will determine the nature and extent of that Broker's duty to you. YOU ARE STRONGLY ADVISED TO INVESTIGATE THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY. IF YOU DO NOT DO SO, YOU ARE ACTING AGAINST THE ADVICE OF BROKERS.

**E. YOU ARE ADVISED TO CONDUCT INVESTIGATIONS OF THE ENTIRE PROPERTY, INCLUDING, BUT NOT LIMITED TO THE FOLLOWING:**

1. **GENERAL CONDITION OF THE PROPERTY, ITS SYSTEMS AND COMPONENTS:** Foundation, roof, plumbing, heating, air conditioning, electrical, mechanical, security, pool/spa, other structural and non-structural systems and components, fixtures, built-in appliances, any personal property included in the sale, and energy efficiency of the Property. (Structural engineers are best suited to determine possible design or construction defects, and whether improvements are structurally sound.)

2. **SQUARE FOOTAGE, AGE, BOUNDARIES:** Square footage, room dimensions, lot size, age of improvements and boundaries. Any numerical statements regarding these items are APPROXIMATIONS ONLY and have not been verified by Seller and cannot be verified by Brokers. Fences, hedges, walls, retaining walls and other natural or constructed barriers or markers do not necessarily identify true Property boundaries. (Professionals such as appraisers, architects, surveyors and civil engineers are best suited to determine square footage, dimensions and boundaries of the Property.)

3. **WOOD DESTROYING PESTS:** Presence of, or conditions likely to lead to the presence of wood destroying pests and organisms and other infestation or infection. Inspection reports covering these items can be separated into two sections: Section 1 identifies areas where infestation or infection is evident. Section 2 identifies areas where there are conditions likely to lead to infestation or infection. A registered structural pest control company is best suited to perform these inspections.

4. **SOIL STABILITY:** Existence of fill or compacted soil, expansive or contracting soil, susceptibility to slippage, settling or movement, and the adequacy of drainage. (Geotechnical engineers are best suited to determine such conditions, causes and remedies.)

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2004, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.
BIA REVISED 10/02 (PAGE 1 OF 2)

Buyer's Initials (__X___)(_____)
Seller's Initials (_____)(_____)
Reviewed by _____ Date _____



## BUYER'S INSPECTION ADVISORY (BIA PAGE 1 OF 2)

Agent: C. Edward Bullock　　Phone: (510) 818-4100　　Fax: (510) 881-8301　　Prepared using WINForms® software
Broker: Danville Realty Corporation 21790 Hesperian Boulevard,  Hayward CA 94541-7003

Property Address: 14600 Catlins, San Leandro, Ca                          Date: March 24, 2006

**5. ROOF:** Present condition, age, leaks, and remaining useful life. (Roofing contractors are best suited to determine these conditions.)

**6. POOL/SPA:** Cracks, leaks or operational problems. (Pool contractors are best suited to determine these conditions.)

**7. WASTE DISPOSAL:** Type, size, adequacy, capacity and condition of sewer and septic systems and components, connection to sewer, and applicable fees.

**8. WATER AND UTILITIES; WELL SYSTEMS AND COMPONENTS:** Water and utility availability, use restrictions and costs. Water quality, adequacy, condition, and performance of well systems and components.

**9. ENVIRONMENTAL HAZARDS:** Potential environmental hazards, including, but not limited to, asbestos, lead-based paint and other lead contamination, radon, methane, other gases, fuel oil or chemical storage tanks, contaminated soil or water, hazardous waste, waste disposal sites, electromagnetic fields, nuclear sources, and other substances, materials, products, or conditions (including mold (airborne, toxic or otherwise), fungus or similar contaminants). (For more information on these items, you may consult an appropriate professional or read the booklets "Environmental Hazards: A Guide for Homeowners, Buyers, Landlords and Tenants," "Protect Your Family From Lead in Your Home" or both.)

**10. EARTHQUAKES AND FLOODING:** Susceptibility of the Property to earthquake/seismic hazards and propensity of the Property to flood. (A Geologist or Geotechnical Engineer is best suited to provide information on these conditions.)

**11. FIRE, HAZARD AND OTHER INSURANCE:** The availability and cost of necessary or desired insurance may vary. The location of the Property in a seismic, flood or fire hazard zone, and other conditions, such as the age of the Property and the claims history of the Property and Buyer, may affect the availability and need for certain types of insurance. Buyer should explore insurance options early as this information may affect other decisions, including the removal of loan and inspection contingencies. (An insurance agent is best suited to provide information on these conditions.)

**12. BUILDING PERMITS, ZONING AND GOVERNMENTAL REQUIREMENTS:** Permits, inspections, certificates, zoning, other governmental limitations, restrictions, and requirements affecting the current or future use of the Property, its development or size. (Such information is available from appropriate governmental agencies and private information providers. Brokers are not qualified to review or interpret any such information.)

**13. RENTAL PROPERTY RESTRICTIONS:** Some cities and counties impose restrictions that limit the amount of rent that can be charged, the maximum number of occupants; and the right of a landlord to terminate a tenancy. Deadbolt or other locks and security systems for doors and windows, including window bars, should be examined to determine whether they satisfy legal requirements. (Government agencies can provide information about these restrictions and other requirements.)

**14. SECURITY AND SAFETY:** State and local Law may require the installation of barriers, access alarms, self-latching mechanisms and/or other measures to decrease the risk to children and other persons of existing swimming pools and hot tubs, as well as various fire safety and other measures concerning other features of the Property. Compliance requirements differ from city to city and county to county. Unless specifically agreed, the Property may not be in compliance with these requirements. (Local government agencies can provide information about these restrictions and other requirements.)

**15. NEIGHBORHOOD, AREA, SUBDIVISION CONDITIONS; PERSONAL FACTORS:** Neighborhood or area conditions, including schools, proximity and adequacy of law enforcement, crime statistics, the proximity of registered felons or offenders, fire protection, other government services, availability, adequacy and cost of any speed-wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, protected species, wetland properties, botanical diseases, historic or other governmentally protected sites of improvements, cemeteries, facilities and condition of common areas of common interest subdivisions, and possible lack of compliance with any governing documents or Homeowners' Association requirements, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Buyer.

Buyer and Seller acknowledge and agree that Broker: (i) Does not decide what price Buyer should pay or Seller should accept; (ii) Does not guarantee the condition of the Property; (iii) Does not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; (iv) Does not have an obligation to conduct an inspection of common areas or areas off the site of the Property; (v) Shall not be responsible for identifying defects on the Property, in common areas, or offsite unless such defects are visually observable by an inspection of reasonably accessible areas of the Property or are known to Broker; (vi) Shall not be responsible for inspecting public records or permits concerning the title or use of Property; (vii) Shall not be responsible for identifying the location of boundary lines or other items affecting title; (viii) Shall not be responsible for verifying square footage, representations of others or information contained in Investigation reports, Multiple Listing Service, advertisements, flyers or other promotional material; (ix) Shall not be responsible for providing legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller; and (x) Shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals.

By signing below, Buyer and Seller each acknowledge that they have read, understand, accept and have received a Copy of this Advisory. Buyer is encouraged to read it carefully.

X _____   03/24/2006
Buyer Signature                Date             Buyer Signature              Date
San Leandro Boardhouse #2

_____   3/28/2006
Seller Signature               Date             Seller Signature             Date

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.) NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

BIA REVISED 10/92 (PAGE 2 OF 2)
        BUYER'S INSPECTION ADVISORY (BIA PAGE 2 OF 2)

**EXHIBIT 38**

1   Jayne W. Williams, Esq. (SBN: 63203)
    jwilliams@meyersnave.com
2   Deborah J. Fox, Esq. (SBN: 110929)
    dfox@meyersnave.com
3   Philip A. Seymour (SBN: 116606)
    pseymour@meyersnave.com
4   Kimberly M. Drake, Esq. (SBN: 209090)
    kdrake@meyersnave.com
5   MEYERS, NAVE, RIBACK, SILVER & WILSON
    555 12ᵗʰ Street, Suite 1500
6   Oakland, California  94607
    Telephone: (510) 808-2000
7   Facsimile: (510) 444-1108

8   Attorneys for Defendant
    CITY OF SAN LEANDRO
9

10

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13   INTERNATIONAL CHURCH OF THE          Case No.  C07-03605-PJH
     FOURSQUARE GOSPEL,
14                                        DECLARATION OF DEBBIE
                                          POLLART IN SUPPORT OF CITY'S
15                 Plaintiff,             MOTION FOR SUMMARY
                                          JUDGMENT
16   v.

17   CITY OF SAN LEANDRO, a municipal     Hearing:
18   corporation,                         Date:       October 1, 2008
                                          Time:       9:00 a.m.
19                 Defendant.             Courtroom:  3
20
     FAITH FELLOWSHIP FOURSQUARE          Honorable Phyllis J. Hamilton
21   CHURCH,                              Complaint Filed: 7/12/07

22                 Real Party in Interest.
23

24

25

26

27

28

                            EXHIBIT 38

1    I, Debbie Pollart, declare as follows:

2    1.    The following facts are within my personal knowledge and, if called upon to

3    testify, I could and would testify competently with respect thereto.

4    2.    I was Planning Manager for the City of San Leandro ("the City") from

5    November 2002 through May 2007. I worked as a consultant for the City from 1998 to

6    2000 and was hired as a full-time employee in 2000. I have been a full-time employee

7    with the City of San Leandro for the past eight years. I am currently the Facilities & Open

8    Space Manager in the City's Public Works Department.

9    3.    In my capacity as Planning Manager, I also served as the Secretary to the

10   San Leandro Planning Commission ("Planning Secretary"). As the Planning Secretary, I

11   reviewed all minutes, prepared the agenda and furnished all members of the Commission

12   with a copy of the agenda and copies of all correspondence and other papers relating to

13   items appearing on the agenda.

14   4.    In my capacity as Planning Manager, I also personally dealt with Faith

15   Fellowship Foursquare Church and its representatives (hereinafter the "Church") on a

16   number of different occasions, in connection with their current location at 577 Manor

17   Boulevard, and their property located at 14600 and 14850 Catalina Street.

18                 PERMITTED RELIGIOUS ASSEMBLY USES IN SAN LEANDRO

19   5.    At the present time, and based on information known to the City, there are a

20   total of 45 churches operating within the City of San Leandro, including the religious

21   assembly facilities operated by the Church at 577 Manor Boulevard.

22   6.    Under the City's current zoning, churches and other religious assemblies

23   generally are classified as an "Assembly Use," which is defined in Article 3 of the Zoning

24   Code as follows:

25         "Assembly Uses. Meeting, recreational, social facilities of a private or non-

26         profit organization primarily for use by member or guests, or facilities for

27         religious worship and incidental religious education (but not including

28         schools as defined in this section). This classification includes union halls,

                                          1

1  social clubs, fraternal organizations, and youth centers." Zoning Code,

2  Article 3, Exhibit 2, 008.

3  7.  Churches and religious assemblies are and have been allowed in the City's

4  residential zones with a conditional use permit ("CUP") for many years. As a result, most

5  existing churches located in the City are located in residential zones. Exhibit 3 is a true

6  and correct copy of Article 5 of the City of San Leandro Zoning Code, which sets forth the

7  zoning regulations for residential zoning districts. As indicated in sections 2-504.B, 2-

8  506.B, 2-508.B and 2-510.B of Article 5, Assembly Uses are conditionally permitted uses

9  (*i.e.* permitted with a CUP) in all residential zones.

10  8.  Exhibit 8 is a true and correct copy of the zoning map of the City showing the

11  residential zones in which churches are permitted with a CUP. As indicated on the legend,

12  residential zones are shown in colors in the yellow-tan-orange spectrum. These areas

13  comprise about 52% of the City's total land area, with the RS single family residential zone

14  comprising the great majority of that area. Based on a review of the zoning map and parcel

15  information in the City's information system, approximately 78 parcels in the City's

16  residential zones are over 3.5 acres in size.

17  9.  Since March 2007 Assembly Uses, including churches, are also permitted

18  with a CUP in industrial and commercial zones that are also designated with the Assembly

19  Use Overlay. The Assembly Use Overlay zoning regulations were adopted as the result of

20  events described elsewhere below. Exhibit 9 is a map entitled "City of San Leandro

21  Assembly Use Criteria Study" showing the location and extent of properties included in

22  the Assembly Use Overlay Zone.

23  10.  A total of 196 individual parcels ranging in size from .11 to 27.15 acres are

24  located in the Assembly Use Overlay zone. Of these individual parcels, four are over 10

25  acres in size, eight are over 5 acres in size and 24 are over 2 acres in size. The remaining

26  parcels are smaller parcels which could be individually developed with a religious facility

27  or other assembly use, or could be aggregated into larger parcels to accommodate larger

28  facilities. All parcels within the Assembly Use Overlay zone are located in areas

2

1   containing 2 or more contiguous acres of land subject to the Assembly Use Overlay

2   zoning.  As shown on Exhibits 9, 10, there are a total of thirteen such areas in industrial

3   and commercially zoned areas of the City.  The Assembly Use Overlay zoning has been

4   deliberately applied only to areas of two or more contiguous acres of land to accommodate

5   larger churches where the financial resources exist to acquire the land and develop these

6   churches.

7   11.   Exhibit 10 to this declaration is a true and correct copy of a printout of a

8   computer generated listing of all individual parcels included in the Assembly Use Overlay

9   zone, showing the parcel number, address, current zoning, and size in square feet and in

10  acres for each.  The information was produced by the GIS data system maintained by the

11  City and used for all zoning and other City matters concerning property locations and

12  boundaries.

13  12.   The total amount of land included in the Assembly Use Overlay zone is

14  approximately 220 acres.  The total number of acres of land in which Assembly Uses are

15  conditionally permitted in the City (*i.e.* the sum of residential areas and areas zoned with

16  the Assembly Use Overlay) is approximately 4,650 acres, or 54.6% of the total area of the

17  City.

18  13.   During the time I have been employed by the City, the City has received

19  applications to open a total of two new churches in the City.  The first of these was

20  approved by the City in 2000.  The second sequence of applications were for the proposed

21  relocation of the Faith Fellowship Foursquare Church to 14600-14850 Catalina Street

22  which is the subject of this legal action.

23  14.   I understand that few or no new churches were opened in the City of San

24  Leandro in the decade prior to my employment with the City.  This is consistent with the

25  general development status and population characteristics of the City.  As indicated in the

26  City's General Plan, the City is almost entirely built out, and there are only a few scattered

27  parcels of vacant developable land left in San Leandro.  Almost all new construction is the

28  result of redevelopment activity involving improvements on existing developed properties,

3

Declaration of Debbie Pollart in Support of Motion for Summary Judgment          [C07-03605-PJH]

1  or demolition and replacement of older structures and improvements with newer

2  development. The 2000 census placed the total population of the City at 79,462 persons.

3                    THE ICFG APPLICATION AND

4        ADOPTION OF THE ASSEMBLY USE OVERLAY ZONING

5        15.    On May 3, 2006, in my capacity as Planning Manager, I, along with then-

6  acting Community Development Director Hanson Hom and then-acting Economic

7  Development Director Luke Sims, met with Church representatives regarding their desire

8  to relocate to a non-residential district. The Church representatives informed us that they

9  wanted to relocate to 14600 and 14850 Catalina Street (the "Catalina Street property"),

10  which is within the City's Industrial Park ("IP") zoning district, and adjacent to several

11  manufacturing plants such as Kennerly Spratling, a manufacturer of plastics, Otis

12  Spunkmeyer, a large scale frozen/baked goods manufacturer, Coast Crane, which sells,

13  leases and/or services construction cranes, and Challenge Dairy, a manufacturer of dairy

14  products. During the May 3rd meeting, staff informed the Church representatives that,

15  pursuant to the San Leandro Zoning Code (the "Zoning Code"), religious assembly uses

16  were conditionally permitted uses in the City's Residential zoning district only. We

17  further informed the Church representatives that the current Zoning Code did not allow

18  assembly uses within the IP district. We advised the Church representatives that in order

19  to relocate to the Catalina Street property, two changes to the Zoning Code were needed:

20  (1) amendment of the Zoning Code to make assembly a conditionally permitted use in the

21  Industrial Limited ("IL") zoning district, and (2) an amendment of the zoning map to

22  designate the Catalina Street property as IL.

23        16.    At this time (and until the present) the City's Zoning Code had three

24  industrial zoning classifications, *i.e.* the IL (Industrial Limited) zone; the IP (Industrial

25  Park) zoning district; and the IG (Industrial General) zoning district. Exhibit 4 is a true

26  and correct copy of Article 7 of the Zoning Code which contains the basic Zoning Code

27  regulations for industrial zones.

28  ///

---

4

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                    [C07-03605-PJH]

1        a.     The IL (Industrial Limited) zoning is intended to provide areas

2 appropriate for low- to moderate- intensity industrial uses and commercial services uses

3 and light manufacturing capable of being located near residential areas without excessive

4 impacts. This zoning is also intended to protect the permitted industrial and commercial

5 uses from competition for space and potential conflicts with different types of commercial,

6 industrial, and other uses. *See* Exhibit 4, Article 7, Section 2-700, p. 021. The IL zone is

7 thus typically employed on the City's zoning map as a buffer area between residential uses

8 and more intensive industrial uses, or in areas where more intensive industrial use is not

9 appropriate due to proximity of residential of other sensitive uses.

10        b.     The IG (Industrial General) zoning is intended to "provide and protect

11 existing industrial sites and allow for continued operation of existing general industry,

12 subject to performance standards and buffering requirements to minimize potential

13 environmental impacts. Certain types of retail sales are permitted under specified

14 limitations." Exhibit 4, Article 7, § 2-700, p. 021. This zone serves traditional and newer

15 industrial uses which often have impacts or operating characteristics that make them

16 unsuitable for location near residences, traditional commercial uses and other sensitive

17 uses, *e.g.* high volumes of truck traffic, noise, releases of smoke, dust, diesel fumes or

18 other pollutants, night lighting.

19        c.     The IP (Industrial Park) zone is intended to "provide and protect lands

20 for the development in a landscaped setting of communities of high technology, research

21 and development facilities, limited industrial activities (including production and assembly

22 but not raw materials processing or bulk handling), small scale warehousing and

23 distribution, industrial office centers, certain types of specified retail sales, and related

24 uses." Exhibit 4, Article 7, § 2-700, p. 021. The IP zoning is intended to attract and

25 maintain newer high technology light industrial, office and service uses that are important

26 to maintaining the economic and job base for the community in the 21st century economy.

27      17.    At the time of the May 3, 2006 meeting, City staff advised the Church

28 representatives to apply for a rezone from IP to IL because, from a staff perspective, the IL

5

1    zoning district was more amenable to assembly use than the IP zoning district. More

2    specifically, the IL district's purpose is to provide areas of low-to-moderate intensity

3    industrial uses which are capable of being located adjacent to residential areas and serve as

4    a buffer between residential areas and light industry. In contrast, the IP zoning designation

5    is meant to serve commerce, high technology, production and assembly, retail and related

6    uses.

7        18.    At the May 3, 2006 meeting neither I, Mr. Hom nor Mr. Sims made any

8    representation to the Church representatives present about the likelihood of approval of the

9    rezone request or a conditional use permit for the proposed church at the Catalina Street

10   properties. Approval of these measures would require discretionary action by the City

11   Planning Commission and City Council after consideration of all relevant factual and

12   policy considerations, and could not be predicted. I also did not at any subsequent time

13   advise Church representatives that approval of their application was likely to occur, nor to

14   my knowledge did any other person associated with the City. I am certain that neither I or

15   anyone else associated with the City at any time advised Church representatives that it

16   would be safe or prudent to purchase the Catalina Street property before a final decision

17   had been made on the Assembly Use Overlay zoning, or before a final decision on the

18   Church's subsequent application for a zoning amendment to have the property included in

19   the Assembly Use Overlay zone.

20       19.    On May 19, 2006 I received and processed the Church's application to

21   rezone the Catalina Street property from IP to IL, and to amend the Zoning Code to allow

22   religious assembly use in the IL zoning district. A true and correct copy of the rezoning

23   application subsequently filed by the Church is attached hereto as Exhibit 26.

24       20.    After meeting with Church representatives and receiving the application, I

25   and other City staff began discussing some of the larger planning and policy issues, and

26   particularly issues of consistency with the City's legally adopted General Plan, raised by

27   the proposed zoning amendment. The amendment to the text of the Zoning Code to allow

28   assembly uses in the IL zone would apply to all properties zoned IL, and therefore had

Declaration of Debbie Pollart in Support of Motion for Summary Judgment     [C07-03605-PJH]

1   City-wide implications. The expansion of assembly uses outside of residential zoning

2   districts presented a major shift in policy regarding location of assembly uses in the City.

3   The proposed expansion of assembly uses outside of residential districts would therefore

4   require input and analysis and eventual final action from the City Council, Planning

5   Commission, and Board of Zoning Adjustments. Matters of particular concern were the

6   potential for conflicts between industrial and assembly uses, and potential effects on the

7   City's industrial employment and economic base.

8       21.    Under California law, zoning ordinances must be consistent with the City's

9   General Plan. (Government Code § 65860.) A true and correct copy of relevant portions

10  of the City's current General Plan is attached as Exhibit 7 to this declaration. The location

11  of assembly uses in industrial zones posed two sets of issues with respect to consistency

12  with the General Plan and also generally sound planning practices. The first set of issues

13  related to ensuring compatibility between assembly uses and industrial uses, *i.e.* avoiding

14  unacceptable impacts such as noise, dust or constant truck traffic on permitted assembly

15  uses, and, conversely, avoiding unacceptable constraints on industrial operations in order

16  to avoid potential impacts on, or complaints from, permitted assembly uses. The second

17  set of concerns related to potential displacement of industrial and commercial uses by

18  assembly uses, thereby affecting employment opportunities and the economic base of the

19  City. Both of these potential problem sets are recognized in the General Plan. *See* General

20  Plan Land Use Element, Exhibit 7, pp. 118-121.

21      22.    The General Plan contains a number of policies and provisions where were

22  directly relevant to these two sets of issues. These include the following:

23          a.    The Land Use Element of the General Plan provides, Exhibit 7 at 119:

24      "The areas most suitable for conversion to non-industrial uses are those

25      located adjacent to existing housing, or in areas which lack the amenities to

26      meet the needs of modern industry. Such areas exist along San Leandro

27      Boulevard, Alvarado Street, and Marina Boulevard."

28

---

7

Declaration of Debbie Pollart in Support of Motion for Summary Judgment            [C07-03605-PJH]

661

1       b.      General Plan Policy 10.04 (Exhibit 7, Land Use Element, p.
2    141) provides:
3       *"Industrial Sanctuary*  – Protect the City's major industrial areas from
4       encroachment by uses that are potentially incompatible with existing viable
5       industrial activities, or which may inhibit the ability of industry to operate
6       effectively."
7       c.      General Plan Policy 33.04 (Exhibit 7, Environmental Hazards
8    Element, p. 180) provides:
9       *"Separation from Sensitive Uses.*  Provide adequate and safe separation
10   between areas where hazardous materials are present and sensitive uses such as
11   schools, residences and public facilities."
12      d.      General Plan Policy 7.09 (Exhibit 7, Land Use Element, p.
13   129) establishes the following policy:
14      "Build upon the locational strengths and transportation features of West San
15      Leandro to support the area' continued development as a major industrial,
16      technology, and office employment center.  In accordance with the West San
17      Leandro Plan, limit the encroachment of incompatible residential and retail
18      uses into the area, and promote additional development and redevelopment
19      with manufacturing, technology, warehouse and distribution, offices/flex and
20      similar uses."
21      e.      General Plan Policy 7.10 (Exhibit 7, Land Use Element, 130)
22   provides:
23      "Facilitate the gradual transition of the South-of-Marina (SOMAR) area into
24      a cohesive light industrial district characterized by light manufacturing,
25      office/flex, research and development, bio-medical, e-commerce, and similar
26      uses, along with complementary business services and employee amenities."
27      f.      General Plan Policy 13.01 (Exhibit 7, Transportation Element, 179)
28   provides:

8

---

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                    [C07-03605-PJH]

1    "Ensure that future land use development decisions are in balance with the

2    capacity of the City's transportation system."

3    23.    The City's Zoning Code also contains similar general policies requiring the

4    City to generally balance and maintain compatibility between adjoining uses to the extent

5    possible. Section 1-104.A of Zoning Code, for example, states that a basic goal of the

6    Zoning Code is to "Preserve the character and quality of residential neighborhoods and

7    commercial and industrial areas consistent with the character of the development districts

8    of the City." Zoning Code, Article 1, RFJN Exhibit 1, p. 005.

9    24.    As a result of these internal discussions, City staff advised the Church by

10   letter dated June 29, 2006, that a rezoning of the nature proposed in their application would

11   require thorough analysis by staff, the Planning Commission, the Board of Zoning

12   Adjustments, and, ultimately the City Council. A true and correct copy of the City's letter

13   to Jim Lee on behalf of the Church, dated June 29, 2006, is submitted concurrently as

14   Exhibit 25. This would in turn prevent any prompt action on their application for a

15   rezoning.

16   25.    After further discussion and evaluation of the relevant planning

17   considerations and City policies in the General Plan, staff identified two principal

18   alternatives for expanding permissible areas for assembly uses.

19   26.    The first alternative was to make assembly uses a conditionally permitted use

20   in all areas zoned IL. This alternative would have allowed about 94 acres of additional

21   property available for assembly uses in the City, although some of this property included

22   railroad rights-of-way.

23   27.    The second alternative was to create an overlay zoning designation that

24   could be applied to properties that were potentially suitable for assembly uses in any non-

25   residential zone.

26   28.    To develop the second alternative, staff identified a number of initial site

27   selection criteria based on General Plan policies and relevant planning considerations.

28   Among these criteria were that the sites (1) would not be located along major commercial

9

Declaration of Debbie Pollart in Support of Motion for Summary Judgment          [C07-03605-PJH]

663

1    corridors, in order to preserve the commercial character of these areas; (2) the overlay

2    would apply only to contiguous industrially zoned areas of 2 acres or more, in order to

3    allow for development of larger churches; and (3) the site would abut on or be within ¼

4    mile of a designated arterial street. The ¼ mile distance specification in this last criterion

5    was adopted on the basis of a recommendation of the Engineering & Transportation

6    Department. The application of these initial selection criteria resulted in identification of

7    some 13 potential new areas, totaling some 218 acres, for assembly uses in City industrial

8    zones.

9        29.    On October 12, 2006 the two alternatives developed by staff were presented

10    to the Business Development Sub-Committee of the City Council at its regular meeting of

11    that date. The Business Development Sub-Committee is a standing sub-committee of the

12    City Council intended to monitor matters affecting the economic development and welfare

13    of the City and to provide consultation and direction to staff on pending matters where

14    policy guidance is desirable. After the staff presentation and discussion, the members of

15    the Sub-Committee expressed a strong preference for the second alternative, *i.e.* the

16    overlay zoning approach, because it appeared to provide greater opportunities for

17    expansion of religious and other assembly uses in the City. A true and correct copy of the

18    staff report prepared for the Business Development Sub-Committee meeting is submitted

19    as Exhibit 11. A true and correct copy of the Minutes of the October 12, 2006 Business

20    Development Sub-Committee meeting is submitted as Exhibit 12.

21        30.    On October 19, 2006 the City Planning Commission and Board of Zoning

22    Adjustments conducted a joint work session to discuss three major planning issues being

23    addressed by the City, including the issue of assembly uses in industrial zones. At this

24    meeting City staff again presented the two planning alternatives developed by staff for

25    consideration, *i.e.* the options of (1) allowing assembly uses as conditionally permitted

26    uses in the IL (light industrial) zone; or (2) applying an overlay zoning to suitable

27    properties in all industrial zones. At the conclusion of the work session, the Board and

28    Commission members voted 7-1-1 to support pursuit of the second option, *i.e.* the overlay

10

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                    [C07-03605-PJH]

1    zoning approach. The comments of the Commissioners and Board members indicated that

2    the second alternative was preferred because it would allow for greater expansion of

3    religious and non-religious assembly uses in the City while also being consistent with

4    other established goals and policies in the General Plan. A true and correct copy of the

5    staff report prepared for the October 19, 2006 joint workshop is submitted as Exhibit 13 to

6    this declaration. A true and correct copy of the Minutes of the joint workshop is submitted

7    as Exhibit 14 to this declaration.

8         31.    After the October 19, 2006 joint workshop, staff continued to refine the

9    criteria for selection of properties for inclusion in the assembly use overlay zone, and

10   began drafting proposed text for the actual Zoning Code amendments that would create the

11   Assembly Use Overlay zoning classification and regulations. The eight (8) criteria used to

12   finally select industrial zoned properties for inclusion in the proposed Assembly Use

13   Overlay zone were the following:

14   •    The site was not located along a major commercial corridor.

15   •    The site was not located in the Downtown, Bayfair, Marina

16        Boulevard/SOMAR or West San Leandro General Plan special "Focus

17        Areas."

18   •    The site was not located in a regional-serving retail area.

19   •    The site was not located inside the Downtown Transit-Oriented

20        Development Strategy ("TOD") study area.

21   •    The site abuts or was within ¼ mile of an arterial street.

22   •    The site was not located in a residential zone. (Churches are already

23        permitted with a CUP in all City residential zones.)

24   •    The site was not public land or zoned Public Service ("PS"), Open Space

25        ("OS") or Commercial Recreation ("CR"), or owned by an Exempt Public

26        Agency or public utility.

27   •    The site was within a contiguous overlay area of 2 or more acres.

28   ///

11

1    32.    The eight selection criteria were all based on General Plan policies and goals

2    discussed previously in this declaration.

3    33.    The foregoing criteria resulted in selection of 196 individual properties in 13

4    contiguous areas for inclusion in the Assembly Use Overlay zone.

5    34.    On February 22, 2007 the City's Planning Commission conducted a public

6    hearing on the proposed Assembly Use Overlay zoning amendments. After receiving

7    public testimony, including extensive testimony from representatives and supporters of the

8    Church, the Planning Commission voted to recommend approval of the Assembly Use

9    Overlay zoning amendments to the City Council. A true and correct copy of a Staff Report

10    for a regular meeting of the Planning Commission on February 22, 2007 is submitted as

11    Exhibit 15 to this declaration. A true and correct copy of the Minutes from the February

12    22, 2007 Planning Commission meeting is submitted as Exhibit 16 to this declaration.

13    35.    On March 19, 2007 the City Council conducted its public hearing on the

14    proposed Assembly Use Overlay zoning amendments. After hearing public testimony,

15    which again included extensive testimony from representatives and supporters of the

16    Church, the City Council voted unanimously (7-0) to adopt Ordinance Nos. 2007-005 and

17    2007-006 which, respectively, amended the text of the Zoning Code to add the Assembly

18    Use Overlay zoning designation and standards, and amend the zoning map to apply the

19    Assembly Use Overlay zoning designation to 196 parcels in City industrial zones. A true

20    and correct copy of a Staff Report for the City Council meeting of March 19, 2007 is

21    submitted as Exhibit 17 to this declaration. A true and correct copy of the Minutes of the

22    March 19, 2007 City Council meeting is submitted as Exhibit 18 to this declaration.  True

23    and correct copies of Ordinance No. 2007-005 and Ordinance No. 2007-006 are submitted

24    as Exhibits 19 and 20 to this declaration.

25    <u>THE CHURCH'S SUBSEQUENT REZONING APPLICATIONS</u>

26    36.    Based on the eight selection criteria that had been utilized to select properties

27    for inclusion in the Assembly Use Overlay zone, the Catalina Street property purchased by

28    the Church had not been included in the Assembly Use Overlay zone. Representatives of

12

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                              [C07-03605-PJH]

1   the Church were aware of this as the proposed Assembly Use Overlay zoning amendments

2   went through the public hearing process, and had communicated their requests to have the

3   Catalina Street property included in the overlay zone, or to be otherwise allowed to

4   develop a church on the property, to City staff, to the Planning Commission and to City

5   Councilmembers both at public hearings and through other communications. City staff

6   consistently advised Church representatives that the staff recommendation concerning the

7   properties to be included in the Assembly Use Overlay zone would be based strictly on the

8   objective planning criteria developed from the General Plan, and would not be changed on

9   a case-by-case basis for individual properties that did not meet all the criteria. Staff also

10  advised Church representatives, however, that the final decision as to which properties

11  were included in the Assembly Use Overlay zone would be made by the City Council, and

12  that they had the right to apply for an amendment to the zoning map to include their

13  property in the Assembly Use Overlay zone if they chose to do so. However, neither I nor

14  any other member of the City staff to my knowledge advised Church representatives that

15  staff would support the amendment, or that the amendment was likely to be approved by

16  the Planning Commission or City Council.

17      37.     On March 20, 2007, the day following the City Council hearing on the

18  Assembly Use Overlay zoning amendments, representatives of the Church filed an

19  application to amend the zoning of their Catalina Street property from IP to IP with the AU

20  (Assembly Use) Overlay. A true and correct copy of this application is submitted as

21  Exhibit 26 to this declaration.

22      38.     On April 12, 2007 the Planning Commission conducted a public hearing on

23  the rezoning application. Following the close of the public hearing, the Planning

24  Commission voted to deny the application for rezoning. A true and correct copy of a Staff

25  Report for the Planning Commission of April 12, 2007 is submitted as Exhibit 21 to this

26  declaration. A true and correct copy of the Minutes of the April 12, 2007 Planning

27  Commission meeting is submitted as Exhibit 22 to this declaration.

28  ///

---

13

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                    [C07-03605-PJH]

1    39.    The Church appealed the Planning Commission decision to the City Council

2  on April 16, 2007.

3    40.    On May 7, 2007 the City Council conducted a public hearing on the appeal.

4  After hearing public testimony from the Church's representatives and supporters, the City

5  Council closed the public hearing and voted to deny the appeal. A true and correct copy of

6  a Staff Report for the City Council hearing of May 7, 2007 is submitted as Exhibit 23 to

7  this declaration. A true and correct copy of the Minutes of the March 7, 2007 City Council

8  meeting is submitted as Exhibit 24 to this declaration.

9    41.    The primary grounds for denial of the rezoning application was that the

10  Catalina Street property did not meet two of the eight criteria previously used in selecting

11  properties for inclusion in the Assembly Use Overlay zone. Specifically, the Catalina

12  Street property was located in a general plan "focus area" (the West San Leandro Business

13  District), and was located more than ¼ mile from a designated arterial street. Policy 7.09

14  of the City's General Plan, quoted in paragraph 22.d above, establishes a policy of

15  developing the West San Leandro industrial area as major industrial, technology, and

16  office employment center, and accordingly promoting additional development and

17  redevelopment of such uses while limiting encroachment of incompatible uses in the area.

18  Continued industrial development of this area is one of the key elements of the General

19  Plan strategy for maintaining a viable economic and employment base in the City. *See*

20  Exhibit 7, General Plan Land Use Element, pp. 111-121. It was the belief of City staff,

21  and apparently the Planning Commission and City Council, that preservation of this area

22  and the Catalina Street property in particular, for some form of industrial or service use

23  consistent with the goals of Policy 7.09 was important to the City's welfare and to

24  maintaining the integrity of the General Plan.

25    42.    The staff recommendation also reflected the fact that City staff did not

26  believe it was appropriate to abandon the objective criteria that had been used to determine

27  the extent of the Assembly Use Overlay zone in the immediately preceding Assembly Use

28  Overlay zoning amendment process. During the process of developing the Assembly Use

14

Declaration of Debbie Pollart in Support of Motion for Summary Judgment

[C07-03605-PJH]

1   Overlay zone, staff had considered alternate site selection approaches under which

2   properties might be included if they met fewer than all 8 of the selection criteria developed

3   from the General Plan. Staff had rejected this approach because it quickly led to arbitrary

4   and inconsistent results. Staff was not presented with any new information during the

5   Church's rezoning application process that suggested that the selection criteria relied on in

6   preparing the City-wide Assembly Use Overlay zoning amendments should be modified or

7   abandoned so soon after completion of that process.

8       43.    The staff report for the Planning Commission and City Council hearings on

9   the rezoning application also notes that staff recommended denial in part on the ground

10   that the Catalina Street property is located in proximity to a significant number of nearby

11   sites operating with Hazardous Materials Business Plans ("HMBPs"). HMBPs are

12   required by California law for any industrial, commercial, or other facility that uses, stores,

13   produces or generates quantities of hazardous materials exceeding certain minimum

14   threshold amounts. The amounts and types of hazardous materials actually present on any

15   property subject to a HMBP varies considerably, and may range, by way of example, from

16   possession of very small amounts of radioactive or biologically hazardous materials

17   through use and storage of significant amounts of industrial chemicals through storage of

18   large quantities of volatile petroleum products.

19       44.    Staff had not previously considered potential site-specific conflicts between

20   assembly uses and hazardous material handlers during the process of preparing the City-

21   wide Assembly Use Overlay zoning amendments because the analysis conducted for the

22   City-wide amendments was directed at City-wide planning and policy concerns.

23   Accordingly, the criteria used in selecting areas for the Assembly Use Overlay zone were

24   based on more generally applicable planning principles rather than site-by-site analysis.

25   Consideration of site-specific factors is generally done at the time application is made for

26   specific use of a particular parcel, *i.e.* at the time a CUP application is filed. Site-specific

27   factors are also typically considered when, as in this case, a rezoning or a general plan

28   amendment application is made for a particular use of a particular parcel. In this particular

15

1   case, it was understood that if the rezoning was granted, the Church would continue to

2   process and invest further money in an application for a CUP for the Church.  It was

3   therefore staff's conclusion that it was appropriate to consider the number of nearby

4   properties operating with HMBPs at the time of the rezoning decision.  Information

5   gathered for the staff reports indicated that there were eight (8) businesses with HMBPs

6   within 500 feet of the Catalina Street property, and thirteen (13) businesses with HMBPs

7   within ¼ mile of the property.  The primary basis for the staff recommendation for denial

8   of the rezoning application, however, was inconsistency with two of the planning criteria

9   applied to all other sites in the Assembly Use Overlay zone.

10        45.    Based on discussion at the May 7, 2007 City Council hearing on the rezoning

11  application, it does not appear that the presence of nearby facilities operating under

12  hazardous materials plans was considered by the City Council to be a ground for denial of

13  the rezoning application.

14        46.    Neither the City Council, Planning Commission nor City planning staff has

15  adopted any policy or regulation preventing location of Assembly Uses within ¼ mile (or

16  any other specific radius) of one or any other number of sites operating with HMBPs.

17  Generally as a matter of public responsibility City planners and decisionmakers will

18  consider any potential public health or safety issue that comes up in connection with any

19  development proposal, and certainly would do so with respect to assembly uses where

20  there is a high potential for large numbers of untrained individuals of all ages to be

21  exposed in the event of a release of hazardous materials.  Whether the nearby presence of

22  hazardous materials affects the final decision requires consideration of a number of highly

23  site-specific factors, including the types, locations, volatility and quantities of nearby

24  hazardous materials; the potential for actual release of hazardous materials; the numbers,

25  ages and health status of persons potentially exposed; adequacy of access and egress in the

26  event of a release of materials; type and quality of construction of the assembly building;

27  factors affecting dispersal patterns such as the presence or absence of natural or man made

28  barriers and prevailing wind patterns; and any other site-specific factor that could affect

---

16

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                    [C07-03605-PJH]

1    the degree of exposure in the event of a release of hazardous materials. The decision

2    would also likely take into account the feasibility of reducing exposure through project-

3    specific mitigation measures, *e.g.* alarm systems, emergency evacuation plans, training of

4    permanent staff, or enhanced construction standards or buffer zones to reduce potential

5    exposure. The degree to which these considerations would affect any future decision to

6    approve a new Assembly Use in any area thus depends on a variety of complex factual

7    issues that cannot be assessed in the abstract, as well as the discretion of the City's elected

8    and appointed decisionmakers, *i.e.* the Planning Commission and the City Council.

9                           THE CHURCH'S CUP APPLICATION

10           47.    On or about March 28, 2007, shortly after the Church submitted its

11   application for rezoning of the Catalina Street property into the Assembly Use Overlay

12   zone, representatives of the Church submitted an application for a CUP for their proposed

13   assembly use of the Catalina Street property. After an initial review, I determined that the

14   CUP application was incomplete and could not be processed. On April 25, 2007, I notified

15   Church representatives that their application was incomplete by a letter addressed to Jim

16   Lee, the designated representative of the Church. The letter also listed the specific

17   additional information that would be necessary to make the application complete. A true

18   and correct copy of my letter to Jim Lee, on behalf of the Church, is attached hereto as

19   Exhibit 27.

20           48.    I did not receive any response to the incomplete letter during my remaining

21   tenure as Planning Manager for the City. I understand that a complete application was

22   eventually submitted and processed by the City at the Church's request even though the

23   rezoning to allow Assembly Uses on the Catalina Street property with a CUP had been

24   denied. The CUP application was eventually denied by the City Planning Commission and

25   City Council on appeal due to inconsistency with the zoning and additional factors such as

26   inadequate parking space.

27   ///

28   ///

---

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                [C07-03605-PJH]

1    I declare under penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct. Executed on this _26_ day of August 2008 in San Leandro,

3  California.

4

5                                                        Debbie Pollart

6    1133707.2
     136.5016

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Debbie Pollart in Support of Motion for Summary Judgment          [C07-03605-PJH]