**EXHIBIT 40**

1   Kevin T. Snider, State Bar No. 170988
    *Counsel of record*
2   Matthew B. McReynolds, State Bar No. 234797
    PACIFIC JUSTICE INSTITUTE
3   P.O. Box 276600
    Sacramento, CA 95827
4   Tel. (916) 857-6900
    Fax (916) 857-6902
5   Email: kevinsnider@pacificjustice.org
6          mattmcreynolds@pacificjustice.org

7   Peter MacDonald, State Bar No. 69789
    LAW OFFICE OF PETER MACDONALD
8   400 Main Street, Suite 210
    Pleasanton, CA 94566-7371
9   Tel. (925) 462-0191
10  Fax. (925) 462-0404
    Email: pmacdonald@macdonaldlaw.net
11

12  Attorneys for Plaintiff and Real Party in Interest

13
                **IN THE UNITED STATES DISTRICT COURT**
14              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15

16  INTERNATIONAL CHURCH OF THE      ) Case No.: CO7-03605-PJH-JCS
    FOURSQUARE GOSPEL,               )
17                                   ) **DECLARATION OF SENIOR PASTOR**
                                     ) **GARY MORTARA IN SUPPORT OF**
    Plaintiff,                       ) **MOTION FOR SUMMARY JUDGMENT**
18                                   )
19  v.                               )
                                     )
20  CITY OF SAN LEANDRO,             )
                                     )
21  Defendants.                      )
    FAITH FELLOWSHIP FOURSQUARE      ) Date:  October 1, 2008
22  CHURCH,                          ) Time:  9:00 a.m.
                                     ) Courtroom:  3
23  Real Party in Interest.          ) Hon.:  Phyllis J. Hamilton

24

25      I, Gary Mortara, do hereby declare as follows:

26      1.      That if called upon, I could and would testify truthfully, as to my own personal

27  knowledge, as follows:

28  _____

                    DECLARATION OF GARY MORTARA

                                -1-

                            EXHIBIT 40

2.    I am the Senior Pastor of Faith Fellowship Foursquare Church (CHURCH), located at 577 Manor Boulevard, San Leandro, California 94579 (MANOR PROPERTY).

### History of the CHURCH

3.    The CHURCH was originally founded in 1947. My wife and I took over the pastorate of this CHURCH in September 1993. At that time there were only 65 people attending and we were meeting in the first new church site that had been built in the City of San Leandro (CITY) in 25 years.  The CHURCH has grown rapidly since 1993. After a year or so in a sanctuary that only seated 200 people, we had grown enough to add a second service. Soon after, we expanded to three and then four Sunday services.  We expanded our sanctuary size by adding 80 more seats and still needed to hold four Sunday services to accommodate worshippers. Then we purchased the property next door and built a brand new sanctuary with 650-700 seats.  This project was completed in April 2003.

### Catalina Property

5.    Near the close of 2005, just two and a half years later, we were already at three Sunday services to accommodate the crowds which grew to over 1,500.  We began looking around San Leandro for a possible new location.  People started to turn away from Faith Fellowship due to the lack of parking and massive traffic problems we were causing in our residential neighborhood.  The reason we originally located in a residential area was that the CITY only allowed churches in residential areas as of right.  There were no plans for church growth or allowances for areas that could accommodate a large church gathering.  After months of searching throughout the community, we found a building which had been on the market for over seven months and further investigated the purchase of this property.

6.    In February, 2006, the CHURCH found ideal property on 14600 and 14850 Catalina Street (hereinafter "CATALINA PROPERTY").

7.    On May 11, 2006, following the direction of CITY officials (Decl. of Debbie Pollart filed by the CITY, Court Document 50, pg. 1, at ¶ 4), the CHURCH filed a Planning Permit Application for a Zoning Map Amendment on the CATALINA PROPERTY from Industrial Park to Industrial Limited to allow a subsequent application for a Conditional Use Permit for an assembly use.  (Exhibit A of the Decl. of Debbie Pollart filed by the CITY, Court Document 50-2, at pg. 1).

8.    On December 29, 2006, the CHURCH, believing that the CITY would approve its application for a Zoning Map Amendment, closed escrow on the CATALINA PROPERTY.

9.    Instead of processing the application, the CITY set out to create an assembly overlay.  (Decl. of Debbie Pollart filed by the CITY, Court Document 50, pp. 2-3 at ¶¶ 6-9).  The CHURCH requested to be included in the Assembly Use Overlay District.

10.    On February 22, 2007, the Planning Commission recommended approval of the proposed Assembly Use Overlay District and Map amendments, which did not include the CATALINA PROPERTY.  (Exhibit G of the Decl. of Debbie Pollart filed by the CITY, Court Document 50-8, pp. 5-9).

11.    On March 19, 2007, the City Council approved the Assembly Use Overlay District and Map Amendments effective on May 1, 2007, creating an Assembly Use Overlay, consisting of 196 properties, but not the CATALINA PROPERTY.  (Exhibit A §k(3) filed by ICFG, Court Document 31-3, pg. 3.)

12.    The CITY's staff report stated that the CATALINA site failed to meet two of eight criteria that the CITY put in place for the Assembly Use Overlay.  (Exhibit A §n(2) filed by ICFG, Court Document 34-2, pg. 5).

706

13.   An additional criterion of public health and safety, which the Planning Commission did not apply to the 196 properties approved for assembly use two months earlier was also given as a reason for the denial of inclusion of the CATALINA PROPERTY. It said the presence, and the potential future presence, of hazardous materials and activities in the vicinity of the CHURCH's site and the intended assembly use, rendered it inappropriate for rezoning with the Assembly Use Overlay. This was allegedly based on findings that there are eight (8) businesses operating under a Hazardous Materials Business Plan within 500 feet of the CHURCH's site, and an additional 13 businesses between 500 feet and one-quarter mile of the site. (*Id.*, pp. 5-6).

14.   The Planning Commission denied the application of the CHURCH on April 12, 2007. (Exhibit A §n(2) filed by ICFG, Court Document 34-5, pg. 21).

15.   The City Council denied the CHURCH's appeal on May 7, 2007. (Exhibit A §o(4) filed by ICFG, Court Document 35-11, pp. 12-13).

16.   The CHURCH also submitted an application for a conditional use permit (CUP) on March 27, 2007, under the existing zoning based on the fact that an assembly use is allowed if it is "entertainment." (Exhibit H of the Decl. of Debbie Pollart filed by the CITY, Court Document 50-9, pg. 1). The application was initially deemed incomplete by the CITY. (Exhibit I of the Decl. of Debbie Pollart filed by the CITY, Court Document 50-10, pg. 2-3). After the CHURCH submitted all required information, the CITY denied the CUP application on February 19 2008. (Exhibit 1 attached to this declaration is a true and correct copy of the CITY's minutes of Feb. 19, 2008).

17.   The Defendants' denial of the CHURCH's use of the CATALINA PROPERTY for religious assembly has caused, and continues to cause, economic damages to the CHURCH. Since January 2, 2007, when it completed the purchase, the CHURCH has made monthly mortgage payments of $33,809.88 each, over $1,100 a day, without being able to use its property.

18.   The CHURCH has grown to approximately 1,700 people in attendance on any given Sunday. Indeed, the CHURCH has grown such that it has reached the full capacity of the MANOR PROPERTY. Until this last year, the CHURCH has experienced significant annual growth. That growth has stopped this last year since the capacity of the MANOR PROPERTY has been exhausted.

19.   In an attempt to mitigate the growth and stay true to our religious convictions (discussed below) we sent out five of our pastors and some of our congregation to other areas. In 2001 we sent Pastor Brian Goodell to San Mateo along with 75 of our congregation; in 2002 the CHURCH sent Pastor Anthony Clifton to Oakland with 25 of parishioners from Faith Fellowship; in 2005 Pastor Benjamin Robinson was sent to Emeryville with 45 people from the CHURCH; again in 2005 Faith Fellowship sent Pastor Victor Cervantez to Hayward with 40 from the congregation; and, in 2007 Pastor David Silvey was sent to Mountain House with 25 people from the CHURCH.

20.   Despite this, many people have been, and continue to be, turned away due to lack of space and parking. Our classrooms for children are overcrowded and parents feel this isn't safe and end up leaving, telling us they will return when we have more room.

**Essential Tenets of Faith and Theology**

21.   I am a member of the clergy in the International Church of the Foursquare Gospel (ICFG) in which I was licensed as a minister in 1989 and ordained in 1997. My biblical and theological training has been at Life Bible College and Patten University. Moreover, I serve as the Divisional Supervisor over six other churches in my denomination, ICFG. As such, I am qualified to provide testimony as to the tenets of faith and theology for ICFG, described below.

22.   ICFG is episcopal in polity. This form of polity is also referred to as a hierarchical form of church governance. The CHURCH is a member of ICFG.

DECLARATION OF GARY MORTARA

-5-

23.    The core beliefs and values of ICFG and, by extension, the CHURCH, include: (1) local and global evangelism to lead people to faith in Christ; (2) discipleship to instruct believers in life and service; (3) works of compassion, justice, and human aid; and, (4) joyous corporate worship of God.

24.    "Evangelism" is the proclamation of the Christian Gospel, i.e., (1) God exists; (2) God desires a relationship with people; (3) because of sin, people are separated from God; (4) God sent his son, Jesus, to the earth as a man to demonstrate God's love and to pay the debt, accrued by human sin, through his own death; (5) Jesus authenticated the truth of his claims by rising from the dead; and, (6) those who believe that Jesus is God's son and was raised from the dead will be saved from their sin and thus restored to relationship with God. Communicating the Gospel and making as many converts to the Christian faith as possible is the primary goal of ICFG and the CHURCH.

### Impact of the Denial of the use of the Catalina Building

25.    The denial of the use of the CATALINA PROPERTY for religious assembly has an enormous impact on our CHURCH's ability to exercise our religious beliefs relative to evangelism. Every Sunday dozens of cars are turned away from the CHURCH at the MANOR property because there is no place for them. Moreover, the MANOR PROPERTY has an insufficient number of rooms to accommodate the various meetings and activities on Sundays. Sunday worship services, Sunday school and other activities have portions of those gatherings calculated to articulate the Gospel to those who are not Christians. Practically every Sunday there are people who accept the Christian faith. As such, through the years hundreds of people have been converted. Due to the denial of the use of the CATALINA PROPERTY, the CHURCH has lost, and continues to loose, opportunities to present the Gospel to numerous people each Sunday. This has substantially burdened our religious exercise.

DECLARATION OF GARY MORTARA

-6-

26.    In like manner, the Sunday activities also have portions of them set aside for the discipleship of believers. In that many cars are turned away each Sunday at the MANOR PROPERTY, the CHURCH is unable to deliver the discipleship services that our faith requires. Due to the denial of the use of the CATALINA PROPERTY, the CHURCH has lost, and continues to loose, opportunities to disciple numerous believers each Sunday. This has substantially burdened our religious exercise.

27.    The lack of space also hinders us from meeting the social needs of the community which we are known for. We provide free marriage and family biblical instruction. We have Celebrate Recovery, a drug and alcohol program. Our Youth ministry helps teens get out of gangs and off drugs and back in school. The CHURCH assists people in getting through the difficulty of divorce and we often help individuals find jobs. Moreover, the CHURCH's ability to provide meals to 200-300 of the needy on Wednesdays is severely curtailed because the MANOR kitchen is smaller than an average home kitchen.   The CATALINA PROPERTY would enable the CHURCH to fulfill these missions and goals. However, due to the denial of the use of the CATALINA PROPERTY, the CHURCH has lost, and continues to loose, opportunities to engage in works of compassion, justice, and human aid. This has substantially burdened our religious exercise.

28.    Those turned away each Sunday, due to the denial of the use of the CATALINA PROPERTY, results, in a profound theological sense, in the infliction of suffering in this local expression of the body of Christ. The absence of dozens of worshippers every Sunday is a substantial burden on the religious practices of gathering together as one body for worship, fellowship and ministry.

29.    In sum, the move to our new building, which is already built, would enable us to

1  practice our religious beliefs and accomplish the mission we have been called to do.

2  I declare, under penalty of perjury under the laws of the State of California and the United

3  States of America, that the foregoing is true and correct and is of my own personal knowledge,

4  and indicate such below by my signature executed on this 25th day of August, 2008, in the County

5  of Alameda, City of San Leandro.

6

7

8

9  /S/ Gary Mortara
   Gary Mortara, Declarant

10

11

12

13

14

15

16  **Attorney Attestation re Signature**

17

18  I hereby attest that I have on file all holograph signatures for any signatures indicated by a

19  "conformed" signature (/S/) within this efiled document.

20

21  /S/ Kevin Snider
22  Kevin T. Snider
    Matthew B. McReynolds
23  Peter D. MacDonald
    Attorneys for Plaintiff and
24  Real Party in Interest

25

26

27

28

DECLARATION OF GARY MORTARA

711

INTERNATIONAL CHURCH
FOURSQUARE GOSPEL,

Plaintiff,

v.

CITY OF SAN LEANDRO, et. al.

Defendants.

FAITH FELLOWSHIP FOURSQUARE
CHURCH,

Real Party in Interest.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: CO7-03605-PJH-JCS

**EXHIBIT 1 OF DECLARATION OF
GARY MORTARA IN SUPPORT OF
MOTION FOR SUMMARY
JUDGMENT**


Date:   October 1, 2008
Time:  9:00 a.m.
Courtroom:  3
Hon.:  Phyllis J. Hamilton

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 0

712

MINUTES

## CITY OF SAN LEANDRO CITY COUNCIL AND
## SAN LEANDRO REDEVELOPMENT AGENCY
## JOINT MEETING

### FEBRUARY 19, 2008

Civic Center
835 East 14th Street
San Leandro, California

| CLOSED SESSION | 6:15 PM—City Manager's Office, Large Conference Room |
| --- | --- |

1.  **CALL TO ORDER**

    A.  Roll Call

        PRESENT:    Members Grant, Gregory, Prola, Souza, Starosciak, Stephens;
                    Mayor Santos

        ABSENT:     None

2.  **PUBLIC COMMENTS**

    Public Comments are limited to 3 minutes per speaker, subject to adjustment by the Mayor.
    When you address the City Council, you should fill out a speaker card and submit it to the
    City Clerk so the order of speakers may be determined and an official record of names and
    addresses obtained. The public is invited to make comments on Closed Session Items only at
    this time.

3.  **CLOSED SESSION—CITY COUNCIL ONLY**

    The City Council will adjourn to Closed Session regarding:

    A.  Conference with Legal Counsel—Existing Litigation Pursuant to California
        Government Code Section 54956.9(a):

        1.  International Church of the Foursquare Gospel v. City of San Leandro (United
            States District Court, Northern District, Case No. C07-03605 PJH)

4.  **ADJOURN**

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 1

713

| REGULAR MEETING | 7:00 PM—City Council Chambers |
|---|---|

1.  **CALL TO ORDER**

    The meeting was called to order at 7:00 p.m.

    A.  **Pledge of Allegiance to the Flag**

        Councilmember Bill Stephens led the Pledge of Allegiance to the Flag.

    B.  **Roll Call**

        PRESENT:    Members Grant, Gregory, Prola, Souza, Starosciak, Stephens;
                    Mayor Santos

        ABSENT:     None

        Mayor Santos stated that he donated $500 from his Community Empowerment Funds to
        the San Leandro Scholarship Foundation.

2.  **PRESENTATIONS/RECOGNITIONS**

    None.

3.  **PUBLIC HEARINGS—CITY COUNCIL**

    Public Hearing Comments are limited to 5 minutes per speaker, subject to adjustment by the
    Mayor. When you address the City Council, you should fill out a speaker card and submit it
    to the City Clerk so the order of speakers may be determined and an official record of names
    and addresses obtained.

    A.  Matter of Appeal by International Church Foursquare Gospel (Property Owner and
        Applicant) of the Board of Zoning Adjustments' Denial of PLN2007-00013;
        Conditional Use Permit to Establish a Ministry and Associated Activities in the IP
        Industrial Park District; 14600 and 14850 Catalina Street; Assessor's Parcel Numbers
        80G-933-20, 80G-933-21 and 80G-933-22-1; Faith Fellowship Worship Center, a.k.a.
        International Church Foursquare Gospel (Applicant and Property Owner).

        This being the time and place for the Public Hearing on the above matter, City Manager
        Jermanis provided background on the item, and introduced Planning Manager Kathleen
        Livermore. Ms. Livermore gave a short presentation, providing information on the
        December 6, 2007, denial by the Board of Zoning Adjustments (BZA) of the application
        for Conditional Use Permit by Faith Fellowship Worship Center to establish a ministry

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 2

714

and associated activities at 14600 and 14850 Catalina Street; the applicant's appeal to the City Council of the BZA decision; and staff's recommendation to uphold the BZA decision and make findings for denial of the appeal and application. Ms. Livermore reported that the proposed use meets the definition of "assembly use" under the San Leandro Zoning Code, which is not a permitted or conditionally permitted use in the IP District. Ms. Livermore gave an overview of the matter and the events leading up to tonight's hearing. She noted that since it could find no basis for approval, staff has cited an exemption to the environmental review process. Ms. Livermore also noted that the term "assembly use" in the Uniform Building Code has a different definition and application than it does in the Zoning Code.

Ms. Livermore pointed out that some material that was handed out at the BZA hearing was inadvertently omitted from the City Council agenda packet. Since the Council and the Applicant received the material just this evening, Ms. Livermore suggested allowing additional time for the Applicant's presentation.

Pastor Gary Mortara, representing the Applicant, addressed the City Council, apologizing to the Council for the consternation and problems of the past, and expressing an interest in working with the City to find a future home for the church. Pastor Mortara commended the BZA, commenting that the Board was very gracious and sympathetic to Faith Fellowship's position and plight, but felt powerless to take a different action. He asked for advice on how Faith Fellowship can work together with the City to serve the community and to find an acceptable site for a future church.

City Attorney Jayne Williams stated that the matter before the City Council is the appeal of the Conditional Use Permit, and the Council can direct its comments to that matter. Ms. Williams noted that discussions between the City and representatives of Faith Fellowship will continue.

The Hearing was then opened to the public.

There being no comments from the public, and without objection, the Public Hearing was closed.

Councilmember Prola stated that he is glad to hear that Faith Fellowship is willing to work with City to find a new location in San Leandro. He commented that he recognizes Faith Fellowship's good work in the community, and hoped that something could be worked out.

Mayor Santos concurred with Councilmember Prola's comments.

Vice Mayor Grant thanked Pastor Mortara for his comments and apology. She agreed with Councilmember Prola's comments, and stated that she hoped an appropriate site could be found for the church.

Councilmember Gregory concurred with his Council colleagues, and stated that he felt the City and Faith Fellowship have a future. He remarked that there is no question how

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 3

715

much Faith Fellowship brings to the community, and he wished everyone luck as the matter moves forward.

- Minute Order No. 2008-006, Motion Denying the Appeal by International Church Foursquare Gospel (Applicant and Property Owner), and Upholding the Decision of the Board of Zoning Adjustments' Denial of PLN2007-00013; Conditional Use Permit to Establish a Ministry and Associated Activities, Defined by the Zoning Code as an Assembly Use. The proposed facility is not a permitted or conditionally permitted use in the IP Industrial Park District; 14600 and 14850 Catalina Street; Assessor's Parcel Numbers 80G-933-20, 80G-933-21 and 80G-933-22-1; Faith Fellowship Worship Center, a.k.a. International Church Foursquare Gospel (Applicant and Property Owner).                     (1098)

The City Council denied the appeal by International Church Foursquare Gospel (Applicant and Property Owner), and upheld the decision of the Board of Zoning Adjustments' denial of PLN2007-00013; Conditional Use Permit to establish a ministry and associated activities, defined by the Zoning Code as an Assembly Use. The proposed facility is not a permitted or conditionally permitted use in the IP Industrial Park District; 14600 and 14850 Catalina Street; Assessor's Parcel Numbers 80G-933-20, 80G-933-21 and 80G-933-22-1; Faith Fellowship Worship Center, a.k.a. International Church Foursquare Gospel (Applicant and Property Owner).

M/S/C Prola and Souza.  Ayes: 7; Noes: 0

4. PUBLIC HEARINGS—JOINT CITY COUNCIL/ REDEVELOPMENT AGENCY

None.

5. PUBLIC COMMENTS

Public Comments are limited to 3 minutes per speaker, subject to adjustment by the Mayor. When you address the City Council, you should fill out a speaker card and submit it to the City Clerk so the order of speakers may be determined and an official record of names and addresses obtained. The public is invited to make comments on items of public interest NOT listed on the Agenda.

None.

6. CITY MANAGER AND CITY ATTORNEY REPORTS AND COMMENTS

None.

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 4

716

7.  AMENDMENT OF CONSENT CALENDAR

City Councilmembers or staff have an opportunity at this time to request that an item be
removed from the Consent Calendar for the presentation of a staff report or other special
consideration.  Members of the Public may request the opportunity to address the City
Council regarding items remaining on the Consent Calendar by filling out a speaker card and
submitting it to the City Clerk prior to the calling of Item 7, Amendment of Consent
Calendar.  Items remaining on the Consent Calendar will be considered for approval under
one motion.

Consent Calendar was amended to remove Items 8.B. and 8.G.  Items will be considered
under Item 9, Items Removed from Consent Calendar.

8.  CONSENT CALENDAR

Consent Calendar items are considered for approval by the City Council with one single
action.  As described above in Item 7, Amendment of Consent Calendar, the City Council
may remove items from the Consent Calendar for purposes of presentation or discussion.
Members of the public who have requested to address the Council regarding items remaining
on the Consent Calendar may do so for up to 3 minutes per item with a maximum of 5
minutes for all items.  Items listed on the Consent Calendar are deemed to have been read by
title.

Items 8.B. and 8.G. were removed from the Consent Calendar to Item 9, Items Removed
from Consent Calendar.  The remaining items on the Consent Calendar were approved
by the following vote:

M/S/C Stephens and Prola.  Ayes: 7; Noes: 0

A.  Minutes of the Meeting of February 4, 2008.  Approved as submitted.

B.  Resolution Approving and Confirming the Accounting Report for Development Fees
for Street Improvements (DFSI) and Park Development Fees (accepts the annual
accounting report for Fiscal Year 2006-07, pursuant to California Government Code
Section 66006).  (Moved to Item 9, Items Removed from Consent Calendar)  (2575)

C.  Resolution No. 2008-015, Resolution Designating Placement of Stop Signs,
Intersections, Title VI, Chapter 1 of the San Leandro Municipal Code (Preda Street at
Lucille Street) (authorizes the installation of stop signs on eastbound and westbound
Preda Street at Lucille Street).  Funding: Gas Tax Fund.                            (2942)

D.  Resolution No. 2008-016, Resolution Approving Parcel Map 9527 for 2601, 2603 and
2605 Walnut Drive, San Leandro, Assessor's Parcel No. 079A-0565-025; Owner and
Subdivider: Phat Vo (provides for the conversion of the existing single-story single-
family home and existing two-story two-family dwelling into condominiums for sale as
three individual units).                                                            (3130)

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 5

717

E.  **Resolution No. 2008-017**, Resolution Approving a Contractual Services Agreement with Wiss, Janney, Elstner Associates, Inc. Relating to the Water Pollution Control Plant (WPCP) Rehabilitation Project, Project No. 07-593-52-239 (provides for concrete forensic analysis of various structures at WPCP). Cost: $36,950. Funding: WPCP Enterprise Fund.                                                                                    (2323)

F.  **Resolution No. 2008-018**, Resolution Approving a Contractual Services Agreement with Freyer and Laureta, Inc., Relating to the Sanitary Sewer Pipeline Replacement Project 2007-08, Project No. 07-593-52-211 (provides for design services for the subject project). Cost: $44,820. Funding: Water Pollution Control Plant (WPCP) Enterprise Fund.                                                                                    (2323)

G.  Resolution of the Redevelopment Agency of the City of San Leandro Authorizing the Executive Director to Execute a $50,000 Consulting Services Agreement Between the San Leandro Redevelopment Agency and Building Futures with Women and Children (BFWC) for Assistance with Development and Implementation of a Local Homeless Plan (provides for Project Open Doors to assist with developing and implementing the City's long-term homeless prevention plan and to address homelessness under the Alameda County EveryOne Home Plan). Funding: Redevelopment Agency Set-Aside Fund. (Moved to Item 9, Items Removed from Consent Calendar)       (2547/3103)

H.  **Resolution No. 2008-019**, Resolution Approving an Increase in Signature Limits for Consulting Services Agreements Requiring City Manager and City Council Approvals (authorizes the City Manager to approve CSAs up to $50,000 and requires City Council approval for CSAs over $50,000).                                                      (1368)

9.  **ITEMS REMOVED FROM CONSENT CALENDAR**

Public comments are limited to 3 minutes per speaker per item, subject to adjustment by the Mayor.

8.B.  **Resolution No. 2008-020**, Resolution Approving and Confirming the Accounting Report for Development Fees for Street Improvements (DFSI) and Park Development Fees (accepts the annual accounting report for Fiscal Year 2006-07, pursuant to California Government Code Section 66006).                                            (2575)

Councilmember Souza asked questions regarding the budget figures listed in the Accounting Reports for the DFSI and Park Development fees. Interim Finance Director Perry Carter responded to the Council's questions.

Councilmember Starosciak made a motion to approve the item, and requested that the feasibility for charging a development (impact) fee for public safety be referred to the City Council Finance Committee for consideration. Mayor Santos indicated that, rather than refer this matter to a Council Committee, he would like to appoint an ad hoc committee to look into this as well as other revenue enhancements.

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 6

M/S/C Starosciak and Prola. Ayes: 7; Noes: 0

8.G.  <u>Resolution No. 2008-005 RDA</u>, Resolution of the Redevelopment Agency of the City
of San Leandro Authorizing the Executive Director to Execute a $50,000 Consulting
Services Agreement Between the San Leandro Redevelopment Agency and Building
Futures with Women and Children (BFWC) for Assistance with Development and
Implementation of a Local Homeless Plan (provides for Project Open Doors to assist
with developing and implementing the City's long-term homeless prevention plan and
to address homelessness under the Alameda County EveryOne Home Plan).  Funding:
Redevelopment Agency Set-Aside Fund.                                         (2547/3103)

Councilmember Starosciak noted that the Scope of Services states that the contractor
will facilitate/co-facilitate "one to three community meetings."  She asked why the
agreement lists a range rather than a definite number of meetings, and she expressed
concern that one meeting may not be sufficient.  Housing/CDBG Manager Tom Liao
suggested that a specific number, or an "at least" number, could be listed instead.
Councilmember Starosciak stated that she would like to see a minimum of two meetings
held, and perhaps more.

Councilmember Starosciak made a motion to approve the resolution, with an
amendment to the agreement to change the "one to three community meetings" to "a
minimum of two community meetings."  The motion was seconded by Councilmember
Prola.

— Approved with amendment to agreement to change "one to three community
meetings" to "a minimum of two community meetings"

M/S/C Starosciak and Prola. Ayes: 7; Noes: 0

10.  **ACTION ITEMS**

Public comments are limited to 3 minutes per speaker per item, subject to adjustment by the
Mayor.

A.  Report on Closed Session Actions Taken

Ms. Williams stated that there were no reportable actions taken in this evening's closed
session.

11.  **CITY COUNCIL REPORTS**

A.  Reports on Intergovernmental Agencies

Councilmember Prola reported that, at the Alameda County Mosquito Abatement
District (ACMAD) Board meeting on February 13, the District discussed plans to hold

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 7

an election to increase its assessment. The increase would be the first since 1982. Councilmember Prola stated that a significant portion of the District's property tax revenue is being taken by State programs, and the District must replace this revenue in order to maintain its current service level. The election will conducted by mail, with ballots sent out beginning March 14, 2008. The proposed assessment is $5.00 per year for single family residential properties; $1.60 per dwelling unit for apartments up to 20 units, and $.50 for any units over 20; as well as an assessment for agricultural properties, dry pasture and timberlands.

Vice Mayor Grant reported that she attended the Alameda County Housing Authority meeting. At the meeting, a budget review revealed a significant revenue shortfall. Vice Mayor Grant reported that the Oakland Housing Authority will be taking over the management of a public housing project in the Ashland area, which until now has been managed by the Alameda County Housing Authority.

Mayor Santos reported on the East Bay Dischargers Authority (EBDA), stating that the Board continues its attempts to reform the agency, and will select a consultant to assist in the process. He reported that the EBDA General Manager is leaving on April 30. Mayor Santos indicated that there is no unanimity from the EBDA Board at this time regarding the issue of its treasurer.

Mayor Santos reported on the Board meeting of the East Bay Economic Development Alliance (East Bay EDA). He reported that the cities of Berkeley, Oakland and Richmond have entered into a green corridor agreement, leaving San Leandro and other local cities out of the process. British Petroleum (BP) has granted $500 million for the alternative energy and fuel study. Mayor Santos commented that he feels the City should entertain participation in the green corridor study. He commented favorably on the Green Collar Program undertaken by the Bronx in New York, on which a presentation was made at the U.S. Conference of Mayors. Mayor Santos reported that he attended a work session on foreclosures conducted by the East Bay EDA.

As alternate to the East Bay Regional Communications System (EBRCS) Authority, Mayor Santos reported that he attended a meeting last week, and he provided an update on the process for receiving federal funding for EBRCS. He stated that former Fire Chief Bill McCammon has been appointed as the EBRCS Executive Director. Mayor Santos also reported that Congressional representatives Ellen Tauscher and Barbara Lee have written to the City of Oakland, encouraging them to join the EBRCS.

Mayor Santos commented on the recently issued Alameda County Transportation Improvement Authority (ACTIA) report, which highlights several San Leandro programs and activities.

Councilmember Souza asked whether the East Bay Regional Park District (EBRPD) and the Port of Oakland have contributed toward the Slough Bridge project. Mr. Jermanis indicated that those agencies are looking to the City to take the lead on the project. If the City is unable to fully fund the project through grants, the EBRPD has agreed to fund half the remaining cost.

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 8

B.   Reports on Conferences and Seminars

None.

C.   Reports on City Council Committees

None.

12.   CITY COUNCIL COMMENTS

Councilmember Gregory reported that he attended the annual DECA (Delta Epsilon Chi) event at San Leandro High School on February 14, at which students presented their business plans to local business leaders. He stated that it was an eye-opening experience, and he encouraged the Council to attend a future event. Councilmember Gregory announced that Recreation and Human Services Director Carolyn Knudtson recently learned that the City was awarded a grant from Kaiser Permanente for the Shape Up San Leandro program, and he thanked Ms. Knudtson for her good work.

Vice Mayor Grant reported that she requested $500 from her Community Empowerment Funds be given to the African American Business Council for its Career Day, which will include San Leandro and Lincoln High Schools and will be held this Thursday, February 21. She described the event, and encouraged Councilmembers to attend if possible. Vice Mayor Grant recalled the issue raised by Councilmember Starosciak of the large, low-hanging Comcast cables. She stated that, since that time, she has begun to notice the huge and unsightly cables all around town. Vice Mayor Grant also commented that Comcast has decided to make the area in front of the PG&E easement its utility parking lot. She noted that, due to the curvature of the street, the trucks pose a visibility issue. Mr. Jermanis stated that staff will look into this issue.

Councilmember Souza commented on the notification process for street sweeping. She suggested that perhaps the notification can be published on the City's website, or in the CityNews newsletter, which residents can save for reference. Councilmember Souza congratulated the Shape Up San Leandro program for receiving the Kaiser grant.

Councilmember Starosciak pointed out that in the picture of the Lark Street crosswalk shown in the recent ACTIA report, the thick, heavy Comcast lines are prominent. Councilmember Starosciak commented that she would like to see a moratorium on the installation of cable lines until a better solution can be found. She stated that what Comcast is doing to the community and its quality of life with these cables is outrageous. Councilmember Starosciak stated that she would like to see the Council address this issue, and possibly request that Comcast underground the cables. Mr. Jermanis reported that Comcast will be coming to a future City Council Facilities and Transportation Committee to explain its upgrade program, and the Committee and staff will have an opportunity to address the cable issues.

Vice Mayor Grant asked whether the City could present alternatives to Comcast to the thick wires it is currently installing. Mr. Jermanis indicated that Engineering and Transportation

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 9

721

Director Uche Udemezue will be prepared to address the alternatives at the Facilities Committee meeting.

Councilmember Starosciak requested that tonight's meeting be adjourned in memory of Tony Sanzo, a Pearl Harbor survivor and active member of Mission Bay.  Councilmember Starosciak commented that she attended a recent meeting of the Washington Manor Homeowners Association, which was very well attended.  The Homeowners Association will cosponsor the celebration of the one year anniversary of the Washington Manor Branch Library.  Councilmember Starosciak commented that she met with the four District 4 Youth Advisory Commissioners, and they shared with her their conversation with the Recreation and Parks Commission about finding activities for teens and youth, such as indoor rock climbing or laser tag.  Councilmember Starosciak stated that she would like to see a Strategic Plan developed for the Police Department.

Councilmember Stephens expressed support for Councilmember Starosciak's proposal for requesting that Comcast underground its cables.

Councilmember Prola commented that he toured a safe house run by Building Futures with Women and Children, and is very impressed with the organization and its work. Councilmember Prola attended a celebration of the Lunar New Year at the Main Library on February 9.  He thanked Mr. Udemezue and Keith Cooke from the Engineering and Transportation Department for the stop signs at Lucille and Preda Streets that were approved tonight, noting that he has received several calls from residents in that neighborhood about the traffic problems.  Councilmember Prola requested that tonight's meeting be adjourned in memory of Gerald Sheehan, who was his neighbor for over 30 years.

Mayor Santos announced that he is forming an ad hoc committee comprised of Vice Mayor Grant and Councilmembers Starosciak and Gregory.  Mayor Santos stated that the ad hoc committee should address the following matters: the budget shortfall; funding for the construction of the Senior Center; a Public Safety building, and possibly a joint Police and Fire facility; street and pavement repairs; and additional police personnel.

Vice Mayor Grant asked whether an ad hoc committee is necessary, and if perhaps the Finance Committee could address these matters.  Mayor Santos indicated that some of the issues would be outside the purview of the Finance Committee.  He cautioned the ad hoc committee members not to share their discussions with the other members of the Council.

Mayor Santos stated that he would adjourn tonight's meeting in memory of Gerald Sheehan; Antonio Frank "Tony" Sanzo; the Kirkwood, Colorado, City Council members; and Army Specialist Michael Manibog, a San Leandro High School graduate who was killed in Iraq. Mr. Manibog's name will be added to the memorial at Veteran's Park.  Mayor Santos announced that the flags at City facilities will fly at half staff this week.

13.  **ADJOURN**

The meeting was adjourned at 8:10 p.m. and

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 10

**MINUTES**                                                                                                        Page 11
City of San Leandro City Council and San Leandro Redevelopment Agency Joint Meeting—February 19, 2008

- In memory of Gerald Sheehan.
- In memory of Antonio Frank "Tony" Sanzo.
- In memory of the Kirkwood, Colorado City Councilmembers.
- In memory of Michael Manibog.

RESPECTFULLY SUBMITTED:

*Marian Handa*

MARIAN HANDA
City Clerk of the City of San Leandro

Exhibit 1(Pltf)
Decl. of G. Mortara
Page 11

723

**EXHIBIT 41**

1   Kevin T. Snider, State Bar No. 170988
    *Counsel of record*
2   Matthew B. McReynolds, State Bar No. 234797
    PACIFIC JUSTICE INSTITUTE
3   P.O. Box 276600
    Sacramento, CA 95827
4   Tel.  (916) 857-6900
    Fax  (916) 857-6902
5   Email: kevinsnider@pacificjustice.org
6           mattmcreynolds@pacificjustice.org

7   Peter D. MacDonald, State Bar No. 69789
    LAW OFFICE OF PETER MACDONALD
8   400 Main Street, Suite 210
    Pleasanton, CA 94566-7371
9   Tel. (925) 462-0191
10  Fax. (925) 462-0404
    Email: pmacdonald@macdonaldlaw.net
11

12  Attorneys for Plaintiff and Real Party in Interest

13              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
14

15                                    )   Case No.: C07-03605 –PJH-JCS
                                      )
16  INTERNATIONAL CHURCH OF THE       )
    FOURSQUARE GOSPEL,                )
17                                    )   **PLAINTIFF AND REAL PARTY IN**
                                      )   **INTEREST'S NOTICE OF MOTION FOR**
18        Plaintiff,                  )   **SUMMARY JUDGMENT;**
                                      )   **PLAINTIFF AND REAL PARTY IN**
19  vs.                              )   **INTEREST'S MEMORANDUM OF POINTS**
                                      )   **AND AUTHORITIES IN SUPPORT OF**
20  CITY OF SAN LEANDRO, et al.,     )   **MOTION FOR SUMMARY JUDGMENT**
                                      )
21        Defendants.                 )   **(FRCP 56)**
                                      )
22                                    )
                                      )
23  FAITH FELLOWSHIP FOURSQUARE       )   **Date:**  October 1, 2008
    CHURCH,                           )   **Time:**  9:00 a.m.
24                                    )   **Ctrm:**  3
                                      )   **Hon.:**  Phyllis J. Hamilton
25        Real Party in Interest.     )
                                      )   First Amended Complaint Filed: Oct. 26, 2007
26  _____)

27              EXHIBIT 41
                                                        724
28  _____

    Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

## NOTICE OF MOTION

TO EACH PARTY AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 1, 2008, at 9:00 a.m., or as soon thereafter as this matter can be heard in Courtroom 3 of this Court, located at 450 Golden Gate Ave., San Francisco, CA, 94102, Plaintiff, International Church of the Foursquare Gospel and Real Party in Interest, Faith Fellowship Foursquare Church, by and through their counsel, move for an order granting summary judgment.

This motion, filed pursuant to Federal Rule of Civil Procedure 56, is based on this Notice of Motion; the Plaintiff and Real Party in Interest's Memorandum of Points and Authorities in Support of this Motion, set forth below; the Declarations of Kevin T. Snider, Gary Mortara and Dave Mortara, filed herewith; the Exhibits filed herewith; and all the papers, records, exhibits and documents on file herein, and evidence, oral and documentary, which has, or may be submitted on the hearing on these matters.

The relief sought is summary judgment as to the causes of action in the First Amended Complaint filed October 26, 2007.

/S/ Kevin Snider
Kevin T. Snider
Matthew B. McReynolds
Peter D. MacDonald
*Attorneys for Plaintiff and
Real Party in Interest*

725

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

i

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### TABLE OF CONTENTS

3

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii

4

ISSUES PRESENTED FOR SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . .1

5

SUMMARY OF THE FACTS AND ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6

LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

7

   I.   Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

8

   II.  The City's denial of Religious Assembly Use at the Catalina property violates
      RLUIPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

9

10

       A. The City's actions violate RLUIPA's "Equal Terms" provision. . . . . . . . . . . . 6

11

          (i) The City's application of eight criteria to exclude the Church is
             unprecedented  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

12

          (ii) The City's allowance of entertainment and recreational assembly uses—
             but not religious assembly—directly violates the specific mandate of
             RLUIPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

13

          (iii)The City's imposition of a hazardous materials burden on the Church is
             inexplicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14

15

       B. The City's actions substantially burden the Church. . . . . . . . . . . . . . . . . . . .

16

          (i)     The City has fully and flatly denied the Church's rezoning and CUP
               applications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17

          (ii)    The Church's core functions are being inhibited by the inadequate
               facility in which the City has forced it to remain. . . . . . . . . . . . . .11

18

19

       C.  The City's actions violate RLUIPA's "Total Exclusion" provision. . . . . . . . . . 14

20

       D.   The City's proffered interests are woefully inadequate to justify its
          prima facie RLUIPA violation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

21

          (i)     The City's actions cannot survive strict scrutiny. . . . . . . . . . . . . . .14

22

          (ii)    The City cannot demonstrate a compelling state interest. . . . . . . . .15

23

             *(a) Preservation of sufficient land and facilities to maintain the*
                 *City's industrial base is not a compelling state interest. . . . . 16*

24

             *(b) Maintaining consistency with and implementing the City's*
                 *General Plan, does not rise to the level of a compelling state*

25

                 *interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16*

26

             *(c) Avoidance of conflict with neighboring industrial uses is not a*
                 *compelling state interest. . . . . . . . . . . . . . . . . . . . . . . . . 17*

27

28

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

(iii)   Even assuming, *arguendo*, that the City's interest is compelling, the means taken to achieve this interest are not narrowly tailored. . . . 18

III.   The City's denial of Religious Assembly Use at the Catalina property violates the First and Fourteenth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

A.  Free Exercise of Religion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

B.  Freedom of Speech. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.  Equal Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

D.  Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.   Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

727

# TABLE OF AUTHORITIES

**Federal Cases**

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520, 533 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19, 20

*Cottonwood Christian Ctr. v. Cypress Redevelopment Agency,*
    218 F.Supp.2d 1203 (C.D.Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Devereaux v. Abbey,*
    263 F.3d 1070 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Employment Div., Dept. of Human Resources v. Smith,*
    494 U.S. 872 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Grace Church of North County v. City of San Diego,*
    2008 WL 2025367 (S.D.Cal. May 9, 2008). . . . . . . . . . . . . . . . . . . . . . . . .12, 15

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal,*
    546 U.S. 418 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15-16

*Guru Nanak Sikh Society of Yuba City v. County of Sutter,*
    456 F.3d 978 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16-17

*Open Homes Fellowship, Inc. v. Orange County, Fla.*
    325 F.Supp.2d 1349 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Hollywood Community Synagogue, Inc. v. City of Hollywood, Fla.,*
    430 F. Supp. 2d 1296 (S.D. Fla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lingle v. Chevron U.S.A. Inc.*
    544 U.S. 528, 542 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Midrash Sephardi, Inc. v. Town of Surfside,*
    366 F.3d 1214 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8-9, 18

*San Jose Christian College v. City of Morgan Hill,*
    360 F.3d 1024 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 19-20

*Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin,*
    396 F.3d 895 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

728

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

*Thomas v. Collins,*
    323 U.S. 516 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Vietnamese Buddhism Study Temple in America v. City of Garden Grove,*
    460 F. Supp. 2d 1165 (C.D. Cal 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5-6, 9, 13, 17

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
    425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Village of Euclid, Ohio v. Ambler Realty Co.*
    272 U.S. 365 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**FEDERAL STATUTES AND RULES**

    Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    42 U.S.C. § 2000 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

    42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 20-21

**OTHER SOURCES**

    146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) . . . . . . . . . . . . . . . .5, 8, 13-14, 17-18

    H. Rep. 106-219, 106th Cong., 1st Sess. 19 (1999) . . . . . . . . . . . . . . . . . . . . . . . .8

729

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

## ISSUES PRESENTED FOR SUMMARY JUDGMENT

Does the City's creation and application of eight land use criteria exclusively to the Church violate the "equal terms" provision of 42 U.S.C.A. § 2000cc (RLUIPA)?

Does the City's imposition of a hazardous materials burden exclusively on the Church violate RLUIPA's "equal terms" provision?

Does the City's curtailment of the Church's ministry and outreach efforts create a "substantial burden" under RLUIPA when there are no other suitable properties for the Church in the City?

Does the City's allowance of commercial entertainment and recreational assembly use at a given location violate RLUIPA's "equal terms" when religious assembly use is prohibited at the same location?

Does the City's denial of religious assembly use at the Catalina property violate the First and Fourteenth Amendments?

Do the City's stated justifications of preserving its industrial base, maintaining consistency with its general plan, and avoiding conflicts with neighboring uses rise to the level of compelling interests under RLUIPA?

## SUMMARY OF THE FACTS AND ARGUMENT

Faith Fellowship Foursquare Church ("Church") is a thriving church family experiencing sustained growth in numbers and community impact. The Church revolves around three core faith-based principles: heartfelt evangelism, relevant discipleship and compassionate outreach.

730

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

1

1  Based on these principles, the Church welcomes approximately 1,700 attendees each Sunday in

2  three worship services.  G. Mortara Decl. ¶18.[1]

3  As it now stands, a church sanctuary designed for 650-700 people is visited every Sunday

4  by more than twice that number of congregants.  *Id.*, ¶¶ 3, 18.  The Church has arranged its three

5  Sunday service times for optimal use of its 154-space parking lot, D. Mortara Depo. 21:19-25,

6  26:8-10.[2]  Yet, as the lot fills up quickly, worshipers have no choice but to attempt parallel parking

7  on Manor Boulevard or parking along side streets, stopping traffic in the neighborhood and

8  prompting weekly complaints to the Church.  *Id.*, 23:4-13, 27:25—28:8.  Even worse, the lack of

9  parking dissuades many would-be worshipers from coming to the Church.  G. Mortara Decl. ¶¶ 5,

10  25.  Since the Church has reached the full capacity of its current property, it is no longer

11  experiencing the growth in attendance which has characterized its history.  *Id.* at ¶ 18.

12  The Church assiduously searched for a solution and found one on Catalina Street

13  ("Catalina") in San Leandro.  The new facility can accommodate over 1,000 people in the

14  sanctuary and an additional 500 in other activities, such as Sunday school for youth and adult Bible

15  studies, per service.  Ample parking surrounds the new location, as well, with more on-site parking

16  and an estimated 400 parking spaces available through agreements with neighboring uses that do

17  not operate on the weekends.  D. Mortara Depo. 199:19-25.[3]  The Catalina property enables

18  Church members to more fully follow their sincerely held beliefs of proclaiming the Gospel,

19  providing instruction, and helping the poor.  There are no other available properties within the AU

20  Overlay that the Church can use.  Bullok Depo. 229:6-11.[4]

---

[1] The cited Declarations are filed concurrently in support of this Motion for Summary Judgment, unless expressly otherwise noted.
[2] K. Snider Decl., at Exh. 9.
[3] K. Snider Decl., at Exh. 9.
[4] K. Snider Decl., at Exh. 1.

731

1    Because the Catalina site was zoned for commercial use, the Church representatives met

2    with City officials to discuss use of the property for religious activities.  These officials then

3    advised the Church to apply for rezoning of the property from Industrial Park (IP) to Industrial

4    Limited (IL).[5]  G. Mortara Decl. ¶ 7.

5         Instead of a forthright processing of the application, the City began an eleven-month course

6    of action to create an assembly use (AU) overlay district.  The City developed eight criteria which,

7    when applied, designated 196 properties for assembly use.[6]  City Staff Report (4/12/07).[7]  City

8    officials cannot identify a single other applicant for assembly use which has been rejected based on

9    these eight criteria  Jermanis Depo. 46:22-24.  The Catalina property is conspicuously absent from

10   the AU Overlay.  Ct. Doc. 31-5.

11

12        In addition to the eight criteria, the City based its exclusion of the Church from the AU

13   Overlay—and concomitant denial of its rezoning request—on the Catalina property's proximity of

14   other uses which have filed a hazardous materials business plan.  City Staff Report, *Id.*, pp. 5-6.[8]

15   The City can identify no other applicant for assembly use which has had such a requirement

16   placed on it.  City's Response to Special Interrogatory No. 5,[9] D. Pollart Depo, pp. 106-107.[10]

17   Indeed, of the 196 properties included in the newly created assembly overlay district, all of them

18   are located within ¼ quarter mile of a business which has a hazardous materials business plan.

19

20

21   _____

22   [5] Industrial Light is an area which generally allows light manufacturing.  Industrial Park is a
     landscaped area used for high technology, research and development, and offices.  (Ex. A(q)(3), p.
     2).
23   [6] D. Pollart Decl., ¶¶ 6-8 previously filed with the Court on Aug. 14, 2007.  (Court Document 50).
24   For sake of clarity and ease of reference, exhibits previously filed with the Court are identified by
     their Court Document ("Ct Doc") number.
25   [7] K. Snider Decl., at Exh. 5, pg. 4.
     [8] There are eight entities which have filed a hazardous materials business plan within 500 feet of
26   the property purchased by the Church and an additional 13 businesses between 500 feet and ¼
     quarter mile with such a plan.   City Staff Report, *Id.*, pp. 5-6.
27   [9] K. Snider Decl., Exhs. 7-8.
28   [10] K. Snider Decl., Exh. 4.

732

1   Further, there are currently numerous assembly uses, including City Hall and the Church's current

2   site where it worships, which are within ¼ quarter mile of a hazardous materials business plan.

3          As an alternative to a change in zoning, the Church submitted an application for a

4   conditional use permit (CUP) within the current zone.  The basis for this was that commercial

5   recreation and entertainment activity, both assembly uses, are allowed within the industrial areas

6   via a CUP.  Following the denial of the Church's preliminary injunction motion, the City Planning

7   Commission unequivocally denied the Church a CUP.  Minutes of 2/17/08 San Leandro City

8   Council Meeting, pg. 4.[11]  The City's actions have placed the Church in an impossible situation.

9

10  Every week prompts more complaints from attendees and neighbors about its overcrowded current

11  facility (D. Mortara Depo, 27-28, 32) and more lost opportunities to evangelize potential visitors

12  who turn away due to the lack of space.  At the same time, the City will not allow the Church to

13  use the one property in San Leandro which will accommodate the Church.  Meanwhile, the Church

14  is expending $33,809.88 per month or approximately $1,100 *every day* for a location it must have

15  but is not permitted to use.  D. Mortara Decl., ¶ 4.

16

17         Denial of the use of the property as a religious assembly has resulted in a severe

18  limitation on the Church's ministry and outreach efforts.  There are no other properties that are

19  available to the Church.  Bullok Depo. 229:6-11; Jermanis Depo, 51:12-25, 52:1-2. As a result, the

20  land use restrictions placed on the Church have placed a "substantial burden" on the Church's

21  religious exercise.

22

23         The Church has made a prima facie showing under RLUIPA.  As such, the burden shifts to

24  the City to demonstrate a narrowly tailored compelling state interest.  The City alleges three

25  compelling state interests as follows:  (1) preservation of sufficient land and facilities to maintain

26

27  _____

28  [11] G. Mortara Decl., Exh. 1.                                    733

    Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

                                          4

the City's industrial base"; (2) "maintaining consistency with and implementing the City's general plan"; and, (3) "avoidance of conflicts with neighboring industrial uses."  In that all of these are essentially economic concerns, they do not rise to the level of a compelling state interest as a matter of law.

Since there are no material disputes of fact—only application of the facts to RLUIPA and 42 U.S.C. § 1983—resolution of this case via summary judgment is appropriate.

## LEGAL ARGUMENT

### I.      Standard of Review

A motion for summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must determine whether there are any genuine issues of material fact under the relevant substantive law. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001).

### II.     The City's denial of Religious Assembly Use at the Catalina property violates RLUIPA.

"The right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements.  The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes." *Vietnamese Buddhism Study Temple in America*, 460 F. Supp. 2d at 1171, quoting 146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) (joint statement of Senators Kennedy and Hatch in support of RLUIPA).  Congress unanimously enacted RLUIPA to level the playing field for houses of worship, aiming to clear the land use landscape of obstacles arbitrarily erected by local governments—obstacles easily recognizable in this case.          **734**

1    RLUIPA is violated by land use regulations which discriminate against religious

2  assemblies.  Treatment of religious assemblies on "less than equal terms with nonreligious

3  assemblies" constitutes impermissible discrimination, 42 U.S.C. § 2000cc(b)(1), as does a land use

4  regulation which "imposes a substantial burden." 42 U.S.C. § 2000cc(a)(1).

5    When RLUIPA is violated in either of these ways, the government is liable unless its

6  conduct survives strict scrutiny. *See, Vietnamese Buddhism Study Temple of America*, 460 F.

7
   Supp. 2d at 1171, quoting 42 U.S.C. § 2000cc(a)(1); *Midrash Sephardi, Inc. v. Town of Surfside*,

8
   366 F.3d 1214, 1232 (11th Cir. 2004). The Church is entitled to relief because the City has

9
   violated RLUIPA both by treating the Church on less than equal terms, and by substantially

10

11  burdening the Church without a compelling justification.

12
   **A.     The City's actions violate RLUIPA's "Equal Terms" provision**

13

14    RLUIPA's equal terms provision sets forth a bright-line standard:

15    (1) EQUAL TERMS- No government shall impose or implement a land use
   regulation in a manner that treats a religious assembly or institution on less than
16    equal terms with a nonreligious assembly or institution.

17    42 U.S.C. § 2000cc(b)(1).

18

19    The City violates this provision (i) by subjecting the Catalina property to eight criteria

20  which have <u>never</u> been applied to any other property within the jurisdiction of the City, (ii) by

21  allowing entertainment and recreational assembly uses but not religious assembly use, and (iii) by

22  placing a hazardous materials burden on the Church but not on any of the 196 properties approved

23
   for assembly or any other assembly uses within the jurisdiction of City.

24

25    Once the Church has produced *prima facie* evidence of an equal terms violation, the City

26  bears the ultimate burden of persuasion on all elements of the claim.  42 U.S.C. § 2000cc-2(b).

27

28    **735**

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

6

(i)     **The City's application of eight criteria to deny the Church's request is unprecedented.**

Following the Church's request for a rezoning of the Catalina property to permit religious assembly use, the City instead created an Assembly Use Overlay which pointedly excluded the Catalina property. The City invented eight criteria, two of which it utilized to exclude the Catalina property from the AU Overlay. The criteria are:

1) Site is not located along a major commercial corridor;
2) Site is not located within the following General Plan Focus Areas: Downtown, Bayfair, Marina Blvd./SOMAR, or West San Leandro;
3) Site is not located in a regional-serving retail area;
4) Site is not located inside the one-half-mile study area identified for the Downtown Transit-Oriented Development (TOD) Strategy;
5) Site abuts or is within one-quarter mile of an arterial street;
6) Site is not located in a Residential Zone ;
7) Site is not considered public land, and is not zoned Public Service (PS), Open Space (OS), or Commercial Recreation (CR); property is not owned by an Exempt Public Agency, or leased/owned by a public utility;
8) Overlay Area must allow a contiguous area greater than or equal to two acres.

Ct Doc 30-2, pp. 4-5. The City denied AU Overlay zoning to the Church location on the basis that the location did not meet the second and fifth criteria. Ct. Doc. 30-2, pp. 4-5. However, City officials have been unable to identify a single other applicant for assembly use within the jurisdiction of the City to which the criteria have been applied. Jermanis Depo., 46:22-24; City's Response to Plaint.'s Interrogatory No. 6. And since no other applicant for assembly use, before or since the Church's request to use the Catalina property, has been subjected to the burden of these eight criteria, there is a showing of an equal terms violation under RLUIPA.

The City's unprecedented—and unequal—treatment of the Church is the first prima facie evidence of an RLUIPA equal terms violation.

**736**

(ii)     **The City's allowance of entertainment and recreational assembly uses—but not religious assembly—directly violates the specific mandate of RLUIPA**

In addition to unequal application of its eight criteria, the City has not treated the Church's Catalina property the same as other, similar properties. The Church applied for a CUP under the existing zoning for the Catalina property because an assembly use is allowed if it is "entertainment." But the City treated the Church differently because it wished to use the property for religious purposes and thus denied the CUP. G. Mortata Decl., Exh 1., pg. 4.

Under RLUIPA, zoning laws must apply to religious assemblies in the same manner that they apply to "similarly situated" assemblies. *Midrash*, 366 F.3d at 1229 (holding that synagogue was similarly situated to clubs and lodges). In fact, the legislative history of RLUIPA specifically identifies "recreation centers" and "places of amusement" as being comparable to religious assemblies for purposes of the statute. H. Rep. 106-219, 106th Cong., 1st Sess. 19 (1999).[12] In a joint statement, Senators Hatch and Kennedy articulated the need for the Equal Terms provision of RLUIPA as follows: "Zoning codes frequently exclude churches in places where they permit . . . large groups of people [to] assemble for secular purposes." 146 Cong. Rec. at S7775.

Here, the City allows both entertainment and commercial recreational assembly uses by permit in IL and IP areas. Ct. Doc 37-3, pp. 2,11. Other assembly uses in IL and IP areas include day care facilities, farmers' markets, cafes, bars, business and trade schools, and full service restaurants. *Id.*, pp. 3-4, 10-11. In that vein, the California Uniform Building Code, applicable in San Leandro, contains a nondiscriminatory definition of Assembly Building as follows:

---

[12] The legislative history lists myriad nonreligious assemblies to be compared with religious ones: "banquet halls, clubs, community centers, funeral parlors, fraternal organizations, health clubs, gyms, *places of amusement, recreation centers*, lodges, libraries, museums, *municipal buildings*, meeting halls, and theatres," H.R. Rep. No. 106-219, 106th Cong., 1st Sess. 19 (1999) (emphasis added); and "*recreation centers* and *health clubs*," 146 Cong. Rec. S7774-01 at S7777 (daily ed. July 27, 2000) (emphasis added).

**737**

1  "*Assembly Building*. *A building or a portion of a building used for the gathering together of 50*

2  *or more persons at one time for such purposes as deliberation, education, worship, entertainment,*

3  *amusement, drinking or dining, or waiting for transportation.*"  Uniform Building Code Section

4  203 A.[13]  Meanwhile, the Catalina property, zoned IP, has been denied both a rezoning and a CUP.

5  The only difference is that the Church seeks to use its property for *religious* assembly.  Since,

6  under *Midrash*, religious assembly is legally indistinguishable from entertainment assembly, the

7

8  Church has—again—been treated on less than equal terms.

9              **(iii)      The City's imposition of a hazardous materials burden on the**
                          **Church is inexplicable.**

10            An equal terms violation also occurs when government officials impose a zoning

11  requirement on a religious group but not on similarly situated nonreligious groups.  *Vietnamese*

12  *Buddhism Study Temple in America v. City of Garden Grove*, 460 F. Supp. 2d 1165 (C.D. Cal.

13

14  2006); see also, *Hollywood Community Synagogue, Inc. v. City of Hollywood, Fla.*, 430 F. Supp.

15  2d 1296, 1323 (S.D. Fla. 2006).  Realizing that its zoning policies directly violated federal law, the

16  City created the AU Overlay to permit assembly uses in places where they would be otherwise

17  impermissible.  Ct. Doc 25-2.  However, City officials then foisted upon the Church an *additional*

18  criterion related to hazardous materials which was not applied to *any* of the 196 properties

19  approved for assembly use  Ct. Doc 34-2, pp. 5-6.  Nor has the City been able to identify any other

20  application for assembly use in which a hazardous materials criterion been placed in San Leandro.

21

22            In a staff report, City officials claimed that the presence—and potential future presence—

23  of hazardous materials and activities in the vicinity of the Catalina site rendered it inappropriate

24

25  _____

26  [13] The definition of "Assembly Building" contained in California's Industrial Relations Code, 8
     C.C.R. 3207(a), mimics the Building Code while also including, "Any building or structure or
     portion thereof used or intended to be used for the showing of motion pictures when an admission
27  fee is charged and when such buildings [sic] or structure is open to the public and has a capacity of
     10 or more persons."                                                            **738**

28

1   for rezoning with the Assembly Use Overlay.  Ct Doc 34-2.  Denial of the Catalina site was based

2   in part on the presence of businesses with Hazardous Materials Business Plans (HMBP's) within

3   ¼ mile.  Pollart Depo. 106:1-17.  But if that criterion were applied across-the-board to all

4   proposed assembly uses it would prohibit assembly use in **all** 196 parcels, since all are within ¼

5   mile of a HMBP.  *Id.* at 105:4-11.  Ironically, even City Hall, located at 835 E. 14th St. in San

6   Leandro, is within ¼ mile of a site with a hazardous materials plan.   Def. Response to Pltf. Req.

7   for Admission #9 (p. 2).  The City's disparate treatment of the Church is exactly the type of

8   discrimination that RLUIPA was enacted to remedy.

9

10      The Church has presented *prima facie* evidence of three areas in which its proposed

11  religious assembly use has been singled out for disfavor:  creation of the eight criteria, refusal to

12  treat the church comparably with commercial recreation and entertainment uses, and the

13  unprecedented imposition of the hazardous materials business plan buffer zone.  As a result, the

14  burden now shifts to the City to demonstrate a narrowly tailored, compelling state interest

15  justifying its disparate treatment of the Church.[14]

16

17      **B.      The City's actions Substantially Burden the Church**

18      In addition to its equal terms provision, RLUIPA separately prohibits local governments

19  from using land use regulations to impose "a substantial burden on the religious exercise of a

20  person, including a religious assembly or institution, unless the government demonstrates that

21  imposition of the burden on the person, assembly, or institution (A) is in furtherance of a

22  compelling governmental interest; and (B) is the least restrictive means of furthering that

23  compelling governmental interest." 42 U.S.C. 2000cc(a)(1).  The Ninth Circuit has determined

24

25

26

27  [14] The Church's current building is also located within ¼ mile of hazardous materials (Ex. B to
    Church Mot. for Prelim. Inj.), yet the City's opposition to the Church's move is keeping the
28  Church at that location.

**739**

1  that a government regulation creates a "substantial burden" when it is "'oppressive' to a

2  'significantly great' extent." *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 456 F.3d

3  978 (9th Cir. 2006) (quoting *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024,

4  1034).

5      **(i)    The City has fully and flatly denied the Church's rezoning and**

6          **CUP requests.**

7      The ongoing injury which the Church is suffering is oppressive to a great extent.  The City

8  rejected the Church's request for rezoning of the Catalina property.  Subsequent to the filing of

9  this lawsuit and the Church's request for a preliminary injunction, the City has entrenched its

10  position by flatly denying the Church's application for a CUP.  G. Mortara Decl., Exh. 1.  The

11  Church has looked into dozens of other properties.  None are suitable.  Bullok Depo. 92:1-17.  Of

12  the properties suggested by City officials, only one was for sale—and it was under contract.  *Id.* at

13

14  94:24—95:13.  Within the Assembly Overlay district created by the City, only thirteen are three

15  acres or more, as required by the Church's size.  Defs. Response to Plaint. Interrog. No. 1.  Those

16  parcels tend toward the extremes of being either dilapidated, fractionalized and irregularly shaped,

17  on the one hand, or occupied commercial shopping centers on the other hand which have no

18  interest in selling to the Church.  Bullok Depo. 202:19—204:5.

19

20      **(ii)    The Church's core functions are being inhibited by the inadequate**

21          **facility in which the City has forced it to remain.**

22      As a result of the City's denials of the rezoning and CUP requests, the Church's core

23  functions are actually inhibited.  The core beliefs and values of the Church include: joyous, united

24  worship of God; local and global evangelism to lead people to faith in Christ; instruction; and

25  works of compassion, justice, and human aid. G. Mortara Decl., ¶ 23.  These elements are

26  incorporated into an overarching holistic approach focused on helping the entire individual.  The

27  inability of the Church to use the Catalina property is a significant restriction on its pursuit of

28

**740**

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

11

1  these core tenets, because it limits the number of members and visitors who can attend, participate

2  in activities, and receive spiritual help at its current location on Manor Blvd.  G. Mortara Decl., ¶¶

3  25-28.

4       Federal courts have acknowledged the struggles of large congregations to find adequate

5  meeting space.  *Grace Church of North County v. City of San Diego*, 2008 WL 2025367, 13

6  (S.D.Cal. May 9, 2008). These courts have further noted the substantial burden created by cities'

7  refusals to allow churches to use property they have purchased.  Consider *Sts. Constantine &*

8  

9  *Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir.2005):

10      The burden here was substantial.  The Church could have searched around for other parcels of land (though a lot more effort would have been involved in such a search

11  than, as the City would have it, calling up some real estate agents), or it could have continued filing applications with the City, but in either case there would have been

12  delay, uncertainty and expense.  That the burden would not be insuperable would not make it insubstantial.

13  

14      The Church already spent months searching for a location to accommodate its size. (G.

15  Mortara Decl. ¶¶ 5-6.)  Indeed, the Church even sent out staff and church members into other

16  cities on five separate occasions to plant new churches, due to lack of space in the present

17  location. *Id.* at ¶ 34.  The Church endured more than a year of delays from the City, *id.* ¶ 31, and

18  it incurred significant expenses in the process. *Id.* at ¶ 32.  The Church continues to expend over

19  $1,100 a day on property it cannot use. *Id.* at ¶ 32.

20  

21      Part of the traditional Christian faith involves meeting together as a "church body" or

22  *corpus*.  The breaking apart of the Church is an impermissible burden.  Those who are turned

23  away each Sunday results in the infliction of suffering in the body.  The absence of these dozens

24  of worshippers in the present case is, in a profound theological sense, a substantial burden on the

25  religious practices of gathering together for worship, fellowship, and ministry.

26  

27  **741**

28

1   Meeting to conduct worship services is one of the primary functions of a church.

2   *Vietnamese Buddhism Study Temple in America*, 460 F. Supp. 2d at 1171 ("The right to assemble

3   for worship is at the very core of the free exercise of religion.   Churches and synagogues cannot

4   function without a physical space adequate to their needs . . .", quoting 146 Cong. Rec. S7774-01,

5   (daily ed. July 27, 2000) (joint statement of Senator Hatch and Senator Kennedy)).   One reason

6
7   why the Church has three separate services is due to lack of parking at the MANOR property. D.

8   Mortara Decl. ¶ 3.   The current location is in a residential neighborhood and has only 154

9   parking spaces.  *Id.* at ¶ 11.   Attendees park on crowded residential streets. *Id.* Often, people must

10  walk blocks to attend Sunday service.  *Id.* at ¶ 4.   Each Sunday numerous vehicles drive off and do

11  not return due to lack of parking.  *Id.* at ¶ 4.   The Church loses the opportunity to minister to

12  dozens of people each Sunday as a result of Defendants' refusal to allow the Church to use the

13
14  Catalina property. (G. Mortara Decl. ¶ 41).   To alleviate the parking at the MANOR property, the

15  Church purchased a neighboring house for $565,000 in May of 2006—to obtain 10 additional

16  parking spaces.   The Church paid $56,500 per parking space.  Ct. Doc. 12, ¶10.

17  The dozens of people in the forty or so vehicles turned away every Sunday creates a

18  substantial burden on the religious exercise of the Church in its evangelistic efforts.  Many

19  precluded from attending are visitors to the Church and are not Christians.   They have been

20
21  invited by congregants or attend on their own for any number of reasons.  It is a core tenet of the

22  Church to share the gospel verbally and by acts of service to others.  Portions of the worship

23  services and ministry activities on Sunday mornings are designed especially for visitors who are

24  not Christians.  *Id.* at ¶ 25.   However, such visitors are inhibited from attending due to the lack of

25  adequate space.  Thus, the City's denial of the use of the Catalina property substantially burdens

26  the Church's evangelistic efforts.  *Id.*

27

28

**742**

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

13

The Church's Sunday services are severely hampered by parking and facility limitations. Use of the Catalina property is vital to the Church's religious exercise. The Church's worship services have been, and continue to be, substantially burdened by Defendants' denial of access to their new facility.

### C.        The City's actions violate RLUIPA's "Total Exclusion" provision.

RLUIPA section 2(b)(3) prohibits land use regulation that "unreasonably limits religious assemblies, instructions, or structures within a jurisdiction." 42. U.S.C. § 2000cc(b)(3)(B). "What is reasonable must be determined in light of all the facts, including the actual availability of land and the economics of religious organizations." 146 Cong. Rec. E1563 (daily ed. Sept. 22, 2000) (statement of Rep. Canady). ICFG and the Church will avoid repetition of "all the facts" stated in the foregoing sections of this Memorandum which demonstrate that there are no suitable, available locations—other than the Catalina property—which can accommodate its continued existence in San Leandro. The City's suggestions that the Church consider relocate to properties which are not even for sale is unreasonable. The City's designation of the Assembly Use Overlay shows that it was well aware of the need for more large assembly use options. Its attempts to gloss over the problem by designating parcels for assembly use which were highly undesirable and, even at that, not available for purchase, did nothing to cure its unreasonable limitations on religious assemblies in San Leandro.

### D.        The City's proffered interests are woefully inadequate to justify its prima facie RLUIPA violation.

#### (i)        The City's actions cannot survive strict scrutiny.

"RLUIPA provides a strict scrutiny standard of review for land use cases." *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F.Supp.2d 1203, 1220 (C.D.Cal. 2002). Once Plaintiff establishes a violation of the Equal Terms provision *or* the imposition of a

**743**

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

1   substantial burden, the legal burden shifts to Defendants to show that the least restrictive means

2   were taken to achieve a narrowly tailored compelling state interest.  42 U.S.C. 2000cc(a)(1)(A)

3   and (B).

### (ii)   The City cannot demonstrate a compelling state interest.

4   
5   When religious exercise is concerned, the compelling interest test cannot be satisfied by

6   reference to broad policy objectives.  In interpreting 42 U.S.C. 2000bb-1(b), the Religious

7   
8   Freedom Restoration Act (RFRA), the Supreme Court noted, "RFRA requires the government to

9   demonstrate that the compelling interest test is satisfied through application of the law 'to the

10  person'-the particular claimant whose sincere exercise of religion is being substantially burdened."

11  *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 126 S. Ct. 1211,

12  
13  1220-21 (2006).   Since RLUIPA followed in the footsteps of RFRA, it is not surprising that its

14  formulation of the compelling interest test also obviates generalized justifications.

15  The denial of the Church to use its Catalina property is not in furtherance of a narrowly

16  tailored compelling governmental interest.  In *Grace Church*, the court held that "preservation of

17  industrial lands for industrial uses does not constitute a 'compelling interest' for purposes of

18  RLUIPA."  *Grace Church of North County v. City of San Diego*, 2008 WL 2025367, 14 (S.D.Cal.

19  May 9, 2008).

20  
21  In response to an Interrogatory requesting identification of every compelling interest

22  supporting the City's denial of religious assembly at the Catalina property, Defendants list just

23  three:

24  
    1.   Preservation of sufficient land and facilities to maintain the City's
       industrial base.
25  
    2.   Maintaining consistency with and implementing the City's general
       plan, including particularly Policies 7.09 and 10.04.
26  
    3.   Avoidance of conflicts with neighboring industrial uses.

27  
Def. Response to Plaint. Interrog. No. 9.                              **744**

28  

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

15

1   Even assuming the doubtful factual validity of the stated interests in relation to the

2   Catalina property, these three interests are not, as a matter of law, compelling.   However, as a

3   threshold matter, whenever the state restricts "expressive association," there is no presumption of

4   constitutionality.   Therefore, the government must have a compelling state interest in the subject

5   matter to justify abridgment, and the scope of the abridgment itself must be the least restrictive

6   means, i.e., no greater than reasonably necessary to serve the state interest.  *Thomas v. Collins,*

7   323 U.S. 516, 530 (1945).

8

9   While the burden falls squarely on the City to prove a compelling state interest, *see, e.g.,*

10  *Gonzales, supra*, the interests advanced by the City will not suffice.

11

12          ***(a)        Preservation of sufficient land and facilities to maintain***
                          ***the City's industrial base is not a compelling state***
13                        ***interest.***

14  The City seeks to increase employment and maximize tax revenues by excluding the

15  Church from a light industrial area.  It is well-settled law that preserving jobs and tax revenues is

16  not a compelling governmental interest. *Guru Nanak Sikh Soc'y,* 456 F.3d at 987.  This is only

17  logical: "If revenue generation were a compelling state interest, municipalities could exclude all

18  religious institutions from their cities." *Cottonwood,* at 1228.  Providing non-profit institutions

19  with tax exemptions—as has long been done in recognition of the invaluable community services

20  they provide—while at the same time using their tax-exempt status as a reason for exclusion is

21  utterly incongruent.  The financial interest offered by the City falls far short of a compelling state

22  interest.

23

24          ***(b)        Maintaining consistency with and implementing the***
                          ***City's General Plan, does not rise to the level of a***
25                        ***compelling state interest.***

26  RLUIPA does not permit a government to use broad and discretionary land use rationales

27  to select the precise property where a religious group can worship. *Guru Nanak,* 456 F.3d at 992,

28

**745**

n.20.  In fact, RLUIPA was targeted at this precise rationale:  "[O]ften, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.'"  146 Cong. Rec. S774-01 (daily ed. July 27, 2000), quoted in *Guru Nanak*, 456 F.3d at 987.

**(c)**  *Avoidance of conflict with neighboring industrial uses is not a compelling state interest.*

The last "compelling interest" stated by the City in its interrogatory response is "[a]voidance of conflict with neighboring industrial uses."  As a factual matter, the City has produced no evidence demonstrating a conflict with other uses on Catalina Street, other than its discredited and disingenuous reliance on the proximity of other uses with a hazardous materials business plan.  To the contrary, the Church's primary uses of the property would take place when the entire area is largely vacant.  If anything, neighboring uses on Catalina have welcomed the Church and are anticipating mutually beneficial shared parking arrangements.  Ct. Doc. 13, ¶45.

Even assuming one could accept *factually* that the City has an interest in avoiding conflict between the Church and neighboring uses, the City has presented no controlling authority—and the Church is aware of none—which comes close to considering "avoidance of conflicts" as a compelling interest.  If the City's vague reference to "conflict" intimates concerns about traffic at Catalina, as it has stated elsewhere, such concerns have specifically been held <u>not</u> to constitute a compelling state interest.  *Vietnamese Buddhism Study Temple in America*, 460 F. Supp. 2d at 1174.

Even were one to take the logical leap of agreeing that avoidance of conflicts with neighbors could be a compelling interest, it would not help the City, since narrow tailoring is also required to achieve that interest.  Ironically, while claiming to be avoiding conflicts with neighboring uses at Catalina, the City's actions have perpetuated conflicts with the Church's

**746**

1    current neighbors.  Ct. Doc. 12, ¶6.   It is difficult to imagine how such a result could be

2    considered a narrowly tailored means of achieving the City's stated interest.

3

4                    **(iii)        Even assuming arguendo that the City's interest is**
                                    **compelling, the means taken to achieve this interest are not**
5                                   **narrowly tailored.**

6            In light of the foregoing discussion, the City has not stated a compelling state interest in

7    denying the Church's AU overlay district amendment application.  Even were it hypothetically

8    possible for the City to state such an interest, however, the inquiry does not end there.  Rather, the

9    City bears the burden of proving that it has used the least restrictive means to further the stated

10   narrowly tailored compelling state interest.

11

12           The Planning Commission Staff Report states that "there is no less restrictive means (i.e.

13   no means short of outright denial of the rezone) that would further the City's interest in

14   safeguarding the health and safety of the future congregants...."  Ct. Doc. 34-2, pg.  7.  This

15   position cannot be reconciled with allowing the 196 other assembly uses as well as entertainment,

16   commercial, recreation and even municipal uses that are also within a ¼ mile proximity to

17   hazardous materials.  It also bears repeating that the City's actions are forcing the Church to

18   remain at a site located within ¼ mile of a Hazardous Materials Business Plan.  Ct. Doc. 38

19   (HMBP Map).

20

21           As far as RLUIPA is concerned, a church use that gathers people for worship and other

22   religious activities is indistinguishable from assembly for commercial entertainment, such as a

23   multi-screen movie theater. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1231, n.14

24   (11th Cir. 2004) citing 146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) (joint statement of

25   Senators Kennedy and Hatch).  If the City can serve the stated health interests while allowing

26   commercial recreation and entertainment activities, it follows that there must be other means of

27

28                                                                                                    **747**

1    serving the health interest while allowing religious assembly concurrently.  In view of the City's

2    failure to articulate in the record an explanation for this double standard, the City has failed to

3    justify its burden as to the least restrictive means prong of RLUIPA.

4    **III.      The City's denial of Religious Assembly Use at the Catalina property violates
          the First and Fourteenth Amendments.**

5

6        **A.      Free Exercise of Religion**

7        The Free Exercise Clause prohibits government regulation of religious beliefs, which

8    includes government regulation of *conduct* relating to religious exercise. *Employment Div., Dept.*

9    *of Human Resources v. Smith,* 494 U.S. 872, 877 (1990).  The conduct at issue is the Church's

10   ability to effectively serve the community by having a facility large enough to accommodate its

11   members and visitors.  The City's pattern of conduct against the Church is impeding the Church's

12   ability to freely exercise its religion.

13

14       The City's actions should be held to the strict scrutiny test because it is directed toward

15   and burdens the free exercise of religion.  A law that targets religious beliefs is never permissible.

16   *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 533 (1993).  "If the

17   zoning law is not neutral or generally applicable, but is directed toward and burdens the free

18   exercise of religion, it must meet the strict scrutiny test." *San Jose Christian College v. City of*

19   *Morgan Hill,* 360 F.3d 1024, 1031 (9th Cir. 2004).  The Catalina property has been targeted

20

21   because it was denied assembly use while comparable properties were allowed assembly use for

22   entertainment and recreation. Also, the Catalina property would pass for assembly use if it had met

23   the eight criteria crafted by the City. The eight criteria have never been used elsewhere.  The

24   Church was effectively targeted by the City. The burden on the Church to accept the loss of the

25   Catalina property has resulted.

26

27

28   **748**

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

1    A law which directly targets religious conduct "will survive strict scrutiny only in rare

2    cases." *Church of the Lukumi Babalu Aye,* 508 U.S. at 545.  The law will not pass the test unless it

3    is "narrowly tailored" to advance a government interest "of the highest order." *Id.*  In light of the

4    foregoing discussion, the City has not identified a compelling, narrowly tailored state interest.

5    The eight criteria of the City's General Plan seek to safeguard places of assembly from the hazards

6    of commercial sites but is too inaptly applied to promote any governmental interest in this regard.

7

8    If there are any significant government interests at issue, the City's General Plan is not drawn

9    narrowly to accomplish them.

10    Even if the City's General Plan is not directed toward the Church, it should still be held to

11    strict scrutiny because the Church is subject to additional First Amendment violations.  "If a law

12    of general application, not targeted at religion, burdens the free exercise of religion *and* some

13    other constitutionally-protected activity, there is a First Amendment violation unless the strict

14    scrutiny test is satisfied." *San Jose* 360 F.3d 1024 at 1031.  Additional violations of the City

15    include violations relating to Freedom of Speech, Freedom of Assembly, Freedom of Association,

16

17    Equal Protection, and Due Process, as explained below.

18        **B.    Freedom of Speech**

19        The Church possesses a right to Freedom of Speech under the First and Fourteen

20    Amendments of the U.S. Constitution. 42 U.S.C. § 1983.  The City has restricted the Church's

21    speech and the Church's (individual member's) right to hear by not allowing the Church to move

22    to the Catalina property.  The Church's present location is overcrowded, the parking is inadequate,

23    and the traffic is congested.  These conditions restrict the number of people the Church can

24    communicate to, and reciprocally restricts the number of people in the Church who can receive the

25    communication.

**749**

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

20

1  Freedom of Speech protects both a communication's source and its recipients. *Va. State*
2  *Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.* 425 U.S. 748, 755 (1976).  The Supreme
3  Court has found that "[i]f there is a right to advertise, there is a reciprocal right to receive the
4  advertising." *Id.* at 755.  In like manner, this reciprocal right inherent to the Freedom of Speech is
5  imperative to an active entity like the Church, where both information providers and information
6  receivers comprise the Church's entity.

7
8  **C.    Equal Protection**

9  The Church is guaranteed Equal Protection under the Fourteenth Amendment of the U.S.
10  Constitution. 42 U.S.C. § 1983.  In *Open Homes Fellowship*, the court, by a rational-basis review,
11  found an Equal Protection violation when a Christian rehabilitation center was held to comply
12  with special zoning requirements which it could not satisfy. *Open Homes Fellowship, Inc. v.*
13  *Orange County, Fla.* 325 F.Supp.2d 1349, 1355. (2004).  There was no rational basis to believe
14  that Open Homes posed a special threat, which would justify special treatment. *Id.* at 1358.  The
15  present case is comparable.  The Catalina property has been denied for assembly use, yet other
16  entertainment and commercial recreational assembly uses have been allowed in similarly zoned
17  areas.  No rational basis can be shown for this distinction.
18

19  **D.    Due Process**

20  The Church is guaranteed Due Process of Law under the Fourteenth Amendment of the
21  U.S. Constitution. 42 U.S.C. § 1983.  Government action which is arbitrary and capricious violates
22  due process. *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 542 (2005).  The purpose of government
23  zoning is to promote the health, morals, safety, and general welfare of the community. *Village of*
24  *Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 387 (1926).  The City's arbitrary Assembly Use
25  Overlay criteria, having intentionally and needlessly delayed and obstructed the Church's use of
26
27  **750**

28

1   the Catalina property, are arbitrary and capricious, fundamentally failing to promote the

2   community's health, morals, safety, and general welfare.[15]

3       The eight criteria and additional hazardous materials business plan restriction placed solely

4   on the Church are arbitrary and capricious. As such, they are violative of due process as well as

5   RLUIPA.

6   **III.    Damages**

7

8       The Church must pay monthly mortgage payments of $33,809.88 for the Catalina property.

9   G. Mortara Decl. at ¶ 4. Since April 12, 2007, the Church has been denied assembly use for its

10  property by the City Planning Commission. The mortgage payments the Church has made after

11  April 12, 2007 are damages to the Church. This growing figure of $33,809.00 per month since

12  April 12, 2007 is mitigated by the amount the Church has gained by renting the property

13  beginning March 2008 for $1,200 per month. D. Mortara Depo, 137-138.

14

15                          **CONCLUSION**

16      The material facts are not in dispute. The Church outgrew its current location and

17  purchased the Catalina property to accommodate the many worshipers who cannot presently

18  attend church services. The City, believing itself to have better designs for the property, denied

19  first a rezoning application, then a CUP application.

20      The City's actions were unlawful, first under the RLUIPA. It did not treat the Church on

21

22  equal terms with other assembly uses in the City, as demonstrated by its invention of eight criteria

23  which it decided the Church did not meet; by its reliance on an unprecedented hazardous materials

24  business plan buffer zone which not even City Hall would be in compliance with; and by its

25

26

27  [15] Much more recently, at least one federal court has found a substantive due process violation in conjunction with an RLUIPA violation, *Layman Lessons, Inc. v. City of Millersville, Tenn.*, 2008 WL 686399, *27 (M.D. Tenn. March 07, 2008).

28                                                                          **751**

1  refusal to consider the Church's proposed use comparably with non-religious assembly and

2  entertainment uses.

3      Besides treatment on less than equal terms, the City violated RLUIPA by placing a

4  substantial burden on the Church's religious exercise without having a compelling governmental

5  interest in doing so.  The City's denial of a rezoning or CUP for the Catalina property means that

6  spiritual seekers and devoted worshipers alike are being prevented from attending the Church at its

7  current Manor location, because there is insufficient room for them.  Consequently, the Church's

8  rapid growth has stagnated, not for lack of interest, but for lack of space.  Much more than an

9  inconvenience, the City's refusal to allow religious assembly at the Catalina property, coupled

10  with the lack of other suitable locations in the City, is preventing the Church from carrying out its

11  core religious tenets of evangelism and outreach.  Moreover, the City's actions have caused the

12  Church significant financial loss in expending funds for a property it is prohibited from occupying.

13  Nor has the City proffered compelling interests necessary to justify the substantial burden it has

14  placed on the Church's religious exercise.

15

16

17      Finally, the City's actions have violated the Church's constitutional rights to Since the

18  founding of our nation, houses of worship have been afforded a high degree of respect and

19  encouragement—until recent years.  It should come as no surprise, then, that the City's arbitrary

20  denial of the Church's ability to use its property to practice and proclaim its religious beliefs

21  violated the Church's Free Exercise of Religion, Freedom of Speech, Equal Protection and Due

22  Process.  RLUIPA simply reinforces the age-old constitutional principle that government hostility

23  toward religious groups is unacceptable and illegal.  ICFG and the Church therefore request

24  summary judgment as to all claims alleged in their First Amended Complaint.

25

26

27

28

**752**

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

23

1    Respectfully submitted:

2    August 26, 2008

3

4

5                                    Respectfully submitted,

6                                     _/S/_ Kevin Snider_____

7                                    Kevin T. Snider
                                     Matthew B. McReynolds
8                                    PACIFIC JUSTICE INSTITUTE
                                     P.O. Box 276600
9                                    Sacramento, CA 95827-6600
                                     Telephone: (916) 857-6900
10                                    Facsimile:  (916) 857-6902

11
                                     Peter D. MacDonald
12                                    LAW OFFICE OF PETER MACDONALD
                                     400 Main Street, Suite 210
13                                    Pleasanton, CA 94566-7371
                                     Tel. (925) 462-0191
14                                    Fax. (925) 462-0404
                                     Email: pmacdonald@macdonaldlaw.net
15

16                                    Attorneys for Plaintiff and Real Party in Interest,
                                     International Church of Foursquare Gospel
17                                    and Faith Fellowship Church of Foursquare Gospel

18

19

20

21

22

23

24

25

26

27                                                            **753**

28

Plaintiff and Real Party in Interest Motion for Summary Judgment; Memo. in Support

24