Jayne W. Williams, Esq. (SBN: 63203)
jwilliams@meyersnave.com
Deborah J. Fox, Esq. (SBN: 110929)
dfox@meyersnave.com
Philip A. Seymour (SBN: 116606)
pseymour@meyersnave.com
MEYERS, NAVE, RIBACK, SILVER & WILSON
555 12th Street, Suite 1500
Oakland, California 94607
Telephone: (510) 808-2000
Facsimile: (510) 444-1108

Attorneys for Defendant
CITY OF SAN LEANDRO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL CHURCH OF THE FOURSQUARE GOSPEL,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF SAN LEANDRO, a municipal corporation,<br><br>    Defendant.<br><br>FAITH FELLOWSHIP FOURSQUARE CHURCH,<br><br>    Real Party in Interest. | Case No. C07-03605-PJH<br><br>CITY OF SAN LEANDRO'S OPPOSITION TO PLAINTIFF AND REAL PARTY IN INTEREST'S MOTION FOR SUMMARY JUDGMENT<br>(Plaintiff's Motion No. 2)<br><br>[Exhibits 1-39 submitted concurrently]<br><br>Hearing:<br>Date:   October 1, 2008<br>Time:   9:00 a.m.<br>Courtroom: 3<br><br>Honorable Phyllis J. Hamilton<br>Complaint Filed: 7/12/07 |

1

TABLE OF CONTENTS

2

Page(s)

3      I.      INTRODUCTION...................................................................................1

4      II.     STATEMENT OF FACTS ......................................................................3

5      III.    THE CITY DID NOT VIOLATE THE EQUAL TERMS PROVISION OF
6              RLUIPA ................................................................................................4

7              A.      The City Did Not Violate the Equal Terms Provision of RLUIPA by
8                      Applying the Same Objective Planning Criteria to The Church's
                       Proposed Catalina Street Property That Were Applied to All Other
9                      Properties Considered for Inclusion in the Assembly Use Overlay
10                     Zone ...........................................................................................5

11             B.      Commercial Entertainment and Recreational Uses Are Not
12                     Assembly Uses Nor are the Similarly Situated to Religious
                       Assembly Uses for Purposes of RLUIPA.......................................7

13
               C.      Hazardous Materials ...................................................................10
14

15     IV.     THE CITY HAS NOT IMPOSED A SUBSTANTIAL BURDEN ON THE
               CHURCH'S EXERCISE OF RELIGION..............................................11
16

17     V.      THE CITY'S ACTIONS WERE THE LEAST RESTRICTIVE MEANS
               OF FURTHERING THE CITY'S COMPELLING INTEREST IN
18             PRESERVING CERTAIN LAND FOR INDUSTRIAL USE................16

19     VI.     THE CITY'S REGULATIONS DO NOT TOTALLY EXCLUDE OR
               UNREASONABLY LIMIT RELIGIOUS LAND USES IN THE CITY ...............18
20

21     VII.    CONSTITUTIONAL CLAIMS.............................................................18

22             A.      Free Exercise of Religion ...........................................................19

23             B.      Freedom of Speech .....................................................................19

24             C.      Equal Protection ........................................................................20
25
               D.      Due Process................................................................................20
26

27     VIII.   CONCLUSION....................................................................................22

28

i

1

TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Board of Regents of State Colleges v. Roth,*
5
    408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)..................................................21

6

*Church of North County v. City of San Diego,*
7
    555 F.Supp.2d 1126 (S.D. Cal. 2008)..........................................................................13

8

*Civil Liberties for Urban Believers v. City of Chicago ("C.L.U.B."),*
9
    342 F.3d 752 (7th Cir. 2003)...............................................................................passim

10

*Congregation Kol Ami v. Abington Township,*
11
    309 F.3d 120 (3rd Cir. 2002).........................................................................20, 21

12

*Grace United Methodist Church v. City Of Cheyenne,*
    451 F.3d 643 (10th Cir. 2006)............................................................................passim

13

*Guru Nanak Sikh Soc. of Yuba City v. County of Sutter,*
14
    456 F.3d 978 (9th Cir. 2006)...................................................................................11

15

*Guru Nanak Sikh Society of Yuba City v. County of Sutter,*
16
    326 F.Supp.2d 1140 (E.D. Cal. 2003)..........................................................................7

17

*Lighthouse Institute for Evangelism, Inc. v. City of Long Branch,*
18
    510 F.3d 253 (3rd Cir. 2007)............................................................................11, 20

19

*Messiah Baptist Church v. County of Jefferson, State of Colo.,*
20
    859 F.2d 820 (10th Cir. 1988).................................................................................12

21

*Midrash Sephardi, Inc. v. Town of Surfside,*
22
    366 F.3d 1214 (11th Cir. 2004)..........................................................................12, 14

23

*North Pacifica LLC v. City of Pacifica,*
    526 F.3d 478 (9th Cir. 2008).................................................................................21

24

*Prater v. City of Burnside, Ky.,*
25
    289 F.3d 417 (6th Cir. 2002).................................................................................21

26

*Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County,*
27
    450 F.3d 1295 (11th Cir. 2006).........................................................................passim

28

TABLE OF AUTHORITIES cont.

Page(s)

**Cases** *cont.*

*San Jose Christian College v. City of Morgan Hill,*
　360 F.3d 1024 (9th Cir. 2004) ........................................................ 9, 12, 14, 19

*Sts. Constantine and Helen Greek Orthodox Church v. City of New Berlin,*
　396 F.3d 895 (7th Cir. 2005) ............................................................. 13

*Ventura County Christian High School v. City of San Buenaventura,*
　233 F.Supp.2d 1241 (C.D. Cal. 2002) ................................................. 7

*Vietnamese Buddhism Study Temple In America v. City of Garden Grove,*
　460 F.Supp.2d 1165 (C.D. Cal. 2006) ................................................. 7

*Vision Church v. Village of Long Grove,*
　468 F.3d 975 (7th Cir. 2006) ......................................................... 11, 20

*Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.,*
　24 F.3d 56 (9th Cir. 1994) ............................................................... 21

*Westchester Day School v. Village of Mamaroneck,*
　386 F.3d 183 (2nd Cir. 2004) ............................................................. 2

*Westchester Day School v. Village of Mamaroneck,*
　504 F.3d 338 (2nd Cir. 2007) ....................................................... 12, 17

**Statutes**

42 U.S.C. § 2000cc ..................................................................... passim

I.    *INTRODUCTION*

The parties have filed cross-motions for summary judgment in this action.[1]  The arguments raised in support of plaintiff's motion have been largely, although not entirely, anticipated and addressed in the papers supporting defendant City of San Leandro's Motion for Summary Judgment Or In the Alternative Summary Adjudication of Claims. This opposition therefore incorporates by reference the argument presented in the memorandum of points and authorities supporting that motion (herein "City's MSJ," reproduced as Exhibit 39 with this opposition).  The opposition also relies principally on the Declaration of former City Planning Manager Debbie Pollart submitted with the City's MSJ (reproduced as Exhibit 38 with this opposition), and the same exhibits submitted in support of the City's MSJ, with minor additions.[2]

In its motion plaintiff International Church of the Foursquare Gospel ("ICFG") and "real party in interest" Faith Fellowship Foursquare Church (collectively, "the Church") offer only token argument in support of the constitutional claims asserted in the Fourth through Ninth Causes of Action of their First Amended Complaint ("FAC").  Indeed, the Church offers no argument at all pertaining to its freedom of association and freedom of assembly claims.  Sixth and Seventh Causes of Action, FAC, pp. 34-35.  The Church's constitutional claims are not only unsubstantiated in its moving papers, but completely fail for reasons discussed in the City's MSJ, as well as for the reasons briefly discussed below. *///*

---

[1]  The Church has now filed two separate motions for summary judgment which are all set to be heard on October 1, 2008, in violation of this Honorable Court's Pre-Trial Instructions which requires leave of court to file more than a single motion.  Pre-Trial Instructions, Section A.2.  The City suggests that the Court should strike this second improperly filed motion and leave this first filed motion on calendar.

[2]  Pursuant to clarification from the Court Clerk, the City is submitting concurrently any prior exhibits referenced herein from the City's prior motion for summary judgment.  The City has utilized the same exhibits numbers found in City's original msj.  The City's msj exhibits were previously authenticated through prior declarations of Deborah J. Fox and Debbie Pollart and also were the subject of a prior Request For Judicial Notice.  Said documents are hereby incorporated by reference.

The Church offers more substantive arguments concerning its claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA," 42 U.S.C. § 2000cc *et seq.*), which comprise the first three causes of action in the Church's First Amended Complaint. These claims all ultimately fail, however, for reasons discussed below and in the City's MSJ. The Church attempts to prevail here upon what can only be considered a skeletal showing of facts. The motion must fail first because the Church clearly has not met its initial burden of showing there are no material issues of fact. More fundamentally, however, the Church's RLUIPA claims fail because they are founded on a fundamentally flawed understanding of what RLUIPA requires.

As various courts have commented, the purpose of RLUIPA is to level the playing field for religious land use, not mandate favoritism or special exemptions from otherwise valid and generally applicable land use policies and regulations. *See, e.g. Westchester Day School v. Village of Mamaroneck*, 386 F.3d 183, 189-190 (2nd Cir. 2004) ["As a legislative accommodation of religion, RLUIPA occupies a treacherous narrow zone between the Free Exercise Clause … and the Establishment Clause …. In our view, if RLUIPA means what the district court believes it does, a serious question arises whether it goes beyond the proper function of protecting the free exercise of religion into the constitutionally impermissible zone of entwining government with religion in a manner that prefers religion over irreligion and confers special benefits on it."]; *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1313 (11th Cir. 2006) ["The bottom line … is that RLUIPA's Equal Terms provision requires equal treatment, not special treatment."]; *Civil Liberties for Urban Believers v. City of Chicago* ("*C.L.U.B.*"), 342 F.3d 752, 761-762 (7th Cir. 2003). Here, the Church wishes to relocate its existing church facilities to a new location that is zoned for industrial use. The City conscientiously considered the Church's request and considerably expanded opportunities for religious assemblies to locate in the City in response to this request. The City also concluded, however, that based on objective planning and zoning criteria, the industrial site preferred by the Church was not actually appropriate for religious or non-religious

2

1   assembly uses.  The Church does not seriously claim, and certainly has offered no

2   evidence, that this decision was in any way motivated by animus or bias towards the

3   Church or towards religion generally.  RLUIPA simply does not immunize churches from

4   the operation of reasonable land use regulations such as those enacted and conscientiously

5   administered by the City.  The Church's RLUIPA claims, like its constitutional claims, are

6   simply without merit.

7   II.    *STATEMENT OF FACTS*

8          The Church makes no serious attempt to explain the factual context for its claims in

9   this motion.  This is perhaps understandable.  A review of the facts clearly dispels any

10  notion that the Church has been the victim of anti-religious discrimination or arbitrary

11  conduct by the City.  Instead, the record reveals only a good faith effort to expand the

12  City's accommodation of religious land uses, while adhering to reasonable objective

13  planning criteria and policies set forth in the City's legally adopted General Plan.  *See*

14  Exhibit 38, Pollart Declaration, ¶¶ 19-35.  A full chronology of the relevant events is set

15  forth in the memorandum supporting the City's motion for summary judgment and the

16  supporting declaration of Debbie Pollart.  Exhibit 39, City's MSJ, pp. 679-680; Exhibit 38,

17  Pollart Decl., ¶¶ 15-41; Exhibits 11-27.

18          As indicated in the Church's current papers, the Church's complaint boils down to

19  the fact that the City declined to rezone certain industrial-zoned property in the City for

20  religious assembly use.  The Church considers the Catalina Street property at issue to be

21  ideal for expansion of its current church operations at 577 Manor Boulevard in the City,

22  and improvidently purchased the property before any formal City decisions were made

23  upon its proposed rezoning, and before the Church had any reasonable expectation that the

24  rezoning would actually occur.  The City, for its part, conducted a comprehensive review

25  of its existing zoning regulations to determine the best approach to expanding possibilities

26  for religious and other assembly uses in the City's commercial and industrial areas.  The

27  City ultimately concluded on the basis of objective planning criteria that the Catalina

28  Street property should not be included in the new Assembly Use Overlay zone.  Exhibit

3

1    38, Pollart Decl., ¶¶ 20-36.  It reached the same conclusion when the Church applied to

2    have the Catalina Street property rezoned into the Assembly Use Overlay zone

3    immediately after this overlay zone was created.  Exhibit 38, Pollart Decl., ¶¶ 36-41.

4         In its motion the Church cites to a smattering of selected facts as the basis for its

5    claims.  These facts are addressed as appropriate below.  Significantly, however, although

6    the Church now argues that the decisionmaking criteria utilized by City were somehow

7    arbitrary or discriminatory, it does not argue anywhere (much less identify supporting

8    evidence) that the City's actions were motivated by any actual discriminatory intent or

9    anti-religious bias.  The Church's claims come down to an argument that the City's

10   enactment and administration of its facially neutral zoning regulations somehow

11   unlawfully restricted the Church's religious activities.

12   III.   *THE CITY DID NOT VIOLATE THE EQUAL TERMS PROVISION OF RLUIPA*

13        Somewhat surprisingly, the Church bases its main claims on the Equal Terms

14   provision of RLUIPA, 42 U.S.C. § 2000cc(b)(1).  The Church contends the City has

15   violated the Equal Terms provision in three ways:

16        1)    By utilizing eight (8) objective planning criteria to designate sites for

17   inclusion in the Assembly Use Overlay zone, and excluding the Catalina Street property on

18   the basis of two of these criteria;

19        2)    Allegedly allowing certain entertainment and recreational uses where

20   religious assemblies are not allowed at the Catalina Street property; and

21        3)    Allegedly imposing a "hazardous materials burden" on the Church.  Two of

22   these arguments were anticipated, albeit in slightly different form, in the City's cross-

23   motion for summary judgment.  Exhibit 39, City's MSJ, pp. 694-696.

24        All three of the claims are without merit.

25   ///

26   ///

27   ///

28   ///

4

A.   *The City Did Not Violate the Equal Terms Provision of RLUIPA by Applying the Same Objective Planning Criteria to The Church's Proposed Catalina Street Property That Were Applied to All Other Properties Considered for Inclusion in the Assembly Use Overlay Zone.*

The Church's first Equal Terms argument is meritless.  The undisputed evidence shows that the City developed eight separate objective planning criteria for selecting sites to be included in Assembly Use Overlay zone.  FAC, ¶ 39; Exhibit 38, Pollart Decl., ¶ 31; Exhibits 15, pp. 223-227; 16, pp. 279-281; 17, pp. 294-298.  The criteria were based on policy and planning consideration set forth in the City's adopted General Plan.  Exhibit 38, Pollart Decl., ¶¶ 22, 32.  One hundred ninety-six (196) properties in the City's existing non-residential zones were found to satisfy all eight criteria.  Exhibit 38, Pollart Decl., ¶¶ 33, 35; Exhibits 10, 20.  All other properties in the City's non-residential zones – including the Church's Catalina Street property – were excluded from the Assembly Use Overlay zone based on these criteria.[3]  When the Church applied to be rezoned into the Assembly Use Overlay zone, its application was rejected because it did not meet two of the 8 selection criteria, *i.e.* the property was located in a General Plan "focus area," and the site was not within ¼ of a designated arterial street.  Exhibit 38, Pollart Decl., ¶¶ 41-42; Exhibit 23, pp. 441, 450-453.  The Church nevertheless contends that the exclusion of the Catalina Street property violates Section 2000cc(b)(1) because "no other applicant for assembly use … has been subjected to the burden of these eight criteria."  Pl. Memorandum, p. 7:19-22.

The argument is devoid of merit.  With respect to the City's initial selection of properties for inclusion in the Assembly Use Overlay zone, the same criteria were applied

///

///

---

[3]  While neither side has quantified the precise number of parcels excluded from the AU Overlay zone, a look at City zoning maps, however, shows that the large majority of parcels in the City's industrial and commercial zones were excluded under this 8 prong test.  Exhibits 8, 9.

CITY'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT (No. 2)                    C07-03605-PJH

1  to *every* non-residential property in the City.[4]  The Catalina Street property was excluded

2  from the Assembly Use Overlay zone for the same reason that hundreds of other properties

3  were excluded – it simply did not meet the selection criteria used by the City and applied

4  equally to all potential candidates for inclusion in the overlay zone.  Exhibit 38, Pollart

5  Decl., ¶ 36.

6      The Church's subsequent application to be rezoned into the Assembly Use Overlay

7  zone was rejected for the same reasons.  The property did not meet two of the criteria just

8  utilized in selecting all other properties in the Assembly Use Overlay zone.  Exhibit 38,

9  Pollart Decl., ¶¶ 36, 41-42.  The City can hardly be accused of violating the Equal Terms

10 provision of RLUIPA by applying the same 8 criteria it had just recently utilized in

11 selecting properties for inclusion in the Assembly Use Overlay zone to an application for

12 rezoning into that zone.

13     The Church apparently reasons that an Equal Terms violation may be premised on

14 the fact that the 8 criteria have not been specifically applied to any other "applicant"

15 seeking a *rezoning* into the Assembly Use Overlay zone.  The simple reason for that,

16 however, is that there never has been any other application for rezoning into the Assembly

17 Use Overlay zone.  For an as-applied challenge under the Equal Terms provision of

18 RLUIPA, the Church must show that it has been treated differently than some *similarly*

19 *situated* entity – in this case, another applicant requesting a similar rezoning into the

20 Assembly Use Overlay zone.  *See Primera Iglesia*, 450 F.3d 1295, 1311-1312.  The fact

21 that the Church was the first (and to date only) entity to apply for such a rezoning did not

22 entitle it to approval under RLUIPA simply because no other similar applications have yet

23 been filed and denied.  Absent evidence that the City has treated another similarly situated

24 applicant differently – and there is none – the Church has no basis for this Equal Terms

25 claim.

26 ///

27

28

_____

[4] Residential properties were excluded from consideration only because Assembly Uses
were already allowed with a CUP in all residential zones.  Exhibit 38, Pollart Decl., ¶¶ 7-8.

B.    *Commercial Entertainment and Recreational Uses Are Not Assembly Uses Nor are the Similarly Situated to Religious Assembly Uses for Purposes of RLUIPA.*

The Church also argues that the City has violated RLUIPA by allowing certain commercial recreational and entertainment uses in its IL and IP zones while refusing to approve a CUP for religious assembly use of the Church's Catalina Street property.   Pl. Memorandum, pp. 8-9.  Although couched in terms of an as-applied attack, the Church does not actually identify any other property in the IL or IP zones upon which commercial recreation or entertainment uses have actually been allowed.  The Church's attack must therefore be construed as a facial challenge to the City's zoning ordinances.  *See Primera Iglesia*, 450 F.3d 1295, 1308-1309 [distinguishing facial and as applied Equal Terms violations].

The Church's facial attack fails for reasons addressed in the City's cross-motion. *See* Exhibit 39, City's MSJ, pp. 691:20-694:5.  For the sake of brevity, these arguments will not be fully repeated here.  Briefly, the argument fails because (1) the commercial recreational and entertainment uses allowed by the City's zoning ordinances are not "assembly" uses or "institutions" within the meaning of 42 U.S.C. § 2000cc(b)(1) and (2) such uses are in any event not "similarly situated" to the Church's proposed use. *Ventura County Christian High School v. City of San Buenaventura*, 233 F.Supp.2d 1241, 1247 (C.D. Cal. 2002); *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 326 F.Supp.2d 1140, 1155 (E.D. Cal. 2003); *Vietnamese Buddhism Study Temple In America v. City of Garden Grove*, 460 F.Supp.2d 1165, 1173 (C.D. Cal. 2006).

In its motion, the Church makes no meaningful attempt to discuss the relevant ordinance provisions, or to show that the types of commercial recreation and entertainment

///
///
///
///

7

1  uses allowed with a CUP in the IL and IP zones can be deemed similar to church use.[5]  The

2  Church offers a couple of weak arguments designed to show that RLUIPA requires

3  Churches to be treated the same as any number of commercial or other types of land uses

4  that have never historically been considered "assemblies" or "institutions" for zoning

5  purposes, nor similar to assembly or institutional uses of any kind.

6       The Church first cites certain passages in the legislative history of RLUIPA for the

7  proposition that "recreation centers" and "places of amusement" must be deemed similar to

8  religious uses under RLUIPA.  The cited passages, however, come from a section of

9  House Report No. 106-219 entitled "Summary of Hearing Testimony" which summarizes

10 *testimony* heard by the House on alleged discrimination against religious uses.  *See* H.R.

11 Rep. 106-219 pp. *18-*24, City Request for Judicial Notice ("RFJN"), Exhibit B, pp. 039-

12 043.  There is obviously a considerable distance between the opinions and sensibilities of

13 partisans testifying before Congress and the actual intent the lawmakers who approve the

14 final version of a statute.  Moreover, the general purpose of the discussion in this section

15 appears to be to set forth the basis for concluding that (1) there was allegedly widespread

16 *intentional discrimination* against churches in land use regulation, (2) such discrimination

17 is often shielded from detection by the excessive discretion enjoyed by zoning officials.

18 H.R. Rep. 106-219, pp. *23-*24, RFJN, Exhibit B, pp. 042-043.  The discussion does not

19 purport to define precisely the parameters of which types of land uses should be considered

20 sufficiently similar to religious uses to invoke equal treatment.  Moreover, if the Church

21 contends that the cited passages are evidence of Congress interpretation of the terms

22 "assembly" and "institution" as used in Section 2000cc(b)(1), the argument proves far too

23 much.  Among the examples of supposed discrimination against churches cited in the

24

25 _____

[5]  Although unclear on this point, the Church appears to be arguing that not only
26 commercial recreation and entertainment facilities constitute assembly uses under
   RLUIPA, but also the bars, cafes, trade schools and "full service restaurants" which are all
27 allowed in the IL and IP zones are assembly uses which must be treated the same as
   churches under RLUIPA.  *See* Pl. Memorandum, p. 8:19-22.  If this is in fact the Church's
   argument, it is absurd on its face.  If accepted, it would essentially rewrite RLUIPA into a
28 proscription that churches must be allowed anywhere that virtually *any* human activity is
   allowed by local zoning.

1    hearing testimony are instances in which churches were allegedly treated differently than

2    museums, municipal buildings, a flower shop, bank, an office building with an auditorium,

3    and a former department store, to say nothing of theaters, funeral parlors and unspecified

4    "recreational uses."  H.R. Rep. 106-219, pp. *19-*22; RFJN Exhibit B, pp. 039-041.

5    Nothing in the actual House Report summary of the bill and its purposes gives any

6    indication of intent to incorporate such a vastly expansive interpretation of the terms

7    "assembly" and "institution" into RLUIPA.  *See* H.R. Rep. 106-219 p. *17, RFJN, Exhibit

8    B, pp. 038-039.  In the final analysis, the Church's argument fails.  The legislative history

9    of RLUIPA does not evidence any intent to abrogate all meaningful distinctions between

10    religious assemblies and institutions and virtually all other types of use likely to attract

11    multiple persons.

12         The Church also argues that the definition of "Assembly Building" in the Uniform

13    Building Code should be deemed to define the term "assembly" for purposes of RLUIPA.

14    If accepted, this definition would make religious assemblies or nonreligious fraternal

15    organizations the equivalents of such diverse uses as restaurants, bars, schools, and bus

16    stations, provided the facilities served 50 or more persons at a time.  Uniform Building

17    Code § 203.A.[6]  Such uses would not qualify as assemblies, however, if the congregation,

18    membership or guest capacity was less than 50 persons.  The UBC classification of

19    "assembly buildings" is obviously crafted to address structural requirements and life safety

20    issues common to aggregations of persons in a single facility for any purpose, *e.g.* floor

21    strength, fire rating, exiting provisions, ventilation requirements, but not to define the

22    nature of the activity in question.   The Church does not provide any evidence that this

23    technical definition was contemplated by Congress when it enacted RLUIPA.  It is well

24    settled that absent clear indication of contrary intent, words in a statute are to be construed

25    in light of their ordinary and common meaning, not technical definitions drawn from

26

27    ───────────────
[6]  Of note, UBC § 202 actually defines Assembly Building as "a building or portion of a
building used for the gathering together of 50 or more persons for such purposes as
deliberation, education, instruction, worship, entertainment, amusement, drinking or dining
28    or awaiting transportation."

1   sources far removed from the apparent purpose and subject matter of the statute. *San Jose*

2   *Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004).

3       C.    *Hazardous Materials.*

4       The Church's arguments about a "hazardous materials burden" are also largely

5   anticipated and debunked in the City's cross-motion for summary judgment. Exhibit 39,

6   City's MSJ, pp. 694:6-696:14. The City has not adopted any formal law or regulation

7   mandating disapproval (or permitting approval) of churches or any other assembly use

8   based on proximity to sites operating with HMBPs. Exhibit 38, Pollart Decl., ¶ 46. The

9   possible proximity of HMBP sites was not considered during preparation of the Assembly

10  Use Overlay zoning amendments simply because consideration of such site-specific

11  criteria was not believed necessary in the context of a City-wide zoning. Exhibit 38,

12  Pollart Decl., ¶ 44. Not even the Church, however, can seriously contend that the

13  proximity of hazardous materials is an inappropriate consideration at the time individual

14  applications for assembly uses are considered. *See* Exhibit 38, Pollart Decl., ¶¶ 43, 46.

15  The record further does not indicate that the presence of nearby HMBPs was a substantial

16  factor in the actual denial of the Church's application. Exhibit 38, Pollart Decl., ¶ 45;

17  Exhibit 24, pp. 503-504. While the Church complains that the presence of nearby HMBPs

18  was considered for the very first time in response to its rezoning application, it does not

19  contend that any other similar applications for rezoning have ever been filed, nor that the

20  City is likely to ignore hazardous materials issues in considering future applications. In

21  the absence of evidence of dissimilar treatment of other similarly situated applicants, the

22  Church simply cannot sustain an Equal Terms claim based on alleged discriminatory

23  application of City decisionmaking standards or criteria. *Primera Iglesia*, 450 F.3d 1295,

24  1311; *Guru Nanak*, 326 F.Supp.2d 1140, 1155.

25      The Church attempts to buttress its claim with a straw man argument to the effect

26  that its rezoning application was denied because it was located within ¼ mile of a property

27  with a HMBP, a criterion which would effectively disqualify all 196 properties in the

28  Assembly Use Overlay zone. The record, however, shows that the health and safety

1    concern identified by City staff resulted from the fact that there were eight businesses

2    within 500 feet of the Catalina Street site, and a total of 13 such businesses within ¼ mile

3    of the site.  Exhibit 38, Pollart Decl., ¶ 44; Exhibit 23, pp. 453-454.  These businesses were

4    authorized to store or handle such substances as combustible liquids, oxidizers, corrosives

5    and miscellaneous hazardous materials in quantities up to 5000 pounds, 550 gallons or

6    22,000 cubic feet.  *Id.*  The staff reports also make it clear that the primary ground for

7    denial of the rezoning request was that the property simply did not use the criteria

8    employed in selecting other sites for the Assembly Use Overlay zone.  Exhibit 38, Pollart

9    Decl., ¶ 41; Exhibit 23, pp. 441-442, 447, 449-453.

10   IV.    *THE CITY HAS NOT IMPOSED A SUBSTANTIAL BURDEN ON THE CHURCH'S*

11          *EXERCISE OF RELIGION*

12          The Church claims that it has been "substantially burdened" by the City's refusal to

13   rezone the Catalina Street property, the "burden" manifesting itself as constraints on the

14   Church's operations at its current Manor Boulevard location, and **costs** incurred in

15   purchasing and holding the Catalina Street property that was the subject of the Church's

16   rezoning requests.

17          As discussed in the City's cross-motion, the term "substantial burden" in RLUIPA

18   is intended to bear the same meaning as that term "substantial burden" in case law

19   construing the Free Exercise clause of the First Amendment.  *Guru Nanak Sikh Soc. of*

20   *Yuba City v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006); *Vision Church v. Village*

21   *of Long Grove*, 468 F.3d 975, 997 (7th Cir. 2006); *C.L.U.B.*, 342 F.3d 752, 760-761; *see*

22   *also* 146 Con. Rec. S7774-01, 7/27/2000, pp. S7775-S7776, City RFJN Exhibit A, p. 008

23   ["These sections enforce the Free Exercise Clause rule against laws that burden religion

24   and are not neutral and generally applicable."].  The Courts have long recognized that

25   burdens which are not oppressive and are imposed on religious activities merely by the

26   operation of laws of general application do not constitute "substantial burdens" on religion

27   triggering strict scrutiny.  *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*,

28   510 F.3d 253, 275-277 (3rd Cir. 2007); *Grace United Methodist Church v. City Of*

---

11

1   *Cheyenne*, 451 F.3d 643, 649-650 (10th Cir. 2006).  Absent facial discrimination against

2   religious activities or evidence of intentional selective application, zoning laws are laws of

3   "general applicability" for purposes of "substantial burden" analysis.  *Id*; *San Jose*

4   *Christian College*, 360 F.3d at 1032 ["A law is one of neutrality and general applicability

5   if it does not aim to "infringe upon or restrict practices because of their religious

6   motivation, and if it does not 'in a selective manner impose burdens only on conduct

7   motivated by religious belief.']."

8        Because incidental burdens do not trigger strict scrutiny, "courts confronting free

9   exercise challenges to zoning restrictions rarely find the substantial burden test satisfied

10  even when the resulting effect is to completely prohibit a religious congregation from

11  building a church on its own property."  *Westchester Day School v. Village of*

12  *Mamaroneck*, 504 F.3d 338, 350 (2nd Cir. 2007); *Messiah Baptist Church v. County of*

13  *Jefferson, State of Colo.*, 859 F.2d 820, 824-825 (10th Cir. 1988).  Such burdens are

14  simply an incident of living in an organized society whose members – nonreligious as well

15  as religious – can all expect equal treatment under regulatory land use laws.

16       In this case, the evidence shows that the City has adopted a zoning scheme that

17  treats religious assemblies on the same footing as other similar assembly uses, and permits

18  these uses with a conditional use permit in a wide variety of locations comprising over

19  54% of the total land area of the City.  Exhibit 38, Pollart Decl., ¶¶ 7-12; Exhibits 2, p. 8;

20  3, pp. 14-16, 18; 8-10, 20.  However inconvenient for the Church, the fact that the Catalina

21  Street property is not one of the sites available for Assembly Uses in the City is an

22  incidental consequence of an otherwise valid and clearly neutral zoning scheme.

23       The Church attempts to overcome these hard facts with claims that no other sites

24  suitable for the Church's needs are actually "available" in the City.  The first problem with

25  this argument is purely legal.  If the burdens, such as they are, imposed on the Church by

26  the unavailability of the Catalina Street site are merely incidental to the operation of the

27  City's overall zoning scheme, the fact that other sites are "unavailable" to the Church for

28  economic or other reasons is simply irrelevant.  *C.L.U.B.*, 342 F.3d 752, 761; *Midrash*

12

1  *Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227, fn 11 (11th Cir. 2004) ["That the

2  congregations may be unable to find suitable alternative space does not create a substantial

3  burden within the meaning of RLUIPA."].  The result might be different if the Church

4  could show arbitrary actions suggesting actual intentional discrimination (*Sts. Constantine*

5  *and Helen Greek Orthodox Church v. City of New Berlin*, 396 F.3d 895, 900-901 (7th Cir.

6  2005); *Grace Church of North County v. City of San Diego*, 555 F.Supp.2d 1126, 1136-

7  1137 (S.D. Cal. 2008) ["outright hostility … decisionmaking that was seemingly arbitrary

8  or pretextual, and ignorance regarding the requirements of controlling federal law"]), or a

9  course of conduct calculated to unreasonably narrow the range of sites otherwise legally

10  available for religious assembly use (*Guru Nanak*, 456 F.3d 978, 991-992).  There is no

11  such evidence here.

12      The second problem – or set of problems – with the Church's arguments are both

13  factual and legal.  The Church cites the deposition testimony of its real estate agent

14  Edward Bullock as evidence that it made a diligent search for potential new church sites in

15  San Leandro, and that none other than the Catalina Street site were available.  Pl.

16  Declaration of Kevin T. Snider, Exhibit 1.  The testimony, however, provides at best very

17  weak support for the proposition that no alternative sites were available as a practical

18  matter.  More critically, the testimony vividly illustrates the legal impossibility of relying

19  on a particular church's subjective needs and financial capabilities or preferences as the

20  yardstick for measuring whether municipal zoning code provisions unreasonably restricts

21  opportunities for religious assemblies.

22      Bullock testified that his criteria for a minimally acceptable site began with the

23  specification that it be at least 3 to 3.5 acres in size or larger.  Snider Decl., Exhibit 1, pp.

24  7:8-19, 15:17-23.  Other limiting criteria for a site acceptable to Bullock were cost, access

25  and egress arrangements and an adequate "road net," configuration of the lot, and the

26  construction type and configuration of existing buildings on the site.  Snider Decl., Exhibit

27  1, pp. 29:22-30:3, 7:19-22, 8:9-20; 9:1-18, 11:10-19, 27:9-28:3.  Bullock also considered

28  sites near railroad tracks, sites in a "rundown" or "dilapidated" condition, and sites with

1   potential for "political" opposition to be unacceptable.  Snider Decl., Exhibit 1, pp. 11:16-
2   19, 11:23-12:3, 13:2-4, 22:1-5, 32-33.  Also according to Bullock, the minimum acceptable
3   building size on the property would be 40,000-50,000 square feet, a criteria which neatly
4   eliminated every other candidate property in the City.  Snider Decl., Exhibit 1, pp. 23:12-
5   25:11.

6        The Church's desire to have a site hand-picked to meet its preferences is
7   understandable.  It does not follow, however, that having to settle for less optimal site or
8   less visually pleasing setting amounts to a substantial burden on the Church's practice of
9   religion.  As the courts have recognized, there is a big difference between regulatory
10  impacts which merely inconvenience the practice of religion and those that impose a
11  substantial burden on religion in any constitutional sense.  "[F]or a land use regulation to
12  impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great extent.'
13  That is, a 'substantial burden' on 'religious exercise' must impose a significantly great
14  restriction or onus upon such exercise."  *Guru Nanak*, 456 F.3d at 988, quoting *San Jose*
15  *Christian College*, 360 F.3d 1024, 1034.  A "substantial burden" is thus one which
16  "exert[s] substantial pressure on an adherent to modify his behavior and to violate his
17  beliefs."  *Id*.; *see also Midrash*, 366 F.3d 1214, 1226 ["significant pressure which directly
18  coerces the religious adherent to conform his or her behavior accordingly."]; *C.L.U.B.*,
19  342 F.3d 752, 761 ["a land use regulation which imposes a substantial burden on
20  religious exercise is one that necessarily bears direct, primary and fundamental
21  responsibility for rendering religious exercise … effectively impractical."].  Mere
22  inconveniences or other less drastic impositions do not constitute substantial burdens on
23  religion.  *See, e.g., Midrash*; 366 F.3d 1214, 1227-1228.

24       Another problem with the testimony of Mr. Bullock is that it illustrates just how
25  easily the Church's own arguments could be manipulated to "prove" that there were
26  literally no alternative sites available for churches in the City.  The Church professes that
27  the Catalina Street property is ideal for its proposed new mega-church facilities.  The
28  property, however, has only 188 parking spaces, which is only 34 more than the 154

1    parking spaces available at the Church's current allegedly overcrowded Manor Boulevard

2    site.  *See* FAC, ¶¶ 13, 52 (p. 16:6); letter of Church attorney Peter MacDonald to

3    Planning Commission, 4/9/07, Exhibit 23, p. 475.[7]  The Church itself may be willing to

4    take its chances regarding the adequacy of parking at the Catalina Street site.  However, it

5    is easy to see that another church suing the City could easily cite the limited parking

6    capacity of the site as grounds for finding that the site was not a practical alternative for

7    relocating a congregation, even were the site zoned for Assembly Uses.

8         The potential grounds for finding the Catalina Street property "unavailable" for

9    religious assembly uses hardly end with parking.  Although the Church, with its

10   nationwide standing, may be able to afford the $5,375,000 price tag for the property (FAC,

11   p. 5:18), this cost might well be deemed prohibitive by many a less prosperous religious

12   group.  Others, unlike the Church, might well find the industrial surroundings inimical to

13   their ideal of a place of worship, just as the Church balks at locating in some of the less

14   affluent parts of the City.  Bullock Deposition, Exhibit 1 to Snider Decl., pp. 11:16 – 12:3,

15   22:1-4.  While the Church apparently finds the current buildings on the Catalina Street

16   property amenable to conversion to church use, another religious group or order might find

17   the structure incommodious or the costs of remodeling unacceptable.  Still other religious

18   groups might find that use of the isolated Catalina Street property, located off major public

19   transportation routes, would impose an unacceptable burden on parishioners who depended

20

21   _____

22   [7]    The Church claims this apparent parking deficiency can be overcome through
     agreements allowing the Church to utilize parking space on adjacent industrial properties.
23   However, the Church has never produced any written agreements confirming its ability to
     utilize offsite parking.  The problem with informal agreements of the type apparently
24   proposed by the Church is that they are likely to evaporate the first time the vice-president
     of a corporate neighbor emerges from overtime work on a Sunday afternoon to find his or
25   her car dented by a parishioner, or the space is needed by firm employees doing overtime
     shifts to meet a production deadline.  The Church acknowledges that it at one time had an
26   informal arrangement to use Sunday morning parking space at a bowling alley near its
     Manor Boulevard facilities, but this arrangement was unilaterally terminated by the
27   bowling alley due to apparent conflicts with the bowling alley's requirements.  Gary
     Mortara Depo., Exhibit 30, pp. 542.1:10-542.3:25.
28

1  on public transportation to attend religious services or participate in other church activities.

2  All these factors indicate the impossibility of holding public zoning authorities to standards

3  that ultimately depend upon the subjective choices, preferences and alleged particular

4  needs of individual religious organizations.

5      As a final matter, the Church's claims that no other practical alternative sites exist is

6  further fatally undercut by the Declaration of Church Senior Pastor Gary Mortara

7  submitted by plaintiffs.  Nowhere in Mortara's declaration, nor anywhere in the Church's

8  moving papers, does the Church attempt to explain why the constraints on its current

9  operations at 577 Manor Boulevard could not be resolved by opening a second more

10  moderately sized facility at a new location.  Instead, Mortara attests that the Church has in

11  fact routinely in recent years dispatched pastors and smaller portions of its congregation to

12  worship at other locations nearer to their homes.  Mortara Decl., ¶ 19.  This alone

13  decisively refutes any argument that a single grand facility is actually required by the

14  Church to conduct its religious activities in the City of San Leandro.  The Church's

15  proposed plans for use of the Catalina Street site also disclose that considerably less than

16  half of the building space will actually be used for worship services.  Exhibit 24, p. 479.

17  The rest will be used for administrative space and a variety of functions that might easily

18  be conducted at other locations, *e.g.* counseling services.

19  V.    *THE CITY'S ACTIONS WERE THE LEAST RESTRICTIVE MEANS OF*

20        *FURTHERING THE CITY'S COMPELLING INTEREST IN PRESERVING*

21        *CERTAIN LAND FOR INDUSTRIAL USE*

22      The Church acknowledges that even regulations which substantially burden religion

23  may be upheld under RLUIPA if they serve compelling governmental interests and are the

24  least restrictive means of doing so.  42 U.S.C. § 2000cc(a)(1)(A), (B).  In this case, the

25  compelling interest served by the City's actions was the preservation of land for industrial

26  and commercial development in compliance with certain key policies in the City's General

27  Plan.  Exhibit 38, Pollart Decl., ¶¶ 22, 31-32, 41; Exhibit 7, pp. 113, 119, 127, 129-130,

28  141; Exhibit 23, pp. 451.  Relying on *Grace Church*, 555 F.Supp.2d 1126, 1140, the

1   Church contends that preservation of industrial land is not compelling "as a matter of law."
2   Pl. Memorandum, pp. 15:15-20, 16:1-2.  The Church offers no evidence of any kind to
3   support its contention that the City's interests are less than compelling, or that less
4   restrictive alternatives existed, in the specific facts of this case.

5       *Grace Church,* 555 F.Supp.2d 1126, does not support the contentions made by the
6   Church here.  In *Grace Church,* the court noted that "even if preservation of industrial
7   lands constituted an important interest, the government bears the burden to show 'a
8   compelling interest in imposing the burden on religious exercise *in the particular case at*
9   *hand*, not a compelling interest in general.'"  *Id.* at 1140, emphasis added, quoting
10  *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 353 (2nd Cir. 2007).
11  The court went on to note that San Diego's interest in excluding the plaintiff from the
12  particular land at issue in that case could not be deemed compelling because the city's own
13  regulations allowed religious assembly and other non-industrial uses in the zone with a
14  conditional use permit.  *Grace Church,* 555 F.Supp.2d at 1140-1141.

15      In this case, religious or other assembly uses have never been allowed on the
16  Catalina Street property, with or without a CUP.  The property is located in an area (the
17  South of Marina or "SoMar" Business District) specifically targeted in the City's General
18  Plan for preservation of industrial and certain commercial development needed to maintain
19  the City's job base and economic welfare.  Exhibit 38, Pollart Decl., ¶ 41; Exhibit 7, p.
20  130.  There is also ample evidence that the Catalina Street site is uniquely suitable for this
21  purpose.  *See* Sims Deposition, Exhibit 29, pp. 526:6-25, 527:23 – 528:18; Jermanis
22  Deposition, Exhibit 28, pp. 517.1:22-518.25; 521.1:12-19.[8]  The Church clearly has not
23  shown the absence of any triable issue as to whether the City's interests are sufficiently
24  compelling and narrowly tailored to justify its restrictions on the specific facts of this case.
25  ///
26  ///
27
28  _____
    [8]  These additional deposition pages are added to the exhibit submitted with the City's
    MSJ, Exhibit 28.

VI.    *THE CITY'S REGULATIONS DO NOT TOTALLY EXCLUDE OR*
       *UNREASONABLY LIMIT RELIGIOUS LAND USES IN THE CITY*

The Church devotes a total of ½ page of argument to its Third Cause of Action, which alleges a violation of 42 U.S.C. § 2000cc(b)(3).  42 U.S.C. § 2000cc(b)(3) prohibits land use regulations that totally exclude or "unreasonably limit[] religious assemblies, institutions, or structures within a jurisdiction."  The Church contends that "What is reasonable must be determined in light of all the facts, including the actual availability of land and the economics of religious organizations."  The Church then proceeds, however, to argue only that "all the facts" mentioned elsewhere in its memorandum demonstrate that there are no other "suitable, available locations" for *the Church* to open a new mega church on the terms it deems acceptable.

Measured by any objective standard, the City provides more than adequate opportunities for religious assemblies and institutions to locate within the City. Approximately 54.6% of the entire land area of the City is available for Assembly Uses, including all residential land and 196 properties in the City's industrial and commercial zones.  Exhibit 38, Pollart Decl., ¶¶ 7-12.  The amount of land available exceeds the apparent demand by several orders of magnitude.  There are a total of 45 churches currently operating in the City, and essentially no apparent demand for additional church space by anyone except for the plaintiff Church.  Exhibit 38, Pollart Decl., ¶¶ 5, 13-14.

Neither the text or history of 42 U.S.C. § 2000cc(b)(3) suggests that the reasonableness of a city's restrictions on religious land uses was to be measured against the special – and in this case extraordinary – demands of a single entity.  Given the range of sites available for religious assembly uses in the City, it is the City and not the Church that is entitled to summary judgment on the Church's total exclusion claim.

VII.   *CONSTITUTIONAL CLAIMS*

The Church's discussion of its Constitutional claims (Fourth through Ninth Causes of Action) reveals these claims to be throwaways.  The Church cites scant authority for only the most general propositions, and cites to no specific factual evidence supporting any

1  of its constitutional claims. The Church's freedom of assembly and freedom of association

2  claims (Sixth and Seventh Causes of Action) are not mentioned at all, and therefore must

3  be deemed waived. On all claims, however, the Church has failed to satisfy its initial

4  burden of showing that it has established all essential elements of its claims.

5     A.    *Free Exercise of Religion.*

6     The Church premises its cursory Free Exercise claim on the absolutely frivolous

7  contention that the Church's Catalina Street property has somehow been "targeted" for

8  anti-religious discrimination, thus exposing the City's actions to strict scrutiny under the

9  First Amendment. The Church clearly does not understand the concepts of "targeting" or

10  discrimination. The record shows that the Catalina Street property was rejected as a site

11  for Assembly Uses based on facially neutral and entirely objective planning standards

12  having nothing to do with religion. Exhibit 38, Pollart Decl., ¶¶ 20-35. The Church does

13  not cite even the slightest evidence of anti-religious motivation on the part of any City

14  official, nor is there any such evidence. The City's zoning regulations are clearly neutral

15  regulations of general applicability which only incidentally affect religion. Such laws need

16  only have a rational basis to survive scrutiny under the Free Exercise clause. *San Jose*

17  *Christian College*, 360 F.3d 1024, 1030-1031; *Grace United*, 451 F.3d 643, 649-650. The

18  Church does not explain, nor could it, why the City's actions lacked a rational basis.

19     B.    *Freedom of Speech.*

20     Somewhat ironically, the Church cites to case law concerning commercial speech

21  for the proposition that the Church's members have a reciprocal right to hear the Church's

22  speech as much as the Church itself has a right to engage in expression. While this may be

23  true, the Church does not claim that the City has in any way interfered with speech activity

24  at the Church's present location at 577 Manor Boulevard. The question of whether the

25  Church is entitled to expand its speech activities to a new location is governed by the

26  traditional test for time, place and manner regulations that do not directly regulate the

27  content of speech. *San Jose Christian College*, 360 F.3d 1024, 1033; *Grace United*

28  *Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 657-658 (10th Cir. 2006). As the

1    Church does not undertake any analysis whatsoever of the relevant factors, no further

2    response by the City is required.  Moreover, as discussed in the City's concurrently

3    pending cross-motion, the City's zoning scheme provides ample opportunities for religious

4    (and other) assembly uses to locate in the City, clearly does meet the test for valid zoning

5    restrictions affecting the location of First Amendment activities.  Exhibit 39, City's MSJ,

6    pp. 696:14-700:14; Exhibit 38, Pollart Decl. ¶¶ 5-14.

7         C.    *Equal Protection.*

8         The Church apparently concedes that its Equal Protection claim is governed by

9    rational basis review.  In any case, this is the law.  *Vision Church*, 468 F.3d 975, 1000-

10    1001; *C.L.U.B.*, 342 F.3d at 766; *Congregation Kol Ami v. Abington Township*, 309 F.3d

11    120, 133-135 (3rd Cir. 2002).  Under this test, a zoning ordinance is presumed

12    constitutional, and the plaintiff bears the burden of negating "every conceivable basis

13    which might support it." *Lighthouse Institute*, 510 F.3d 253, 277.  The Church, however,

14    makes no attempt to explain how the City's stated reasons for declining to rezone the

15    Catalina Street property for Assembly Uses, *i.e.* preservation of the City's industrial base

16    and traffic access considerations, are irrational, nor explain why the City could have no

17    other rational basis for enacting and enforcing the relevant provisions of its zoning code.

18    *See* Exhibit 38, Pollart Decl., ¶¶ 31, 41.  While opinions may differ as to whether and in

19    what circumstances these considerations are compelling, there is no debate whatsoever as

20    to whether these are legitimate considerations for rational basis analysis.  *See*

21    *Congregation Kol Ami*, 309 F.3d 120, 134-136, 143 [discussing breadth of municipal

22    zoning power]; *C.L.U.B.*, 342 F.3d at 766.  The Church also makes no serious effort to

23    identify properties or applicants that were truly similarly situated, but treated differently by

24    the City, *e.g.*, applied for a similar zoning amendment that was *granted. Vision Church*,

25    468 F.3d 975, 1002; *Primera Iglesia*, 450 F.3d 1295, 1311.

26         D.    *Due Process.*

27         On its Due Process claim, the Church contends that the eight planning criteria

28    utilized by the City in selecting properties for the Assembly Use Overlay zoning were

1   "arbitrary and capricious," and "intentionally and needlessly delayed and obstructed the
2   Church's use of the Catalina Street property."  Pl. Memorandum, pp. 21:25-22:2.  The
3   Church also apparently objects to consideration of potential health and safety issues
4   affecting its potential use of the site in the form of the so-called "hazardous materials
5   business plans restriction."  Pl. Memorandum, p. 22:3.  These "arguments" are supported
6   neither by reference to specific evidence nor authority of other than the most generic
7   nature.  They hardly provide any basis for granting summary judgment in the Church's
8   favor.

9       In any event, it is clear that all the criteria utilized by the City in selecting properties
10  for the Assembly Use Overlay zone – and for rejecting the Catalina Street site – have a
11  rational connection with legitimate public zoning objectives.  *See* Exhibit 38, Pollart Decl.,
12  ¶¶ 20-35 and Exhibit 23, pp. 449-453; *Congregation Kol Ami*, 309 F.3d 120, 134-136, 143
13  [discussing breadth of municipal zoning power].  There is also no evidence that the
14  Assembly Use Overlay zoning amendment process undertaken by the City in response to
15  the Church's rezoning requests was unduly protracted, given the nature of the task, or that
16  any delays occurring in the process were completely unrelated to legitimate planning
17  considerations, *e.g.* the need to gather information, consider potential alternative courses of
18  action, seek direction from responsible decisionmakers and conduct legally required public
19  hearings.  *See North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 485-486 (9th Cir.
20  2008) [rejecting substantive due process claim based on alleged arbitrary delays].  As
21  discussed in the City's cross-motion, the Church has also failed to establish an essential
22  element of its due process claim, *i.e.* the deprivation of a constitutionally protected liberty
23  or property interest.  *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 570-572,
24  92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Wedges/Ledges of California, Inc. v. City of*
25  *Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994); *Prater v. City of Burnside, Ky.*, 289 F.3d
26  417, 431-432 (6th Cir. 2002).
27  ///
28  ///

21

VIII.    *CONCLUSION*

For the reasons stated above, the Church's motion for summary judgment should be denied as to all claims asserted in the First Amended Complaint. The Church has not shown a colorable violation of RLUIPA or of any provision of the Constitution, nor established the absence of any triable issues on its claims.

Dated: September 10, 2008              MEYERS, NAVE, RIBACK, SILVER & WILSON

By_____/s/_____

    DEBORAH J. FOX
    Attorneys for Defendant
    CITY OF SAN LEANDRO

1144274.3
136.5016

CITY'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT (No. 2)              C07-03605-PJH