**EXHIBIT B**

Westlaw.

H.R. REP. 106-219                                                        Page 1
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
  (Cite as: H.R. REP. 106-219)

*1 RELIGIOUS LIBERTY PROTECTION ACT OF 1999

HOUSE REPORT NO. 106-219
July 1, 1999

Mr. Canady of Florida, from the Committee on the Judiciary, submitted the
following

REPORT

The Committee on the Judiciary, to whom was referred the bill (H.R. 1691) to
protect religious liberty, having considered the same, report favorably thereon
with an amendment and recommend that the bill as amended do pass.

CONTENTS

|                                                                      | Page |
|----------------------------------------------------------------------|------|
| The Amendment .........................................................  | 1    |
| Purpose and Summary ...................................................  | 4    |
| Background and Need for Legislation .......................  | 5    |
| Hearings ................................................................  | 25   |
| Committee Consideration ................................  | 26   |
| Vote of the Committee ..................................  | 26   |
| Committee Oversight Findings ...........................  | 26   |
| Committee on Government Reform and Oversight Findings .... | 26   |
| New Budget Authority and Tax Expenditures ................  | 26   |
| Congressional Budget Office Cost Estimate ................  | 26   |
| Constitutional Authority Statement .......................  | 27   |
| Section-by-Section Analysis and Discussion ..............  | 27   |
| Dissenting Views .......................................  | 32   |
| Additional Dissenting Views ............................  | 40   |

The amendment is as follows:
    Strike out all after the enacting clause and insert in lieu thereof the
following:

*2 SECTION 1. SHORT TITLE.

This Act may be cited as the "Religious Liberty Protection Act of 1999".

SEC. 2. PROTECTION OF RELIGIOUS EXERCISE.

(a) General Rule.-Except as provided in subsection (b), a government shall not
substantially burden a person's religious exercise-
    (1) in a program or activity, operated by a government, that receives Federal
financial assistance; or

EXHIBIT B                                                              026

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
(Cite as: H.R. REP. 106-219)

(2) in any case in which the substantial burden on the person's religious exercise affects, or in which a removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes; even if the burden results from a rule of general applicability.

(b) Exception.-A government may substantially burden a person's religious exercise if the government demonstrates that application of the burden to the person-

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(c) Remedies of the United States.-Nothing in this section shall be construed to authorize the United States to deny or withhold Federal financial assistance as a remedy for a violation of this Act. However, nothing in this subsection shall be construed to deny, impair, or otherwise affect any right or authority of the Attorney General or the United States or any agency, officer, or employee thereof under other law, including section 4(d) of this Act, to institute or intervene in any action or proceeding.

SEC. 3. ENFORCEMENT OF CONSTITUTIONAL RIGHTS.

(a) Procedure.-If a claimant produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of a provision of this Act enforcing that clause, the government shall bear the burden of persuasion on any element of the claim; however, the claimant shall bear the burden of persuasion on whether the challenged government practice, law, or regulation burdens or substantially burdens the claimant's exercise of religion.

(b) Land Use Regulation.-

(1) Limitation on land use regulation.-

(A) Where, in applying or implementing any land use regulation or exemption, or system of land use regulations or exemptions, a government has the authority to make individualized assessments of the proposed uses to which real property would be put, the government may not impose a substantial burden on a person's religious exercise, unless the government demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.

(B) No government shall impose or implement a land use regulation in a manner that does not treat religious assemblies or institutions on equal terms with nonreligious assemblies or institutions.

(C) No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

(D) No government with zoning authority shall unreasonably exclude from the jurisdiction over which it has authority, or unreasonably limit within that jurisdiction, assemblies or institutions principally devoted to religious exercise.

(2) Full faith and credit.-Adjudication of a claim of a violation of the Free Exercise Clause or this subsection in a non-Federal forum shall be entitled to full faith and credit in a Federal court only if the claimant had a full and fair adjudication of that claim in the non-Federal forum.

(3) Nonpreemption.-Nothing in this subsection shall preempt State law that is equally or more protective of religious exercise.

SEC. 4. JUDICIAL RELIEF.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

    (a) Cause of Action.-A person may assert a violation of this Act as a claim or
defense in a judicial proceeding and obtain appropriate relief against a
government. Standing to assert a claim or defense under this section shall be
governed by the general rules of standing under article III of the Constitution.
    (b) Attorneys' Fees.-Section 722(b) of the Revised Statutes (42 U.S.C. 1988(b))
is amended-
    (1) by inserting "the Religious Liberty Protection Act of 1998,"
after  "Religious Freedom Restoration Act of 1993,"; and
    *3 (2) by striking the comma that follows a comma.
    (c) Prisoners.-Any litigation under this Act in which the claimant is a
prisoner shall be subject to the Prison Litigation Reform Act of 1995 (including
provisions of law amended by that Act).
    (d) Authority of United States To Enforce This Act.-The United States may sue
for injunctive or declaratory relief to enforce compliance with this Act.

SEC. 5. RULES OF CONSTRUCTION.

    (a) Religious Belief Unaffected.-Nothing in this Act shall be construed to
authorize any government to burden any religious belief.
    (b) Religious Exercise Not Regulated.-Nothing in this Act shall create any
basis for restricting or burdening religious exercise or for claims against a
religious organization, including any religiously affiliated school or university,
not acting under color of law.
    (c) Claims to Funding Unaffected.-Nothing in this Act shall create or preclude
a right of any religious organization to receive funding or other assistance from a
government, or of any person to receive government funding for a religious
activity, but this Act may require government to incur expenses in its own
operations to avoid imposing a burden or a substantial burden on religious
exercise.
    (d) Other Authority To Impose Conditions on Funding Unaffected.-Nothing in this
Act shall-
    (1) authorize a government to regulate or affect, directly or indirectly, the
activities or policies of a person other than a government as a condition of
receiving funding or other assistance; or
    (2) restrict any authority that may exist under other law to so regulate or
affect, except as provided in this Act.
    (e) Governmental Discretion in Alleviating Burdens on Religious Exercise.-A
government may avoid the preemptive force of any provision of this Act by changing
the policy that results in the substantial burden on religious exercise, by
retaining the policy and exempting the burdened religious exercise, by providing
exemptions from the policy for applications that substantially burden religious
exercise, or by any other means that eliminates the substantial burden.
    (f) Effect on Other Law.-In a claim under section 2(a)(2) of this Act, proof
that a substantial burden on a person's religious exercise, or removal of that
burden, affects or would affect commerce, shall not establish any inference or
presumption that Congress intends that any religious exercise is, or is not,
subject to any other law.
    (g) Broad Construction.-This Act should be construed in favor of a broad
protection of religious exercise, to the maximum extent permitted by its terms and
the Constitution.
    (h) Severability.-If any provision of this Act or of an amendment made by this

**028**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Act, or any application of such provision to any person or circumstance, is held to be unconstitutional, the remainder of this Act, the amendments made by this Act, and the application of the provision to any other person or circumstance shall not be affected.

SEC. 6. ESTABLISHMENT CLAUSE UNAFFECTED.

   Nothing in this Act shall be construed to affect, interpret, or in any way address that portion of the first amendment to the Constitution prohibiting laws respecting an establishment of religion (referred to in this section as the "Establishment Clause"). Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this Act. As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.

SEC. 7. AMENDMENTS TO RELIGIOUS FREEDOM RESTORATION ACT.

   (a) Definitions.-Section 5 of the Religious Freedom Restoration Act of 1993 (42 U.S.C. 2000bb-2) is amended-
   (1) in paragraph (1), by striking "a State, or subdivision of a State" and inserting "a covered entity or a subdivision of such an entity";
   (2) in paragraph (2), by striking "term" and all that follows through  "includes" and inserting "term 'covered entity' means"; and
   (3) in paragraph (4), by striking all after "means," and inserting "any exercise of religion, whether or not compelled by, or central to, a system of religious belief, and includes (A) the use, building, or conversion of real property by a person or entity intending that property for religious exercise; and (B) any conduct protected as exercise of religion under the first amendment to the Constitution.".
   *4 (b) Conforming Amendment.-Section 6(a) of the Religious Freedom Restoration Act of 1993 (42 U.S.C. 2000bb-3(a)) is amended by striking "and State".

SEC. 8. DEFINITIONS.

   As used in this Act-
   (1) the term "religious exercise" means any exercise of religion, whether or not compelled by, or central to, a system of religious belief, and includes (A) the use, building, or conversion of real property by a person or entity intending that property for religious exercise; and (B) any conduct protected as exercise of religion under the first amendment to the Constitution;
   (2) the term "Free Exercise Clause" means that portion of the first amendment to the Constitution that proscribes laws prohibiting the free exercise of religion and includes the application of that proscription under the 14th amendment to the Constitution;
   (3) the term "land use regulation" means a law or decision by a government that limits or restricts a private person's uses or development of land, or of structures affixed to land, where the law or decision applies to one or more particular parcels of land or to land within one or more designated geographical zones, and where the private person has an ownership, leasehold, easement, servitude, or other property interest in the regulated land, or a contract or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219

H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
(Cite as: H.R. REP. 106-219)

Page 5

option to acquire such an interest;
      (4) the term "program or activity" means a program or activity as defined in
paragraph (1) or (2) of section 606 of the Civil Rights Act of 1964 (42 U.S.C.
2000d-4a);
      (5) the term "demonstrates" means meets the burdens of going forward with the
evidence and of persuasion; and
      (6) the term "government"-
      (A) means-
      (i) a State, county, municipality, or other governmental entity created under
the authority of a State;
      (ii) any branch, department, agency, instrumentality, subdivision, or official
of an entity listed in clause (i); and
      (iii) any other person acting under color of State law; and
      (B) for the purposes of sections 3(a) and 5, includes the United States, a
branch, department, agency, instrumentality or official of the United States, and
any person acting under color of Federal law.


                          PURPOSE AND SUMMARY

    H.R. 1691, "The Religious Liberty Protection Act of 1999," protects religious
activities and practices from being substantially burdened by government action.
H.R. 1691 was introduced on May 5, 1999 by bi-partisan co-sponsors, and enjoys the
support of over 80 churches and religious organizations from all points on the
political spectrum. H.R. 1691 was introduced, in part, in response to the Supreme
Court's partial invalidation of the Religious Freedom Restoration Act (RFRA), which
itself was enacted in 1993 in response to an earlier Court decision.
    RFRA was a response to the Supreme Court's opinion in Employment Division v.
Smith, [FN1] holding that the First Amendment's protection of the free exercise of
religion did not extend to religious exercise that is burdened by a neutral law of
general applicability. RFRA restored legal protection for religious exercise in
such situations by requiring religious freedom claims to be analyzed under the
strict scrutiny standard, evaluating whether the offending law is the "least
restrictive" means of furthering a "compelling" government interest. In 1997, the
Supreme Court in City of Boerne v. Flores [FN2] invalidated RFRA as applied to
infringement of religious freedom by state and local governments.
    *5 The Religious Liberty Protection Act of 1998, H.R. 1691's predecessor, was
introduced in the 105th Congress in response to the Boerne decision. The
Subcommittee on the Constitution held five hearings in the 105th Congress on the
need for federal protection of religious freedom after the Boerne decision and on
the Religious Liberty Protection Act of 1998. The hearings examined specific cases
of generally applicable laws and government actions that substantially burden the
free exercise of religion, patterns of religious discrimination by less-than-
generally-applicable laws in the area of land use and zoning, and the
constitutionality and effect of the Religious Liberty Protection Act of 1998. The
Subcommittee reported the bill favorably with certain amendments and no further
action was taken on the bill.
    In the 106th Congress, the Subcommittee on the Constitution held a hearing on
H.R. 1691, the Religious Liberty Protection Act of 1999, on May 12, 1999, and a
markup session on May 25, 1999 in which the Subcommittee reported the legislation
favorably with an amendment to clarify language in the definition section of the
bill. The Committee held a markup session on H.R. 1691 on June 23, 1999 and
reported the bill favorably by voice vote with no amendments.

                                                                              **030**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219                                                                                    Page 6
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
(Cite as: H.R. REP. 106-219)

BACKGROUND AND NEED FOR THE LEGISLATION

Employment Division v. Smith

   The First Amendment to the United States Constitution provides that  "Congress
shall make no law respecting an establishment of religion or prohibiting the free
exercise thereof . . ." Beginning in 1963, free exercise claims were analyzed under
the "compelling state interest" test, providing that when a governmental action or
regulation imposed a significant burden on a sincerely-held religious belief, the
governmental action was unconstitutional as against the religious practitioner
unless it was the "least restrictive" means of furthering a "compelling"
governmental interest. [FN3]

   In Employment Division v. Smith, [FN4]  however, the Supreme Court held that the
First Amendment did not protect religious exercise from being burdened by a neutral
law of general application. The Smith decision arose from an unemployment
compensation dispute involving two Native American employees of a private drug and
alcohol rehabilitation facility in Oregon. The two were fired after they admitted
to ingesting peyote, a sacrament of the Native American Church, during a religious
ceremony. Because Oregon law prohibits the knowing or intentional possession of a
"controlled substance," which includes peyote, [FN5] the state Employment Division
determined that the employers were properly discharged for "cause" and therefore
not entitled to unemployment benefits. The employees sued, challenging the Oregon
law as applied to their religious practice.

   The Oregon Supreme Court held that the state's prohibition on sacramental peyote
use violated the Free Exercise Clause, reaffirming *6 a previous holding that the
state could not deny unemployment benefits. The United States Supreme Court
reversed, declining to apply the "compelling state interest" standard from
Sherbert.

   In essence, the Supreme Court took the cramped view that, while one has a right
to believe a religion, and a right not to be discriminated against because of
religion, one has no constitutional right to practice religion in a way that is
inconsistent with even trivial laws and regulations. [FN6]  Smith's "bare
requirement of formal neutrality," then, serves as a substitute for the particular
protections that the Free Exercise Clause envisions, protections "most often needed
by practitioners of non-mainstream faiths who lack the ability to protect
themselves in the political sphere" and by "any person of religious convictions
caught in conflict with our secular political culture." [FN7]

   The Smith opinion was careful, however, to enumerate exceptions to its ruling.
First, the Court distinguished earlier decisions that invalidated the application
of neutral, generally applicable laws on free exercise grounds, holding that those
cases involved the assertion of free exercise claims coupled with other
constitutional protections. [FN8]  The Smith employees' claim was limited, however,
to the Free Exercise Clause and thus did not fall within the category of "hybrid"
constitutional claims.

   The Smith opinion also found that the heightened standard of review adopted in
Sherbert would apply (1) where the challenged law was either facially non-neutral,
where, for example, it attempts to ban "acts or abstentions only when they are
engaged in for religious reasons or only because of the religious belief that they
display"; (2) even if facially neutral, where the law had the surreptitious purpose
of burdening religious practices; and (3) where the *7 law was not generally
applicable because it failed to regulate secular conduct that implicated the same

031

H.R. REP. 106-219
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
(Cite as: H.R. REP. 106-219)

government interests as the prohibited religious conduct. [FN9]

Finally, and most important for the purposes of the Religious Liberty Protection Act of 1999, the Court held that Sherbert's compelling state interest standard applies where there is "individualized governmental assessment of the reasons for the relevant conduct," as opposed to an "across-the-board criminal prohibition on a particular form of conduct." [FN10]

The Religious Freedom Restoration Act and City of Boerne v. Flores

After three years of hearings, study, and intense drafting and redrafting, the Religious Freedom Restoration Act was enacted by Congress to restore legal protection for religious exercise by requiring all free exercise claims to be examined under strict scrutiny. RFRA, in effect, codified the balancing test that had been used by the courts in the three decades prior to Smith. Under RFRA's balancing test, "government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." [FN11]

Congress based its authority for RFRA on Section 5 of the Fourteenth Amendment, which provides Congress with the "power to enforce" by "appropriate legislation" the constitutional guarantee that no State shall deprive any person of "life, liberty, or property, without due process of law," nor deny any person "equal protection of the laws." [FN12]  In City of Boerne v. Flores, [FN13] however, the Supreme Court ruled that in enacting RFRA Congress had exceeded its enforcement authority under Section 5 of the Fourteenth Amendment.

In Boerne, the Archbishop of San Antonio granted permission to St. Peter Catholic Church, located in the Boerne, Texas, to meet the needs of its growing congregation by enlarging its existing mission-style structure, built in 1923. Subsequently, the Boerne City Council approved an ordinance that required the approval of a Historic Landmark Commission prior to any construction that would affect historic landmarks or buildings located within a historic district. Upon the Archbishop's application, city authorities denied the permit and retroactively changed the boundaries of the historic district to include the church. The Archbishop then filed suit in federal court, relying upon RFRA to challenge the permit denial. The district court held that Congress exceeded its Section 5 enforcement *8 power but the United States Court of Appeals for the Fifth Circuit reversed, holding that the statute was constitutional.

The Supreme Court reversed. In an opinion by Justice Kennedy, the Court ruled that, while Congress has the power to enact legislation "enforcing" the constitutional right to the free exercise of religion under Section 5 of the Fourteenth Amendment, its Section 5 power is limited to enacting laws that will remedy violations of the free exercise clause as the Court has interpreted it. [FN14] Such power exists where Congress has "reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." [FN15]  Congress lacks, however, the authority to decree the substance of the Fourteenth Amendment, and thus cannot legitimately determine on its own what substantive rights are protected by it. [FN16]  In the view of the Court, RFRA's legislative record lacked sufficient evidence of discriminatory laws. [FN17]  Thus, "RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." [FN18]  The Court concluded that RFRA violated venerable principles of federalism because it subjects state laws to the most

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

demanding test of scrutiny in constitutional law, even if those laws did not violate the free exercise clause. This, the Boerne majority said, "would require searching judicial scrutiny of state law with the attendant likelihood of invalidation. This is a considerable congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens." [FN19]  The Supreme Court also regarded RFRA as contradicting the principle of separation of powers. [FN20]

*9 Impact of the Smith and Boerne Decisions

Following the Boerne decision, the Subcommittee on the Constitution conducted several hearings to assess the need for federal protection of religious freedom. The cases presented in oral and written testimony before the Subcommittee involved government action which either requires violation of religious beliefs or practices or which restricts the fulfillment of religious beliefs or practices. [FN21]  For an illustration of the types of cases presented, [FN22]  consider the following: [FN23]

Testimony included instances where government action thwarts the fulfillment of religious sacraments. During the years that RFRA was still valid law, the Ninth Circuit found that RFRA had been violated when prison personnel deliberately intercepted confessional communication. [FN24]  According to the testimony of Mark Chopko, General Counsel to the U.S. Catholic Conference, absent this legal protection, it is debatable whether a prison regulation dictating that all conversations between prisoners and visitors be intercepted would have to exempt religious communications. [FN25]  The strict confidentiality of communications between priest and penitent, required by the Catholic church, has come under strong attack, with litigants attempting to discover sacred confessional information for use in civil lawsuits. [FN26]

Other testimony described religious dietary laws conflicting with government regulations or practices. The testimony of Marc Stern of the American Jewish Congress included a case where the director of an Immigration and Naturalization Service detention facility refused to provide detainees-some of whom were seeking asylum for religious persecution-pork-free diets. Only when President Clinton ordered federal officials to comply with RFRA after being threatened with a lawsuit did the manager agree to provide a pork-free diet. [FN27]  In Michigan, prison officials refuse to purchase matzo, *10 the unleavened bread required to be eaten by Jews on Passover, essentially forcing all Jewish inmates to violate their sacred religious practices. One Jewish organization has offered to donate and ship matzo to meet the prisoners' needs during Passover, but the officials have refused even the donated matzo. [FN28]

Religious clothing formed the basis for a number of cases presented to the Subcommittee. Testimony included a case about a school district in South Carolina that banned the wearing of hats in school. The regulation prevented an Orthodox Jewish student from wearing a yarmulke in school as his religion requires. Only when advised of the possibility of a lawsuit under RFRA did the school board accommodate the student. [FN29]

Another case illustrating this conflict involved the Illinois Athletic Association's requirement that basketball players play bare-headed, precluding any Orthodox Jewish boys from participating due to their religious obligation to wear yarmulkes. The league defended its rule on grounds of safety, contending that if players wore hats, the hats might fall off and cause other players to trip. When an Orthodox school sought to play in the league and have its students wear yarmulkes,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219                                                                    Page 9
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
(Cite as: H.R. REP. 106-219)

its request was denied. The school offered to make the boys attach the yarmulkes to their hair with clips so that they would not fall off. Because this was a pre-Smith case, the Seventh Circuit held that this alternative had to be explored. Without the strict scrutiny standard, the government could completely ignore the Orthodox school's position, given that the regulation at issue is facially neutral. [FN30]

Testimony included descriptions of numerous conflicts between laws and religious obligations and practices. In New York, adult children with strong religious convictions about caring for their ailing parents are prohibited from volunteering to assist with their elderly parents housed in government-regulated nursing homes. [FN31]  This prevents them from fulfilling their understanding of the requirements of the Biblical commandment to honor their father and mother.

Elsewhere, local governments have attempted to interfere with, or altogether eliminate, the proselytizing by Church missionaries through so-called "generally applicable" laws that place severe restrictions on the times and places that missionaries may contact door-to-door. In the span of a year alone, local officials have attempted to curtail church proselytizing in such jurisdictions as Mundelein, Illinois; Dover, New Jersey; Flemington, New Jersey; Chester, Connecticut; Valencia, California; Media, Pennsylvania; Downers Grove, Illinois; Marin County, California; and Seven Hills, Ohio. [FN32] In Miami, an Orthodox Jewish rabbi was threatened with criminal prosecution for leading morning and evening prayers in a converted garage in one of Miami's single-family residential areas. The U.S. Court of Appeals for the Eleventh Circuit held that, in *11 this post-Smith world, the city's interest in an exception-free zoning plan outweighed the rabbi's interest because the services "are not integral to [his] faith." [FN33]

Government officials in Arapahoe County, Colorado, enforced specific numerical restrictions on the number of students that may be enrolled in religious schools, and indeed, on the number of persons in congregations of various churches, as a way of limiting growth. [FN34]  In Douglas County, Colorado, administrative officials proposed restricting the operational hours of a church the same way they do any "commercial" facility. [FN35]  Limiting its operational hours means that a church could not lawfully engage in any act of service or devotion during those forbidden hours-not even devotions such as prayer vigils, which attract no crowd . [FN36]

Throughout the country, religious student groups or clubs are denied access to campus ministry space if they require that their student leaders share their particular religious beliefs. Many campuses deny official charter status altogether to any group that selects its leadership based on religion. This means that the chapter cannot use campus resources available to all other secular groups, meet on campus, use campus media to announce their activities, or distribute literature to their peers. Legal battles over this issue have occurred at University of Arizona, University of Minnesota, University of Kansas, University of Toledo, Texas Institute of Technology, Johnson State University (VT), California State University-Monterey Bay, and Georgia Institute of Technology. [FN37]  Testimony also included a case in New York where a school district allows only secular community groups to rent school facilities on weekends, but denies religious-oriented community groups the opportunity to rent the facilities for worship or religious instruction. [FN38]

Testimony addressed a range of government laws and policies mandating activities contrary to religious convictions. The United States Court of Appeals for the First Circuit rejected a Free Exercise claim brought by parents who objected on religious grounds to their child's participation in a government school program conducted by "Hot, Sexy, and Safer Productions." [FN39] During the program the presenter engaged in a variety of sexually explicit activities in front of the students, including simulating masturbation, using profanity, telling one minor he had a "nice butt,"

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219                                                                                    Page 10
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

and referring to "anal sex." [FN40]  The court rejected the parents' free exercise
claim, questioning "whether the Free Exercise Clause even applies **\*12** to public
education," [FN41]  and finding that the free exercise claim was not conjoined to
any other constitutional right in order to qualify for Smith's " hybrid" exception.
[FN42]

In Maryland, a Catholic hospital was denied government accreditation because of
its religiously-based refusal to instruct its medical residents on the performance
of abortion. [FN43]  Mr. Chopko testified that, in some cases, if church employers
are to provide adequate insurance for their employees, the government requires them
to provide a full panoply of medical services, including abortion, which some
churches unequivocally condemn. [FN44]

Other testimony described the case of a Jewish man killed on a commuter train by
another train coming from the opposite direction. The coroner insisted on an
autopsy as the condition to certifying the cause of death. The family of the
deceased strongly objected, on religious grounds, to the performance of an autopsy.
The family offered to agree to other, non-destructive, medical examinations of the
body as a compromise, but the coroner rejected this. Only after a RFRA lawsuit was
contemplated did the state attorney general advise the coroner to accommodate the
request. [FN45]  One district court held that a medically unnecessary autopsy of a
young Hmong man did not constitute a violation of the Free Exercise Clause, despite
the religiously-based belief of his family that the autopsy condemned the spirit of
the deceased. The court had originally ruled in favor of the family, but after
Smith, felt compelled to reverse its earlier ruling. [FN46]

The Subcommittee also heard testimony about a case involving a family's religious
conviction regarding the taking of interest. A Muslim child won a court judgment
for injuries which left him physically and mentally handicapped. The child's lawyer
sought to invest the judgment in an interest-bearing account as required by state
law. The parents objected, since their religious beliefs forbade the taking of
interest. The judge ordered the parties to show cause why the lawyer should not be
appointed guardian with the obligation, over the parents' objections, to invest the
monies in an interest bearing account. While there are financial arrangements that
would provide the same "return" but would not violate the parents' faith, the state
law did not permit an accommodation of this sort. [FN47]

The Religious Liberty Protection Act

The Religious Liberty Protection Act of 1998 was introduced in the House on May
5, 1999. Mindful of the limitations enunciated by the Court in Boerne, H.R. 1691
employs well settled sources of Congressional authority for the protection of
religious exercise. After the Boerne decision, the power of Congress in the area of
religious liberty is limited to the spending power, regulating interstate commerce,
and remedying state infringements on due process, equal protection, or the
privileges and immunities of citizenship. **\*13** H.R. 1691 employs all of these
remaining avenues of established Congressional authority. [FN48]

While the means used by H.R. 1691 are different from those used by RFRA, the ends
of each Act are the same: to restore the requirement that courts examine
substantial government burdens on the exercise of religion to determine whether the
offending state action is the "least restrictive" means of furthering a
"compelling" governmental interest. To trigger a claim under H.R. 1691, a religious
person or organization must first demonstrate that the government has
"substantially burden[ed]" religious exercise. The modifier "substantially" is
intended to ensure that strict scrutiny is not triggered by trivial, technical, or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

de minimus burdens on religious exercise. While both Acts employ a "substantial burden" threshold, H.R. 1691 clarifies that the burdened religious activity need not be compulsory or central to a religious belief system as a condition for the claim. [FN49]

To defeat a religious claim under H.R. 1691's compelling interest/strict scrutiny test, the government must not merely show a compelling government interest, but must show that its refusal to grant an exemption or accommodation for religious claimants is in furtherance of that compelling government interest.

Some discussion in the Committee process was motivated by a concern that H.R. 1691 will "trump" certain civil rights laws. H.R. 1691's purpose is to protect religious liberty, one of the most fundamental of "civil rights." The question should not be H.R. 1691's effect on "civil rights," but how to resolve the inevitable conflicts between the exercise of one civil right, in this case religious liberty, and other civil rights. [FN50] H.R. 1691 imposes a standard of review, not an outcome, and cases are litigated on real facts before the court. Thus, it is difficult in some hypothetical cases to predict with certainty which interests will prevail. One thing, however, is certain: Without H.R. 1691, the free exercise claimant, burdened by a law of general application, will very nearly always lose.

With respect to claims of discrimination on the basis of sex, Steven K. Green, Legal Director of Americans United for Separation of Church and State, states that, "in most conflicts involving individual religious claimants, the antidiscrimination laws will probably prevail." Religious Liberty Protection Act: Hearing on H.R. **\*14** 4019 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th Cong. (July 14, 1998) (statement of Dr. Steven K. Green, Legal Director, Americans United for Separation of Church and State) <<http://www.house.gov/judiciary/222496.htm>> [hereinafter Green Testimony]. A H.R. 1691 claim would likely prevail over a sex discrimination claim in the context of the clergy, according to Professor Doug Laycock of the University of Texas Law School. Id. (statement of Douglas Laycock, Professor, University of Texas Law School) [hereinafter Laycock Testimony, July 14, 1998]. Such a result seems to be a reasonable balancing of the state's interest in eradicating sexual discrimination against the liberty of many religions to adhere to centuries-old practices regarding the ordination of clergy.

There have also been several cases in which a RLPA-type defense was raised in response to claims by unmarried cohabitants of discrimination in housing based on marital status. The courts are split on this issue. Some hold in favor of the religious liberty claimant. See Thomas v. Municipality of Anchorage, 165 F.3d 692, 714 (9th Cir. 1999) (holding that government has no compelling interest in eradicating marital status discrimination); Cooper v. French, 460 N.W.2d 2, 6-7, 10-11 (Minn. 1990) (holding that marital status does not include unmarried cohabitation; plurality holding that the government has no compelling interest in eradicating marital status discrimination). Others hold in favor of the unmarried cohabitants. See McCready v. Hoffius, 586 N.W.2d 723 (Mich. 1998) (finding state's interest in providing equal access to housing compelling and uniform application of law the least restrictive means of serving that interest), vacated in part, 1999 WL 226862 (Mich. April 16, 1999); Swanner v. Anchorage Equal Rights Commission, 874 P.2d 274 (Alaska 1994) (holding that granting religious liberty claimant an exemption would thwart the state's interest in eradicating marital status discrimination); Jasniowski v. Rushing, 678 N.E.2d 743 (Ill. App. Ct. 1997) (finding state's interest in providing equal access to housing compelling and uniform application of law the least restrictive means of serving that interest), vacated, 685 N.E.2d 622 (Ill. 1997).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
(Cite as: H.R. REP. 106-219)

Page 12

It is useful to examine in some detail the application and effect of the substantive provisions of H.R. 1691.

Spending clause provision

H.R. 1691 applies to programs or activities operated by a government and which receive federal financial assistance. It does not apply to private-sector grantees, unless they are acting under color of state law and the government retains sufficient control that "the alleged infringement of federal rights [is] "fairly attributable to the State."' [FN51]  This provision is modeled directly on similar provisions in other civil rights laws, including Title VI of the Civil Rights Act of 1964, which forbids race discrimination in federally assisted programs, [FN52] and Title IX of the Education Amendments of 1972, which forbids sex discrimination in federally assisted educational programs. [FN53] Congressional power to attach conditions to federal spending *15 has been consistently upheld since Steward Machine Co. v. Davis. [FN54]  Conditions on federal grants must be "[]related to the federal interest in particular national projects or programs." [FN55]  Under H.R. 1691, federal aid to one program does not demand compliance in other programs; the bill's protections are properly confined to each federally assisted "program or activity."

H.R. 1691 protects the religious exercise of beneficiaries of state and local programs that are federally subsidized or assisted from most government interference. H.R. 1691 would make it more difficult for the government to sustain, for example, a state requirement that welfare-to-work recipients attend training classes on Sunday, a public school's refusal to excuse religious students from sexually explicit contraception programs, and a public medical school's rejection of an applicant due to her religious objection to performing abortions. H.R. 1691 would protect the religious liberty of students and faculty in public schools and universities, job trainees, welfare recipients, tenants in public housing, and participants in many other federally-assisted but state-administered programs. H.R. 1691 would provide a cause of action where an individual is excluded from a federally-assisted program because of her religious dress, or because of her observance of the Sabbath or of religious holidays, or because she said prayers over meals or at certain times during the day.

Commerce clause provision

H.R. 1691 relies on Congress' power to regulate commerce among the States [FN56] and includes a jurisdictional element to be proven in claims resting on this power. [FN57]  Specifically, H.R. 1691 states that "a government shall not substantially burden a person's religious exercise in any case in which the substantial burden on the person's religious exercise affects, or in which a removal of that substantial burden would affect, commerce with foreign nations, among the several states or with Indian Tribes." H.R. 1691 would make it more difficult for the government to, for example, deny a Catholic hospital accreditation for refusing to instruct residents on how to perform abortions, or prohibit a Jewish day school from requiring *16 its teachers to be of the same faith. H.R. 1691 provides a claim where an individual is denied an occupational license or a driver's license because of a religious practice.

The commerce provision of H.R.1691 provides as an element of the claim that the burden on religious exercise or the removal of that burden must affect commerce. Thus, H.R. 1691 protects only as much religious exercise as Congress is

**037**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219                                                                                    Page 13
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

constitutionally empowered to protect. The provision is tautologically constitutional: to the extent that the commerce power reaches some burdens on religious exercise, the bill will protect the religious exercise; to the extent that it does not reach the burden on religious exercise, the bill will not reach that far. H.R. 1691 thus does not raise the constitutional problems associated with the Gun Free Schools Act, [FN58] which was invalidated in United States v. Lopez. [FN59]

In Lopez, the Court invalidated the Gun Free Schools Act (the Act) because it was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise." [FN60]  The Court stressed that because the Act "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce," the Act was unconstitutional. [FN61]  The Court distinguished the Act from another federal firearm statute which it had previously upheld, 18 U.S.C. S 1202(a), which made it a crime for a felon to "posses[s], or transpor [t] in commerce . . . any firearm." [FN62]  The Lopez Court found it significant that "[t]he Court [in Bass] interpreted the possession component of [the firearm statute] to require an additional nexus to interestate commerce," and thus upheld 18 U.S.C. S 1202(a). [FN63]  The Lopez Court stated that, "[u]nlike the statute in Bass, [the Act] has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." [FN64]  H.R. 1691, in line with the requirement articulated in Lopez, includes an express jurisdictional element, and would require a case-by-case analysis of the affect on interstate commerce. [FN65]

**\*17 Section 5, Fourteenth Amendment land use provision**

H.R. 1691 follows the Supreme Court's directive in Boerne to aim legislation under Section 5 of the 14th Amendment at certain laws where there is a significant likelihood of unconstitutionality. [FN66]  Local land use regulation, which lacks objective, generally applicable standards, and instead relies on discretionary, individualized determinations, presents a problem that Congress has closely scrutinized and found to warrant remedial measures under its Section 5 enforcement authority. A detailed description of how land use regulations substantially burden religious exercise follows the explanation of H.R. 1691's land use provisions.

Section 3(b)(1)(A) specifically targets the established evidence of discriminatory land use regulations based on Congress' remedial power under Section 5 of the 14th Amendment, pursuant to the Court's directive in Boerne, [FN67] and tracks the Smith opinion's explanation that, where governmental bodies possess authority to make "individualized assessments" of the reasons for certain conduct, those bodies may not substantially burden a person's free exercise activities without a compelling interest. [FN68]  Section 3(b)(1)(A) advances this very proposition, requiring a compelling state interest "in any system of land use regulation or exemption" in which "a government has the authority to make individualized assessments of the proposed uses to which real property would be put," and thus protects free exercise as interpreted by the Smith Court.

The Court in Boerne explained that Congress's enforcement power under Section 5 of the 14th Amendment is a remedial power and may not be used to alter an interpretation of substantive law made by the Supreme Court. [FN69] Statistical and anecdotal evidence strongly indicates a pattern of abusive and discriminatory actions by land use authorities who have imposed substantial burdens on religious exercise. Accordingly, the land use subsections of H.R. 1691 require these

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

authorities to meet the strict scrutiny standard to justify their actions. In remedying the problems that land use regulations have posed for religious individuals and organizations attempting to exercise First Amendment rights, H.R. 1691 carefully follows the Boerne Court's interpretation of Section 5 and operates as precisely the type of "enforcement" that the Boerne Court invited.

   Other subsections in 3(b)(1) remedy substantial burdens caused by certain specific land use regulation schemes as demonstrated by extensive testimony. The remedies for these burdens are different from the strict scrutiny test of subsection 3(b)(1)(A). Subsection 3(b)(1)(B) seeks to prevent a municipal zoning authority from treating houses of worship, scripture studies in homes, and religious schools in a manner less favorably than nonreligious assemblies.

   Subsection 3(b)(1)(C) prohibits land use regulations from discriminating against an assembly or institution on the basis of religion or religious denomination. This provision would prevent a government from discriminating against houses of worship, church *18 schools, home Bible studies or other religious gatherings, either because they are religious or because of their particular religious viewpoint.

   Subsection 3(b)(1)(D) requires zoning authorities to make reasonable provision for religious land use. Under this provision, a city cannot ban churches altogether nor unreasonably limit the sites where religious schools may locate. Reasonableness is a familiar legal standard that relies upon the facts and circumstances in each case and jurisdiction.


Summary of hearing testimony

   Religions are practiced by communities of believers. At the very core of religious liberty is the ability to assemble for worship. Finding a location for a new church, however, can be extremely difficult in the face of pervasive land use regulation and the nearly unlimited discretionary power of land use authorities. The frustration of this core First Amendment right is not limited to certain religions or to certain areas of land. Churches, large and small, are unwelcome in suburban residential neighborhoods and in commercial districts alike.

   Land use regulations frequently discriminate by design, other times by their neutral application, and sometimes by both. Hearings before the Subcommittee on the Constitution in the 105th and 106th Congresses provide a substantial record of evidence indicating a widespread pattern of religious discrimination in land use regulation. [FN70]

   While longstanding churches in residential communities do not generally feel threatened by outright removal, attempting to locate a new church in a residential neighborhood is typically an exercise in futility. The Subcommittee received testimony explaining that, unless a church can meet in a single house, the only way to build a church in a residential zone is to find several adjacent lots that are on the market simultaneously, buy them, and tear down the houses-an unfeasible strategy on its face. [FN71]

   Commercial districts, therefore, are the only feasible avenue for the location of new churches. Land use schemes exist permitting churches only in residential areas, which give the appearance that *19 regulators are being generous to churches, when just the opposite is true. [FN72]  Other testimony revealed that some land use regulations deliberately exclude all new churches from an entire city. [FN73]  One attorney specializing in land use litigation testified that it is not uncommon for ordinances to establish standards for houses of worship differing from those applicable to other places of assembly, such as where they are conditional uses or not permitted in any zone. [FN74] " The result of these zoning patterns is to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219                                                                Page 15
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

foreclose or limit new religious groups from moving into a municipality.
Established houses of worship are protected and new houses of worship and their
worshipers are kept out." [FN75]

Another zoning expert testified about a survey of twenty-nine zoning codes from
suburban Chicago. In twelve of these codes, there was no place where a church could
locate without the grant of a special use permit. [FN76]  In ten codes, churches
could locate as of right only in residential neighborhoods, with the attendant
problems discussed above. [FN77]  Some codes employed a scheme where churches were
authorized to locate in specified sites, but those sites happened to be where
existing churches were already located. [FN78] Therefore, twenty-two of the twenty-
nine suburbs effectively denied churches the right to locate except by grant of a
special use permit. In other words, it was within the complete discretion of land
use regulators whether these individuals had the ability to assemble for worship.
"The zoning board did not have to give a specific reason. They can say it is not in
the general welfare, or they can say that you are taking property off the tax
rolls."A [FN79]

Significantly, non-religious assemblies need not follow the same rules. This
survey revealed that uses such as banquet halls, clubs, community centers, funeral
parlors, fraternal organizations, health clubs, gyms, places of amusement,
recreation centers, lodges, libraries, museums, municipal buildings, meeting halls,
and theaters are often permitted as of right in zones where churches require a
special use permit, or permitted on special use permit where **20 churches are
wholly excluded. [FN80]  One explanation suggested for this disparate treatment was
that local officials may not want non-tax-generating property taking up space where
tax-generating property could locate. [FN81]

Regulators typically have virtually unlimited discretion in granting or denying
permits for land use and in other aspects of implementing zoning laws. In fact, the
Subcommittee heard testimony of repeated cases in Chicago where the City Council
rezoned an individual parcel of property upon application for a special use permit
by a church to disqualify the church altogether. [FN82]  In another example, a city
issued a building permit to a church, and after the church had commenced
construction on the building, the city revoked the permit on the assertion that the
city had erred in calculating the number of parking spaces its code would require.
[FN83]  This inherent uncertainty for churches attempting to locate is exacerbated
by the fact that, as one witness explained, the church must commit to a costly
lease or a mortgage to hold the property while it litigates in order to have
standing. [FN84]

The Subcommittee heard testimony regarding a study conducted at Brigham Young
University finding that Jews, small Christian denominations, and nondenominational
churches are vastly over represented in reported church zoning cases. [FN85]  The
testimony included discussion of a pattern of abuse that exists among land use
authorities who deny many religious groups their right to free exercise, often
using mere pretexts (such as traffic, safety, or behavioral concerns) to mask the
actual goal of prohibiting constitutionally protected religious activity. [FN86]
Religious groups accounting for only 9% of the population account for 50% of the
reported litigation involving location of churches, and 34% of the reported
litigation involving **21 accessory uses at existing churches. [FN87]  These small
groups plus unaffiliated and nondenominational churches account for 69% of the
reported location cases and 51% of the reported accessory use cases. [FN88]  Jews
account for only 2% of the population, but 20% of the reported location cases and
17% of the reported accessory use cases. [FN89]

In Congressional testimony regarding a survey of the efforts of Presbyterian
congregations in land use and zoning matters, almost half of the cases examined

**040**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

involved no generally applicable rule and individualized decision making by regulators: 32% of the congregations requiring a land use permit reported that "no clear rules permitted or forbade what we wanted to do, and everything was decided based on the specifics of this particular case (e.g., variance, waiver, special use permit, conditional use permit, amendment to the zoning ordinance, etc.)"; [FN90] 15% reported that "even though a clear rule seemed to permit or forbid what we wanted to do, the land use authority's principal decision involved granting exceptions to the rule based on the specifics of this particular case." [FN91] Presbyterian congregations needing a land use permit in a span of 5 years, 10%, or roughly 325 to 400 congregations, reported significant conflict with government or neighbors over the land use permit. [FN92] Significantly, the Brigham Young study discovered only five reported cases involving Presbyterian churches, [FN93] which highlights the great disparity between reported and actual cases. The success rate of churches in the relatively few reported cases has, in fact, declined. [FN94]

   The statistical and survey-related evidence of religious discrimination presented to the Subcommittee was supported by persuasive anecdotal evidence. One witness described twenty-one cases where cities refused to permit churches to use existing buildings that non-religious assemblies had previously used. [FN95] In three of the most egregious cases, churches applied for permits to use a flower shop, a bank, and a theater. In each case, upon application for a use permit by the church, the land use regulator rezoned each small parcel of land into tiny manufacturing zones, rendering the churches non-*22 permitted uses for these "zones." [FN96] Other examples included the City of Rockford, Illinois's refusal to allow the Family Christian Center to use a former school building; this decision was ultimately found to be arbitrary and capricious. [FN97] Living Word Outreach Full Gospel Church and Ministries in Chicago Heights, Illinois was refused the use of a Masonic Temple for religious assembly. [FN98] Gethsemane Baptist in Northlake, Illinois was refused the use of a VFW hall as a church hall. [FN99] Faith Cathedral Church in Chicago was refused the use of a funeral parlor complete with chapel and spacious parking. [FN100] Vinyard Church in Chicago was refused the use of a former theater for religious services. [FN101] Evanston Vinyard Church in Evanston, Illinois was not allowed to use an office building with an auditorium for the purpose of religious assembly. [FN102] Cornerstone Community Church in Chicago Heights was not allowed to use a former department store for religious gatherings. [FN103]

   This brash display of religious discrimination is not endemic to the State of Illinois. In Forest Hills, Tennessee, a Mormon church was denied a permit to use property which had formerly been used as a church. The site was in a cluster of four large churches near a major intersection-one Methodist, one Presbyterian, and two Churches of Christ. When one of the churches closed, the Mormon church bought the property and applied for its use as a church. The city denied the permit on the basis that a temple would not be "in the best interests of and promote the public health, safety, morals, convenience, order, prosperity, and general welfare of the City" and citing its desire to have no more churches in the community. The judge concluded that the city's decision was "essentially aesthetic, to maintain a 'suburban estate character' of the City" and upheld the exclusion. [FN104]

   Because Orthodox Jews may not use motorized vehicles on the Sabbath, they must live within walking distance of a synagogue or shul. [FN105] It is very easy, therefore, for land use regulators to exclude Orthodox Jews from living in a neighborhood by excluding their place of worship. The City of Los Angeles refused to allow fifty elderly Jews to meet for prayer in a house in the large residential neighborhood of Hancock Park. The City permitted other places of assembly in Hancock Park, including schools, recreational uses, and embassy parties, but

**041**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

refused this use because Hancock Park had no place of worship and the City did not
want to create a precedent for one. [FN106]

*23 One witness before the Subcommittee testified to having handled more than
thirty such cases in New Jersey. [FN107]  He explained that land use regulators
often refuse permits for Orthodox synagogues because they do not have as many
parking spaces as the city requires for the number of seats. [FN108]  One vivid
example of this tactic was the case of the City of Cheltenham Township,
Pennsylvania, which insisted that a synagogue construct the required number of
parking spaces despite their being virtually unused. When the synagogue finally
agreed to construct the unneeded parking spaces, the city denied the permit anyway,
citing the traffic problems that would ensue from cars for that much parking.
[FN109]  A related example occurred in Long Island, New York, where a bustling
beach community with busy weekend night activity excluded a synagogue on the basis
that it would bring traffic on Friday nights. [FN110]

The Subcommittee also received testimony of overt religious bigotry in zoning
hearings. [FN111]  One witness described a hearing in which "an objector turned to
the people in the audience wearing skull caps and said 'Hitler should have killed
more of you."' [FN112]  In New Jersey, a zoning board invited testimony on the
effect that substantial Orthodox Jewish populations had had on other communities.
[FN113]  Another witness discussed a case involving the application for a permit by
the Family Christian Center, where a neighbor implored, "Let's keep these God
damned Pentecostals out of here." [FN114]  This sentiment was apparently shared by
the judge; although the application was for a permit to use an existing school
building, the judge said from the bench, "We don't want twelve-story prayer towers
in Rockford," an apparent reference to the twelve-story prayer tower at Oral
Roberts University. [FN115]

This factual record, complete with statistical and anecdotal evidence, results in
the Committee's finding that many exercises of land use regulation are
unconstitutional. Congress therefore exercises its enforcement power pursuant to S
5 of the Fourteenth Amendment as a means of remedying these abuses of the First
Amendment right to free exercise. [FN116]

*24 Many cities overtly exclude churches, others do so subtly. The motive is not
always easily discernible, but the result is a consistent, widespread pattern of
political and governmental resistance to a core feature of religious exercise: the
ability to assemble for worship.

Several conclusions flow from the land use evidence gathered by the Subcommittee:

Some land use regulations are designed to exclude churches, other regulations are
in fact implemented to exclude churches. Many zoning schemes around the country
make it illegal to start a church anywhere in the community without discretionary
permission from a land use authority. In a significant number of communities, it is
difficult or impossible to build or occupy space for a new church. While
discrimination can be very difficult to prove in any individual case, many of the
land use regulations affected by H.R. 1691 have a significant likelihood of being
unconstitutional.

Land use regulation is commonly administered through individualized processes not
controlled by neutral and generally applicable rules. The standards in
individualized land use decisions are often vague, discretionary, and subjective.

Conflicts between religious organizations and land use regulators are much more
common than reported cases would indicate. Smaller and less mainstream
denominations are over-represented in reported land use disputes, but they win
their claims at the same rates as larger churches; this over-representation in
reported cases indicates discriminatory regulation of these faiths and not the
merits of their cases or their own propensity to litigate. Land use regulation has

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

a disparate impact on churches and especially on small faiths and nondenominational churches.

Inferences from reported cases are re-enforced by anecdotal evidence of discrimination from around the country. Churches are often refused permission to meet in buildings designed for meetings, and in which secular meetings have been permitted. Religious discrimination is sometimes coupled with racial and ethnic discrimination.

Section 5, Fourteenth Amendment burden shifting provision

Finally, H.R. 1691 simplifies the litigation of all free exercise claimants by shifting the burden of persuasion to the government once the claimant shows a prima facie case. Under Section 3(a), if a claimant demonstrates a prima facie violation of the Free Exercise Clause, the burden of persuasion then shifts to the government on all issues except the burden on religious exercise. This provision facilitates enforcement of the right to religious exercise as defined by the Supreme Court. Thus, when a claimant shows a burden on religious exercise by a discriminatory motivation, by a less than generally applicable law, or under the hybrid rights theory, [FN117] the burden of persuasion on all elements except the religious exercise burden would shift to the government. Because the Supreme *25 Court's free exercise test has many exceptions of uncertain scope, shifting the burden of persuasion has important implications. This exercise of Section 5 authority thus favors the constitutional right to free exercise where the facts are uncertain; where the government demonstrates that no constitutional violation has occurred pursuant to rules set forth by the Supreme Court, then the government wins on the merits.

Federalism

H.R. 1691 lifts burdens on religious exercise without dictating the means by which governments might accomplish this. H.R. 1691 does not impose any specific affirmative duty, implement a federal regulatory program, or conscript state officers. Its core policy is not to regulate the states, but to deregulate the exercise of religion. H.R. 1691 pre-empts state laws that fall within the scope of Congressional power and substantially burden religious exercise without a compelling reason, and it provides a cause of action to enforce that policy. RFRA deregulates religious exercise at the federal level, and H.R. 1691 would pre-empt state regulation inconsistent with that federal policy. The structure of RLPA's spending and commerce power sections is strikingly parallel to the structure of the Airline Deregulation Act, [FN118] which also deregulated a field of private activity and pre-empted inconsistent state regulation.

H.R. 1691 does not violate the Tenth Amendment as interpreted by the Supreme Court in New York v. United States [FN119] and Printz v. United States. [FN120] Both cases explicitly recognize Congressional power to make "compliance with federal standards a precondition to continued state regulation in an otherwise pre-empted field." [FN121] What is prohibited by New York and Printz is any attempt by Congress to require a state, in its sovereign capacity, to regulate its own citizens according to federal dictate, or to impress state officials to implement or enforce federal policy. Put another way, the federal government may not "commandeer" state legislatures or state officials to affirmatively enact or enforce federal policy. But it may prohibit them from violating federal policy regulating or deregulating private activity in fields subject to Congressional

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.    043

power.

## HEARINGS

The Committee's Subcommittee on the Constitution held one day of hearings on H.R. 1691, Religious Liberty Protection Act of 1999 on May 12, 1999. Testimony was received from the following witnesses: Dr. Richard Land, President, Ethics and Religious Liberty Commission of the Southern Baptist Convention; Lawrence G. Sager, Robert B. McKay Professor of Law, New York University School of Law; Von Keetch, Counsel, The Church of Jesus Christ of Latter-Day Saints; J. Brent Walker, General Counsel, Baptist Joint Committee on Public Affairs; Dr. Clarence E. Hodges, Vice President, Seventh-day Adventist Church of North America; Christopher *26 E. Anders, Legislative Counsel, American Civil Liberties Union; Rabbi David Saperstein, Director and Counsel, Religious Action Center of Reform Judaism; Chai Feldblum, Professor of Law and Director, Federal Legislation Clinic, Georgetown University Law Center; Douglas Laycock, Associate Dean for Research, University of Texas Law School; Oliver S. Thomas, Special Counsel for Religious and Civil Liberties, National Council of Churches; Reverend C. J. Malloy, Jr., First Baptist Church of Georgetown; Bradley Jacobs for Michael P. Farris, President, Home School Legal Defense Association; Marci A. Hamilton, Professor of Law, Benjamin N. Cardozo School of Law; Steven T. McFarland, Director, Center for Law & Religious Freedom, Christian Legal Society.

## COMMITTEE CONSIDERATION

On Wednesday, May, 26, 1999, the Subcommittee on the Constitution met in open session and ordered favorably reported the bill, H.R. 1691, as amended, by a voice vote, a quorum being present. On June 15 and 23, 1999, the Committee met in open session and ordered favorably reported the bill, H.R. 1691, with amendment by voice vote, a quorum being present.

## VOTE OF THE COMMITTEE

There were no roll call votes.

## COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

## COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Reform and Oversight were received as referred to in clause 3(c)(4) of rule XIII of the Rules of the House of Representatives.

## NEW BUDGET AUTHORITY AND TAX EXPENDITURES

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.          **044**

Clause 3(c)(2) of House rule XIII is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 3(c)(3) of rule XIII of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill, H.R. 1691, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974:

**\*27** U.S. Congress,

Congressional Budget Office,

Washington, DC, June 28, 1999.

Hon. Henry J. Hyde,
Chairman, Committee on the Judiciary,
House of Representatives, Washington, DC.
   Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 1691, the Religious Liberty Protection Act of 1999.
   If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Susanne S. Mehlman.

Sincerely,
     Dan L. Crippen, Director.
   Enclosure.

H.R. 1691-Religious Liberty Protection Act of 1999

   CBO estimates that enacting H.R. 1691 would have no significant impact on the federal budget because this bill would primarily address state actions. Because enactment of H.R. 1691 would not affect direct spending or receipts, pay-as-you-go procedures would not apply.
   Under current law, a state or local government may infringe upon a person's exercise of religion as long as that action bears a rational relationship to the government's interest. H.R. 1691 would preclude, under certain circumstances, any infringement on a person's exercise of religion unless the state or local government could show that it furthered a compelling interest by the least restrictive means.
   H.R. 1691 would allow the federal government to sue state and local governments to enforce compliance with provisions of the bill. CBO expects that any costs associated with this authority would be insignificant. Such federal costs, if any, would be subject to the availability of appropriated funds.
   Section 4 of the Unfunded Mandates Reform Act excludes from the application of that act any legislative provisions that enforce the constitutional rights of individuals. CBO has determined that H.R. 1691 fits within that exclusion.
   The CBO staff contact for this estimate is Susanne S. Mehlman. This estimate was approved by Robert A. Sunshine, Deputy Assistant Director for Budget Analysis.

CONSTITUTIONAL AUTHORITY STATEMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Pursuant to clause 3(d)(1) of rule XIII of the Rules of the House of Representatives, the Committee finds the authority for this legislation in Article I, section 8, clause 1; Article I, section 8, clause 3; Article VI, clause 2; Amendment V; and Amendment XIV, section 5 of the Constitution.

## SECTION-BY-SECTION ANALYSIS

Section 1. This section provides that the title of the Act is the Religious Liberty Protection Act of 1999.

Section 2. The introductory and concluding clauses of S 2(a) track the substantive language of RFRA, providing that where the section *28 applies, government shall not substantially burden a person's exercise of religion. This general rule is expressly subject to the compelling interest exception set out in S 2(b).

Section 2(a)(1) applies this general rule to programs or activities receiving federal financial assistance. This subsection ensures that no person will be unnecessarily deprived of the benefits of a federally assisted program, or unnecessarily forced to abandon or compromise religious practices as a condition of participation in a federally assisted program.

Section 2(a)(2) applies the general rule to cases in which the substantial burden affects commerce, or removal of the burden would affect commerce. This so-called jurisdictional element must be proved in each case as an element of the cause of action. This subsection does not treat religious exercise itself as commerce, but it recognizes that the exercise of religion sometimes requires commercial transactions, such as the construction of churches, the hiring of employees, or the purchase of supplies and equipment. Where the burden or removal of the burden on religious exercise affects one of these commercial transactions, the Act applies.

Section 2(b) is taken verbatim from RFRA. It states the compelling interest exception to the general rule that government may not substantially burden religious exercise. The application of the burden to the person whose religious exercise is burdened-not the government program in general-must serve a compelling interest by the least restrictive means.

Section 2(c) prevents any threat of withholding federal funds from a federally assisted activity. Withholding funds is too drastic a remedy to be used effectively, and it hurts the intended beneficiaries of the federally assisted program (who are also the intended beneficiaries of this Act). But the United States may enforce the Act with injunctive and declaratory remedies preserved in this section and expressly created in S 4(d).

Section 3. This section is legislation to enforce the Fourteenth Amendment. But in many of its applications, it is also an exercise of the commerce power, because burdensome regulation of religious uses will prevent construction projects or real estate transactions that affect commerce. Where the effect on commerce can be proved, land use regulation may be challenged either under S 2(b)(2) or under S 3.

Section 3(a) simplifies enforcement of the Free Exercise Clause as interpreted by the Supreme Court. The Court applies the compelling interest test to laws that are not neutral and generally applicable, to laws that provide for individualized assessment of regulated conduct, to regulation motivated by hostility to religion, to cases involving hybrid claims that implicate both the Free Exercise Clause and some other constitutional right, and to other exceptional cases. Many of these exceptions present issues in which the facts are uncertain and difficult to prove, or essential information is controlled by the government. Section 3(a) provides

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

generally that if a complaining party produces prima facie evidence of a free exercise violation, the government then bears the burden of persuasion on all issues except burden or substantial burden on religion.

Section 3(b)(1) codifies parts of the Court's constitutional tests as applied to land use regulation. Section 3(b)(1)(A) provides that if a *29 land use regulation gives government the authority to make individualized assessments of the proposed uses of real property, then the authorities applying that regulation may not substantially burden the free exercise of religion unless application of the burden to the person furthers a compelling interest by the least restrictive means. This directly enforces that part of Employment Division v. Smith, 494 U.S. 872 (1990), that applies the compelling interest test to cases in which the regulated conduct is subject to individualized assessment.

Section 3(b)(1)(B) requires that land use regulation treat religious assemblies or institutions on equal terms with nonreligious assemblies or institutions. Section 3(b)(1)(C) forbids land use regulations that discriminate on the basis of religion or religious denomination. These provisions directly enforce the constitutional rule that government may not discriminate against religion or unnecessarily burden religious exercise with laws that are less than generally applicable.

Section 3(b)(1)(D) provides that government may not unreasonably exclude religious assemblies from a jurisdiction, or unreasonably limit them within the jurisdiction. This provision enforces the rule that First Amendment uses cannot be excluded from a municipality. Schad v. Borough of Mt. Ephraim, 452 U.S. 61 (1981). What is reasonable must be determined in light of all the facts, including the physical and financial availability of land to religious organizations.

Section 3(b)(2) requires a full and fair opportunity to litigate land use claims arising under the Free Exercise Clause or under section 3(b). For example, if a zoning board refuses to entertain a federal claim because of limits on its jurisdiction, or if it excludes evidence of how places of secular assemblies were treated, and if the state court then confines itself to the record before the zoning board, the resulting judgment is not entitled to full faith and credit in a federal suit under the Free Exercise Clause or section 3(b) of this Act.

Section 3(b)(3) expressly provides that equally or more protective state law is not preempted. Some state zoning laws make accommodations for religious uses, and those accommodations are unaffected by this Act.

Section 4. This section provides remedies for violations. Sections 4(a) and (b) track RFRA, creating a private cause of action for damages, injunction, and declaratory judgment, and creating a defense to liability, and providing for attorneys' fees. These claims and defenses lie against a government, but the Act does not abrogate the Eleventh Amendment immunity of states. In the case of violation by a state, the Act must be enforced by suits against state officials and employees.

Section 4(c) subjects prisoner claims to the Prison Litigation Reform Act. Section 4(d) expressly authorizes the United States to sue for injunctive or declaratory relief to enforce the Act.

Section 5. This section states several rules of construction designed to clarify the meaning of all the other provisions. Section 5(a) provides that nothing in the Act authorizes government to burden religious belief; this tracks RFRA. Section 5(b) provides that nothing in the Act creates any basis for restricting or burdening religious exercise or for claims against a religious organization not *30 acting under color of law. These two subsections serve the Act's central purpose of protecting religious liberty, and avoid any unintended consequence of reducing religious liberty.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

An example of a religious organization acting under color of law would be one that undertook by contract to administer a government program. That government program would be subject to this Act even though administered by a religious organization.

Sections 5(c) and 5(d) have been carefully negotiated to keep this Act neutral on all disputed questions about government financial assistance to religious organizations and religious activities. Section 5(c) states neutrality on whether such assistance can be provided at all; S 5(d) states neutrality on the scope of existing authority to regulate private organizations that accept such aid.

Section 5(e) emphasizes that this Act does not require states to pursue any particular public policy or to abandon any policy, but that each state is free to choose its own means of eliminating substantial burdens on religious exercise. The Act preempts laws that unnecessarily burden the exercise of religion, but it does not impose any specific policy on the states or require any affirmative conduct by the states.

Section 5(f) provides that proof of an effect on commerce under S 2(a)(2) does not establish any inference or presumption that Congress meant to regulate religious exercise under any other law.

Section 5(g) provides that the Act should be broadly construed to protect religious exercise to the maximum extent permitted by its terms and the Constitution. Section 5(h) provides that each provision of the Act is severable from every other provision.

Section 6. This section is taken verbatim from RFRA. It is language designed to ensure that the Act is neutral on all disputed issues under the Establishment Clause.

Section 7. Section 7 amends the Religious Freedom Restoration Act. Sections 7(a)(1) and (2) collectively conform RFRA to the Supreme Court's decision in City of Boerne v. Flores, 521 U.S. 507 (1997), eliminating all references to the states and leaving RFRA applicable only to the federal government.

Section 7(a)(3) clarifies the definition of "religious exercise," conforming the RFRA definition to the definition in this Act.

Section 8. This section defines important terms used in the Act. Section 8(a)(1) defines "religious exercise," clarifying issues that had generated litigation under RFRA. Religious exercise need not be compulsory or central to the claimant's religious belief system, and building a church, or otherwise using real property for religious purposes, is religious exercise. As under RFRA, religious exercise includes any conduct that is the exercise of religion under the First Amendment.

Section 8(a)(2) defines "Free Exercise Clause" to mean both the clause in the First Amendment and the application of that clause under the Fourteenth Amendment.

Section 8(a)(3) defines land use regulation to include only regulation that applies to particular parcels or zones and to persons with a property interest in the affected land. Regulation that applies to all land in a jurisdiction is not land use regulation, even if it has some connection to land. Such regulation may be also reached *31 under S 2 if it affects commerce or is implemented with federal financial assistance, but it cannot be reached under S 3.

Section 8(a)(4) incorporates the relevant parts of the definition of program or activity from Title VI of the Civil Rights Act of 1964. This definition ensures that federal regulation is confined to the program or activity that receives federal aid, and does not extend to everything a state does.

The definition of "demonstrates" in S 8(a)(5) is taken verbatim from RFRA. It includes both the burden of going forward and the burden of persuasion.

The definition of "government" in S 8(a)(6)(A) tracks RFRA, except that the United States and its agencies have been deleted, because the United States remains

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.                    **048**

H.R. REP. 106-219                                                    Page 24
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

subject to RFRA. Section 8(a)(6)(B) puts the United States and its agencies back in for the purposes of S S 3(a) and (5), because the burden-shifting provision in S 3(a), and some of the rules of construction in S 5, do not appear in RFRA.

## *32 DISSENTING VIEWS

We cannot support H.R. 1691, the "Religious Liberty Protection Act of 1999" (hereinafter "RLPA"). We believe that this bill will be found unconstitutional by the Supreme Court. We are further concerned that the bill is not well-crafted and will be used to undermine its stated goal of enhancing religious protections for all citizens. For these reasons, we offer the following dissenting analysis.

Brief summary of applicable law

H.R. 1691 is a legislative response to several Supreme Court decisions regarding the Free Exercise Clause of the First Amendment. Prior to 1990, Sherbert v. Verner, 374 U.S. 398 (1963), was widely recognized as the seminal Free Exercise case. Sherbert involved a South Carolina woman who was refused unemployment compensation because she refused to work on her Saturday Sabbath. The state of South Carolina later refused her unemployment compensation. The state argued that the woman simply refused an employment opportunity. The Court held, however, that the state's refusal violated the Free Exercise Clause because its denial of unemployment compensation forced Sherbert to choose between religious adherence and unemployment compensation benefits. In doing so, the Court applied a "compelling interest" test and determined that the state government's interest in denying the benefits was neither compelling, nor narrowly tailored to the least restrictive means. Sherbert, 374 U.S. at 409.

In 1990, the Court retreated from the strict scrutiny standard it had articulated in Sherbert in Employment Division, Oregon Department of Human Resources v. Smith, 494 U.S. 872 (1990). Instead of applying strict scrutiny, the Court determined that laws of general applicability are presumptively constitutional so long as such laws are not motivated by a governmental desire to burden religion.

In Smith, two Native American state employees who worked as counselors for a private drug rehabilitation organization ingested peyote (a powerful hallucinogen) for ceremonial purposes as members of the Native American Church. The rehabilitation agency fired the counselors, who later filed unemployment compensation claims. The state rejected the unemployment compensation claims of both workers on grounds that both were dismissed for "work-related misconduct."

After unsuccessfully appealing their claims to the Oregon Supreme Court, the plaintiffs sought U.S. Supreme Court review of the state court decision. The Court vacated and remanded the Oregon high court decision to determine whether sacramental use of peyote violated Oregon's illicit drug laws. The Oregon Supreme Court determined that Oregon drug laws prohibited the consumption of peyote, even for religious uses. The state court further held *33 that this prohibition violated the Free Exercise Clause and the case returned to the United States Supreme Court for review.

The Supreme Court reversed the state court determination that Oregon drug laws violated the Free Exercise Clause by prohibiting the religious use of peyote. Justice Scalia, writing for the majority, observed that the Court has never held that an individual's religious beliefs excuse that individual from compliance with an otherwise valid law prohibiting conduct that the government is free to regulate. Allowing exceptions to every state law or regulation affecting religion "would open

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.    **049**

H.R. REP. 106-219                                                                                          Page 25
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
(Cite as: H.R. REP. 106-219)

the prospect of constitutionally required exemptions from civic obligations of almost every conceivable kind." <u>Smith, 494 U.S. at 890</u>. Scalia cited compulsory military service, tax obligations, vaccination requirements and child-neglect laws as examples of facially neutral laws that prohibit conduct that the government is free to regulate regardless of the religious burden. Citing these policy concerns, the Court concluded that a law which is religiously neutral may be uniformly applied to all persons without regard to any burden or prohibition placed on their exercise of religion. In the case of the plaintiffs in Smith, the Free Exercise Clause afforded no religious exemption from the Oregon illicit drug laws for ceremonial uses of peyote. Consequently, the plaintiffs' claims for unemployment compensation were held to be properly denied.1

RLPA creates a right of action where any religiously-neutral state or local law is alleged to "substantially burden" a religious practice. Where such a burden is alleged, the state or local government law at issue will be found in violation of the statute unless the government can demonstrate that the law furthers a compelling government interest and is the least restrictive means of achieving that interest. In other words, unless the challenged government law survives strict scrutiny analysis, an individual's right to practice his or her religion will take precedence over that law. Initially, RLPA appears to track the "Religious Freedom Restoration Act of 1993" (hereinafter "RFRA"), which passed a Democratic majority House of Representatives by a voice vote.2 See <u>42 U.S.C. S 2000bb-2000bb-4</u>.

One major difference between the RFRA and RLPA is that they use different constitutional authority to impose strict scrutiny on state and local laws. RFRA drew upon Section 5 of the Fourteenth Amendment.3 However, in 1997, the Supreme Court found that the broad protections accorded individuals against state and local laws *34 under RFRA were excessive and could not be supported under Section 5. The case, <u>City of Boerne, Texas v. Flores, 521 U.S. 507 (1997)</u>, involved a local Catholic church that wanted to raze much of its existing structure to build a larger sanctuary. The Boerne city council refused to grant a building permit to allow the expansion, contending that the designation of the sanctuary as an historic site impeded its expansion under a local historic preservation ordinance. Archbishop Flores of San Antonio challenged the denial of the building permit under RFRA. The city contended that RFRA was unconstitutional as applied to the local historic preservation ordinance.

In holding that Congress "exceeded its authority" under Section 5 of the Fourteenth Amendment, the Court explained that Section 5 is remedial in nature and requires proportionality between constitutionally recognized harm and the statutory means used to guard against that harm. Where the extent of harm is small, the means adopted to cure the harm must be modest. Where the harm is great, the corrective measures may be more expansive.

In Boerne, the Court found that RFRA provided extreme measures to protect free exercise rights but provided no factual predicate in the legislative record to justify such a broad enactment. The Court compared RFRA to the Voting Rights Act of 1965, which also provided broad protections under the Fourteenth Amendment. However, in the case of the Voting Rights Act, the Court said, Congress presented a detailed legislative record identifying the broad scope of the problems to be remedied by that Act. RFRA, unlike the Voting Rights Act, had no such factual background, and therefore its broad-based measures were deemed unconstitutional as applied to state and local law.4 The proponents of RLPA have proffered the same sort of legislative record as Congress established in 1993.5 We agree with proponents of RLPA that its broad protections cannot be achieved by use of Section 5.6 However, unlike RLPA's proponents, *35 we believe that the substitution of Commerce Clause and Spending Clause powers raises even more questions of law and

050
© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

policy, which may invite the Court to overturn RLPA.

Commerce clause

Congress has authority to regulate state activities that "substantially affect" interstate commerce.7 In the past Congress has successfully invoked its commerce power to enact, among other things, many civil rights laws, including the Civil Rights Act of 1964, the Age Discrimination in Employment Act and the Americans with Disabilities Act.8

For the most part, the Supreme Court has given significant deference to Congress' determination that its commerce clause authority is properly invoked in a given statute. However, in one recent decision, United States v. Lopez, 514 U.S. 549 (1995), the Court did find an outer limit to the commerce authority of Congress. The Lopez decision may call into question whether RLPA is a proper exercise of Congressional authority.

In Lopez, the Court considered the "Gun-Free School Zones Act of 1990," which, among other things, made it a federal offense to "knowingly possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." In an opinion written by Chief Justice Rehnquist, the Court found that there was no rational nexus between the Act and interstate commerce. First, the Court noted that the Act was a criminal statute, which "by its terms has nothing to do with 'commerce' or any sort of economic enterprise." Lopez, 514 U.S. at 561. Second, the Court observed that the Gun-Free Schools Act contained no jurisdictional element that "would ensure, through a case-by-case inquiry, that [ ] firearm possession [ ] affects interstate commerce." Id. Third, the Court noted that the legislative record contained no findings that the "effects upon interstate commerce of gun possession in a school zone." Citing these three factors, the Court found that the Gun Free School Zones Act could not be upheld under the Commerce Clause, because "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." Id. at 567.

It is clear the H.R. 1691 does not provide a facially valid interstate commerce nexus. Therefore, we believe that Lopez will require courts to conduct a preliminary hearing on whether the claimant has established an interstate commerce nexus before a RLPA case proceeds to the merits. This approach will no doubt lead to inconsistent results. Moreover, we believe that tying religious *36 burdens to interstate commerce may create a bias toward adherents of larger religious groups, since those groups are more likely to engage in interstate commerce. Even so, where a particular religious practice is at issue, this bill may discriminate among practices within a large religious domination. These consequences do not follow from the spirit of inclusiveness that have characterized our earlier efforts to promote religious free exercise.

Spending clause

The test of whether a given enactment is an appropriate use of Spending Clause power is whether the legislation establishes a nexus between conditions of accepting the federal financial assistance in question and the purpose of those funds. The classic case in this area involved the federal legislation designed to encourage states to increase the drinking age from 18 to 21 years. In that instance, Congress attempted to condition the disbursement of federal highway funds on state agreement to a higher drinking age requirement. The Supreme Court, in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

South Dakota v. Dole, 514 U.S. 549 (1995), held that such a use of spending power
was proper. The Court found a nexus between the condition and the purpose of funds-
promotion of highway safety. Moreover, the Court determined that the ability of
states to reject the condition (and thereby relinquish their entitlements to the
conditioned highway funds) was a significant factor. As in the Commerce Clause
area, RLPA does not on its face evidence a nexus with federal spending. Instead, it
applies to all "programs or activities" that receive federal financial assistance.
The Spending Clause power implicated in this bill is one of its more curious
provisions. One cannot be certain about what sorts of laws will be challenged under
this provision, and the proponents of this bill have not articulated any examples.

Separation of powers

   We believe that the Boerne decision also indicates that Congress may have
violated separation of powers principles by enacting RFRA, an issue the Court would
be forced to decide if RLPA is enacted. If the Smith decision stands for anything,
it stands for the Court's determination that an across-the-board strict scrutiny
standard would work a substantial injustice to other important but not compelling
government interests. Rather than reject strict scrutiny, as the proponents of RLPA
have claimed the Court did, the Court retained that standard but decided to apply
it on an as-needed basis. While Smith no doubt left the religious community with
some uncertainty about the standard governing Free Exercise challenges, we cannot
agree with the proponents of RLPA that the Court has abandoned its commitment to
our longstanding tradition of religious free exercise. As Professors Sager and
Eisgruber have stated, "The Supreme Court held in Employment Division, Department
of Human Resources v. Smith, and reiterated in Church of the Lukumi Babalu Aye v.
Hialeah, 508 U.S. 520 (1993), that 'where the State has in place a system of
individual exemptions, it may not refuse to extend that system to cases of
religious hardship *37 without compelling reason."' [FN9]  By imposing an across-
the-board strict scrutiny standard, which the Court has expressly declined to apply
in Smith, RLPA raises serious separation of power issues. Indeed, the very language
of the Boerne decision indicates that this concern is real. [FN10]

Land use provisions and Section 5 concerns

   RLPA sets forth a procedure for religious-based challenges to all federal, state
and local zoning regulations and requires that the challenged regulations be
defended against a strict scrutiny standard. To effect this sweeping right of
action, RLPA uses the same Congressional authority that the Supreme Court rejected
in Boerne, Section 5 of the Fourteenth Amendment. Using the test outlined by the
Court in Boerne, we are called to ask whether RLPA's protections are proportionate
to the present land use problems faced by religious organizations and individuals
adherents. We suggest that it is not.
   As we have suggested, the proponents of this bill have articulated the same sort
of anecdotal evidence of land use discrimination that the Court considered in
Boerne. We doubt that the instances articulated, even when viewed in a totality,
will establish a pattern sufficient to justify making every federal, state and
local land use decision and regulation vulnerable to attack.

Drafting concerns and other consequences

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Even if we agreed that this legislation is necessary (a position we do not hold),
we are not as certain as the proponents of H.R. 1691 that this bill is crafted in
such way as to meet its goals. We note here a few of the most glaring deficiencies
in the drafting of this bill:

1. H.R. 1691 fails to track the minimal standards governing Commerce Clause
authority. RLPA does not include the baseline standard established by the Supreme
Court in U.S. v. Lopez, supra, the "substantial affects" test. Instead, the framers
of this bill have attempted to broaden its coverage to conduct that merely
"affects" interstate commerce.

*38 2. H.R. 1691 contradicts Supreme Court law governing Free Exercise Clause
cases. While Congress may be able to create statutory rights to protect religious
liberty, Congress may not dictate to the Supreme Court how it is to decide First
Amendment cases. Several sections of RLPA allude to a First Amendment cause of
action, and to the extent that RLPA contemplates such actions, the across-the-
board strict scrutiny requirement is inconsistent with the Supreme Court holding in
Oregon v. Smith.

3. H.R. 1691 repeats the errors of RFRA by using Section 5 of the Fourteenth
Amendment to impose its broad land use provisions. The land use provisions of RLPA
apply to all state and local land use laws. The Supreme Court considered the very
same record evidence of land use discrimination before it rejected RFRA, and there
is little doubt that the Court would reach the same result in this context.

These are only a few of the concerns we have about the drafting of this bill, and
we have expressed these concerns throughout the subcommittee and full committee
consideration process. While proponents of this bill have sought our endorsement of
the bill, they have shown that any efforts to improve it will be rejected. While
there are times when the national legislature must act in the dark to ensure
fairness in our society, this bill has not been crafted in the dark but has been in
the making for almost ten years. We understand the frustration of the proponents of
this bill but we cannot "go along" with a bill that falls short of its noble goals.

We know from our brief experience with RFRA and with several state versions of
that statute that some religious groups will use RLPA to attack state and local
civil rights laws. See Smith v. Employment & Housing Comm'n, 913 P.2d 909 (Cal.
1996) ("marital status" includes unmarried heterosexual couples and the
government's interest in providing equal housing access to such couples is
compelling); Swanner v. Anchorage Equal Rights Comm'n, 874 P.2d 274 (Alaska 1996)
(same); compare, Cooper v. French, 460 N.W.2d 2 (Minn. 1990) ("marital status" does
not include unmarried cohabiting couples; a plurality of the court held that there
was no compelling governmental interest in preventing marital status
discrimination); Attorney General v. Desilets, 636 N.E.2d 233 (Mass. 1994)
(remanding for further consideration of whether governmental interest in preventing
marital status discrimination in housing is compelling). However, the Ninth Circuit
recently decided a case in which it held that the government interest in preventing
marital status discrimination was not compelling. See Thomas v. Municipality of
Anchorage, 1999 U.S. App. Lexis 440 (9th Cir. Jan. 14, 1999). We can expect that,
if passed, RLPA will invite more of these challenges, because it specifically
authorizes individuals to raise a religious liberty affirmative defense in any
judicial proceeding. Thus, the religious liberty defense could be asserted against
federal civil rights plaintiffs in cases concerning disability, sexual orientation,
familial status and pregnancy. Employers in non-religiously affiliated
organizations, for example, may assert the religious liberty defense against gay or
lesbian applicants. Even if a majority of these defense claims fail, they will
increase the cost of bringing a federal civil rights suit.

*39 Proponents of RLPA claim that the bill leaves all protections against racial

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

discrimination intact, because laws against racial discrimination have always been
held to be compelling.11 However, RLPA will also require that challenged anti-
discrimination laws aimed at race or gender must follow the least restrictive means
of achieving those purposes. Presumably, substantial litigation could arise on that
ground as well. We therefore regret that the majority has failed to take into
account this issue by protecting civil rights laws and by rejecting amendments
offered before the full committee that would have addressed this concern.

    We would like to believe that the consequences of RLPA would end with the civil
rights issue. However, not even the proponents of RLPA can suggest that its
potential adverse impact is so limited. We can expect challenges to historic
preservation ordinances, environmental protection laws and child welfare laws.
Whenever such a law is challenged, the government will be hamstrung by the strict
scrutiny requirements.

Conclusion

    If RLPA is the best that can be done in light of the First Amendment, then
perhaps we should allow the alleged unfairness of the present system to reveal
itself through the many Free Exercise cases that continue to be argued year after
year. This approach may be more effective and more expeditious in the long-term
than picking a fight with the Supreme Court, as RLPA may be perceived to do.
Perhaps the role of religious free exercise is less certain today than it was prior
to the Smith decision. Perhaps there is a role for the federal government to play
in fostering an environment in which religious faith is encouraged. But RLPA is not
the panacea its proponents contend that it is.

    By attempting to avoid constitutional traps, the proponents of RLPA are trapping
their own stated interests by relying on the Commerce and Spending clauses. We
cannot agree that drawing lines between religious adherents based on their
interstate commerce impact follows our tradition of religious free exercise or our
tradition against the establishment of religion. By imposing an across-the-board
strict scrutiny standard, RLPA will be used to attack state and local civil rights
laws, child welfare laws and a host of other laws that may not be compelling but
that nonetheless serve important governmental functions. In the end, we find
ourselves faced with a bill that even the Sherbert Court may have recognized as
dangerous. As that Court expressed it, "Even when [ ] action is in accord with
one's religious convictions, it is not totally free from legislative restrictions."
    John Conyers, Jr.
    Robert C. Scott.
    Melvin L. Watt.
    Maxine Waters.
    Marty Meehan.
    Tammy Baldwin.

                    *40 ADDITIONAL DISSENTING VIEWS

    We believe that legislation restoring the legal protections for the free exercise
of religion, which the Supreme Court rendered virtually a dead letter in its
infamous decision in Employment Division v. Smith, [FN1] demands swift and
effective legislative action. The Congress has tried previously to achieve this
with the Religious Freedom Restoration Act [RFRA], [FN2] which the court struck
down in part City of Boerne v. Flores. [FN3] While RFRA remains good law at the
federal level, [FN4] protection against infringements of this fundamental liberty

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

by state and local governments remains limited, and the state of religious liberty in America precarious.

We strongly believe that legislation along the lines of the Religious Liberty Protection Act [RLPA] is necessary. It restores the application of strict scrutiny in those cases in which facially neutral, generally applicable laws have the incidental effect of burdening the free exercise of religion. Government should not have the ability to subject our first freedom to a substantial burden unless it is able to demonstrate that it has used "the least restrictive means of achieving a compelling state interest." [FN5]  Legislation restoring this appropriate balance between the rights of individuals and minority religions, including the religions of racial and ethnic minorities with different religious beliefs, on the one hand, and the prerogatives of the majority on the other, should remain at the top of the legislative agenda.

The Supreme Court's Decision in Smith set a truly dangerous precedent. As Justice Scalia acknowledged in writing for the majority, "It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious practices that are not widely engaged in . . . ." [FN6]

Justice Scalia went on to accept this plainly foreseeable tyranny of the majority as the "unavoidable consequence of democratic government." [FN7]  He dismissed our nation's proud heritage of protecting religious freedom as a "luxury" which we "cannot afford." [FN8]

The Framers of our Bill of Rights clearly understood the danger of subjecting fundamental rights to a popular vote. As Mr. Justice Jackson explained,

The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, *41 to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, and a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to a vote; they depend on the outcome of no elections. [FN9]

We believe it is important that Congress act affirmatively to reinstate that understanding. We are, however, concerned that this legislation, as drafted, would not simply act as a shield to protect religious liberty, but could also be used by some as a sword to attack the rights of many Americans, including unmarried couples, single parents, lesbians and gays. We find deeply disturbing the prospect that legislation drafted to restore fundamental rights might have the unintended consequence of stripping large numbers of Americans of newly-won rights to seek and retain employment, a place to live and their just and equal place in society-rights that have for too long been denied to too many.

We have received testimony from a representative of at least one organization that has brought free exercise litigation in an effort to undermine these newly won civil rights and that fully intends to use the statute, once enacted, to further that legal effort. [FN10]  While those religious beliefs may be sincere and entitled to a fair hearing, we believe it is necessary to strike the appropriate balance between respect for such beliefs and the legitimate claims of others to protection under the law. That balance is, in our view achievable without threatening this vital legislation and the fundamental religious liberties it seeks to protect.

At both Subcommittee and Full Committee, Mr. Nadler offered an amendment, drafted in consultation with both religious and civil rights groups, which would have achieved that balance. It would have done so, without carve-outs and without singling out any religious belief or practice for different adverse treatment. Instead, it sought to clarify that religious liberty is an individual right

**055**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219                                                          Page 31
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

expressed by individuals and through religious associations, educational
institutions and houses of worship. It would have made clear that the right to
raise a claim under RLPA would have applied to that individual right, but that non-
religious corporate entities could not seek refuge in a religious claim under RLPA
to attack civil rights laws. Individuals could still have raised claims based on
their sincerely held religious beliefs which were burdened by government, whether
in the conduct of their businesses, their employment by governments, their
participation in the rental market, their right to observe the Sabbath or to wear
religious articles and to follow the other teachings of their faith, including
those relating to family life, the education of children and the conduct of their
religious institutions.

   At the same time, the amendment recognized that in protecting rights, we are
always balancing other individuals' rights. The courts do it, Congress does it, and
there is no way around it. It **\*42** would have provided a basis to enact a bill that
will pass and that will protect people-real people who are in need of protection.

   We all know that without good faith compromise, by people with vastly different
beliefs, this bill will never pass. That was our experience with RFRA, and nothing
has changed.

   We regret that the majority rejected the Nadler amendment, and we hope that
through further work and negotiation we can craft a final bill that protects the
rights of all Americans and finally restores the legal protections for religious
freedom that have been largely out of reach of average citizens for nearly a
decade.

   Howard L. Berman.
   Jerrold Nadler.
   Sheila Jackson Lee.
   William D. Delahunt.


   FN1 <u>494 U.S. 872 (1990)</u>.


   FN2 <u>521 U.S. 507 (1997)</u>.


   FN3 See <u>Sherbert v. Verner, 374 U.S. 398 (1963)</u>. In Sherbert, a Seventh-Day
Adventist who had refused to work on her religion's Sabbath was awarded
unemployment compensation which had previously been denied.


   FN4 <u>494 U.S. 872 (1990)</u>.


   FN5 See <u>Ore. Rev. Stat. S 475.992(4) (1987)</u>.


   FN6 See Religious Liberty Protection Act: Hearing on H.R. 1691 Before the
Subcomm. on the Constitution of the House Comm. on the Judiciary, 106th Cong. (May
12, 1999) (statement of Douglas Laycock, Professor, University of Texas Law School)
<<http://www.house.gov/judiciary/lay0512.htm>>[hereinafter Laycock Testimony, May
12, 1999].


   FN7 McConnell, <u>Free Exercise Revisionism, 57 U.Chi.L.Rev. at 1152-53</u>.


   FN8 In the majority opinion, Justice Scalia wrote:
   The government's ability to enforce generally applicable prohibitions on
socially harmful conduct, like its ability to carry out other aspects of public

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

policy, "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." Lyng v. Northwest Indian Cemetery Protective Assn., 485 U.S. 439, 451 (1988). To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is "compelling"-permitting him, by virtue of his beliefs, "to become a law unto himself," Reynolds v. United States, 98 U.S. 145, 167 (1878)-contradicts both constitutional tradition and common sense.

Employment Division v. Smith, 494 U.S. at 881-82. See also Wisconsin v.Yoder, 406 U.S. 205 (1972) (holding that Old Order Amish's free exercise interests, combined with right of parents to direct child's education, outweighed state interest in enforcing compulsory education statute); Wooley v. Maynard, 430 U.S. 705 (1977) (invalidating state law requiring display of license plate slogan that offended individual religious beliefs); West Virginia Board of Education v. Barnette, 319 U.S. 624 (1943) (holding unconstitutional compulsory flag salute statute challenged by religious objectors); Cantwell v. Connecticut, 310 U.S. 296 (1940) (finding state licensing system for religious and charitable solicitations invalid where administrator had discretion to deny license to any cause he deemed nonreligious).

The Court's attempt to justify this distinction between mere free exercise claims and "hybrid" claims rested on its conclusion that the cases involving hybrid claims "specifically adverted to the non-free-exercise principle involved." Smith, 494 U.S. at 881, n. 1. This footnote explanation has been described as "no explanation at all." Sarah J. Gralen Rous, Why Free Exercise Jurisprudence in Relation to Zoning Restrictions Remains Unsettled After Boerne v. Flores, 52 SMU L. Rev. 305, 317 (1999). Moreover, Smith itself could have been viewed as a hybrid case, involving both the right of free exercise and a right pursuant to the Free Speech Clause to communicate one's religious message through the act of using peyote. See Michael W. McConnell, Free Exercise Revisionism and the Smith Decision, 57 U. Chi. L. Rev. 1109, 1122 (1990).


FN9 Smith, 494 U.S. at 877. The Court faced this precise issue in Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993). There, adherents to the Santeria faith leased city land with plans to engage in worship services involving the killing, cooking, and ingestion of animals. After becoming aware of the Santeria believers' intentions, the city adopted an ordinance prohibiting the slaughter of animals within city limits. The Supreme Court, however, invalidated the ordinance, holding that, while facially neutral, it failed to reach a range of secular conduct with similar effects. No longer viewed as a neutral, generally applicable law, the ordinance thus fell outside the scope of Smith and the Court struck it down pursuant to the strict scrutiny standard.


FN10 Smith, 494 U.S. at 884.


FN11 42 U.S.C. S 2000bb-1.


FN12 U.S. Const. amend. XIV.


FN13 521 U.S. 507 (1997).


FN14 See Boerne, 521 U.S. at 519 (citing South Carolina v. Katzenbach, 383 U.S. 301, 326 (1966)).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN15 Boerne, 521 U.S. at 532.

FN16 Boerne, 521 U.S. at 532. Commentators have criticized this important element
of the Boerne holding. For example, as Professor McConnell explains, "[t]he
historical record shows that the framers of the [Fourteenth] Amendment expected
Congress, not the Court, to be the primary agent of its enforcement, and that
Congress would not necessarily consider itself bound by Court precedents in
executing that function." Michael W. McConnell, Institutions and Interpretation: A
Critique of City of Boerne v. Flores, 111 Harv. L. Rev, 153, 194 (1997). See also
Religious Liberty Protection Act: Hearing on H.R. 1691 before the Subcomm. on the
Constitution of the House Comm. on the Judiciary, 106th Cong. (May 12, 1999)
(statement of Dr. Richard D. Land, President-Treasurer, Ethics and Religious
Liberty Commission) (stating that the Boerne Court "incorrectly focused on the
issue of whose right it is to interpret the Constitution. From the Supreme Court's
perspective, it was a turf war.").

FN17 Boerne, 521 U.S. at 530.

FN18 Boerne, 521 U.S. at 532.

FN19 Boerne, 521 U.S. at 534.

FN20 The opinion appears to reinforce a broad role for courts in exercising their
constitutional function. See Religious Liberty Protection Act: Hearing on H.R. 4019
Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th
Cong. (June 16, 1998) (statement of W. Cole Durham Jr., Professor, J. Reuben Clark
Law School, Brigham Young University) << http://
www.house.gov/judiciary/durham.htm>> [hereinafter Durham Testimony] (asserting that
Boerne diminished the legislative role for protection of religious liberty).
Justice Scalia's concurrence, in which he responds to the historical evidence
offered in Justice O'Connor's dissent to cast doubt on the Smith rule, appears,
however, to suggest a broader role for legislative prerogatives:
   Who can possibly be against the abstract proposition that government should
not, even in its general, nondiscriminatory laws, place unreasonable burdens upon
religious practice? Unfortunately, the abstract proposition must ultimately be
reduced to concrete cases. The issue presented by Smith is, quite simply, whether
the people, through their elected representatives, or rather this Court, shall
control the outcome of those concrete cases. . . . The historical evidence put
forward by the dissent does nothing to undermine the conclusion we reached in
Smith: It shall be the people.
   Boerne, 521 U.S. at 544 (Scalia, J., concurring).
   As Professor McConnell argues, however:
   The oddity, of course, is that RFRA was enacted by the elected representatives
of the people. In declaring RFRA unconstitutional, the Boerne Court overturned the
will of the people' in the name of protecting their democratic voice from undue
interference by the judiciary. Justice Scalia's democratic rhetoric thus seems at
cross-purposes with his conclusion.
   McConnell, Institutions and Interpretation, 111 Harv.L.Rev. at 168.

FN21 Testimony regarding cases in the area of land use and zoning will be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

described in more detail below in the section devoted to H.R. 1691's land use
provision.

FN22 Several witnesses made the point that state and local governments have taken
the message of Smith to be that they never have to make exemptions for religious
believers, and can therefore simply refuse to respond to their requests. Because
RFRA gave citizens a potentially viable claim, officials had a reason to engage in
discussions with potential claimants which often resulted in mutually acceptable
solutions. The Need for Federal Protection of Religious Freedom after Boerne v.
Flores, II, 1997: Oversight Hearings Before the Subcomm. on the Constitution of the
House Comm. on the Judiciary, 105th Cong. (March 26, 1998)(statement of Mark
Chopko, General Counsel, U.S. Catholic Conference)
<<http://www.house.gov/judiciary/222353.htm>> [hereinafter Chopko Testimony]
(accord statement of Mark Stern, Director, Legal Department, American Jewish
Congress) <<http://www.house.gov/judiciary/222390.htm>> [hereinafter Stern
Testimony, March 26, 1998).

FN23 These anecdotes explain why the issue has come to the attention of Congress.
Elsewhere in the Report, we discuss the sources of Congressional power to address
the problems illustrated by these examples.

FN24 See Mockaitis v. Harcleroad, 104 F.3d 1522 (9th Cir. 1997).

FN25 Chopko Testimony.

FN26 See Hadnot v. Shaw, 826 P.2d 978 (Okla. 1992); Scott v. Hammock, 870 P.2d
947 (Utah 1994). See Religious Liberty Protection Act: Hearings on H.R. 1691 Before
the Subcomm. on the Constitution of the House Comm. on the Judiciary, 106th Cong.
(May 12, 1999) (statement of Von Keetch, Counsel, Church of Jesus Christ of Latter-
Day Saints)<<http:// www.house.gov/judiciary/keet0512.htm>> [hereinafter Keetch
Testimony, May 12, 1999].

FN27 Stern Testimony, March 26, 1998.

FN28 The Need for Federal Protection of Religious Freedom After Boerne v. Flores,
II: Hearing Before the Subcomm. on the Constitution of the House Comm. on the
Judiciary, 105th Cong. (March 26, 1998)(statement of Isaac M. Jaroslawicz, Director
of Legal Affairs for Aleph Institute) <<http://
www.house.gov/judiciary/222356.htm>> [hereinafter Jaroslawicz Testimony].

FN29 Jaroslawicz Testimony.

FN30 Id.

FN31 Keetch Testimony, May 12, 1999. See Greater New York Health Care Facilities
v. Axelrod, 770 F. Supp. 183 (S.D.N.Y. 1991).

FN32 Keetch Testimony, May 12, 1999.

FN33 The Need for Federal Protection of Religious Freedom After Boerne v. Flores,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

II: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th Cong. (March 26, 1998) (statement of Steve McFarland, Director, Center for Law and Religious Freedom) <<http://www.house.gov/judiciary/222355.htm>> [hereinafter McFarland Testimony, March 26, 1998].

FN34 Chopko Testimony.

FN35 Id.

FN36 Id. One such act of devotion performed in Catholic Churches is known as the Perpetual Adoration of the Blessed Sacrament. This requires that the Blessed Sacrament in the Church never be left unattended, necessitating 24-hour access to the Church by parishioners.

FN37 Religious Liberty Protection Act: Hearing on H.R. 4019 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th Cong. (July 14, 1998) (statement of Steve McFarland, Director, Center for Law and Religious Freedom) [hereinafter McFarland Testimony, July 14, 1998].

FN38 McFarland Testimony, July 14, 1998 (citing Bronx Household of Faith v. Community Sch. Dist., 127 F.3d 207 (2d Cir. 1997), cert. denied 118 S.Ct. 1517 (1998).

FN39 See Brown v. Hot, Sexy, and Safer Prods., Inc., 68 F.3d 525 (1st Cir. 1995).

FN40 See id. at 529.

FN41 Id. at 536.

FN42 See id. at 539.

FN43 See St. Agnes Hospital v. Riddick, 748 F. Supp. 319 (D. MD. 1990)); Keetch Testimony, May 12, 1999. Alarmingly, the District Court in St. Agnes found a compelling government interest in requiring the Catholic hospital to teach abortion.

FN44 Chopko Testimony.

FN45 Stern Testimony, March 26, 1998.

FN46 Keetch Testimony, May 12, 1999.

FN47 Stern Testimony, March 26, 1998.

FN48 In addition, H.R. 1691 clarifies that RFRA applies to federal law, policies, property, and employees. This clarification is appropriate given that the Supreme Court in Boerne held RFRA unconstitutional only as applied to actions of state and local governments. See Florida Prepaid Postsecondary Education Expense Board v.

**060**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

College Savings Bank, 1999 WL 412723, *7 (U.S., June 23, 1999)(stating that Boerne invalidated RFRA "insofar as RFRA was made applicable to the states); In re Young, 141 F.3d 854 (8th Cir.)(upholding RFRA as applied to federal laws), cert. denied Christians v. Crystal Evangelical Free Church, 119 S.Ct. 43 (1998).

   FN49 One issue raised during the Subcommittee Markup was whether a business corporation could make a claim under H.R. 1691. The requirement of H.R. 1691 that the claimant demonstrate a substantial burden on religious exercise is equally applicable whether a claimant is a natural person or a corporation. Most corporations are not engaged in the exercise of religion, but religious believers, such as people in the Kosher slaughter business, should not be precluded from bringing a claim under H.R. 1691 simply because they incorporated their activities pursuant to existing law.

   FN50 With respect to claims of racial discrimination, the government's interest is compelling. See Bob Jones Univ. v. United States, 461 U.S. 574, 604 (1983) (holding that the government's "compelling" and "overriding interest in eradicating racial discrimination in education . . . substantially outweighs whatever burden denial of tax benefits places on petitioners' exercise of their religious beliefs"). As Steven T. McFarland of the Center for Law and Religious Freedom testified during a Subcommittee hearing on July 14, 1998, "the general standard of compelling government interest . . . has no difficulty being met in the area of racial discrimination." McFarland Testimony, July 14, 1998.

   FN51 See Rendell-Baker v. Kohn, 457 U.S. 830 (1982).

   FN52 42 U.S.C. S 2000d (1994).

   FN53 20 U.S.C. S 1681 (1994).

   FN54 301 U.S. 548 (1937).

   FN55 South Dakota v. Dole, 483 U.S. 203, 207 (1987).

   FN56 U.S. Const. Art. I S 8.

   FN57 One objection raised to the use of the commerce clause is motivated by a generalized concern over the legitimacy of invoking the commerce clause of the U.S. Constitution as authority for the legislation. This objection is based on a narrow reading of the commerce clause that has long been rejected by the Supreme Court. A wide range of federal laws have relied upon the commerce clause as constitutional authority. The Federal Fair Labor Standards Act, which set minimum wage and maximum working hours for employees, has been upheld by the Supreme Court as a valid exercise of the federal Commerce Power. See United States v. Darby, 312 U.S. 100 (1941). The Court's contemporary reading of the Commerce Clause has also been invoked as constitutional authority for numerous federal criminal laws, including those prohibiting the possession of a firearm that has been transported in interstate commerce, see 18 U.S.C. S S 921-928, and prohibiting extortionate credit transactions or "loan sharking," see 18 U.S.C. S S 891 et seq. Congress has repeatedly used the commerce power as the basis for effective legislation to protect civil rights. H.R. 1691 simply follows that tradition. For example, Title

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

Page 37

II of the Civil Rights Act of 1964, which prohibits racial discrimination in places of public accommodation, was based on Congress' power to regulate commerce. That provision has been upheld by the Supreme Court as applied to hotels, see Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964); restaurants, see Katzenbach v. McClung, 379 U.S. 294 (1964); and public recreational facilities, see Daniel v. Paul, 395 U.S. 298 (1969). Similarly, the Age Discrimination in Employment Act, which prohibits discrimination in employment on the basis of age, has been upheld by the Supreme Court as a valid exercise of Congress' power to regulate commerce. See Equal Employment Opportunity Comm'n v. Wyoming, 460 U.S. 226 (1983).

FN58 18 U.S.C. S 922 (1994).

FN59 514 U.S. 549 (1995).

FN60 Id. at 561.

FN61 Id.

FN62 United States v. Bass, 404 U.S. 336 (1971).

FN63 Lopez, 514 U.S. at 562.

FN64 Id.

FN65 There are many ways in which religious activities, whether engaged in by individuals or institutions, might affect commerce. For example, according to Marc Stern of the American Jewish Congress, "many activities of religious not-for-profit corporations come within the Commerce Clause," including purchasing and providing goods and services. See Religious Liberty Protection Act: Hearings on H.R. 4019 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th Cong. (June 16, 1998) (statement of Marc D. Stern, Director, Legal Department, American Jewish Congress) [hereinafter Stern Testimony, June 16, 1998] (citing Camps Newfound/Owatanna v. Town of Harrison, 117 S. Ct. 1590 (1997)). In Camps Newfound, the Supreme Court concluded that religious camps in Maine were "unquestionably engaged in commerce, not only as a purchaser, but also as a provider of goods and services." 117 S. Ct. at 1596 (citations omitted). See also United States v. Rea, 169 F.3d 1111 (8th Cir. 1999)(upholding federal prosecution under the commerce power for arson of a church). Mr. Stern also noted that under the Supreme Court's Commerce Clause jurisprudence, "the cumulative effects of small-scale economic activity can bring an activity within the Commerce Clause." Stern Testimony, June 16, 1998; see Hodel v. Virginia Surface Mining Ass'n, 452 U.S. 264, 277 (1981) ("[E]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations.") (internal quotation marks omitted); Lopez, 514 U.S. at 556; and Wickard v. Filburn, 317 U.S. 111, 127-28 (1942). See also 18 U.S.C. S 247 (1994 and Supp. II).

FN66 See Boerne, 521 U.S. at 532.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN67 See Boerne, 521 U.S. 507 (1997) (holding that Congress must accept Court's interpretation of constitutional right that Congress means to enforce).

FN68 Smith, 494 U.S. at 884.

FN69 Boerne, 521 U.S. at 532.

FN70 See Religious Liberty Protection Act: Hearing on H.R. 1691 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 106th Cong. (May 12, 1999) (statements of Rabbi David Saperstein, Director and Counsel, Religious Action Center of Reform Judaism) <<http:// www.house.gov/judiciary/sape0512.htm>> [hereinafter Saperstein Testimony] (Steven T. McFarland, Director, Center for Law and Religious Freedom ) << http://www.house.gov/judiciary/mcf0512.htm>> [hereinafter McFarland Testimony, May 12, 1999]; Laycock Testimony, May 12, 1999; Keetch Testimony, May 12, 1999; Religious Liberty Protection Act: Hearing on H.R. 4019 before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th Cong. (July 14, 1998) (statements of Douglas Laycock, Professor, University of Texas Law School) <<http://www.house.gov/judiciary/222498.htm>> (Rev. Elenora Giddings Ivory, Director, Washington Office of the Presbyterian Church (USA) [hereinafter Ivory Testimony) <<http://www.house.gov/judiciary/222495.htm>>; Shoulson Testimony; Religious Liberty Protection Act: Hearing on H.R. 4019 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th Cong. (June 16, 1998) (statement of Douglas Laycock, Professor, University of Texas Law School) <<http://www.house.gov/judiciary/222470.htm>>; and John Mauck, land use attorney, Mauck, Bellande & Cheely, Chicago, IL << http://www.house.gov/judiciary/mauck.pdf>>); Durham Testimony. A well-organized summary of this testimony will appear in an article by Prof. Douglas Laycock to be published in a forthcoming symposium in the University of California-Davis Law Review.

FN71 See Religious Liberty Protection Act of 1998, Hearing on H.R. 4019 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th Cong. (statement of Bruce D. Shoulson, attorney) <<http:// www.house.gov/judiciary/222494.htm>> [hereinafter cited as Shoulson Testimony].

FN72 See Cornerstone Bible Church v. City of Hastings, 740 F. Supp. 654, 663 (D. Minn. 1990) (holding that zoning ordinance left open "ample alternative channels of communication" because church could locate in residential zones), rev'd in part, on other grounds, 948 F.2d 464 (8th Cir. 1991); City of Chicago Heights v. Living Word Outreach Full Gospel Church and Ministries, Inc., 707 N.E.2d 53, 59 (Ill. App. 1999) (upholding exclusion of churches from commercial zones in part because residential zones were open to churches). Churches face similar obstacles from landmarking regulations. See The Need for Federal Protection of Religious Freedom and Boerne v. Flores, I, Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th Cong. (1998) (statement of Richard Robb, First Presbyterian Church of Ypsilanti, Michigan) <<http://www.house.gov/judiciary/22383.htm>> (describing case where city landmarked a building on lot which had been purchased by a church for expansion).

FN73 See Keetch Testimony (describing Corporation of the Presiding Bishop v. Board of Comm'rs, No. 95-1135 (Chancery Ct. Davidson County, Tenn., Jan. 27, 1998),

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.    063

H.R. REP. 106-219                                                                    Page 39
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

where the court found that even though the city intended there to be and there was
in fact "no property in the City" where the church locate, "there was no evidence
of discriminatory intent directed at the church").

FN74 Shoulson Testimony.

FN75 Id.

FN76 Mauck Testimony.

FN77 Id.

FN78 Keetch Statement (describing Corporation of the Presiding Bishop v. Board of
Comm'rs, No. 95-1135 (Chancery Ct. Davidson County, Tenn., Jan. 27, 1998), in which
the four existing churches and one school were zoned ER-Educational and Religious
Zone); 1999 House Hearing, supra note 53 (statement of Douglas Laycock,
<<http://www.house.gov/judiciary/lay0512.htm>>) (describing Morning Star Christian
Church v. City of Rolling Hills Estates, Cal. (pending in the Superior Court of the
County of Los Angeles), in which city created "Institutional Zone" that included
only existing churches, and barred churches even on special use permit from all
other zones).

FN79 Mauck Testimony.

FN80 Mauck Testimony. Every code surveyed treated at least one of these uses more
favorably than churches, and one treated twelve of such uses more favorably. Many
business uses are also generally permitted as of right without special use permits.

FN81 See Mauck Testimony (describing case of Cornerstone Community Church in
Chicago Heights, Illinois, where the city preferred that an old department store
building remain vacant rather than approve the use by a church because of the
opportunity to approve a tax-generating occupant).

FN82 See Ira Iglesia de la <u>Biblia Abierta v. Banks, 129 F.3d 899 (7th Cir. 1997)</u>
(holding alderman protected by absolute legislative immunity).

FN83 See McFarland Testimony, March 26, 1998.

FN84 See Mauck Testimony ("[j]udicial remedies are often not available. The
churches don't have the money, or the municipalities can wait them out because a
church has a choice of buying a building that it can't use or having to carry that
expense and pay the mortgage every month, if you can get a mortgage, on a building
that it can't use, or walking away.") See <u>Love Church v. City of Evanston, 896 F.2d
1082 (7th Cir. 1990)</u> (holding that church lacked standing to challenge zoning
restrictions because it did not have a lease on a specific property, despite fact
that no lease would be granted pending zoning litigation).

FN85 See Keetch Testimony, May 12, 1999; see also Religious Liberty Protection
Act of 1998, Hearing Before the Subcomm. on the Constitution of the House Comm. on
the Judiciary (statement of Prof. W. Cole Durham, Brigham Young Univ.)

**064**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)    Page 40
**(Cite as: H.R. REP. 106-219)**

<<http://www.house.gov/judiciary/durham.htm>> (discussing study) [hereinafter
Brigham Young Study].

FN86 Durham Testimony. Indeed, as shown by the BYU study, while factors other
than religious prejudice serve to "explain some of the disparity . . . the
differences (among religious groups) are so staggering that it is virtually
impossible to imagine that religious discrimination is not playing a significant
role." Id. (emphasis added). See Church of the Lukumi Babalu Aye v. City of
Hialeah, 508 U.S. 520, 534 (1993) (quoting Walz v. Tax Comm'n, 397 U.S. 664, 696
(1970) (Harlan, J. concurring) ("[T]he Free Exercise Clause protects against
government hostility which is masked as well as overt. 'The Court must survey
meticulously the circumstances of governmental categories to eliminate, as it were,
religious gerrymanders.' "). See also Islamic Center of Mississippi v. City of
Starkville, 840 F.2d 293 (5th Cir. 1988) (reversing a district court holding that
no inference of discrimination existed where local officials ordered a Muslim group
to cease worship services in its building, despite the fact that a next door
residence produced more noise and traffic congestion while serving as a worship
center for Pentecostal Christians and was not required to cease services).

FN87 See Keetch Testimony.

FN88 Id.

FN89 Id.

FN90 See Religious Liberty Protection Act of 1998: Hearing on S.2148 Before the
Sen. Comm. on the Judiciary, 105th Cong. (statement of Prof. Douglas Laycock, Univ.
of Texas) (reporting data from survey of Presbyterian congregations [hereinafter
Laycock Senate Testimony).

FN91 Id.

FN92 See Religious Liberty Protection Act of 1998: Hearing on H.R. 4019 Before
the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th Cong.
(June 16, 1998) (testimony of Rev. Eleanora Giddings Ivory, Partner, Washington
Office of the Presbyterian Church (U.S.A.) (Presbyterians are a mainline
denomination, yet still experience problems). 8% reported that government imposed
conditions that increased the cost of the project by more than 10%. Id.

FN93 Keetch Statement.

FN94 See The Need for Federal Protection of Religious Freedom and Boerne v.
Flores, II: Hearing Before the Subcomm. on the Constitution of the House Comm. on
the Judiciary, 105th Cong. (statement of Von Keetch, Partner, Kirton & McConkie)
<<http://www.house.gov/judiciary/222358.htm>> (citing report showing churches
winning 71 out of 106 prior to 1980 and only 48 out of 83 afterwards). See
Christian Gospel Church v. San Francisco, 896 F.2d 1221 (9th Cir. 1990); Messiah
Baptist Church v. County of Jefferson, 859 F.2d 820 (10th Cir. 1988) (upholding
exclusion of church from agricultural zone); Grosz v. City of Miami Beach, 721 F.2d
729 (11th Cir. 1983) (upholding prohibition on prayer services in rabbi's
residence); Lakewood Congregation of Jehovah's Witnesses v. City of Lakewood, 699

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

F.2d 303, 304 (6th Cir. 1983) (upholding exclusion of church from "residential" lot on six-lane highway).

FN95 See Mauck Testimony.

FN96 Id

FN97 See Family Christian Fellowship v. County of Winnebago, 503 N.E.2d 367 (Ill. App. 1986).

FN98 See City of Chicago Heights v. Living Word Outreach Full Gospel Church and Ministries, Inc., 707 N.E.2d 53 (Ill. App. 1999) (finding the denial of the special use permit to be arbitrary and capricious).

FN99 Mauck Testimony.

FN100 Id.

FN101 Id.

FN102 Id.

FN103 Id.

FN104 Id.

FN105 Shoulson Testimony; Stern Testimony, June 1998.

FN106 See Need for Federal Protection of Religious Freedom after Boerne v. Flores: Oversight Hearings Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 106th Cong. (February 26, 1998) (statement of Rabbi Chaim Baruch Rubin, Congregation Etz Chaim, Los Angeles, California) <<http://www.house.gov/judiciary/22382.htm>>.

FN107 Shoulson Testimony.

FN108 Shoulson Testimony; Stern Testimony, June 1998.

FN109 Orthodox Minhan v. Cheltenham Township Zoning Hearing Board, 552 A.2d 772, 773 (Pa. Com. 1989).

FN110 See Stern Testimony, March 1998.

FN111 Racial or ethnic discrimination may also play a part. One witness testified to a case in which the mayor told the city manager to deny the permit because "We don't want Spics in this town." The city manager who disclosed this statement was fired. Mauck Testimony. He described several other cases in which racial motivations involving black and Korean churches were evident. Id. (describing Ira Iglesia de la Biblia Abierta, Christ Center, Pipe Stream Morning Star Retreat, and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

Korean Central Covenant Church). Wayne, New Jersey denied a permit to a black church, after one official opposed the permit on the ground that the city would soon look like Patterson, a predominantly African-American city nearby. Stern Testimony, March 1998. Clifton, New Jersey denied permits for a black mosque four times, offering parking concerns as the reason, then approved a white church nearby that raised the very same parking issues. Id.

FN112 Shoulson Testimony. See Stern Testimony, March 1998 (describing anti-Semitic views openly expressed against a Jewish proposal that had received land use approval in Ohio).

FN113 Id.

FN114 Mauck Testimony.

FN115 Id.

FN116 See U.S. Const. amend. XIV. See also Boerne, 521 U.S. at 532 (holding that Congress's S 5 enforcement power requires "reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." (emphasis added). Cf. Rous, supra note 8, at 331 (arguing that the Smith rule is "untenable in free exercise zoning challenges"); Shelley Ross Saxer, Zoning Away First Amendment Rights, 53 Wash. U. J. Urb. & Contemp. L. 1 (1998) (arguing that land use regulations that burden free exercise rights should be treated as prior restraints); McConnell, Institutions and Interpretation, supra note 21, at 195 (discussing the "remedial" understanding of S 5 and arguing that RFRA was the type of enforcement legislation that the Fourteenth Amendment envisions).

FN117 See Church of the Lukumi Babalu Aye, 508 U.S. 520; Boerne, 521 U.S. 507.

FN118 Laycock Testimony, May 12, 1999; Thomas C. Berg, The Constitutional Future of Religious Freedom Legislation, 20 UALR L.J. 715, 761-62 (1998).

FN119 505 U.S. 144 (1992).

FN120 521 U.S. 898 (1997).

FN121 Printz, 521 U.S. at 925-26; accord, New York, 505 U.S. at 167; Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 291 (1981).

FN1Subsequent to Smith, Congress made the religious use of peyote by members of the Native American Church legal under federal law. See 42 U.S.C. 1996a (enacted October 6, 1994). Oregon also decriminalized the religious use of peyote. Ore. Rev. Stat. 475.992(5) (1996).

FN2Prior to passing RFRA, the Democratic majority passed several other important reforms to foster a more inclusive religious environment. When the Supreme Court held that a Jewish soldier did not have First Amendment right to wear a yarmulke, the 100th Congress passed a bill that allows members of the U.S., military to wear

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

religious apparel. 10 U.S.C. 774 (1987). When the Supreme Court held that road construction proposed on a site held to be sacred by Native Americans did not pose a free exercise issue, the 100th Congress withdrew funding for Forest Service road construction that would have harmed the sacred site. House Comm. on Appropriations, Dept. of the Interior and Related Agencies Appropriations Bill, 1989, H.R. Rep. No. 713, 100th Congress, 2d Sess. 72 (1988).

FN3Section 2 of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." Religious freedom has been recognized as a "liberty" interest under the Fourteenth Amendment. Section 5 of the Fourteenth Amendment provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

FN4It is hard to say with any certainty that the Boerne holding can be limited solely to the Court's interpretation of Congress' power under the Fourteenth Amendment. Some scholars, including Professor Lawrence Sager, contend that the Boerne Court's S 5 analysis masked deeper misgivings about RFRA that could not be corrected by substituting Commerce and Spending Clause powers. If, for example, imposition of the "compelling interest" in the text of the statute violates the separation of powers doctrine, RLPA has inherited this constitutional defect from RFRA. See Christopher L. Eisgruber & Lawrence G. Sager, Congressional Power and Religious Liberty After City of Boerne v. Flores, 1997 Sup. Ct. Rev. 79 (1997); Christopher L. Eisgruber & Lawrence G. Sager, Why the Religious Freedom Restoration Act Is Unconstitutional, 69 N.Y.U. L. Rev. 437 (1994).

FN5The legislative record described in the Boerne opinion bears a striking similarity to the record that has been established thus far with respect to RLPA.
    RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry. The history of persecution in this country detailed in the hearings mentions no episodes occurring in the past 40 years. The absence of more recent episodes stems from the fact that, as [Doug Laycock] testified, "deliberate persecution is not the usual problem in this country." Rather the emphasis of the hearings was on laws of general applicability which place incidental burdens on religion. Much of the discussion centered upon anecdotal evidence of autopsies performed on Jewish individuals and Hmong immigrants in violation of their religious beliefs and on zoning regulations and historic preservation laws, which as an incident of their normal operation, have adverse effects on churches and synagogues. It is difficult to maintain that they are examples of legislation enacted or enforced due to animus or hostility to the burdened religious practices or that they indicate some widespread pattern of religious discrimination in this country. Congress' concern was with the incidental burdens imposed, not the object or purpose of the legislation.
    Boerne, 117 S.Ct. 2157, 2169 (1997) (citations and parentheses omitted).

FN6We note, however, that the land use provisions included in H.R. 1691 attempt to use Section 5 power. The broad protections included therein may indeed tempt the Supreme Court to overturn those provisions, and it seems odd that the framers of the proposed legislation would forward it without a stronger record of land use abuse. Given the record, as we will point out later, we believe that the Supreme Court may well overturn the land use provisions.

**068**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 106-219                                                        Page 44
H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

FN7Article I, Section 8, clause 3 of the United States Constitution provides
Congress with authority to "regulate Commerce with foreign nations, and among the
several states, and with the Indian Tribes."

FN8Other examples of Congressional acts that have successfully used the Commerce
power include federal regulation of intrastate coal mining, Hodel v. Virginia
Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 276-280 ((1981), intrastate
extortionate credit transactions, Perez v. United States, 402 U.S. 146, 155-56
(1971), restaurants using substantial interstate supplies, Katzenbach v. McClung,
379 U.S. 294, 299-301 (1964), inns and hotels catering to interstate guests, Heart
of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 252-53 (1964), and
production and consumption of wheat, Wickard v. Filburn, 317 U.S. 111 (1942).

FN9 See, Professors Lawrence Sager and Christopher Eisgruber, Explanatory Notes
on the "Religious Liberty Enforcement Act," (Letter to Minority Counsel, dated May
20, 1999) (quoting Smith, 494 U.S. at 884 (quotations, citations, and alterations
omitted)).

FN10 Consider the final few sentences of the opinion in which the Court strikes
an ominous tone:
    Our national experience teaches that the Constitution is preserved best when
each part of the government respects both the Constitution and the proper actions
and determinations of the other branches. When the Court has interpreted the
Constitution, it has acted within the province of the Judicial Branch, which
embraces the duty to say what the law is. Marbury v. Madison, 1 Cranch, at 177, 2
L.Ed. 60. When the political branches of the Government act against the background
of a judicial interpretation of the Constitution already issued, it must be
understood that in later cases and controversies the Court will treat its
precedents with the respect due them under settled principles, including stare
decisis, and contrary expectations must be disappointed. RFRA was designed to
control cases and controversies, such as the one before us; but as the provisions
of the federal statute here invoked are beyond congressional authority, it is this
Court's precedent, not RFRA, which must control. . . . Broad as the power of
Congress is under the Enforcement Clause of the Fourteenth Amendment, RFRA
contradicts vital principles necessary to maintain separation of powers and the
federal balance.
    Boerne, 117 S.Ct. 2157, 2172 (1997). Admittedly, the Court was not altogether
clear about what "vital principles" were compromised by the enactment of RFRA;
however, this language does evidence the Court's disfavor with Congress enacting a
statute that seeks to restore a strict scrutiny standard in an area where the Court
has previously rejected it.

FN11While the race and gender interests may be protected even under a compelling
interest test, the requirement that a law must also meet the "least restrictive
means" test seems to open those laws to attack. On an as-applied basis, it is not
out of the question to suppose that at least some race and gender anti-
discrimination laws could be struck down under this bill.

FN1 494 U.S. 872 (1990).

FN2 42 U.S.C. 2000bb et. seq.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.    **069**

H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)
**(Cite as: H.R. REP. 106-219)**

FN3 521 U.S. 507 (1997).

FN4 Christians v. Crystal Evangelical Free Church (In re: Young), 141 F.3d 854, 856 (8th Cir. 1998).

FN5 Thomas v. Review Board, Indiana Employment Security Commission, 450 U.S. 707, 718 (1981).

FN6 Smith. at 890.

FN7 Id.

FN8 Id. at 888.

FN9 West Virginia State Board of Education v. Barnette, 319 U.S. 624, 638 (1943).

FN10 Hearing on H.R. 1691, The Religious Liberty Protection Act of 1999 Before the Subcomm. On the Constitution of the House Judiciary Committee, 105th Congress 167 (May 12, 1999) (Testimony of Steven T. McFarland) (Unofficial Transcript).

H.R. REP. 106-219, H.R. Rep. No. 219, 106TH Cong., 1ST Sess. 1999, 1999 WL 462644 (Leg.Hist.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.