**EXHIBIT 14**

# SAN LEANDRO
## BOARD OF ZONING ADJUSTMENTS
## AND PLANNING COMMISSION
## SISTERS CITY GALLERY ROOM

835 East 14th Street
San Leandro, CA 94577

**MINUTES FOR JOINT WORKSESSION**          **October 19, 2006**

**7:00 P.M. Call to Order**

| Item 1:  Roll Call |
| --- |

| | |
| --- | --- |
| **Present:** | Board of Zoning Adjustment Members Chin, Marr, Pearson, Chair Raposo. |
| | Planning Commission Members Collier, Dlugosh, Kleebauer, Ponder, Wohltmann, Chair Perras. |
| **Excused:** | Boardmembers Eliason, Sidari, and Vice Chair Goldt; Planning Commission Vice Chair Reed |
| **Staff:** | Debbie Pollart, Planning Services Manager and Secretary to the Planning Commission; Hanson Hom, Community Development Director; Stephanie Stuart, Assistant City Attorney, and Barbara Templeton, Recording Secretary. |

| Item 2:  Public Comments |
| --- |

**None.**

| Item 3:  Joint WorkSession |
| --- |

**Planning Services Manager Pollart** explained that the joint worksession would focus on three separate topics related to the City Council's directive to analyze potential Zoning Code amendments. The three, to be covered and discussed in order:

- Development standards for large homes
- The residential condominium conversion process
- The potential for Assembly uses in industrial (IL) areas

EXHIBIT 14                                           *E-1*

*Joint BZA/PC Worksession Minutes*
*Agenda No. 06-20*

*October 19, 2006*
*Page 2 of 13*

| **Large Homes** |
| --- |

For large homes, the Zoning Code amendments adopted in 2001 instituted the Site Plan Review process, whereby review is in place for new homes and additions that result in homes exceeding 4,000 square feet. The current code also calls for notification to adjacent properties for homes of this size in RO and RS districts, to properties within a 500-foot radius in the RS-VP (Bay-O-Vista), and if the home is two stories, the decision-maker is the BZA at a public hearing. Ms. Pollart noted two distinct types of review. A "minor" review with view preservation applies to single-story additions up to 250 square feet in the RS-VP District. Single story additions and new single-story construction of homes in RO, RS and RS-40 Districts does not trigger site plan review (unless the work would result in a home exceeding 4,000 square feet). The minor review may be approved administratively by the Zoning Enforcement Official, with appropriate noticing. A "major" site plan review process, on the other hand, requires noticing, and review by the ZEO at a public hearing. The ZEO also has the option of bumping any application up for further review to the Site Development Sub-Commission. Ms. Pollart referenced the General Plan policies that apply to residential development, all of which were covered in the staff report. Issues to address include:

- Compatibility with the neighborhood
- Issues of privacy to minimize impact on neighbors in terms of blocking sun, creating shadows and interfering with views
- Off-street parking; the requirement is currently two parking spaces regardless of the size of the home

General Plan policies regarding infill and underutilized parcels speak to the fact that the City encourages infill, and there are few greenfields left in the City. The General Plan also favors a mixture of residential housing stock, from multi-family dwellings all the way up to executive homes. To get a sense of what other communities are doing with regard to standards for large homes, the Planning Department staff went online to check municipal codes of jurisdictions ranging from Beverly Hills and Pasadena -- which have regulated large homes for years -- to Palo Alto, Albany and Sunnyvale. They examined the lot coverage, the maximum floor area and maximum height, parking requirements, step-back requirements on second stories, and each community's discretionary review process. Among the findings: San Leandro standards are pretty much in line with regard to lot coverage (50% in RS and 33⅓% in RO in San Leandro)as well as maximum heights and minimum parking requirements. As for second stories, Ms. Pollart indicated that the ZEO uses a guideline in which the second floor covers from 30-75% of the first floor, but this guideline is not codified. At this time, she added, San Leandro does not regulate the maximum floor area. The Floor Area Ratio (FAR) is the total livable area divided by the lot square footage. The livable area excludes attics, basements, garages and so forth. She provided Commissioners with a table showing how FAR standards in the different communities would have affected the possible square footage of a dozen different homes from about 2,500 square feet and up in the RS, RO and RS-VP districts. While San Leandro lacks specific regulations regarding second-story coverage and floor area, the Planning Department's analysis suggests that San Leandro's review process is

*E-2*

much more rigorous than most of the cities reviewed, particularly in terms of neighborhood notification and public input. Among the specific areas in which the Planning Department sought input from the BZA and the PC:

- **Compatibility with the neighborhood** - may call for establishing a FAR limit to limit the size and scale of homes. To give Boardmembers and Commissioners an idea of how FAR standards might apply, Ms. Pollart prepared another chart that showed, for example, that on a 6,000 square-foot lot, a 35% FAR standard might allow a home with livable area of 2,100 square feet, while a 50% FAR standard would bump allowable square footage up to 3,000. The Planning staff also came up with a range of FAR standard recommendations for consideration, based on lot size and zoning district. For the RS, RS-40, RS-VP and RD Districts, for example, the recommended FAR for lots of less than 5,000 square feet is 50%, for 2,500 square feet of living space, plus 400 square feet for a garage. For an 8,000 square-foot RO district lot, the recommended 50% FAR would allow construction of a home with 4,000 square feet of living space with an additional 500 square feet for a garage. Staff used a "graduated" formula to develop recommendations for larger lots, so that the 50% FAR applies to the first 5,000 square feet of the lot, with FAR dropping to 30% for the next 5,000 square feet. If the lot exceeds 10,000 square feet, the FAR falls to 10% for that portion of the lot in excess of 10,000 square feet.

- **Privacy and shade impacts** - FAR standards might be established to address the issue of second-story step-backs, or such step-backs could be codified separately. Other potential standards may result from the creation of "daylight plane" requirements such as those that currently require commercial developments to be angled back to prevent them from looming over any adjacent residential properties.

- **Off-street parking** - Concerns over this issue have been made at recent public meetings before the Planning Commission, the Board of Zoning Adjustments and the City Council alike. Among the potential options to address this issue is increasing off-street parking requirements (not necessarily covered) for homes with five or more bedrooms.

The Planning staff's next step is to develop proposed zoning code amendments based on Commissioners' input.

**Commissioner Kleebauer** addressed the parking issue by noting that in some areas, such as downtown, the City is focusing on transit-oriented housing developments to discourage use of private vehicles. She expressed concern that increased parking requirements for large homes not be citywide, lest it not runs counter to that focus.

**Commissioner Dlugosh** added that the City needs a more aggressive formula to ensure provision for sufficient off-street parking for large dwellings, whether the formula derives from square footage or number of bedrooms. Also agreeing with Commissioner

*E-3*

Case 3:07-cv-03605    I    Document 132-13    Filed 08/2    )08    Page 5 of 14

*Joint BZA/PC Worksession Minutes*
*Agenda No. 06-20*

*October 19, 2006*
*Page 4 of 13*

Kleebauer's point, he indicated that the solution would need flexibility built-in to support the public transit focus rather than detract from it.

**Planning Manager Pollart** pointed out that future downtown infill development would likely be a multi-family project, whereas the parking requirements under discussion would apply specifically to single-family homes.

**Commissioner Kleebauer** added that parking issues have been discussed at several Planning Commission meetings in the context of some of the denser single-family developments, including row homes in the 3,000-square-foot neighborhood.

**Boardmember Marr** asked whether the discussion covers Mulford Gardens, because parking issues also come up in regard to these properties, which have single-family homes with duplexes in back that are being converted into condominiums.

**Planning Manager Pollart** responded that the condominium conversion discussion, next on the agenda, would address Commissioner Marr's question.

**Boardmember Pearson** said that he'd prefer to require additional off-street parking for large homes rather than hope that residents would opt for mass transit and not have additional cars.

**Commissioner Kleebauer** explained that her focus is on housing so convenient to mass transit that the occupants would be less car-dependent, as in New York. In denser areas of the City, she said, we should not necessarily always require two covered parking spaces since we are trying to encourage use of public transit.

**Planning Manager Pollart**, in response, raised the issue of enforcement. Today's planned developments proceed under condition that garages are used for cars, and the homeowners' association (HOA) is responsible for enforcement, but the City lacks a vehicle for enforcing such conditions with single-family homes that are not part of a planned development.

**Commissioner Perras** pointed out that more and more, homeowners use garage space for storage rather than parking, and wondered if anything might be done to reverse that trend.

**Community Development Director Hom** explained the difficulty and impracticality in enforcing because the compliance staff is so small and has so many other priorities.

**Commissioner Perras** noted that where houses are close together, if someone parks a recreational vehicle (RV) in the driveway, neighbors backing out cannot even see oncoming traffic. He referenced regulations regarding fence height of three feet, but no governance of vehicles six feet high.

**Planning Manager Pollart** replied that RV parking is on the department's "to do" list. In the meantime, some regulations do already govern RVs, to the extent that code compliance does not issue citations on RVs that are parked in a driveway deeper than the 20-foot front yard setback. The understanding behind the code is that RVs can park in side yards behind a fence.

*E-4*

*Joint BZA/PC Worksession Minutes*　　　　　　　　　　　　　　　　*October 19, 2006*
*Agenda No. 06-20*　　　　　　　　　　　　　　　　　　　　　　　　*Page 5 of 13*

**Commissioner Dingosh** pointed out that if the City passes ordinances in response to community pushes for standards – such as requirements to park in garages – that it is incumbent on the community to enforce those standards.

**Community Development Director Hom** agreed, but reiterated that current resources are insufficient to handle the workload and the backlog of items requiring enforcement.

**Commissioner Kleebauer** requested a legal opinion on constitutional property ownership rights, wondering whether the City can tell citizens how to use their private property.

**Assistant City Attorney Stuart** said she would have to look at it, because the City does also have some rights, particularly as regards issues of health and safety, for example.

**Commissioner Kleebauer** clarified, noting that the issue of garage space would bring the question of regulations inside rather then limiting it to the outside.

**Boardmember Chin**, returning to the subject of FAR standards, requested clarification about the combination of RS and RS-VP lots that would require BZA review under the recommendations that Planning Manager Pollart outlined. She noted that the proposal would mean a huge change from current practice.

**Planning Manager Pollart** agreed, noting that the proposal would indeed result in more public hearings, more staff work, and more BZA review, and explained that the staff recommendation resulted from a sense that large homes, regardless of the zoning district, seem to call for a higher level of review than simply administrative approval. Referring again to one of the charts distributed, Ms. Pollart explained that none of the homes in the RS District would have resulted in BZA review with a large home threshold at 4,000 square feet. Similarly, none of the RO properties would have required BZA review unless there was a corresponding condo conversion involved, and those in the RS-VP District went to the BZA not because they were large, but because all involved height exception requests.

**Community Development Director Hom** added that staff is seeking balance, and is not trying to eliminate the speedier, less expensive, more expeditious administrative approval process for most homeowners. The question becomes whether a higher level of review – which costs more and takes longer – is needed when it comes to large homes.

**Planning Manager Pollart** requested a sense of whether Commissioners favor the idea of establishing FAR limits or codified guidelines such as a daylight plane.

**Chair Raposo** agreed that guidelines are needed to give the process some structure to help not only applicants but also the BZA, the Planning Commission and the City Council.

**Boardmember Chin** asked whether FAR standards would alter the maximum lot coverage standards that are already in place.

**Planning Manager Pollart** said that FAR standards would not affect the current lot coverage standards, because lot coverage is just what is on the ground, exclusive therefore of any second floor, which FAR would accommodate, and such "accessories" as pools and patios that are open on at least two sides.

*E-5*

*Joint BZA/PC Worksession Minutes*
*Agenda No. 06-20*

*October 19, 2006*
*Page 6 of 13*

**Commissioner Kleebauer** pointed out that only one of the properties listed on the Planning Department's FAR chart properties would have required BZA review under the 50% FAR standard.

**Commissioner Collier** suggested that the more guidelines we have in place, the easier it becomes to explain things to applicants in ways that are not difficult to understand, the simpler the process becomes, and the fewer the exceptions are necessary. She wondered if the additional provision for garage space beyond a FAR standard is necessary, considering that so many garages serve a purpose other than parking. Commissioner Collier also favors a second-story step-back to improve neighborhood compatibility, and other standards that avoid more "improvements" that have nothing in common with the house to which they are added.

**Boardmember Pearson** would like to see a maximum FAR established, asking how such guidelines would affect RO lots with a single-family home on the front of the property and a duplex in back. He favors limits that would restrict too much coverage of a single lot.

**Planning Manager Pollart** explained that the RO District would indeed be the most affected by FAR guidelines, in terms of limited on-site square footage. It may reduce options to two single-family homes on such lots, rather than one single-family home and a duplex, or only allow a much smaller duplex. However, she added, these properties are the ones that have raised the most concerns, with neighbors complaining that many of the new developments are out of character and out of scale with the neighborhood.

**Commissioner Dlugosh**, responding to Ms. Pollart's observations about the increasing numbers of applications for duplex construction in the RO Districts, noted that years ago, property owners that are now adding duplexes kept livestock on the land behind their homes.

**Boardmember Marr** agreed that the issue comes up over and over in the RO District, and the neighbors don't like it the way it is.

**Planning Manager Pollart**, in recapping the discussion, said the Commissioners want the Planning Department to look at establishing FAR standards and develop language that codifies second-story construction standards. However, she was not sure she heard a consensus regarding parking.

**Boardmember Pearson** responded that he would like to see more parking required.

**Joe Collier**, 694 Douglas, requested an opportunity to make a comment. His concern involves the number of families living in a single-family home, and the number of cars associated with them.

**Community Development Director Hom** explained that federal and state fair housing laws place rather high maximums on the number of adults that live in a home – up to 10 unrelated adults – and the City cannot be more restrictive.

**Chair Rapose** pointed out that some of the older apartment complexes in the City, such as on Estabrook, require only one parking place per apartment, which has a great impact on neighbors because there are so many additional cars used by apartment residents and their guests.

*E-6*

Case 3:07-cv-03605    I    Document 132-13    Filed 08/2    )08    Page 8 of 14

**Community Development Director Hom** pointed out that current regulations on multiple-unit construction require more parking than in the past.

**Commissioner Dingosh,** referring to the FAR comparison sheet, asked what sort of parking would be required of, for instance, an 8,500-square-foot home.

**Planning Manager Pollart** explained that if the standard were based on bedroom count, the Beverly Hills example would require three spaces for five bedrooms, and four spaces for six or more bedrooms. She added that the parking standard could be based on square footage instead of number of bedrooms.

**Community Development Director Hom** recalled that the issue of parking spaces per bedroom came up with Site Plan Review process that was implemented about four years ago. At that time, he said, the recommendation was to not require additional parking spaces, because there was no desire to promote more construction of three-car garages that would detract from the look of neighborhoods.

**Commissioner Kleebauer** noted that San Leandro requires at least two covered parking places, whereas some of the other communities just require one covered but permit another to be uncovered. She asked that if the City goes the route of requiring additional parking spaces for large homes, that they not necessarily require them to be covered spaces.

**Boardmember Chin** wondered, if a homeowner wanted to add four bedrooms to a three-bedroom home, would additional off-street parking also be required?

**Commissioner Dingosh** indicated that the application in this instance would be denied unless the remodel included provision for more off-street parking.

**Commissioner Collier** expressed concern about the Building Department's use of the term "bedroom" to spaces exceeding 90 square feet, and that it needs to be explained to applicants.

**Planning Manager Pollart,** noting that the Planning Department would make the determination of parking requirements, regardless of what the addition is called, and said that this situation might be a reason to go in the direction of square footage rather than terminology.

**Community Development Director Hom** added that definitions would have to be clear to avoid a proliferation of applications for approvals involving dens, home offices, recreation rooms and so on to avoid the requirement for additional off-street parking.

---

### Residential Condominium Conversions

**Planning Manager Pollart** turned next to the residential condominium conversion process. She noted that existing regulations are that proposals involving up to four units are subject to obtaining use permits. The BZA has been seeing a lot of such applications in both RO and RD Districts. New units, she explained, already trigger the Site Plan Review process, with the ZEO doing the administrative approval. Currently, the Engineering and Transportation Department examines Parcel Map applications. For this

process, plans are forwarded to the Planning Department for a so-called "Planner's Report" to indicate conformance with the Subdivision Map Act and the General Plan. The Engineering and Transportation Department takes the Parcel Map application, along with the Planner's Report, to the City Council for approval, with neither a Planning Commission nor Board of Zoning Adjustments recommendation required. With applicants who split the process and apply for conversion to condominiums apart from building construction, the BZA gets involved only from the use permit standpoint. Accordingly, Planning staff recommends deleting the Zoning Code section that requires the use permit because it involves only how the land is divided, not something over which the BZA normally has purview today. Referencing the question that Boardmember Marr had raised earlier about Mulford Gardens parking, Ms. Pollart said that staff is recommending that for the RO District, parking be the same as for RS, RD and RS-40 Districts. Currently, she added, the code requires the RO duplexes to have only three off-street parking spaces, whereas an RD District duplex requires four spaces. Depending on Commissioners' input, the Planning Department will next generate specific amendment language to submit to the Planning Commission, the Board of Zoning Adjustments and the City Council to approve the changes.

**Boardmember Chin** requested a clarification about the Parcel Map process. In response, Ms. Pollart reiterated that the Parcel Map process, in and of itself, requires no recommendation from either the Board of Zoning Adjustments or the Planning Commission before going to the City Council. Mr. Hom added that the Site Plan Review is another matter; it would trigger public noticing.

**Commissioner Dlugosh** inquired how the City Council handles lot line review. When Ms. Pollart confirmed that after the engineering review, lot line adjustment requests typically go on the Consent Calendar, he further said these applications would not automatically trigger public hearings. Mr. Hom added that the only time the BZA gets involved is if the proposed adjustment does not conform to Zoning Code standards.

---

### Assembly Uses

**Planning Manager Pollart** explained the situation regarding the potential of Zoning Code amendments that would permit Assembly uses in certain industrial districts. For clarification, she pointed out that while Religious Assembly and Clubs and Lodges have separate definitions in the Zoning Code, they must be treated equally as Assembly uses under the provisions of RUILPA, the law requiring equal treatment for all manner of assembly uses. Currently, she explained, Religious Assembly is permitted conditionally in any R District. By way of background, Ms. Pollart said that earlier this year, Faith Fellowship requested a modification of the Zoning Code to also conditionally permit assembly uses in the IL District. Faith Fellowship has outgrown its current facility in Washington Manor and is looking at the former MDL building on Catalina. The Faith Fellowship application prompted the Planning Department to look at the General Plan, which suggests that the areas most suitable for conversion from industrial to non-industrial are a) those located adjacent to existing housing, or b) in areas which lack amenities to meet needs of modern industry – San Leandro Boulevard north of Davis

*E-8*

Street, Alvarado Street, and Marina Boulevard west of the Auto Row area. She indicated that the General Plan also discusses adaptive reuse (i.e., keeping the industrial base up-to-date), tax-base enhancement, the industrial sanctuary, and also of the separation of industrial uses from sensitive uses, such as schools, churches and the like. Based on General Plan considerations, the Planning Department developed several criteria to evaluate potential areas for additional assembly uses.

- Not located along major commercial corridor, to preserve the commercial sections of East 14th Street, for example, and the Auto Row area along Marina Boulevard;
- Not in a designated IG or IP District, except possibly on the periphery, to preserve the industrial core;
- Size of parcels (Planning looked at sites or areas encompassing at least two acres);
- Abuts or within a quarter-mile of an arterial (direct access to and from freeways and other arterials would minimize traffic wending its way through neighborhoods to reach an assembly site);
- Vacant/underutilized property; some of the so-called "underutilized" properties, Ms. Pollart explained, are currently occupied but there might be a higher, better use for them some years down the road.

With that as the framework, Staff identified 13 potential areas, indicating which of the five criteria each area meets (map included). The areas:

| | |
|---|---|
| 1 | East part of town, off of Grand Avenue near Interstate 580 |
| 2 | Park Street Island near Siempre Verde Park and San Leandro Boulevard; much of the adjacent property is currently zoned IL |
| 3 | North of Marina Boulevard in the area of Williams Street, Alvarado Street and Martinez Street |
| 4-5-6 | Along the Washington Avenue corridor, beginning at about San Leandro Boulevard and going southeast |
| 7 | Along Washington Avenue, south of Halcyon Drive/Floresta Boulevard |
| 8 | Along Hesperian west of Bayfair Center |
| 9 | Off Lewelling Boulevard near Interstate 880 |
| 10 | The Wicks Boulevard/Merced Street area |
| 11 | The Marina Faire Shopping Center area along Doolittle Drive |
| 12 | The Windsor Square Shopping Center |
| 13 | The southwestern corner of the City, including the Frito Lay property and an existing industrial park in the Grant Avenue area |

Staff developed two options for Commissioners to consider:

- Option 1 – Amend Zoning Code via a text amendment to conditionally permit Assembly uses in IL Zones. To address the issue of insufficient parking, base development standards could be derived for Assembly uses. Option 1 would affect 94 acres (including railroad right-of-way).

- Option 2 – Apply an Assembly Overlay District, akin to the 'S' Overlay District and PD Overlay Districts, where the underlying zoning would remain whatever it

*E-9*

is but Assembly uses would be allowed via a use permit in the 13 specified areas. This option would apply to approximately 218 acres, including some railroad right-of-way.

Neither option would affect the current standards that conditionally permit Religious Assembly uses in R Districts. In addition, staff would prepare a new definition for Assembly uses, to avoid future confusion over how Religious Assembly and Clubs/Lodges are regulated. Ms. Pollart said that the City Council's Business Development Sub-Committee has requested the Commissioners' feedback on this issue, after which the Planning Department will submit recommendations to Board of Zoning Adjustments, the Planning Commission, and, ultimately, the City Council.

**Commissioner Dlugosh** asked whether the criteria would apply to applications for Assembly use permits, because some of the 13 properties clearly are too small to fit the two-acre criterion.

**Planning Services Manager Pollart** replied that the two acres would not necessarily be a requirement, but came to the list of criteria via research on "mega" churches. These churches, she explained, tend to have congregations of 1,500 to 2,000 or more, with some sort of activity going on every day, with a building of 50,000 square feet or more, and a site of two-plus acres.

**Commissioner Dlugosh** followed up by asking whether Staff has a definitive set of criteria on which to evaluate applications; Ms. Pollart said that standards could be developed. Mr. Hom added that if the City takes the overlay approach, it would need development standards and criteria such as those that were created for the S Overlay District for Auto Row, in order for Staff, the Board of Zoning Adjustments and/or the Planning Commission to determine compliance. Mr. Hom also indicated that Staff is trying to recognize the trend toward larger churches, and accordingly was looking for options that may have less neighborhood impact in a semi-industrial area than in a residential district, without compromising the City's industrial base, its employment base, and economic development codes.

**Commissioner Wohltmann** asked whether it was possible to proceed with both options, rather than choosing one or the other. Ms. Pollart indicated that going ahead with both is certainly feasible; they are not mutually exclusive. Mr. Hom pointed out, however, that some IL parcels may not be suitable for assembly uses.

**Commissioner Wohltmann** also asked whether Staff had discussed the options with any other religious use representatives, to which Ms. Pollart replied no, only to the applicant himself. In fact, she added, the property that interests Faith Fellowship is zoned IP, and thus is not in any of the 13 identified areas. If Option 1 were enacted, the church would have to request a re-zone of the property from IP to IL. If Option 2 were enacted, the applicant would have to request that their subject property be included in the new Assembly Overlay District to conditionally permit Assembly uses.

**Commissioner Collier** suggested that Option 2 seems to be the most logical and most generous of the two, because large churches would have far less impact on commercial and industrial areas on Sundays than they currently do in residential areas.

E-10

*Joint BZA/PC Worksession Minutes*
*Agenda No. 06-20*

*October 19, 2006*
*Page 11 of 13*

**Planning Services Manager Pollart** then emphasized the importance of developing good definitions of Assembly use, because a club or a lodge may have a meeting once a month, whereas a large church may have activities going on every day.

**Commissioner Collier** agreed that churches often do have daily activities, but the need for ample parking on the weekends far exceeds weekday requirements, a condition that is more conducive to Assembly uses in industrial areas, where most of the businesses would be closed on weekends, at least on Sundays.

**Planning Services Manager Pollart** asked how the Commissioners would like the Planning Department to proceed. Mr. Hom asked if there were suggestions for areas to add or delete.

**Commissioner Dlugosh** wondered if the areas listed might be an acceptable starting point, but could be revised later, to which Ms. Pollart replied that the City can initiate a rezone process at any time.

**Chair Raposo** requested information regarding parking at a large church. Suppose, he said, the site has at least two acres. A small church would have plenty of room for parking; a large church might not. Mr. Hom clarified that the two acres is not intended as a minimum, but gave the staff a basis on which to start looking at potential areas. Ms. Pollart added that the current parking standard calls for one parking place for each 100 square feet of main seating area – the church's sanctuary area – and that square footage devoted to classrooms, day care and other such uses does not count in terms of required parking. In the context of other communities, San Leandro's requirement is on the low side, which is another issue that staff is looking at.

**Commissioner Dlugosh** said that he favors Option 2, because it provides a definitive area to start with.

**Commissioner Wohltmann** said that he favors pursuing both options simultaneously, or combining them, because including Option 1 adds more potential sites to the equation.  ·

**Planning Services Manager Pollart** pointed out that the only overlap between Options 1 and 2 is in Areas 2 and 3, but that there is a stretch of IL Zone along Doolittle Drive south of Area 11 that would come in if the two options were combined.

**Community Development Director Hom** noted that the only conflict with combining the two options would be in the 'S' Overlay District along Marina Boulevard. Pollart pointed out that she believes only one overlay district can apply at a time, so Area 3 would exclude the 'S' Overlay District parcels on Marina Boulevard.

**Gary Mortara**, head pastor of Faith Fellowship, said that he has gone to all the surrounding businesses near the former MDL building to determine whether they had any issues with Faith Fellowship coming into the area. He reported having personally received "an agreed-upon thumbs up," and that one of the fire captains deems it a perfect place for a church because of the ample parking and the limited weekend traffic. The church uses its buildings on a large scale on Wednesday nights and Sunday mornings, with small groups (up to 50 people) on some other evenings. Noting that the property has been in escrow since February, with a $50,000 deposit holding it until October 31, he urged the Boardmembers and Commissioners to help. Pastor Mortara also said the only reason that Faith Fellowship wants to move is because the congregation has outgrown its

*E-11*

*Joint BZA/PC Worksession Minutes*
*Agenda No. 06-20*

*October 19, 2006*
*Page 12 of 13*

current site. Going from 65 to more than 1,500 people has created a parking and traffic nightmare. Faith Fellowship, he said, wants to sell its current church to a congregation that is one-ninth the size of theirs.

**Boardmember Chin** asked whether Option 1 might be pursued now, with Option 2 tabled for possible future adoption.

**Community Development Director Hom** indicated hearing three suggestions: Option 1; Option 2; and combined, to an extent, both Options 1 and 2.

**Commissioner Wohltmann** concurred with Boardmember Chin. His point, he reiterated, was to create as large a pool of potential sites as possible. Commissioner Wohltmann also asked how Option 1 helps Faith Fellowship, with its October 31 deadline.

**Planning Services Manager Pollart** replied that neither option is feasible within Faith Fellowship's deadline. Hom indicated that the MDL site does not meet the criteria that staff laid out; specifically, it is not on the edge, but rather entirely surrounded by industrial properties.

**Boardmember Marr** asked whether Faith Fellowship is coming before BZA or the Planning Commission for this. Pollart explained that the church requested modifying the Zoning Code text to conditionally permit assembly uses in the IL Zone, followed by a request for a re-zone from IP to IL. Either way, the City cannot act by the church's October 31 deadline.

**Commissioner Dlugosh** suggested a straw vote to give Staff some direction on the option or options to pursue.

**Chair Raposo** conducted a straw poll.

- Option 1 – 1 Aye
- Option 2 – 7 Ayes
- Combined Options 1 and 2 – 1 Aye

**Planning Services Manager Pollart** said that when the recommendation is formulated for the City Council's Business Development Sub-Committee, the group would be informed about Option 1 but also told that the straw vote favored Option 2.

---

| Item 4:  Miscellaneous |
| --- |

**Planning Services Manager Pollart** reminded Boardmembers and Commissioners about Ethics Training scheduled for October 30, explaining that such training must be completed by January 1, 2007.

**Assistant City Attorney Stuart** indicated that there are options online for completing the requirement, offered by the Fair Political Practices Commission (http://www.fppc.ca.gov/).

*E -12*

*Joint BZA/PC Worksession Minutes*
*Agenda No. 06-20*

*October 19, 2006*
*Page 13 of 13*

---

### Item 3:  Adjourn

**Chair Raposo** adjourned the joint worksession at 9:16 p.m.


Respectfully Submitted,


Debbie Pollart, Planning Services Manager
Recording Secretary, Barbara Templeton