**EXHIBIT 29**

**Golden Gate Reporting**

1                    UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3

4    INTERNATIONAL CHURCH OF THE
     FOURSQUARE GOSPEL,

5                        Plaintiff,

6           vs.                            No. C 07-03605 PJH

7    CITY OF SAN LEANDRO, et al.,

8                        Defendants,

9    _____/

10

11   FAITH FELLOWSHIP FOURSQUARE
     CHURCH,

12          Real Party in Interest.

13   _____/

14

15

16                    DEPOSITION OF LUKE SIMS

17

18   DATE:              MAY 19, 2008

19   TIME:              10:50 A.M.

20

21   LOCATION:          MEYERS NAVE RIBACK SILVER & WILSON
                        555 13th Street
22                      Suite 150
                        Oakland, California 94607
23
     Reported By:       Jane H. Stuller
24                      Certified Shorthand Reporter
                        License Number 7223, RPR
25

Page 1

**Golden Gate Reporting**

```
 1                          APPEARANCES

 2

 3   For the Plaintiff:

 4           LAW OFFICE OF PETER MacDONALD
             BY:  PETER MacDONALD
 5           400 Main Street
             Suite 210
 6           Pleasanton, California 94566
             (925) 462-0191
 7           pmacdonald@macdonaldlaw.com

 8                    and

 9           PACIFIC JUSTICE INSTITUTE
             BY:  MATTHEW B. McREYNOLDS
10           Sacramento Office
             9851 Horn Road
11           Sacramento, California 95827-6600
             (916) 857-6900 ext 203
12           mattmcreynolds@pacificjustice.org

13

     For Defendant CITY OF SAN LEANDRO:
14

             MEYERS NEVES RIBACK SILVER & WILSON
15           By:  DEBORAH J. FOX
             333 South Grand Avenue
16           Suite 1678
             Los Angeles, California 90071
17           (213) 626-2906
             dfox@meyersnave.com
18

19

20

21

22

23

24

25

                                               Page 2
```

**Golden Gate Reporting**

```
 1    accommodate the flow of people in and out of a church.
 2    There was also a concern about the loss of this office
 3    building as a resource for economic development and
 4    jobs.  And that's all I can recall.
 5    BY MR. MacDONALD:
 6         Q.  Does the loss of a particular building -- one
 7    building in a city of San Leandro's size have an impact
 8    on the overall economic viability of a city?
 9         MS. FOX:  Objection; irrelevant, vague and
10    ambiguous as to "one building."
11         THE WITNESS:  I can say this:  A unique
12    building would potentially have that impact, yes.
13    BY MR. MacDONALD:
14         Q.  And you consider this to be a unique building?
15         A.  This building is unique in San Leandro, yes.
16         Q.  How would you describe the building in terms of
17    what type of building it is and what is it that makes it
18    unique?
19         A.  It is a clean modern, one-level office building
20    that is very attractive and very conducive to certain
21    users that would like to be in an industrial area with
22    both office and research and development and a loading
23    dock, which this building has; and there are just
24    literally maybe three or four buildings in all of San
25    Leandro that have those characteristics.
```

Page 28

**Golden Gate Reporting**

1      Q.  In your role as economic development director,

2   are you aware of -- kind of the range at which vacant

3   industrial land sells for in San Leandro?

4      A.  Generally, yes.

5      Q.  Generally, what would that range be?

6      A.  Well, it would depend a great deal on the

7   characteristics of the site.  The value of real estate

8   -- particularly industrial real estate in San Leandro

9   varies quite widely.

10      Q.  So if there weren't a building on this site,

11   what would the approximate range of the value be on the

12   Catalina site?

13          MS. FOX:  Objection; vague as to time.

14          MR. MacDONALD:  The time would be 2006.

15          MS. FOX:  January 1st, 2006?

16          MR. MacDONALD:  Actually --

17          MS. FOX:  Mr. Sims --

18          MR. MacDONALD:  Actually, May 18th, 2006.

19          MS. FOX:  Counsel, we need to take another

20   break.

21          (Recess.)

22   BY MR. MacDONALD:

23      Q.  You mentioned that there were three or four

24   other office buildings of the kind of quality equal or

25   similar to the building at Catalina Court that were

                                            Page 29

**Golden Gate Reporting**

1  available for potential employers.

2        What are those buildings that you're aware of?

3    A.  Well, just to clarify.  Not that they were

4  available for potential employers.  I meant to say

5  earlier that there were three or four buildings that I

6  can think of, period, that would be of similar nature to

7  this.  And those would be a -- there's a building at 27

8  or 2500 Merced Street, which is a business-park type of

9  building, heavy office.  There is a building at 2040

10  Williams Street, again, mixed with a heavy office; and

11  then a large building at 1717 Doolittle Drive, which is

12  very heavy office, but also large manufacturing space as

13  well.

14        I will say that this particular building where

15  it's 40-plus thousand square feet of -- of single-floor

16  office with very little manufacturing associated with

17  it, is -- I cannot actually think of another building

18  quite exactly like that building --

19    Q.  Okay.

20    A.  -- anywhere in San Leandro.

21    Q.  Would it surprise you if I told you I talked to

22  the MDL personnel director, and she told me that they

23  relocated from San Leandro to San Ramon because they did

24  not want to be in an industrial district?

25    A.  Yes.

Page 30

**Golden Gate Reporting**

```
 1              "I would have to say no."

 2              "Question:  Would $200 per square.

 3         foot sound like numbers -- a number

 4         that's close to what your estimate would

 5         be?")

 6         THE WITNESS:  I don't know.

 7   BY MR. MacDONALD:

 8      Q.  If someone told you it was $200 per square

 9   feet, would that surprise you or would you think it was

10   higher or lower?

11         MS. FOX:  Objection; lacks foundation.

12         MR. MacDONALD:  $200 per square foot for

13   construction of the kind of office building that is

14   located at Catalina Court.

15         THE WITNESS:  That would strike me as being

16   high.

17   BY MR. MacDONALD:

18      Q.  Okay.  San Leandro puts a fair amount of

19   emphasis on economic development; is that correct?

20      A.  Yes.

21      Q.  Why is that?

22      A.  I think it's because of a tradition that goes

23   back several decades where we had our roots after the

24   turn of the century as an industrial center serving a

25   largely agricultural economy, and then up through the
```

Page 34

**Golden Gate Reporting**

1   post-World War II era where California's population

2   rapidly expanded and the city became a large

3   manufacturing center to serve that growing population;

4   and that tradition continues on through today where I

5   think the community felt very proud of that heritage of

6   manufacturing and employment and its status as a major

7   manufacturing employment center, and that it felt that

8   that was an important public policy goal to maintain

9   that employment base and the jobs and the industrial

10  activity that's associated with it.

11      Q.  Since you took over as economic development

12  director in 1998, how has -- how has San Leandro

13  performed in terms of metrics that you're aware of,

14  numbers of jobs, tax base and those kinds of things?

15      A.  Generally speaking, because obviously I can't

16  recall specific statistics, in terms of employment, I

17  think it's generally the case that it has been stabled I

18  would say over that ten-year period to maybe slight --

19  slight increase perhaps, but generally stable.

20          In terms of -- of occupancy of industrial

21  buildings, it has -- occupancy has increased rather

22  dramatically from a vacancy rate close to 20 percent in

23  the early 1990s to what we have today of generally

24  between -- it varies quarter to quarter, but generally

25  between 3 and 5 percent.  So the level of activity as

Page 35

Golden Gate Reporting

```
 1      A C K N O W L E D G E M E N T   O F   D E P O N E N T

 2

 3         I, LUKE SIMS, do hereby acknowledge I have read and

 4      examined the foregoing pages of testimony, and the same

 5      is a true, correct and complete transcription of the

 6      testimony given by me, and any changes or corrections,

 7      if any, appear in the attached errata sheet signed by

 8      me.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     06/24/2008

25     Date                        LUKE SIMS
```

Page 63

Case 3:07-cv-03605-   |   Document 132-23    Filed 08/2   08    Page 10 of 29

**Golden Gate Reporting**

```
1    Golden Gate Reporting
     35 Mitchell Boulevard, Suite 8
2    San Rafael, California 94903
     (415) 499-DEPO (3376)
3

4              E R R A T A   S H E E T

5    Case Name:   INTERNATIONAL CHURCH OF THE FOURSQUARE
     GOSPEL VS. City OF SAN LEANDRO, et al.
6    Witness Name:  LUKE SIMS
     DEPOSITION DATE: MAY 19, 2008
7
```

| Page No. | Line No. | Change |
|----------|----------|--------|
| 4 | 22 | "Pox" to "Fox" |
| 5 | 19 | Capitalize "Business Development Committee" throughout document |
| 10 | 2-3 | "in master of" to "a master of arts in" |
| 10 | 13 | "portable" to "affordable" |
| 10 | 22 | "1991" to "1998" |
| 12 | 5 | "That's specific area." To "That specific area?" |
| 12 | 15 | "they're" to "they were" |
| 13 | 21 | "a" to "in" |
| 15 | 25 | "Holm" to "Hom" |
| 16 | 1 | "Matora" to "Mortara" |
| 27 | 18 | "concerned" to "concern" |
| 35 | 17 | "stabled" to "stable" |
| 41 | 11 | "Mia Lorenz" to "Amalia Lorentz" |

```
23    Signature                    Date         06/24/2008
```

Page 64

532

**EXHIBIT 30**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


INTERNATIONAL CHURCH OF THE
FOURSQUARE GOSPEL,

CERTIFIED
COPY

    Plaintiff,

vs.          No. C07-03605

CITY OF SAN LEANDRO, a municipal
corporation, DOES 1-50,

    Defendants.

       /


DEPOSITION OF GARY MORTARA

VOLUME I

(PAGES 1 - 148)



Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 018667

State of California

Tuesday, May 20, 2008



EMERICK & FINCH (925) 831-9029

Page 1

```
 1              MR. SNIDER:  I should have been a smoker, but I

 2    never bothered taking it up.

 3              MS. FOX:  No, no, no, you shouldn't have.

 4              That Oakland Foursquare facility, was that

 5    located in what some would term a strip commercial

 6    building?

 7         A.  No.

 8         Q.  Would it be accurate to describe it as a

 9    storefront church?

10         A.  Some might.  I wouldn't.

11         Q.  Was it in a standalone building?

12         A.  Uh-huh.

13         Q.  That's a "yes"?

14         A.  Yes.  I'll get it.

15         Q.  We'll give you a little more coffee and then your

16    verbal responses will improve, I'm sure.

17         A.  I'll get it.

18         Q.  The first time is always difficult.

19              How big was the building?

20         A.  Square footage?

21         Q.  Yes.

22         A.  It was small.  Gosh, I'm going to guess 2 to

23    3,000 square feet.

24         Q.  And how many members did you have in July -- in

25    or about July 1993?
```

Page 29

1      A.   About 65.

2      Q.   And how many services were you having on Sundays?

3      A.   One.

4      Q.   Is your wife also a pastor?

5      A.   She is a nurse.

6      Q.   And what is her name, please?

7      A.   Tisha, T-I-S-H-A, Mortara.

8      Q.   All right.   The first church was Oakland

9   Foursquare.   Was the second church Faith Fellowship?

10     A.   Yes.

11     Q.   And when did you move to Faith Fellowship?

12     A.   September of 1993.

13     Q.   And you have been there ever since?

14     A.   Yep -- yes.

15     Q.   Was there any break in your tenure?   By that I

16  mean did you take a year sabbatical?   Did you go someplace

17  else and regain your demonstrative good life for a period

18  of time?

19     A.   No.

20     Q.   In September 1993, where was the location of

21  Faith Fellowship?

22     A.   577 Manor Boulevard, San Leandro, California.

23     Q.   Why did you move to Faith Fellowship?

24     A.   The previous pastor resigned in August of '93

25  because the constituency had dropped down to about -- I

Page 30

1    keeping with your then average weekly attendance or were

2    you hoping to and planning for accommodating growth?

3        A.   I think we knew that we would continue to grow

4    to some degree, yes.

5        Q.   Do you have a figure -- a best estimate you can

6    give me, Pastor Gary, of your average weekly attendance

7    today?

8        A.   It fluctuates between 1,300 and 1,550 in

9    attendance.

10       Q.   All right.  And do you have any projections for

11   what type of growth you hope to obtain in the next two to

12   three years?

13       A.   At this building or at Catalina?

14       Q.   At this building.

15       A.   We can't grow much beyond 1,700 people at this

16   site.

17       Q.   And what is your hope for the growth numbers at

18   the Catalina site?

19       A.   We want to reach as many people for Jesus

20   Christ as we possibly can.

21       Q.   Do you have an estimated figure that you had in

22   mind for the Catalina site?

23       A.   3 to 5,000.

24       Q.   Weekly attendance?

25       A.   Uh-huh.

1       A.   Well, you have to remember that there wasn't a

2   church built in San Leandro for over 17 years until they

3   built Faith Fellowship the original site.  So there was

4   no real awareness of what the rules were for churches.

5       Q.   My question is was there a person at Faith

6   Fellowship who was supposed to become aware of what the

7   rules were so you all could know the rules of the game?

8       A.   That's why I personally went to the meeting

9   with Sam Millicek and somebody else to find out:  Okay.

10  We found a building.  How can we make this a usable site

11  for assembly?  It fits all our criteria.

12      Q.   So were you the person who was going to figure

13  out the rules of the zoning and how one would move

14  forward?

15      A.   No.  I was going to ask.

16      Q.   So you were looking to the city folks to give you

17  that direction?

18      A.   Uh-huh.

19      Q.   That's a "yes"?

20      A.   Yes.

21          MS. FOX:  I'm sorry.  I am going to have to

22  take a break.

23              (A recess was taken from 11:23 a.m.

24              to 11:30 a.m.)

25  BY MS. FOX:

Page 75

1    Q.  Pastor Gary, do you ever recall Ed Bullok telling

2    you that John Jermanis cautioned that Faith Fellowship

3    should not go buy that site?

4    A.  He may have.

5    Q.  Do you recall that?

6    A.  Vaguely.

7    Q.  Do you recall that you were advised by Ed Bullok

8    or anyone else that John Jermanis cautioned you shouldn't

9    go hard, so to speak, with dollars that become

10   nonrefundable on that site?

11   A.  I don't remember that.

12   Q.  When Ed Bullok would report to you on what

13   happened with this meeting with John Jermanis, did he do

14   that in writing?  Did he do that by email or did he do

15   that verbally or all of the above?

16   A.  I remember verbally.  I don't remember anything

17   officially in a document.

18   Q.  During the course of this transaction, did you

19   communicate via email with Ed Bullok?

20   A.  I may have.

21   Q.  Did you ever make any effort to check your email

22   accounts for production of any documents in connection

23   with this litigation?

24   A.  I checked my emails all the time so --

25   Q.  So opposed to just checking your emails, which at

Page 76

1                their statements."

2    BY MS. FOX:

3         Q.  So Pastor Gary, can you answer that for me?  What

4    was the conversation and who was it with about those

5    issues?

6         A.  Again, the way it was worded was "asked."  I

7    don't remember asking them if they thought I should put

8    deposit money down.  I think it was a conversation that

9    they brought up and my response to them was:  We just

10   need to be heard.  You told us to file an application

11   but nobody is hearing our case, and, you know, we were

12   in negotiations on this building.

13        Q.  I understand that you were having conversations

14   with the City staff where you were telling them:  We need

15   to get this process moving; correct?

16        A.  Uh-huh -- yes.

17        Q.  But at any time, did you have conversations with

18   the staff where you told them that you had monies that you

19   were now going to have to make nonrefundable in this

20   transaction?

21        A.  Yes, I'm sure we did.

22        Q.  All right.  Who do you recall telling that to?

23        A.  I would guess that it was Debbie Pollart

24   because she was the point person, but I don't remember.

25        Q.  And is it your recollection that Ms. Pollart at

Page 82

1  any time assured you that your transaction would have

2  smooth sailing and you shouldn't worry about your

3  nonrefundable deposits?

4      A.  No.  She didn't say that.

5      Q.  Did you ever purchase a single-family residence

6  at the Manor site?

7      A.  Yes.

8      Q.  And where was that located?

9      A.  Directly next door to the church.

10     Q.  And was that purchased for parking?

11     A.  Parking.

12     Q.  And when did that occur --

13     A.  I don't --

14     Q.  -- that purchase?

15     A.  I don't have the date on that.

16     Q.  I know we have been at it for a fair amount of

17  time this morning, Pastor Gary, but even though you have

18  been very diligent, I am happy to take a break if you want

19  to take an early lunch.  I am entitled to your best

20  recollection.  So this is my day to ask questions.

21     A.  Okay.

22     Q.  So if you can take a moment to reflect.  We know

23  when you bought the hardware store.  You've told us the

24  dates of the new facility opening.  Can you help me,

25  please, place when the purchase of that single-family home

Page 83

540

1    occurred.

2        A.   I am going to have to guess.   2005.

3        Q.   And how large was the piece of property upon

4    which the single-family home sat?

5        A.   I do not know.

6        Q.   Originally we were talking about the fact that

7    you had originally had a one-acre site.  You added a 1.4

8    acre site to it for a total of 2.4.

9             As we sit here today, what is the total acreage

10   of the Manor property?

11       A.   2.4.  And then there is a house next door

12   that's not contiguous because there is a street --

13   cul-de-sac there.

14       Q.   And is that now paved over for parking?

15       A.   What paved over?

16       Q.   Sorry.  The single-family home that was purchased

17   at or about 2005.  Was that home then demolished?

18       A.   No.  Still sitting there.

19       Q.   All right.  What is being used at that location?

20       A.   We park in the driveway, on the street, on the

21   front lawn, and on the cul-de-sac.  We purchased the

22   house strictly so a neighbor wouldn't tie us up and take

23   more parking from us.

24       Q.   All right.  And did you make any use of the

25   interior of the house itself?

Page 84

1      A.   Yes.

2      Q.   And do you know whose handwriting that is that

3  says:  This offer is further subject --

4      A.   It's pretty good writing so it's not mine.

5      Q.   And I can stipulate it's not James Lee's.

6      A.   Yeah, I'm not sure who wrote that.

7      Q.   How about condition F?

8      A.   This agreement is specifically conditioned upon

9  buyer, in buyer's sole judgment, determining that the

10  subject real property is suitable for and approved for

11  use as a church.  This condition shall remain in full

12  force and effect until removed in writing by buyer.

13  What about it?

14      Q.   Do you know who drafted that condition?

15      A.   I'm assuming -- it would be an assumption -- Ed

16  Bullok, if this is his document.

17      Q.   Do you recall discussing this offer with Ed

18  Bullok before it was submitted?

19      A.   Yes.

20      Q.   And did Ed Bullok advise you that it is prudent

21  practice in a land use transaction to make sure you have

22  land use entitlement approved before you move forward with

23  a large purchase?

24      A.   Something to that effect.

25      Q.   Do you recall whether or not this condition, 36F,

Page 87

1      A.  David Mortara.

2      Q.  Before he joined about 14 months ago, who was in

3  charge of parking?

4      A.  Volunteers.

5      Q.  I know that you have identified someone as in

6  charge of facilities.  Was that Jim Lee?

7      A.  Yes.

8      Q.  Is parking part of facilities?

9      A.  No.

10      Q.  How about the Manor Bowl?  Did you ever have an

11  agreement with Manor Bowl for the provision of parking?

12      A.  Verbally.

13      Q.  And what was the verbal agreement you had with

14  Manor Bowl?

15      A.  Something to the effect of:  Can we park cars

16  here on Sunday mornings during our service times?

17      Q.  And they said yes at some point in time?

18      A.  Yes.

19      Q.  And can you place for me what point in time --

20  what time period you actually used Manor Bowl to park any

21  cars?

22      A.  I would say from the start of the opening of

23  the new building, 2003 April, for about maybe a year.

24      Q.  How much did you pay them for that?

25      A.  Nothing.

Page 129

1        Q.  Did you shuttle people from Manor Bowl or did

2    they walk?

3        A.  They mostly walked.

4        Q.  How far is it?

5        A.  .3 miles.

6        Q.  Did you have a shuttle bus?

7        A.  No.  But we do now.

8        Q.  And then at some point you stopped using Manor

9    Bowl for parking?

10       A.  Yes.

11       Q.  And who is the owner of Manor Bowl that you were

12   dealing with for the parking arrangement?

13       A.  I have no idea.

14       Q.  Who made the verbal representation that Faith

15   Fellowship could use that area for parking?

16       A.  I did.

17       Q.  Who made it on behalf of Manor Bowl?

18       A.  The owner's wife or the owner.  I forget which

19   at that time.

20       Q.  And do you recall that individual's name?

21       A.  No, I don't.  I couldn't even pick him out of a

22   crowd of two.

23       Q.  At some point in time, did Manor Bowl change

24   ownership?

25       A.  I'm not sure.

Page 130

1        Q.   Approximately a year later, you stopped using

2   Manor Bowl for parking; correct?

3        A.   Uh-huh.

4        Q.   That's a "yes"?

5        A.   Yes.

6        Q.   And I understand that Manor Bowl no longer wanted

7   you all to use their facility for parking; is that

8   correct?

9        A.   Yes.

10       Q.   Did they tell you why?

11       A.   They didn't tell us why.  I heard other reasons

12   why.

13       Q.   All right.  How did you learn that you could no

14   longer use Manor Bowl for parking?  Did the owner call you

15   up and say:  I'm sorry, Gary, but you are just going to

16   have to stop doing that?

17       A.   No, it wasn't directly to me.  It was through

18   someone maybe on staff to me.

19       Q.   And how did that come to your attention?

20       A.   I forget now.

21       Q.   And they simply said:  Stop using our parking

22   facilities?

23       A.   Yes, something to the effect they have bowling

24   on Sunday mornings, and it was taking up from their

25   people -- parishioners -- what do they call it --

1      A.  We did.

2          MS. FOX:  All right.  Counsel, we have come to

3   the bewitching hour for me.  I need to terminate our

4   deposition to be reset to finish up.  I appreciate you

5   coming early today.  It ends up that my son is receiving

6   an award tonight so I need to be there.  So I appreciate

7   your accommodation of that.  And so we need to conclude.

8          There are some documents perhaps we can have

9   before day two.  I suggest we confer by email for a

10  convenient time for day two that meets everybody's

11  schedule.

12         MR. SNIDER:  Okay.

13         THE REPORTER:  Counsel, to confirm, you are

14  ordering a copy with a disk?

15         MR. SNIDER:  Yes.

16         THE REPORTER:  A condensed also?

17         MR. SNIDER:  Yes.

18         THE REPORTER:  Thank you.

19         (The deposition was adjourned at 2:49 p.m.)

20

21

22                      _____
                              GARY MORTARA

23

24

25

Page 144

Case 3:07-cv-03605-    Document 132-23    Filed 08/27/ /8    Page 23 of 29

## CERTIFICATE OF REPORTER

I, LORI A. YOCK, CSR No. 5801, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth.

That said deposition was taken before me at the time and place set forth and was taken down by me in shorthand and thereafter reduced to computerized transcription under my direction and supervision, and I hereby certify the foregoing deposition is a full, true and correct transcript of my shorthand notes so taken.

And I further certify that I am neither counsel for nor related to any party to said action nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 1st day of June, 2008.

_____
LORI A. YOCK
CSR No. 5801

544

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


INTERNATIONAL CHURCH OF THE
FOURSQUARE GOSPEL,

         Plaintiff,

vs.                      No. C07-03605

CITY OF SAN LEANDRO, a municipal
corporation, DOES 1-50,

         Defendants.

                   /

**CERTIFIED COPY**


DEPOSITION OF GARY MORTARA

VOLUME II

(PAGES 149 - 214)


Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 018667

State of California

Friday, June 6, 2008


EMERICK & FINCH (925) 831-9029

Page 149

1    research and find it.

2        Q.   Did you talk to Jim Lee about whether or not he

3    remembered if condition 36F, the typewritten condition,

4    had, in fact, been deleted from the transaction?

5        A.   I may have.

6        Q.   And do you recall what he said?

7        A.   He didn't know what happened to it.

8        Q.   When you all proposed the new sanctuary back in

9    2003 that opened in Easter 2003, do you recall who the

10   planning person was that you primarily dealt with in that

11   regard with the City?

12       A.   I don't, but John Jermanis said he was there at

13   that time and he was part of the approval process.

14       Q.   Do you recall whether or not the City discouraged

15   you in any fashion from moving forward with that new

16   sanctuary?

17       A.   My initial plan of a 1,200 seat auditorium they

18   shot down.  When I came back with this auditorium, they

19   immediately approved it.

20       Q.   Do you recall why the 1,200 person auditorium was

21   shot down, as you described it?

22       A.   Two reasons.  One was parking.  The

23   neighborhood couldn't accommodate the parking.  Two,

24   where I envisioned the sanctuary sitting would have been

25   up against the houses, and the neighbors weren't in

Page 180

1    favor of that.

2        Q.   Ultimately did you think you got fair treatment

3    in the approval of your CUP in 2003 by the City?

4        A.   Yes, my second request for this particular

5    building.  We downsized the square footage of the

6    sanctuary so we wouldn't need as many parking places,

7    and we moved the building towards the freeway instead of

8    the houses.  So they were very accommodating of that.

9        Q.   Now, we talked a little bit last time about the

10   numbers of folks that attend services.  Those gold sheets

11   -- in your mind, do those gold sheets represent membership

12   numbers or is that a separate issue or separate records

13   that are kept in that regard?

14       A.   Separate.

15       Q.   All right.  And how are the membership figures

16   kept?  Are they on a particular document?

17       A.   I believe so.  My secretary keeps all of that.

18   We don't make a real big push for church membership.

19       Q.   Is there a particular requirement of what you

20   have to do to be a member of Faith Fellowship?

21       A.   Yes.

22       Q.   And what is that?

23       A.   You have to be nine years old.  You have to be

24   a born-again believer in the Lord Jesus Christ and

25   preferably baptized in water.

Page 181

```
 1    play here?

 2         A.   Yeah.   We believe the City is violating the

 3    law.

 4              MS. FOX:   All right.   I have no further

 5    questions.

 6              THE REPORTER:   Counsel, are you ordering a

 7    copy?

 8              MR. SNIDER:   Yes.

 9              THE REPORTER:   Thank you.

10              (The deposition was concluded at 12:10 p.m.)

11

12

13                        _____
                                GARY MORTARA
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 210

Case 3:07-cv-03605-    Document 132-23    Filed 08/27    8    Page 28 of 29

## CERTIFICATE OF REPORTER

1
2
3      I, LORI A. YOCK, CSR No. 5801, a Certified
4  Shorthand Reporter in and for the State of California,
5  do hereby certify:
6          That prior to being examined, the witness named
7  in the foregoing deposition was by me duly sworn to
8  testify to the truth, the whole truth, and nothing but
9  the truth.
10         That said deposition was taken before me at the
11  time and place set forth and was taken down by me in
12  shorthand and thereafter reduced to computerized
13  transcription under my direction and supervision, and I
14  hereby certify the foregoing deposition is a full, true
15  and correct transcript of my shorthand notes so taken.
16         And I further certify that I am neither counsel
17  for nor related to any party to said action nor in any
18  way interested in the outcome thereof.
19         IN WITNESS WHEREOF, I have hereunto subscribed
20  my name this 18th day of June, 2008.
21
22
23                          _____
                            LORI A. YOCK
24                          CSR No. 5801
25

EMERICK & FINCH (925) 831-9029