**EXHIBIT 38**

1   Jayne W. Williams, Esq. (SBN: 63203)
    jwilliams@meyersnave.com
2   Deborah J. Fox, Esq. (SBN: 110929)
    dfox@meyersnave.com
3   Philip A. Seymour (SBN: 116606)
    pseymour@meyersnave.com
4   Kimberly M. Drake, Esq. (SBN: 209090)
    kdrake@meyersnave.com
5   MEYERS, NAVE, RIBACK, SILVER & WILSON
    555 12th Street, Suite 1500
6   Oakland, California  94607
    Telephone: (510) 808-2000
7   Facsimile: (510) 444-1108

8   Attorneys for Defendant
    CITY OF SAN LEANDRO
9

10

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13   INTERNATIONAL CHURCH OF THE          Case No.  C07-03605-PJH
     FOURSQUARE GOSPEL,
14                                         DECLARATION OF DEBBIE
15                  Plaintiff,             POLLART IN SUPPORT OF CITY'S
                                           MOTION FOR SUMMARY
16   v.                                    JUDGMENT

17   CITY OF SAN LEANDRO, a municipal      Hearing:
18   corporation,                          Date:       October 1, 2008
                                           Time:       9:00 a.m.
19                  Defendant.             Courtroom:  3
20
     FAITH FELLOWSHIP FOURSQUARE
21   CHURCH,                               Honorable Phyllis J. Hamilton
                                           Complaint Filed: 7/12/07
22
                    Real Party in Interest.
23

24

25

26

27

28

                            EXHIBIT 38

     Declaration of Debbie Pollart in Support of Motion for Summary Judgment          [C07-03605-PJH]

1     I, Debbie Pollart, declare as follows:

2        1.    The following facts are within my personal knowledge and, if called upon to

3 testify, I could and would testify competently with respect thereto.

4        2.    I was Planning Manager for the City of San Leandro ("the City") from

5 November 2002 through May 2007. I worked as a consultant for the City from 1998 to

6 2000 and was hired as a full-time employee in 2000. I have been a full-time employee

7 with the City of San Leandro for the past eight years. I am currently the Facilities & Open

8 Space Manager in the City's Public Works Department.

9        3.    In my capacity as Planning Manager, I also served as the Secretary to the

10 San Leandro Planning Commission ("Planning Secretary"). As the Planning Secretary, I

11 reviewed all minutes, prepared the agenda and furnished all members of the Commission

12 with a copy of the agenda and copies of all correspondence and other papers relating to

13 items appearing on the agenda.

14        4.    In my capacity as Planning Manager, I also personally dealt with Faith

15 Fellowship Foursquare Church and its representatives (hereinafter the "Church") on a

16 number of different occasions, in connection with their current location at 577 Manor

17 Boulevard, and their property located at 14600 and 14850 Catalina Street.

18     <u>PERMITTED RELIGIOUS ASSEMBLY USES IN SAN LEANDRO</u>

19        5.    At the present time, and based on information known to the City, there are a

20 total of 45 churches operating within the City of San Leandro, including the religious

21 assembly facilities operated by the Church at 577 Manor Boulevard.

22        6.    Under the City's current zoning, churches and other religious assemblies

23 generally are classified as an "Assembly Use," which is defined in Article 3 of the Zoning

24 Code as follows:

25       "Assembly Uses. Meeting, recreational, social facilities of a private or non-

26       profit organization primarily for use by member or guests, or facilities for

27       religious worship and incidental religious education (but not including

28       schools as defined in this section). This classification includes union halls,

1

1    social clubs, fraternal organizations, and youth centers." Zoning Code,

2    Article 3, Exhibit 2, 008.

3       7.    Churches and religious assemblies are and have been allowed in the City's

4    residential zones with a conditional use permit ("CUP") for many years. As a result, most

5    existing churches located in the City are located in residential zones. Exhibit 3 is a true

6    and correct copy of Article 5 of the City of San Leandro Zoning Code, which sets forth the

7    zoning regulations for residential zoning districts. As indicated in sections 2-504.B, 2-

8    506.B, 2-508.B and 2-510.B of Article 5, Assembly Uses are conditionally permitted uses

9    (*i.e.* permitted with a CUP) in all residential zones.

10       8.    Exhibit 8 is a true and correct copy of the zoning map of the City showing the

11   residential zones in which churches are permitted with a CUP. As indicated on the legend,

12   residential zones are shown in colors in the yellow-tan-orange spectrum. These areas

13   comprise about 52% of the City's total land area, with the RS single family residential zone

14   comprising the great majority of that area. Based on a review of the zoning map and parcel

15   information in the City's information system, approximately 78 parcels in the City's

16   residential zones are over 3.5 acres in size.

17       9.    Since March 2007 Assembly Uses, including churches, are also permitted

18   with a CUP in industrial and commercial zones that are also designated with the Assembly

19   Use Overlay. The Assembly Use Overlay zoning regulations were adopted as the result of

20   events described elsewhere below. Exhibit 9 is a map entitled "City of San Leandro

21   Assembly Use Criteria Study" showing the location and extent of properties included in

22   the Assembly Use Overlay Zone.

23       10.   A total of 196 individual parcels ranging in size from .11 to 27.15 acres are

24   located in the Assembly Use Overlay zone. Of these individual parcels, four are over 10

25   acres in size, eight are over 5 acres in size and 24 are over 2 acres in size. The remaining

26   parcels are smaller parcels which could be individually developed with a religious facility

27   or other assembly use, or could be aggregated into larger parcels to accommodate larger

28   facilities. All parcels within the Assembly Use Overlay zone are located in areas

2

1   containing 2 or more contiguous acres of land subject to the Assembly Use Overlay

2   zoning. As shown on Exhibits 9, 10, there are a total of thirteen such areas in industrial

3   and commercially zoned areas of the City. The Assembly Use Overlay zoning has been

4   deliberately applied only to areas of two or more contiguous acres of land to accommodate

5   larger churches where the financial resources exist to acquire the land and develop these

6   churches.

7       11.    Exhibit 10 to this declaration is a true and correct copy of a printout of a

8   computer generated listing of all individual parcels included in the Assembly Use Overlay

9   zone, showing the parcel number, address, current zoning, and size in square feet and in

10  acres for each. The information was produced by the GIS data system maintained by the

11  City and used for all zoning and other City matters concerning property locations and

12  boundaries.

13      12.    The total amount of land included in the Assembly Use Overlay zone is

14  approximately 220 acres. The total number of acres of land in which Assembly Uses are

15  conditionally permitted in the City (*i.e.* the sum of residential areas and areas zoned with

16  the Assembly Use Overlay) is approximately 4,650 acres, or 54.6% of the total area of the

17  City.

18      13.    During the time I have been employed by the City, the City has received

19  applications to open a total of two new churches in the City. The first of these was

20  approved by the City in 2000. The second sequence of applications were for the proposed

21  relocation of the Faith Fellowship Foursquare Church to 14600-14850 Catalina Street

22  which is the subject of this legal action.

23      14.    I understand that few or no new churches were opened in the City of San

24  Leandro in the decade prior to my employment with the City. This is consistent with the

25  general development status and population characteristics of the City. As indicated in the

26  City's General Plan, the City is almost entirely built out, and there are only a few scattered

27  parcels of vacant developable land left in San Leandro. Almost all new construction is the

28  result of redevelopment activity involving improvements on existing developed properties,

3

Case 3:07-cv-03605-PJH    Document 128    Filed 08/27/2008    Page 5 of 19

1    or demolition and replacement of older structures and improvements with newer

2    development. The 2000 census placed the total population of the City at 79,462 persons.

3 THE ICFG APPLICATION AND

4 ADOPTION OF THE ASSEMBLY USE OVERLAY ZONING

5       15.    On May 3, 2006, in my capacity as Planning Manager, I, along with then-

6    acting Community Development Director Hanson Hom and then-acting Economic

7    Development Director Luke Sims, met with Church representatives regarding their desire

8    to relocate to a non-residential district. The Church representatives informed us that they

9    wanted to relocate to 14600 and 14850 Catalina Street (the "Catalina Street property"),

10    which is within the City's Industrial Park ("IP") zoning district, and adjacent to several

11    manufacturing plants such as Kennerly Spratling, a manufacturer of plastics, Otis

12    Spunkmeyer, a large scale frozen/baked goods manufacturer, Coast Crane, which sells,

13    leases and/or services construction cranes, and Challenge Dairy, a manufacturer of dairy

14    products. During the May 3rd meeting, staff informed the Church representatives that,

15    pursuant to the San Leandro Zoning Code (the "Zoning Code"), religious assembly uses

16    were conditionally permitted uses in the City's Residential zoning district only. We

17    further informed the Church representatives that the current Zoning Code did not allow

18    assembly uses within the IP district. We advised the Church representatives that in order

19    to relocate to the Catalina Street property, two changes to the Zoning Code were needed:

20    (1) amendment of the Zoning Code to make assembly a conditionally permitted use in the

21    Industrial Limited ("IL") zoning district, and (2) an amendment of the zoning map to

22    designate the Catalina Street property as IL.

23       16.    At this time (and until the present) the City's Zoning Code had three

24    industrial zoning classifications, *i.e.* the IL (Industrial Limited) zone; the IP (Industrial

25    Park) zoning district; and the IG (Industrial General) zoning district. Exhibit 4 is a true

26    and correct copy of Article 7 of the Zoning Code which contains the basic Zoning Code

27    regulations for industrial zones.

28    ///

4

Declaration of Debbie Pollart in Support of Motion for Summary Judgment      [C07-03605-PJH]

1          a.      The IL (Industrial Limited) zoning is intended to provide areas

2   appropriate for low- to moderate- intensity industrial uses and commercial services uses

3   and light manufacturing capable of being located near residential areas without excessive

4   impacts.  This zoning is also intended to protect the permitted industrial and commercial

5   uses from competition for space and potential conflicts with different types of commercial,

6   industrial, and other uses. *See* Exhibit 4, Article 7, Section 2-700, p. 021.  The IL zone is

7   thus typically employed on the City's zoning map as a buffer area between residential uses

8   and more intensive industrial uses, or in areas where more intensive industrial use is not

9   appropriate due to proximity of residential of other sensitive uses.

10         b.      The IG (Industrial General) zoning is intended to "provide and protect

11  existing industrial sites and allow for continued operation of existing general industry,

12  subject to performance standards and buffering requirements to minimize potential

13  environmental impacts.  Certain types of retail sales are permitted under specified

14  limitations." Exhibit 4, Article 7, § 2-700, p. 021.  This zone serves traditional and newer

15  industrial uses which often have impacts or operating characteristics that make them

16  unsuitable for location near residences, traditional commercial uses and other sensitive

17  uses, *e.g.* high volumes of truck traffic, noise, releases of smoke, dust, diesel fumes or

18  other pollutants, night lighting.

19         c.      The IP (Industrial Park) zone is intended to "provide and protect lands

20  for the development in a landscaped setting of communities of high technology, research

21  and development facilities, limited industrial activities (including production and assembly

22  but not raw materials processing or bulk handling), small scale warehousing and

23  distribution, industrial office centers, certain types of specified retail sales, and related

24  uses." Exhibit 4, Article 7, § 2-700, p. 021.  The IP zoning is intended to attract and

25  maintain newer high technology light industrial, office and service uses that are important

26  to maintaining the economic and job base for the community in the 21st century economy.

27  17.    At the time of the May 3, 2006 meeting, City staff advised the Church

28  representatives to apply for a rezone from IP to IL because, from a staff perspective, the IL

5

1   zoning district was more amenable to assembly use than the IP zoning district.  More

2   specifically, the IL district's purpose is to provide areas of low-to-moderate intensity

3   industrial uses which are capable of being located adjacent to residential areas and serve as

4   a buffer between residential areas and light industry.  In contrast, the IP zoning designation

5   is meant to serve commerce, high technology, production and assembly, retail and related

6   uses.

7      18.    At the May 3, 2006 meeting neither I, Mr. Hom nor Mr. Sims made any

8   representation to the Church representatives present about the likelihood of approval of the

9   rezone request or a conditional use permit for the proposed church at the Catalina Street

10  properties.  Approval of these measures would require discretionary action by the City

11  Planning Commission and City Council after consideration of all relevant factual and

12  policy considerations, and could not be predicted.  I also did not at any subsequent time

13  advise Church representatives that approval of their application was likely to occur, nor to

14  my knowledge did any other person associated with the City.  I am certain that neither I or

15  anyone else associated with the City at any time advised Church representatives that it

16  would be safe or prudent to purchase the Catalina Street property before a final decision

17  had been made on the Assembly Use Overlay zoning, or before a final decision on the

18  Church's subsequent application for a zoning amendment to have the property included in

19  the Assembly Use Overlay zone.

20     19.    On May 19, 2006 I received and processed the Church's application to

21  rezone the Catalina Street property from IP to IL, and to amend the Zoning Code to allow

22  religious assembly use in the IL zoning district.  A true and correct copy of the rezoning

23  application subsequently filed by the Church is attached hereto as Exhibit 26.

24     20.    After meeting with Church representatives and receiving the application, I

25  and other City staff began discussing some of the larger planning and policy issues, and

26  particularly issues of consistency with the City's legally adopted General Plan, raised by

27  the proposed zoning amendment.  The amendment to the text of the Zoning Code to allow

28  assembly uses in the IL zone would apply to all properties zoned IL, and therefore had

6

1   City-wide implications.  The expansion of assembly uses outside of residential zoning

2   districts presented a major shift in policy regarding location of assembly uses in the City.

3   The proposed expansion of assembly uses outside of residential districts would therefore

4   require input and analysis and eventual final action from the City Council, Planning

5   Commission, and Board of Zoning Adjustments.  Matters of particular concern were the

6   potential for conflicts between industrial and assembly uses, and potential effects on the

7   City's industrial employment and economic base.

8       21.    Under California law, zoning ordinances must be consistent with the City's

9   General Plan.  (Government Code § 65860.)  A true and correct copy of relevant portions

10  of the City's current General Plan is attached as Exhibit 7 to this declaration.  The location

11  of assembly uses in industrial zones posed two sets of issues with respect to consistency

12  with the General Plan and also generally sound planning practices.  The first set of issues

13  related to ensuring compatibility between assembly uses and industrial uses, *i.e.* avoiding

14  unacceptable impacts such as noise, dust or constant truck traffic on permitted assembly

15  uses, and, conversely, avoiding unacceptable constraints on industrial operations in order

16  to avoid potential impacts on, or complaints from, permitted assembly uses.  The second

17  set of concerns related to potential displacement of industrial and commercial uses by

18  assembly uses, thereby affecting employment opportunities and the economic base of the

19  City.  Both of these potential problem sets are recognized in the General Plan.  *See* General

20  Plan Land Use Element, Exhibit 7, pp. 118-121.

21      22.    The General Plan contains a number of policies and provisions where were

22  directly relevant to these two sets of issues.  These include the following:

23          a.    The Land Use Element of the General Plan provides, Exhibit 7 at 119:

24      "The areas most suitable for conversion to non-industrial uses are those

25      located adjacent to existing housing, or in areas which lack the amenities to

26      meet the needs of modern industry.  Such areas exist along San Leandro

27      Boulevard, Alvarado Street, and Marina Boulevard."

28

7

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                    [C07-03605-PJH]

1         b.     General Plan Policy 10.04 (Exhibit 7, Land Use Element, p.

2     141) provides:

3     *"Industrial Sanctuary* – Protect the City's major industrial areas from

4     encroachment by uses that are potentially incompatible with existing viable

5     industrial activities, or which may inhibit the ability of industry to operate

6     effectively."

7         c.     General Plan Policy 33.04 (Exhibit 7, Environmental Hazards

8 Element, p. 180) provides:

9     *"Separation from Sensitive Uses.* Provide adequate and safe separation

10 between areas where hazardous materials are present and sensitive uses such as

11 schools, residences and public facilities."

12         d.     General Plan Policy 7.09 (Exhibit 7, Land Use Element, p.

13 129) establishes the following policy:

14     "Build upon the locational strengths and transportation features of West San

15     Leandro to support the area' continued development as a major industrial,

16     technology, and office employment center. In accordance with the West San

17     Leandro Plan, limit the encroachment of incompatible residential and retail

18     uses into the area, and promote additional development and redevelopment

19     with manufacturing, technology, warehouse and distribution, offices/flex and

20     similar uses."

21         e.     General Plan Policy 7.10 (Exhibit 7, Land Use Element, 130)

22 provides:

23     "Facilitate the gradual transition of the South-of-Marina (SOMAR) area into

24     a cohesive light industrial district characterized by light manufacturing,

25     office/flex, research and development, bio-medical, e-commerce, and similar

26     uses, along with complementary business services and employee amenities."

27         f.     General Plan Policy 13.01 (Exhibit 7, Transportation Element, 179)

28 provides:

Declaration of Debbie Pollart in Support of Motion for Summary Judgment        [C07-03605-PJH]

1    "Ensure that future land use development decisions are in balance with the
2    capacity of the City's transportation system."

3    23.    The City's Zoning Code also contains similar general policies requiring the
4    City to generally balance and maintain compatibility between adjoining uses to the extent
5    possible. Section 1-104.A of Zoning Code, for example, states that a basic goal of the
6    Zoning Code is to "Preserve the character and quality of residential neighborhoods and
7    commercial and industrial areas consistent with the character of the development districts
8    of the City." Zoning Code, Article 1, RFJN Exhibit 1, p. 005.

9    24.    As a result of these internal discussions, City staff advised the Church by
10   letter dated June 29, 2006, that a rezoning of the nature proposed in their application would
11   require thorough analysis by staff, the Planning Commission, the Board of Zoning
12   Adjustments, and, ultimately the City Council. A true and correct copy of the City's letter
13   to Jim Lee on behalf of the Church, dated June 29, 2006, is submitted concurrently as
14   Exhibit 25. This would in turn prevent any prompt action on their application for a
15   rezoning.

16   25.    After further discussion and evaluation of the relevant planning
17   considerations and City policies in the General Plan, staff identified two principal
18   alternatives for expanding permissible areas for assembly uses.

19   26.    The first alternative was to make assembly uses a conditionally permitted use
20   in all areas zoned IL. This alternative would have allowed about 94 acres of additional
21   property available for assembly uses in the City, although some of this property included
22   railroad rights-of-way.

23   27.    The second alternative was to create an overlay zoning designation that
24   could be applied to properties that were potentially suitable for assembly uses in any non-
25   residential zone.

26   28.    To develop the second alternative, staff identified a number of initial site
27   selection criteria based on General Plan policies and relevant planning considerations.
28   Among these criteria were that the sites (1) would not be located along major commercial

9

1    corridors, in order to preserve the commercial character of these areas; (2) the overlay

2    would apply only to contiguous industrially zoned areas of 2 acres or more, in order to

3    allow for development of larger churches; and (3) the site would abut on or be within ¼

4    mile of a designated arterial street. The ¼ mile distance specification in this last criterion

5    was adopted on the basis of a recommendation of the Engineering & Transportation

6    Department. The application of these initial selection criteria resulted in identification of

7    some 13 potential new areas, totaling some 218 acres, for assembly uses in City industrial

8    zones.

9         29.    On October 12, 2006 the two alternatives developed by staff were presented

10    to the Business Development Sub-Committee of the City Council at its regular meeting of

11    that date. The Business Development Sub-Committee is a standing sub-committee of the

12    City Council intended to monitor matters affecting the economic development and welfare

13    of the City and to provide consultation and direction to staff on pending matters where

14    policy guidance is desirable. After the staff presentation and discussion, the members of

15    the Sub-Committee expressed a strong preference for the second alternative, *i.e.* the

16    overlay zoning approach, because it appeared to provide greater opportunities for

17    expansion of religious and other assembly uses in the City. A true and correct copy of the

18    staff report prepared for the Business Development Sub-Committee meeting is submitted

19    as Exhibit 11. A true and correct copy of the Minutes of the October 12, 2006 Business

20    Development Sub-Committee meeting is submitted as Exhibit 12.

21         30.    On October 19, 2006 the City Planning Commission and Board of Zoning

22    Adjustments conducted a joint work session to discuss three major planning issues being

23    addressed by the City, including the issue of assembly uses in industrial zones. At this

24    meeting City staff again presented the two planning alternatives developed by staff for

25    consideration, *i.e.* the options of (1) allowing assembly uses as conditionally permitted

26    uses in the IL (light industrial) zone; or (2) applying an overlay zoning to suitable

27    properties in all industrial zones. At the conclusion of the work session, the Board and

28    Commission members voted 7-1-1 to support pursuit of the second option, *i.e.* the overlay

Case 3:07-cv-03605-PJH    Document 128    Filed 08/27/2008    Page 12 of 19

1   zoning approach.  The comments of the Commissioners and Board members indicated that

2   the second alternative was preferred because it would allow for greater expansion of

3   religious and non-religious assembly uses in the City while also being consistent with

4   other established goals and policies in the General Plan.  A true and correct copy of the

5   staff report prepared for the October 19, 2006 joint workshop is submitted as Exhibit 13 to

6   this declaration.  A true and correct copy of the Minutes of the joint workshop is submitted

7   as Exhibit 14 to this declaration.

8         31.    After the October 19, 2006 joint workshop, staff continued to refine the

9   criteria for selection of properties for inclusion in the assembly use overlay zone, and

10   began drafting proposed text for the actual Zoning Code amendments that would create the

11   Assembly Use Overlay zoning classification and regulations.  The eight (8) criteria used to

12   finally select industrial zoned properties for inclusion in the proposed Assembly Use

13   Overlay zone were the following:

14       •   The site was not located along a major commercial corridor.

15       •   The site was not located in the Downtown, Bayfair, Marina

16           Boulevard/SOMAR or West San Leandro General Plan special "Focus

17           Areas."

18       •   The site was not located in a regional-serving retail area.

19       •   The site was not located inside the Downtown Transit-Oriented

20           Development Strategy ("TOD") study area.

21       •   The site abuts or was within ¼ mile of an arterial street.

22       •   The site was not located in a residential zone.  (Churches are already

23           permitted with a CUP in all City residential zones.)

24       •   The site was not public land or zoned Public Service ("PS"), Open Space

25           ("OS") or Commercial Recreation ("CR"), or owned by an Exempt Public

26           Agency or public utility.

27       •   The site was within a contiguous overlay area of 2 or more acres.

28   ///

---

11

1    32.    The eight selection criteria were all based on General Plan policies and goals

2    discussed previously in this declaration.

3    33.    The foregoing criteria resulted in selection of 196 individual properties in 13

4    contiguous areas for inclusion in the Assembly Use Overlay zone.

5    34.    On February 22, 2007 the City's Planning Commission conducted a public

6    hearing on the proposed Assembly Use Overlay zoning amendments. After receiving

7    public testimony, including extensive testimony from representatives and supporters of the

8    Church, the Planning Commission voted to recommend approval of the Assembly Use

9    Overlay zoning amendments to the City Council. A true and correct copy of a Staff Report

10   for a regular meeting of the Planning Commission on February 22, 2007 is submitted as

11   Exhibit 15 to this declaration. A true and correct copy of the Minutes from the February

12   22, 2007 Planning Commission meeting is submitted as Exhibit 16 to this declaration.

13   35.    On March 19, 2007 the City Council conducted its public hearing on the

14   proposed Assembly Use Overlay zoning amendments. After hearing public testimony,

15   which again included extensive testimony from representatives and supporters of the

16   Church, the City Council voted unanimously (7-0) to adopt Ordinance Nos. 2007-005 and

17   2007-006 which, respectively, amended the text of the Zoning Code to add the Assembly

18   Use Overlay zoning designation and standards, and amend the zoning map to apply the

19   Assembly Use Overlay zoning designation to 196 parcels in City industrial zones. A true

20   and correct copy of a Staff Report for the City Council meeting of March 19, 2007 is

21   submitted as Exhibit 17 to this declaration. A true and correct copy of the Minutes of the

22   March 19, 2007 City Council meeting is submitted as Exhibit 18 to this declaration.  True

23   and correct copies of Ordinance No. 2007-005 and Ordinance No. 2007-006 are submitted

24   as Exhibits 19 and 20 to this declaration.

25   ## THE CHURCH'S SUBSEQUENT REZONING APPLICATIONS

26   36.    Based on the eight selection criteria that had been utilized to select properties

27   for inclusion in the Assembly Use Overlay zone, the Catalina Street property purchased by

28   the Church had not been included in the Assembly Use Overlay zone. Representatives of

12

1   the Church were aware of this as the proposed Assembly Use Overlay zoning amendments

2   went through the public hearing process, and had communicated their requests to have the

3   Catalina Street property included in the overlay zone, or to be otherwise allowed to

4   develop a church on the property, to City staff, to the Planning Commission and to City

5   Councilmembers both at public hearings and through other communications.  City staff

6   consistently advised Church representatives that the staff recommendation concerning the

7   properties to be included in the Assembly Use Overlay zone would be based strictly on the

8   objective planning criteria developed from the General Plan, and would not be changed on

9   a case-by-case basis for individual properties that did not meet all the criteria.  Staff also

10  advised Church representatives, however, that the final decision as to which properties

11  were included in the Assembly Use Overlay zone would be made by the City Council, and

12  that they had the right to apply for an amendment to the zoning map to include their

13  property in the Assembly Use Overlay zone if they chose to do so.  However, neither I nor

14  any other member of the City staff to my knowledge advised Church representatives that

15  staff would support the amendment, or that the amendment was likely to be approved by

16  the Planning Commission or City Council.

17          37.     On March 20, 2007, the day following the City Council hearing on the

18  Assembly Use Overlay zoning amendments, representatives of the Church filed an

19  application to amend the zoning of their Catalina Street property from IP to IP with the AU

20  (Assembly Use) Overlay.  A true and correct copy of this application is submitted as

21  Exhibit 26 to this declaration.

22          38.     On April 12, 2007 the Planning Commission conducted a public hearing on

23  the rezoning application.  Following the close of the public hearing, the Planning

24  Commission voted to deny the application for rezoning.  A true and correct copy of a Staff

25  Report for the Planning Commission of April 12, 2007 is submitted as Exhibit 21 to this

26  declaration.  A true and correct copy of the Minutes of the April 12, 2007 Planning

27  Commission meeting is submitted as Exhibit 22 to this declaration.

28  ///

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                    [C07-03605-PJH]

1    39.    The Church appealed the Planning Commission decision to the City Council

2  on April 16, 2007.

3    40.    On May 7, 2007 the City Council conducted a public hearing on the appeal.

4  After hearing public testimony from the Church's representatives and supporters, the City

5  Council closed the public hearing and voted to deny the appeal. A true and correct copy of

6  a Staff Report for the City Council hearing of May 7, 2007 is submitted as Exhibit 23 to

7  this declaration. A true and correct copy of the Minutes of the March 7, 2007 City Council

8  meeting is submitted as Exhibit 24 to this declaration.

9    41.    The primary grounds for denial of the rezoning application was that the

10  Catalina Street property did not meet two of the eight criteria previously used in selecting

11  properties for inclusion in the Assembly Use Overlay zone. Specifically, the Catalina

12  Street property was located in a general plan "focus area" (the West San Leandro Business

13  District), and was located more than ¼ mile from a designated arterial street. Policy 7.09

14  of the City's General Plan, quoted in paragraph 22.d above, establishes a policy of

15  developing the West San Leandro industrial area as major industrial, technology, and

16  office employment center, and accordingly promoting additional development and

17  redevelopment of such uses while limiting encroachment of incompatible uses in the area.

18  Continued industrial development of this area is one of the key elements of the General

19  Plan strategy for maintaining a viable economic and employment base in the City. *See*

20  Exhibit 7, General Plan Land Use Element, pp. 111-121. It was the belief of City staff,

21  and apparently the Planning Commission and City Council, that preservation of this area

22  and the Catalina Street property in particular, for some form of industrial or service use

23  consistent with the goals of Policy 7.09 was important to the City's welfare and to

24  maintaining the integrity of the General Plan.

25    42.    The staff recommendation also reflected the fact that City staff did not

26  believe it was appropriate to abandon the objective criteria that had been used to determine

27  the extent of the Assembly Use Overlay zone in the immediately preceding Assembly Use

28  Overlay zoning amendment process. During the process of developing the Assembly Use

14

Declaration of Debbie Pollart in Support of Motion for Summary Judgment          [C07-03605-PJH]

668

1   Overlay zone, staff had considered alternate site selection approaches under which

2   properties might be included if they met fewer than all 8 of the selection criteria developed

3   from the General Plan. Staff had rejected this approach because it quickly led to arbitrary

4   and inconsistent results. Staff was not presented with any new information during the

5   Church's rezoning application process that suggested that the selection criteria relied on in

6   preparing the City-wide Assembly Use Overlay zoning amendments should be modified or

7   abandoned so soon after completion of that process.

8       43.     The staff report for the Planning Commission and City Council hearings on

9   the rezoning application also notes that staff recommended denial in part on the ground

10  that the Catalina Street property is located in proximity to a significant number of nearby

11  sites operating with Hazardous Materials Business Plans ("HMBPs"). HMBPs are

12  required by California law for any industrial, commercial, or other facility that uses, stores,

13  produces or generates quantities of hazardous materials exceeding certain minimum

14  threshold amounts. The amounts and types of hazardous materials actually present on any

15  property subject to a HMBP varies considerably, and may range, by way of example, from

16  possession of very small amounts of radioactive or biologically hazardous materials

17  through use and storage of significant amounts of industrial chemicals through storage of

18  large quantities of volatile petroleum products.

19      44.     Staff had not previously considered potential site-specific conflicts between

20  assembly uses and hazardous material handlers during the process of preparing the City-

21  wide Assembly Use Overlay zoning amendments because the analysis conducted for the

22  City-wide amendments was directed at City-wide planning and policy concerns.

23  Accordingly, the criteria used in selecting areas for the Assembly Use Overlay zone were

24  based on more generally applicable planning principles rather than site-by-site analysis.

25  Consideration of site-specific factors is generally done at the time application is made for

26  specific use of a particular parcel, *i.e.* at the time a CUP application is filed. Site-specific

27  factors are also typically considered when, as in this case, a rezoning or a general plan

28  amendment application is made for a particular use of a particular parcel. In this particular

15

1    case, it was understood that if the rezoning was granted, the Church would continue to

2    process and invest further money in an application for a CUP for the Church. It was

3    therefore staff's conclusion that it was appropriate to consider the number of nearby

4    properties operating with HMBPs at the time of the rezoning decision. Information

5    gathered for the staff reports indicated that there were eight (8) businesses with HMBPs

6    within 500 feet of the Catalina Street property, and thirteen (13) businesses with HMBPs

7    within ¼ mile of the property. The primary basis for the staff recommendation for denial

8    of the rezoning application, however, was inconsistency with two of the planning criteria

9    applied to all other sites in the Assembly Use Overlay zone.

10         45.    Based on discussion at the May 7, 2007 City Council hearing on the rezoning

11   application, it does not appear that the presence of nearby facilities operating under

12   hazardous materials plans was considered by the City Council to be a ground for denial of

13   the rezoning application.

14         46.    Neither the City Council, Planning Commission nor City planning staff has

15   adopted any policy or regulation preventing location of Assembly Uses within ¼ mile (or

16   any other specific radius) of one or any other number of sites operating with HMBPs.

17   Generally as a matter of public responsibility City planners and decisionmakers will

18   consider any potential public health or safety issue that comes up in connection with any

19   development proposal, and certainly would do so with respect to assembly uses where

20   there is a high potential for large numbers of untrained individuals of all ages to be

21   exposed in the event of a release of hazardous materials. Whether the nearby presence of

22   hazardous materials affects the final decision requires consideration of a number of highly

23   site-specific factors, including the types, locations, volatility and quantities of nearby

24   hazardous materials; the potential for actual release of hazardous materials; the numbers,

25   ages and health status of persons potentially exposed; adequacy of access and egress in the

26   event of a release of materials; type and quality of construction of the assembly building;

27   factors affecting dispersal patterns such as the presence or absence of natural or man made

28   barriers and prevailing wind patterns; and any other site-specific factor that could affect

16

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                    [C07-03605-PJH]

1  the degree of exposure in the event of a release of hazardous materials. The decision

2  would also likely take into account the feasibility of reducing exposure through project-

3  specific mitigation measures, *e.g.* alarm systems, emergency evacuation plans, training of

4  permanent staff, or enhanced construction standards or buffer zones to reduce potential

5  exposure. The degree to which these considerations would affect any future decision to

6  approve a new Assembly Use in any area thus depends on a variety of complex factual

7  issues that cannot be assessed in the abstract, as well as the discretion of the City's elected

8  and appointed decisionmakers, *i.e.* the Planning Commission and the City Council.

9                    <u>THE CHURCH'S CUP APPLICATION</u>

10        47.    On or about March 28, 2007, shortly after the Church submitted its

11  application for rezoning of the Catalina Street property into the Assembly Use Overlay

12  zone, representatives of the Church submitted an application for a CUP for their proposed

13  assembly use of the Catalina Street property. After an initial review, I determined that the

14  CUP application was incomplete and could not be processed. On April 25, 2007, I notified

15  Church representatives that their application was incomplete by a letter addressed to Jim

16  Lee, the designated representative of the Church. The letter also listed the specific

17  additional information that would be necessary to make the application complete. A true

18  and correct copy of my letter to Jim Lee, on behalf of the Church, is attached hereto as

19  Exhibit 27.

20        48.    I did not receive any response to the incomplete letter during my remaining

21  tenure as Planning Manager for the City. I understand that a complete application was

22  eventually submitted and processed by the City at the Church's request even though the

23  rezoning to allow Assembly Uses on the Catalina Street property with a CUP had been

24  denied. The CUP application was eventually denied by the City Planning Commission and

25  City Council on appeal due to inconsistency with the zoning and additional factors such as

26  inadequate parking space.

27  ///

28  ///

---

17

671

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct. Executed on this 26 day of August 2008 in San Leandro,

3    California.

4

5                                         _____
                                                      Debbie Pollart
6    1133707.2
     136.5016
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Debbie Pollart in Support of Motion for Summary Judgment                    [C07-03605-PJH]

**EXHIBIT 39**

1   Jayne W. Williams, Esq. (SBN:63203)
    jwilliams@meyersnave.com
2   Deborah J. Fox, Esq. (SBN: 110929)
    dfox@meyersnave.com
3   Philip A. Seymour (SBN: 116606)
    pseymour@meyersnave.com
4   Kimberly M. Drake, Esq. (SBN: 209090)
    kdrake@meyersnave.com
5   MEYERS, NAVE, RIBACK, SILVER & WILSON
    555 12th Street, Suite 1500
6   Oakland, California 94607
    Telephone: (510) 808-2000
7   Facsimile: (510) 444-1108

8   Attorneys for Defendant
    CITY OF SAN LEANDRO
9

10

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13  INTERNATIONAL CHURCH OF THE           Case No.  C07-03605-PJH
    FOURSQUARE GOSPEL,
14
                                          DEFENDANT CITY OF SAN
15              Plaintiff,                 LEANDRO'S MOTION FOR
                                          SUMMARY JUDGMENT OR IN
16  v.                                    THE ALTERNATIVE SUMMARY
                                          ADJUDICATION OF CLAIMS
17
    CITY OF SAN LEANDRO, a municipal
18  corporation,                          Hearing:
                                          Date:         October 1, 2008
19                                        Time:         9:00 a.m.
                Defendant.                Courtroom:    3
20

21

22  FAITH FELLOWSHIP FOURSQUARE           Honorable Phyllis J. Hamilton
    CHURCH,                               Complaint Filed: 7/12/07
23

24              Real Party in Interest.

25

26

27

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                              [C07-03605-PJH]

EXHIBIT 39

## TABLE OF CONTENTS

Page(s)

I.  INTRODUCTION AND BACKGROUND FACTS.................................................1

II.  THE CITY HAS NOT IMPOSED A "SUBSTANTIAL BURDEN" ON
    PLAINTIFF'S EXERCISE OF RELIGION UNDER RLUIPA ...............................3

    A.  The City's Actions Did Not Impose a Substantial Burden on the
        Religious Activities of the Church................................................................3

        1.  The "Substantial Burden" Test .......................................................3

        2.  Churches, Like Other Uses, Are Not Entitled to Rezoning
            Upon Demand Under RLUIPA...........................................................5

        3.  The City's Decision Not to Rezone the Catalina Street
            Property Does Not Amount to a Substantial Burden on the
            Exercise of Religion ........................................................................7

        4.  The City's Actions Have Not Imposed a Substantial Financial
            Burden on The Church....................................................................11

    B.  The City's Actions Served a Compelling Governmental Interest and
        Were The Least Restrictive Means of Protecting That Interest.....................11

III.  THE CITY'S REGULATIONS DO NOT VIOLATE THE "EQUAL
     TERMS" PROVISIONS OF RLUIPA..............................................................12

    A.  Background Law...........................................................................................12

    B.  Commercial Recreation and Entertainment Business are Not
        "Assemblies or Institutions" Nor Are They Similar to Church Uses ...........13

    C.  Hazardous Waste Criteria ...........................................................................16

IV.  THE CITY'S REGULATIONS DO NOT TOTALLY EXCLUDE OR
     UNREASONABLY RESTRICT RELIGIOUS ASSEMBLIES IN SAN
     LEANDRO .....................................................................................................18

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

[C07-03605-PJH]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF CONTENTS cont.

Page(s)

V.    THE CHURCH'S CONSTITUTIONAL CLAIMS PRESENT NO TRIABLE
       ISSUE...................................................................................................19

       A.    The City Has Not Unconstitutionally Interfered with the Church's
              First Amendment Right to the Free Exercise of Religion..............................19

       B.    The City Has Not Interfered with the Church's Freedom of Speech............20

       C.    The City Has Not Interfered with The Church's or Its Members
              Freedom to Assemble or Freedom of Association.......................................22

       D.    The City Has Not Denied the Church Equal Protection of the Law.............23

       E.    The City Did Not Violate the Church's Right to Due Process.....................23

              1.    The Vagueness Claim..................................................................24

              2.    The Claim for Unreasonable Delay..............................................25

VI.   CONCLUSION................................................................................................25

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                    [C07-03605-PJH]

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Arnel Development Co. v. City of Costa Mesa,*
  28 Cal.3d 511, 169 Cal.Rptr. 904 (1980)................................................................24

6

*Board of Regents of State Colleges v. Roth,*
  408 U.S. 564, 92 S.Ct. 2701 (1972)....................................................................24

8

*Christian Gospel Church, Inc. v. City and County of San Francisco,*
  896 F.2d 1221 (9th Cir. 1990), *cert den.* 498 U.S. 999 (1990)......................23

10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520, 113 S.Ct. 2217 (1993)..............................................................4, 5

12

*City of Renton v. Playtime Theatres, Inc.,*
  475 U.S. 41, 106 S.Ct. 925 (1986)..........................................................10, 21, 22

*Civil Liberties for Urban Believers v. City of Chicago,*
  342 F.3d 752 (7th Cir. 2003).............................................................3, 6, 11, 23

*Congregation Kol Ami v. Abington Township,*
  309 F.3d 120 (3rd Cir. 2002)....................................................................23

*Episcopal Student Foundation v. City of Ann Arbor,*
  341 F.Supp.2d 691 (E.D. Mich. 2004)............................................................7, 9

*Grace United Methodist Church v. City Of Cheyenne,*
  451 F.3d 643 (10th Cir. 2006)..........................................................7, 19, 20, 21

*Guru Nanak Sikh Soc. of Yuba City v. County of Sutter,*
  456 F.3d 978 (9th Cir. 2006)...............................................................3, 4

*Guru Nanak Sikh Society of Yuba City v. County of Sutter,*
  326 F.Supp.2d 1140 (E.D. Cal. 2003)..................................................13

*Hale O Kaula Church v. Maui Planning Com'n.,*
  229 F.Supp.2d 1056 (D. Hawaii 2002).................................................13

*Konikov v. Orange County, Fla.,*
  410 F.3d 1317 (11th Cir. 2005)...........................................................25

28

iii

TABLE OF AUTHORITIES cont.

Page(s)

**Cases** cont.

Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v.
    City of Lakewood, Ohio,
    699 F.2d 303 (6th Cir. 1983) ....................................................................... 19

Lighthouse Institute for Evangelism, Inc. v. City of Long Branch,
    510 F.3d 253 (3rd Cir. 2007) ............................................................ 5, 13, 19, 20

Lyng v. Northwest Indian Cemetery Protective Ass'n,
    485 U.S. 439, 108 S.Ct. 1319 (1988) ............................................................. 4

Members of City Council of City of Los Angeles v. Taxpayers for Vincent,
    466 U.S. 789, 104 S.Ct. 2118 (1984) ......................................................... 22

Messiah Baptist Church v. County of Jefferson, State of Colo.,
    859 F.2d 820 (10th Cir. 1988) ........................................................... 5, 19, 20

Midrash Sephardi, Inc. v. Town of Surfside,
    366 F.3d 1214 (11th Cir. 2004) .............................................................. 4, 13

Petra Presbyterian Church v. Village of Northbrook,
    489 F.3d 846 (7th Cir. 2007) ............................................................. 6, 7, 11

Prima Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County,
    450 F.3d 1295 (11th Cir. 2006) ............................................................. 13, 18

San Jose Christian College v. City of Morgan Hill,
    360 F.3d 1024 (9th Cir. 2004) ........................................................... passim

Sts. Constantine and Helen Greek Orthodox Church v. City of New Berlin,
    396 F.3d 895 (7th Cir. 2005) ................................................................ 4, 7

The Lighthouse Institute for Evangelism, Inc. v. The City of Long Branch,
    406 F.Supp.2d 507 (D.N.J. 2005) ............................................................ 7

Topanga Press, Inc. v. City of Los Angeles,
    989 F.2d 1524 (9th Cir. 1993) ............................................................ 10, 22

Ventura County Christian High School v. City of San Buenaventura,
    233 F.Supp.2d 1241 (C.D. Cal. 2002) ........................................................ 13

iv

1

TABLE OF AUTHORITIES cont.

2

Page(s)

3    **Cases** *cont.*

4
*Vietnamese Buddhism Study Temple In America v. City of Garden Grove,*
5    460 F.Supp.2d 1165 (C.D. Cal. 2006) ............................................................... 13

6    *Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.,*
7    455 U.S. 489, 102 S.Ct. 1186 (1982)................................................................. 25

8    *Vision Church v. Village of Long Grove,*
9    468 F.3d 975 (7th Cir. 2006) ....................................................................*passim*

10   *Ward v. Rock Against Racism,*
      491 U.S. 781, 109 S.Ct. 2746 (1989)................................................................. 21
11

12   *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.,*
      24 F.3d 56 (9th Cir. 1994) ................................................................................ 24

13

14   *Westchester Day School v. Village of Mamaroneck,*
      386 F.3d 183 (2nd Cir. 2004) ........................................................................... 10

15   *Westchester Day School v. Village of Mamaroneck,*
16   504 F.3d 338 (2nd Cir. 2007) ................................................................... 4, 5, 7

17   **Statutes**

18   42 U.S.C. § 1983.................................................................................................. 19
19
      42 U.S.C. § 2000cc ....................................................................................*passim*
20

21

22   1133758.3
      136.5016
23

24

25

26

27

28

v

I.      *INTRODUCTION AND BACKGROUND FACTS*

The Faith Fellowship Church is the local affiliate of the International Church of the Foursquare Gospel (collectively "the Church"). The Church has been extraordinarily successful growing from a congregation of 65 in 1993 to an estimated total of 1300-1550 in 2008 with allegedly as many as 1700 attendees at the Church's current location at 577 Manor Boulevard on a single day. First Amended Complaint ("FAC"), ¶ 12; Mortara Depo., Exhibit 30, p. 534, ln. 24 to p. 535, ln 1; p. 536, lns. 15-16. The Church has also undertaken to provide numerous charitable, social and educational services at its current facilities, including youth ministries, feeding the disadvantaged, weight management classes and other programs. FAC ¶¶ 59, 68, 69. According to the Church, the 577 Manor Boulevard property is hampered by lack of adequate parking and the need to juggle the scheduling of its support facilities on its existing church campus. The Church believes all these problems would be resolved, however, were it allowed to relocate its church operations to an larger property with existing buildings consisting of 3 adjoining parcels at 14600-14850 Catalina Street (the "Catalina Street Property") in a prime industrial zoned area of San Leandro. Sims Depo., Exhibit 29, p. 526, lns. 19-25.

Several City representatives met with Church representatives in early 2006 to discuss the Church's relocation plans. The Church was advised that the Catalina Street property was zoned "IP" (Industrial Park), and that assembly uses such as churches were not allowed in that zone. To pursue relocation to that site, the Church would have to apply for amendments to the Zoning Code text to allow churches with a conditional use permit; City staff advised that the Church could also apply to change the zoning from IP to IL (Industrial Limited) since this was a more appropriate zone. Declaration of Debbie Pollart, ¶¶ 15-17. The Church filed its land us application on May 19, 2006 (Exhibit 26) some sixty plus days after it had already entered into an escrow on the Catalina property. Exhibits 36 and 37. City staff quickly recognized that the proposed amendments raised City-wide policy considerations about locating assembly uses in industrial zones. This precipitated a lengthy evaluation of potential options for expanding potential locations for

---

1

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                                    [C07-03605-PJH]

1 | assembly uses, which were at that time only allowed in residential zones with a conditional
2 | use permit. Pollart Decl., ¶¶ 18, 20-24. After obtaining policy direction at public meetings
3 | of the Business Development Sub-Committee of the City Council and a joint meeting of
4 | the City Planning Commission and Board of Zoning Adjustments, City staff proceeded to
5 | prepare draft zoning amendments to create a new Assembly Use Overlay zone which
6 | would allow assembly uses with a CUP on suitable properties in industrial and commercial
7 | zones. Pollart Decl., ¶¶ 25-30. Ultimately some 196 properties, ranging in size from .12
8 | to 27.15 acres in size were selected based on 8 objective criteria adopted from the City's
9 | General Plan. The Assembly Use Overlay zoning amendments were presented to and
10 | approved by the City Planning Commission (Exhibits 15, 16) and then by the City Council
11 | on March 19, 2007. Pollart Decl., ¶¶ 31-35; Exhibits 17, 18.

12 |      Meanwhile, with no encouragement from the City, and against sound business
13 | practices (Exhibit 34, p. 581), the Church proceeded to enter into a contract to purchase the
14 | Catalina Street property. Pollart Decl., ¶¶ 15, 18. The sale was completed on December
15 | 29, 2006. FAC ¶¶ 16, 22, 30, 33. However, the Catalina Street property was not among
16 | those selected for inclusion in the Assembly Use Overlay zone. On March 30, 2007 the
17 | Church applied for a zoning amendment to include its property in the Assembly Use
18 | Overlay zoning. City staff recommended against the amendment primarily based on the
19 | site's inconsistency with 2 of the established 8 criteria that had been used to systematically
20 | select properties for the recently completed comprehensive Assembly Use Overlay zone.
21 | The Planning Commission voted to deny the application on April 12, 2007. Pollart Decl.,
22 | ¶ 38; Exhibits 21, 22. The City Council denied the Church's appeal following a full public
23 | hearing on May 7, 2007. Pollart Decl., ¶ 40; Exhibits 23, 24.

24 |      This action was commenced by the Church on July 12, 2007. This Honorable Court
25 | denied the Church's application for a preliminary injunction on October 2, 2007.
26 | ///
27 | ///
28 | ///

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

[C07-03605-PJH]

680

II.    *THE CITY HAS NOT IMPOSED A "SUBSTANTIAL BURDEN" ON PLAINTIFF'S*
*EXERCISE OF RELIGION UNDER RLUIPA*

Plaintiff's First Cause of Action is brought under 42 U.S.C. § 2000cc(a)(1), generally known as the "substantial burden" provision of RLUIPA. The Church alleges that the City has imposed a "substantial burden" on it by, in a nutshell, denying the rezoning requests that would have allowed the Church to relocate to a new larger site where it believes its operation would not be hampered by parking overflow or scheduling issues for its various ancillary outreach activities. The FAC also includes obligatory allegations to the effect that the City's regulations are not supported by compelling governmental interests, and that the City failed to select the least restrictive means for achieving the City's interests, as well as allegations concerning the financial costs the Church has endured in its efforts to secure City approval for new, larger facilities at Catalina. FAC ¶¶ 71-81.

The Church's substantial burden claim fails for several reasons. First, the Church cannot establish that the City's refusal to rezone a particular parcel of industrial land at the Church's request amounts to a "substantial burden" on religion versus mere incidental limitations. Second, even if the Church has been "substantially burdened," the City's actions furthered a compelling public interest and adopted the least restrictive means.

A.    *The City's Actions Did Not Impose a Substantial Burden on the Religious*
*Activities of the Church.*

1.    *The "Substantial Burden" Test.*

It is generally agreed that the term "substantial burden" in RLUIPA is to be construed in light of the term "substantial burden on religion" as employed in Supreme Court and appellate court jurisprudence involving the Free Exercise clause of the First Amendment. *Guru Nanak Sikh Soc. of Yuba City v. County of Sutter,* 456 F.3d 978, 988 (9th Cir. 2006); *Vision Church v. Village of Long Grove,* 468 F.3d 975, 996-997 (7th Cir. 2006); *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 760-761 (7th Cir. 2003) ("*C.L.U.B.*").

3

1    Two interrelated elements must be considered in determining whether a particular
2    government action or regulation inflicts a "substantial burden" on religion.  *See*
3    *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 348-350 (2nd Cir.
4    2007).  The first issue is the *impact* on religious activity.  The Ninth Circuit and other
5    circuits have made it clear that the impact must directly impinge upon the plaintiff's ability
6    to practice religion, and must be truly substantial.  "[F]or a land use regulation to impose a
7    'substantial burden,' it must be 'oppressive' to a 'significantly great extent.'  That is, a
8    'substantial burden' on 'religious exercise' must impose a significantly great restriction or
9    onus upon such exercise.'"  *Guru Nanak*, 456 F.3d at 988, quoting *San Jose Christian*
10   *College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004).  A "substantial
11   burden" is thus one which "exert[s] substantial pressure on an adherent to modify his
12   behavior and to violate his beliefs."  *Id.; see also Midrash Sephardi, Inc. v. Town of*
13   *Surfside*, 366 F.3d 1214, 1226 (11th Cir. 2004) ["significant pressure which directly
14   coerces the religious adherent to conform his or her behavior accordingly."]; *C.L.U.B*, 342
15   F.3d 752, 761 ["a land use regulation which imposes a substantial burden on religious
16   exercise is one that necessarily bears direct, primary and fundamental responsibility for
17   rendering religious exercise … effectively impractical."].

18    The second issue that must be considered is the nature or context of the challenged
19   governmental actions.  *Westchester*, 504 F.3d at 350; *see Lyng v. Northwest Indian*
20   *Cemetery Protective Ass'n*, 485 U.S. 439, 451, 108 S.Ct. 1319 (1988) [validity of action
21   cannot be determined from effect alone].  Governmental action that is specifically targeted
22   upon core religious activities will almost invariably be found to impose a substantial
23   burden, if for no other reason than such conduct is almost necessarily oppressive and places
24   an "onus" on religion.  *See, e.g. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
25   508 U.S. 520, 532, 113 S.Ct. 2217 (1993).  Actions that are purely arbitrary or fail to serve
26   any valid purpose are also suspect and likely to be found to impose a substantial burden.
27   *Westchester*, 504 F.3d at 350-351; *see, e.g., Sts. Constantine and Helen Greek Orthodox*
28   *Church v. City of New Berlin*, 396 F.3d 895, 900-901 (7th Cir. 2005).

4

1        At the other end of the spectrum are facially neutral regulations of general

2   applicability adopted for purposes unrelated to religion. *See Lukumi*, 508 U.S. at 531;

3   *Westchester*, 504 F.3d at 350-351. Burdens imposed on religious activities by this type of

4   regulation are considered *incidental* burdens which must be borne by religious

5   organizations on the same footing as non-religious parties, and not "substantial burdens on

6   religion" absent extraordinary facts. Zoning regulations, absent abuse or arbitrary

7   application, generally fall within the "generally applicable" category of regulation.

8   *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 275-76

9   (3rd Cir. 2007). "A law is one of neutrality and general applicability if it does not aim to

10  "infringe upon or restrict practices because of their religious motivation, and if it does not

11  'in a selective manner impose burdens only on conduct motivated by religious belief.'"

12  *San Jose Christian College*, 360 F.3d at 1032, quoting *Lukumi*, 508 U.S. at 533, 543.

13  Because incidental burdens, no matter how significant, do not trigger strict scrutiny,

14  "courts confronting free exercise challenges to zoning restrictions rarely find the

15  substantial burden test satisfied *even when the resulting effect is to completely prohibit a*

16  *religious congregation from building a church on its own property.*" *Westchester*, 504

17  F.3d at 350, emphasis added; *see Lighthouse Institute for Evangelism*, 510 F.3d at 274-

18  275; *Messiah Baptist Church v. County of Jefferson, State of Colo.*, 859 F.2d 820, 824-825

19  (10th Cir. 1988).

20              2.    *Churches, Like Other Uses, Are Not Entitled to Rezoning Upon*

21                    *Demand Under RLUIPA.*

22        Applying the foregoing principles, the Ninth Circuit and other circuits have

23  squarely rejected the proposition that refusal to rezone a particular site for religious uses,

24  without considerably more, may constitute a substantial burden on religious exercise. In

25  simplest terms, RLUIPA does not exempt churches from the realities of the real estate

26  market or the necessity of making reasonable efforts to accommodate themselves to valid

27  zoning provisions before claiming they have been "substantially burdened" in violation of

28  RLUIPA.

---

5

1    The Ninth Circuit first addressed a "substantial burden" claim in *San Jose Christian*

2   *College*, 360 F.3d at 1033-1035. The plaintiff sued after the city denied an application to

3   rezone property for use as a religious college on procedural grounds. *Id.* at 1027-1028. The

4   Ninth Circuit affirmed a summary judgment in favor of the city, finding that denial of the

5   rezoning application did not impose a substantial burden. The Court went on to note that

6   even if the applicable ordinance may have rendered the plaintiff unable to provide worship

7   or education services at the proposed site, "there is no evidence in the record demonstrating

8   that College was precluded from using other sites within the city." *Id.* at 1035.

9    In *C.L.U.B* , 342 F.3d 752, the Seventh Circuit upheld summary judgment for the

10   city and rejected the RLUIPA and constitutional free exercise claims of five churches, each

11   of which had applied for and were denied "special use" permits. The Court noted that the

12   alleged "scarcity of affordable land" and costs of navigating the municipal permitting

13   requirements did not constitute a substantial burden on religion where viable sites

14   ultimately existed and, in that case, were ultimately located by the plaintiffs. The Court

15   noted that neither RLUIPA or the Free Exercise clause require cities to grant churches

16   preferential rights over other land uses, nor insulate churches from "the harsh reality" that

17   "the marketplace sometimes dictates that certain facilities are not available to those who

18   desire them." *Id.* at 761-762.

19    In *Petra Presbyterian Church v. Village of Northbrook*, 489 F.3d 846 (7th Cir.

20   2007), the church contracted to purchase an industrially zoned property containing buildings

21   that it wanted to convert to a church and religious classrooms. However, churches were not

22   allowed in the zone. After the town planning commission responded negatively to the

23   church's rezoning application, the church withdrew its application but then proceeded to

24   buy the property and use it for church purposes anyway. The village secured an injunction

25   against continued church use of the property. The 7th Circuit rejected the church's

26   subsequent RLUIPA substantial burden claim, finding that a prohibition on churches in

27   industrial zones was neither unreasonable nor a substantial burden on religion. *Id.* at 850-

28   851. The Court noted "When there is plenty of land on which religious organizations can

6

1    build churches (or, as is common nowadays, convert to churches buildings previously

2    intended for some other use) in a community, the fact that they are *not permitted to build*

3    *everywhere* does not create a substantial burden." *Id.* at 851; emphasis added.

4        In *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 654-655

5    (10th Cir. 2006) the court rejected a Free Exercise claim that denial of a permit for a

6    religious day care center imposed a substantial burden on the plaintiff, noting that the

7    plaintiff could apply to locate the facility at a site properly zoned for it, or simply operate

8    its existing religious facilities on a "less grandiose" scale. And, in *The Lighthouse Institute*

9    *for Evangelism, Inc. v. The City of Long Branch*, 406 F.Supp.2d 507, 515-516 (D.N.J.

10   2005) the Court found that adoption of a redevelopment plan and rezoning that required

11   the plaintiff to relocate their existing church did not impose a substantial burden on the

12   plaintiff where there was evidence that alternate locations were available in the city.

13       Similarly, in *Episcopal Student Foundation v. City of Ann Arbor*, 341 F.Supp.2d

14   691, 705 (E.D. Mich. 2004), the Court found that the plaintiff could not claim a substantial

15   burden in the absence of evidence that it was impractical to lease or sublease alternate

16   facilities that would allow it to conduct some or all of its religious activities elsewhere.

17            3.    *The City's Decision Not to Rezone the Catalina Street Property Does*

18                  *Not Amount to a Substantial Burden on the Exercise of Religion.*

19       Under the foregoing standard, the Church clearly cannot establish that it has been

20   "substantially burdened" by the City's actions challenged here. While religious assemblies

21   are not allowed on the Church's Catalina Street property, any burden this imposes on the

22   Church is clearly an incidental result of the City's larger zoning provisions and plaintiff's

23   core religious activities are not burdened. There is no evidence of intentional

24   discrimination or arbitrary conduct toward the Church. *See Westchester*, 504 F.3d at 350-

25   351; *Sts. Constantine and Helen Greek Orthodox Church*, 396 F.3d at 900-901. Instead,

26   the record shows a good faith effort by the City to *expand* opportunities for religious

27   assembly uses in the wake of the Church's initial application. Pollart Decl., ¶ 20; Exhibits

28   11-20, inclusive. The fact that the Church's property ultimately was not included in this

7

1   expansion based on objective and reasonable planning criteria does not entitle the Church
2   to relief under RLUIPA.  Pollart Decl., ¶ 36.

3          There can also be little dispute that the City's zoning provisions as a whole provide
4   adequate sites for religious assemblies.  Churches (and other Assembly Uses) have been
5   allowed with a CUP in *all* City residential zones for many years.  Pollart Decl., ¶ 7; *see*
6   Zoning Code, Article 5, §§ 2-504.B.2, 2-506.B.2, 2-508.B.2, 2-510.B.2; City's RFJN,
7   Exhibit 3, pp. 013-016, 018.  These zones comprise approximately 52% of the City.
8   Pollart Decl., ¶ 8.  The enactment of the Assembly Use Overlay zoning amendments in
9   early 2007 added an *additional* 196 properties of various sizes located in both industrial
10  and commercial zones.  Pollart Decl., ¶ 35; Exhibit 20.  These numbers are not
11  disproportionate to the actual demand for church space in the City.  There are currently a
12  total of 45 churches in the City.  Pollart Decl., ¶ 5.  Only two applications for new church
13  facilities were received by the City in the last five years.  *Id.*, ¶ 13. According to the
14  Church's own pastor, no new churches were built in the City in the 17 years preceding
15  these applications.  Exhibit 30, Mortara Depo., p. 537, lns. 1-3.

16         The Church has previously offered a number of arguments as to why the City's
17  actions should still be deemed to impose a substantial burden.  None have merit.

18         First and foremost, the Church apparently contends that there are no available sites
19  other than its Catalina Street property that are large enough to accommodate the size of
20  congregation and the range of additional social, charitable and educational activities it
21  claims are also important to its exercise of religion.  The evidence, however, does not
22  support a conclusion that no other similarly sized sites are available.  There are, to begin
23  with, approximately 78 sites over 3.5 acres in the City's residential zones.  Pollart Decl., ¶
24  8.  Of the parcels subject to the Assembly Use Overlay, four are over 10 acres in size; eight
25  are over 5 acres in size; 24 are over 2 acres in size and the largest is 27.15 acres.  Pollart
26  Decl., ¶ 10; Exhibit 9.  Beyond this, the AU Overlay zone was deliberately applied only to
27  areas containing a minimum of 2 acres of contiguous land, precisely so that smaller parcels
28  ///

8

1  could be aggregated to allow larger assembly uses, as is the case with the 3 adjoining

2  parcels that comprise the Church's Catalina Street property.  Pollart Decl., ¶ 10.

3       The second problem with the Church's argument is that the Church cannot show

4  that its various religious activities must occur at a single location.  While the Church may

5  *wish* to assemble its entire congregation in a single facility for worship services, it cannot

6  seriously argue that conducting services in two smaller locales, or conducting multiple

7  services *as it does now* would effectively prevent the Church's members from practicing

8  their religion.  The Church's all-in-one-place argument is even weaker with respect to the

9  many other activities the Church wishes to include under its umbrella of operations.  Many

10  counseling services include its weight-management classes and various educational

11  activities, clearly could be accomplished at other smaller locations, some of which may

12  require no discretionary City approvals at all, *e.g.* leased office space.  *See Episcopal*

13  *Student Foundation*, 341 F.Supp.2d at 704-705.  And, some activities such as the Church's

14  food programs, might well be conducted more effectively at a separate new location with

15  adequate kitchen, storage or other specialized facilities, and with greater accessibility to

16  their intended beneficiaries and less conflict with other Church activities and less impact to

17  affected neighbors.  It is clear that the Church has adequate financial resources to lease or

18  acquire additional property for these purposes.  In 2005, for example, it purchased a single

19  family residential parcel adjacent to its present facilities simply to acquire additional

20  parking spaces.  Exhibit 30, Mortara Depo., p. 540, lns. 5-11, p. 541, lns. 20-23.

21       The Church cannot avoid these alternatives by insisting it must have a single large

22  property of its own choosing, no matter how sincere that belief may be.  As noted

23  previously, burdens placed on religious exercise are deemed incidental burdens rather than

24  substantial burdens when they result from the neutral operation of a rational zoning

25  scheme.  In allocating space among the various uses necessary to any functioning society,

26  municipalities also often face limited choices constrained by topography, past development

27  patterns, natural and political boundaries, environmental and transportation constraints, and

28  the planning rationale of maintaining reasonable separation between incompatible uses.

9

1   Having made reasonable efforts to accommodate religious uses – as the City clearly has – a

2   municipality cannot be faulted under RLUIPA for failing to anticipate or accommodate

3   demands by a religious organization for a particular property deemed specially suited to its

4   individual goals, ambitions or budget.  This would not only exceed RLUIPA's goal of

5   securing equality – not special privileges – for religious assemblies, but also exceed

6   constitutional limits on preferences that may be given for religion.  *Westchester Day*

7   *School v. Village of Mamaroneck*, 386 F.3d 183, 189-190 (2nd Cir. 2004).  The fact that

8   the Church wishes to build an extraordinary size church and religious complex does not

9   obligate a moderate size and largely already-built-out city such as San Leandro to jettison

10  its adopted zoning plans to accommodate this demand.

11         It may be noted that the courts have extensively dealt with similar land use issues in

12  the context of the Free Speech clause.  The rule that has developed there is that local

13  governments must zone a sufficient number of properties to accommodate the reasonably

14  anticipated demand for First Amendment uses.  *City of Renton v. Playtime Theatres, Inc.*,

15  475 U.S. 41, 106 S.Ct. 925 (1986); *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d

16  1524 (9th Cir. 1993).  Municipalities are *not* required to guarantee that these properties

17  will actually be for sale, nor pre-equipped with buildings and improvements or visual

18  settings deemed desirable for First Amendment uses.  *Id.*  While the Church may bridle at

19  comparison with cases involving some less wholesome forms of First Amendment activity,

20  there is no reason to believe the same rules do not apply to all forms of free speech,

21  including those clearly on a parity with religious expression.  Under these rules, were

22  Borders to sue the City simply because there were no commercially zoned parcels left in

23  the City that were large enough to accommodate its particular demands, the suit would

24  clearly fail.  The result is the same here.  The Church cannot unilaterally define its needs

25  and resulting alleged burdens on its practice of religion in a manner which trumps the

26  City's ability to make and adhere to otherwise reasonable zoning decisions.

27  ///

28  ///

10

1          4.    *The City's Actions Have Not Imposed a Substantial Financial Burden*

2                *on The Church.*

3       The Church also complains that costs associated with purchasing and holding the

4 Catalina Street property have imposed a substantial burden. FAC ¶ 84. The costs of

5 acquiring real estate and of pursuing necessary government approvals are, of course,

6 inherent costs incidental to any acquisition and development or reuse of property, and not

7 normally cognizable as a burden on religion. *San Jose Christian College*, 360 F.3d at 1035

8 ["the costs, procedural requirements, and inherent political aspects of the permit approval

9 process were 'incidental to any high-density urban land use' and thus '[did] not amount to

10 a substantial burden on religious exercise.'"]; *C.L.U.B.*, 342 F.3d at 760-761. While the

11 Church rather unwisely paid non-refundable deposits and then purchased the Catalina

12 Street property before any zoning approvals were obtained, it did not do so on the advice

13 of the City, or even in the best judgment of its own advisors. Pollart Decl., ¶¶ 15, 18;

14 Exhibit 36. The Church's financial burden is one entirely of the Church's own choosing,

15 not a burden imposed by the City. *See Petra Presbyterian*, 489 F.3d at 851 [no substantial

16 burden where church purchased property knowing it was subject to restrictions].

17       Of note, the original offer made by the Church was specifically conditioned "upon

18 Buyer in its sole judgment determining that the subject real property is suitable for *and*

19 *approved for use as a church.* This condition shall remain in full force and effect until

20 removed in writing by Buyer." Exhibit 36, Commercial Property Purchase Agreement and

21 Joint Escrow Instructions of March 24, 2006, p. 634; emphasis added. Just 4 days later

22 this contingency was deleted by the Church (Exhibit 37, p. 648) and the Church now tries

23 to shoulder the City with the effects of its poor business planning.

24          B.    *The City's Actions Served a Compelling Governmental Interest and Were*

25             *The Least Restrictive Means of Protecting That Interest.*

26       Even assuming the Church has shown a substantial burden, the City's actions are

27 lawful under RLUIPA if supported by a compelling governmental interest and is the "least

28 restrictive" means of furthering that interest. 42 U.S.C. § 2000cc(a)(1)(A), (B). In

---

11

1  determining whether an asserted governmental interest is sufficiently compelling, the court

2  looks at the specific facts of the case, not general propositions. *Westchester*, 504 F.3d at

3  353. The City's principal reason for refusing to rezone the Catalina Street property was

4  that the property is considered a core property for maintaining the City's industrial base, as

5  evidenced in the City's General Plan. Pollart Decl., ¶ 20; Exhibit 7. The City may or may

6  not have a compelling interest in preserving *every* industrially zoned parcel for industrial

7  uses, but it certainly has a compelling interest in preserving some land for industrial use.

8  The Catalina Street site historically employed some 400 persons. Exhibit 28, Jermanis

9  Depo., p. 518, lns. 10-19. The evidence further shows that the Catalina Street property is

10 in fact uniquely important by reason of its location and current accommodations to the

11 preservation of a viable industrial base in the City. Exhibit 29, Sims Depo., p. 526, lns. 6-

12 28; pp. 529, ln. 18 to 530, ln. 10. Denial of the rezoning was also indisputably the only

13 practical – and therefore least restrictive – means of achieving the City's legitimate goal.

14 Approval of Church use with conditions would not preserve the property for industrial use.

15 III.    THE CITY'S REGULATIONS DO NOT VIOLATE THE "EQUAL TERMS"

16         PROVISIONS OF RLUIPA

17         42 U.S.C. § 2000cc(b)(1), known as the "Equal Terms" provision of RLUIPA,

18 provides that "[n]o government shall impose or implement a land use regulation in a

19 manner that treats a religious assembly or institution on less than equal terms with a

20 nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

21         The Church's Second Cause of Action asserts that the City violated section

22 2000cc(b)(1) by: (1) allegedly failing to treat the Church the same as commercial

23 recreation and entertainment businesses; and (2) rejecting the Church's rezoning

24 application because its property was located within a 1/4 mile of businesses operating with

25 hazardous materials business plans. FAC ¶¶ 92-94. Neither claim has merit.

26         A.    Background Law.

27         The Ninth Circuit has not yet addressed the Equal Terms provision of RLUIPA.

28 Lower courts in this circuit, however, have construed this provision as a codification of

---

12

1   "existing Supreme Court decisions under the Free Exercise and Establishment Clauses of

2   the First Amendment as well as under the Equal Protection Clause of the Fourteenth

3   Amendment." *Ventura County Christian High School v. City of San Buenaventura,* 233

4   F.Supp.2d 1241, 1246 (C.D. Cal. 2002); *Guru Nanak Sikh Society of Yuba City v. County*

5   *of Sutter,* 326 F.Supp.2d 1140, 1155 (E.D. Cal. 2003); *Hale O Kaula Church v. Maui*

6   *Planning Com'n.,* 229 F.Supp.2d 1056, 1070-1071 (D. Hawaii 2002).

7        Therefore, "in evaluating plaintiffs' claims under either [the equal terms provision

8   of] RLUIPA or the Equal Protection Clause of the Fourteenth Amendment, the Court must

9   first inquire as to whether defendants have treated plaintiffs in an unequal manner to

10  *similarly situated* entities." *Ventura County,* 233 F.Supp.2d at 1247 (emphasis added); *see*

11  *also Vietnamese Buddhism Study Temple In America v. City of Garden Grove,* 460

12  F.Supp.2d 1165, 1173-1174 (C.D. Cal. 2006); *Guru Nanak,* 326 F.Supp.2d at 1155.

13       Other circuits are divided on application of the "similarly situated" standard to Equal

14  Terms claims. *See Lighthouse Institute,* 510 F.3d at 264-268; *Vision Church,* 468 F.3d 975,

15  1003; *Midrash Shephardi,* 366 F.3d 1214, 1230; *Prima Iglesia Bautista Hispana of Boca*

16  *Raton, Inc. v. Broward County,* 450 F.Supp.2d 1295, 1311 (11th Cir. 2006) ["similarly situated"

17  requirement applicable to "as applied" claims].   At a minimum, however, it is clear than

18  section 2000cc(b)(1), by its express terms, allows a claim based only on alleged differential

19  treatment of a "nonreligious assembly or institution." *Midrash Sephardi,* 366 F.3d at 1230.

20       B.    *Commercial Recreation and Entertainment Business are Not "Assemblies or*

21             *Institutions" Nor Are They Similar to Church Uses.*

22       The Church's first Equal Terms claim is apparently based on the fact that the City's

23  current Zoning Code allows "Commercial Recreation" and "Entertainment Activities" in

24  the IP and IL industrial zones with a CUP, whereas churches (and other Assembly Uses)

25  are permitted in these zones (also with a CUP) only in areas subject to the Assembly Uses

26  Overlay District.  *See* RFJN, Exhibit 4, Zoning Code, Article 7, §§ 2-708.B.5, 2-708.B.9.

27  ///

28  ///

---

13

1        This claim fails because Commercial Recreation and Entertainment Activities are

2 not similar to religious assemblies or institutions in any relevant respect, nor do they

3 qualify as "assemblies" or "institutions."

4        "Assembly Uses" are defined in the City's Zoning Code as "Meeting, recreational,

5 social facilities of a private or non-profit organization primarily for use by members or

6 guests, or facilities for religious worship and incidental religious education (but not

7 including schools as defined in this section).  This classification includes union halls,

8 social clubs, fraternal organizations, and youth centers." RFJN, Exhibit 2, 008.

9        "Entertainment Activities," in contrast, are defined in the Zoning Code to include

10 specified types of recurring performing events, plus dancing and electronically displayed

11 events), but to *exclude* activities "for the non-profit, charitable or educational [purposes] of

12 public or private institutional uses." RFJN, Exhibit 2, p. 010.  While "Commercial

13 Recreation" is defined as "Provision of participant or spectator recreation or

14 entertainment," and includes "amusement parks, bowling alleys, ice/roller skating rinks,

15 golf courses, miniature golf courses, and scale-model courses." RFJN, Exhibit 2, p. 009.

16 These uses cannot reasonably be classified as "assemblies" or "institutions."

17        The terms "assembly" and "institution" are not defined in RLUIPA.  The Court

18 therefore must construe the terms "in accordance with [their] 'ordinary, contemporary

19 common meaning.'" *San Jose Christian College*, 360 F.3d at 1034.  While dictionary

20 definitions may be helpful, common usage is normally the best guide to legislative intent.

21 It cannot seriously be contended that Congress intend the terms "non-religious assembly"

22 and "institution" to be equated with common types of commercial for profit types of uses

23 (such as bars, nightclubs, sports stadiums, amusement parks, etc.) when this is so

24 obviously inconsistent with the common usage of these terms.

25        Turning to the dictionary, the term "assembly" is defined in Webster's New

26 Universal Unabridged Dictionary as "a number of persons gathered together, usually for a

27 particular purpose, whether religious, political, educational, or social." RFJN, Exhibit 32.

28 On its face, this definition conveys a group of persons voluntarily gathered for

14

1   associational purposes, not a group whose common denominator is that they paid the price
2   of admission. The dictionary definition can perhaps be literally stretched to any activity
3   involving an aggregation of persons for similar purposes. Such an interpretation proves
4   too much. Under this interpretation, shoppers gathered for a sales event, workers
5   assembled in a factory or an office to work, or bar patrons gathered for a drink could all be
6   described as an "assembly." There is nothing in RLUIPA or its legislative history,
7   however, which suggests that Congress intended such a far-reaching result, which would
8   essentially abolish all permissible distinctions between conventionally recognized (and
9   typically non-profit) assembly uses and common commercial activities involving
10  aggregations of people. Whatever ambiguity may adhere to the term "assembly," it cannot
11  seriously be argued that the term is commonly employed to refer to commercial
12  businesses, including those involving paid-for entertainment or recreational activity.

13      The term "institution" is assigned 8 different meanings in Webster's New Universal
14  Unabridged Dictionary. RFJN, Exhibit 33. It can literally, if euphemistically, be applied
15  to almost any human organization or even informal activities such as a weekly pick-up
16  basketball game in a local park. The primary meaning assigned by Webster's, however, is
17  "an organization, establishment, foundation, society, or the like, devoted to the promotion
18  of a particular object, esp. one of public, educational, or charitable character." RFJN,
19  Exhibit 33. This is a common sense usage and while it is true that the term "institution"
20  can be employed to refer to business enterprises of a venerable nature, *e.g.* a bank or other
21  financial "institution," the term is seldom employed to refer to ordinary commercial
22  enterprises such as skating rinks or movie theaters.

23      Since Entertainment Activities and Commercial Recreation as defined by the City
24  are not "assemblies" or "institutions" within the meaning of RLUIPA, the City believes it
25  is unnecessary to further consider whether these uses should be "similarly situated" with
26  Assembly Uses. In any event, while some assembly uses and some commercial
27  entertainment or recreation businesses may have *some* commonalities, there are also
28  typically substantial differences in intensity of use, hours of operation and resulting traffic,

15

1  impacts on neighboring uses and locational preferences, to say nothing of profit motive.
2  Given these factors and the longstanding historical distinctions between assembly and
3  institutional uses versus commercial uses generally, the City could clearly lawfully
4  determine that Assembly Uses as defined in the City's Zoning Code are not "similarly
5  situated" to commercial entertainment and recreational uses.

6      C.   *Hazardous Waste Criteria.*

7          The Church's second Equal Terms claim is that the City has imposed a standard on
8  the Church's proposed Catalina Street church that has not been applied to any other
9  assembly use, *i.e.* a separation requirement preventing the church from be located within a
10  "¼ mile circumference" of any business operating under a hazardous materials business
11  plan.  FAC ¶ 42.  The short answer to this claim is that the City has not enacted any such
12  standard, let alone selectively applied it to the Church.

13         The apparent basis for this claim is the fact that the staff reports for the City Planning
14  Commission and City Council hearings on the Church's 2007 rezoning application
15  recommended denial of the application *in part* upon the presence of some eight businesses
16  with Hazardous Materials Business Plans ("HMBPs") *within 500 feet* of the Catalina Street
17  property, and a total of 13 such businesses within ¼ mile.  Pollart Decl., ¶¶ 43-46; Exhibit
18  21, pp. 403-404.  The record, however, does not indicate that the City Council actually
19  relied on this criteria in making the decision to reject the rezoning.  Instead, the minutes,
20  hearing transcript and the staff reports themselves make it clear that the primary ground for
21  denial of the rezoning was the fact that the Catalina Street property did not satisfy two of the
22  criteria used to select all other properties in the Assembly Use Overlay zone, *i.e.* the
23  property was more than ¼ mile from a designated arterial street, and in a "focus area"
24  reserved by the General Plan for industrial and commercial development.  Pollart Decl., ¶¶
25  41, 45; Exhibits 22, 24, 35.

26         The Church's Equal Terms claim here fails for three reasons.  First, the "Equal
27  Terms provision of RLUIPA by its terms provides that governments shall not "impose or
28  implement a *land use regulation in a manner that treats a religious assembly or institution*

---

16

1   *on less than equal terms with a nonreligious assembly or institution.*" 42 U.S.C. §

2   2000cc(b)(1), emphasis added.  Contrary to the Church's implication, the City has not

3   adopted – much less "imposed" on the Church  any regulation requiring a "1/4

4   circumference" (or any other specific separation) between assembly uses and sites with

5   HMBPs.  No such regulation or standard appears in the City's General Plan, zoning code,

6   assembly use overlay criteria, or any other city regulation.  Pollart Decl., ¶ 46.

7          What the Church is apparently objecting to is the consideration of the proximity of

8   hazardous wastes as a public health and safety issue affecting the Catalina Street property.

9   The statute, however, is addressed at discriminatory application of actual regulations. There

10   appears nothing in the statute or commonly accepted principles of law that would allow the

11   Court to hold municipalities liable for merely *considering* new information on a zone change

12   application.

13          Even were one to assume that consideration of new criteria were actionable under

14   RLUIPA, there remains the issue of causation.  Clearly a plaintiff cannot claim relief under

15   RLUIPA if it has suffered no actual harm from the agency's alleged errant analysis.  At a

16   minimum then, the Church must show that consideration of the HMBP was actually

17   responsible for the denial of its rezoning application.  The evidence simply does not support

18   any such argument.  While the subject of HMBPs was indeed considered by City staff and

19   the City Planning Commission, the record does not show that the final City Council

20   decision was actually affected by this consideration.  Representatives of the Church testified

21   extensively, and apparently persuasively, that the mere possession of HMBPs by nearby

22   businesses was not in and of itself sufficient to justify denial of the rezoning application.

23   Exhibit 35.  The City Council apparently agreed.  No mention of the issue was made by any

24   Councilmember voting on the rezoning.  Exhibit 35.  The record further affirmatively

25   indicates that the primary ground for rejection of the rezoning at all stages of consideration

26   was the fact that the Catalina Street property did not meet two of the eight specific criteria

27   utilized in selecting all other properties in the Assembly Use Overlay zone.  Pollart Decl., ¶

28   ///

---

17

1   44; Exhibit 23, p. 447. The failure of this parcel to satisfy the 8 established criteria (which

2   all of the 196 parcels satisfied) was the basis for denying the rezoning application.

3   A final problem with the Church's HBMP argument is that there is no evidence that

4   the City has applied different criteria to similarly situated applicants, of either a religious

5   or non-religious nature. *See Prima Iglesia*, 450 F.3d at 1311 [plaintiff in as applied Equal

6   Terms must show differential application to *similarly situated* parties]. To sustain its

7   HBMP claim, the Church would have to show that the City intentionally ignored the

8   presence of HBMPs in the context of another similar *rezoning* application. *Id.* at 1311-

9   1313 [no Equal Terms claim where plaintiff sought "markedly different forms of zoning

10  relief."]. The Church cannot do this. No other applicant has ever requested rezoning of

11  industrial land to accommodate an assembly use. Pollart Decl., ¶ 44. There is also no

12  basis for suspecting actual discrimination. Faced with the prospect of a massive assembly

13  use in an industrial zone, the City prudently considered public safety issues posed by the

14  close proximity of hazardous materials.

15  IV.   *THE CITY'S REGULATIONS DO NOT TOTALLY EXCLUDE OR*

16  *UNREASONABLY RESTRICT RELIGIOUS ASSEMBLIES IN SAN LEANDRO*

17  The Church's Third Cause of Action is based on 42 USC § 2000cc(b)(3), which

18  prohibits state or local land use regulations which either totally exclude religious

19  assemblies from a jurisdiction, or unreasonably limit such uses. There is little case law

20  construing this provision of RLUIPA. However, it is clear that the City's regulations do

21  not totally exclude religious uses from the City.

22  Aside from the 45 existing religious uses, including the Church's own existing

23  campus, the City regulations allow churches with a CUP in all residential zones, and also

24  on the 196 sites in other commercial and industrial zones in the Assembly Use Overlay.

25  *See* Zola Decl.; Exhibit 34. *Vision Church*, 468 F.3d at 990 [no 'total exclusion' where

26  churches allowed with special permit in residential zones]. The same evidence on its face

27  precludes any claim that the City's regulations "unreasonably restrict" such uses. With 45

28  ///

18

1  existing churches in the City there is no evidence of any unmet demand for Church space

2  in the City. Pollart Decl., ¶ 5.

3  V.    *THE CHURCH'S CONSTITUTIONAL CLAIMS PRESENT NO TRIABLE ISSUE*

4         The Church's Fourth through Ninth Causes of Action present various constitutional

5  claims under 42 U.S.C. § 1983. If the Church cannot sustain a claim under RLUIPA, its

6  claims must also fail under the standards governing its Free Exercise, Free Speech and

7  other constitutional claims.

8         A.    *The City Has Not Unconstitutionally Interfered with the Church's First*

9               *Amendment Right to the Free Exercise of Religion.*

10        Plaintiff's Fourth Cause of Action seeks relief under the Free Exercise Clause of the

11 First Amendment. FAC ¶¶ 103-104. The claim is based on the same facts as the Church's

12 RLUIPA "substantial burden" claim, and fails for essentially the same reasons. In

13 addition, the constitutional claims suffers from another threshold problem. Federal courts

14 have not recognized a First Amendment right to practice religion *on any particular parcel*

15 *of land*, absent a showing that the proposed site itself possesses some special religious

16 significance. *Lighthouse Institute for Evangelism*, 510 F.3d at 273-274; *Grace United*

17 *Methodist*, 451 F.3d at 654-655; *Messiah Baptist Church*, 859 F.2d at 824-825; *Lakewood,*

18 *Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio*, 699 F.2d 303,

19 306-307 (6th Cir. 1983). Although the Church's claims are premised on the City's refusal

20 to rezone its Catalina Street property for church use, the Church does not claim this

21 property has any intrinsic religious significance. There is no claim that the City has taken

22 any actions to interfere with religious activities at the Church's current operations at 577

23 Manor Boulevard.

24        Even were the Church's Free Exercise rights deemed implicated by the denial of the

25 Catalina Street rezoning, the Church cannot show that the City's actions inflicted a

26 substantial burden for reasons stated in Section II above. In addition, courts evaluating Free

27 Exercise claims in the zoning context generally apply only a rational basis test. Under the

28 rational basis test, so long as the challenged zoning actions are of general application and

19

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                                    [C07-03605-PJH]

697

1    neutral towards religious activity itself, they need not be narrowly tailored nor justified by a

2    compelling governmental interest, regardless of any incidental restrictions they may impose

3    on religious activities. *San Jose Christian College*, 360 F.3d at 1030-1031; *Lighthouse*

4    *Institute for Evangelism*, 510 F.3d at 277; *Grace United Methodist*, 451 F.3d at 649; *Vision*

5    *Church*, 468 F.3d at 1001. The First Amended Complaint does not allege any facts

6    suggesting that the City zoning regulations affecting the Church or churches generally are

7    targeted at religious activity. The Church also has not made any such claim in discovery.

8    The City's regulations are clearly neutral on their face. The evidence shows that the City's

9    actions were based on legitimate public policy considerations, *i.e.* the need to preserve the

10   City's industrial base. Pollart Decl., ¶ 20; Exhibit 13. Nothing more is required to survive

11   scrutiny under the Free Exercise clause. *See, e.g., Lighthouse Institute for Evangelism,* 510

12   F.3d at 273-277 [upholding exclusion of churches from redevelopment zone]; *C.L.U.B*, 342

13   F.3d 752, 763-764; *Messiah Baptist Church*, 859 F.2d at 823-826.

14            B.    *The City Has Not Interfered with the Church's Freedom of Speech.*

15            The Church's Fifth Cause of Action alleges that the City has violated the Church's

16   First Amendment right to free speech by discriminating against the Church "by restricting

17   its speech rights and the congregants' corresponding right to hear." FAC ¶ 106. The

18   complaint further alleges that these restrictions result from the "crowded facilities,

19   inadequate parking, and traffic congestion at the CHURCH's present location," which

20   alleged hinder or deter Church members from entering the current facilities to exercise their

21   rights. *Id.* Plaintiff does not allege, however, that the City has taken any affirmative actions

22   to hinder or suppress any speech activities undertaken at their current church site. Neither

23   does the Church claim, nor could it, that any of the City actions challenged in this case were

24   motivated by a desire to suppress religious (or other) speech activity. The Church's claim

25   thus boils down to the proposition that City has denied free speech by precluding the

26   Church and its members from expanding by relocating to the Catalina Street property.

27            In these circumstances, zoning regulations will be upheld against a free speech

28   challenge notwithstanding any incidental effects on speech activity so long as they meet

20

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                                    [C07-03605-PJH]

1    the common First Amendment test for time, place and manner regulations. *San Jose*

2    *Christian College*, 360 F.3d at 1032, citing *City of Renton*, 475 U.S. 41; *Grace United*, 451

3    F.3d at 657.  Under this test, zoning regulations must be upheld so long as they are

4    "designed to serve a substantial governmental interest," "do not unreasonably limit

5    alternative avenues of communication," and are "narrowly tailored" in the sense that they

6    are directed only at the particular class of activities or land uses reasonably believed to

7    generate the type of impacts regulated by the ordinances. *City of Renton*, 475 U.S. at 47

8    and 52; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746 (1989).

9        The City's zoning regulations are clearly content neutral with respect to religious

10   speech and expression.  They do not provide for granting or withholding permits on the

11   basis of the applicant's speech or viewpoint, religious or otherwise.  Where a zoning

12   regulation serves legitimate purposes unrelated to the regulation of speech, it is deemed

13   content neutral even if it has some incidental effects on speech activities. *San Jose*

14   *Christian College*, 360 F.3d at 1033; *City of Renton*, 475 U.S. at 48-49.

15       It is beyond serious dispute that zoning regulations generally advance substantial

16   governmental interests. *City of Renton*, 475 U.S. at 50 ["a city's interest in attempting to

17   preserve the quality of urban life is one that must be accorded high respect."]; *Grace*

18   *United*, 451 F.3d at 657.  Municipalities have a legitimate interest in regulating the

19   location of assembly uses, including churches, so as to avoid or minimize conflicts with

20   other uses. *Vision Church*, 468 F.3d at 1000.

21       The regulations, however, need not be the least restrictive means available for

22   addressing potential problems. *Ward*, 491 U.S. at 797-798.  The "narrow tailoring"

23   requirement is satisfied "so long as the regulation promotes a substantial governmental

24   interest that would be achieved less effectively absent the regulation." *Id.* at 799.  Here,

25   the City's regulations allow Assembly Uses in all residential zones, and prohibit them in

26   commercial and industrial zones only where necessary to further specific goals and

27   policies reflected in the criteria utilized in establishing the Assembly Use Overlay zone.

28   Pollart Decl., ¶ 7; Exhibit 3.  Nothing more is required to satisfy the narrow tailoring

---

21

1  requirement. *See Members of City Council of City of Los Angeles v. Taxpayers for*

2  *Vincent*, 466 U.S. 789, 808, 104 S.Ct. 2118 (1984) [upholding total ban on private signs on

3  public rights-of-way on grounds that "By banning these signs, the City did no more that

4  eliminate the exact source of the evil it sought to remedy."].

5  Zoning regulations also may not "unreasonably limit alternative avenues of

6  communication," meaning that they may not unreasonably restrict the total amount of land

7  available for expressive uses. *City of Renton*, 475 U.S. at 53-54. As discussed previously,

8  Assembly Uses are allowed in over half the total area of the City, and many, many more

9  properties than the apparent demand for religious uses requires. Pollart Decl., ¶ 12;

10  Exhibit 9. The City is not required to guarantee that all of these sites are currently

11  available for sale and development or conversion for churches or other First Amendment

12  uses. *City of Renton*, 475 U.S. at 53-54 ["That respondents must fend for themselves in the

13  real estate market, on an equal footing with other prospective purchasers and lessees, does

14  not give rise to a First Amendment violation."]; *Topanga Press*, 989 F.2d 1524, 1536.

15      C.    *The City Has Not Interfered with The Church's or Its Members Freedom to*

16             *Assemble or Freedom of Association.*

17  The Church's Sixth and Seventh Causes of Action allege in conclusory fashion that

18  the City has deprived the Church of its "right to freely assemble" and "right to freely

19  associate" for the "purposes of religious worship and expression." FAC ¶¶ 109, 112.

20  Again, the Church does not allege that the City has taken any actions to interfere with or

21  deter participation in activities at the Church's current Manor location. These claims

22  therefore fail for much the same reasons as the Church's Free Exercise and Free Speech

23  claims. *See San Jose Christian College*, 360 F.3d at 1033; *Grace Church*, 451 F.3d at 658;

24  *C.L.U.B*, 342 F.3d 752, 765; *Lighthouse Institute*, 406 F.Supp.2d 507, 521-522. While the

25  City has declined to approve a proposed new Assembly Use on the vacant Catalina Street

26  property, this does not violate the Constitution.

27  ///

28  ///

22

    D.    *The City Has Not Denied the Church Equal Protection of the Law.*

    The Church's Eighth Cause of Action asserts a denial of the Church's right to Equal Protection. The claim incorporates and is presumably based on the same allegations as the Church's Equal Terms claim under RLUIPA. FAC ¶¶ 114-115.

    Absent allegations of such invidious intentional discrimination – and none are presented – the Church's Equal Protection claim is reviewed under the rational basis test. *C.L.U.B.*, 342 F.3d at 766; *Congregation Kol Ami v. Abington Township*, 309 F.3d 120, 133 (3rd Cir. 2002). To sustain the claim, the Church must show (1) that it has been treated differently (and less favorably) than other *similarly situated* individuals or entities; and (2) that the dissimilar treatment is irrational, *i.e.* bears no reasonable relationship to a legitimate governmental purpose. *Christian Gospel Church, Inc. v. City and County of San Francisco*, 896 F.2d 1221, 1225-1226 (9th Cir. 1990), *cert den.* 498 U.S. 999 (1990); *Congregation Kol Ami*, 309 F.3d at 133-134, 136-137.

    In light of the previous discussion of the Church's Equal Terms claim, the Church's Equal Protection claims also fail on this basis. The City may rationally distinguish between religious and other assembly uses on the one hand, and commercial recreational and entertainment uses on the other. *See* section III, *supra.* Although the Church complains that the proximity of businesses with HMBPs was not considered in the initial site selection process for the Assembly Use Overlay zone, the Church cannot show any of the following; (1) that its rezoning application was actually rejected on this ground, as opposed to other legitimate grounds; (2) that the City has or will fail to consider HMBPs in other cases involving site-specific applications for Assembly Uses; (3) that consideration of HMBPs was arbitrary and failed to serve any legitimate public purpose.

    E.    *The City Did Not Violate the Church's Right to Due Process.*

    The Church's Ninth and final Cause of Action alleges that the City denied the Church due process of law by (1) denying the Church the use of the Catalina Street property based on vague and indefinite General Plan, zoning and other criteria; and (2) "intentionally prolonging the Assembly Use Permit application process in order to obstruct, delay and

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT          [C07-03605-PJH]

1   prevent the CHURCH's use of the CATALINA property." FAC ¶ 118.  Neither of these

2   claims asserts a legally colorable due process claim, nor is supported by fact.

3       To state any kind of due process claim, the plaintiff must allege the deprivation of

4   some legally protected interest in life, liberty or property.  *Board of Regents of State*

5   *Colleges v. Roth*, 408 U.S. 564, 570-572, 92 S.Ct. 2701 (1972); *Wedges/Ledges of*

6   *California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994); *Prater v City of*

7   *Burnside, Ky.*, 289 F.3d 417, 431-432 (6th Cir. 2002).  The extent of legally protected

8   property rights is generally defined by "existing rules or understandings that stem from an

9   independent source such as state law."  *Roth*, 408 U.S. at 577.  The Church does not have a

10  protected property or liberty interest in constructing religious assembly facilities on the

11  Catalina Street property.  This use of the property has never been legally authorized or

12  actually occurred.  *Wedges/Ledges*, 24 F.3d at 62.

13      The Church here cannot claim a deprivation of property under either a vested rights

14  or entitlement theory.  It is undisputed that the Church's Catalina Street property has never

15  been zoned to allow assembly uses, either with or without a CUP.  Although the Church

16  *applied* for rezoning of the property, rezoning is under California law a purely legislative

17  act.  *Arnel Development Co. v. City of Costa Mesa*, 28 Cal.3d 511, 516, 169 Cal.Rptr. 904

18  (1980).  Legislative decisions are in turn generally constrained by no substantive criteria at

19  all beyond the minimum constitutional requirement that such actions be rationally related

20  to legitimate governmental interests.  *Id.*  The Church therefore clearly has no protected

21  property interest in its applications to rezone the Catalina Street property.

22      While the Church might also conceivably claim a liberty interest in its right to

23  conduct religious activities, any claim based on this theory must also fail.  There is no

24  recognized liberty interest in building a church on property that has never been devoted to

25  such use and has never been zoned for it.

26          1.    *The Vagueness Claim.*

27      The Church's vagueness claim necessarily fails for lack of a protected liberty

28  property interest.  Moreover, the reach of a due process challenge based on the vagueness

24

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                                    [C07-03605-PJH]

702

1   doctrine is inapplicable here.  The concerns implicated by overly vague laws are (1) that
2   they fail to give persons "of ordinary intelligence" fair notice of what the law requires and
3   to conform their conduct accordingly, and (2) they invite arbitrary, subjective and
4   inconsistent enforcement by failing to establish ascertainable standards.  *Village of Hoffman*
5   *Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186 (1982); *Konikov v.*
6   *Orange County, Fla.*, 410 F.3d 1317, 1329-1331 (11th Cir. 2005).  A void-for-vagueness
7   challenge, however, necessarily contemplates a statute or ordinance that directly regulates
8   conduct, and whose violation gives rise to potential loss of life, liberty or property, *i.e.*
9   criminal or civil prosecution.  The due process clause does not restrict the factors that a
10  governmental agency may consider when deciding whether or not *to adopt or amend* an
11  existing regulation, as opposed to apply it to particular conduct.
12          2.      *The Claim for Unreasonable Delay.*
13          The Church's claim for undue delay also fails for lack of a protected liberty or
14  property interest.  There is no constitutional provision that requires a City to meet time
15  limits when considering zoning or rezoning measures.  The record further does not establish
16  any arbitrary or unreasonable delay.  Pollart Decl., ¶¶ 15, 18, 20, 24.  The City was
17  confronted with a major policy issue by the Church's initial application.  It nevertheless
18  moved forth deliberately and completed a major amendment to its existing zoning scheme
19  within one year, and acted upon the Church's subsequent rezoning application in little more
20  time than necessary to process the application, prepared staff reports and notice public
21  hearings.  Pollart Decl., ¶ 20, 24-35.  There is no basis for a claim of unreasonable delay.
22  VI.     *CONCLUSION*
23          In light of the foregoing, City respectfully requests this Honorable Court grant its
24  motion for summary judgment.
25  Dated: August 27, 2008             MEYERS, NAVE, RIBACK, SILVER & WILSON
26
27                                     By_____/s/_____
                                          DEBORAH J. FOX
28                                        Attorneys for Defendant
                                          CITY OF SAN LEANDRO

---

25

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                                    [C07-03605-PJH]