Jayne W. Williams, Esq. (SBN: 63203)
jwilliams@meyersnave.com
Deborah J. Fox, Esq. (SBN: 110929)
dfox@meyersnave.com
Philip A. Seymour (SBN: 116606)
pseymour@meyersnave.com

MEYERS, NAVE, RIBACK, SILVER & WILSON
555 12th Street, Suite 1500
Oakland, California  94607
Telephone: (510) 808-2000
Facsimile: (510) 444-1108

Attorneys for Defendant
CITY OF SAN LEANDRO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL CHURCH OF THE FOURSQUARE GOSPEL,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN LEANDRO, a municipal corporation,<br><br>Defendant.<br><br>FAITH FELLOWSHIP FOURSQUARE CHURCH,<br><br>Real Party in Interest. | Case No.  C07-03605-PJH<br><br>DEFENDANT CITY OF SAN LEANDRO'S REPLY TO OPPOSITION TO CITY'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION OF CLAIMS<br><br>Hearing:<br>Date:        October 1, 2008<br>Time:        9:00 a.m.<br>Courtroom:    3<br><br>Honorable Phyllis J. Hamilton<br>Complaint Filed: 7/12/07 |

1

TABLE OF CONTENTS

2

Page(s)

3  I.  THE CHURCH HAS NOT SHOWN THAT THE CITY'S REFUSAL
4      TO REZONE THE INDUSTRIALLY ZONED CATALINA STREET
       PROPERTY IMPOSES A SUBSTANTIAL BURDEN ON THE
5      EXERCISE OF RELIGION...................................................................... 1

6      A.  RLUIPA Does Not Abolish the Distinction Between Substantial
7          Burdens Imposed on Religion and Incidental Burdens Imposed
           Equally Upon Religious and Non-Religious Entities Affected by
8          Land Use Regulations. ................................................................ 1

9      B.  Existing Ninth Circuit Cases Do Not Support the Church's
10         Substantial Burden Claim. .......................................................... 3

11     C.  The Deposition Testimony of the Church's Real Estate Agent
12         Does Not Create A Triable Issue of Fact as to Whether Alternate
           Sites are Available to the Church.................................................. 7
13
14     D.  The Church Has Produced No Evidence that It Requires a Single
           Large Site to Carry Out Its Religious Mission............................. 10
15
16  II.  THE CITY HAS NOT VIOLATED THE EQUAL TERMS
        PROVISION OF RLUIPA..................................................................... 11
17
18     A.  Assembly Uses Versus Commercial Recreation and
           Entertainment Uses. .................................................................... 11
19
       B.  The "Hazardous Materials Burden." ............................................ 15
20
21  III.  THE CHURCH'S TOTAL EXCLUSION/UNREASONABLE
         LIMITATIONS CLAIM ...................................................................... 16
22
    IV.  COMPELLING INTEREST .................................................................. 17
23
24  V.  THE CHURCH RAISES NO MATERIAL ISSUE PRECLUDING
        SUMMARY JUDGMENT ON ITS CONSTITUTIONAL CLAIMS...................... 18
25
    VI.  CONCLUSION ................................................................................... 20
26

27

28

TABLE OF AUTHORITIES

Page(s)

**Cases**

*City of Renton v. Playtime Theaters, Inc.,*
    475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) ..........................................................19

*Civil Liberties for Urban Believers v. City of Chicago,*
    342 F.3d 752 (7th Cir. 2003)............................................................................... passim

*Grace Church of North County v. City of San Diego,*
    555 F.Supp.2d 1126 (S.D. Cal. 2008) ......................................................................18, 19

*Guru Nanak Sikh Soc. of Yuba City v. County of Sutter,*
    456 F.3d 978 (9th Cir. 2006)............................................................................... passim

*Guru Nanak Sikh Society of Yuba City v. County of Sutter,*
    326 F.Supp.2d 1140 (E.D. Cal. 2003) .........................................................................11

*International Church of the Foursquare Gospel v. City of Chicago Heights,*
    955 F.Supp. 878 (N.D. Ill. 1996) ........................................................................9, 18, 19

*Lighthouse Institute for Evangelism, Inc. v. City of Long Branch,*
    510 F.3d 253 (3rd Cir. 2007) ......................................................................................1

*Love Church v. City of Evanston,*
    896 F.2d 1082 (7th Cir. 1990).....................................................................................9

*Midrash Sephardi, Inc. v. Town of Surfside,*
    366 F.3d 1214 (11th Cir. 2004)........................................................................... passim

*Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County,*
    450 F.3d 1295 (11th Cir. 2006).................................................................................16

*San Jose Christian College v. City of Morgan Hill,*
    2002 WL 971779 (N.D. Cal. 2002)...............................................................................4

*San Jose Christian College v. City of Morgan Hill,*
    360 F.3d 1024 (9th Cir. 2004).............................................................................. passim

*Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin,*
    396 F.3d 895 (7th Cir. 2005).....................................................................................6

ii

1

TABLE OF AUTHORITIES cont.

2

Page(s)

3

**Cases** *cont.*

4

*Ventura County Christian High School v. City of San Buenaventura,*
    233 F.Supp.2d 1241 (C.D. Cal. 2002)...............................................................11

5

6

*Vision Church v. Village of Long Grove,*
    468 F.3d 975 (7th Cir. 2007)..............................................................................2

7

8

*Westchester Day School v. Village of Mamaroneck,*
    504 F.3d 338 (2nd Cir. 2007).........................................................................1, 6

9

10

**Statutes**

11

42 U.S.C. § 2000cc................................................................................2, 12, 17

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I.    *THE CHURCH HAS NOT SHOWN THAT THE CITY'S REFUSAL TO REZONE*

2         *THE INDUSTRIALLY ZONED CATALINA STREET PROPERTY IMPOSES A*

3         *SUBSTANTIAL BURDEN ON THE EXERCISE OF RELIGION*

4         In its opposition, the Church does not challenge any of the central facts underlying

5    the City's request for summary adjudication of the Church's "substantial burden" claim.

6    The Church, for example, does not claim that it has been subjected to any intentional anti-

7    religious discrimination, nor does it deny that religious assembly uses are allowed by the

8    City's zoning code on approximately 54% of the total area of the City.  This includes all

9    property located in residential zones, and 196 additional properties in the City's industrial

10   and commercial zones.  Pollart Decl, ¶¶ 7-12.  The Church's response instead is to attempt

11   to rewrite the concept of "substantial burden," under RLUIPA and controlling case law,

12   and to contend, based on the deposition testimony of its real estate agent Edward Bullock,

13   that no sites other than the industrially zoned Catalina Street property are actually available

14   for the mega facilities that the Church would like to operate.

15        A.    *RLUIPA Does Not Abolish the Distinction Between Substantial Burdens*

16              *Imposed on Religion and Incidental Burdens Imposed Equally Upon*

17              *Religious and Non-Religious Entities Affected by Land Use Regulations.*

18        Apparently sensing the weakness of its position, the Church begins its argument by

19   contending that the Court should ignore past case law and all authorities outside the Ninth

20   Circuit in interpreting the "substantial burden" provision of RLUIPA.  The Church

21   apparently recognizes that the traditional test for defining a "substantial burden" on

22   religion is fatal to its position in this case.  As discussed in the City's opening

23   memorandum, the term "substantial burden" as developed in case law generally does not

24   include burdens, even significant ones, that result incidentally from the neutral

25   enforcement of laws of general applicability, such as zoning ordinances.  *Westchester Day*

26   *School v. Village of Mamaroneck*, 504 F.3d 338, 350 (2nd Cir. 2007); *San Jose Christian*

27   *College v. City of Morgan Hill*, 360 F.3d 1024,1030-1031 (9th Cir. 2004); *Lighthouse*

28   *Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 275-275 (3rd Cir.

1    2007). Further, as both RLUIPA case law and legislative history materials demonstrate,

2    the term "substantial burden" in RLUIPA is intended to be construed to have the same

3    meaning as in case law applying the Free Exercise Clause of the First Amendment. *Guru*

4    *Nanak Sikh Soc. of Yuba City v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006);

5    *Vision Church v. Village of Long Grove*, 468 F.3d 975, 996-997 (7th Cir. 2007); *Civil*

6    *Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 760-761 (7th Cir. 2003)

7    ("*C.L.U.B.*"). RLUIPA modifies the traditional test only in that it expands the test to apply

8    to all aspects of the religious exercise, including the use of land for religious purposes, and

9    not merely to religious practices deemed central to the faith. 42 U.S.C. § 2000cc-5(7).

10    The Church contends that this Court should disregard the distinction between

11    substantial burdens and incidental burdens resulting from laws of general applicability

12    because this aspect of the "substantial burden" test has not been specifically addressed in

13    either of the two published Ninth Circuit cases applying RLUIPA. This head-in-the-sand

14    approach, however, is neither tenable nor ultimately helpful to the Church.

15    Although neither of the Ninth Circuit's current RLUIPA decisions specifically rely

16    on the concept of incidental burdens on religion, it is also clear that neither holds that

17    RLUIPA was intended to rewrite the traditional substantial burden test. Instead, as the

18    Court noted in *Guru Nanak Sikh Soc. of Yuba City v. County of Sutter*, 456 F.3d 978, 988,

19    "The Supreme Court's free exercise jurisprudence is instructive in defining a substantial

20    burden under RLUIPA." The Court then cited with approval the decisions of other circuits

21    which have expressly noted that the substantial burden test under RLUIPA is intended to

22    be interpreted in light of prior case law interpreting the term substantial burden in the Free

23    Exercise context. *Id*. at 988 and fn 11, citing *Midrash Sephardi, Inc. v. Town of Surfside*,

24    366 F.3d 1214, 1226 (11th Cir. 2004); and *C.L.U.B.*, 342 F.3d at 760-761. Moreover, the

25    legislative history of RLUIPA, which the Church is fond of quoting only when convenient

26    to its purposes, also makes it clear that the substantial burden provision of RLUIPA is

27    intended to essentially codify the traditional test. City Request for Judicial Notice, Exhibit

28    A, p. 009.

1    The Church's request that Ninth Circuit RLUIPA case law be considered in splendid

2    isolation is further undercut by the fact that the Ninth Circuit itself has relied on cases from

3    other circuits in interpreting RLUIPA. *See San Jose Christian*, 360 F.3d at 1035, citing

4    *C.L.U.B.*, 342 F.3d 752; *Guru Nanak*, 456 F.3d at 988-990 [citing various Seventh Circuit,

5    Eleventh Circuit and district court cases]. In doing so, the Ninth Circuit has also generally

6    aligned itself with those circuits that have held that the denial of use of a particular site for

7    valid zoning reasons does not amount to a substantial burden on religion, so long as the

8    municipality has not precluded or unreasonably limited opportunities for the use of other

9    sites in its jurisdiction. *See C.L.U.B.,* 342 F.3d 752, 760-761; *Midrash*, 366 F.3d 1214,

10   1227, fn 11. Significantly, in *Midrash*, a case which the Church elsewhere cites with

11   approval, the court took a clear position that alleged practical unavailability of alternate

12   sites does not create a government-imposed substantial burden on religion if the government

13   itself has not made such sites legally unavailable. The *Midrash* court noted "[t]hat the

14   congregations may be unable to find suitable alternative space does not create a substantial

15   burden within the meaning of RLUIPA. As the Seventh Circuit noted, 'whatever specific

16   difficulties [the plaintiff church] claims to have encountered, they are the same ones that

17   face all [land users], not merely churches.'" *Midrash*, 366 F.3d at 1227, fn. 11.

18   The fact that the Ninth Circuit has not expressly addressed and adopted the

19   arguments advanced by the City in this case hardly means that these arguments are

20   inconsistent with the law of this circuit. The simple fact is that RLUIPA is a relatively

21   new, and somewhat esoteric, statutory scheme, and case law construing its provisions is

22   relatively sparse and developing, even when decisions of all federal circuits are taken into

23   account. The Ninth Circuit's two existing RLUIPA decisions can hardly be deemed to

24   definitively address all major issues the Court may face here.

25   B.    *Existing Ninth Circuit Cases Do Not Support the Church's Substantial*

26         *Burden Claim.*

27   The second major problem with the Church's purported reliance on Ninth Circuit

28   case law is that these cases actually do not help the Church.

3

1     The Church contends that it has "avoided the pitfalls of the plaintiffs in *San Jose*

2   *Christian College* by securing the City's full and final denial" of its rezoning and CUP

3   applications.[1]   Opposition Memorandum, p. 4:7-9.  The Church simply ignores, however,

4   the larger factual setting and legal issues addressed in *San Jose Christian*.  Although the

5   plaintiff's application was denied in part on procedural grounds, *i.e.*, the lack of a complete

6   application, the District Court decision discloses that the plaintiff's rezoning request was

7   rejected on several additional grounds, including the city's preference that the property be

8   reserved for hospital use.  *San Jose Christian College v. City of Morgan Hill*, 2002 WL

9   971779, p. 1 (N.D. Cal. 2002).  As the Ninth Circuit noted in its decision, the city actually

10  convened a task force to consider future options for the property while the plaintiff's

11  application was pending, and the task force ultimately recommended that the proposed site

12  remain zoned exclusively for hospital use.  *San Jose Christian*, 360 F.3d at 1029.  The

13  Ninth Circuit addressed this ground for denial by noting "... while the PUD ordinance may

14  have rendered College unable to provide education and/or worship at the Property, there is

15  no evidence in the record demonstrating that College was precluded from using other sites

16  within the city."  *San Jose Christian*, 360 F.3d at 1035.  The Ninth Circuit also cited with

17  approval the Seventh Circuit's decision in *C.L.U.B.*, 342 F.3d 752, which found that the

18  denial of use permits for various churches did not impose a substantial burden under

19  RLUIPA where other sites were potentially available.  *San Jose Christian*, 360 F.3d at

20  1035.  *San Jose Christian* thus clearly does not support the Church's position that a

21  substantial burden may be claimed simply by showing that the plaintiff has received a

22  definitive denial of an application for use of one particular property.

23  ///

24

25  ―――――――――――――――

 [1]   The First Amended Complaint contains no reference to a CUP application by the

26  Church.  Any issues pertaining to the CUP denial are thus not properly before the Court for
    purposes of this motion.  As a point of fact, the Church did file a CUP application for use

27  of the Catalina Street property, and the CUP was denied on the ground that religious
    assembly uses were not allowed on the property with or without a CUP.  Pollart Decl., ¶

28  48.  The denial of the CUP application thus adds nothing to the Church's claims.

4

1    *Guru Nanak*, 456 F.3d 978, deals with a dramatically different factual situation than

2    presented in this case. As the Ninth Circuit made clear in its decision, a substantial burden

3    was found in *Guru Nanak* based on a sustained course of conduct by the defendant county

4    that indicated that the church's options for successfully locating a church anywhere in the

5    County boiled down to "*a few scattered parcels* that the County may or may not ultimately

6    approve." *Id.* at 992; emphasis added. The substantial burden experienced by the plaintiff

7    religious sect in *Guru Nanak* thus resulted from the cumulative effect of two sequential

8    denials of applications to use two separate properties, plus the substantial likelihood of

9    rejection, with attendant additional costs and delays, of any further applications.

10    Unlike the Church in this case, the plaintiff in *Guru Nanak* did not demand a rezoning

11    of land where churches were not already allowed, nor did it seek special accommodation for

12    a church of extraordinary size. Instead, the plaintiff first applied for a conditional use permit

13    (CUP) to allow a 5,000 square foot temple for its 75 person Sikh congregation on 1.89 acres

14    of residential land, where churches and temples were already allowed with a CUP. The

15    County Planning Commission denied the application, against the recommendation of its

16    professional planning staff, based on neighborhood concerns over noise and traffic; in other

17    words, the same type of objections that might be raised in any residential area. *Guru Nanak*,

18    456 F.3d at 983. The plaintiff then found a 28.79 rural parcel, seemingly well buffered from

19    any possible neighbor concerns, on land zoned for agriculture, where churches and temples

20    were also permitted with a CUP. The planning commission approved the CUP by a 4-3 vote

21    with various conditions agreed to by the plaintiff that would have eliminated any possible

22    significant environmental effects. The Board of Supervisors nevertheless denied the permit

23    on appeal based on alleged conflicts with neighboring agricultural uses and concerns over

24    "leapfrog development." *Id.* at 983-984.

25    With this background, the Ninth Circuit found that the County had imposed a

26    substantial burden on the plaintiff based on two considerations: "(1) that the County's

27    broad reasons given for its tandem denials could easily apply to all further applications by

28    Guru Nanak; and (2) that Guru Nanak readily agreed to every mitigation measure

5

1 suggested by the Planning Division, but the County, without explanation, found such

2 cooperation insufficient." *Id.* at 989. The decision goes on to discuss in detail the

3 contradictory rationales given by the County for rejection of the plaintiff's successive

4 applications.

5      It is clear that *Guru Nanak* falls within the class of cases that have found a

6 substantial burden based on essentially arbitrary or discriminatory nature of the

7 defendants' actions. *See Westchester Day School*, 504 F.3d 338, 350-351; *Sts. Constantine*

8 *and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900-901 (7th

9 Cir. 2005). The plaintiff in *Guru Nanak* was presented with a classic Catch-22 which

10 effectively eliminated any chance of actually locating its church anywhere in Sutter

11 County. If it attempted to locate in a residential zone, its application would be denied due

12 to impacts on neighboring residents. If it attempted to locate away from established

13 residential areas, the application would be denied due to potential conflicts with agriculture

14 or concerns over "leapfrog" development. *Guru Nanak*, 456 F.3d at 991. Further, the

15 County's stated rationales for denial appeared to lack any substantial factual basis. The

16 applicant had agreed to comply with a range of conditions crafted by the County's own

17 professional planning staff to mitigate all potential impacts of the project such as noise or

18 interference with neighboring agricultural uses. *Id.* These results were not merely the

19 incidental effect of a neutral application of County zoning laws, but the apparent result of

20 the County's unwillingness to approve religious assembly uses in practice, even in areas

21 where they were permitted by the zoning code.

22      The Church does not attempt to explain how the extreme facts of *Guru Nanak* are in

23 any way analogous to those of this case. While it is true that the City has made it clear that

24 it will not approve religious assembly use of the Catalina Street property, this property has

25 never been zoned for any type of assembly use. The City's response to the Church's initial

26 application also did not trigger any apparent attempt to impose more stringent

27 requirements on church uses. Instead, the City's response was to significantly expand

28 opportunities for churches to locate in City commercial and industrial areas, albeit not at

6

1   the Catalina Street site preferred by the Church.  The Church also does not explain how the

2   rejection of one single proposed site could be deemed "to a significantly great extent have

3   lessened the possibility" of locating an alternate site or sites for Church expansion.

4   Obviously it has not.  The Church has produced no evidence that the City would refuse to

5   actually approve church use of another reasonable site actually zoned to permit such use in

6   the City.  The Church's reliance on *Guru Nanak* is thus badly misplaced.

7       C.    *The Deposition Testimony of the Church's Real Estate Agent Does Not*

8             *Create A Triable Issue of Fact as to Whether Alternate Sites are Available to*

9             *the Church.*

10          The Church also contends that, despite the legal availability of numerous properties

11  in the City for assembly uses, no sites suitable for the Church's needs other than the

12  Catalina Street property are actually "available."  The sole evidence offered for this

13  proposition is the deposition testimony of the Church's real estate agent Edward Bullock.

14  Declaration of Kevin Snyder, Exhibit 2.  This "evidence," such as it is, is insufficient to

15  create a triable issue of fact.  The cited testimony contains virtually no concrete

16  information justifying Bullock's disqualification of sites, and no information *at all* as to

17  why the great majority of the 196 properties in the City's Assembly Use Overlay zone

18  were deemed unacceptable.  Bullock rejected some sites simply because they were in "less

19  desirable industrial and commercial locations."  Exhibit 2 to Snider Declaration, p. 6:19 –

20  7:10.  As discussed in the City's opposition to the Church's cross-motion for summary

21  judgment, additional testimony in the Bullock deposition discloses that Bullock's selection

22  criteria are so narrowly circumscribed as to make the testimony essentially worthless in

23  determining whether a reasonable number of other sites are potentially available to the

24  Church, assuming the Church was willing to be even moderately flexible in its demands.

25  *See* City of San Leandro's Opposition to Plaintiff and Real Party in Interest's Motion for

26  Summary Judgment, pp. 13:22 – 14:5.

27          The Church's desire to have a site hand-picked to meet its preferences is

28  understandable.  It does not follow, however, that having to settle for a less optimal site or

7

1  less visually pleasing setting amounts to a substantial burden on the Church's practice of

2  religion. As the courts have recognized, there is a big difference between regulatory

3  impacts which merely inconvenience the practice of religion and those that impose a

4  substantial burden on religion in any constitutional sense. "[F]or a land use regulation to

5  impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great extent.'

6  That is, a 'substantial burden' on 'religious exercise' must impose a significantly great

7  restriction or onus upon such exercise." *Guru Nanak*, 456 F.3d at 988, quoting *San Jose*

8  *Christian College*, 360 F.3d 1024, 1034. A "substantial burden" is thus one which

9  "exert[s] substantial pressure on an adherent to modify his behavior and to violate his

10 beliefs." *Id.*; *see also Midrash*, 366 F.3d 1214, 1226 ["significant pressure which directly

11 coerces the religious adherent to conform his or her behavior accordingly."]; *C.L.U.B.*, 342

12 F.3d 752, 761. Mere inconveniences or the prospects of a less than prime real estate

13 location do not constitute substantial burdens on religion. *See, e.g., Midrash*; 366 F.3d

14 1214, 1227-1228.

15      The Church also contends that sites that are currently occupied or not currently for

16 sale cannot be considered available alternative sites for purposes of considering the

17 burdens imposed by the City's land use regulation. In pursuing this argument, however,

18 the Church is essentially asking the Court to transform RLUIPA from a statute which

19 protects Church's from unfair discrimination into one which requires states and local

20 governments to grant churches immunity from local market conditions, a special

21 consideration afforded to no other type of development. The Church, however, does not

22 cite any authority suggesting that hardships imposed on churches by the realities of the

23 market place must be treated as burdens imposed by government regulation. Case law is

24 the opposite. Absent some showing that the government has arbitrarily and unreasonably

25 limited opportunities for religious institutions to compete in the real estate market place, or

26 imposed costs on religious uses that are not normally borne by persons seeking to buy

27 property for comparable nonreligious assembly or institutional purposes, the unavailability

28 of land due to current market conditions is not a government imposed burden on religion.

8

1   *See Midrash*, 366 F.3d 1214, 1227 fn 11, quoting *Love Church v. City of Evanston*, 896

2   F.2d 1082, 1086 (7th Cir. 1990) ["The harsh realities of the marketplace sometimes dictate

3   that certain facilities are not available to those who desire them."]; *International Church of*

4   *the Foursquare Gospel v. City of Chicago Heights*, 955 F.Supp. 878, 880 (N.D. Ill. 1996)

5   ["Additional expense, at least so long as it is not an inflated expense not imposed upon

6   most landowners, is not a substantial burden"]. As a practical matter, the Church also

7   cannot reasonably contend that the validity of the City's zoning scheme depends upon how

8   many and what type of properties are available for immediate purchase on any given day.

9   Neither can it reasonably claim that the City is responsible for the fact that the majority of

10  properties that the Church might actually consider suitable for its purposes are already

11  occupied by other users, including possibly other churches.

12       As a final matter, the Church claims that the deposition testimony of City Manager

13  John Jermanis creates a triable fact as to whether alternate locations for the Church are

14  available. The cited testimony reads as follows:

15       Q.   Okay. And in looking at the whole issue of Faith Fellowship Church,

16       are you aware of any locations within San Leandro which would – which –

17       any buildings within San Leandro which they could acceptably locate."

18       A.   No.

19  Deposition Transcript, pages 51:23 – 52:2, attached as Exhibit 1 to the Snider Declaration,

20  pp. 5-6.

21       Jermanis' testimony simply reflects the facts that there appear to be no other

22  properties of any type in San Leandro with ready-made buildings that meet all the

23  Church's stated requirements. The testimony does not suggest that there are no other sites

24  that are objectively reasonable alternatives for churches generally, or even for the plaintiff

25  Church if it were willing to adjust its demands in light of the choices available to it. The

26  Church's reliance on this testimony further demonstrates the fundamental problem with its

27  entire line of argument. If the Church's position were correct, it would not matter how

28  much land a City zoned for religious assembly uses in the entire City, so long as the one

1   parcel left unavailable for church use had a building on it that the Church deemed uniquely

2   suited for its needs.  RLUIPA does not require state and local governments to go to this

3   extreme.

      D.    *The Church Has Produced No Evidence that It Requires a Single Large Site*

4

5   *to Carry Out Its Religious Mission.*

6         The Church lastly attempts to buttress its arguments by contending that "not being

7   able to worship together at one venue on Sunday poses a substantial burden on the

8   religious exercise of the Church."  Opp. Memorandum at pp. 9:21-13:2.  This argument is

9   apparently offered in response to the City's observation that crowding at the Church's

10  current location could be alleviated simply by opening a second smaller church in the City,

11  and/or relocating some of the Church's ancillary programs to other locations.  The Church

12  appears to contend that the "core precepts" preclude this type of practical adaptation to

13  increased demand for church space, and instead require all Church members to gather at a

14  single large facility, *i.e.*, the proposed Catalina Street property, to conduct "corporate

15  worship."  Opp. Memorandum, p. 10.

16        The first problem with this argument is that it is not supported by the Church's own

17  evidence.[2]  While the deposition testimony and declarations cited by the Church clearly

18  establish that group worship is a core Church practice, none of the testimony even suggests

19  that gathering *all* the Church's members in the same place at the same time is important or

20  significant to the Church's mission.  The evidence actually shows the opposite.  The

21  Church does not dispute that it currently conducts three separate Sunday services.  Opp.

22  Memorandum, p. 12:13-14.  The Church does not contend that this practice will cease if it

23  is allowed to use the Catalina Street site.  Moreover, the Church's own plans for the

24  Catalina Street site disclose that less than one quarter of the space at the Catalina Street site

25  would actually be used for worship services.  Exhibit 23, p. 479.

26

27           [2] While, as the Church contends, it may not be within the province of the Court to pass

28  judgment on the "legitimacy" of the Church's beliefs, it certainly is within the province of
the Court to determine whether the evidence establishes the existence of such a belief.

10

1    In his declaration supporting the Church's cross-motion for summary judgment,

2  Church Pastor Gary Mortara also discloses that the Church already has a practice of

3  assigning congregants from other areas to smaller congregations located outside of San

4  Leandro when this is convenient for the Church or for the congregants.  Declaration of

5  Senior Pastor Gary Mortara in Support of Motion for Summary Judgment, p. 5, ¶ 19.

6  These facts refute any claim that the Church's religious beliefs require it to have a single

7  church of massive size in order to be able to adhere to its faith.  While turning away

8  congregants or potential congregants from services at its existing facilities may indeed now

9  occur at the Church, there is no evidence suggesting that this fact could not be alleviated

10  by the expedient (and likely less costly) alternative of simply opening a second smaller

11  church facility in the City rather than insisting upon the creation of a mega church on

12  industrial land.

13  II.    *THE CITY HAS NOT VIOLATED THE EQUAL TERMS PROVISION OF RLUIPA*

14        A.    *Assembly Uses Versus Commercial Recreation and Entertainment Uses.*

15    The Church does not appear to disagree that its first Equal Terms claim is a facial

16  challenge rather than an as-applied challenge to the City's zoning ordinances.  The Church

17  nevertheless makes no attempt to explain how the commercial entertainment and

18  recreational uses specifically allowed by the relevant sections of the City zoning code are

19  "similarly situated" to religious assembly or institutional uses.  This alone is sufficient to

20  defeat the Church's Equal Terms claim.  *Ventura County Christian High School v. City of*

21  *San Buenaventura*, 233 F.Supp.2d 1241, 1247 (C.D. Cal. 2002); *Guru Nanak Sikh Society*

22  *of Yuba City v. County of Sutter*, 326 F.Supp.2d 1140, 1155 (E.D. Cal. 2003).

23    The Church does advance two basic arguments as to why commercial entertainment

24  and recreational uses should be considered "assemblies" or "institutions" for purposes of

25  RLUIPA, even if they are not "similarly situated" to religious assembly uses.  Both of

26  these arguments are copied from the Church's own cross-motion for summary judgment,

27  and fail for the reasons addressed in the City's opposition to that motion.  At the risk of

28  repetition, the City's arguments will be reiterated here.

11

The Church's main argument is purportedly based on the legislative history of RLUIPA. The Church specifically cites certain passages in the legislative history for the proposition that "recreation centers" and "places of amusement" were deemed by Congress to be similar to religious assembly uses or institutions. The cited passages, however, come from a section of House Report No. 106-219, entitled "Summary of Hearing Testimony," which summarizes testimony heard by the House on alleged discrimination against religious uses. *See* H.R. Rep. 106-219 pp. 18-24, City Request for Judicial Notice ("RFJN"), Exhibit B, pp. 39-43. There is obviously a considerable distance between the opinions of partisans testifying before Congress and the actual intent of the lawmakers who approve the final version of a statute. The general purpose of the discussion cited by the Church is not to explain the intent of statutory language, but rather to set forth the basis for concluding that: (1) there was allegedly widespread intentional discrimination against churches in land use regulation; and (2) such discrimination is often shielded from detection by the excessive discretion enjoyed by zoning officials. H.R. Rep. 106-219, pp. 23-24, RFJN, Exhibit B, pp. 42. The discussion does not purport to define precisely the parameters of which types of land uses should be considered sufficiently similar to religious uses to invoke equal treatment. Moreover, if the Church contends that the cited passages are evidence of Congress' interpretation of the terms "assembly" and "institution" as used in section 2000cc(b)(1), the argument proves far too much. Among the examples of supposed discrimination against churches cited in the hearing testimony are instances in which churches were allegedly treated differently than museums, municipal buildings, a flower shop, bank, an office building with an auditorium, and a former department store, to say nothing of theaters, funeral parlors and unspecified "recreational uses." H.R. Rep. 106-219, pp. 19-22; RFJN Exhibit B, pp. 40-42. Nothing in the actual summary of the bill and its purposes found elsewhere in the Report suggests that Congress intended to equate the terms "assembly" and "institution" in 42 U.S.C. § 2000cc(b)(1) with such a vast array of divergent uses. *See* H.R. Rep. 106-219 p. 17, RFJN, Exhibit B, p. 39. As discussed in the City's opening memorandum, the prevailing

1   rule is that words employed in a statute will be construed in light of their common and

2   ordinary meanings, absent clear indications of intent to the contrary.[3] *San Jose Christian,*

3   360 F.3d 1024, 1034. It simply strains credibility that Congress would have selected the

4   terms "assembly" and "institution" to describe common commercial uses which typically

5   resemble religious assemblies about as much as a church bingo game resembles a Las

6   Vegas casino.

7        The Church also purports to find support for its position in *Midrash,* 366 F.3d 1214,

8   1230-1231. The court in *Midrash* noted that at least one dictionary definition of the term

9   "assembly" includes "a company of persons collected together in one place [usually] and

10  usually for some common purpose (as deliberation and legislation, worship, *or social*

11  *entertainment*"). *Id.* at 1230, emphasis added. Based on this, the court went on to

12  conclude that private clubs, as defined by the defendant city's zoning ordinance, qualified

13  as a form of "assembly." The ordinance in question specifically defined a private club as

14  "a building and facilities or premises, owned and operated by a corporation, association,

15  person or persons for social, educational or recreational purposes, *but not primarily for*

16  *profit and not primarily to render a service which is customarily carried on as a business.*"

17  *Id.* at 1231, emphasis changed from original. The *Midrash* court concluded that this

18  definition "comports with the natural and ordinary understanding of 'assembly' as a group

19  gathered for a common purpose." *Id.* In other words, and contrary to the Church's

---

[3] Somewhat amazingly, the Church has filed separate objections to the City's Request for Judicial notice of the dictionary meanings of the terms "assembly" and "institution." See Plaintiff and Real Party in Interest's Objections to Defendant's Request for Judicial Notice of Exhibits 32-33. Given that the sole legal authority cited by the Church also relied on dictionary definitions, this objection cannot be well taken. *See Midrash,* 366 F.3d 1214, 1230. The Church nevertheless argues that "legislative intent" controls the proper definitions of these terms, and that "legislative intent" must be determined from the legislative history. The Church, of course, has it backwards. It is well settled that analysis of legislative intent begins with the words of the statute itself, and that statutory language is normally to be construed in light of the common and ordinary meaning of the words employed. *San Jose Christian,* 360 F.3d 1024, 1034. Only when the language is ambiguous or leads to improbable results is it appropriate to turn to legislative history materials for further illumination. *Id.*

1    representations, the *Midrash* court concluded that for-profit commercial businesses

2    generally do not qualify as assembly uses.  It may be noted that the definition found in the

3    Chicago ordinance is entirely consistent with the distinction between Assembly Uses and

4    Commercial Recreation and Entertainment Activities drawn by San Leandro here.  Exhibit

5    2, pp. 8, 9, 10.

6         The fundamental problem with the Church's interpretation of *Midrash* and the

7    legislative history of RLUIPA is that the Church focuses on the terms "social" and

8    "recreational" purposes and ignores the group or collective context denoted by the term

9    "assembly."  While a movie theater, restaurant or hockey rink may indeed collect a large

10   assemblage of persons, the defining characteristic of such uses is that they are not group

11   organizations, but activities conducted for private profit.  The customers of such

12   enterprises are not members of an organization or society, nor sharers of any common

13   communal goals or interests.  Rather, they are simply individuals whose only similarity is

14   that they have paid the price of admission.

15        The Church also weakly argues that the definitions of "Assembly Building" found

16   in the California Uniform Building Code should be deemed to define the term "assembly"

17   for purposes of RLUIPA.  If accepted, this definition would make religious assemblies or

18   nonreligious fraternal organization the equivalents of such diverse uses as restaurants, bars,

19   schools, and bus stations, provided the facilities served 50 or more persons at a time.  Opp.

20   Memorandum, p. 16:1-3.  Such uses would not qualify as assemblies, however, if the

21   congregation, membership or guest capacity was less than 50 persons.

22        Somewhat inconsistently, the Church also argues that the definition of "Assembly

23   Building" found in the California Industrial Relations Code should be controlling.  If

24   accepted, however, the definition of assembly would extend to movie theaters with a

25   capacity of 10 or more persons, but only if open to the public.  Opp. Memorandum, p.

26   16:5-10.  This definition would thus exclude precisely the type of private clubs or lodges,

27   *i.e.*, a film-buffs society, found to constitute a form of assembly use in *Midrash,* 366 F.3d

28   at 1031, and other cases construing the Equal Terms provisions of RLUIPA.

1    The definitions of "assembly building" found in California administrative codes were

2  obviously crafted to address certain structural requirements and safety issues, common to

3  any large gathering of persons in a single room, and having nothing to do with religious

4  versus nonreligious uses.  For obvious reasons, the Church does not provide any evidence

5  that these technical definitions were contemplated by Congress when it enacted RLUIPA.

6    B.    *The "Hazardous Materials Burden."*

7    The Church begins its argument on the subject of the "hazardous materials burden"

8  by accusing the City of "backpedaling" on the City's prior administrative decisions.

9  However, while the Church correctly notes that this issue was mentioned in the Planning

10  Commission's findings, it points to no evidence in the record indicating that the City

11  Council, the City's final decisionmaking body, actually considered this issue significant.

12  Compare *Guru Nanak,* 456 F.3d at 984 [discussing comments by Board of Supervisors

13  members disclosing basis for rejection of CUP application].  Perhaps more to the point, the

14  Church cites no evidence that the other two reasons cited by the Planning Commission and

15  staff for rejection of the Church's rezoning application were in any way pretextual.  At a

16  minimum, then, the Church has failed to provide any basis for concluding that so-called

17  imposition of the "hazardous materials burden" was the actual cause for rejection of the

18  rezoning application.

19    The Church also fails to provide any reasoned argument as to why consideration of

20  the proximity of hazardous materials business plans (HMBPs) was improper in connection

21  with the Church's application for rezoning of an individual parcel.  As explained in the

22  City's opening memorandum and supporting declaration of Debbie Pollart, not every

23  conceivable decisionmaking factor was considered at the time the Assembly Use Overlay

24  zone was created.  Pollart Decl., ¶¶ 31, 36, 44.  This does not mean that additional factors

25  could not or should not have been considered before the City approved the rezoning of an

26  additional individual parcel into the Assembly Use Overlay zone.  The rezoning requested

27  by the Church was clearly just the first step toward the filing of a CUP application in which

28  the Church would be required to expend additional time and money if it wished to operate a

15

1   church on the site.  If public health and safety issues such as possible exposure to hazardous

2   material releases were ever going to be considered – as they certainly would have to be at

3   the time of any CUP application – the City would have done the Church no favors by

4   simply ignoring the issue at the time of rezoning only to have it addressed at the CUP phase.

5          As a purely legal matter, the Church's "hazardous materials burden" argument fails

6   because the Church cannot show that it has been treated differently than any similarly

7   situated applicant, *i.e.*, that the City failed to consider possible hazardous material impacts

8   at the time it approved some other application for rezoning into the Assembly Use Overlay

9   zone. *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d

10  1295, 1311 (11th Cir. 2006).

11         On a practical and policy level, the Church's "hazardous materials burden"

12  argument also must fail because it leads to absurd results.  The Church apparently would

13  contend that consideration of *any* new site-specific criteria after a general rezoning

14  measure would violate the Equal Terms provision of RLUIPA.  The argument, to say the

15  least, proves too much.  If accepted, the argument means that the City could never consider

16  possible hazardous material dangers to an assembly use, even if the proposed site turned

17  out to be contaminated with toxic wastes or located next to an aging natural gas tank farm

18  or chemical manufacturing plant.  As another example, the record indicates that the City

19  did not consider the parking capacity of individual parcels at the time it selected the 196

20  properties included in the Assembly Use Overlay zone.  Instead, it sensibly assumed that

21  such factors would be considered at the time the City received individual development

22  applications.  This does not mean it would be unlawful under RLUIPA to consider parking

23  capacity at the time the City received an application for a rezoning or for a CUP for a

24  particular assembly use.

25  III.   *THE CHURCH'S TOTAL EXCLUSION/UNREASONABLE LIMITATIONS CLAIM*

26         The Church does not offer any explanation as to why the range of sites available for

27  religious assembly uses in the City is unreasonable by any objective standard.  The

28  Church, for example, does not dispute that 45 churches already exist in the City, that

16

1　approximately 54% of the City's entire land area is available for religious assembly uses,

2　or that there is no apparent unmet demand for church space other than that – such as it is –

3　asserted by the Church.  Pollart Decl., ¶¶ 5-12.  The Church nevertheless argues that "all

4　the facts" show that there is "no suitable, available locations" in the City that would

5　accommodate the particular needs and desires of the Church.  "All the facts" apparently

6　means the deposition testimony of Edward Bullock critiqued above, which does not

7　purport to address the availability of land for any religious use other than that meeting the

8　specific demands of the Church.  As noted there, Bullock's criteria include rejection of

9　sites deemed "undesirable" because they were "dilapidated" or "in need of maintenance

10　and repair."  Exhibit 2 to Snider Declaration, p. 7:1-5.

11　　　　There is nothing in the text or history of 42 U.S.C. § 2000cc(b)(3) that suggests that

12　an "unreasonable limitation" for the purposes of this section was to be measured against

13　the alleged particular needs or subjective desires of a single church.  The section, by its

14　terms, provides that local governments shall not implement any land use regulation that

15　"unreasonably limits religious assemblies, institutions or structures [all in the plural] *within*

16　*a jurisdiction*."  42 U.S.C. § 2000cc(b)(3)(B).  The Church offers no evidence on the

17　overall availability (or lack thereof) of land for churches generally in the City, and thus has

18　raised no triable issue of fact on this cause of action.

19　IV.　　*COMPELLING INTEREST*

20　　　　The question of whether the City's actions furthered a compelling governmental

21　interest and were the least restrictive means of doing so become material only if the Court

22　determines that the Church has met its burden of showing a triable issue of fact as to

23　whether the City has imposed a substantial burden on the Church's exercise of religion, or

24　has violated the Equal Terms provisions of RLUIPA.  *C.L.U.B.*, 342 F.3d at 760 [plaintiff

25　must "first demonstrate that the regulation at issue actually imposes a substantial burden

26　on religious exercise"].

27　　　　The Church suggests that the City's stated interest in preserving land for industrial

28　use can *never* constitute a compelling governmental interest.  Opp. Memorandum, citing

1 *Grace Church of North County v. City of San Diego*, 555 F.Supp.2d 1126, 1140 (S.D. Cal.

2 2008). The authority cited by the Church, however, does not support this proposition. The

3 holding of *Grace Church* was simply that the claim of a compelling interest must be

4 demonstrated with respect to the particular facts of the case, not by reference to general

5 propositions. *Id.* at 1140. As the Church is well aware from its own experience, courts

6 have previously found that a local government's interest in preserving an adequate

7 economic base may be compelling. *See International Church of the Foursquare Gospel v.*

8 *City of Chicago Heights*, 955 F.Supp. 878, 881 (N.D. Ill. 1996). As the court there noted,

9 a city "must create an economic underpinning." *Id.* Without a minimal level of industrial

10 activity, there will not only be no employment for churchgoers and non-churchgoers alike,

11 but also no commercial food processing, no manufactured clothing, no building materials

12 or furnishings, nor any of the myriad of other goods necessary to maintain society.

13         Whether a city can show that its interests in preserving industrial land are

14 compelling in the specific circumstances of a particular case ultimately depends on the

15 facts of the case. An overabundance of such land or the ready availability of alternate sites

16 may militate against such a finding. Here, however, the City has introduced specific

17 evidence that the Church's Catalina Street property is uniquely qualified to further the

18 City's long-term interests in preserving an adequate industrial base in the City. Exhibit 28,

19 p. 518, lines 10-19; Exhibit 29, p. 526 lines 6-28, pp. 529, line 18 – 530, line 10. The

20 Church has not rebutted this evidence in any way. Neither does the Church suggest any

21 less drastic action than denying its rezoning application that would have equally well

22 served the City's interest in preserving the Catalina Street property for industrial use. On

23 the evidence presented, the City is entitled to summary judgment on this issue.

24 V.    *THE CHURCH RAISES NO MATERIAL ISSUE PRECLUDING SUMMARY*

25        *JUDGMENT ON ITS CONSTITUTIONAL CLAIMS*

26         The Church offers only token argument in support of its constitutional claims. For

27 all practical intents and purposes, these claims must be deemed conceded. The Church

28 nowhere cites specific evidence supporting its constitutional claims, nor does it address the

18

1    specific elements of any of its constitutional claims or the case law distinguishing these

2    elements and the governing standards of review that distinguish these claims from the

3    Church's RLUIPA claims.  In particular, the Church makes no attempt to explain how the

4    City's actions might fail the test for time, place and manner restrictions of speech and

5    assembly which govern its Fifth through Seventh Causes of Action, nor how the City

6    might fail the rational basis test that governs the Church's Eighth and Ninth Causes of

7    Action for denial of Equal Protection and Due Process.

8        Somewhat predictably, the Church takes umbrage with the invocation of case law

9    governing regulation of sexually-oriented businesses, *i.e.*, *City of Renton v. Playtime*

10   *Theaters, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).  The Church fails to

11   note, however, that use of the *Renton* test has been specifically mandated by the Ninth

12   Circuit and other circuits adjudicating religious free speech challenges to zoning

13   regulations.  *San Jose Christian*, 360 F.3d 1024, 1032-1033; *Grace United Methodist*

14   *Church v. City of Cheyenne*, 451 F.3d 643, 657 (10th Cir. 2006); *International Church of*

15   *the Foursquare Gospel v. City of Chicago Heights*, 955 F.Supp. 878, 880.

16       The Church also argues that the City cannot "use broad and discretionary land use

17   rationales as leverage to select the precise parcel of land where a religious group can

18   worship."  Opp. Memorandum, p. 22:4-6, quoting *Guru Nanak*, 456 F.3d at 992, fn. 20.

19   The quoted language, however, addresses RLUIPA, not the separate requirements of the

20   constitution.  More to the point, the City in this case clearly has not attempted to micro-

21   manage precisely where the Church may locate.  It has simply determined, on the basis of

22   valid, objective and clearly neutral planning criteria of general applicability that the

23   Church may not utilize one particular piece of industrial land for religious assembly

24   purposes.

25   ///

26   ///

27   ///

28   ///

19

1  VI.    *CONCLUSION*

2        The Church has failed to show there are any triable material issues of fact

3  precluding summary judgment on all of its claims.  The Church simply relies on an

4  extreme interpretation of RLUIPA that is not supported by Ninth Circuit case law, the case

5  law of any other circuit, nor the text or legislative history of RLUIPA itself.   The City's

6  motion for summary judgment should be granted.  Alternately, in the event that the Court

7  finds there is a triable issue as to one or more of the Church's causes of action, partial

8  summary judgment should be granted as to all other claims.

9  Dated: September 17, 2008          MEYERS, NAVE, RIBACK, SILVER & WILSON

10

11

12                                     By____/s/_____

13                                        DEBORAH J. FOX
                                          Attorneys for Defendant
14  1147359.4                              CITY OF SAN LEANDRO
    136.5016

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CITY'S REPLY TO OPPOSITION TO MSJ                                    C07-03605-PJH